# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

FIREFIGHTERS' RETIREMENT SYSTEM,
AND ALL OTHERS SIMILARLY SITUATED,          CIVIL ACTION NO.

Plaintiffs,

v.

NORTHERN TRUST INVESTMENTS, N.A.,
THE NORTHERN TRUST COMPANY

Defendants.

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

*Page*

I.     OVERVIEW ................................................................................................................. 1

II.    JURISDICTION AND VENUE ................................................................................... 3

III.   THE PARTIES.............................................................................................................. 4

IV.    SECURITIES LENDING ............................................................................................. 4

V.     DEFENDANTS' SECURITIES LENDING PROGRAM ............................................ 8

       A. The Northern Trust Entities and their Relationship to FRS ........................ 10

VI.    DEFENDANTS' WRONGFUL CONDUCT ............................................................. 15

       A. Summary ....................................................................................................... 15

       B. The Collateral Pools at Issue ....................................................................... 16

              1. The Core USA Collateral Pool........................................................... 16

              2. The STEP Pool ................................................................................... 17

       C. Defendants Grossly Mismanaged the Collateral Pools ................................ 18

       D. Defendants Selected Improper Investments for the Collateral Pools........... 19

       E. Defendants Ignored Early Warning Signs of Collateral Pool Problems ...... 22

       F. Collateral Pool Performance Continued to Deteriorate After Northern Trust Was
          Aware of Problems........................................................................................ 23

       G. Defendants Imposed Strict Redemption Restrictions on the Clients. .......... 24

       H. FRS and The Clients Suffered Injury Because of Defendants' Securities Lending
          Practices ……………………………………………………………………..25

       I. Defendants Earned Substantial Fees While Grossly Mismanaging the Collateral Pools
          and Causing the Clients to Suffer Substantial Losses. ................................. 27

VII.   APPLICABLE LAW.................................................................................................. 29

VIII.  CLASS ACTION ALLEGATIONS .......................................................................... 30

IX.    CLAIMS FOR RELIEF............................................................................................. 33

X.     PRAYER FOR RELIEF............................................................................................. 37

XI.    JURY DEMAND........................................................................................................ 38

Plaintiff Firefighters' Retirement System ("FRS") is a public pension fund organized for the benefit of active and retired firefighters in the State of Louisiana.[1] FRS brings this action on its own behalf and also on behalf of all other persons and/or entities that are not regulated by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*., and that participated in Defendants' securities lending program (the "Clients"). FRS by and through its undersigned attorneys alleges the following based on its knowledge, information and belief, facts obtained through investigation by its counsel and/or publicly filed documents.

## I.     OVERVIEW

1.      This is a class action complaint against Defendant Northern Trust Investments, N.A. ("NTI") (f/k/a Northern Trust Investments, Inc.) and its affiliate The Northern Trust Company ("NTC").[2] FRS brings this action on behalf of all Clients participated in Defendants' "securities lending" program during the Class Period.

2.      NTI manages investment funds in which FRS and a large number of other Clients invest. Billions of dollars of Clients' assets are invested in these funds, which hold publicly traded securities. Defendants operated a securities lending program ("Lending Program"), loaning the securities held in the investment funds and reinvesting the collateral received from borrowers of those securities for the benefit of the Clients. The Defendants mismanaged the reinvestment of the collateral, which caused the Clients to lose hundreds of millions of dollars.

---

[1] FRS is managed by a Board of Trustees pursuant to LA REV. STAT. § 11:2251. FRS and its Board of Trustees are referred to collectively herein as "FRS."

[2] NTI and NTC will be referred to, collectively, as "Defendants."

3.       Securities lending is a complex, opaque, and poorly regulated activity.[3]  The intricacies of Defendants' Lending Program and the damage it did to FRS and other Clients are explored in great detail later in this Complaint.  But first, FRS presents this short summary to provide context for the detailed allegations to follow.

4.       NTI is the Clients' fiduciary because it has possession and control over the Clients' assets, it has discretion over how to invest these investments, and it otherwise manages all aspects of the Lending Funds[4] in which the Clients invested.

5.       NTC is the Clients' fiduciary because it manages all aspects of the Lending Program for the benefit of FRS and other Clients.

6.       The Lending Program is supposed to provide the Clients with a very small return in exchange for very small risk.

7.       It is especially important that Defendants minimize risk in their Lending Program because FRS and other Clients contain the retirement money that firefighters, policemen, teachers, and other future retirees count on to live out their golden years.  Other Clients contain endowments necessary to sustain charities or moneys that will otherwise be needed for worthy projects in the future.

8.       Under the terms of the Lending Program, Defendants received 40% of the net revenues from securities lending, leaving 60% to the Clients.  But under this deal, Defendants do not bear any of the losses from the Lending Program.  Instead, Defendants established a classic

---

[3]  *See* Craig Karmin and Leslie Scism, *SEC Weighs New Rules for Lending of Securities*, Wall St. J., Sept. 29, 2009. ("Securities regulators are exploring new regulations for the multi-trillion dollar securities-lending market, the first major step regulators have taken in the area in decades. . . . The opacity of the securities-lending market worries regulators on several counts. The lack of transparency in the market has some people concerned that certain market participants could take on big risks that could threaten the financial system. Another issue is how securities lenders invest the cash collateral put up by borrowers.").

[4]  All funds that participate in the Lending Program will be referred to as the "Lending Funds."

"heads we win, tails you lose" scenario.  This arrangement rewards Defendants for imposing more risk on FRS and the other Clients than is appropriate for a securities lending program.

9.      This arrangement also creates a structural incentive for Defendants to take inordinate risk with the Clients' money and to put their fee-generating interests ahead of the principal protection interests of the Clients.

10.     Defendants took excessive risks with their Lending Program.  These risks were unwarranted and were not in the best interest of the FRS and the Clients.  A prudent investment manager acting in the best interests of its clients would not have taken such risks.

11.     These unwarranted risks led to losses of at least hundreds of millions of dollars. This lawsuit seeks among other things, to recoup this money for Louisiana's firefighters and others who are invested in similarly situated Clients.

12.     FRS brings this action as a class action under Fed. R. Civ. P. 23 on behalf of itself and its beneficiaries and all other similarly situated Clients and their beneficiaries—which is to say, the beneficiaries of all persons and entities that invested in the Lending Funds.

## II.      JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), 18 U.S.C. § 1964 (a) and (c), and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because FRS is of diverse citizenship from the Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs.

14.     Venue is proper here pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to FRS's claims occurred in this District.  Defendants' principal places of business are located within this District.  On information and belief, the Lending Program and the reinvestment of collateral were managed by Defendants in this District.

### III.      THE PARTIES

15.      FRS is a public pension plan organized for the benefit of active and retired firefighters in the State of Louisiana.  Among other funds, FRS invested in Northern Trust's NTGI Collective S&P 400 MidCap Equity Index Fund ("S&P 400 Fund") and its NTGI Collective S&P 500 Index Fund ("S&P 500 Fund").  FRS suffered losses in both of these funds as a result of Defendants' breach of their duties to FRS.

