**5**

## SECURITIES LENDING
## AUTHORIZATION AGREEMENT

This Agreement dated and effective as of _August 1,_ 2006 is between NORTHERN TRUST INVESTMENTS, N.A., as Trustee ("Trustee") of the Northern Trust Global Investments Common Funds and Northern Trust Global Investments Collective Funds (each herein referred to as "Lender") and THE NORTHERN TRUST COMPANY (herein referred to as "Agent") and governs the lending of U.S. and non-U.S. securities ("Securities") by Agent as agent for Lender from one or more of Lender's accounts in the custody of Agent (collectively the "Account"). This Agreement includes as attachments Schedule A, the Borrower Schedule attached thereto, Schedule B, the Collateral Schedules attached thereto, Schedule C, Custom Cash Collateral Account Guidelines, Schedule D, Fees, Annex I, Form of Notice and Consent Regarding Fee Arrangement of Lending Fiduciary in Accordance with Prohibited Transaction Class Exemption 82-63, and Annex II, Form of Notice and Consent Regarding Participation of Collective Funds in EquiLend in Accordance with the Equilend Prohibited Transaction Exemption, all of which, together with any substitutions therefor, are hereby incorporated herein. Certain capitalized terms used herein are defined in section 12 below.

1.   **Authorization.**   Trustee, on behalf of Lender, hereby appoints Agent to lend Securities of the Account in accordance with the terms of this Agreement and authorizes Agent to lend Securities of certain common and collective funds held under the Declaration of Trust of the Northern Trust Global Investments Common or the Declaration of Trust of the Northern Trust Global Investments Collective Funds Trust (as applicable) as designated in writing by Trustee to Agent from time to time to one or more Borrowers selected by Agent (other than Agent or any parent, subsidiary or affiliate of Agent) who are listed or described on Schedule A attached hereto (as it may exist from time to time).

2.   **Agent's Responsibility as to Loans.** Before entering into any Loan with a Borrower, Agent shall be responsible for the following:

2.1    Agent shall enter into a Borrowing Agreement with the Borrower, the terms of which may vary depending upon the country of domicile of the Borrower, the jurisdictions in which the Borrower does business, any separate negotiation between Agent and Borrower and other factors, but shall comply in all material respects with the requirements of this Agreement concerning the Borrowing Agreement. A copy of the sample form of Borrowing Agreement currently offered to borrowers is available upon request.

2.2    Upon receipt of notice from a Borrower of its desire to borrow Securities upon stated terms, Agent shall determine the account or accounts from which to loan Securities by using Agent's impartial sequential systems that match Loan requests with the accounts of Agent's various Participating Lenders holding eligible Securities.

**Defendant's P. I. EX. 7**

2.2.1   Notwithstanding the foregoing, Agent may provide for an exclusive borrowing arrangement for one or more funds, whereby a single Borrower listed on Schedule A selected by Agent shall be entitled, for a fixed period, to be the sole person entitled to borrow securities of the fund. During any period in which a fund is subject to an exclusive borrowing arrangement, (a) the fund shall not participate in Agent's loan allocation system described above, (b) the fund shall receive a fee from the Borrower at a fixed rate based on the market value of the fund, (c) Agent shall have the right to terminate the arrangement at any time by notice, and (d) Agent's compensation shall be the same as set forth in Schedule C. Upon termination of any exclusive borrowing arrangement with respect to a fund, the fund shall be eligible to participate in Agent's loan allocation system.

2.3   Agent shall obtain from the potential Borrower the most recent audited statement of its financial condition and the most recent unaudited statement of its financial condition, if more recent than the audited statement, and shall make a reasoned determination that the potential Borrower is creditworthy.

2.4   Agent shall require the Borrower to furnish, with respect to each Loan, or agree in the Borrowing Agreement that each Loan shall constitute, a representation that there has been no material adverse change in its financial condition since the date of the most recent financial statement furnished pursuant to the preceding paragraph.

3.   **Collateral.**  In the lending of Borrowed Securities, protection is afforded by the Collateral received from a Borrower pursuant to the terms of the Borrowing Agreement. All Collateral so received, and all investments of cash Collateral, shall be held either in the physical custody of Agent or for the account of Agent by an agent or subcustodian of Agent or a central bank, depository or clearing corporation acting as a depository.

3.1   Trustee, on behalf of Lender, hereby selects the Core USA Collateral Section for the custody of Collateral and, except as provided in section 3.6 below, the investment of cash Collateral. A copy of the Collateral Schedule for Core USA Collateral Section currently in effect is attached hereto as Attachment A, the terms of which are hereby incorporated into this Agreement by specific reference. By doing so, Trustee, on behalf of Lender, shall have authorized Agent, in Agent's discretion, except as provided in section 3.6 below, (1) to accept as Collateral any of the types of collateral described in the Collateral Schedule for the Collateral Section, (2) to accept in exchange for Borrowed Securities Collateral having a Market Value not less than the minimum value specified in the Collateral Schedule for that Collateral Section, (3) to invest any cash Collateral for such Loans in any of the types of eligible investments described in the Collateral Schedule for that Collateral Section and (4) otherwise to act with respect to Collateral in compliance with the Collateral Schedule for the Core USA Collateral Section as then in effect.

3.2   Within each Collateral Section, cash Collateral shall be invested, either separately in connection with one or more Term Loans (as hereinafter defined) or in one or more pooled investment funds, in accordance with the investment restrictions

2

described in the Collateral Schedule for that Section. Pooled cash Collateral shall earn an average rate of return, determined daily, based on the earnings of each fund and cash Collateral invested in connection with Term Loans may earn either a fixed or variable return during the term of the Loan.

3.3     For purposes of investments of cash Collateral, the designation by Trustee, on behalf of Lender, of a collateral investment option pursuant to this Agreement (excluding pursuant to section 3.6) shall prevail over any contrary provisions of any other instrument between the parties concerning investment of cash of the Account.

3.4     Agent reserves the right to add additional Collateral Sections (with corresponding Collateral Schedules), to divide or discontinue existing Collateral Sections, to limit participation in any Collateral Section or to change any of the essential characteristics of any Collateral Section; provided, however, that Lender shall be given at least 30 days' advance written notice of any material change in the Collateral Sections. Agent may also at its discretion provide unique options for separate investment of cash collateral to particular Participating Lenders, who will participate in the loan allocation system described in paragraph 2.2 but may not participate in any Collateral Section.

