**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | The Hon. William T. Hart, *Judge Presiding.* Magistrate Judge Michael T. Mason |
| Plaintiffs, | ) ) | Case No. 09-CV-07203 |
| v. | ) ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT PURSUANT TO RULE 12(b)(6)**

Michele L. Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Counsel for Defendants Northern Trust
Investments, N.A. and
The Northern Trust Company*

Dated: September 3, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    Plaintiffs' Securities Lending Activity ........................................................... 2

    The Credit Markets Freeze................................................................................ 5

    Plaintiffs' Claims ............................................................................................... 6

ARGUMENT ............................................................................................................ 7

I.      Having Expressly Authorized Payment Of A 40% Fee, Plaintiffs Cannot
        Maintain An Action For Damages On The Theory That The Fee Should
        Have Been Lower ............................................................................................... 7

II.    Plaintiffs Have Failed To State A Claim Based On The Theory That NTC
        Improperly Structured The Collateral Pools ..................................................10

        A.     Plaintiffs' Conflict Of Interest Allegations Fail As A Matter Of Law .................11

        B.     Plaintiffs' Claim That The Pools Were Improperly Structured Fails
              As A Matter Of Law In Light Of The Collateral Investment Guidelines .............13

III.   Plaintiffs' Claims That Collateral Was Imprudently Invested And Managed
        Fail As A Matter Of Law ...................................................................................17

        A.     Plaintiffs' Allegations With Respect To Particular Securities Fail......................17

              1.     Plaintiffs Offer No Plausible Basis For Their Claim That NTC
                    Should Have Known That Lehman Brothers Was Likely
                    To Fail...........................................................................................17

              2.     Plaintiffs Offer No Plausible Basis For Their Claim That NTC
                    Should Have Known That Sigma And Theta Were Likely
                    To Fail...........................................................................................19

              3.     Plaintiffs Provide Almost No Information About The Other
                    Securities That Resulted In Realized Losses ...............................20

        B.     Plaintiffs' Theory That NTC Should Have Restructured The Collateral
              Pool Investments Before September 2008 Also Fails As A Matter
              Of Law ............................................................................................22

CONCLUSION ......................................................................................................................... 25

TABLE OF EXHIBITS ............................................................................................................. A-1

# TABLE OF AUTHORITIES

## CASES

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
 499 F.3d 663 (7th Cir. 2008) ........................................................................ 21

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009) ........................................................................... *passim*

*Bank of Ill. in Mt. Vernon v. Bank of Ill. in Mt. Vernon*,
 300 N.E.2d 507 (Ill. App. 5th Dist. 1973) ....................................................... 9

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................... *passim*

*The Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v.
The Bank of N.Y. Mellon Corp.*,
 2010 WL 1558587 (S.D.N.Y. 2010) ....................................................... *passim*

*BP Corp. N. Am. Inc. v. N. Trust Invs., N.A.*,
 2008 WL 5263695 (N.D. Ill. 2008) .............................................................. 1, 6

*Clark Bros. Sales Co. v. Dana Corp.*,
 77 F. Supp. 2d 837, 852 (E.D. Mich. 1999) .................................................... 8

*Constellation Energy Group, Inc., ERISA Litig., In re*,
 2010 WL 3221821 (D. Md. 2010) ................................................................ 22

*DeBruyne v. Equitable Life Assurance Society of the U.S.*,
 920 F.2d 457 (7th Cir. 1990) ....................................................................... 25

*DiFelice v. U.S. Airways*,
 497 F.3d 410 (4th Cir. 2007) ....................................................................... 25

*Eyler v. Comm'r of Internal Revenue*,
 88 F.3d 445 (7th Cir. 1996) ......................................................................... 25

*Gore v. Ind. Ins. Co.*,
 876 N.E.2d 156 (Ill. App. 1st Dist. 2007) ........................................................ 8

*Guerrand-Hermes v. J.P. Morgan & Co.*,
 769 N.Y.S.2d 240 (App. Div. 2003) ............................................................. 16

*Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*,
 971 F.2d 1332 (7th Cir. 1992) .................................................................... 8, 9

iii

*Hecker v. Deere & Co.*,
　556 F.3d 575 (7th Cir. 2009) ............................................................2, 3

*Hughes v. LaSalle Nat'l Bank, N.A.*,
　419 F. Supp. 2d 605 (S.D.N.Y. 2006),
　*vacated on other grounds*, 2007 WL 4103680 (2d Cir. 2007)........................... 9

*Huntington Bancshares Inc. ERISA Litig., In re*,
　620 F. Supp. 2d 842 (S.D. Ohio 2009) ............................................... 25

*Jones v. Harris Assocs. L.P.*,
　130 S. Ct. 1418 (2010)................................................................. 10

*Jones v. Harris Assocs. L.P.*,
　527 F.3d 627 (7th Cir. 2008) ......................................................... 10

*Kanawi v. Bechtel Corp.*,
　590 F. Supp. 2d 1213 (N.D. Cal. 2008) ............................................... 25

*Keach v. U.S. Trust Co.*,
　419 F.3d 626 (7th Cir. 2005) ......................................................... 25

*Lambos v. Lambos*,
　292 N.E.2d 587 (Ill. App. 1st Dist. 1973)............................................. 9

*Landmen Partners Inc. v. The Blackstone Group, L.P.*,
　659 F. Supp. 2d 532 (S.D.N.Y. 2009).................................................. 24

*Lehman Bros. Secs. & ERISA Litig., In re*,
　683 F. Supp. 2d 294 (S.D.N.Y. 2010).................................................. 19

*Mahle v. First Nat'l Bank of Peoria*,
　610 N.E.2d 115 (Ill. App. 3d Dist. 1993) ............................................. 9

*McCormick v. McCormick*,
　536 N.E.2d 419 (Ill. App. 1st Dist. 1988)............................................. 9

*Mid-West Energy Consults., Inc. v. Covenant Home, Inc.*,
　815 N.E.2d 911 (Ill. App. 1st Dist. 2004)............................................. 8

*MoneyGram Int'l Secs. Litig., In re*,
　626 F. Supp. 2d 947 (D. Minn. 2009)...............................................23, 24

*Summers v. State St. Bank & Holding Co.*,
　453 F.3d 404 (7th Cir. 2006) ......................................................... 18

*The Reserve Fund Secs. & Derivative Litig., In re*,
    673 F. Supp. 2d 182 (S.D.N.Y. 2009) ............................................................................. 1

*Resolution Trust Corp. v. Holtzman*,
    618 N.E.2d 418 (Ill. App. 1st Dist. 1993) .......................................................... 8

*Rubin v. MF Global*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009) ............................................................... 25

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ........................................................................ 3

## STATUTES

15 U.S.C. § 80a-1 *et seq.* ......................................................................................... 10

735 ILCS 5/13-205 ................................................................................................ 9

760 ILCS 5/5(a)(2) ................................................................................................ 25

## REGULATIONS

Federal Financial Institutions Examination Council Supervisory
    Policy on Securities Lending, 62 Fed. Reg. 40816 (July 30, 1997) ................................ 13

## MISCELLANEOUS

3 *Scott on Trusts* § 216 (3d ed. 1967) ........................................................................ 9

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") submit this memorandum in support of their motion to dismiss plaintiffs' amended complaint pursuant to Rule 12(b)(6) for failure to state a claim.

