**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | The Hon. William T. Hart, *Judge Presiding.* Magistrate Judge Michael T. Mason |
| Plaintiffs, | ) ) | Case No. 09-CV-07203 |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS CERTAIN CLAIMS PURSUANT TO RULE 12(b)(1)**

Michele Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Counsel for Defendants Northern Trust
Investments, N.A. and
The Northern Trust Company*

Dated:  September 3, 2010

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") submit this memorandum in support of their motion to dismiss the direct lending claims asserted by plaintiffs City of Pontiac General Employees Retirement System ("Pontiac General") and City of Pontiac Policemen's & Firemen's Retirement System ("Pontiac Police & Fire"), on the ground that these plaintiffs suffered no loss from their direct lending activities and therefore lack constitutional standing to pursue those claims. Defendants also move to dismiss the claims asserted by the three plaintiff indirect lenders — Pontiac Police & Fire, the Public School Teachers' Pension & Retirement Fund of Chicago ("CTPF"), and the State of Louisiana Firefighters' Retirement System ("Louisiana Firefighters") — to the extent that they challenge the activities of commingled lending funds in which those plaintiffs never invested.

## INTRODUCTION

In order to have Article III standing, a plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986) (quotation marks and citation omitted). Pontiac General and Pontiac Police & Fire both allege that they suffered "losses" as a result of their direct securities lending activity because of NTC's claimed mismanagement of the collateral pool they selected (Core USA). Complt. ¶¶ 18-19.[1] But neither explains what those alleged losses consist of or makes any attempt to quantify them. In fact, as demonstrated below, although a collateral deficiency was declared in Core USA, neither Pontiac entity wound up incurring any loss because of it. Because neither suffered any loss arising out of NTC's investment of cash collateral in Core USA, their claims for alleged breaches of fiduciary

---

[1] As explained in greater detail below, there are both "direct" and "indirect" lenders in NTC's securities lending program. Complt. ¶¶ 28-29. Direct lenders lend their own securities. Complt. ¶ 28. Indirect lenders invest in commingled funds, and it is the commingled funds that lend their securities. Complt. ¶ 29.

duty, contract, and the duty of good faith and fair dealing arising out of their direct lending activity must be dismissed for lack of standing. Because Pontiac General has asserted only direct lending claims, it should be dismissed from the action.

The three remaining plaintiffs are all indirect participants in securities lending, through commingled lending funds. Plaintiffs invested in a total of just six of NTI's commingled lending funds. In their complaint, however, plaintiffs allege claims with respect to *all* of the more than fifty commingled lending funds sponsored by Northern Trust Global Investments ("NTGI") that engaged in lending activity. Complt. ¶¶ 29-30, 115. For the reasons outlined below, plaintiffs lack standing to complain about the management of any funds in which they did not invest. Accordingly, if the case were to proceed beyond the motion to dismiss stage, plaintiffs' claims would have to be limited to the six commingled lending funds in which they invested.[2]

## BACKGROUND

### *The Pontiac Plaintiffs' Claims*

As explained in greater detail in defendants' memorandum in support of its Rule 12(b)(6) motion, NTC acts as securities lending agent for its customers that choose to engage in lending. In its capacity as agent, NTC lends securities owned by its customers to qualified borrowers, who use the securities for a variety of purposes. Complt. ¶¶ 23-26, 28-29. The borrowers put up 102% of the value of the securities as collateral for the loan, typically providing cash. Complt. ¶ 25. NTC then invests the cash collateral as each securities lender directs. Complt. ¶¶ 28-29. NTC offers a variety of collateral pools with different investment guidelines. The collateral pools invest in fixed-income securities, which generate revenue for the lenders by paying interest. Complt. ¶ 26. When loans terminate, collateral is repaid to the borrower, in some cases

---

[2] Defendants have also filed concurrently with their Rule 12(b)(1) motion a motion to dismiss the entire amended class action complaint under Rule 12(b)(6) for failure to state a claim. If the Court grants defendants' 12(b)(6) motion, it need not consider defendants' standing arguments.

