# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | Case No. 09-7203<br><br>Hon. Robert W. Gettleman<br><br>Magistrate Judge Michael T. Mason<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(b)(6)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

      A.      Northern Trust's Securities Lending Program ........................................ 3

      B.      Defendants Mismanaged The Collateral Pools ...................................... 5

I.      THE LEGAL STANDARDS GOVERNING DEFENDANTS' MOTION ...................... 7

II.     DEFENDANTS IMPRUDENTLY STRUCTURED THE COLLATERAL
       POOLS IN VIOLATION OF THEIR FIDUCIARY DUTIES ........................................ 9

            a.      The Collateral Pool Investment Guidelines Do Not Absolve
                  Defendants Of Their Failure To Comply With Their Fiduciary
                  Duties ........................................................................................... 10

            b.      Defendants' Investments In SIV Securities Were Not Permitted By
                  The STEP Collateral Pool Guidelines ......................................... 14

            c.      Defendants' Selection Of Collateral Pool Assets Was Tainted By
                    A Conflict Of Interest ................................................................. 15

III.    DEFENDANTS' BREACHED THEIR DUTY TO PRUDENTLY MANAGE
       THE COLLATERAL POOLS .......................................................................... 17

            a.      Defendants Had A Duty To Manage The Collateral Pools
                  Consistent With The Objectives Of The Securities Lending
                  Program ....................................................................................... 17

            b.      The Financial Crisis Does Not Excuse Defendants' Imprudence ............. 20

IV.    PLAINTIFFS STATE CLAIMS ARISING OUT OF THE SECURITIES
       LENDING FEES INDIRECT LENDERS PAID DEFENDANTS .................................. 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Fid. Fire Ins. Co. v. Gen. Ry. Signal Co.*,
    540 N.E.2d 557 (Ill. App. Ct. 1989) .......................................................................9

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
    446 F.3d 728 (7th Cir. 2006) ...............................................................................17

*Board of Trustees of Southern California IBEW-NECA Defined Contribution Plan v.
    Bank of N.Y. Mellon Corp.*,
    No. 09-Civ. 6273(RMB)(AJP), 2010 WL 1558587 (S.D.N.Y. Apr. 14, 2010).......................13

*BP Corp. N. Am. Inc. Sav. Plan Inv. Oversight Comm. v. N. Trust Invs., N.A.*,
    No. 1:08-cv-06029 (N.D. Ill. June 18, 2009)............................................................20

*Clark v. Robert W. Baird Co., Inc.*,
    142 F. Supp. 2d 1065 (N.D. Ill. 2001) ....................................................................25

*Clayton v. James B. Clow & Sons*,
    154 F. Supp. 108 (N.D. Ill. 1957) ..........................................................................24

*Comp. Okla. v. BNY Mellon, N.A.*,
    No. CIV-08-469-KEW, 2009 WL 2366112 (E.D. Okla. July 31, 2009) ................................ 20

*Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*,
    No. 03 C 1455, 2003 WL 21801022 (N.D. Ill. Aug. 4, 2003)..................................14

*Diebold v. N. Trust Invs., N.A.*,
    No. 1:09-cv-01934, 2010 WL 3700387 (N.D. Ill. Sept. 7, 2010)....................................*passim*

*FedEx Corp. v. N. Trust Co.*,
    No. 2:08-cv-02827 (W.D. Tenn. May 20, 2009) ....................................................20

*Finley v. Marathon Oil Co.*,
    75 F.3d 1225 (7th Cir. 1996) ...............................................................................15

*First Nat'l Bank of Chicago v. Ret. Trust for Emps. of Standard Oil Co.*,
    No. 90 C 3981, 1991 WL 285269 (N.D. Ill. Dec. 27, 1991) ..................................23

*Freedom Mortg. Corp. v. Burnham Mortg., Inc.*,
    No. 03 C 6508, 2010 WL 2403031 (N.D. Ill. June 14, 2010) ..................................8

*Fuller Family Holdings, LLC v. N. Trust Co.*,
    863 N.E.2d 743 (Ill. App. Ct. 2007) ......................................................................25

*George v. Kraft Foods Global, Inc.*,
   674 F. Supp. 2d 1031 (N.D. Ill. 2009) .................................................................21

*Gibson v. City of Chicago*,
   910 F.2d 1510 (7th Cir. 1990) ...............................................................................7

*Guerrand-Hermes v. J.P. Morgan & Co.*,
   769 N.Y.S.2d 240 (App. Div. 2003) .......................................................................8

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
   302 F.3d 18 (2d Cir. 2002)....................................................................................15

*Himel v. Cont. Ill. Nat'l Bank & Trust Co. of Chicago*,
   596 F.2d 205 (7th Cir. 1979) ................................................................................22

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)...................................................................23

*In re Estate of Collins*,
   139 Cal. Rptr. 644 (Ct. App. 1977) ......................................................................11

*In re Gen. Growth Props., Inc.*,
   No. 08 CV 6680, 2010 WL 1840245 (N.D. Ill. May 6, 2010)...............................17

*In re Lehman Bros. Sec. & ERISA Litig.*,
   683 F. Supp. 2d 294 (S.D.N.Y. 2010)..............................................................20, 21

*In re MoneyGram Int'l Sec. Litig.*,
   626 F. Supp. 2d 947 (D. Minn. 2009).....................................................................8

*In re Sears, Roebuck & Co. ERISA Litig.*,
   No. 02 C 8324, 2004 U.S. Dist. LEXIS 3241 (N.D. Ill. Mar. 3, 2004) ...................15

*Janowiak v. Tiesi*,
   932 N.E.2d 569 (Ill. App. Ct. 2010), *reh'g denied* (July 8, 2010).........................24

*Jefferson Nat'l Bank of Miami Beach v. Centr. Nat'l Bank in Chicago*,
   700 F.2d 1143 (7th Cir. 1983)................................................................................8

*Keach v. U.S. Trust Co. N.A.*,
   313 F. Supp. 2d 818 (C.D. Ill. 2004) ....................................................................17

*Landmen Partners Inc. v. The Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009)......................................................................8

*LaSalle Bank Nat'l Ass'n v. Paramont Props.*,
   588 F. Supp. 2d 840 (N.D. Ill. 2008) .....................................................................9

*Leigh v. Engle,*
  727 F.2d 113 (7th Cir. 1984) ...................................................................................10

*Leigh v. Engle,*
  858 F.2d 361 (7th Cir. 1988) ...................................................................................16

*Martin v. Consultants & Adm'rs, Inc.,*
  966 F.2d 1078 (7th Cir. 1992) .................................................................................19

*Merchants Nat'l Bank of Aurora v. Frazier,*
  67 N.E.2d 611 (Ill. App. 2 Dist. 1946) ...................................................................22

*People v. Canton Nat'l Bank,*
  6 N.E.2d 220 (App. Ct. Ill. 1937) ...........................................................................19

*People v. Cent. Republic Trust Co.,*
  20 N.E.2d 999 (Ill. App. Ct. 1939) .........................................................................16

*Priebe v. Autobarn Ltd.,*
  240 F.3d 584 (7th Cir. 2001) .....................................................................................9