16.      Defendant NTI has its principal place of business is in Chicago, Illinois.  It is a fiduciary with respect to FRS and the Clients.

17.      Defendant NTC is an affiliate of NTI and serves as the securities lending agent for the Lending Funds, which held Plan assets.  As the securities lending agent, it is responsible for administering the Lending Program and is a fiduciary to the Clients.  It also has its principal place of business in Chicago, Illinois.

### IV.   SECURITIES LENDING

18.      Done correctly, securities lending provides Clients, like FRS, a way to earn extra and low-risk marginal investment return in exchange for loaning Clients' securities.

19.      Securities lending is like any other lending.  The lender temporarily transfers some of its securities to a borrower, and in return, the borrower typically provides assets as collateral to the lender.

20.      There are three major players in securities lending transactions:

   A.  the lender;

   B.  the borrower; and

   C.  the lending agent.

Here, the lenders were FRS and other Clients, through their Trustee, NTI; the lending agent was NTC; and the borrowers were various third parties that borrowed securities.

21.     Borrowers often borrow the securities to cover short sales.[5]  Short sellers borrow a stock from the lender, and sell it with the hope that, when the time comes to return the stock to the securities lender, the borrower can purchase the stock on the market for a price lower than the borrower initially sold it.  This way, borrowers hope to pocket the difference between what the stock was worth when they borrowed it and what it was worth when they returned it.  For example, pretend that a short seller borrowed 100 shares of IBM that was valued at $100 a share.  Immediately after borrowing, the borrower sells those shares for $10,000.  Then, at some time in the future, the borrower has to return the 100 shares of IBM to the lender.  At this time, IBM is trading for $97 a share.  The borrower goes out on the market, purchases 100 shares of IBM for $9,700 and then returns the 100 shares to the lender, pocketing $300 in the process.

22.     Rather than dealing directly with many different lenders, short sellers typically locate securities available for borrowing through "lending agents."  Like brokers of other goods or services, securities lending agents, like NTC, serve as a clearinghouse for securities lending and borrowing by pooling supply and demand and facilitating transactions between principals.

23.     Index Funds—such as the S&P 400 and the S&P 500 Index Funds owned by FRS and other Clients—are a ready source of stocks for lending agents to use because these funds' turnover is relatively low and predictable, and thus they have a stable inventory of stocks for loan.  *See* Gene D'Avolio, *The Market For Borrowing Stock*, 66 J. Fin. Econ. 271, 277 (2002).

---

[5] The Securities and Exchange Commission defines a "short sale" as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller."  SEC Reg. SHO, Rule 200(a), 17 CFR § 240.3b-3(a) (2002).

24.     The lending agent enters into an agreement with the lender that allows the lending agent to lend securities on the lender's behalf.  This agreement gives the lending agent the responsibility for selecting and approving potential borrowers and sets the terms for splitting any profit derived from securities lending between the lender and the lending agent.

25.     Having secured the securities to loan via the lending agreement, the lending agent then enters into borrowing agreements with various borrowers.  Under the borrowing agreement, the terms of the securities loan are set (*e.g.*, amount of securities, duration of loan, fees, etc.).

26.     The lender (through the lending agent) demands from the borrowers collateral of approximately 102% of the value of the securities lent.  This collateral protects the lenders in case the borrower cannot return the securities.  This collateral is invested while it remains with the lending agent.  Invested correctly, the collateral can earn the lending agent and lender a small return.  Collateral needs to be invested in safe, liquid instruments to protect lenders from loss and to meet the demands of borrowers when they return the borrowed securities.

27.     The lending agent generally invests the collateral from the securities loan in safe, short-term, liquid instruments so that the lender can receive some securities lending income from the reinvestment of the collateral with minimal risk to principal and a high degree of liquidity.[6]  As the Wall Street Journal reported,

> The idea behind securities lending is to take advantage of large numbers. [Securities lenders] accumulate large quantities of long-term corporate bonds and

---

[6] Depending on its risk appetite, the securities lending agent can choose to assume more or less risk through its lending and/or cash collateral reinvestment programs.  Securities lending programs that seek higher returns through cash collateral programs by lending out larger balances or by adopting more flexible collateral policies incur more risk than lending programs that employ more conservative policies.  *See Securities Lending:  Your Questions Answered*, International Securities Lending Association, p. 10, www.isla.co.uk (last viewed September 26, 2009). Risk here can be minimized when counterparties define their collateral parameters to ensure that only liquid securities are used, or when they can hold a buffer of collateral over and above the value of lent securities.  *Id.*  Risk can also be minimized by investing the collateral only in very safe, short-term instruments.  *Id.*  That was not done here.

other securities, earmarked to pay claims down the road. They can goose that return by lending out the securities to banks and brokers in exchange for cash collateral. The [lenders] then invest that cash to squeeze out a bit more yield for themselves and the securities borrowers. They usually achieve this by parking the cash in other fixed-income investments, such as Treasury bonds.

Serena Ng and Liam Pleven, *An AIG Unit's Quest to Juice Profit --- Securities-Lending Business Made Risky Bets*, Wall St. J., Feb. 5, 2009.

28.     Thus, securities lending programs can provide institutional investors with a marginal increase in the returns on their investments in stocks and other securities—provided that the collateral is prudently reinvested.  In the event that the collateral is not appropriately invested or risk controls are otherwise lacking in program management, the marginal return comes with disproportionate risk.  As explained further below, that is what happened here.

29.     The lending agent (here, NTC) is compensated for brokering the securities lending transaction by receiving fees for facilitating the transaction.  In addition to these fees, the lending agent receives a percentage of the investment return (if any) generated by reinvestment of the collateral that the borrower provided.

30.     Reinvestment income is largely risk-free for NTC, the lending agent here. NTC's enviable, risk-free posture becomes most apparent when a "collateral deficiency" occurs. A collateral deficiency is declared by the lending agent when it determines that a substantial portion of the reinvested collateral is so impaired that it will not pay at duration and has less value than when purchased such that the reinvested collateral is not sufficient to repay the borrower upon redemption.  When there is a collateral deficiency, the lender has to make up the difference to the borrower.  This is the case despite the fact that the lender did not choose the borrower, did not choose the securities to lend, and did not choose how to reinvest the collateral.

Moreover, while the lender shoulders 100% of the collateral reinvestment losses, the lender only gets about 60% of any collateral reinvestment gains—the lending agent keeps the rest.

31.     Although a securities lending program can be managed in a manner suitable for retirement plans, they can also be easily exploited, creating an unduly high risk for retirement plans. As the *Wall Street Journal* described:

> Imagine you hire a real-estate agent to sublet your house. Now imagine he keeps 30% to 50% of the rent for himself. Finally, imagine that the real-estate agent makes you pay for the damages that resulted when the tenants he brought in trashed your house…. If you think that sounds unfair, get a load of how the mutual-fund industry has milked investors through the arcane practice of securities lending. Like subletting your house, securities lending is sensible and beneficial in the right hands -- but can wreak havoc when it is done wrong.

Jason Zweig, *The Intelligent Investor: Is Your Fund Pawning Shares at Your Expense?* Wall St. J., May 30, 2009.