3.5     Except as provided in Schedule C with respect to the Custom Cash Collateral Account, the risk of any loss of Collateral or investment of cash Collateral (including a loss of income or principal, or loss of market value thereof) is allocated as follows:

(i)     any loss resulting from the insufficiency of income from the investment of cash Collateral to pay Rebate Fees or other expenses properly paid from such income shall be allocated to Agent in the same percentage as Agent's fee under Schedule D, with the balance of such losses allocated to Lender;

(ii)     any loss arising from a Collateral Deficiency (as defined in section 12.4 below) shall be allocated pro rata among all the Participating Lenders within a Collateral Section as of the date the Collateral Deficiency occurs, based on each Participating Lender's portion of the total Market Value of Borrowed Securities attributable to the Collateral Section on that date;

(iii)     any loss resulting from an insufficiency of Collateral or its proceeds to pay for the cost of purchasing Equivalent Securities or otherwise to make the Lender whole in the event of a default by a Borrower (other than an insufficiency due to a Collateral Deficiency) that is not recoverable from the Borrower or within the scope of Agent's obligations under section 16 shall be borne solely by the Lender; and

(iv)     notwithstanding the foregoing, Agent shall be liable for losses resulting from its negligence or intentional misconduct in performing the duties allocated to it under this Agreement with respect to Collateral.

3.5.1     Trustee, on behalf of Lender, shall pay to Agent, upon Agent's written demand therefor, such amounts as are determined by Agent to be necessary from time to time to satisfy the Lender's obligation under this Agreement or any Collateral

Schedule with respect to Collateral Deficiencies and insufficiencies of cash Collateral income. Trustee, on behalf of Lender, hereby grants to Agent a lien upon and security interest in any property of or due the Lender at any time in the possession of Agent to secure the payment of such obligations.

3.6    Notwithstanding the foregoing, whenever Trustee, on behalf of Lender, and Agent may designate one or more Funds for participation in the Custom Cash Collateral Account (each such fund herein referred to as a "Designated Fund"), cash Collateral for Loans of Securities of the Designated Fund that would otherwise be invested in the cash Collateral fund for the Collateral Section selected by Lender shall instead be held and invested for the sole benefit and risk of the Designated Fund in the Custom Cash Collateral Account for Northern Trust Global Investments Common and Collective Funds (the "Collateral Account") in accordance with the guidelines and procedures set forth in Schedule C below.  Cash Collateral invested in the Collateral Account shall not be a part of any Collateral Section, provided that in all other respects the Designated Fund shall be deemed to participate in the Collateral Section selected by Lender.

4.    **Collateral Margin.**

4.1    The Borrowing Agreement shall provide that at the time a Loan is made there shall be a transfer of Borrowed Securities against a transfer (occurring prior thereto or, in the case of Securities transferred through a depository, central bank or clearing organization, before the close of the same business day in accordance with the rules, customs and practices of that depository, bank or organization) of Collateral having a Market Value equal to such percentage of the Market Value of the Borrowed Securities as Agent and the Borrower shall agree; provided that such percentage shall not be less than the minimum percentage (not less than 100% of the initial Market Value of the Borrowed Securities) required in the applicable Collateral Schedule for Loans from the Account.

4.2    Each business day the Agent and the Borrower shall determine the Market Value of the Collateral and the Borrowed Securities.  If on any business day the Market Value of all the Collateral shall be less than the Required Value (as hereinafter defined), Agent shall demand from the Borrower, subject to a de minimis rule of change in value appropriate to the type of Borrowed Securities, additional Collateral so that the Market Value of the additional Collateral, when added to the Market Value of the Collateral previously delivered to Agent, shall equal the Required Value.

4.3    If on any business day the Market Value of all the Collateral shall be greater than the Required Value, Agent shall, upon request from the Borrower, subject to a de minimis rule of change in value appropriate to the type of Borrowed Securities, redeliver to Borrower such amount of Collateral selected by Borrower so that the Market Value of all Collateral equals the Required Value.

5.    **Termination of Loans; Remedies upon Default.**

5.1    Agent shall retain the right pursuant to the terms of the Borrowing Agreement to terminate a Loan at any time, whereupon the Borrower shall deliver Equivalent Securities to Agent within (a) the customary delivery period for such Securities, (b) five business days or (c) the time negotiated for such delivery by Agent and the Borrower, whichever period is least, and Agent shall concurrently therewith deliver collateral identical to the Collateral to the Borrower.  In addition, a Borrower may terminate a Loan at any time upon notice to Agent and by delivery to Agent of Equivalent Securities.  Lender or its agent shall have the right to direct Agent to terminate a Loan of Lender's Securities at any time in whole or in part.

5.2    If upon termination of a loan a Borrower shall fail to deliver Equivalent Securities, Agent shall exercise the remedies available to it under the relevant Borrowing Agreement and applicable law, customs and practices for the benefit of the Participating Lender or Lenders thereby affected.  Agent shall have the right to, and in the event of a Filing with respect to a Borrower shall, purchase Equivalent Securities, apply the Collateral to the payment of the purchase price of the Securities purchased, any other obligations of the Borrower under the Borrowing Agreement and all reasonable related expenses, and either pay to the Borrower any amounts then remaining, or demand from the Borrower any amounts then due and owing, all in accordance with the requirements of applicable law and the provisions of the relevant Borrowing Agreement, together with interest on such amounts and at such rates as are permitted by the Borrowing Agreement and applicable law.  All recoveries for the benefit of Lender under this paragraph shall be credited to Lender's account when received.

6.    **Distributions; Voting, etc.**

6.1    Trustee, on behalf of Lender, acknowledges that during the term of any Loan the Borrower shall hold all incidents of ownership with respect to the Borrowed Securities, including but without limitation the rights to vote the Borrowed Securities and to transfer or loan Borrowed Securities to others.