## INTRODUCTION

On September 15, 2008, Lehman Brothers filed for bankruptcy, starting a cascade of events that resulted in a worldwide credit freeze and the worst recession since the Great Depression.[1]  Many investors suffered losses as a result of these unexpected events, including those who had invested in highly rated fixed-income securities that suddenly defaulted or declined in value as the market for such securities collapsed.  In this case, plaintiffs seek to hold the defendants liable for investment losses they allegedly suffered as a result of their participation in NTC's securities lending program, on the theory that defendants should have foreseen the cataclysm and done something to avoid at least some of the losses.  For the reasons outlined below, plaintiffs' claims should be dismissed because they are based on conclusory allegations of imprudence unsupported by anything other than hindsight.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court explained that plaintiffs are not entitled to proceed with a complaint asserting claims that are merely conceivable or possible; instead, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs have failed to meet that burden here under any of the theories they have put forth.

---

[1] *See BP Corp. N. Am. Inc. v. N. Trust Invs., N.A.*, 2008 WL 5263695, at *1 (N.D. Ill. 2008) (Ex. W-1) ("[A]fter nearly a year of stress caused by concerns over residential lending, Lehman Brothers declared bankruptcy, Bank of America acquired Merrill Lynch, and the government bailed out AIG. Shortly thereafter, the stock market plummeted and the credit markets seized up."); *In re The Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 185 n.3, 195 (S.D.N.Y. 2009) (the Lehman bankruptcy "brought the financial markets to a standstill" and caused "some of the most cataclysmic failures in our economic history").  All unreported cases are appended hereto as Exs. W-1 through W-3.

## BACKGROUND

### *Plaintiffs' Securities Lending Activity*

NTC has for many years operated a multi-billion dollar securities lending program, arranging loans of securities owned by NTC customers and sponsored funds to pre-approved borrowers, who use the securities for a variety of purposes. The borrowers put up collateral equal to 102% of the market value of the loaned securities, typically in cash. Complt. ¶ 25. NTC then invests the cash in fixed-income securities, which pay interest, generating revenue for the participants in the program. Complt. ¶ 23. When the loans are terminated, the collateral is returned to the borrowers, who may also receive an additional payment or "rebate" as compensation for the use of the collateral. To generate positive securities lending revenue for its clients, NTC must invest in fixed-debt instruments that bear a higher average rate of interest than the rebates paid to borrowers. Complt. ¶ 26. As is customary, NTC's fees for acting as securities lending agent are based on a percentage of the net revenues realized from securities lending activity — that is, the interest earned on collateral minus rebates paid to borrowers. *Id.*

NTC has both direct and indirect participants in its securities lending program. Direct participants lend their own securities pursuant to individually negotiated agreements. Complt. ¶ 28. Direct lenders may choose to invest their collateral in a number of collateral sections or pools that NTC offers; each pool has its own collateral investment guidelines, which describe what types of fixed-income investments are permissible, what ratings are required, and what types of maturities are allowed. *Id.*; *see also* Exs. A & B.[2] Direct lenders also have the option of

---

[2] Defendants have submitted along with this memorandum documents that are partially quoted in the complaint, as well as the documents that govern the parties' relationships, including the relevant SLAAs and custody agreements. The Court can and should consider all of these documents in ruling on the motion to dismiss because there can be no dispute as to the authenticity of the documents and they are referred to in the complaint, whether directly or indirectly, and are central to plaintiffs' claims. *See*

creating their own customized investment guidelines. *See* Ex. C, at 4-5; Ex. D, at 14; Ex. E, at 14. NTC negotiates fee arrangements individually with direct lenders. Complt. ¶¶ 26, 31.

Indirect participants, by contrast, do not lend their own securities. Instead, they invest in a variety of stock and bond funds sponsored by Northern Trust Global Investments ("NTGI"), and it is those "commingled funds" that lend the funds' securities. Complt. ¶ 29. NTI is the trustee of these funds, which are typically index funds that buy and sell securities in a way that is designed to replicate the performance of a particular index. Complt. ¶¶ 20, 30. In its capacity as trustee of the commingled funds, NTI entered into a Securities Lending Authorization Agreement ("SLAA") with NTC pursuant to which NTC acts as the securities lending agent for the funds that engage in lending. Complt. ¶¶ 30-31; *see also* Exs. F & G. NTI selected Core USA as the collateral section for some of the funds; for others, it chose a custom collateral pool consisting of investments in the NTGI Collective Short Term Extendable Portfolio ("STEP") and the NTGI Collective Short Term Investment Fund ("STIF"). *See* Ex. F, at 2-3, 17-20. NTI also agreed that the funds in which plaintiffs invested would pay NTC a fee for its services equal to 40% of net securities lending revenue. Complt. ¶ 31.[3]

There are four plaintiffs in this action, all of which are large, sophisticated government pension plans, which collectively manage billions of dollars worth of investments. Complt. ¶¶ 16-19. One of the plaintiffs — City of Pontiac General Employees Retirement System ("Pontiac General") — is a direct lender only. Pontiac General entered into an SLAA with NTC in 2007 and selected Core USA as its collateral section. Complt. ¶ 19; *see also* Ex. E, at 14.

Plaintiff City of Pontiac Policemen's & Firemen's Retirement System ("Pontiac Police &

---

*Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

[3] The SLAA between NTI and NTC provides that the fee would be 25% for Enhanced EAFE Funds, 35% for International Funds, and 40% for all other funds. *See* Ex. F, at 21.

Fire") entered into an SLAA in 2007, also choosing Core USA. Complt. ¶ 18; *see also* Ex. D, at 14. In 2004, Pontiac Police & Fire had entered into a Collective Fund Custody Agreement ("CFCA") with NTI pursuant to which it invested in three different commingled lending funds: the NTGI-QM Collective Daily Russell 1000 Growth Index Fund – Lending; the NTGI-QM Collective Intermediate Government/Credit Bond Index Fund – Lending; and the NTGI-QM Collective Daily Russell 1000 Value Fund – Lending. Complt. ¶ 18; *see also* Ex. I, at 2; Exs. J-L. The Pontiac Police & Fire CFCA expressly provides (in ¶ 8) that NTC will act as securities lending agent for the funds and states that "[a]s compensation for such services, the Retirement System authorizes the payment by any Lending Fund in which Retirement System assets are invested of a monthly fee equal to 40% of the securities lending revenue earned by such Lending Fund," net of rebate payments. Ex. H, at 4.