along with an additional amount (called a "rebate") to compensate the borrower for the use of the cash. Securities lenders make money on the spread between the interest the fixed-income securities in the pool generate and the rebates that are paid to borrowers. *Id.*

NTC's securities lending program generates billions of dollars worth of collateral which, over the years, has earned substantial revenues for customers who loaned their securities through the program. Complt. ¶¶ 22-23. These "direct" lenders enter into individually negotiated agreements with NTC. Complt. ¶ 28. In 2007, the two Pontiac entities entered into Securities Lending Authorization Agreements ("SLAAs") in which they directed NTC to invest the cash collateral generated by their securities lending activity in the Core USA Collateral Section. Giraldi Aff., Exs. A & B.[3] They both agreed that NTC would receive a fee for acting as their securities lending agent equal to 35% of the net securities lending revenue plaintiffs realized (that is, revenue generated by the collateral investments minus rebates paid to borrowers). Giraldi Aff., Ex. A, at 15 & Ex. B, at 15.

Under the SLAAs, the Pontiac entities agreed that if there were ever any principal losses in the fixed-income securities held by the collateral pool, whether because of a default or a drop in market value, they would make up their share of the shortfall, thus guaranteeing that there would be enough collateral in the pool to repay the borrowers in full. Giraldi Aff., Ex. A, at 3 & Ex. B, at 3. The mechanism established for covering principal losses was the declaration of a Collateral Deficiency by NTC. This was a mechanism that NTC had never been required to use

---

[3] "The law is clear that when considering a motion that launches a factual attack against jurisdiction, '[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quoting *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (internal quotation marks omitted)); *see also Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) (a "district court has not only the right, but the duty to look beyond the allegations of the complaint to determine [whether] it [has] jurisdiction to hear" a claim).

with respect to Core USA prior to September 2008, because historically virtually all of the fixed-income securities held by the collateral pools matured at par. Giraldi Aff., ¶ 3.

On September 15, 2008, however, Lehman unexpectedly declared bankruptcy. Core USA held notes issued by Lehman, which went into default because of the bankruptcy. Complt. ¶ 96; Giraldi Aff., ¶ 3. In addition, the cascade of events that followed Lehman's bankruptcy brought the credit markets to a screeching halt, causing the values of many securities held in Core USA and other collateral pools to fall. On September 18, 2008, NTC declared a Collateral Deficiency in Core USA and segregated the Lehman securities into a sub-fund. *See* Complt. ¶ 96; Giraldi Aff., ¶ 5. At that time, each participant in Core USA was given its *pro rata* share of the sub-fund, with the securities valued at 13 cents on the dollar. The remaining 87 cents was treated as a realized loss and folded into a larger Collateral Deficiency. Giraldi Aff., ¶¶ 3, 5. The remainder of the Collateral Deficiency was calculated based on the gap between the book and market values of the other assets held by Core USA. *Id.* ¶ 3. As the SLAAs required, the Collateral Deficiency was shared among the participants in Core USA based upon their percentage interest in the securities on loan as of September 18, 2008. *Id*. ¶ 6, Ex. A, at 3 & Ex. B, at 3.

Under the SLAAs, NTC could have required all of the lenders that used Core USA for their collateral to immediately pay for their share of the Lehman sub-fund, as well as their share of the Collateral Deficiency. *Id*. ¶ 6. But it did not do so. The bulk of the Collateral Deficiency was for unrealized losses — that is, "paper" losses that were due, not to defaults or sales, but rather to declines in market value. *Id.* ¶ 3. Those unrealized losses would be reversed if market values rebounded. Because it was hoped that all but the Lehman loss would be temporary, NTC posted a payable in each customer's account for its *pro rata* share of the amount that was due

4

(including the payment for the Lehman loss and the Lehman sub-fund), rather than requiring immediate payment. *Id.* ¶¶ 4-7.