*Pub. Serv. Co. of Colo. v. Chase Manhattan Bank,*
  577 F. Supp. 92 (S.D.N.Y. 1983) ............................................................................11

*Sinclair v. State Bank of Jerseyville,*
  566 N.E.2d 44 (Ill. App. Ct. 1991) ...........................................................................9

*St. Petersberg v. Wachovia Bank, Nat'l Ass'n,*
  No. 8:10-cv-693-T-26TBM, 2010 WL 2991431 (M.D. Fla. July 27, 2010) ..........20

*Summers v. State St. Bank & Trust Co.,*
  453 F.3d 404 (7th Cir. 2006) ...................................................................................20

*Swanson v. Citibank, N.A.,*
  614 F.3d 400 (7th Cir. 2010) .....................................................................................8

*Tamayo v. Blagojevich,*
  526 F.3d 1074 (7th Cir. 2008) ...................................................................................8

*U.S. Nat'l Bank v. First Nat'l Bank,*
  142 P.2d 785 (Or. 1943) ...........................................................................................11

*United States v. LaSalle Bank, N.A.,*
  No. 07 C 6196, 2008 WL 4874169 (N.D. Ill. July 29, 2008) ..................................25

*Woodmen of the World Life Ins. Soc'y v. U.S. Bank Nat'l Ass'n,*
  No. 8:09-cv-00407 (D. Neb. Aug. 6, 2010) .............................................................21

*Woolard v. Woolard*,
    547 F.3d 755 (7th Cir. 2008) ...................................................................................14

*Workers Comp. Reinsurance Ass'n v. Wells Fargo Bank N.A.*,
    No. 62-CV-08-10825, 2d Judicial Dist., MN (St. Paul) (June 3, 2010) ...................................20

STATUTES

760 Ill. Comp. Stat. 5/5(a)(1) (2002) ...........................................................................8

Fed. R. Civ. P.

    Rule 8(a) ...................................................................................................8

    Rule 12(b)(6) ......................................................................................... *passim*

    Rule 23 ...................................................................................................25

    Rule 60(b) ...............................................................................................13

MISCELLANEOUS

Restatement (Second) of Trusts, § 227, cmt. v (1959) ...................................................11

Restatement (Third) of Trusts, § 77 ..........................................................................9

Restatement (Third) of Trusts §91, cmt. f (2007) ........................................................11

Plaintiffs respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint Pursuant to Rule 12(b)(6).

## INTRODUCTION

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") (collectively "Northern Trust" or "Defendants"), through their imprudent and self-serving conduct, caused Plaintiffs—pension funds for Chicago's school teachers, firefighters in Louisiana and police officers, firefighters and other public employees from Michigan—and the Class to lose over $1 billion.  Defendants caused those losses by making imprudent investments in risky and long-term securities through their management of a securities lending program that—by its very nature—was supposed to be a safe, conservative way for these pension funds and the Class to earn incremental returns.  Northern Trust's imprudent investments included exotic securities described as one cause of the financial crisis, risky mortgage-backed securities and bonds that would not mature for decades.  Indeed, more than half the securities in an "ultra short term" fund were not due for two years, and nearly 20% were not due for two decades.

After locking Plaintiffs into these risky, long-term investments, Defendants ignored numerous signs of the worsening financial crisis, including repeated warnings by Northern Trust's Chief Economist that "the banking system cannot escape significant losses" once the housing bubble pops.  Despite those warnings, Defendants failed to take prudent action to protect Plaintiffs' investments when, as their Chief Economist predicted, the subprime mortgage collapse led major financial institutions and other entities in which the funds were invested to declare billions of dollars in losses.  Despite its role as a fiduciary with total discretion over investment decisions, Northern Trust placed its own interests ahead of Plaintiffs and the Class.

Defendants' motion to dismiss, which is rife with misstatements of fact and law, should be rejected by this Court because the very contentions asserted by Defendants here have already been rejected in a parallel proceeding in this District. *See Diebold v. N. Trust Invs., N.A.*, No. 1:09-cv-01934, 2010 WL 3700387 (N.D. Ill. Sept. 7, 2010) (Hibbler, J.).[1]  In *Diebold*, Judge Hibbler denied Defendants' motion to dismiss a class action on behalf of pension funds which had likewise suffered losses in the same Northern Trust investment funds due to the same misconduct at issue in this Action.  That decision, handed down just days after Defendants filed the instant motion, refutes Northern Trust's arguments about its liability for mismanaging Plaintiffs' investments.  As in *Diebold*, here "Defendants both understate the allegations made by the Plaintiffs and overstate the requirements imposed by the Supreme Court's recent interpretations of Rule 8."  *Id.* at *3.  The allegations in *Diebold* showed that "given the information the Defendants had about the economy, a prudent fiduciary would have altered the way in which the assets of the collateral pool were managed."  *Id.* at *4.  Plaintiffs' allegations here are in fact more robust than those in *Diebold* and, for the reasons articulated by Judge Hibbler therein and discussed below, should be sustained.

Defendants do not even contest the core of Plaintiffs' allegations:  that Northern Trust, acting as a fiduciary to Plaintiffs, imprudently managed Plaintiffs' assets, and Plaintiffs suffered losses as a result.  Instead, Defendants contend they cannot be liable for investment decisions, prudent or otherwise, that fell within the relevant investment guidelines.  That argument, rejected in *Diebold*, is contrary to well-established law and ignores Plaintiffs' allegations that the investments at issue were contrary to the stated investment objectives—and in some cases, the guidelines themselves—for the funds in question.  Moreover, the question of whether Defendants

---

[1] All unreported cases are appended hereto as Exhibits B through N.

2

acted prudently is a question reserved for the trier of fact and not properly considered on a motion to dismiss. Defendants' second argument, that Plaintiffs' losses were caused by an unforeseeable economic crisis, is contradicted by Northern Trust's Chief Economist who "foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst" and was rejected by Judge Hibbler in *Diebold*. Defendants' failure to heed their Chief Economist's warnings, and the other signs that would have guided a prudent fiduciary, was driven by Northern Trust's interest in protecting its own bottom line. This argument—like Defendants' other attempts to justify their imprudent investment decisions on a motion under Rule 12(b)(6)—has already been rejected, and should likewise be rejected here.

## STATEMENT OF FACTS

### A. Northern Trust's Securities Lending Program

Northern Trust's securities lending program (the "SLP") was intended to be a safe, conservative way for Plaintiffs and the Class to generate modest returns that could be used to offset some of the expenses involved in administering their investment portfolios. ¶24.[2] Pontiac General participated directly in the SLP, lending eligible securities from its own portfolio to qualified borrowers. Louisiana Firefighters participated indirectly by investing in several of Northern Trust's commingled investment funds (the "Commingled Lending Funds") which, in turn, loaned securities through the SLP. Chicago Teachers and Pontiac Police & Fire participated as both direct and indirect lenders. ¶¶16-19, 28-29.

In each case, in exchange for lending their securities, participants receive cash collateral equivalent to at least 102% of the borrowed security's market value. That collateral is then invested in commingled pools operated by Northern Trust (the "Collateral Pools"). Because the cash collateral must be repaid when the loan is terminated and can be called back at any time, the

---

[2] Citations to "¶___" refer to paragraphs in the Complaint (Dkt. # 32).