## V.     DEFENDANTS' SECURITIES LENDING PROGRAM

32.     Defendants  have been in the securities lending business since 1981.

33.     Defendants largely thrive on fee-based services.  They have long pursued a business strategy that requires them to develop recurring sources of fee-based income from corporate and institutional clients like FRS.  Defendants' parent company has stated that it "is one of a select group of major bank holding companies in the United States that generates more revenues from fee-based services than from net interest income."  *See* Ex. 1 for Form 10-K, February 27, 2009, at 3.

34.     As stated earlier, securities lending, especially as practiced by Defendants, is very complicated and can be an attractive opportunity for self-dealing.  The following chart shows how complicated the lending system that Defendants set up actually is.



FRS & other Clients
NTI acts as custodian over Plan assets and places assets into specified Lending Funds
Custody and Trust Agreements
Contract
NTI
-Manages Lending Funds & Collateral Pools
-Selects Investments
Securities Lending Authorization Agreement
Contract
1
NTI Places Assets Into
Lending Funds
Held in trust by NTI
Profits & Losses Shared pro rata
9
NTC
-Administers Securities Lending Program through Agreement with NTI
-Lending Agent
-Selects Borrowers
-Lends Fund Securities
-Collects Collateral from Borrowers
-Places Collateral into Pools at NTI's Direction
8b
100%
Collateral Pool Losses
Lend Securities from Funds Out via NTC
2
60%
40%
8a
Collateral Pool Profits
Collateral Pool Profits and Losses Distributed
NTC Places Collateral Into Pools
3
2
Return Securities To Lending Funds via NTC
7
4
NTC Takes Collateral In
6
Collateral Pools
-Collateral Reinvested for Benefit of Lending Funds
-Collateral Returned to Borrowers at end of Loan Term
Short Sell Borrowed Securities
Contract
Borrowers
Return Collateral + Rebate Fee
5
-Enter into Borrowing Agreements with NTC
-Provide collateral to NTC for borrowed securities
-Return borrowed securities to NTC at expiration of loan term
Borrowing Agreements

**A.    The Northern Trust Entities and their Relationship to FRS**

35.    NTC and NTI worked hand-in-hand in the Lending Program.  The relationship and respective functions of NTC and NTI are illustrated below in a series of charts.

36.    In March of 2002, FRS entered into a "Collective Fund Custody Agreement" ("Custody Agreement") with NTI.  *See* Ex. 2 for Collective Fund Custody Agreement, March 19, 2002.



37.    Under the Custody Agreement, FRS appointed NTI as custodian over an account in the name of FRS.  *See id.* at ¶ 1. FRS transferred assets to the custodial account and directed NTI to invest those assets in specified Lending Funds (here, NTGI S&P 400 and NTGI S&P 500).  *See* Ex. 2 for Custody Agreement, exhibit A; Ex. 3 for Amendment to Collective Fund Custody Agreement, March 5, 2007, exhibit B.



10

38.     In addition to being the Custodian over the FRS Account created by the Custody Agreement (see above), NTI is also the trustee for the Lending Funds, pursuant to a Declaration of Trust. *See* Ex. 4 for *Amendment and Restatement of Declaration of Trust*, Jan. 31, 2006. As the trustee for the Lending Funds, NTI was responsible for management of these Funds. *See id.* at §3.06. This included investing and reinvesting the assets of the Lending Funds. *See id.* at §3.07(a).



39.     NTI also had the authority under the Declaration of Trust to lend the securities contained in the Lending Funds. *See id.* at §3.07(d). Further, in the Custody Agreement, NTI specifically stated that it would engage in securities lending through The Northern Trust Company ("NTC"), NTI's affiliate. NTI appointed NTC to serve as the lending agent for the Lending Funds, with responsibility for administering the securities lending program. *See* Ex. 2, ¶8.



40.     NTI, in its role as trustee of the Lending Funds,[7] entered into a Securities Lending Authorization Agreement ("Lending Authorization") with NTC. *See* Ex. 5 for *Lending*

---

[7] Discussed in ¶ 38, *supra*.

*Authorization*.  This Lending Authorization permitted NTC to lend out securities from the Funds to borrowers.  *See id*. at ¶ 1.  In turn, NTC, as the lending agent, entered into Borrowing Agreements with the Borrowers, which NTC selected.  *See id*. at ¶ 2.1.



41.     Like many lending transactions, the Borrowers were required to put up collateral. *See id*. at ¶ 3.  As the Lending Authorization states, "[i]n the lending of Borrowed Securities, protection is afforded by the Collateral received from a Borrower pursuant to the terms of the Borrowing Agreement. All Collateral so received, and all investments of cash Collateral, shall be held either in physical custody of Agent or for the account of Agent . . . ." *Id*.



42.     When NTC received collateral from the borrowers, it reinvested the collateral into "Collateral Pools."  *See id*. at ¶ 3.1.  NTI, as Trustee for FRS, directed NTC to reinvest the

collateral into specified Collateral Pools. *See id.* Here, those Collateral Pools included the Core USA Collateral Pool and the STEP Collateral Pool.



43.     The collateral was then held and/or reinvested for the duration of the securities loan period.  When the loan period was over, NTC was supposed to return the collateral (or its equivalent value) to the Borrower, along with a rebate fee.  The Borrower, in turn, was supposed to return the lent securities.



44.     NTI had sole investment discretion for the Lending Funds at all relevant times. Neither FRS, the Clients, nor any member of the Class had the discretion to direct the manner in which NTC managed the Lending Program.

45.     NTI also had discretion as to how to invest the Collateral Pools.  Neither FRS, the Clients, nor any member of the Class had the discretion to direct the manner in which NTI managed the Collateral Pools.

46.     Each of the Collateral Pools had investment guidelines, set forth in attachments to a collateral schedule, that uniformly required NTI to manage the Collateral Pools in the

manner necessary to preserve capital and provide for liquidity ("Collateral Schedule"). *See* Ex. 6 for Core U.S.A. Collateral Section, Collateral Schedule, at 2 ("Cash Collateral of the Core U.S.A. Collateral Section is invested to seek to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity.").

47.     If the Collateral Pools had been properly managed, then there should have been revenue from the securities lending process (net of any fees paid to NTC, NTI, and the Borrower).  This revenue was to be split between NTC and the Lending Fund.  NTC would receive 40% of the revenue and the Lending Fund would receive 60%. *See* Ex. 2, ¶ 8.  But here, the Collateral Pools were not properly managed and a collateral deficiency resulted.  So, the reinvested collateral did not have the full value that NTC was required to return to the Borrower. In this case, the Lending Funds (and ultimately FRS and other Clients) were responsible for making up the entire difference between the collateral owed to the Borrower, plus a rebate, and its actual value due to NTC's and NTI's mismanagement.  These losses (and any gains) were passed along from the Lending Funds to the Clients in proportion to how much each Plan invested in the Lending Fund.



48.     The Lending Funds at issue in this case did not all invest in the same securities; however, they all participated in Defendants' Lending Program and suffered losses for exactly the same reasons: acceptance of improper collateral; imprudent collateral reinvestment; and improper management of the Collateral Pools.