6.2    The Borrower shall, in accordance with the terms of the Borrowing Agreement, be required to pay to Agent the equivalent (herein called "Substitute Payments") of all distributions made by the issuer of the Borrowed Securities during the term of a Loan to which the Lender would have been entitled had the Securities not been loaned, including, but not limited to, cash dividends, interest payments, shares of stock as a result of stock splits and stock dividends and the rights to purchase additional Securities.  Agent shall credit to Lender's Account the amounts of all Substitute Payments of cash on the payable dates thereof, subject to section 9.3 of this Agreement. All other Substitute Payments shall be credited to the Lender's Account when received from the Borrower, except that stock splits shall be deemed part of the Borrowed Securities. All Substitute Payments shall be subject to any requirements of applicable taxing authorities concerning withholding of tax on such payments.  Agent shall pay to a Borrower the distributions Agent receives on Borrower's Securities that are delivered by the Borrower as Collateral.

5

6.3    The rates of tax withholding or credit used to determine the amount of any Substitute Payment of cash by a Borrower with respect to Borrowed Securities shall be determined and agreed to by Agent at the time a Loan is made and shall not thereafter be subject to retroactive adjustment for any reason. Agent shall have no liability for errors made in determining such amounts, if Agent acted in good faith and without negligence based on all the most current relevant information in the possession of Agent at that time.

7.    **Revenues.**

7.1    Lender's Net Revenue during any period shall consist of (a) in the case of cash Collateral, the aggregate income derived from the investments of cash Collateral during the period, net of (i) any applicable payment or withholding of tax, (ii) aggregate Rebate Fees paid or accrued to the Borrowers pursuant to the Borrowing Agreements and (iii) certain expenses, adjustments and charges as disclosed in this Agreement, the applicable Collateral Schedules or the annual financial statements of the applicable Collateral Sections, and (b) in all other cases, the aggregate loan Premiums or Loan Fees paid by the Borrowers pursuant to the Borrowing Agreements; reduced by any applicable payment or withholding of tax.

7.2    Lender's Net Revenue shall be credited by Agent monthly to the Account, provided that Agent may simultaneously deduct from the Account, as compensation for Agent's services under the securities lending program, a fee equal to such amounts as shall be agreed upon in writing from time to time by the parties and set forth in Schedule C attached hereto.

8.    **Reports.**    Within approximately two weeks after the end of each month, Agent shall furnish to Lender a statement of account for the month listing the Borrowed Securities, the Borrowers to whom they have been lent, the Net Revenue received therefrom and the fees of the Agent.

9.    **Concerning the Agent.**

9.1    Agent shall administer the securities lending program in conformity with the applicable laws governing each Loan and all rules, regulations and exemptions from time to time promulgated and issued under the authority of those laws. Nothing in this Agreement shall be construed to require Agent to take any action which in Agent's reasonable belief could cause Agent or Lender to violate any applicable law. In the event of a change in the securities lending program required in order to comply with a change in applicable laws, rules, regulations or exemptions, Agent shall notify Lender in writing thereof and such change shall be deemed to be a part of this Agreement.

9.2    Agent shall not be responsible for delays or failures in performance caused by circumstances reasonably beyond Agent's control, including but not limited to fires, storms, earthquakes and other similar occurrences, power outages, work stoppages, closure or malfunctioning of central banks, securities exchanges, or depositories, defaults by subcustodians chosen by Agent in the exercise of reasonable care, political disturbances, acts of terrorism and breakdowns in governmental functions of all types.

6

9.3    Agent may at its discretion, but shall not be required to, make loans or advances to any Collateral Section or to Lender in order to provide temporary liquidity to the Collateral Section or to Lender as a result of a Collateral Deficiency or otherwise. All such advances shall bear interest at the Treasury Rate until paid if then permitted under ERISA or any applicable exemption thereunder. Any advances made to a Collateral Section shall be charged among the relevant Participating Lenders in the same manner as the Collateral Deficiency. Agent may also advance funds to Lender for the payment of Rebate Fees or other amounts due to a Borrower, or for the payment of Substitute Payments, Net Revenues or any other amounts due from the Borrower to Lender hereunder. Any advance to Lender of amounts due from a Borrower shall be conditional upon receipt by Agent of final payment from the Borrower and may be reversed to the extent final payment is not received. Any interest received by Agent under this paragraph shall be in addition to Agent's other compensation under this Agreement.

9.4    In performing its duties hereunder, Agent shall be held to the standard of care exercised by banks generally in performing similar duties and shall be responsible only for its negligence or intentional misconduct. In no event shall Agent be liable for special, indirect or consequential damages of any kind, even though Agent may have been previously informed of the possibility that such damages may occur.

10.    **Representations and Warranties.**    The parties hereby make the following representations and warranties to each other, each of which shall continue throughout the term of this Agreement and of each Loan hereunder.

10.1    Agent hereby represents and warrants as follows:

10.1.1 It has all necessary corporate and governmental authority to execute and deliver this Agreement, to engage in the transactions contemplated hereby and to perform its respective obligations hereunder.

10.1.2 It has, or at the time of any relevant Loan shall have, obtained all necessary approvals of applicable governmental and self-regulatory organizations (including approval by Inland Revenue as an agent for the purposes of stock lending regulations and an approved UK collecting agent), and satisfied all conditions and qualifications imposed by applicable taxing authorities, necessary in order to comply with all statutes, laws, rules and regulations applicable to that Loan.

10.2    Trustee, on behalf of Lender, hereby represents and warrants as follows:

10.2.1 It has taken all corporate action and obtained all necessary governmental, administrative, and other approvals necessary to execute and deliver this Agreement, to engage and cause Lender to engage in the transactions contemplated hereby and to perform its obligations hereunder.

10.2.2 Neither it nor Lender is restricted under the terms of its constitution, by statute, rule or regulation or in any other manner from lending Securities to Borrowers

in accordance with this Agreement or from otherwise performing its obligations hereunder.

    10.2.3 It is absolutely entitled to cause Lender to pass full ownership of all Securities provided hereunder to Borrowers free from all liens, charges and encumbrances.

    10.2.4 It has informed the participants in collective and common funds which lend securities pursuant to this Agreement of Agent's authorization hereunder .

11.    **Disclosure and Confidentiality.**  Trustee, on behalf of Lender, authorizes Agent to disclose, to any Borrower who at any time so requests, (1) it or Lender's name or the name of any applicable fund of the Lender; (2) the fact that it has authorized Agent to lend Lender's Securities to the Borrower; (3) the fact that specific Securities loaned to the Borrower are owned by Lender; (4) any publicly available financial information concerning Lender in Agent's possession; and (5) any other information the Agent reasonably believes is necessary to effectuate the transactions contemplated herein, including tax i.d. numbers. Before disclosing any information described in this paragraph to a Borrower who has requested it, Agent shall obtain from the Borrower, as a condition for such disclosure, a written agreement (which may be the Borrowing Agreement) requiring the Borrower to hold such information in confidence.