Like Pontiac Police & Fire, the Public School Teachers' Pension & Retirement Fund of Chicago ("CTPF") is both a direct and indirect lender. Complt. ¶ 17. CTPF entered into a Securities Lending Agreement with NTC in 1990. Ex. C. During the period at issue here, CTPF created its own custom collateral pool for cash collateral over which it retained the right to give investment directions. Ex. M, at 2, 8-9. In 2006, the Board of Trustees of the CTPF also entered into a CFCA with NTI pursuant to which it invested in the NTGI-QM Collective S&P Mid Cap 400 Equity Special Purpose Index Fund – Lending. Complt. ¶ 17; *see also* Ex. N, at 6; Ex. O. Like Pontiac Police & Fire, the CTPF Board of Trustees signed a CFCA in which it expressly authorized any lending fund in which it invested to pay NTC a fee for its services as securities lending agent equal to 40% of net securities lending revenues. Ex. N, at 3.

The last plaintiff — State of Louisiana Firefighters' Retirement System ("Louisiana Firefighters") — participated in NTC's securities lending program only indirectly. Louisiana

Firefighters entered into a CFCA with NTI in 2002 pursuant to which it invested in the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Index Fund – Lending index fund and the NTGI-QM Collective S&P 500 Equity Index Fund – Lending.  Complt. ¶ 16; *see also* Exs. P-R.  Like the other plaintiffs who invested in lending funds, in its CFCA the Louisiana Firefighters expressly authorized the payment by any lending fund in which it invested of a fee to NTC of 40% of net securities lending revenue.  Ex. P, at 3.

### *The Credit Markets Freeze*

In the fall of 2008, Lehman Brothers' bankruptcy triggered a series of events that adversely impacted securities lending programs like NTC's.  Both Core USA and STEP held fixed-income securities issued by Lehman, which defaulted when Lehman declared bankruptcy.  Complt. ¶¶ 80, 96.  Shortly thereafter, Sigma and Theta, structured investment vehicles or "SIVs" in whose securities STEP had invested, failed, resulting in another impairment.  Complt. ¶ 95.  Other fixed-income securities held in the collateral pools also declined in value as credit markets froze, creating a gap between the market value of the assets the pools held and the amount necessary to ensure repayment of all borrowers when loaned securities were returned.  Complt. ¶ 80.[4]

NTC and NTI took a number of steps to protect and support their clients in response to this crisis.  On September 18, NTC declared a Collateral Deficiency in Core USA, posting a payable (which was allocated *pro rata* to the participants in that pool) sufficient to cover the

---

[4]  Since September 2008, there have been additional realized losses in the collateral pools as a result of asset sales.  Complt. ¶¶ 111-13.  In 2009, Core USA and STEP realized losses when they sold fixed-income securities issued by CIT Corp.  Complt. ¶¶ 111-12.  Realized losses were also incurred as a result of investments in fixed-income securities issued by Sallie Mae, Capmark Financial, and Greenpoint Mortgage.  Complt. ¶ 113.

shortfall between the market and book values of the assets held by Core USA. Complt. ¶ 96.[5] At the same time, NTC voluntarily contributed a total of $150 million to securities lending clients who had invested directly or indirectly in certain collateral pools, including Core USA, and pledged a 20% reduction in fees for the next year. *See* Affidavit of Nancy Giraldi in Support of Defendants' Motion to Dismiss Certain Claims Pursuant to Rule 12(b)(1), ¶ 10.[6]

In September 2008, NTC also instituted withdrawal safeguards that allowed direct participants in its securities lending program to exit the program, but only in ways that avoided the risk of a catastrophic run, ensured that the collateral pools would retain the liquidity necessary to repay borrowers' collateral, and enabled NTC to treat all participants equitably. Complt. ¶ 106; *see also BP Corp.*, 2008 WL 5263695, at *2 & n.2. NTI imposed similar safeguards governing client redemptions from the commingled lending funds. Complt. ¶ 107; *see also BP Corp.*, 2008 WL 5263695, at *2 & n.2. Ordinary course transactions, including redemptions and withdrawals to fund benefit payments, continued as before. Notably, plaintiffs do not claim that they attempted to exit either the securities lending program or the commingled lending funds at any relevant point in time, nor do they contend that they were ever deprived of the ability to pay benefits or to make withdrawals for other ordinary course transactions.

### *Plaintiffs' Claims*

Plaintiffs assert three claims under three different legal theories — breach of fiduciary duty (Count I), breach of contract (Count II), and breach of an alleged contractual duty of good faith and fair dealing (Count III). Plaintiffs' first claim challenges the securities lending fees

---

[5] Plaintiffs allege in ¶ 96 that NTC also declared a Collateral Deficiency to recognize a decline in the market value of the securities held in STEP. However, as the STEP declaration explains, market values of the assets in that fund automatically flow through the daily calculations of its net asset value. *See* Ex. B, at 3.

[6] As demonstrated in defendants' 12(b)(1) motion, when NTC's contribution and the reduction in fees is taken into account, the two Pontiac entities (like many others) incurred no investment losses from their direct participation in securities lending.

6

paid by the commingled lending funds on the theory that NTI should have negotiated a fee lower than 40% with NTC. Plaintiffs' other claims seek recovery of investment losses they allegedly suffered as a result of impairments or below-par sales of fixed-income securities held by the collateral pools.[7] One theory plaintiffs advance for holding NTC liable for these losses is that NTC should have invested collateral only in very short-term and extremely conservative (and therefore low-yielding) instruments, but invested instead in longer-term, "risky" securities in order to increase the fees it received for acting as securities lending agent. Plaintiffs' other theory is that NTC should have foreseen the collapse of the credit markets and either should have avoided investing in particular securities or should have sold those securities at a loss prior to September 2008. For the reasons outlined below, all of these claims should be dismissed.

## ARGUMENT

### I.  Having Expressly Authorized Payment Of A 40% Fee, Plaintiffs Cannot Maintain An Action For Damages On The Theory That The Fee Should Have Been Lower.

Plaintiffs allege that NTI violated contractual and fiduciary duties to participants in its commingled lending funds by agreeing to pay NTC a 40% fee for its services as lending agent. Complt. ¶¶ 133, 145, 150-51. Plaintiffs do not claim (nor could they) that a 40% fee was unreasonable or that it was higher than customary fees charged by securities lending agents in similar programs. Instead, they base their claim entirely on the fact that NTC negotiated lower fees with some direct lenders. Complt. ¶ 31. A fundamental flaw in this argument is that NTI was not secretly negotiating fees with its affiliate. On the contrary, NTI not only disclosed the

---

[7] Plaintiffs also criticize other actions NTC allegedly took, but plaintiffs do not appear to be basing any claim on those actions. For example, plaintiffs vaguely allege that at some undefined point in time NTC improperly redirected securities lending revenues to offset realized losses. Complt. ¶¶ 28, 114. But plaintiffs do not say whether they themselves were affected. Plaintiffs also seem to be criticizing NTC and NTI both for imposing withdrawal safeguards in September 2008 after the credit markets collapsed and for failing to do so earlier. Complt. ¶¶ 106-10. But apart from asserting that these actions increased their losses, plaintiffs do not dispute defendants' right to impose withdrawal safeguards.

fee in the Fund Declarations for each lending fund, but also obtained the explicit authorization of each of the three plaintiffs who invested in lending funds to pay a 40% fee. *See* Ex. H, at 4; Ex. J, at 2; Ex. K, at 2; Ex. L, at 2; Ex. N, at 3; Ex. O, at 2; Ex. P, at 3; Ex. Q, at 2; Ex. R, at 2. As a matter of law, that authorization precludes plaintiffs from challenging the fees.