At or about the time the Collateral Deficiency was declared, NTC announced that, in an effort to support affected clients, it would be voluntarily contributing $150 million to securities lending participants who were invested in pools that had suffered a collateral deficiency, including Core USA. *Id.* ¶ 10. Although NTC had not yet required participants to pay the payables they owed, it gave each participant its share of the $150 million support payment immediately, in cash. *Id.* In addition to providing this direct support, NTC also unilaterally waived a portion of its securities lending fees through September 2009, cutting its contractually agreed fees by 20%. *Id*. ¶ 11.

In 2009, Core USA realized another loss when NTC sold securities issued by CIT Group, Inc., at a price below book value. *Id.* ¶ 12. Once again, NTC did not immediately charge lenders for that loss; instead, it simply reclassified a portion of the existing payable from unrealized to realized loss. *Id.*

In September 2009, NTC announced that Core USA participants would be required to pay the portion of the payable that was attributable to realized losses by December 15, 2009. *Id.* ¶ 13. On that date, Pontiac General paid $150,793 to Core USA for its share of the pool's realized losses and Pontiac Police & Fire paid $58,820. *Id*. ¶¶ 14-15. These realized losses, however, were more than offset by each entity's respective share of NTC's 2008 cash contribution and by the benefit each received from the reduction in NTC's fees. Thus, although Pontiac General paid a total of $150,793 in realized losses, it had already received monetary benefits from NTC totaling $157,537. Similarly, Pontiac Police & Fire paid a total of $58,820 in realized losses, but had already received $60,989 in monetary benefits from NTC. *Id*. ¶ 16. So,

rather than losing anything, the Pontiac entities actually had a small net *gain* even after they paid the realized loss portion of the payable.

The same was true with respect to the Lehman sub-fund. In December 2009, plaintiffs' shares in that sub-fund were worth more than they were required to pay for them. Participants paid for their shares based on a valuation of 13 cents on the dollar, but by mid-December 2009 the value of the securities had risen to about 19 cents on the dollar. *Id.* ¶¶ 5, 17. Furthermore, by February 28, 2010, the value of the Lehman sub-fund securities had increased to over 22 cents on the dollar from the initial 13 cents that Core USA participants had paid to purchase that asset. *Id.* ¶ 18. Thus, once again, the Pontiac entities have each gained, rather than lost, because of the impairment of the Lehman securities.

Finally, the rebound the markets experienced later in 2009 caused the market value of the securities in Core USA to rise, making it unnecessary to maintain the unrealized loss portion of the Collateral Deficiency. As a result, at the end of November 2009, NTC was able to reverse approximately 77% of the unrealized loss portion of the payable. On March 15, 2010, NTC reversed the remainder, eliminating all of the outstanding payment obligations the Pontiac entities (and the rest of the Core USA participants) had to the collateral pool. *Id.* ¶ 20.

Thus, notwithstanding the declaration of a collateral deficiency, the Pontiac entities suffered no losses because of their participation in direct securities lending activity. In fact, they *gained* from NTC's careful management of the crisis that began in September 2008, while at the same time enjoying significant revenues from their continued securities lending activity. From January 1, 2008 through July 21, 2010, Pontiac General had $716,027 in net revenue from direct securities lending; during that time, Pontiac Police & Fire had $258,171 in net revenue. *Id.* ¶ 21.

*The Indirect Lending Claims*

NTC also serves as securities lending agent for more than fifty commingled funds sponsored by Northern Trust Global Investments ("NTGI") that engage in securities lending. Complt. ¶ 30. Three of the plaintiffs invested in only six of these funds. These "indirect lenders" seek damages against NTC and the funds' trustee (NTI) on the theory that (i) the funds in which they invested suffered losses because of their securities lending activity and (ii) NTI supposedly agreed to pay NTC too high a fee for its services as securities lending agent. Each of the six NTGI-sponsored funds in which the three plaintiffs invested had a different investment strategy. For example, the Louisiana Firefighters' Retirement System invested in the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Index Fund – Lending, which attempts to replicate the performance of the S&P's index of 400 Mid Cap stocks. Complt. ¶ 16. Pontiac Police & Fire, in turn, invested in the NTGI-QM Collective Daily Russell 1000 Growth Index Fund – Lending, which attempts to replicate the performance of its namesake benchmark index. Complt. ¶ 18. Although plaintiffs invested in only six funds, they purport to challenge defendants' conduct with respect to *all* of the NTGI-sponsored funds that engage in securities lending. Complt. ¶¶ 29-30, 115. For the reasons outlined in Part II below, plaintiffs lack standing to challenge defendants' conduct with respect to funds in which they did not invest.