Collateral Pools, by their nature, must be invested in conservative, short-term, liquid investments in order to preserve capital while generating nominal returns. ¶¶2, 23-24.

Because the securities on loan could be called back at any time and the Pool collateral had to be returned, prudence, contractual obligations and applicable industry standards all required that the collateral be invested in conservative, short-term, highly liquid investments in order to preserve capital and provide for liquidity. ¶¶23, 39. For example, the investment objective for the Core USA Collateral Pool was to maximize income "to the extent consistent with preservation of liquidity." ¶43. The Short Term Extendable Portfolio ("STEP") Collateral Pool was an "ultra-short duration" fund attempting to outperform "high grade" short-term money market funds. ¶42. The investment guidelines for those Collateral Pools required that they be managed in a manner "consistent with the preservation of capital and maintenance of liquidity." Defs.' Ex. A at 2. The investment of cash collateral was also governed by the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending, which obligated Defendants to invest the cash collateral in safe, liquid instruments. ¶36.

As managers of the SLP and the Collateral Pools, Defendants served as fiduciaries to the Class and were required to act prudently and solely in the best interests of the Class, and assumed liability for their own negligence. ¶¶ 20, 23, 33. For performing this service, Northern Trust received a percentage of the earnings generated by the Collateral Pools, yet bore none of the risk of loss on those investments. ¶¶7, 27. For indirect lending clients, NTI negotiated with its affiliate, NTC, for the Commingled Lending Funds to pay a 40% fee for securities lending while NTC, when negotiating at arm's-length with other clients, agreed to fees that were less than half this amount. ¶¶7, 26, 31, 136, 146, 151; *see also* Defs.' Ex. H.

### B.      Defendants Mismanaged The Collateral Pools

In pursuit of higher lending fees and in breach of its fiduciary and contractual duties, Northern Trust ignored the investment objectives for the Collateral Pools and imprudently invested hundreds of millions of dollars in exotic, unregistered securities, such as structured investment vehicles ("SIVs"), as well as other securities that were both too long-term and high-risk for SLP collateral investment. ¶¶4-5, 48-49.  For example, by mid-2007 more than half the securities in STEP were not due to mature for at least 2 years, and 18% were not due to mature for at least 20 years.  ¶44.  Similarly, at the height of the financial crisis in October 2008, a third of the securities in Core USA were not due to mature for over 2 years.  ¶45.

The longer-term securities Defendants purchased carried a higher credit risk—the risk that the issuer may be unable to pay the obligation due at maturity—than comparable short-term securities and were therefore unsuitable for the Collateral Pools.  ¶54.  Because of this risk, those securities yield higher returns than comparable short-term securities, and thus provided Defendants with greater returns through enhanced securities lending fees than investments in shorter-term notes.  Similarly, high-risk securities such as SIV notes provided higher returns to Defendants, but were illiquid, unregistered assets that could not be quickly or easily sold, and therefore presented unacceptable levels of risk to Plaintiffs.  ¶¶44-47, 50-51, 89.

Moreover, Defendants structured the Collateral Pools with imprudent levels of exposure to the housing market and to financial institutions that were likewise heavily exposed to the housing market. As early as 2004, Northern Trust's own Chief Economist, Paul Kasriel, warned of a housing bubble and recession that would directly, and severely, impact the U.S. banking industry because of the unprecedented exposure to housing loans and other consumer debt held by U.S. banks.  ¶¶57-63.  Indeed, Kasriel issued a series of warnings that alerted them to the risks their imprudent investments posed to the SLP.  These included:

5

- Kasriel's 2004 warning that "60% of U.S. banks' earning assets are mortgage-related" and his 2006 conclusions that "this is the most inflated housing market in the post-war era" and that "the banking system could not escape significant losses" from a recession in housing. ¶¶58, 62.

- The predictions by Northern Trust economists, in 2006 and 2007 that "additional price declines" and "increased foreclosures" signaled serious problems with mortgage-backed assets and other consumer debt products. ¶¶63-65.

- Kasriel's October 2007 report that SIVs posed unique risks given the "concern about the credit quality of the assets, especially subprime mortgage-related paper." ¶66.

Before the Collateral Pools incurred realized losses, Kasriel's warnings were corroborated by the collapse of the subprime mortgage market and the revelation of massive losses by a host of major domestic and foreign banks. ¶¶69-70, 73-74. These included severe write-downs at HSBC, UBS, CIT, Merrill Lynch, Citigroup, BNP Paribas, Sallie Mae, and Lehman Brothers, as well as the failures of over 100 lenders in 2007 alone. ¶¶72, 81, 111. News stories that year railed against SIVs as "shadowy debt instruments" inappropriate for many commingled funds. ¶99. By that time, Northern Trust had stopped purchasing new SIV notes for its money market funds because of those risks, and acknowledged the unique hazards facing SIVs that lacked support from a sponsoring bank, such as those held in STEP. ¶90. In February 2008, two similarly unsupported SIVs held in Northern Trust's money market funds defaulted, causing massive losses and forcing Northern Trust to contribute $229 million to clients in those funds. ¶92. The numerous storm clouds foreboding the risks of the SIVs in which STEP was invested, including one SIV's failure in October 2007 to refinance more than $20 billion that was coming due within the year, provided Defendants with more than enough warning to prudently restructure the Collateral Pools. ¶¶89-92, 98-110.

In fact, Defendants acknowledged internally that the Collateral Pools were no longer appropriate vehicles for the investment of cash collateral long before the first realized losses

6

were incurred.  Internal Northern Trust documents stressed the need for increased liquidity in the Collateral Pools as early as June 2007, and Michael Vargas, a Managing Director at Northern Trust, has testified that "[Northern Trust] would not be going out and selling STEP as an investment vehicle to new prospects" in April 2008.  ¶¶10, 83, 93.  But rather than trying to refocus the Collateral Pools on less risky short-term investments, Defendants actually changed the Collateral Pool guidelines in mid-2007 to permit up to 15% of Core USA to be invested in longer-term securities in order to increase Northern Trust's earnings.  Even when the Collateral Pools began to suffer unrealized losses, Defendants refused to dispose of these imprudent investments because Northern Trust would have had to consolidate the Pools onto its own balance sheet if it suffered realized losses that its clients would not cover.  Motivated by their concern over the risk of consolidation that would decimate Northern Trust's financial condition—rather than a faithful consideration of the best interests of Plaintiffs and the Class to whom they owed duties of undivided loyalty and prudence—Defendants failed to divest of the moribund assets they had selected.  ¶77.

As a result of Defendants' imprudence and the conflicts of interest that guided their decisions, STEP incurred massive realized losses in September 2008 on investments in Lehman Brothers—including securities not due to mature until 2012—and SIVs. ¶80.  Core USA incurred massive realized losses on Lehman Brothers at that time as well, and both STEP and Core USA subsequently incurred additional losses on other imprudent investments in long-term securities.  ¶¶80.  As a result of Defendants' imprudence, the Collateral Pools suffered realized losses of well over $1 billion. ¶80.