## VI.     Defendants' Wrongful Conduct

### A.     Summary

49.     Defendants failed to prudently manage their Lending Program and have thereby caused substantial losses to FRS and other Clients.  Defendants caused these losses by failing to use secure, liquid instruments for Collateral Pool investments and by failing to manage the asset/liability duration differences within the Collateral Pools.

50.     The Collateral Pools that NTI managed, which were created through investment of the cash collateral received from the securities borrowers, held assets valued at between $11 billion and $73 billion as of mid-summer 2008.  Remember, the bulk of this money must be returned to the securities borrowers when they return the securities.  So, it is critical that this collateral be reinvested in safe and liquid instruments.  This is especially important to FRS and other Clients because they bear all the risk of loss in the Collateral Pools.

51.     In 2008, a collateral deficiency occurred when the value of Collateral Pool investments value dropped below the amount owed to securities borrowers when they returned the securities.

52.     The risk of collateral deficiencies could have been minimized—and in view of Defendants' contractual and fiduciary duties to FRS and the Clients, should have been minimized—had Defendants restricted investments of the Collateral Pools to short-duration, high-quality, liquid investments and then carefully managed potential asset/liability duration

differences within the Collateral Pools. But Defendants did not do this. Like a gambler playing with house money (since Defendants placed all the risk of loss for investments in the Collateral Pools on the Lending Funds and bore no risk of loss through the securities lending program), Defendants opted instead for a risky strategy that inflicted major losses on the Collateral Pools, requiring FRS and other Clients to pay for Collateral Pool deficiencies.

53.     Defendants' breaches of duty caused FRS and the other Clients to incur substantial losses.

### B.     The Collateral Pools at Issue

54.     At least two different Collateral Pools, including the Collective Short Term Extendable Portfolio Pool (the "STEP Pool") and/or the Core USA Collateral Pool (the "Core USA Pool") are at issue here.

### 1.     The Core USA Collateral Pool

55.     The Core USA Pool was a large commingled collateral pool that had upwards of $70 billion in assets during the relevant time period. The net asset value ("NAV") of the Core USA Pool is supposed to be maintained on a constant $1.00 basis. When the principal value of the collateral held in the pool drops below the amount owed to borrowers of the loaned securities, NTC may declare that a "collateral deficiency" has occurred.

56.     On September 19, 2008, NTI declared a collateral deficiency in the Core USA Pool in the amount of $885.6 million. About $100 million of this amount was attributable to Lehman Brothers bonds, which were worthless and written down. The Clients, and all other investors in Lending Funds on whose behalf securities lending collateral was invested in the Core USA Pool at that time, had *pro rata* exposure to the losses suffered. These losses caused the NAV to drop below $1.00.

57.     NTC declared that a collateral deficiency had occurred. This allowed the NAV of the Core USA Pool to return to $1.00, which was the value necessary to repay borrowers. NTI posted a "payable" to each of the Clients that, through Lending Fund investments, participated in the Core USA Pool. This "payable" was equal to each Plan's proportionate share of the collateral deficiency and resulted in a reduction in value of each Plan's investments in the Lending Funds.

**2.      The STEP Pool**

58.     The STEP Pool was conceived as an ultra short-duration-total-return fund that attempted to outperform high-grade, short-term money market instruments. *See* Ex. 7 for *NTGI Collective Short Term Extendable Portfolio Fund Declaration,* January 31, 2006. The STEP Pool is a variable net asset value ("NAV") fund that is valued daily based on the market value of its holdings. As a result, reductions in market value flow automatically to the securities lenders, that is, to the Clients that invest collateral in the STEP Pool.

59.     On September 19, 2008, Defendants determined that three assets in the STEP Pool (securities issued by Lehman Brothers Holdings, Theta Finance and Sigma Finance) were worthless. They then distributed these worthless securities from the STEP Pool into a liquidating account. They then declared that all investors in the STEP Pool, including the Lending Funds, had a *pro rata* interest in the liquidating account and would be required to pay the full amount of the shortfall resulting from the write-off of the worthless assets.

60.     By September 2008, the total value of the STEP Pool declined in value by 7.57% to approximately $10.4 billion, a loss of approximately $851,758,000. By the end of October 2008, NTI reported internally that there was no liquidity in the STEP Pool. Upon information and belief, as a result of losses in the STEP Pool, a Plan with a $500 million

investment in the S&P 500 Index Fund, a Lending Fund, would be required to make a cash payment of $3 million to NTI or see a corresponding drop in the NAV of its investment in the fund S&P 500 Index Fund.

###### C.   Defendants Grossly Mismanaged the Collateral Pools

61.     Defendants invested the Collateral Pools, worth billions of dollars, in debt instruments, bonds, notes, and other fixed income instruments.   Defendants made imprudent investment decisions regarding the instruments they placed in the Collateral Pools.   Given the massive size of the Collateral Pools, and Defendants' purported sophistication and investment expertise, the Defendants should not have made these imprudent decisions.

62.     As demonstrated by the poor investment performance of the STEP Pool in 2007, during the relevant period, NTI imprudently invested the cash NTC had received from Borrowers in Collateral Pool investments that had substantial exposure to the risky subprime mortgage sector and to the vagaries of the credit market and commercial paper market.   For example, one of the largest contributors to STEP's performance was the CIT Group,[8] which had an underperforming home lending business that it sold in mid-2008, and had ratings of only A- from Standard & Poors on the STEP holdings as of August 31, 2008.   *See* Ex. 8 for *Securities Lending Collateral Pool Update*, at 3 .   Other key contributors to STEP's performance were: (1) Capmark Financial Group, which had significant exposure in the commercial mortgage sector, and had ratings of only BBB- from Standard & Poors on the STEP holdings as of August 31, 2008; and (2) iStar Financial Inc., a finance company focused on the commercial real estate industry, which had ratings of only BBB from Standard & Poors on the STEP holdings as of August 31, 2008. *See id.*   Rather than being highly-rated investment securities, these ratings on the STEP Pool's

---

[8]   On November 1, 2009, CIT filed a Chapter 11 petition (S.D.N.Y. Bkr. 09-16565). As a result, noteholders are facing substantial reductions in the value of their investments.

holdings from Standard & Poors all indicate that the securities were risky and highly susceptible to changes in economic conditions.

63.     At a minimum, Defendants should have taken steps to ensure that the fixed income investments in the Collateral Pools were not overly exposed to problems in the housing sector, including the subprime sector.

### D.     Defendants Selected Improper Investments for the Collateral Pools

64.     Defendants invested cash collateral received for securities loans in securities or other investment instruments that were illiquid, highly-leveraged, and unduly risky, and that contained mortgage-backed securities and other securitized debt instruments; alternatively, Defendants accepted such toxic assets as collateral for securities loans in the first instance. Among these investments were securities issued by Lehman Brothers Holdings, Theta Finance and Sigma Finance.  None of these were prudent investments for the Collateral Pools in light of the purpose and objectives of the Lending Program, namely incremental returns with low risk and high liquidity.