12.    **Definitions.**  For the purposes of this Agreement, the following definitions shall apply.

12.1    "Borrowed Securities," with respect to any Borrower, shall mean (a) Securities of the Account that have been loaned to the Borrower and (b) for purposes of Sections 4.2 and 4.3 shall include Securities of all other relevant Participating Lenders loaned to the Borrower, plus in either case (1) all cash, securities or other property received in the event of a call, redemption, exchange, maturity or similar action or event with respect to the Borrowed Securities, and (2) all cash, securities or other property received or issued in exchange or replacement for the Borrowed Securities in the event of a merger, consolidation, recapitalization, reorganization, liquidation or takeover of the issuer of the Borrowed Securities.

12.2    "Borrowing Agreement" shall mean the master borrowing agreement, as amended, entered into between Agent and a Borrower establishing the general terms and conditions governing all Loans to that Borrower.

12.3    "Collateral" shall mean (a), with respect to a particular Loan, all collateral delivered to the Agent by a Borrower with respect to the relevant Borrowed Securities; (b), with respect to Sections 4.2 and 4.3, all Collateral delivered to the Agent by a Borrower with respect to all Loans of all Participating Lenders to that Borrower; and (c) with respect to a Collateral Section, all types of collateral permitted for the Section under the applicable Collateral Schedule then in effect.

12.4 "Collateral Deficiency" shall mean, with respect to any Collateral within a Collateral Section, (a) any loss of principal value of a specific investment of cash Collateral, (b) any decline in the net asset value of a cash Collateral fund, (c) any shortfall arising from the necessary liquidation of an investment of cash Collateral for a Term Loan; or (d) any amount not recoverable with respect to an obligation or instrument (including, but without being limited to, a letter of credit, certificate of deposit, banker's acceptance, assured payment or other bank obligation, local authority bond or bill, or private issue bond) received from a Borrower as Collateral due to simultaneously existing defaults by the issuer thereof and the Borrower furnishing such Collateral.

12.5 "Collateral Schedule" shall mean a written instrument delivered by Agent to Trustee, on behalf of Lender, as the same may be amended from time to time, describing (1) the types of securities or other property acceptable as Collateral, or as investments of cash Collateral, within a particular Collateral Section, (2) the characteristics of any fund(s) available for the investment of cash Collateral within the Collateral Section, (3) the required minimum initial Market Value of such Collateral and (4) any other relevant information concerning the Collateral Section.

12.6 "Collateral Section" shall mean at any relevant time Collateral held by the Agent for a group of Participating Lenders who have each elected, as to their respective accounts, to accept similar types of Collateral for Loans, to have cash Collateral for those Loans invested in similar types of investments, and to share revenues from pooled cash Collateral, all subject to and in accordance with the applicable Collateral Schedule and the terms of this Agreement.

12.7 "Equivalent Securities" shall mean Securities that are identical (as to issuer, class, quantity and description) to the relevant Borrowed Securities, and such term shall include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate).

12.8 "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, including the regulations and exemptions promulgated thereunder.

12.9 "Filing" shall mean a filing by a Borrower (or by a creditor of, or some other person acting with respect to, the Borrower) of a petition in bankruptcy or a petition seeking reorganization, winding-up, liquidation, dissolution or similar relief, including appointment of a trustee, receiver or liquidator of a substantial part of the property of the Borrower under a bankruptcy, insolvency or similar statute, code, law rule or regulation of any jurisdiction.

12.10 "Loan" shall mean a loan of Securities to a Borrower from the Account of Lender or from another Participating Lender.

12.11 "Market Value" of Borrowed Securities and Collateral shall be determined as provided in the relevant Borrowing Agreement, and shall include accrued interest if appropriate to particular Securities.

9

12.12   "Participating Lender" shall mean at any time any person who has appointed Agent as agent for the purpose of lending Securities and for whom Agent is then acting in that capacity.

12.13   "Premium or Loan Fee" shall mean an agreed fee required to be paid by a Borrower to Agent for the benefit of Lender in respect of each Loan of Lender's Securities as to which the Borrower has furnished non-cash Collateral.

12.14   "Rebate Fee" shall mean an agreed amount required to be paid by Agent for the account of Lender to a Borrower in respect of each Loan of Lender's Securities as to which the Borrower has furnished cash as Collateral.

12.15   "Required Value" shall mean the Market Value of all the Borrowed Securities outstanding to a Borrower plus any additional margin as agreed upon between Agent and the Borrower in conformity with the relevant Collateral Schedule.

12.16   "Substitute Payment" shall have the meaning given in paragraph 6.2 hereof.

12.17   "Term Loan" shall mean a Loan collateralized by cash, in which the agreed date of maturity or renegotiation of the Loan is greater than one business day.  Cash collateral for a Term Loan is invested separately from other cash Collateral and other Term Loans.

12.18   "Treasury Rate" shall mean the rate per annum on 90-day U.S. Treasury Bills as quoted in the Midwest Edition of *The Wall Street Journal* from time to time during the relevant period (or if not there quoted, as quoted in any publication reasonably selected by Agent).

13.     **Tax Considerations.**

13.1    Each Borrower shall represent, as a condition for any Loan, that it has obtained all necessary approvals of applicable governmental and self-regulatory organizations (including approval by Inland Revenue as an approved Borrower or UK intermediary), and has satisfied all conditions and qualifications imposed by applicable taxing authorities, necessary in order to comply with all statutes, laws, rules and regulation applicable to that Loan, which representation shall continue throughout the term of each Loan.

13.2    Trustee, on behalf of Lender, shall provide Agent with complete, accurate and current information necessary to permit Agent to comply with applicable tax statutes, rules and regulations relating to the lending of Securities.  In addition, Trustee, on behalf of Lender, shall properly execute and deliver to Agent any and all forms, undertakings, and other documents reasonably requested by Agent in order to comply with such statutes, rules and regulations.