Plaintiffs have no claim for breach of contract based on the lending funds' payment of a 40% fee to NTC, since the governing contracts — plaintiffs' individual Collective Funds Custody Agreements — expressly authorized the payment of a 40% fee. Plaintiffs also cannot avoid the explicit terms of their agreements by invoking an implied duty of good faith and fair dealing. Under Illinois law, a duty of good faith and fair dealing is "used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. 1st Dist. 1993). It is "not an independent source of duties for contracting parties." *Gore v. Ind. Ins. Co.*, 876 N.E.2d 156, 162 (Ill. App. 1st Dist. 2007). When a contract is clear and unambiguous, a court cannot use the duty of good faith and fair dealing to alter its terms. *See Mid-West Energy Consults., Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 915 (Ill. App. 1st Dist. 2004).[8] Here, the contracts Pontiac Police & Fire, CTPF, and Louisiana Firefighters all signed with NTI could not have been clearer in authorizing the lending funds to pay NTC a 40% fee, and thus their fee claims under Counts II and III of the complaint fail as a matter of law.

That leaves only a breach of fiduciary duty as a basis for challenging the fees paid by the commingled lending funds. Such claims are subject to a five-year statute of limitations. *See*

---

[8] The CTPF and Louisiana Firefighters' CFCAs provide (in ¶ 11) that Illinois law governs. The Pontiac Fire & Police CFCA provides that Michigan law governs. Ex. N, at 4; Ex. P, at 4. Michigan law on the implied covenant of good faith and fair dealing is the same. *See, e.g.*, *Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp. 2d 837, 852 (E.D. Mich. 1999) ("Under Michigan law, this implied covenant does not override the express terms of the parties' contract, and cannot form the basis for a claim independent of that contract.").

*Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1337 (7th Cir. 1992) (citing 735 ILCS 5/13-205). That statute of limitations bars Louisiana Firefighters and Pontiac Fire & Police from challenging the fees paid by the funds in which they invested, since they entered into CFCAs authorizing the 40% fee in 2002 and July 2004, respectively, more than five years before this lawsuit was filed on November 17, 2009.

In any event, the fact that all of the plaintiffs specifically authorized the fees at issue precludes all of them from asserting a breach of fiduciary duty claim. Under Illinois law, a beneficiary can "consent[] to an act or omission by his trustee, even one that is a breach of trust." *Lambos v. Lambos*, 292 N.E.2d 587, 590 (Ill. App. 1st Dist. 1972) (citing 3 *Scott on Trusts* § 216 (3d ed. 1967)). Consent cuts off any claims so long as the beneficiary "is competent, has full knowledge of the relevant facts, knows his legal rights and his consent is not induced by any other improper conduct of the trustee." *McCormick v. McCormick*, 536 N.E.2d 419, 430 (Ill. App. 1st Dist. 1988) ("As a general rule, a beneficiary of a trust who consents to or approves of an act, omission or transaction by a trustee, may, upon grounds of waiver or estoppel, be precluded from subsequently objecting to the impropriety of such act, omission or transaction."); *accord Hughes v. LaSalle Nat'l Bank, N.A.*, 419 F. Supp. 2d 605, 617-18 (S.D.N.Y. 2006) (applying Illinois law: "no breach of fiduciary duty, including one where recovery under the theory of unjust enrichment is sought, can be alleged if the plaintiff consented to the action taken by the fiduciary."), *vacated on other grounds*, 2007 WL 4103680 (2d Cir. 2007); *Mahle v. First Nat'l Bank of Peoria*, 610 N.E.2d 115, 117 (Ill. App. 3d Dist. 1993); *Bank of Ill. in Mt. Vernon v. Bank of Ill. in Mt. Vernon*, 300 N.E.2d 507, 509 (Ill. App. 5th Dist. 1973) (rejecting claim that bank engaged in self-dealing "because the acts were specifically authorized by the beneficiary").

The Seventh Circuit has noted that, where fees are concerned, the "rule in trust law is

straightforward: A trustee owes an obligation of candor in negotiation, and honesty in performance, but may negotiate in his own interest and accept what the settlor or governance institution agrees to pay." *Jones v. Harris Assocs. L.P.*, 527 F.3d 627, 632 (7th Cir. 2008). Thus, "[t]he existence of the fiduciary duty does not imply judicial review for reasonableness; the question a court will ask, if the fee is contested, is whether the client made a voluntary choice *ex ante* with the benefit of adequate information." *Id*. at 633.[9] Plaintiffs here do not claim that they lacked full knowledge of the relevant facts when they authorized the securities lending fee in their respective CFCAs. Accordingly, their consent precludes plaintiffs from challenging the fees paid by the commingled lending funds to NTC in its capacity as lending agent.

## II. Plaintiffs Have Failed To State A Claim Based On The Theory That NTC Improperly Structured The Collateral Pools.

Plaintiffs acknowledge that under the terms of the SLAAs, lenders are ordinarily responsible for any principal losses that may be suffered if a fixed-income security purchased for the collateral pools defaults or is sold below book value. Complt. ¶ 30.[10] However, plaintiffs seek reimbursement from NTC for any principal losses they suffered on the theory that the collateral pools were structured in a way that was *per se* imprudent. Plaintiffs allege that collateral pool investments should have been limited to extremely short-term, highly conservative and therefore low-yielding fixed-income securities that presented little or no risk of default. Complt. ¶ 126. They contend that NTC instead invested in "risky," longer-term securities in the hope of generating larger interest payments and thus increased securities lending revenues for itself, secure in the knowledge that it would never have to share in any principal

---

[9] The decision in *Jones* was reversed in *Jones v. Harris Associates L.P.*, 130 S. Ct. 1418 (2010), on the ground that the Seventh Circuit had misinterpreted the fee provisions of the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.* Nothing in the Supreme Court's opinion, however, casts doubt on Chief Judge Easterbrook's reading of the common law with respect to fiduciary fees.

[10] Lenders must reimburse the collateral pool for any principal losses it suffers on its fixed-income investments so there will be sufficient principal to repay borrowers when loans are terminated.

losses. Complt. ¶ 132. Plaintiffs allege that NTC acted imprudently and also violated a fiduciary duty of loyalty and a contractual duty of good faith and fair dealing by supposedly preferring its own interests over its clients' interests. Complt. ¶¶ 132, 149.