**ARGUMENT**

**I.     The Pontiac Plaintiffs Lack Standing To Pursue The Claims Alleged
        In The Amended Complaint Based On Their Direct Lending Activity.**

"Article III standing requires an injury-in-fact capable of being redressed by a favorable decision of the court." *Bond v. Utreras*, 585 F.3d 1061, 1072 (7th Cir. 2009). To satisfy the injury-in-fact requirement, plaintiffs must show "'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or

hypothetical.' A particularized injury is one that affects the plaintiff in a 'personal and individual way.' Moreover, a plaintiff must properly allege such an injury for each claim they seek to assert." *Schultz v. Prudential Ins.*, 678 F. Supp. 2d 771, 782 (N.D. Ill. 2010) (citations omitted); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[T]he Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press."). "The party invoking federal jurisdiction bears the burden of establishing the elements of standing. . . . '[W]here standing is challenged as a factual matter, the plaintiff bears the burden of supporting the allegations necessary for standing with competent proof.'" *Perry v. Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999) (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 862 (7th Cir. 1996)); *accord Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009).

In this case, plaintiffs allege that NTC breached contractual and fiduciary duties by improperly investing cash collateral in fixed-income securities that plaintiffs say were too risky for a securities lending program. Plaintiffs claim that they suffered losses because of the Collateral Deficiency declared in Core USA and contend that NTC should be held liable for those losses because it imprudently selected the fixed-income securities that either defaulted (in the case of the securities issued by Lehman), were sold at a loss (in the case of the CIT Group securities) or experienced "paper" declines in market value. Complt. ¶¶ 80-82, 96.

For all of the reasons outlined above, however, the Pontiac plaintiffs in fact suffered no losses because of the Collateral Deficiency in Core USA. In addition to all of the revenue the Pontiac entities have continued to earn from lending their securities, they have already been compensated by NTC for more than their share of realized losses. Indeed, they actually *profited*

8

from their share of the Lehman securities and from the monetary assistance NTC provided.[4]

Since they were never required to pay any of Core USA's unrealized losses, which were fully

extinguished by the market recovery and the reversal of the Collateral Deficiency, plaintiffs have

no basis for complaining that they suffered any losses. Because these plaintiffs have no injury-

in-fact with respect to their direct lending claims, those claims should be dismissed for lack of

standing to assert them. *See Fishman Haygood Phelps Walmsley Willis & Swanson L.L.P v.*

*State Street Corp.*, 2010 WL 1223777, at *5-*8 (D. Mass. 2010) (Ex. A),[5] (dismissing complaint

by indirect lenders against securities lending agent on the ground that plaintiffs had not alleged

that they suffered any actual losses from securities lending activity and therefore had failed to

demonstrate that they had standing to sue for alleged breaches of duty with respect to

management of the collateral pools).

## II.    The Indirect Lenders Cannot Sue For Alleged Misconduct With Respect To The Commingled Lending Funds In Which They Did Not Invest.

The three plaintiffs who are indirect lenders invested in six different collective index

funds that engaged in securities lending: (i) the NTGI-QM Collective Daily Russell 1000 Growth

Index Fund – Lending; (ii) the NTGI-QM Collective Daily Russell 1000 Value Index Fund –

Lending; (iii) the NTGI-QM Collective Intermediate Government/Credit Bond Index Fund –

Lending; (iv) the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Index Fund – Lending;

(v) the NTGI-QM Collective S&P Mid Cap 400 Equity Special Purpose Index Fund – Lending;

and (vi) the NTGI-QM Collective S&P 500 Equity Index Fund – Lending. Complt. ¶¶ 16-18. In

addition to challenging defendants' conduct with respect to securities lending by these funds,

---

[4] The Pontiac entities also had the use of the cash support NTC provided and the additional revenue paid as a result of NTC's voluntary fee concessions *before* they were required to pay for either their share of the realized losses or the Lehman sub-fund.