## I.    THE LEGAL STANDARDS GOVERNING DEFENDANTS' MOTION

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case.  *See Gibson v. City of Chicago*, 910 F.2d

1510, 1520 (7th Cir. 1990). Here, Plaintiffs need only to satisfy the liberal standards of Rule 8(a) by pleading "facts in sufficient context that plausibly suggests an entitlement to legal relief," and the Court must accept as true all of the well-pleaded facts and all reasonable inferences that can be drawn therefrom. *Diebold*, 2010 WL 3700387, at *3 (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 561-62 (2007)); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("plaintiff must give enough details about the subject-matter of the case to present a story that holds together."); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (the court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor").[3]

Plaintiffs allege that Defendants breached their fiduciary and contractual duties, including their duty of good faith and fair dealing. Under Illinois law, a plaintiff may recover for breach of fiduciary duty where: "(1) a fiduciary duty exists on defendant's part; (2) the defendant breached that fiduciary duty; and (3) damages proximately resulted from the breach." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, No. 03 C 6508, 2010 WL 2403031, at *11 (N.D. Ill. June 14, 2010) (citation omitted). Under Illinois law, fiduciaries "are held to a high standard of conduct and must exercise the highest degree of fidelity and the utmost good faith in the administration of the trust." *Jefferson Nat'l Bank of Miami Beach v. Centr. Nat'l Bank in Chicago*, 700 F.2d 1143, 1152 (7th Cir. 1983). Among other things, a fiduciary has a duty "to invest and manage trust assets as a prudent investor would" with "the exercise of reasonable care, skill and caution" in a manner consistent with the terms of the trust. 760 Ill. Comp. Stat. 5/5(a)(1) (2002); *see also*

---

[3] The cases that Defendants cite that concern motions for summary judgment— including *Guerrand-Hermes v. J.P. Morgan & Co.*, 769 N.Y.S.2d 240, 242-43 (App. Div. 2003)—as well as the heightened pleading standards for fraud claims—*In re MoneyGram Int'l Sec. Litig.*, 626 F. Supp. 2d 947, 970 (D. Minn. 2009), *Landmen Partners Inc. v. The Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 544 (S.D.N.Y. 2009)—are inapposite because the factual and pleading burdens in those cases are inapplicable to the Rule 8 standards on a motion to dismiss.

Restatement (Third) of Trusts, § 77 ("The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.").  Under this standard, "a fiduciary acts imprudently, for example, when it fails to adequately investigate or monitor a plaintiff's investments, or adequately diversify or structure a plaintiff's investments." *Diebold*, 2010 WL 3700387, at *3 (internal citations omitted).

To state a claim for breach of contract under Illinois law, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) its performance of the contract; (3) defendant's breach of the contract; and (4) that it was damaged as a result of the breach. *Priebe v. Autobarn Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001).[4]  The agreements governing Plaintiffs' participation in the SLP acknowledged Defendants' fiduciary status and likewise required Northern Trust to prudently invest the Collateral Pools in the best interests of Plaintiffs and the Class and to bear all losses arising from its own negligence.  ¶¶33-37.

## II. DEFENDANTS IMPRUDENTLY STRUCTURED THE COLLATERAL POOLS IN VIOLATION OF THEIR FIDUCIARY DUTIES

The Complaint sets out, through detailed allegations about the securities held in STEP and Core USA, how Defendants imprudently structured the Collateral Pools in a manner wholly inconsistent with the stated short-term and conservative purpose of those Pools, due in no small part to their own self-interest in maximizing fees to benefit themselves at Plaintiffs' expense. Defendants' attempt to dismiss claims based on that imprudence must be rejected, as they were in *Diebold*, both because Defendants' argument fails as a matter of law and because it presents questions of fact that cannot be resolved under Rule 12(b)(6).  *See Diebold*, 2010 WL 3700387,

---

[4] Under Illinois law, the duty of good faith and fair dealing is implied in every contract, and breach of that duty can provide an independent basis for relief.  *See LaSalle Bank Nat'l Ass'n v. Paramont Props.*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008); *Sinclair v. State Bank of Jerseyville*, 566 N.E.2d 44, 47 (Ill. App. Ct. 1991) (*citing Washburn v. Union Nat'l Bank & Trust Co.*, 502 N.E.2d 739, 743 (Ill. App. Ct. 1986); *Am. Fid. Fire Ins. Co. v. Gen. Ry. Signal Co.*, 540 N.E.2d 557, 561 (Ill. App. Ct. 1989).

at *3 ("[W]hether a particular investment choice was imprudent is a particularly fact-sensitive inquiry that would not be appropriate to resolve on a motion to dismiss").

Defendants cannot distinguish *Diebold* simply because the claims there arose under ERISA because the duty of care under ERISA is no different than that applicable here, as ERISA has been "interpreted under principles applicable to trustees under the common law of trusts, with a view toward establishing uniform standards." *Leigh v. Engle*, 727 F.2d 113, 123 n.18 (7th Cir. 1984). Indeed, because Plaintiffs here invested in the identical Collateral Pools at issue in *Diebold*, Defendants cannot logically argue that their management of those Pools was subject to different standards of care dictated by the character of the investor in those pools.

      a.    **The Collateral Pool Investment Guidelines Do Not Absolve Defendants Of Their Failure To Comply With Their Fiduciary Duties**

Defendants do not dispute that they served as fiduciaries in their management of the Collateral Pools and, as such, were required to invest those Pools prudently, and in accordance with their stated purpose: the preservation of capital through conservative investment in short-term securities. Defendants' primary defense to Plaintiffs' claim is that Defendants would be insulated from liability for their imprudence if the securities they purchased were permitted by the applicable investment guidelines. That argument finds no support in the law and is contrary to the allegations in the Complaint. Indeed, Plaintiffs specifically allege that Defendants' investments in long-term securities were contrary to the stated investment objective of the Collateral Pools and that investments in SIV notes were ***not*** permitted by the guidelines. ¶52. Moreover, even if some of the impaired assets fell within the applicable guidelines, the Restatement of Trusts makes clear that:

> *[T]he fact that an investment is permitted does not relieve the trustee of the fundamental duty to act with prudence. The fiduciary must still exercise care, skill, and caution in making decisions to acquire or retain the investment*....

10

Nor does mere authorization with regard to an investment or type of investment constitute an exculpatory clause.

Restatement (Third) of Trusts §91, cmt. f (2007) (emphasis added).

Courts have repeatedly rejected attempts by fiduciaries to invoke the terms of trust documents to insulate them against claims of imprudence under analogous facts. *See, e.g., Pub. Serv. Co. of Colo. v. Chase Manhattan Bank*, 577 F. Supp. 92, 103, 104 (S.D.N.Y. 1983) (holding provision in trust agreement granting trustee "sole discretion" in the exercise of investment powers did not limit "liability for prudently exercising that discretion," noting that once "it becomes clear or should have become clear that [an] investment is no longer proper for a trust, it is the duty of the trustee to dispose of it within a reasonable time."); *U.S. Nat'l Bank v. First Nat'l Bank*, 142 P.2d 785, 791 (Or. 1943) (trustee's duty of prudent investing is not performed merely by investing in an "authorized" investment but also requires the use of "care and skill and caution in selecting the particular investment"); *In re Estate of Collins*, 139 Cal. Rptr. 644, 650 (Ct. App. 1977) (where an instrument specifically authorizes investment in a particular type of security, the trustee still must use "care and skill and caution" in making such investments).[5] Indeed, in *Diebold*, the court rejected Defendants' identical argument that plaintiffs had "failed to point to a single investment that deviated from the [investment] guidelines," and denied Defendants' motion. *Diebold*, 2010 WL 3700387, at *3. Accordingly, the investment guidelines governing the Collateral Pools do not insulate Defendants from their imprudent and self-interested investment decisions.