65.     Take, for instance, Lehman Brothers, whose risky equities trading and hyper-leveraged business strategies drove it into bankruptcy on September 15, 2008.  In 2008, Lehman suffered enormous losses due to its investment exposure to risky subprime mortgage loans. Among other things, Lehman held on to large positions in subprime and other lower-rated mortgage tranches at the same time it was securitizing and selling to others payment streams from the underlying mortgages. Whether Lehman did this because it was simply unable to sell the lower-rated bonds, or rather because it made a conscious decision to hold them, is unclear.  In any event, huge losses accrued in Lehman's lower-rated mortgage-backed securities throughout 2008. In the second fiscal quarter of 2008, Lehman reported losses of $2.8 billion and was forced

to sell off $6 billion in assets. In the first half of 2008 alone, Lehman stock lost 73% of its value. In light of its massive and highly leveraged exposure to the most volatile sectors of the credit markets, Lehman was an utterly inappropriate Collateral Pool investment for FRS and the Clients.

66. Likewise with Theta Finance ("Theta"), in whose securities Defendants also invested in the Collateral Pools for FRS and the Clients. Theta was created by London-based Gordian Knot, an investment firm set up by former Citigroup Inc. bankers. It managed $11 billion of assets as of August 2008, according to Gordian Knot. *See* http://www.bloomberg.com/apps/news?pid=20601009&sid=auPDzlCVkQAA (last viewed September 29, 2009). Theta was designed to earn a return by buying bonds and selling credit-default swaps, derivatives that insure bondholders against a company defaulting on its debt. Derivatives are financial instruments derived from stocks, bonds, loans, currencies, and commodities, or linked to specific events like changes in the weather or interest rates. Theta's bond portfolio includes credit-card debt, bank and insurer obligations, mortgage-backed securities, and collateralized loan obligations, according to a Moody's report. *See id.* In 2008, Theta saw its credit rating cut by several steps by Moody's. In March 2009, due to Theta's "continued deterioration," its Moody's rating fell to Baa2, the second-lowest investment grade. *See* http://www.bloomberg.com/apps/news?pid=20601009&sid=a331.alwWCO0&refer=bond (last viewed on September 29, 2009). The Moody's report cited the "significant deterioration" in Theta's holdings of credit derivatives—which, ironically, included derivative contracts on Lehman Brothers and also contracts on the failed subprime mortgage lending giant Washington Mutual. *See id.* Like Lehman, Theta had large and highly leveraged exposure to the most

volatile sectors of the credit markets and was thus an utterly inappropriate Collateral Pool investment for FRS and the Clients.

67.     And so it went with Sigma Finance ("Sigma"), another failed structured investment vehicle operated by Gordian Knot, which like Theta was devoted to investing in subprime mortgage-backed securities, other consumer credit receivables, and collateralized debt obligations.  Sigma's credit rating plummeted in 2008 as its asset-backed holdings deteriorated. *See*  http://www.bloomberg.com/apps/news?pid=newsarchive&sid=afx0FoYkn2kg  (last viewed on September 29, 2009).  Remarkably (given the innate volatility in credit markets) in April of 2008 about 59% of Sigma's assets were financial company securities, while another 15% were collateralized debt obligations, which legendary investor Warren Buffet has called "financial weapons                     of                     mass                     destruction." http://www.wikinvest.com/wiki/Collateralized_debt_obligation_%28CDO%29 (last viewed on September 29, 2009).  On October 1, 2008, Sigma announced that it was ceasing operations and appointing a receiver.  Like Lehman and Theta, Sigma had large and highly leveraged exposure to the most volatile sectors of the credit markets and was thus an utterly inappropriate Collateral Pool investment for FRS and the Clients.

68.     These Collateral Pool investments were inappropriately risky for retirement plan investors—especially when compared to the relatively small amount of positive return that the Clients could expect to receive from the Lending Program and in light of the other objectives of the program, namely liquidity and preservation of principal.  These unduly risky investments caused the Lending Funds, in which the Clients invested, to suffer substantial losses, disproportionate to the relatively small amount of return the Clients could possibly earn from the Collateral Pools.

69. Reversals and set-backs in the Collateral Pool investments selected by Defendants, such as Lehman Brothers, Sigma and Theta, caused the Collateral Pools to have collateral deficiencies, requiring the Clients and all other investors in the Lending Funds to make up the shortfall in the value of collateral posted by third-party borrowers. The *Wall Street Journal* reported:

> Because of the losses in its cash collateral investments, Northern Trust says its securities-lending revenue in the third quarter was negative $4.6 million. That figure was down from $150 million in revenue from securities lending, or 15% of the bank's total revenue, in the second quarter.

Craig Karmin and Leslie Scism, *Securities-Lending Sector Feels Credit-Crisis Squeeze*, Wall St. J., Oct. 30, 2008.

70. Defendants reported negative revenue in their securities lending sector, but it was the Lending Funds that bore the losses on the illiquid assets held as collateral. Some institutional investors, such as the University of Washington and retirement plans sponsored by BP PLC, unsuccessfully "tried to withdraw entirely from four Northern Trust Corp. index funds engaged in securities lending." Eleanor Laise, *401(k)s Hit by Withdrawal Freezes - Investors Cry Foul as Some Funds Close Exits*, Wall St. J., May 5, 2009. But Defendants refused to allow investors to withdraw. All of these events exposed the Clients to the unduly risky and illiquid position that Defendants had built into the Lending Funds by mismanaging the Collateral Pools.

**E. Defendants Ignored Warning Signs of Collateral Pool Problems**

71. Defendants failed to properly select investments for some of the Collateral Pools and compounded this failure by not divesting or selling holdings from the Collateral Pools before it was imprudent to continue holding them.

72. The Defendants undertook no remedial efforts to slow or stop the Lending Funds' securities lending activities, or to change the type of investments that the Collateral Pools were making. NTI continued to invest the Collateral Pools in the same types of risky and

subprime fixed-income instruments as it always had. The Defendants' risk management of their Lending Program later proved to be completely inadequate, particularly insofar as it concerned management of the investment risk faced by the Collateral Pool investments.

73.     As the fiduciary for the Clients' investment in the Collateral Pools, charged with the highest duty known to law, NTI should have carefully evaluated the risks facing these pools, and mitigated this risk.