13.3    Notwithstanding the first sentence of paragraph 9.1 hereof, Agent shall attempt in good faith to comply with all applicable tax laws, treaties, rules and regulations governing Lender's participation in Agent's securities lending program based on

10

Agent's best interpretation of those laws, treaties, rules and regulations and the information furnished by Trustee, on behalf of Lender; provided, however, that notwithstanding the foregoing Lender shall indemnify Agent for taxes payable by Agent that otherwise should have been paid from amounts received by Lender, plus interest on such taxes at the Treasury Rate until paid, plus any penalties other than penalties resulting from Agent's negligence or intentional misconduct.

13.4    Trustee, on behalf of Lender, acknowledges that it is responsible for satisfying itself as to the tax consequences to Lender relating to the lending of its securities by Agent pursuant to this Agreement. Agent does not offer any advice as to the foregoing. Trustee, on behalf of Lender, understands and acknowledges that the tax characteristics and requirements of any of lending fund's participants may vary from those of other lending fund participants and, as such, the Trustee hereby agrees and acknowledges as follows: (1) it is Trustee's sole duty and responsibility to investigate, understand and account for all tax consequences to the Lender and lending funds participants of entering into this Agreement and any Loan; (2) that, as set forth in herein, the Borrower holds all incidents of ownership of any Security which is the subject of any Loan and that the tax characteristics of any dividend or income thereon may change or be distinct from the tax characteristics of any substitute payment with respect thereto; and (3) that Agent will lend the Securities pursuant to this Agreement on behalf of the Lender pursuant to this Agreement as if all lending fund participants were tax-exempt entities and in accordance with the way Agent runs the program and negotiate Loans on behalf of all other tax-exempt entities generally, not withstanding the fact that certain tax benefits or credits may be lost for certain of a lending fund's participants on account thereof. Agent shall incur no liability to the Lender, the Trustee or any of a lending fund's participantsfor acting as set forth herein. The Trustee on behalf of Lender hereby agrees to indemnify Agent, its officers, employees, agents successors and assigns (the "Indemnified Parties") and hold the Indemnified Parties harmless against all liabilities, demands, claims, actions, charges, expenses and losses arising directly out of any adverse tax consequences of lending its Securities under this Agreement, which such indemnification shall survive termination of this Agreement.

14.    **Miscellaneous.**

14.1    This Agreement may be amended by instrument in writing signed by the parties and may be terminated by either party at any time by written notice to the other party, subject to the performance by both parties of any of their respective obligations that remain outstanding at the time of termination. Upon termination of this Agreement by either party, Agent shall terminate all outstanding Loans of Lender's Securities and shall make no further Loans thereof.

14.2    This Agreement supersedes any preexisting securities lending agreement, and prevails over any contrary provisions of any other agreement, between the parties. This Agreement represents the entire agreement of the parties concerning its subject matter and supersedes any and all prior or contemporaneous written or oral communications with regard thereto. The invalidity or unenforceability of any

11

provision of this Agreement shall not affect the validity and enforceability of any other provision hereof.

14.3    Neither party may assign its obligations hereunder without the prior written consent of the other party. This Agreement is solely for the benefit of the parties hereto and their successors and permitted assigns. Nothing in this Agreement shall be construed to give any rights whatever against either party to any person who is not a party hereto, nor shall any such person be considered a "third party beneficiary" of this Agreement.

14.4    Section headings are for convenience only and may not be used for interpretation.

14.5    Trustee, on behalf of Lender, acknowledges that PROVISIONS OF THE SECURITIES INVESTOR PROTECTION ACT OF 1970 MAY NOT PROTECT THE LENDER WITH RESPECT TO LOANS OF BORROWED SECURITIES AND THEREFORE THE COLLATERAL DELIVERED BY BORROWER TO AGENT MAY CONSTITUTE THE ONLY SOURCE OF SATISFACTION OF BORROWER'S OBLIGATIONS IN THE EVENT BORROWER FAILS TO RETURN THE BORROWED SECURITIES.

15.    **ERISA Considerations.**    Trustee, on behalf of Lender, agrees to comply with the procedures set forth in Department of Labor Prohibited Transaction Exemptions 82-63 and 2002-30, as either may be amended or any successor exemption of either, applicable to the participation of qualified employee benefit plans in commingled bank investment funds. Unless otherwise agreed between the parties, each notice and consent obtained in compliance with Prohibited Transaction Class Exemption 82-63 from new ERISA participants in a Northern Trust Global Investments common or collective fund shall be in the form of Annex I hereto and each notice and consent obtained from such participants in compliance with Prohibited Transaction Exemption 2002-30 shall be in the form of the Annex II hereto. Agent agrees to comply with all applicable provisions of ERISA, including but not limited to Prohibited Transaction Class Exemption 81-6.

16.    **Indemnification.**

16.1    Agent shall indemnify, defend and hold Lender harmless from and against any losses, damages, costs and expenses (other than special, incidental, indirect or consequential losses, damages, costs or expenses) Lender may incur if Agent is unable to recover Borrowed Securities and distributions made during the term of the Loan or Loans with respect to those Securities as a result of:

(i)    Agent's failure to make a reasoned determination of the creditworthiness of a Borrower through adequate analysis of all material, public information available to Agent's Credit Policy Committee before lending a security as provided in section 2 of this Agreement and during the term of the Loan or Loans a Filing occurs;

      (ii)    Agent's failure to demand adequate and appropriate Collateral on a prompt and timely basis as provided in section 4 hereof, perfect a security interest or obtain rights equivalent thereto in the Collateral, maintain control of the Collateral as provided in this Agreement or make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material, public information available to Agent's Trust Credit Committee; or

      (iii) Agent's failure otherwise to perform its duties and responsibilities under this Agreement in accordance with the terms hereof or applicable law.

16.2    Irrespective of the applicability of paragraph 16.1, in the event of a Filing, Agent shall (1) credit Lender's account with the amount of distributions made with respect to the Borrowed Securities of Lender that are due and payable by the Borrower on or before the date of Filing but not so paid and (2) transfer into Lender's Account replacement Securities that are Equivalent Securities by purchasing such securities in the principal market in which such securities are traded; except that Agent may, at its option, in lieu of replacing some part or all of the Borrowed Securities, credit Lender's Account with an amount equal to the Market Value on the date of Filing of Borrowed Securities not replaced, which amount shall be satisfiable at Agent's option in cash, or by a transfer to Lender's Account of Collateral securities valued as of the date of Filing, or by a combination of cash and Collateral securities valued as of the date of Filing.