As demonstrated below, plaintiffs' theory fails as a matter of law for two reasons. First, plaintiffs have failed to properly allege a conflict of interest arising out of the fee arrangement they themselves explicitly approved — let alone any basis for believing that NTC in fact improperly preferred its own interests. Second, the central premise of plaintiffs' theory — that collateral was improperly invested — is belied by the governing collateral guidelines.

### A.      Plaintiffs' Conflict Of Interest Allegations Fail As A Matter Of Law.

Plaintiffs' allegation that NTC's conduct was tainted by a conflict of interest is based on the assumption that NTC had no incentive at all to avoid principal losses because its fees were calculated based on net revenues, without any deduction for principal losses. But plaintiffs' assumption ignores the fact that if the interest payments the collateral pool receives decline because of defaults, so does NTC's fee. Moreover, if in any month interest received falls below the level needed to pay rebates to borrowers, the SLAAs require NTC to share in the losses incurred to pay borrowers. Ex. D, at 3; Ex. E, at 3; Ex. F, at 3. Under plaintiffs' own theory, that alone gave NTC a powerful incentive to choose investments that were likely to pay interest to maturity.

In addition, the SLAAs expressly provide that NTC would be liable for losses resulting from its negligence in performing the duties allocated to it with respect to collateral. Ex. D, at 3; Ex. E, at 3; Ex. F, at 3. That too makes it illogical to assume that NTC would deliberately sacrifice prudence for increased yields. Thus, when the fee arrangement is viewed in the context of the SLAA as a whole, it is apparent that it did not create a conflict of interest. On the

contrary, having a performance-based fee served to align the interests of NTC with those of its customers.  Indeed, if it did not, plaintiffs, who are sophisticated fiduciaries managing billions of dollars worth of investments (Complt. ¶¶ 16-19), would not have agreed to the arrangement.

This is enough, standing alone, to dispel any assertion of an inherent conflict of interest. But other allegations in the complaint make the assertion that NTC was unconcerned with the risk of principal losses utterly incoherent.  The complaint affirmatively alleges that NTC was reluctant to realize losses in 2008 because if customers could not be persuaded to pay the losses allocated to them, NTC supposedly would have been required to consolidate the assets of the collateral pool on its own balance sheet and to reflect all of the pool's investment losses on its own income statement.  Complt. ¶¶ 77-78.  But if, as plaintiffs allege, NTC had a strong incentive to avoid realizing losses in 2008, it necessarily follows that it would have had an equally strong incentive to avoid investing collateral in risky securities that were likely to lead to such losses.

In order to avoid dismissal, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  But when a complaint "stops short of the line between possibility and plausibility of 'entitle[ment] to relief'" (*Twombly*, 550 U.S. at 557) — that is, where a claim is merely "conceivable" and "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" (*Iqbal*, 129 S. Ct. at 1950-51) — it must be dismissed.  *Twombly*, 550 U.S. at 557.  Here, plaintiffs have failed to offer any plausible basis for their claim that NTC preferred its own interests to those of its customers.  Their unfounded speculation about NTC's motives based on the fee arrangements to

12

which plaintiffs themselves agreed does not give rise to a reasonable inference that NTC had an *incentive* to act contrary to their interests — let alone that it in fact did so.

Because plaintiffs have failed to properly allege any self-dealing on NTC's part, their claims for a breach of the duty of loyalty in ¶ 132 and for a breach of an alleged contractual duty of good faith and fair dealing in ¶ 149 should be dismissed.[11]

**B.      Plaintiffs' Claim That The Pools Were Improperly Structured Fails As A Matter Of Law In Light Of The Collateral Investment Guidelines.**

To the extent plaintiffs challenge the way in which the collateral pools were structured, their claims fail for another, independent reason — the investments were made in accordance with the written investment guidelines for each collateral pool.  Plaintiffs allege that "all of the Collateral Pools were to be invested in highly conservative, short-term investments designed to maintain liquidity," and that NTC violated its fiduciary and contractual duties by investing instead in what plaintiffs describe as "risky and long-term securities," including SIVs, asset-backed securities, and securities issued by entities that had exposure to asset-backed securities. Complt. ¶¶ 3-4. Putting aside plaintiffs' conclusory, self-serving characterization of such investments, their claim fails because plaintiffs completely ignore the fact that the investment guidelines for Core USA and STEP expressly *allowed* precisely these types of investments.[12]

---

[11] Count III should also be dismissed because it is duplicative of plaintiffs' contract claim.  As explained above (*supra*, at 8 & note 8), under both Illinois and Michigan law, there is no independent cause of action for breach of the duty of good faith and fair dealing.

[12] In ¶ 36 of the complaint, plaintiffs allege that NTC promised to comply with the Federal Financial Institutions Examination Council ("FFIEC") Supervisory Policy on Securities Lending, 62 Fed. Reg. 40816 (July 30, 1997), which they describe as requiring NTC "to invest the cash collateral in safe, liquid instruments." The FFIEC Supervisory Policy, however, was mentioned only in CTPF's agreement. *See* Ex. C, at 10.  Moreover, that Policy provides no guidance about how cash collateral *should be* invested.  Instead, it simply notes how cash collateral is "[g]enerally" invested, or was in 1997, when the Policy was issued.  *See* 62 Fed. Reg. at 40818.  Rather than establishing guidelines for the investment of cash collateral, the Policy instructs bank lenders that they "should establish written guidelines for selecting investments for cash collateral." *Id.* Since NTC did establish written investment guidelines for cash collateral, it complied with the FFIEC Policy.

In its SLAA, each direct lender (including NTI on behalf of the commingled lending funds) chose how cash collateral would be invested, whether in one of the collateral sections NTC offered or in a custom collateral pool. In so doing, the lender expressly "authorized" NTC, in its discretion, to "invest any cash Collateral . . . in any of the types of eligible investments described in the Collateral Schedule for that Collateral Section and . . . otherwise to act with respect to Collateral in compliance with the Collateral Schedule for the [chosen collateral pool] as then in effect." *See, e.g.*, Ex. F, at 2. All of the collateral investments at issue here were either in Core USA or STEP. Complt. ¶¶ 16-19, 23.[13] Thus, it is the Core USA Collateral Schedule and the STEP Fund Declaration that establish the parameters for structuring the collateral pools. Plaintiffs partially quote those documents in ¶¶ 42 and 43 of the complaint, but they conveniently leave out the most important parts. For example, plaintiffs quote the statement in the STEP Declaration describing it as an "ultra short duration total return fund that attempts to outperform high grade, short term money market instruments." Complt. ¶ 42. But they leave out the warning a few lines later that states that STEP is "not an appropriate investment for those whose primary objective is absolute stability of principal" and that it is "recommended that investors have a minimum time horizon of 1 year." Ex. B, at 1, ¶ 1.