[5] All unreported cases cited herein are appended hereto as Exs. A through F.

however, plaintiffs also purport to challenge defendants' conduct with respect to all of the other

commingled funds that engage in lending — over fifty funds in all. Complt. ¶¶ 29-30, 115.

Plaintiffs lack standing to bring any claims with respect to funds in which they did not

invest because there is no way they can ever show that any losses in those funds caused them an

injury-in-fact. Numerous cases make this point. For example, in *In re Lehman Bros. Securities*

*& ERISA Litigation*, the named plaintiffs in a proposed class action had invested in 9 out of 94

separate offerings of mortgage-backed securities, which they alleged were all conducted pursuant

to the same shelf registration. 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2010). Plaintiffs claimed

that all of the offerings involved the same alleged misstatements and that they could therefore

sue on behalf of all of the investors in all 94 offerings. The district court rejected this argument,

holding that plaintiffs lacked standing to complain about any of the 85 offerings in which they

did not participate because "none can have been injured with respect to these offerings." *Id*. at

490. The court also rejected plaintiffs' argument that standing was not an issue and that the only

question was whether they could adequately represent the class they had proposed. The court

noted that "[s]tanding is a threshold constitutional requirement that mandates an allegation of

injury traceable to the conduct of which plaintiffs complain. It cannot be dispensed with by

styling the complaint as a class action." *Id*.; *accord In re IndyMac Mortgage-Backed Secs.*

*Litig.*, 2010 WL 2473243, at *3 (S.D.N.Y. 2010) (Ex. B); *City of Ann Arbor Employees' Ret.*

*Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417, at *1, *7-*8 (E.D.N.Y. 2010)

(Ex. C). The same analysis necessarily applies here.

There is a long line of cases involving mutual funds that have reached the same result. In

*Hoffman v. UBS-AG*, the court held that "[p]laintiffs lack standing for claims relating to funds in

which they did not personally invest." 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008). The court

reached the same result in *Siemers v. Wells Fargo & Co.*, concluding that plaintiff lacked standing to pursue claim under § 36(b) of Investment Company Act of 1940 as to "funds other than those owned by plaintiff." 2006 WL 3041090, at *7-*8 (N.D. Cal. 2006) (Ex. D). In *In re Salomon Smith Barney Mutual Fund Fees Litigation*, the court dismissed for lack of standing claims arising out of the 68 funds in which no named plaintiff had an interest despite plaintiffs' argument that all of the investors in all of the funds were injured by a common scheme. 441 F. Supp. 2d 579, 604-08 (S.D.N.Y. 2006); *accord Nenni v. Dean Witter Reynolds, Inc.*, 1999 WL 34801540, at *2 (D. Mass. 1999) (Ex. E); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at *10 (S.D.N.Y. 2005) (Ex. F), *vacated on other grounds*, 2006 WL 74439 (S.D.N.Y. 2006). The same principle should apply here: plaintiffs lack standing to complain about any alleged misconduct with respect to lending funds in which they did not invest.

CONCLUSION

For the foregoing reasons, Pontiac General should be dismissed from the action and the direct lending claims asserted by Pontiac Police & Fire should be dismissed for lack of standing. In addition, any claims for alleged misconduct relating to commingled lending funds other than the funds in which the remaining plaintiffs actually invested should also be dismissed for lack of standing.

Respectfully submitted,

Dated: September 3, 2010

/s/ Michele Odorizzi
Michele Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Caryn L. Jacobs

11

WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Counsel for Defendants Northern Trust
Investments, N.A. and
The Northern Trust Company*

12