---

[5] *See also* Restatement (Second) of Trusts, § 227, cmt. v (1959) ("An authorization by the terms of the trust to invest in a particular type of security does not mean that any investment in securities of that type is proper... Thus, if the trustee is authorized by the terms of the trust to invest in railroad bonds, he is guilty of a breach of trust if he invests in bonds of a railroad company in which a prudent man would not invest because of the financial condition of the company.").

At any rate, the Complaint makes clear that Northern Trust's investments were not in accordance with the purpose and intended characteristics of the Collateral Pools. To the contrary, Defendants' decision to structure the Collateral Pools with risky, longer-term assets— with over 20% of the STEP assets not due for at least 10 years as of July 2007 and over 30% of the assets in Core USA not due for over two years as of October 2008—effectively transformed them from "ultra short-term" funds to long-term funds, in contravention of their stated objectives. ¶¶44-46. This radical departure from narrow purpose of the Collateral Pools is not sanctioned by the terms of the investment guidelines, and Defendants' imprudent conduct is not absolved by invoking their terms.[6]

Indeed, the "Investment Objective" set forth in the Collateral Pools' investment guidelines made clear that collateral reinvestment was intended to generate incremental returns at low risk, with preservation of principal and maintenance of liquidity the funds' prime objectives. ¶¶39, 43. The Investment Objectives of STEP restricted the Fund to investments appropriate for an "ultra short duration total return fund that [can help] outperform high grade, short term money market instruments." Defs.' Ex. B at 1 (emphasis added). To that end, the guiding Investment Objective of Core USA was "the preservation of capital and maintenance of liquidity" and that "liquidity and principal preservation [are] prime objectives." Defs.' Ex. A. at 2. The investment guidelines for those Pools cannot be read independently of the Investment Objectives the guidelines were intended to achieve.

The fact that the investment guidelines permitted, as part of a diversified portfolio designed to meet these goals, investment in some longer-duration assets did not allow

---

[6] Defendants' suggestion that that certain Plaintiffs "chose" how their collateral would be invested is flatly wrong. Direct participants in the SLP selected the Collateral Pool for the investment of their cash collateral, but had **no** control over the management of those Pools. *See, e.g.,* Defs.' Ex. D, at 2, §3.1.

Defendants to abandon the stated "Investment Objective" or imprudently focus the Pools on long-term investments. All the investments had to be made in a manner consistent and "in accordance" with the stated Investment Objective, and Plaintiffs' allegations—including the fact that nearly 40% of the total market value of STEP in the months before the Lehman Brothers collapse consisted of either exotic SIV securities or assets issued by financial companies with heavy exposure to mortgages and consumer loans, some with maturity dates years into the future—demonstrate they were not. Accordingly, Defendants' argument that the iteration of permitted classes of securities in the guidelines trumps the primary investment objective of the Collateral Pools must be rejected.

*Board of Trustees of Southern California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09-Civ. 6273(RMB)(AJP), 2010 WL 1558587, at *6 (S.D.N.Y. Apr. 14, 2010) ("*BNY*") is inapposite. *BNY* focused solely on the specific allegations in that complaint of whether Lehman Brothers securities were appropriate investments for a securities lending program. In contrast to the conclusory allegations that were dismissed in *BNY*, the Complaint here alleges numerous facts that establish Defendants' imprudence in not only acquiring long-term Lehman Brothers notes and continuing to hold those securities well after Lehman Brothers disclosed massive losses, but also in structuring the Collateral Pools with risky, long-term securities and failing to divest of those assets, including Lehman Brothers notes, following numerous warnings from Northern Trust's Chief Economist and facts showing that Defendants knew—well before the Pools suffered any realized losses—that they were inappropriate investments for the SLP.[7] ¶¶8, 83, 94. The well-pleaded allegations in the

---

[7] Judge Berman recently granted plaintiffs' Rule 60(b) motion to vacate the *BNY* decision cited by Defendants. *See Bd. of S. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of N.Y. Mellon Corp.,* No. 09 Civ. 6273(RMB)(AJP) (S.D.N.Y. Sept. 7, 2010) (Dkt. #83).

Complaint provide a perfectly coherent account of Defendants' self-interested and imprudent mismanagement of the Collateral Pools, and any dispute they may have with these facts is not properly considered on a motion to dismiss.

<b>b.    Defendants' Investments In SIV Securities Were Not Permitted By The STEP Collateral Pool Guidelines</b>

The Complaint alleges in detail why Northern Trust's investment in SIVs were imprudent investments to make and retain for the Pools.  The Complaint also alleges that SIVs were not among the enumerated classes of securities permitted by the investment guidelines.  ¶52.  The STEP guidelines never reference SIVs, which are fundamentally different from the classes of permitted investments.  *See* Defs.' Ex. B.  Northern Trust's chief economist described SIVs as "investment funds…that purchase asset-backed securities, financing their purchases through the issuance of asset-backed commercial paper."  Such investment funds do not have the established track record on which to judge their performance and are exposed to unique risks, including liquidity, management and other risks, not faced by those in other asset classes.  ¶53.  Indeed, Defendants differentiated SIVs from assets such as mortgage-backed securities, and acknowledged that the SIV notes in STEP were riskier than other types of SIVs.  *Id.*

Because SIV notes were not among the authorized securities in the STEP investment guidelines, Defendants' investment in those assets constitutes a breach of duty.  *See, e.g., Woolard v. Woolard*, 547 F.3d 755, 761 (7th Cir. 2008) (finding breach of trust where challenged action was not among list of permissible activities that mirrored those in 760 Ill. Comp. Stat. 5/4.20 of the Illinois Trusts Act).  Any contention that SIVs are analogous to permitted categories of securities creates an issue of fact that cannot be resolved under Rule 12(b)(6).  *See, e.g., Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, No. 03 C 1455, 2003 WL 21801022, at \*2 (N.D. Ill. Aug. 4, 2003) ("If there are questions…that cannot be answered by reading the contract,

14

extrinsic evidence is necessary to determine the intent of the parties, and a motion to dismiss cannot be granted.") (citation omitted).

> ### c. Defendants' Selection Of Collateral Pool Assets Was Tainted By A Conflict of Interest

Defendants' investment decisions in structuring the Collateral Pools were tainted by a conflict of interest that drove Northern Trust to load STEP and Core USA with risky and long-term securities in order to generate higher securities lending revenues. Specifically, because Northern Trust shared in the earnings generated by the Collateral Pools but did not share Plaintiffs' risk in the event of an investment loss, Defendants had an incentive to focus the investments on higher-risk securities—such as longer-term notes and those issued by SIVs— which paid a higher return but presented higher credit and liquidity risks than were warranted given the narrow purpose of the Collateral Pools. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) ("[A] conflict of interest is built into any royalty arrangement, or any other arrangement in which one party to a contract receives a percentage of gross revenues.").