    **F.      Collateral Pool Performance Continued to Deteriorate After Northern Trust was Aware of Problems.**

74.     While the problems with the STEP Pool's performance started during 2007, during mid-2008 its performance continued to deteriorate.  As of May 31, 2008, the STEP Pool had a market value of $13,691,333,575.08, with an average maturity of 48 days. The Fund was distributed such that 57.50% was in corporate debt instruments, 6.4% in banking, and 15.7% in cash equivalents. By August 31, 2008, the STEP Pool's market value had declined over $2 billion, and had a market value of $11,426,574,645.96, with an average maturity of 45 days. As of August 31, 2008, the Fund was distributed such that 63.7% was in corporate debt, with an additional 7.0% in banking, 10.3% in mortgage-backed securities, 6.1% in commercial MBS, and only 5.9% in cash equivalents and 1.7% in Treasuries.  *See* Ex. 9 for Securities Lending Update, September 25, 2008.  As of the end of August 2008, the benchmark return for the Pool (1 month LIBOR) was 1.82%, while the Pool's return was -.36%.  *See id.*

75.     Like the STEP Pool, the Core USA Pool also suffered significant declines in value during 2008.  As of May 31, 2008, the value of the Core USA Fund was $68.02 billion, but by August 31, 2008, its value had declined by nearly $6 billion to $62.13 billion.  *See* Ex. 10 for Northern Trust Global Investments, Investment Profile: Core USA Cash Collateral Fund,

May 31, 2008; Ex. 11 for Quantitative Index Review, Investment Profile: Core USA Cash Collateral Fund, August 31, 2008.

76.        As the securities borrowers demanded the return of collateral that Defendants had invested in illiquid, longer-term investments (such as derivatives and mortgage-backed or asset-backed securities) contained in the Collateral Pools, the Clients and other Lending Fund investors were forced to realize immediate losses at the nadir of the market. They were forced to book these losses because the Collateral Trusts could not hold the investments to duration.

**G.        Defendants Imposed Strict Redemption Restrictions on the Clients.**

77.        FRS and other Clients that wish to take more than a minimal amount of their assets out of a Lending Fund must take with them their *pro rata* share of the worthless, toxic assets in the Collateral Pools and the commensurate liability to the Borrowers who posted the collateral. Given current market conditions for these assets, as described above, the liquidity of the Clients' investments have been substantially impaired. *See* Ex. 12 for *Summary of Redemption Request Procedures*.

78.        Further, Defendants are permitting redemptions from the Lending Funds only twice a month, with the maximum client redemption pegged at the greater of 15% of the fund's holdings, or $1 million. And the limited request will be honored only on a *pro rata* basis subject to available liquidity as defined by Defendants. *Id*. Thus, Clients seeking to rebalance their portfolios in these volatile market conditions have been severely constrained by Defendants' redemption restrictions, leading to yet further consequential losses for the Clients and FRS.

79.        Defendants have been unable to satisfy the redemption requests even under the very limited parameters described above. For example, for redemptions requested as of April 17, 2009, Defendants only honored 65% of the requests to a Custom Pool and 35% of the requests

from Lending Funds with exposure to the STEP Pool. *See* Ex. 13 for April 17, 2009, email from Floyd Simpson.

80.     As of May 15, 2009, Defendants have only honored 65% of the requests for a Custom Collateral Pool and 25% of the redemption requests from Lending Funds with exposure to the STEP Pool. *See* Ex. 14 for May 15, 2009 email from Floyd Simpson.

81.     Hundreds of Defendants' clients, including FRS, are clamoring to redeem their interests in the Lending Funds. *See* Exs. 13 and 14.

**H.     FRS and The Clients Suffered Injury Because of Defendants' Securities Lending Practices**

82.     Defendants made unduly risky and imprudent investments through their Lending Program that exposed retirement investors to losses on supposedly safe collateral investments. Market reports highlighted these abuses:

> If your broker borrows your stock in a cash (not a margin) account, he has to ask your permission -- and if anything goes wrong and he can't return the borrowed shares, his firm is on the hook to make you whole. You have no such protection when your mutual fund or exchange-traded fund takes your own money and lends it out; incredibly, here you are the one holding the bag.
> …
> Your fund should lend out your securities, but the proceeds should go to you. And fund managers should reinvest the collateral only in absolutely safe securities. The current system, where they keep half the gains and stick you with all the risks, has got to go.

Zweig, *The Intelligent Investor*, *supra* at 10.

83.     Per attached letters from Defendants to FRS, some of the securities in the Core USA Pool are now illiquid, and certain of those securities have defaulted and/or are permanently impaired.  *See* Exs. 15 and 16.   Some of these permanently-impaired holdings have been segregated into a sub-fund, which is posted as both an asset and a liability on the books of the Lending Funds that use the Core USA Pool to invest its cash collateral. As of July 2009, assets

from the STEP Pool that Defendants had moved to the STEP Liquidation Fund were valued in the $.15-.17 range for Lehman cash bonds, and the Theta and Sigma investments remained valued at $0. *See* Ex. 17 for Northern Trust, *STEP & STIF Comprehensive Report for July 2009*, Market Commentary, at 3. The amount of the declared collateral deficiency attributable to certain of the funds using Core USA for investment of cash collateral was debited as a payable on the books of such funds. *See* Ex. 15 for Letter from Mac Nickey to Steven Stockstill, September 23, 2008. The net effect of all of this is that the FRS and the Clients lost hundreds of millions of dollars due to NTI's imprudent management of the Core USA Pool.

84. Likewise, some of the securities in the STEP Pool are, in Defendants' own words, "permanently impaired" and have caused "realized losses" of principal to FRS and the Clients. *See* Ex. 16 for Letter from Mac Nickey to Steven Stockstill, September 23, 2008. This essentially means that the FRS and other Clients suffered tremendous losses in the STEP Pool managed by NTI.

85. Indeed, as a result of some of the investment losses borne by the Lending Funds following the mismanagement of the Collateral Pools, Defendants' parent company voluntarily contributed approximately $150 million to make up a portion of the collateral deficiency in five securities lending collateral pools, including in the Core USA Pool.

86. As of mid-September 2008, Defendants declared that there were collateral deficiencies in the Collateral Pools. As a result of the collateral deficiencies, Defendants also began requiring that the Lending Funds "pay" for the losses in the collateral deficiencies by marking a correspondingly lower net asset value in the Lending Funds. Thus, there is another layer of harm in addition to the aforementioned "realized losses" that Defendants caused through their imprudent management of their securities lending program. If the Clients sought to

26

discontinue use of NTI's investment management, and take their business elsewhere, then the Clients would have to "repay" Defendants for the losses they suffered through Defendants' mismanagement of the Collateral Pool investments.

87.     Upon information and belief, in 2008, Defendants managed approximately $270 billion in securities lending collateral.  The STEP Pool, which represented only about 5% of the $270 billion in securities lending, reportedly lost 1.35% in March 2008 alone.  This was, at that time, the fourth consecutive month of losses for the STEP Pool.  And, as Defendants informed FRS, for the Core USA Pool, FRS specifically suffered damage in the form of "principal losses" and at least one "booked [] receivable" that Defendants caused to be paid out of FRS's investment holdings in a lending  index fund (the S&P 400 Index Fund) and into the Core USA Pool, to make up for a collateral deficiency resulting from Defendants' imprudent management decisions.   *See* Ex. 17.  In addition, Defendants explained that they were requiring the Collective S&P 500 Index Fund in which the Plan invested "to pay principal losses" in the STEP Pool, which would result in a lower NAV for that fund.  *See* Ex. 16.