16.3    In the event that a Collateral Deficiency or a loss arising from any loss of principal value of a specific investment of cash Collateral in the Collateral Account exists at the same time as a Borrower Filing, Agent shall have the right to set off the unpaid amount of any obligation of the Lender to the Agent arising under the terms of this Agreement from the Collateral Deficiency or Collateral Account loss against any obligation Agent may have to Lender under this section 16. Agent shall be subrogated to, and Lender shall be deemed to have transferred to the Agent, all of Lender's corresponding rights against a Borrower (and against any guarantor of the Borrower) and in the Collateral and its proceeds to the extent of any payment, transfer or credit made pursuant to this section 16.

17.    **Governing Law.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Illinois other than the conflict of law principles thereof, except to the extent pre-empted by the laws of the United States of America, which shall govern to that extent.

THE NORTHERN TRUST COMPANY    NORTHERN TRUST INVESTMENTS, N.A., as Trustee of the Northern Trust Global Investments Common Funds and the Northern Trust Global Investments Collective Funds

13

By: _Sandra L Linn_          By: _John L Krieg_
                             Name: _John L. Krieg_
                             Title: _Senior Vice President_

Date: _9/1/06_

Examined
As To Form   JAV

15

**SCHEDULE A
TO SECURITIES LENDING AUTHORIZATION AGREEMENT**

*LIST OF ELIGIBLE BORROWERS*

16

**SCHEDULE B**
**TO SECURITIES LENDING AUTHORIZATION AGREEMENT**

*COLLATERAL SCHEDULE FOR THE*
*CORE USA COLLATERAL SECTION*

17

**SCHEDULE C**
**TO SECURITIES LENDING AUTHORIZATION AGREEMENT**
**(the "Agreement")**

*CUSTOM CASH COLLATERAL ACCOUNT*
*FOR NTGI COMMON AND COLLECTIVE FUNDS*

C-1.    A Custom Cash Collateral Account (herein referred to as the "Collateral Account") is hereby established for the collective investment of cash Collateral received in respect of Loans of Securities of any NTGI common or collective fund that has been designated pursuant hereto for participation in the Collateral Account (each such fund being herein referred to as a "Designated Fund").

C-2.    Cash Collateral received in the Collateral Account with respect to any Designated Fund shall be added to and commingled for investment purposes with all other cash Collateral held in the Collateral Account for all the Designated Funds. The Collateral Account shall be invested exclusively in units of The Northern Trust Company Collective Short Term Investment Fund ("STIF") and The Northern Trust Company Collective Short Term Extendible Portfolio ("STEP"), in such proportions as Agent and Trustee, on behalf of Lender may agree in writing from time to time; provided that the initial allocation between STEP and STIF shall be 75% STEP and 25% STIF, with a tolerance of + or - 5% for each of STEP and STIF. Agent shall monitor the allocation between the funds each business day and in the event Agent determines that the allocation is outside such range, Agent shall, as soon as practicable, buy or sell units of STEP or, at its discretion, STIF to the extent necessary to bring the allocation back within such range.

C-3.    Although STIF is a fund in which the net asset value of the fund is maintained at a constant dollar unit value each business day, STEP is a fund in which the net asset value of each unit can fluctuate from day to day. Notwithstanding the foregoing, Trustee, on behalf of Lender, hereby directs Agent to maintain the Collateral Account as a fund comprised of units having a constant net asset value of $1.00 per unit and to value the fund using the amortized cost method for that purpose. Except as provided in section C-4 below, Agent will not determine or monitor the fair market value of the investments of the fund as a means of comparing the unit value of the Collateral Account with the market value of its investments or for any other purpose. Each Designated Fund hereby represents and confirms on a continuing basis throughout the term of this Agreement that such a method of valuation and account maintenance is consistent with all laws, rules, regulations and accounting procedures applicable to the Designated Fund and has been approved by the Designated Fund's independent auditors.

C-4.    *Accounting Methodology.* Daily additions to or withdrawals from the Collateral Account shall be automatically invested in or withdrawn from STIF. In the unlikely event that net withdrawals from STIF result in an overdrawn cash position in STIF, Agent will cover the overdraft and may charge the Collateral Account with its normal overdraft charges. The STEP portion of the Collateral Account shall be valued each business day. For purposes of maintaining a constant unit value of the Collateral Account but not for purposes of allocation of risk, the STEP unit value components (realized gains or losses, unrealized gains or losses and

18

income accruals) will be all treated as income accruals and will be combined with STIF yield to determine the daily yield and accrued income of the Collateral Account. Agent shall declare the yield and accrued income of the Collateral Account each business day. All STEP units in the Collateral Account will be redeemed and repurchased periodically in order to realize any gains or losses accrued in the Collateral Account.

C-5. *Income.* Income on hand in the Collateral Account, less rebate fees and other out-of-pocket expenses properly paid from income, which may include Agent's reasonable and necessary charges in administering the Collateral Account, shall be allocated monthly to the Designated Funds and monthly income so allocated shall be distributed on the fifteenth day of the following month (or if such day is not a business day, on the next following business day).

C-6. *Risk of Loss.* The risk of any loss incurred within the Collateral Account (including a loss of income or principal, or loss of market value thereof) shall be allocated as follows:

(i) Any loss resulting from the insufficiency of income of the Collateral Account to pay Rebate Fees or other expenses properly paid from such income shall be allocated to Agent in the same percentage as Agent's fee under Schedule C, with the balance of such loss allocated to the Designated Funds, except that Agent shall not be liable in whole or in part for any income insufficiency arising from either realized or unrealized losses in principal value of STIF or STEP.

(ii) Any loss of principal or principal value in the Collateral Account shall be solely the liability of the Designated Funds. For purposes of allocation of risk, the share of any realized or unrealized losses in STIF or STEP allocable to the Collateral Account shall be treated as principal losses of the Collateral Account.

(iii) Any loss resulting from an insufficiency of Collateral in the Collateral Account or its proceeds to pay for the cost of purchasing Equivalent Securities or otherwise to make the Lender whole in the event of a default by a Borrower that is not recoverable from the Borrower or within the scope of Agent's obligations under section 16 of the Agreement shall be borne solely by the Designated Funds.