Moreover, plaintiffs ignore the fact that the STEP Fund Declaration expressly allows the kinds of investments that plaintiffs now contend should have been out-of-bounds, including "[m]ortgage and other asset backed securities" and a wide variety of other types of securities. *Id.* at 1-2, ¶ 3. The Fund Declaration also made clear that STEP would not be invested entirely in very short-term instruments, noting that "[t]he Fund has no final maturity restriction on

---

[13] STEP was not in fact used as a collateral pool; instead, custom collateral pools were created using a blend of units in STIF and STEP. Ex. F, at 3, 18-20; Ex. M, at 2, 8-9. However, plaintiffs complain only about STEP's performance. Plaintiffs also refer to other collateral pools, but none of the named plaintiffs alleges that it invested, either directly or indirectly, in any pools other than Core USA and STEP.

individual securities." *Id*. at 2, ¶ 4. Although STEP would "seek to maintain a dollar weighted average maturity" of "not more than 150 days," the term "maturity" was defined to mean either the date when interest rates reset or when the principal could be recovered by demand or an optional put. *Id*. The Declaration also explained the credit quality requirements that had to be met at the time of purchase: commercial paper and other short-term obligations had to be rated in the two highest categories; "bonds and other long-term obligations" had to be rated investment grade. *Id*. at 2, ¶ 5.

Significantly, plaintiffs do not allege that any of the securities NTC purchased for STEP violated these specific guidelines at the time they were purchased. Nor do they claim that Core USA was invested in a manner that was contrary to its own specific investment guidelines. Those guidelines stated that Core USA sought "to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity by investing cash Collateral of this section in accordance with the guidelines stated below." Ex. A, at 2. In the portion plaintiffs quote (¶ 43), the guidelines "emphasize liquidity and principal preservation as prime objectives," but plaintiffs leave out the warning that immediately follows — that "[t]here can be no assurance that these objectives will be attained." *Id*. The guidelines also explain that "[w]ithin quality, maturity, and market sector diversification guidelines, investments are made in those securities with the most attractive relative yields." *Id*.

The list of eligible securities in Core USA included a variety of instruments, such as "[a]sset-backed securities, including mortgage-backed securities," all types of commercial paper, bank deposits, money market funds and the like. *Id.* at 2-3. Sixty percent of the investments were allowed to have a maturity (again defined to include the interest rate reset date or date when principal can be recovered) exceeding 97 days. *Id*. at 4. Longer term instruments were not

prohibited, as plaintiffs imply. In fact, floating rate instruments could have a final maturity of 60 months (subject to a 15% cap on those exceeding 36 months), while other securities had to have a maturity date or demand feature not exceeding 18 months. *Id*. Commercial paper and other short-term obligations had to be in the highest rated category when purchased, while "bonds and other long-term obligations" had to be rated when purchased in one of the three highest rating categories. *Id*. at 3.

As sophisticated fiduciaries investing billions of dollars of pension assets, plaintiffs must have been aware of these investment guidelines. Indeed, the three plaintiffs who were direct investors specifically *chose* how their collateral would be invested. The two Pontiac entities chose Core USA and expressly agreed to the Core USA guidelines that were then in effect, which were attached as an exhibit to their SLAAs. *See* Ex. D, at 14; Ex. E, at 14. And plaintiff CTPF had its own custom fund for collateral, which it designed and controlled. Ex. M, at 2, 8-9. Under these circumstances, plaintiffs cannot argue now — in the clear light of hindsight, after they allegedly suffered losses — that the guidelines were somehow inappropriate for the investment of securities lending collateral.

NTC cannot be held liable for either a breach of fiduciary duty or breach of contract for following the investment guidelines that were established when the lending relationship began. *See Guerrand-Hermes v. J.P. Morgan & Co.*, 769 N.Y.S.2d 240, 242-43 (App. Div. 2003) (ordering dismissal of breach of fiduciary claim where defendant complied with investment guidelines); *see also The Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of N.Y. Mellon Corp.*, 2010 WL 1558587, at *6-*7 (S.D.N.Y. 2010) ("*BNY Mellon*") (Ex. W-2) (dismissing complaint against securities lending agent where, among other things, the facts alleged did not show a deviation from the governing collateral investment guidelines). Because plaintiffs

have not — and cannot — allege that NTC violated the applicable investment guidelines when it purchased securities for Core USA and STEP, their claim that those pools were structured in violation of NTC's contractual or fiduciary duties fails as a matter of law.

### III. Plaintiffs' Claims That Collateral Was Imprudently Invested And Managed Fail As A Matter Of Law.

Plaintiffs also contend that NTC acted imprudently by either investing in or failing to sell the particular securities that resulted in realized losses after September 2008. Alternatively, plaintiffs claim that at some point in 2007 NTC should have foreseen the coming storm and restructured *all* of its collateral pools to meet the profile plaintiffs now contend, with hindsight, would have avoided the losses they suffered. Both of these claims fail as a matter of law.

#### A. Plaintiffs' Allegations With Respect To Particular Securities Fail.

##### 1. Plaintiffs Offer No Plausible Basis For Their Claim That NTC Should Have Known That Lehman Brothers Was Likely To Fail.

Plaintiffs claim that NTC was negligent in either purchasing or not selling securities issued by Lehman Brothers that defaulted when Lehman unexpectedly filed for bankruptcy on September 15, 2008. Plaintiffs do not contend that the Lehman securities violated the applicable collateral investment guidelines when they were purchased. Instead, their argument seems to be that NTC should have sold the Lehman securities at some unidentified point in time before September 15, 2008, even if it was required to realize a loss to do so.

The same argument was made and rejected in *BNY Mellon*, where the court dismissed claims that another securities lending agent (BNY Mellon) acted imprudently by investing cash collateral in Lehman notes. As here, the notes were debt securities, which were expected to be paid in full so long as Lehman remained in business. Thus, in deciding whether plaintiffs had sufficiently alleged that BNY Mellon's retention of the Lehman notes was imprudent, the court

framed the issue as whether plaintiffs had offered "any factually supported assertions that Defendants 'actually or constructively knew about Lehman's imminent collapse.'" 2010 WL 15558587, at *6. The court held that plaintiffs had failed to meet that burden.