Defendants concede these facts but claim that no conflict existed because Northern Trust faced the risk of decreased fees if the Collateral Pools suffered principal losses and, therefore, its interests were aligned with Plaintiffs and the Class. Not so. Defendants did not share in the risk that the Collateral Pool investments would result in a realized loss, or that unrealized losses or decreased liquidity would result in the withdrawal limitations that locked Plaintiffs into those Pools. It is there that the interests of Defendants and Plaintiffs diverged and gave rise to the conflict of interest. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 32 (2d Cir. 2002) (finding breach of duty of loyalty where fiduciary chose not to allocate riskier assets in accounts where defendant bore risk of investment losses, as opposed to accounts that did not bear such risk); *In re Sears, Roebuck & Co. ERISA Litig.*, No. 02 C 8324, 2004 U.S.

15

Dist. LEXIS 3241, at *15 (N.D. Ill. Mar. 3, 2004) (fiduciaries' interest in income derived from inflated stock price sufficient to plead a breach of duty of loyalty); *see also Leigh v. Engle*, 858 F.2d 361, 364 (7th Cir. 1988) (finding breach of duty of loyalty where fiduciaries "made investment decisions out of personal motivations, without making adequate provision that the trust's best interests would be served"); *People v. Cent. Republic Trust Co.*, 20 N.E.2d 999, 1005 (Ill. App. Ct. 1939) ("where a trustee has come into a position where his interests…conflict with the best interests of the trust, and the trust sustains a loss from transactions growing out of such conflicting interests the trustee will be required to reimburse the trust").

Defendants argue that the conflict is eliminated because Northern Trust assumed liability for its own negligence. This is specious because a disloyal fiduciary does not expect to be held liable for his misconduct, and the potential for liability does not therefore prevent conflicts of interest. If the potential liability for breaching their duties actually prevented fiduciaries from placing their interests ahead of trust beneficiaries, then no fiduciary would ever be found liable for breaching a duty of loyalty.

Last, Defendants argue that their imprudent investment decisions could not have been motivated by a conflict of interest if, as Plaintiffs allege, the investment losses that resulted from their high-risk investments gave rise to the risk that Northern Trust would be required to consolidate the Collateral Pools onto its books if there was a realized loss that its clients would not cover. A fair reading of the Complaint, however, makes clear that Defendants' awareness of the risk of consolidation did not even materialize until *after* the Collateral Pools began to suffer unrealized losses on the risky, long-term securities that Defendants had selected, and was in fact contingent on Northern Trust's clients not covering those losses. ¶78. The fact that Defendants' self-interest in generating enhanced fees was later supplanted by their desire to avoid

16

consolidation when these improper investments soured does not provide a defense to Plaintiffs' claims on a motion to dismiss, but rather is a question for a jury.

## III. DEFENDANTS' BREACHED THEIR DUTY TO PRUDENTLY MANAGE THE COLLATERAL POOLS

In addition to improperly structuring the Collateral Pools, Defendants further breached their fiduciary responsibilities to manage the Pools by failing to mitigate the risk of loss in the Collateral Pools (i) in accordance with the narrow purpose of the SLP and (ii) in the face of the clear warning signs of the subprime mortgage collapse and the impending financial crisis.

### a. Defendants Had A Duty To Manage The Collateral Pools Consistent With The Objectives Of The Securities Lending Program

The conflicts of interest that pervaded Defendants' conduct drove them to breach their duty to ensure that the Collateral Pools were appropriately invested to achieve their narrow purpose in light of the changing economic environment. When the subprime mortgage crisis began, the Collateral Pools managed by Northern Trust faced massive exposure to long-term investments tied to the housing and banking markets. Defendants received ample warnings of those risks and prudent management of the Pools required them to act to mitigate that risk. *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006) ("[a] trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent."); *Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818, 871 (C.D. Ill. 2004) ("fiduciary's duty to investigate the plan's administration is...an ongoing duty to monitor investments with reasonable diligence and remove plan assets from an investment that is improper") (internal citations omitted); *In re Gen. Growth Props., Inc.*, No. 08 CV 6680, 2010 WL 1840245, at *7 (N.D. Ill. May 6, 2010) ("Defendants exercised discretion when determining whether the Plan's assets were prudently invested....Defendants also possessed the duty to protect the…assets.").

17

Taking into account the purpose of STEP and Core USA—both purportedly conservative, short-term funds—and the fact that Northern Trust had invested those Pools in (1) long-term investments, (2) securities with heavy exposure to the housing and banking industries, and, with regard to STEP, (3) exotic high-risk SIVs, Defendants had to be acutely aware of the increased credit risk and exposure to the housing industry that the Pools faced. ¶¶42-53. Indeed, these improper investments were not minor components of the Collateral Pools: the 10 largest holdings in STEP—totaling nearly 40% of the total market value of the portfolio—were either exotic SIV securities or securities issued by financial companies with heavy exposure to mortgages and consumer loans, *four* of which defaulted and resulted in realized losses for Plaintiffs and the Class. *See* Defs.' Ex. V, at 7.

In fact, nearly four years before any losses were incurred in the Collateral Pools, Defendants began receiving extensive warnings, including from their own Chief Economist, regarding the impending housing crisis and its impact on the financial institutions and mortgage-related assets, including SIVs, in which they had invested the Collateral Pools. ¶¶57-58. The fact that, nearly a year before any losses were incurred, Defendants also began receiving warnings of the specific risks facing the very securities that ultimately caused Plaintiffs' losses—including the SIVs, Lehman Brothers, CIT, Greenpoint Mortgage, Capmark Financial and Sallie Mae—underscores the severity of Defendants' imprudence. ¶¶97, 110-13.

Defendants' failure to prudently respond to these developments was driven by a second conflict of interest that arose once the Collateral Pools began to incur unrealized losses. Specifically, once Northern Trust learned it would be required to consolidate realized losses incurred in the Collateral Pools on its books if it could not obtain recovery from Plaintiffs—which would result in potentially catastrophic consequences for Northern Trust—Defendants

became heavily incentivized to avoid creating *any* realized loss, even if selling a security for some loss would benefit Plaintiffs and the Class by avoiding greater losses as the housing crisis intensified. ¶77. Internal Northern Trust documents show that, by May 2008, Northern Trust realized that STEP was inappropriate as an investment in the SLP, and wanted to implement a change "as quickly as possible," but did "not want to realize any losses" to do so because of the risk of consolidation. ¶¶8, 78, 94. The mere existence of that conflict is sufficient to create a reasonable inference that Northern Trust breached its primary duty to manage the Collateral Pools for the sole benefit of Plaintiffs and the Class. *People v. Canton Nat'l Bank*, 6 N.E.2d 220, 225 (App. Ct. Ill. 1937) (bank trustee faced divided loyalty where it put itself in a position "antagonistic to the beneficiaries of the trust.").