**I.        Defendants Earned Substantial Fees While Grossly Mismanaging the Collateral Pools and Causing the Clients to Suffer Substantial Losses.**

88.     The fees and other compensation Defendants collected in connection with their securities lending activities were unreasonable in light of the risks taken by Defendants with the Clients' assets in the Lending Funds and the investment losses suffered by the Clients as a result of Defendants' imprudent management of the Collateral Pools.  As one consultant commented, "a perennial problem with securities lending programs" occurs where the money manager gets a percentage of the earned investment gains and therefore has an incentive "to creep out there on the risk scale."  Douglas Appell, *Northern Trust Posts Loss On Securities Lending Collateral Pool*, Pension & Investments, Apr. 28, 2008, *available at*

http://www.pionline.com/article/20080428/PRINTSUB/102645557. Defendants put their own interests ahead of the Clients' interests by taking unnecessary and unreasonable risk in investing the Collateral Pools in order to maximize Defendants' share of the investment returns.   Despite Defendants mismanagement of the Collateral Pools, since the third quarter of 2007, they have collected over $300 million in fees from their securities lending programs.

89.     On April 17, 2007, Northern Trust Corporation reported that in the first quarter of 2007, its securities lending fees totaled $46.0 million. *See* Ex. 18 for Bloomberg Transcript, Northern Trust Corp. "Q1 2007 Earnings Call" (April 17, 2007).

90.     On October 17, 2007, Northern Trust Corporation reported that in the third quarter of 2007, its securities lending fees totaled $33.0 million. *See* Ex. 19 for Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record Third Quarter 2007 Earnings of $.93 per share, up 26% from the Prior Year" (October 17, 2007).

91.     On January 16, 2008, Northern Trust Corporation reported that in the fourth quarter of 2007, its securities lending fees totaled $55.1 million. *See* Ex. 20 for Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record Full Year 2007 Operating Earnings of $3.66 per Share, up 22% from the Prior year.  Reported Earnings are $3.24 per Share, up 8% from the prior year" (January 16, 2008).

92.     On April 15, 2008, Northern Trust Corporation reported that in the first quarter of 2009, its securities lending fees totaled $31.9 million. *See* Ex. 21 for Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record First Quarter 2008 Operating Earnings of $1.03 per share, up 23% from Prior Year.  Reported earnings are $1.71 per share, up 104% from Prior Year" (April 15, 2008).

93.     On July 16, 2008, Northern Trust Corporation reported that in the second quarter of 2008, its securities lending fees totaled a record $149.9 million, up 104% compared with the prior year quarter reflecting "improved spreads on the investment of cash collateral and an approximate $25 million partial recovery of prior period unrealized losses in one mark-to-market investment fund." *See* Ex. 22 for Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Second Quarter 2008 Earnings of $.96 per share, up 4% from the Prior Year" (July 16, 2008).

94.     On January 21, 2009, Northern Trust Corporation reported that in the fourth quarter of 2008 its securities lending fees totaled $44.2 million, compared with $55.1 million in the fourth quarter of 2007, which Northern Trust stated reflected "lower volumes." *See* Ex. 23 for Press Release, Northern Trust Corp., "Northern Trust News Release, "Northern Trust Corporation Reports Record Fourth Quarter Operating Earnings of $1.39 per Common Share, Up 43%" (January 21, 2009).

95.     Thus, while the Clients were exposed to massive risk, and incurred substantial losses as a result of Defendants' imprudence, Defendants garnered hundreds of millions of dollars of no-risk fees.

## VII.    APPLICABLE LAW

96.     Defendants maintain their principal place of business in Chicago, Illinois.

97.     NTI has entered into form "Collective Fund Custody Agreements" with FRS and the Clients. FRS's Collective Fund Custody Agreement with Defendants was executed by FRS and NTI in 2002. It has been amended only once since then, in 2007; that amendment did not involve the securities lending provisions of the Collective Fund Custody Agreement between

FRS and NTI. Upon information and belief, the Clients have executed and entered into similar agreements with NTI.

98.     These Collective Fund Custody Agreements govern Defendants' relationship with FRS and the other Clients, and, as explained further below, define the terms and conditions under which Defendants may engage in securities lending with securities owned by FRS and the Clients.

99.     The Collective Fund Custody Agreement between FRS and NTI contains a provision entitled "Governing Law." That provision reads as follows: "The terms and provisions of this Agreement shall be construed and governed in accordance with the laws of the State of Illinois to the extent that such laws are not preempted by the laws of the United States of America. The invalidity of any part of this Agreement shall not affect the remaining parts thereof."

100.     Given that Defendants maintain their principal place of business in Illinois and have elected for Illinois law to govern its relationship with FRS and the Clients concerning its securities lending program, Illinois law applies to the claims asserted here.

## VIII.  CLASS ACTION ALLEGATIONS

101.     **Class Definition.**  FRS brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Clients and the following class of persons similarly situated (the "Class"):

> All persons or entities that are not governed by ERISA and that invested or maintained investments between January 1, 2007 and the present (the "Class Period") in any Lending Fund managed or operated by Northern Trust, where such Lending Fund invested collateral received from borrowers of securities owned by such Lending Fund in one or more Collateral Pools managed or operated by Northern Trust.

102.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to FRS at this time, and can only be ascertained through appropriate discovery, FRS believes that hundreds of Clients throughout the country invested in the Lending Funds during the Class Period and sustained losses as a result of Defendants' imprudent securities lending activities.  For example, the Schedule D to the Form 5500 filed by a Northern Trust affiliate for the S&P 500 Fund lists over 100 pension plans as investors in the fund.  The S&P 500 Fund is but one of dozens of Lending Funds that engaged in securities lending. In addition, communications from Defendants reveal that well over a hundred plans have sought redemptions from Lending Funds that have been restricted due to illiquidity and collateral deficiencies in the Collateral Pools. *See* Exs. 15 and 16.

103.    **Commonality.**  The claims of FRS and all Class members originate from the same misconduct and breaches of duty committed by Defendants with regard to its management of their Lending Program in which each Plan participated and for which Defendants' conduct was the same. Proceeding as a class action is particularly appropriate here, because Plan assets are held in Lending Funds and/or Collateral Pools managed by Defendants, which treated any losses as proportional to all investors, and, therefore, Defendants' imprudent actions affected all Clients in the same manner.

104.    Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The many questions of law and fact common to the Class include:

    a.    Whether Defendants are fiduciaries to the Clients;

    b.    Whether Defendants breached their fiduciary duties to the Clients;

c. Whether Defendants' acts proximately caused losses to the Clients and, if so, the appropriate relief to which the Clients are entitled;

d. Whether Defendants breached explicit terms of their contracts with the Clients concerning securities lending; and

e. Whether Defendants breached their contractual duties of good faith and fair dealing with respect to the Clients.

105. **Typicality.** FRS's claims are typical of the claims of the members of the Class because its claims seek relief based on Defendants' fiduciary status and the duties that flow from it (which are uniform across the Clients and their members), and are based on substantially similar or uniform Collective Fund Custody Agreements into which Defendants have entered into with FRS and with the Clients, as well as declarations of trust for Lending Funds and Collateral Pools and the securities lending authorization agreements between them. If cases were brought and prosecuted individually, each of the Clients and members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

106. **Adequacy.** FRS will fairly and adequately protect the interests of the members of the Class and has retained counsel who are competent and experienced in class action and fiduciary litigation. FRS has no interests antagonistic to or in conflict with those of the Class. FRS has undertaken to protect vigorously the interests of the absent members of the Class.