(iv) Notwithstanding the foregoing, Agent shall be liable for losses resulting from its negligence or intentional misconduct in performing the duties allocated to it under this Agreement with respect to the Collateral Account.

C-7. For the avoidance of doubt, notwithstanding that the Designated Funds will not be participating in the cash Collateral fund of the Collateral Section elected by Trustee, on behalf of Lender, each Designated Fund shall nevertheless be liable for any Collateral Deficiencies occurring with respect to that cash Collateral fund (for which Agent is not liable) in the same proportion as the total Market Value of the Designated Fund's Borrowed Securities supported by non-cash Collateral and Term Loan Collateral bears to the total Market Value of Borrowed Securities of all Participating Lenders attributable to that Collateral Section at the time such Collateral Deficiency occurs.

C-8.     Capitalized terms used in this Schedule and not defined herein shall have the meanings assigned to them in the Agreement. As used in this Schedule, the term "Designated Funds" shall mean on any relevant date or dates the Designated Funds then participating in the Collateral Account in the proportions, as reflected on the books and records of the Agent, in which they participate in the Collateral Account as of that date or dates.

**SCHEDULE D**
**TO SECURITIES LENDING AUTHORIZATION AGREEMENT**
**("Agreement")**

**FEES**

The Agent shall be entitled to receive the following fees for services provided under this Agreement. The fees below are expressed as a percentage of Lender's Net Revenue (as defined in paragraph 7.1 of the Agreement) applicable to Loans of all types of securities eligible to be loaned from the funds listed opposite the fee percentage.

| | |
|---|---|
| Enhanced EAFE Funds | 25% |
| International Funds | 35% |
| All other Funds | 40% |

**ANNEX I**
**To Securities Lending Authorization Agreement**
**(the "Agreement")**


**FORM OF NOTICE AND CONSENT REGARDING FEE ARRANGEMENT OF**
**LENDING FIDUCIARY IN ACCORDANCE WITH**
**PROHIBITED TRANSACTION EXEMPTION 82-63**


**NOTICE AND CONSENT**
*REGARDING SECURITIES LENDING ARRANGEMENTS*


Employee benefit plans of any sort (each, a "Plan") whose assets are managed by The Northern Trust Company or its affiliates (collectively, "Northern") may have such assets invested in one or more common funds or collective funds (each, a "Fund"), which are authorized to lend securities. Any such securities lending will be in accordance with Department of Labor Prohibited Transaction Class Exemptions 81-6 and 82-63. Northern has been appointed to serve as securities lending agent for the Funds, with responsibility for administering the securities lending program. As compensation for such services, the undersigned Authorizing Fiduciary on behalf of the Plan authorizes the payment by each Fund in which Plan assets are invested of a monthly fee equal to 40% (50% in the case of assets currently placed in Pyramid Equity Index Fund and 20% in the case of the Collective Monthly EAFE Index ex Futures Fund, in each case following the management by Northern of such assets in the Fund) of the securities lending revenue earned by such Fund (such revenue to be calculated net of rebates paid to the borrowers of securities and other expenses). If the Authorizing Fiduciary subsequently notifies Northern that it no longer desires Plan assets to be included in the securities lending program for a Fund, Northern will cause the Plan's assets to be redeemed from the Fund within thirty (30) days following its receipt of such notice.

In connection with the foregoing, Northern has provided the Authorizing Fiduciary with such reasonably available information as it reasonably believes is necessary for the Authorizing Fiduciary to determine whether the foregoing authorization should be granted. In addition, Northern will provide any other reasonably available information that the Authorizing Fiduciary may reasonably request.

The Authorizing Fiduciary may terminate this consent at any time by notifying Northern in writing.

Dated: _____

NAME OF PLAN:_____

NAME OF AUTHORIZING FIDUCIARY: _____ _____

By: _____
Its: _____

22

**ANNEX II**
**To Securities Lending Authorization Agreement**
**(the "Agreement")**


**FORM OF NOTICE AND CONSENT CONCERNING PARTICIPATION OF**
**COLLECTIVE FUNDS IN EQUILEND IN ACCORDANCE WITH THE**
**EQUILEND PROHIBITED TRANSACTION EXEMPTION**

To:     The Authorizing Fiduciary of any employee benefit plan ("Plan") that intends to participate in a Common or Collective Fund (each, a "Fund") of The Northern Trust Company ("Northern") for which Northern acts as Lending Fiduciary.

This Notice and Consent sets forth the rights of any Plan proposing to invest its assets in a Fund with respect to transactions between EquiLend and the Fund.

EquiLend is a joint venture of various securities lending agents and securities borrowers, in which Northern has an equity interest. The purpose of EquiLend is to provide a common electronic "platform" for the negotiation of securities lending and borrowing transactions. A description of EquiLend and its platform is attached hereto as Attachment A. The Fund currently participates in the EquiLend platform.

EquiLend's activities are offered in two stages: in the first phase the Fund participates in EquiLend's common electronic platform for information sharing and negotiation of loans; in the second phase, EquiLend offers to the Fund for sale or licensing specific ancillary services and products as described in Attachment A.

The Fund is not charged any additional fee for utilizing EquiLend's platform or for ancillary products used by the Fund; rather the fees charged by EquiLend for participation in its platform and the cost of purchasing or licensing lending-related products are paid by Northern. The fees for participation in the platform include an initiation fee and an annual fee (payable by both lenders and borrowers) that is structured on a tiered basis. Each annual fee level will entitle each participant at that level to a certain number of transactions, with excess transactions being subject to additional charges. Participants paying the highest annual fee level are entitled to an unlimited number of transactions. Northern, as an equity owner of EquiLend, was not required to pay the initiation fee. Northern expects its annual fee to be at the highest level which will entitle Northern to an unlimited number of transactions with no incremental cost.

As one of the equity owners of EquiLend, Northern has a financial interest in the successful operation of EquiLend. As a result, EquiLend has obtained Prohibited Transaction Exemption 2002-30 from the U.S. Department of Labor which (a) enables Northern (and the other securities lending agents with equity interests in EquiLend) to utilize EquiLend's platform for lending the securities of Plans and (b) permits EquiLend to sell or license ancillary products to Northern or to a Plan to which EquiLend is a party in interest. The final form of the

23

exemption was published on June 6, 2002 in the Federal Register, and is retroactively effective to March 29, 2002.