Like plaintiffs here, the plaintiffs in *BNY Mellon* alleged that Bear Stearns' near-collapse should have alerted securities lending agents in the spring of 2008 that Lehman would be next. *See* Complt. ¶ 86. In rejecting that argument, the district court noted that the very same news articles that speculated on the possibility that Lehman might suffer a run like Bear Stearns also contained "pro-Lehman" commentary, noting that Moody's had reaffirmed its ratings on Lehman and that independent analysts were predicting that Lehman would weather the storm. *Id.*

Plaintiffs argue that NTC should have known better because it should have figured out that Lehman had misrepresented the extent of its exposure to mortgage-backed securities. In support, they cite a speech given in May 2008 by a hedge fund manager challenging statements that Lehman's CFO had made and a June 2008 analyst report suggesting that Lehman had not been completely forthcoming. Complt. ¶ 97. But plaintiffs offer no reason why NTC should have credited charges made by a hedge fund manager who specialized in short-selling, rather than statements made by Lehman's CFO. And the June 10, 2008 analyst's report plaintiffs cite predicted that Lehman stock, which was then trading at almost $30 per share, would rise in the second half of 2008 to the $33-34 range. Ex. S, at 1. That is hardly the kind of performance that would suggest to an outsider like NTC that the company was in imminent danger of collapsing and defaulting on all of its debt. As the Seventh Circuit observed in *Summers v. State St. Bank & Holding Co.*, "it would be *hubris* for a trust company . . . to think it could predict [an issuer's] future more accurately than the markets could" and "preposterous" for a plaintiff "to challenge the market's valuation." 453 F.3d 404, 408 (7th Cir. 2006). Indeed, if the *market* had

understood that Lehman was about to collapse and would not be rescued, as Bear Stearns had been, NTC could not possibly have protected the collateral pools by selling the Lehman securities because the market price of those securities would already have plummeted.

In *BNY Mellon*, the district court noted that it was "'theoretically conceivable'" that BNY Mellon "should have known about Lehman's precarious financial condition," but that "the *Twombly* decision argues against crediting this type of speculation." 2010 WL 1558587 at *6. Another court reached the same result in *In re Lehman Bros. Securities & ERISA Litigation*, 683 F. Supp. 2d 294, 301-03 (S.D.N.Y. 2010). In that case, participants in Lehman's own ERISA plan who suffered significant losses when Lehman's stock became worthless following its bankruptcy sued the plan fiduciaries on the theory that they must have been aware that Lehman was likely to fail and acted imprudently by continuing to allow employees to acquire and hold Lehman stock. Relying on *Twombly* and *Iqbal*, the court granted the defendants' motion to dismiss because plaintiffs had failed to offer any factual basis for their claim that Lehman's own plan fiduciaries should have known that bankruptcy was imminent. *Id.* Any claim that an *outsider* like NTC should have known what was likely to happen is even less plausible.

## 2. Plaintiffs Offer No Plausible Basis For Their Claim That NTC Should Have Known That Sigma And Theta Were Likely To Fail.

Plaintiffs also allege that NTC was imprudent for investing STEP assets in securities issued by two structured investment vehicles, Sigma and Theta, which defaulted shortly after Lehman's bankruptcy. Complt. ¶¶ 98-105. Plaintiffs argue that SIVs were inherently inappropriate for collateral investments and that these SIVs were particularly vulnerable because they were not sponsored by a major bank. Complt. ¶ 90. But plaintiffs do not and could not allege that securities issued by SIVs were outside the broad range of investments permitted in STEP. Nor do they allege that these securities did not have acceptable credit ratings. Indeed,

plaintiffs' own articles point out that the SIVs had the highest possible rating (AAA) and that their securities were purchased by, among others, money market funds. Even by April 2008, when Sigma was downgraded by the rating agencies, its ratings fell only from AAA to AA– (Standard and Poor's) and A2 (Moody's), still comfortably within the STEP guidelines and above investment grade. Ex. T, at 1.

Furthermore, the very articles plaintiffs cite note that, while money market funds were running off their Sigma exposure as notes matured, they were not actively trying to sell or expressing concern about a risk of default. In an April 2008 article quoted in ¶ 101, a spokeswoman for Fidelity, which held $2.7 billion in Sigma senior debt in its money funds, was quoted as saying that the securities represented "minimal credit risk." Ex. U, at 3. And Federated, described as the fourth largest U.S. manager of money market funds, responded to an email about the Moody's downgrade by stating that it remained comfortable with its $1.25 billion investment in Sigma. *Id.*

Under these circumstances, just as in the Lehman situation, plaintiffs' one-sided survey of newspaper articles does not provide any basis for inferring that NTC knew or should have known at any relevant point in time that Sigma was in imminent danger of collapse.

### 3. Plaintiffs Provide Almost No Information About The Other Securities That Resulted In Realized Losses.

Plaintiffs also allege that Core USA and STEP suffered losses as a result of securities issued by CIT Corp., Sallie Mae, Greenpoint Mortgage, and Capmark Financial. Complt. ¶¶ 80-111-13. But the complaint offers little or no analysis as to why NTC supposedly should have realized that it was imprudent either to buy or hold these securities. Plaintiffs describe these instruments as "long-term" securities because they did not mature until 2010 and, in the case of Sallie Mae, until October 2011. Complt. ¶¶ 47, 80. But since these maturities were permissible

under the investment guidelines for the collateral pools, plaintiffs cannot claim that it was imprudent to invest in them simply because of their duration.

Apart from that criticism, plaintiffs' allegations about these securities are sketchy at best. *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2008) (under *Twombly*, a complaint must be dismissed where the allegations are "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8"). All they say about Sallie Mae is that it was a student loan company that in January 2008 disclosed $750 million in loan losses. Complt. ¶ 113. That single fact does not provide any basis for inferring that in January 2008 the Sallie Mae securities the collateral pools held were in danger of default, or that the securities could have been sold at a price better than NTC ultimately received for them. The same is true of Capmark and Greenpoint Mortgage. All plaintiffs allege as to those issuers is that Capmark was a mortgage and real estate investment firm and that Greenpoint issued mortgage-backed securities. *Id.* This is precisely the kind of "unadorned, the-defendant-unlawfully-harmed-me accusation" that is insufficient to state a claim under *Iqbal*. 129 S. Ct. at 1949 ("'[A] formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 557)).

With respect to CIT Corp., plaintiffs fail to explain how or why NTC supposedly should have known that the CIT securities the pools held were in imminent danger of default, either when it purchased CIT securities or at some point in time when it could have sold them at a higher price than it ultimately obtained. Plaintiffs allege that in the last half of 2007, CIT reported $1.5 billion in write-downs, charges, and provisions with respect to its portfolio of subprime mortgage loans and that it disposed of that portfolio by mid-2008. Complt. ¶ 111.

That CIT had write-offs and loan provisions of that magnitude, however, says nothing about its size and strength, let alone the likelihood that it would survive to pay off the debt it had issued.

### B. Plaintiffs' Theory That NTC Should Have Restructured The Collateral Pool Investments Before September 2008 Also Fails As A Matter Of Law.

Plaintiffs also claim that, even if the collateral pool investments were not *per se* inappropriate for a securities lending program when they were purchased, prudence required NTC to restructure the pools at some point before September 2008.[14] Plaintiffs allege that it "should have been clear" to NTC "by mid-2007 that the subprime mortgage collapse implicated a broad array of investments held in the Collateral Pools" and they contend that NTC should have sold all of the long-term assets in the pool, as well as all asset-backed securities and securities issued by any issuer with exposure to asset-backed securities. Complt ¶¶ 73, 75-76. Plaintiffs recognize that, in response to stress in the credit markets in the summer of 2007, NTC began building liquidity in Core USA and STEP by allowing longer-term instruments to mature and then reinvesting the proceeds solely in very short duration instruments such as money markets, treasuries and agency securities. Complt. ¶ 83. But they argue — again in hindsight — that NTC did not do enough to protect the collateral pools from losses.