These exact claims involving mismanagement of the Collateral Pools were sustained in *Diebold*. In that case as here, the plaintiffs alleged that Northern Trust imprudently managed the Collateral Pools despite information "for two years [that] the market risk of asset-backed investments was increasing and that it was becoming difficult to sell fixed-income investments." *Diebold*, 2010 WL 3700387, at *3. Judge Hibbler found that plaintiffs adequately alleged that Defendants "ignored warning signs that would have alerted a prudent fiduciary to follow a different investment strategy." *Id.* at *4.[8] Judge Hibbler also recognized that news articles cited in complaint "plausibly [suggested] that a prudent fiduciary would have altered their investment" and helped provide "sufficient factual detail…to suggest the Plaintiffs have a right to relief." *Id.*

The decision in *Diebold* is in accord with other courts that have sustained similar breach of duty claims for imprudent portfolio management. *See*, *e.g.*, *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1087-1088 (7th Cir. 1992) (holding that the "flaw in the trustees' argument

---

[8] Unlike in *Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 853 (S.D. Ohio 2009), where the complaint only included general facts about the subprime market, Plaintiffs here plead numerous facts showing that Defendants were aware of the risks of specific securities in the Collateral Pools. ¶¶98-103.

19

is that it ignores the continuing nature of a trustee's duty under ERISA to review plan investments and eliminate imprudent ones"); *Comp. Okla. v. BNY Mellon, N.A.*, No. CIV-08-469-KEW, 2009 WL 2366112, at \*4 (E.D. Okla. July 31, 2009) (denying motion to dismiss in securities lending case where plaintiff alleged defendant breached its duties in selecting and maintaining certain medium term notes issued by Sigma); *St. Petersberg v. Wachovia Bank, Nat'l Ass'n*, No. 8:10-cv-693-T-26TBM, 2010 WL 2991431, at \*2-3 (M.D. Fla. July 27, 2010) (sustaining breach of duty and contract claims in securities lending action). Indeed, breach of duty and breach of contract claims against Northern Trust arising out its mismanagement of the SLP have already been sustained in two other cases. *See BP Corp. N.A. Inc. Sav. Plan Inv. Oversight Comm. v. N. Trust Invs., N.A.*, No. 1:08-cv-06029 (N.D. Ill., June 18, 2009) (Hibbler, J.) (Dkt. #102); *FedEx Corp. v. N. Trust Co.*, No. 2:08-cv-02827 (W.D. Tenn. May 20, 2009) (Dkt. #25); *see also Workers Comp. Reinsurance Ass'n v. Wells Fargo Bank N.A.*, No. 62-CV-08-10825, 2d Judicial Dist., MN (St. Paul) (June 3, 2010) (jury verdict finding defendants liable for breach of fiduciary duty).

### b. The Financial Crisis Does Not Excuse Defendants' Imprudence

In the face of this precedent, Defendants contend that their duty to prudently manage the Collateral Pools turned on their ability to predict with perfect foresight both the collapse of individual investments and the extent of the financial crisis. Defs.' Br. at 17-22. That is wrong. Plaintiffs do not allege that Defendants "should have known" specific securities in the Collateral Pools were all likely to fail or default, or even that Defendants should have known the full extent of the financial crisis.[9] Nor are such allegations necessary to state the claims that Northern Trust breached its duties.

---

[9] *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir. 2006) and *In re Lehman Bros. Sec. & ERISA Litig.*, 683 F. Supp. 2d 294 (S.D.N.Y. 2010) are inapposite because both cases involve

20

The gravamen of Plaintiffs' imprudent management claim is that the signs of the collapsing mortgage market coupled with the warnings from Northern Trust economists and others would have alerted a prudent investor at that time that continuing to hold long-term and illiquid securities, particularly those that had exposure to the housing and banking markets, was inappropriate for the specific purpose of the conservative, short-term Collateral Pools. ¶¶69, 73, 82. *See Diebold*, 2010 WL 3700387, at *4; *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1048-1049 (N.D. Ill. 2009) (sustaining fiduciary duty claim based on "continued appropriateness of the…investment options."); *Woodmen of the World Life Ins. Soc'y v. U.S. Bank Nat'l Ass'n*, No. 8:09-cv-00407 (D. Neb. Aug. 6, 2010) (Dkt. #70) (breach of duty claims sustained where investment SIVs as securities lending collateral were "inconsistent with…investment goals").

Defendants' view of the facts, wherein the financial crisis begins only with the collapse of Lehman Brothers in September 2008, is directly contrary to the facts alleged in the Complaint and nothing more than revisionist history. Defendants were on notice by late 2006, if not earlier, from their own Chief Economist of the relationship between an extended downturn in the housing markets and the overall health of financial institutions, and specifically of the risks to unsupported SIVs. ¶¶62-66. Northern Trust's internal documents recognized this same vulnerability, and the severity of these risks was confirmed for Defendants when two SIVs in which Northern Trust money market funds had invested defaulted, requiring Northern Trust to provide over $229 million to stabilize those funds. ¶90. Indeed, these risks were unmistakable to Defendants given the alarming developments in the financial markets beginning well over a year before the collapse of Lehman Brothers, including, in 2007:

---

employee stock ownership plans, where plaintiffs must specifically plead that the "fiduciary [had] knowledge at a pertinent time of an imminent corporate collapse or other dire situation." *In re Lehman Bros.*, 683 F. Supp. 2d at 301.

- HSBC's $10.5 billion write-down of mortgage-backed securities;

- The collapse of New Century, the nation's second largest mortgage lender, followed by the failures of 100 other lenders that year;

- The implosion of Bear Stearns hedge funds exposed to subprime mortgages; and

- Billions of dollars in write-downs of mortgage-related and SIV assets at financial institutions such as UBS, Merrill Lynch, Citigroup, and BNP Paribas. ¶¶70-74.

By April 2008, Defendants themselves internally acknowledged the need to increase liquidity in the Collateral Pools, with Northern Trust executives admitting that STEP was not an appropriate vehicle for new prospects by that time. ¶94. Yet, even by October 2008, Core USA held more than $7.6 billion in asset-backed securities, including securities backed by mortgages and other consumer loans, 80%—or over $6.3 billion—of which were not due to mature for over two years. Similarly, in March 2008, nearly 40% of the market value of STEP consisted of securities issued by financial institutions or SIVs with distant maturity dates, and over 10% of those holdings resulted in realized losses. Defs.' Ex. V; ¶47. Taken as a whole, these allegations present a clear picture that Defendants breached their duty to prudently manage the Collateral Pools in light of their own initial investment decisions and to restructure the Pools when they became inconsistent with the SLP's stated objectives. It is this failure—not the severity of the financial crisis—that gives rise to Plaintiffs' claims.

Even in cases without such clear warnings, courts have refused to relax the fiduciary standards imposed on trustees in the face of purportedly unforeseeable economic events. *See, e.g., Merchants Nat'l Bank of Aurora v. Frazier*, 67 N.E.2d 611, 617 (Ill. App. 2 Dist. 1946) (holding that the financial conditions during the Great Depression provided no excuse for trustee's imprudent investments); *Himel v. Cont. Ill. Nat'l Bank & Trust Co. of Chicago*, 596 F.2d 205, 209 n.6 (7th Cir. 1979) ("[u]nfavorable economic conditions do not excuse imprudent

22

investments by a trustee" and would not provide a defense to claims of breach of fiduciary duty); *First Nat'l Bank of Chicago v. Ret. Trust for Emps. of Standard Oil Co.*, No. 90 C 3981, 1991 WL 285269, at *2 (N.D. Ill. Dec. 27, 1991) (denying summary judgment when dispute existed as to whether losses stemmed from "fiduciary violations [or] from the unprecedented drop in real estate in the late eighties").