107. **Rule 23(b)(1)(A)&(B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate

actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

108.    **Rule 23(b)(2) Requirements.**  Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

109.    **Rule 23(b)(3) Requirements.**   In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## IX.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Contract

110.    FRS repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

111.    FRS and the Clients entered into a form contract with NTI called a "Collective Fund Custody Agreement" ("Custody Agreement").  *See* Ex. 2.  The Custody Agreement is valid and enforceable.   FRS for its part performed all required duties and fulfilled all relevant conditions under the Custody Agreement.

112.    The Custody Agreement states that it "embodies the entire agreement between the parties and supersedes any and all prior commitments, agreements, representations, and

understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto." *Id.*

113.     The Custody Agreement specifies the terms under which NTI may engage in securities lending with securities owned by FRS and the Clients.

114.     The Custody Agreement states that any securities lending in which Defendants engage "will be in accordance with Department of Labor Prohibited Transaction Class Exemptions 81-6 and 82-63."

115.     Department of Labor Prohibited Transaction Class Exemption 81-6 requires that the Clients be able to terminate the loan arrangement at any time.  Defendants have prevented FRS and other Clients from terminating their securities lending relationship in violation of the contract.

116.     This breach directly and proximately damaged FRS and the Clients by preventing them from transacting and managing their funds in the ordinary course.

## COUNT II

**Breach of the Duty of Good Faith and Fair Dealing**.

117.     FRS repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

118.     Under Illinois law, implicit in every contract is a duty of good faith and fair dealing.  This duty requires a party that has contractual discretion to exercise it reasonably and with proper motives.  This duty "has its most natural and common application to the situation where one party exercises discretionary authority in a manner that affects the rights and duties of the other party." *Rao v. Rao*, 718 F.2d 219, 223 (7th Cir. 1983).  Defendants at all times material

hereto owed this duty to FRS and the Clients in connection with their operation of Defendants' Lending Program under the Agreement.

119.     Defendants breached this duty by unreasonably and imprudently accepting as collateral (and/or by unreasonably and imprudently investing Collateral Pool cash in) risky asset-backed securities, including Sigma and Theta securities and Lehman Brothers securities. Defendants did this by employing their discretion as lending agent under the Agreement. Defendants had an economic incentive to do this because under the Agreement they stood to earn forty percent (40%) of any profits made on those investments, while Defendants bore none of the risk of loss from these risky investments.

120.     This breach directly and proximately damaged FRS and the Clients.  The aforementioned securities have become permanently impaired and/or otherwise declined in value, inflicting losses on FRS and the Clients.

## COUNT III

### Breach of Fiduciary Duty

121.     FRS repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

122.     Under the Agreement, Defendants are a "collective fund trustee" with respect to FRS and the Clients, and as such had custody and control and exercised same over the retirement funds of FRS and the Clients.  In addition to NTI serving as the collective fund trustee, NTC served as the lending agent in securities lending transactions, and the investment manager of the Collateral Pools.

123.     Defendants were fiduciaries to FRS and the Clients and as such owed FRS and the Clients fiduciary duties at all times material hereto.  *See Nonnast v. Northern Trust Co.*, 29 N.E. 2d 251, 261 (Ill. 1940) (trustees serve in fiduciary capacity).

124.     As the Illinois Supreme Court (quoting Justice Cardozo) put it:  "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."  *Id.* (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (N.Y. Ct. App. 1928)).

125.     The scope of the fiduciary duties and responsibilities of Defendants included managing the assets of FRS and the Clients competently and for the benefit of FRS and the Clients alone.

126.     Contrary to these duties, Defendants failed to loyally and prudently manage the assets of the Clients.  Specifically, Defendants breached their duties to the Clients by, *inter alia*, (a) exposing the Clients' assets to excessive levels of risk; (b) failing to discharge their duties solely in the interests of the Clients; and (c) generally failing to invest and manage the assets of the Clients in the manner of a reasonably prudent fiduciary acting under similar circumstances.

127.     Moreover, Defendants failed to conduct an appropriate investigation of the merits of their highly risky and speculative program of securities lending in light of the particular dangers that this program posed to the Clients' assets. Such an investigation would have revealed

to a reasonably prudent fiduciary the imprudence of mismanaging the Clients' assets in this manner.

128.     As a consequence of Defendants' breaches of fiduciary duty alleged herein, the Clients have suffered losses. Had Defendants discharged their fiduciary duties to prudently invest the Clients' assets, the losses suffered by the Clients would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Clients lost hundreds of millions of dollars of retirement assets.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     A determination that this action is a proper class action and certifying FRS as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     A Declaration that Defendants have breached their fiduciary duties to the Clients and the Class;

C.     A Declaration that Defendants have breached their contractual duties to the Clients and the Class and its duty of good faith and fair dealing;

D.     An Order compelling Defendants to make good to the Clients and the Class all losses resulting from the securities lending program and to restore to the Clients and the Class all profits that the Clients would have made if Defendants had fulfilled their fiduciary obligations and contractual duties;

E.     Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Clients and the Class as the result of beaches of fiduciary duty;

F.    An Order awarding attorney fees pursuant to the common fund doctrine and other applicable law;

G.    An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants;

H.    An accounting of all losses suffered by the Clients in connection with Defendants' breaches of fiduciary and contractual duties, including an accounting of all fees and earnings received by Defendants in connection with their Lending Program; and

I.    Granting such other and further relief as the Court may deem just and proper.

## XI.    JURY DEMAND

129.    Plaintiff demands trial on all issues so triable.

DATED this 17th day of November, 2009.

/s/ Elizabeth Hoskins Dow
Elizabeth Hoskins Dow, #6216262
BAILEY & GLASSER LLP
1003 Western Avenue
Joliet, IL 60435
Tel: (815)740-4034
Email: ldow@baileyglasser.com

Todd M. Schneider
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Gregory Y. Porter
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20016

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
7702 E. Doubletree Ranch Road, Suite 300
Scottsdale, AZ  85258
Tel: (480) 607-4368
Fax: (480) 348-3999

Brian A. Glasser
Michael L. Murphy
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Tel: (304) 345-6555
Fax: (304) 342-1110

Todd S. Collins
Shanon J. Carson
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3040
Facsimile: (215) 875-4604

Joseph Peiffer
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue - Suite 4600
New Orleans, LA  70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250

Kirk Reasonover
REASONOVER & OLINDE, L.L.C.
400 Poydras Street, Suite 1980
New Orleans, LA 70130
Tel: (504) 587-1440
Fax: (504) 587-1577

Lynn L. Sarko
Derek Loeser
Laura Gerber
KELLER ROHRBACK
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384

Steven Stockstill
Louisiana Bar No. 19166
3100 Brentwood Drive
Baton Rouge, LA 70809
Tel: (225) 925-4060
Fax: (225) 925-4062

*Attorneys for Plaintiffs*