The exemption requires that an Authorizing Fiduciary of a Plan, the assets of which are proposed to be invested in the Fund, and which has not previously been given 30 days' prior notice of the intention of the Fund to participate in EquiLend, or not less than 15 days' prior notice of an intended purchase or licensing by the Fund of any ancillary product from EquiLend, must approve in advance the participation of the Fund in EquiLend and the purchase or licensing by the Fund of each ancillary product.

In connection with the foregoing, Northern has provided the Authorizing Fiduciary with such reasonably available information as it reasonably believes is necessary for the Authorizing Fiduciary to determine whether Northern's use of EquiLend on behalf of the Fund and EquiLend's proposed sale or licensing of products to the Fund should be authorized. In addition, Northern will provide any other reasonably available information that the Authorizing Fiduciary may reasonably request.

As used in this Notice and Consent, (1) "Authorizing Fiduciary" shall mean a Plan fiduciary who is independent of and not affiliated with Northern and receives no direct or indirect consideration from Northern or an affiliate of Northern in connection with any securities lending transaction involving the Plan; and (2) "Plan" shall mean a "plan" within the meaning of section 3(3) of ERISA subject to Part 4 of Subtitle B of Title I of ERISA, a "plan" within the meaning of section 4975(e)(1) of the Internal Revenue Code of 1986 (as amended), or The Federal Thrift Savings Fund.

By signing this Notice and Consent on behalf of the Plan, the Authorizing Fiduciary of the Plan hereby agrees to and approves the participation of the Fund in EquiLend and the terms governing the sale or licensing of ancillary products by EquiLend to the Fund, all as set forth herein.

Dated: _____

NAME OF PLAN:_____

NAME OF AUTHORIZING FIDUCIARY: _____

     By: _____
     Its: _____

Attachment A

## EQUILEND DESCRIPTION

EquiLend's primary objective is to develop a standards-based global equity borrowing and lending platform intended to streamline the trading, processing, and monitoring of securities lending transactions. The goal of this platform will be to connect participants through a common standards-based process and infrastructure, which EquiLend anticipates will create both efficiencies and liquidity, and reduce the levels of potential problems and risks.

EquiLend delivers six key components to participants in its first phase: (i) availability, (ii) autoborrow, (iii) one-to-one negotiations (iv) contract, billing and marks comparisons (v) recall and return processing and (vi) auction capabilities. EquiLend's platform is also designed to provide the industry with a set of objective benchmarks. Equilend's platform was rolled out to members and subscribing participants on June 25, 2002, following receipt of applicable regulatory approvals.

The EquiLend platform provides a borrower and/or lender with the option of initiating an order to one or many counterparties. When an offer is approved, EquiLend matchs the parties' settlement instructions and send a shared trade ticket to each of the participants' proprietary trading and settlement systems. EquiLend is not itself a principal in any transactions but rather facilitates securities lending transactions between borrowers and lenders by providing access and connectivity between potential borrowers and lenders.

In addition, EquiLend may offer to sell or license current and historical data relating to transactions proposed or occurring on EquiLend's securities lending platform or data derived from historical data utilizing statistical or computational techniques. EquiLend may also sell or license to users certain objective statistical or computational tools that will permit the users to use data provided to evaluate securities lending activities. Those lending-related products may be offered for sale or licensing directly to end users, or may be sold or licensed to securities lending agents for the benefit of their clients.

EquiLend is subsidiary of EquiLend Holdings L.L.C., which is a holding company owned by Barclays Global Investors; Bear, Stearns & Co. Inc.; Credit Suisse First Boston; The Goldman Sachs Group, Inc.; J.P. Morgan Chase & Co.; Lehman Brothers; Merrill Lynch; Morgan Stanley; Northern Trust Corporation; State Street Corporation; and UBS.

**AMENDMENT TO SECURITIES LENDING AUTHORIZATION AGREEMENT**
Between NORTHERN TRUST INVESTMENTS, N.A., as trustee of the Northern Trust
Global Investments Common Funds and Northern Trust Global Investment Collective
Funds and THE NORTHERN TRUST COMPANY, dated August 1, 2006

**WHEREAS:**

I.       Reference is made to the securities lending authorization agreement between The
Northern Trust Company (the "**Agent**") and Northern Trust Investments, N.A., as
trustee ("**Trustee**") of the Northern Trust Global Investments Common Funds and
Northern Trust Global Investments Collective Funds (each herein referred to as
"**Lender**"), dated 1 August 2006, as amended from time to time, (the
"**Agreement**").

II.      In addition to the provisions contained in the Agreement, the Agent and the
Lender wish to amend the Agreement, as set out in this agreement (the
"**Amendment Agreement**").

**NOW THEREFORE**, in consideration of the mutual agreements herein contained, the
receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as
follows:

A)      Fees. Pursuant to clause 14.1 of the Agreement, schedule D of the Agreement
is hereby amended and restated as follows:

**SCHEDULE D**
**TO SECURITIES LENDING AUTHORIZATION AGREEMENT**


**FEES**
**Effective as of November 1, 2006**


        The Agent shall be entitled to receive the following fees for services provided
under the Agreement.  The fees below are expressed as a percentage of Lender's Net
Revenue (as defined in paragraph 7.1 of the Agreement) applicable to Loans of all types
of securities eligible to be loaned from the funds listed opposite the fee percentage.

        25%     Enhanced EAFE Funds

        30%     NTGI-QM Common Daily Emerging Markets Equity Index Fund
                Lending

        30%     Collective Weekly Emerging Markets Equity Index Fund

1

30%   Collective Weekly Developed International Small Cap Equity
      Index Fund

35%   International Funds (other otherwise listed above)

40%   All other Funds

B)   Except as hereby specifically amended, the Agreement as heretofore set forth
     shall remain in full force and effect.

C)   This Amendment Agreement will be governed by, and construed in
     accordance with laws governing the Agreement.

Executed in two originals

THE NORTHERN TRUST COMPANY      NORTHERN   TRUST   INVESTMENTS,
                                N.A., as Trustee of the Northern Trust Global
                                Investments   Common   Funds   and   the
                                Northern Trust Global Investments Collective
                                Funds

By: _____      By: _____
Name: _Sandra L. Lui_            Name: _Philip DeSanto_
Title: _Senior Vice President_   Title: _VP Product Manager_
Date: _12/12/07_                 Date: _12/11/07_

2