There are a number of fatal flaws in this wholly conclusory claim. First and foremost, plaintiffs do not allege any factual basis for their assertion that NTC *could have* prudently restructured its collateral pool investments in the summer of 2007 — notwithstanding the

---

[14] In ¶ 95 of their complaint, plaintiffs criticize NTC for allegedly refusing to divest the collateral pools of "impaired securities" after September 2008. Plaintiffs do not identify what securities they believe were impaired. Nor do plaintiffs allege that these unidentified securities could have been sold in September 2008, when the credit markets had come to a screeching halt, at a price better than NTC ultimately got for them. These vague and unsubstantiated allegations are not nearly enough to state a claim for imprudence for the period after September 2008. *See In re Constellation Energy Group, Inc., ERISA Litig.*, 2010 WL 3221821, at *6 (D. Md. 2010) (Ex. W-3) (dismissing ERISA claim against fiduciary for losses suffered when Constellation's stock fell following the unexpected bankruptcy of Lehman because "once the bankruptcy was announced, it would have been imprudent for the defendants to divest immediately, when Constellation stock was at its lowest price").

difficulties the credit markets were already experiencing — by selling all of the types of assets plaintiffs now claim were inappropriate.  Nor do plaintiffs offer any plausible basis for their assertion that they would have been better off today had such a wholesale restructuring been undertaken in the summer of 2007. Plaintiffs acknowledge that selling off large amounts of assets in 2007 would have resulted in losses.  Complt. ¶ 78.  Plaintiffs do not allege any facts showing that the principal losses would have been smaller had all long-term, asset-backed and financial institution securities been sold earlier rather than being held with the expectation that they would mature at par.  Moreover, the complaint affirmatively alleges that the kind of short-term, ultra-conservative investments plaintiffs now say NTC should have invested in would have offered much lower yields, and thus would have greatly diminished the securities lending revenue the cash collateral generated.  Complt. ¶¶ 54, 88.  Under these circumstances, there is no reason to believe that plaintiffs suffered any harm as a result of NTC's failure to carry out the kind of wholesale restructuring of Core USA and STEP that plaintiffs contend prudence required.

Second, plaintiffs' argument is based on the insupportable assumption that it was imprudent *per se* for NTC to hold fixed-income instruments that involved *any* risk and thus should have invested the billions of dollars in the collateral pool in something akin to Treasury bills.  The guidelines, however, demonstrate that participants in the securities lending program agreed to accept investment risk as a consequence of the investment of cash collateral in fixed-income securities.  Thus, even if, as plaintiffs allege, NTC understood at some point prior to September 2008 that a prolonged housing recession posed risks to the U.S. banking system and ultimately to the economy as a whole, that does not mean that it was imprudent to continue holding *any* securities issued by *any* banks or backed by *any* mortgages or other assets.  *See In re*

*MoneyGram Int'l Secs. Litig.*, 626 F. Supp. 2d 947, 970 (D. Minn. 2009) (complaint must "connect the general external market conditions" to specific securities in defendants' portfolio); *Landmen Partners Inc. v. The Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 544-46 (S.D.N.Y. 2009) (allegations that defendant knew of problems in the subprime residential market did not provide a basis for inferring that defendants should have foreseen difficulties in the commercial real estate market). The question is not whether holding such securities posed *some* risk of loss, but rather whether NTC knew or should have known — at a time when it could have sold the securities at a reasonable price — that a collapse of epic proportions was likely. It is only if this standard is met that plaintiffs would be able to show that it was imprudent to continue holding an entire portfolio of highly rated debt securities. *See BNY Mellon*, 2010 WL 15558587, at *6-*7.

Plaintiffs have not alleged any facts showing that NTC knew or should have known that a cataclysm was on the horizon. Plaintiffs cite a number of statements made by NTC economists about what *might* happen. *See, e.g.*, Complt. ¶ 62 (quoting a statement made on December 11, 2006, that "[i]f a prolonged housing bust ensues, banks could be in big trouble"). But they are unable to point to any predictions of an imminent disaster on the scale of what actually occurred — an unprecedented break-down in the credit markets, multi-billion dollar government bailouts, and a recession that rivals the Great Depression — let alone the kind of consensus view necessary to show that NTC knew or should have known that the kind of extreme action plaintiffs suggest was needed to protect the collateral pools.[15]

---

[15] In ¶ 87, plaintiffs partially quote an internal NTC document as stating in March 2008 that market conditions had "forced many large market participants to sell fixed-income securities at distressed prices" taking "the financial markets to the brink of a dramatic meltdown." But plaintiffs conveniently omit the portion of the analysis that states that notwithstanding market conditions, NTC's portfolio management team remained "comfortable with our exposure to various issuers in the mortgage business, as well as our holdings securitized by mortgage loans, and our Non Captive Finance, Banking and Broker positions." Ex. V, at 12. The memo goes on to state that "all of the securities held in STEP are expected

It is well settled that "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight." *DiFelice v. U.S. Airways*, 497 F.3d 410, 424 (4th Cir. 2007); *see also Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 454 (7th Cir. 1996) (court measures fiduciary duty "at the time [the fiduciary] engaged in the challenged transactions"); 760 ILCS 5/5(a)(2) ("[T]he prudent investor rule is a test of conduct and not of resulting performance."). As the Seventh Circuit famously said in *DeBruyne v. Equitable Life Assurance Society of the U.S.*, a fiduciary duty of care "requires prudence, not prescience." 920 F.2d 457, 465 (7th Cir. 1990); *accord Keach v. U.S. Trust Co.*, 419 F.3d 626, 638 (7th Cir. 2005); *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 853 (S.D. Ohio 2009) ("Defendants cannot be held to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA."). As a result, "20/20 hindsight musings are not sufficient to maintain a cause of action alleging a breach of fiduciary duty" based on the fact that investments underperformed. *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1230 (N.D. Cal. 2008); *see also Rubin v. MF Global*, 634 F. Supp. 2d 459, 474 (S.D.N.Y. 2009) ("Pleading by hindsight" is purely "speculative," and therefore does not satisfy the requirements of *Twombly* and *Iqbal*). Yet in this case hindsight is all plaintiffs can muster in support of their claims that NTC should have restructured its collateral pools in the summer of 2007.

## CONCLUSION

For the foregoing reasons, plaintiffs' amended complaint should be dismissed for failure to state a claim.

Respectfully submitted,

Dated: September 3, 2010

/s/ Michele Odorizzi
Michele Odorizzi

---

to mature at par," predicting that "much of the unrealized losses" that had been suffered over the past eight months would be recouped over the course of the next 21 months. *Id.*

MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Counsel for Defendants Northern Trust
Investments, N.A. and The Northern Trust
Company*