Indeed, Defendants' revisionist version of their management of the SLP is particularly striking given that the misconduct that caused Plaintiffs' losses—Northern Trust's efforts to seek out greater returns by investing in risky, exotic and other mortgage-related assets—helped create the conditions that led to the financial crisis. *See, e.g., In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010) ("The conduct that plaintiffs allege, if true, would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim.").

## IV. PLAINTIFFS STATE CLAIMS ARISING OUT OF THE SECURITIES LENDING FEES INDIRECT LENDERS PAID DEFENDANTS

NTI, as the trustee and fiduciary of the trust that included the Commingled Lending Funds, was required to negotiate "reasonable" fees paid by those Funds to participate in the SLP. *See* Pls.' Ex. A, Dec. of Trust, §3.07(d). NTI effectively conducted these negotiations with itself, through its affiliate NTC—an inherently conflicted transaction. The bargain that these Northern Trust affiliates struck required payment of 40% of the upside of any securities lending income. Significantly, Northern Trust agreed to receive far lower fees for the same services when negotiating at arm's-length with independent parties. Defendants do not dispute that Plaintiffs properly pleaded a claim for breach of contract or fiduciary duty. *See* Defs.' Br. 9-10. Neither do Defendants explain how or why their fees were reasonable given that Defendants routinely negotiated fees that were less than half of that paid by the Commingled Lending Funds,

23

nor are these facts properly argued on a motion to dismiss.  Instead, Defendants erroneously claim that the mere disclosure of the 40% fee relieves Northern Trust of its liability for breaching its duties.

That argument ignores NTI's fiduciary duties under trust law.  It is clear that "the beneficiary of a trust is not bound by his consent to a breach of trust unless the consent was given **with full knowledge of all the facts**."  *Clayton v. James B. Clow & Sons*, 154 F. Supp. 108, 116 (N.D. Ill. 1957) (emphasis added).  "One of the functions of this duty of loyalty is to impose an affirmative obligation to disclose certain information that falls within the scope of the fiduciary relationship."  *Janowiak v. Tiesi*, 932 N.E.2d 569, 581 (Ill. App. Ct. 2010), *reh'g denied* (July 8, 2010).  Further, when the fiduciary negotiates with a beneficiary regarding a transaction in which the fiduciary has an interest, the fiduciary must ensure "that he has made a free and frank disclosure of all the relevant information which he had."  *Id*. at 580.  "[A] trustee cannot simply delegate his own duty to provide information to his beneficiary or force the beneficiary to find other avenues for information he is rightfully owed."  *Id*. at 584.  Plaintiffs sufficiently allege that the disclosure by NTI was incomplete.

Here, the disclosure of the 40% fee paid by investors in the Commingled Lending Funds was insufficient because it did not apprise those investors that Northern Trust negotiated far lower fees with other participants in the SLP through arm's-length negotiations.  By failing to provide this information, NTI breached its duty of loyalty, and deprived the indirect lenders of the information that would have indicated that the fee NTI negotiated with itself was unreasonable.  Accordingly, particularly on a motion to dismiss, the allegations of the Complaint defeat any suggestion that Plaintiffs consented to Defendants' breach of their fiduciary duties.  In any event, whether Defendants made adequate disclosures to the indirect lenders is an issue of

24

fact that cannot be decided on a motion to dismiss. *United States v. LaSalle Bank, N.A.*, No. 07 C 6196, 2008 WL 4874169, at *2 (N.D. Ill. July 29, 2008) ("Courts . . . should not attempt to resolve factual disputes on a motion to dismiss.").[10]

For the same reason, Plaintiffs' claims concerning the unreasonable fee paid by indirect lenders are timely. The discovery rule applies "to [toll] the statute of limitations until the plaintiff knew or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Clark v. Robert W. Baird Co., Inc.*, 142 F. Supp. 2d 1065, 1075 (N.D. Ill. 2001). Here, indirect participants in the SLP were precluded from discovering their injury because Defendants did not provide the "free and frank" disclosures of material information that would have put them on notice of their injury and lead them to inquire further: the lower fees paid by SLP participants who negotiated at arm's-length. Moreover, "[w]hether a plaintiff should have known of the need for inquiry is an objective determination to be made by the trier of fact." *Id.*; *Fuller Family Holdings, LLC v. N. Trust Co.*, 863 N.E.2d 743, 757 (Ill. App. Ct. 2007) ("The issue of when a plaintiff knew or should have known of the cause of action is generally a question of fact"). Accordingly, because the issue is not appropriately considered at this stage, Defendants' motion must be denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

Dated: October 15, 2010

Respectfully submitted,                     /s/ Avi Josefson
                                            Avi Josefson
                                            2835 N. Sheffield Avenue, Suite 409
                                            Chicago, IL 60657

---

[10] To the extent Defendants argue that clients who were both direct and indirect lenders received a full and fair disclosure, they present a factual issue that cannot be addressed at the motion to dismiss stage but must be resolved pursuant to Rule 23, not Rule 12(b)(6).

Tel: (773) 883-5382
avi@blbglaw.com
Illinois Bar No. 6272453

David Wales
Michael Blatchley
Brett Van Benthysen
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 544-1444

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

*Counsel for Plaintiff Public School Teachers'
Pension & Retirement Fund of Chicago and
Proposed Lead Counsel for the Class*

Lynn L. Sarko
Derek W. Loeser
Laura R. Gerber
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

**KELLER ROHRBACK L.L.P.**

Garrett W. Wotkyns
7702 E. Doubletree Ranch Road, Suite 300
Scottsdale, AZ 85258
Tel: (480) 607-4368
Fax: (480) 348-3999

Todd M. Schneider
Mark T. Johnson
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 421-7100
Fax: (415) 421-7105

**SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP**

*Counsel for Plaintiff Louisiana Firefighters'
Retirement System and Proposed Lead Counsel for
the Class*

26

Sharon S. Almonrode
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48037
Tel: (248) 746-0700
Fax: (248) 746-2760
salmonrode@swappc.com
Member Trial and General Bar of
U.S.D.C., N.D. Ill.
Michigan Bar No. P33938

**SULLIVAN, WARD, ASHER & PATTON, P.C.**

*Counsel for Plaintiffs The Board of Trustees of the City of Pontiac Police & Fire Retirement System and The Board of Trustees of the City of Pontiac General Employees Retirement System*

Elizabeth Hoskins Dow
1003 Western Avenue
Joliet, IL 60435
Tel: (815) 740-4034
ldow@baileyglasser.com
Illinois Bar No. 6216262

Gregory Porter
910 17th Street NW
Suite 800
Washington, D.C. 20006
Tel: (202) 543-0226
Fax: (202) 463-2103

**BAILEY & GLASSER LLP**

*Counsel for Plaintiffs*

Steven Stockstill
3100 Brentwood Drive
Baton Rouge, LA 70809
Tel: (225) 925-4060
Fax: (225) 925-4062
Louisiana Bar No. 19166

*Additional Counsel for Plaintiff Louisiana Firefighters' Retirement System*

27