## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | The Hon. Robert W. Gettleman *Judge Presiding.* |
| Plaintiffs, | ) ) | Case No. 09-CV-07203 |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT PURSUANT TO RULE 12(b)(6)

Michele L. Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Counsel for Defendants Northern Trust Investments, N.A. and The Northern Trust Company*

Dated:  November 12, 2010

## INTRODUCTION

Plaintiffs rely heavily on Judge Hibbler's recent decision in *Diebold v. N. Trust Invs., N.A.*, 2010 WL 3700387 (N.D. Ill. 2010) (Ex. 1 hereto), in arguing that defendants' motion to dismiss should be denied.[1] But plaintiffs ignore the fact that their claims differ from those asserted in *Diebold* in fundamental ways that change the Rule 12(b)(6) analysis. First, the *Diebold* complaint did not allege that NTC had violated the investment guidelines for the collateral pools.[2] Here, by contrast, plaintiffs' primary argument is that NTC violated the spirit (if not the letter) of the guidelines by investing some collateral pool assets in longer-term, fixed-income investments that plaintiffs now contend were inherently unsuitable for collateral pool investments. For the reasons outlined in Part II below, the claim that defendants had an obligation to operate virtually risk-free collateral pools fails as a matter of law because it is directly contrary to the plain terms of the governing investment guidelines.

Second, plaintiffs have not made the same prudence argument that Judge Hibbler sustained in *Diebold*. The *Diebold* plaintiffs alleged that, despite awareness of a liquidity crisis in the credit markets in 2007, NTC "took no steps to . . . change the investment strategy of the collateral pools." *Id*. at *2. Judge Hibbler held this allegation sufficient to state a claim for imprudence under ERISA, noting that defendants "may have acted imprudently" if, for example, "a prudent investor would have increased the percentage of liquid assets in the collateral pool in response to the economic situation that confronted the Defendants and yet the Defendants

---

[1]     The Court should be aware that a motion to transfer this case as related to the lower-numbered *Diebold* case has been pending before Judge Hibbler since December 3, 2009. Judge Hibbler has indicated that he is aware that this case was recently transferred to this Court from Judge Hart and that the parties are in the process of briefing defendants' motion to dismiss.

[2]     *See id*. at *1 (noting that each of the collateral pools "retained some assets in cash or overnight securities to provide a measure of liquidity necessary to repay borrowers when loans came due. NTC invested the remainder of the assets in the collateral pools in longer-term fixed-income investments in accordance with the investment guidelines established for each pool").

allowed the percentage of liquid assets in the collateral pool to remain the same."  *Id*. at *4. Here, by contrast, plaintiffs acknowledge that by August 2007, NTC had in fact changed its investment strategy to "build liquidity in STEP and Core USA," by reinvesting the proceeds from all maturing assets in "very short maturity investments," rather than in the broader variety of investments authorized by the guidelines.  Complt. ¶ 83.  Furthermore, although plaintiffs suggest that defendants should have sold some assets before September 2008, they concede that defendants could not have predicted which securities would ultimately become impaired.  As demonstrated in Part III, these concessions leave plaintiffs without any plausible or even coherent basis for claiming that defendants failed to act as a prudent investor.

Finally, in both *Diebold* and this case plaintiffs sought recovery of all or a portion of the fees NTC charged the commingled lending funds for its services as securities lending agent.  In *Diebold*, Judge Hibbler dismissed that claim, on the ground that plaintiffs had failed to properly plead that defendants had engaged in a prohibited transaction in violation of ERISA.  *Id*. at *5. In this case, ERISA does not apply, and (for the reasons outlined in Part I below) plaintiffs have failed to properly plead a common law claim to recoup any of the fees paid to NTC.

## ARGUMENT

### I.    Plaintiffs Cannot Maintain An Action For Damages On The Theory That NTI Had A Duty To Negotiate A More Favorable Securities Lending Fee.

Plaintiffs do not dispute that their investments in the commingled lending funds are governed by the individual Collective Fund Custody Agreements ("CFCA") attached as Exhibits H, I, N, and P to defendants' motion to dismiss.  They also do not deny that those CFCAs expressly authorized any commingled lending fund in which plaintiffs invested to pay NTC a monthly fee equal to 40% of the fund's net securities lending revenues.  Nevertheless, plaintiffs continue to argue that NTI, in its capacity as trustee of the commingled lending funds, somehow

breached fiduciary and contractual obligations it allegedly owed to negotiate a more "favorable fee" or even the "lowest possible fee" with NTC. Complt. ¶¶ 133, 145, 150.

In support of their argument, plaintiffs claim (at 23) that Section 3.07 of the Declaration of Trust required NTI to "negotiate 'reasonable' fees paid by" the commingled lending funds to participate in NTC's securities lending program. The section plaintiffs cite, however, does not impose any obligation on NTI to negotiate the fees paid to the securities lending agent — let alone to secure the best possible arrangement. Instead, that section merely lists NTI's "rights, powers and privileges" as Trustee of the Collective Funds, providing that it has the discretionary power to lend securities through a lending agent, that NTI itself or any of its affiliates could serve in that capacity, and that the securities lending agent (whoever it might be) "shall be entitled to reasonable compensation for its services." *See* Pl. Ex. A. Plaintiffs do not allege (nor could they allege) that the 40% fee was unreasonable. That is enough, standing alone, to require dismissal of their fee claims in Counts I-III of the complaint.

The fact that plaintiffs each individually *agreed* to the 40% fee provides another, independent reason for dismissing plaintiffs' fee claims. Contrary to plaintiffs' argument, defendants never conceded that plaintiffs had properly pleaded a claim for breach of contract. In fact, defendants' opening brief argued (at 8) that plaintiffs could not possibly pursue a claim for either breach of contract or breach of the duty of good faith and fair dealing because the contracts governing their investments in the commingled lending funds all expressly authorize the fees in question. Plaintiffs simply ignore the agreements they signed because they have no answer to this argument.[3] *See Northampton Rest. Group, Inc. v. Firstmerit Bank, N.A.*, 2010 WL

---

[3]    Plaintiffs argue in a footnote (at 9 n.4) that the implied duty of good faith and fair dealing "provide[s] an independent basis for relief" in addition to their breach of contract claim. None of the cases plaintiffs cite supports this proposition. On the contrary, *LaSalle Bank Nat'l Ass'n v. Paramount Props*. notes that the implied duty is "merely a tool to aid in interpreting contract terms." 588 F. Supp. 2d

3069494, at *3 (N.D. Ohio 2010) (Ex. 2 hereto) (dismissing breach of contract claim where complaint failed to cite the contract provision that was allegedly breached and defendant attached to its motion to dismiss a contract expressly permitting the conduct in question).

The fact that plaintiffs agreed to the fees in the CFCAs also precludes any possible claim for breach of fiduciary duty. Plaintiffs argue (at 24) that consent is not valid unless they had full knowledge of all material facts. They then argue that NTI failed to disclose that NTC sometimes negotiated fees lower than 40% with direct lenders. But NTI had no duty to disclose this kind of information to potential investors in its commingled lending funds. In *In re Smith Barney Fund Transfer Agent Litig.*, the court dismissed a securities fraud claim against a mutual fund that was based on a similar theory, holding that "[w]here the total amount of fees paid by a mutual fund [to an affiliate] for various services is disclosed, other information about the fees, such as their allocation or the transfer agent's profit margin, is not material." 2007 WL 2809600, at *3 (S.D.N.Y. 2007) (Ex. 3 hereto). As the court explained, "[a]n individual who knows the amount of fees paid by a fund can compare it to its competitors in deciding whether to invest." *Id.*[4] The same is true here: plaintiffs knew the commingled lending funds would pay NTC a fee equal to 40% of net securities lending revenues. Thus, they had all the information they needed to compare NTGI's commingled lending funds to similar lending funds offered by different banks.

---

840, 858 (N.D. Ill. 2008). And in *Sinclair v. State Bank of Jerseyville*, the court dismissed a claim for breach of the duty of good faith and fair dealing because the plaintiff could not point to any contract between the parties. Thus, plaintiffs' own cases demonstrate that they cannot pursue an independent claim for breach of an implied duty of good faith and fair dealing. 566 N.E.2d 44, 47 (Ill. App. Ct. 1991).

[4] *Heckler v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), makes the same point. In that case, the plaintiff alleged that Fidelity, as trustee for the Deere pension plan, had violated ERISA by failing to disclose that Fidelity mutual funds rebated a portion of the fees they earned on investments by plan participants to Fidelity to defray plan administration expenses. Plaintiffs argued that they had been led to believe that Deere was paying plan administration expenses and that the failure to disclose obscured the truth. The Seventh Circuit upheld the dismissal of the complaint, concluding (among other things) that the revenue-sharing arrangement was not material to plan participants and that disclosure of the total amount of the fees, which the court described as the "critical figure," was enough. *Id.* at 586.

Defendants had no obligation to say more.

Furthermore, plaintiffs do not contend that NTI ever represented that 40% was the lowest fee NTC charged to any customer (whether direct or indirect) for providing securities lending services or that they entered into the CFCA in the mistaken belief that that was the case. Nor could they make such a claim. At least three of the four plaintiffs *knew* that NTC sometimes negotiates lower fees with direct lenders because they themselves had negotiated lower fees for their own direct lending activity. The two Pontiac entities had negotiated fees of 35%. Def. Ex. D, at 15; Def. Ex. E, at 15. And CTPF negotiated a 15% fee just six months before it entered into its CFCA.[5] *See* Ex. 4 hereto. These plaintiffs cannot possibly claim that they consented to the 40% fee for their indirect lending activities without full knowledge of the facts.

Any claims by Louisiana Firefighters and Pontiac Fire & Police are also barred by the five-year statute of limitations. Plaintiffs argue that there is a question of fact as to when these two plaintiffs discovered or should have discovered their claim. But both plaintiffs are sophisticated entities who knew precisely how much the commingled lending funds were paying for securities lending services from the day they entered into their CFCAs. Moreover, the trustees of those funds were themselves fiduciaries who were duty-bound to investigate to ensure that the fees the pension funds were paying were reasonable. *See George v. Kraft Foods Global Inc.*, 674 F. Supp. 2d 1031, 1048 (N.D. Ill. 2009). Because there is nothing in the complaint "that indicates that application of the discovery rule is appropriate in this case," the fee claims asserted by Louisiana Firefighters and Pontiac Fire & Police should be dismissed as time-barred. *Thompson v. Cont'l Cas. Co.*, 602 F. Supp. 2d 943, 945-46 (N.D. Ill. 2009) (dismissing ERISA

---

[5]    As CTPF's agreements show, securities lending fees for direct lenders are often part of a negotiated package of fees for various services — a factual context that is inapplicable to commingled lending funds. *See* Def. Ex. M, app. A (guaranteeing a flat fee for custody services, contingent  on CTPF's entry into NTC's securities lending program within two years of initiating the master custody relationship).

claim as barred by statute of limitations).

## II.    Plaintiffs Have Failed To State A Claim Based On The Theory That NTC Improperly Structured The Collateral Pools.

Plaintiffs argue that Core USA and STEP were *per se* imprudently structured in light of what they describe as the "narrow purpose" of the Collateral Pools. Pl. Br. at 12. According to plaintiffs, collateral pool investments should have been limited to extremely short-term, highly conservative and therefore low-yielding fixed-income securities that presented little or no risk of default. They accuse defendants of investing in "risky," longer-term securities in the hope of generating larger interest payments and thus increased securities lending fees for NTC. But this is all revisionist history. As sophisticated investors, plaintiffs knew that collateral pool investments were not limited to Treasuries and overnight investments. Indeed, three of the four plaintiffs lent out their own securities and affirmatively *chose* collateral pools with detailed investment guidelines that *expressly allowed* the very types of investments that plaintiffs now claim were inappropriate.[6] In addition, all of the plaintiffs agreed that NTC would be paid for its services as securities lending agent based on a percentage of the net securities lending revenue generated, for the obvious purpose of aligning NTC's interests with their own interest in maximizing the amount of revenue the collateral pools generated.

When they agreed to the detailed investment guidelines for Core USA and STEP, plaintiffs accepted a certain level of investment risk. They cannot claim now that investments made in accordance with those guidelines posed too great a risk for collateral pool investments and therefore were *per se* imprudent. Plaintiffs try to avoid this result by arguing that the

---

[6]    Plaintiffs argue (at 12 n.6) that they did not choose how their collateral would be invested, because they only selected the collateral pools and had no control over the way the pools were managed. But this argument ignores the fact that plaintiffs expressly *agreed* to the specific investment guidelines when they chose particular collateral pools. Had they wanted a collateral pool that was limited to short-duration, ultra-conservative investments — and were willing to accept the lower revenues such a pool would generate — they could have insisted that their collateral be invested in that manner.

detailed investment guidelines cannot "trump" what they identify as the "primary investment objectives" of Core USA and STEP. Pl. Br. at 13. But the argument that defendants somehow violated the "spirit" of the investment guidelines by investing in accordance with the detailed guidelines has the law exactly backwards. As the Ninth Circuit observed in rejecting a similar argument, "[w]e are unaware of any authority indicating that a failure to comply with the 'spirit' of written investment guidelines constitutes a breach of the duties imposed by [ERISA] when the actual terms of the guidelines have been followed." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001).

Furthermore, plaintiffs are simply wrong in arguing (at 12) that Core USA's "Investment Objectives" made "preservation of capital and maintenance of liquidity" the sole "guiding" principle, relegating the following four pages of detailed investment guidelines to a mere footnote. The very first sentence disproves plaintiffs' characterization, providing that cash collateral is invested to "seek to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity *by investing cash Collateral of this section in accordance with the guidelines stated below*." Def. Ex. A, at 2 (emphasis added). Although noting that "liquidity and principal preservation" are "prime" — not the *sole* — objectives, the paragraph warns that "[t]here can be no assurance that these objectives will be attained" and ends by stating that "[w]ithin quality, maturity and market sector diversification guidelines, investments are made in those securities with the most attractive yields." *Id.*

Unlike the Core USA guidelines, STEP's Fund Declaration says nothing about liquidity and does not describe preservation of principal as one of STEP's prime objectives. In fact, the Fund Declaration warns that STEP "is not an appropriate investment for those whose primary objective is absolute stability of principal." Def. Ex. B ¶ 1. In explaining STEP's investment

objectives, the Fund Declaration says only that STEP "attempts to outperform high grade, short term money market investments" by investing in a wide variety of different types of fixed-income securities with specified maturity, credit quality, and diversification requirements. *Id.* ¶ 2. Nothing in the Fund Declaration suggests that STEP would be invested only in the kind of short-term, ultra-conservative investments that plaintiffs now say — with the benefit of 20/20 hindsight — were the only suitable investments for a collateral pool.[7]

Significantly, plaintiffs have not identified any investments that were made in Core USA that did not comply with its investment guidelines. They complain that in October 2008, over 30% of the assets in Core USA had a maturity of more than two years, but plaintiffs pointedly do *not* allege that this percentage violated the specific guidelines on maturity/liquidity concentrations at page 4 of the Core USA guidelines. Complt. ¶ 45. Similarly, plaintiffs complain about the length of the maturities in STEP as of July 2007 (*Id.* ¶ 44), but do not contend that these maturities were contrary to the STEP guidelines.

Plaintiffs also do not allege that NTC ever purchased any fixed-income instruments for Core USA or STEP that failed to meet the credit quality or diversification requirements set forth in those guidelines. Plaintiffs do contend that STEP's investments in notes issued by SIVs were unauthorized. But that assertion is contrary to the plain terms of the Fund Declaration, which specifically permitted investments in any "[o]bligations of domestic or foreign corporations, including, but not limited to, commercial paper, notes, bonds and debentures" so long as they met certain credit quality requirements. Def. Ex. B ¶ 3(c). The SIV notes plaintiffs complain about were notes issued by a foreign corporation and thus were permissible investments for

---

[7] Plaintiffs continue to repeat (at 4) their allegation that the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending "obligated Defendants to invest the cash collateral in safe, liquid instruments." As demonstrated in defendants' opening brief (at 13 n.12), however, the FFIEC policy says nothing about how cash collateral should be invested. Instead, it simply advises banks to have written guidelines for the investment of cash collateral.

STEP.  *See* Complt. ¶¶ 51-53; Def. Ex. T, at 1.[8]

As a fallback position, plaintiffs argue that even if defendants fully complied with the investment guidelines for Core USA and STEP, that is not enough to demonstrate that they acted prudently.  Plaintiffs cite a number of cases for the proposition that even an authorized investment can give rise to liability for breach of fiduciary duty if a prudent person would not have made the particular investment in question.  The authorities plaintiffs rely on, however, are inapposite because they all deal with trust provisions authorizing broad *types* of investments and not the kinds of detailed investment guidelines at issue here, which impose maturity, credit quality, and diversification requirements, in addition to authorizing various types of investments.  To illustrate the point:  plaintiffs quote the *Restatement (Second) of Trusts* for the proposition that a trustee who was authorized to invest in railroad company bonds would be guilty of a breach of trust if he bought bonds "in which a prudent man would not invest because of the financial condition of the [railroad] company."  Pl. Br. at 11 n.5 (quoting *Restatement (Second) of Trusts* § 227, cmt. v).[9]  But if the trustee's discretion had been limited so that he was permitted to purchase only those railroad company bonds that had a credit rating in the highest category, his decision to purchase bonds within those guidelines could *not* be deemed imprudent.

So too, in this case, the fact that the guidelines required every instrument that was purchased to be highly rated by Nationally Recognized Statistical Rating Organizations ("NRSOs") creates a presumption that purchases within the guidelines were prudent.  In

---

[8]     Plaintiffs merely assume that the notes were not permitted investments under the plain terms of the Fund Declaration and then argue that there is a question of fact as to whether they are sufficiently analogous to permitted investments to avoid a claim that the investments were unauthorized.  Pl. Br. at 14.  But that is an issue the Court need not reach because the notes were expressly permitted investments.

[9]     *In re Estate of Collins*, 139 Cal. Rptr. 644, 650 (Cal. Ct. App. 1977), also involved an authorization to purchase a particular type of security.  In *Pub. Serv. Co. of Colorado v. Chase Manhattan Bank, N.A.*, 577 F. Supp. 92, 103-04 (S.D.N.Y. 1983), the provision at issue was even broader, giving the trustee the authority to invest in anything he chose, in his "sole discretion."

*Summers v. State St. Bank & Holding Co.*, the Seventh Circuit held that "a trustee is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it that is available to him." 453 F.3d 404, 408 (7th Cir. 2006). Similarly, a trustee is not imprudent to assume that credit ratings by NRSOs will generally provide the best available estimate of the likelihood of default. *See J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 393 (6th Cir. 2008) (describing ratings agencies as "financial market gatekeepers" whose ratings investors consider "important" and rely on as "independently valuable"). Plaintiffs do not allege that defendants had any reason to believe that the credit ratings on the instruments they purchased for Core USA and STEP were wrong. Accordingly, there is no basis for any claim that the guidelines themselves or purchases made pursuant to them were imprudent.

Plaintiffs' assertion that NTC's fee arrangement created a conflict of interest does not alter this analysis. As demonstrated in defendants' opening brief (at 11-13), NTC had ample incentive to avoid purchasing "risky" debt instruments, since defaults would (i) reduce securities lending revenues and (ii) expose NTC to potential negligence claims. Plaintiffs ignore the first argument and dismiss the second, on the ground that a faithless fiduciary never expects to be caught. Pl. Br. at 16.[10] But defendants' argument is not that NTC would fear claims that it breached its duty of loyalty. Instead, the fact that NTC could be held liable for mere negligence provided a strong incentive to operate its program in a way that was designed to do precisely what the investment guidelines contemplated — to "maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity." Def. Ex. A, at 2.

---

[10]    Plaintiffs also try to shrug off the inconsistency between their claim that NTC had no incentive to avoid losses and their allegation that NTC feared realizing losses in STEP, by claiming that it was not until the collateral pools began to suffer unrealized losses that NTC understood that realized losses could create an accounting issue. Pl. Br. at 16. The paragraph of the complaint that plaintiffs cite for this proposition, however, (¶ 78) does not support the claim that the alleged accounting problem was unknown at the time the assets in question were purchased.

### III.    Plaintiffs Have Not Alleged A Plausible Imprudence Theory.

For all of the reasons outlined above, plaintiffs have failed to state a claim based on the notion that the collateral pools were imprudently structured. That raises the question of whether there is anything else that plaintiffs claim defendants did wrong. It is not enough for plaintiffs to point out that they suffered losses when some of the collateral pool investments became impaired and to claim that defendants therefore must have acted imprudently. As the Supreme Court observed in *Ashcroft v. Iqbal*, an "unadorned, the-defendant-unlawfully-harmed-me accusation" does not pass muster even under Rule 8, "[n]or does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). Instead, plaintiffs must be able to advance a plausible theory of imprudence by identifying something a prudent investor allegedly would have done differently.

The Amended Complaint suggested that plaintiffs might be claiming that defendants acted imprudently by either purchasing or retaining the specific debt instruments that ultimately defaulted or were sold at a discount. Defendants' opening brief explained (at 17-22) that plaintiffs had failed to offer the kind of "factual enhancement" necessary to show that such a claim was based on something other than impermissible hindsight.[11] Rather than responding to this argument, however, plaintiffs have backed away from any claim that defendants should have foreseen the failure of *particular* securities, stating that they "do not allege that Defendants 'should have known' specific securities in the Collateral Pools were all likely to fail or default, or even that Defendants should have known the full extent of the financial crisis." Pl. Br. at 20.

---

[11]    A fiduciary duty of care "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). Thus, "20/20 hindsight musings are not sufficient to maintain a cause of action alleging a breach of fiduciary duty" based on the fact that investments failed. *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1230 (N.D. Cal. 2008); *see also Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 474 (S.D.N.Y. 2009) ("Pleading by hindsight" is purely "speculative," and therefore does not satisfy the requirements of *Twombly* and *Iqbal*).

Furthermore, unlike the *Diebold* plaintiffs, plaintiffs here do *not* allege that defendants failed to take any steps to respond to the liquidity crisis that hit the credit markets in 2007. On the contrary, plaintiffs acknowledge that defendants *did* change their investment strategy in August of 2007, building liquidity by reinvesting the proceeds of instruments that matured in Treasuries and other extremely short-term instruments, rather than in the various types of longer term instruments permitted under the guidelines. Complt. ¶ 83.

Although it is far from clear, plaintiffs' brief suggests that they may be claiming that defendants should have sold assets at some unidentified point in time prior to September 2008, even though doing so would have forced the collateral pools to suffer realized losses. Since plaintiffs admit that defendants could not have foreseen which debt securities would default or be permanently impaired, their claim would have to be that defendants should have entirely restructured Core USA and STEP by selling *all* of the asset-backed securities in their portfolios, as well as *all* instruments issued by financial institutions. *If* that is plaintiffs' claim, however, it is entirely implausible and therefore cannot possibly provide the basis for a viable prudence claim.

Plaintiffs' discussion of Defendants' Exhibit V illustrates the problem defendants faced. Pages 6-7 of that exhibit (which is one of the documents plaintiffs referred to and relied upon in framing their complaint) show the characteristics of STEP as of 3/31/08. As plaintiffs point out (at 18 and 22), the ten largest holdings in STEP, which accounted for approximately 39% of its total market value, were concentrated in SIVs and the financial sector.[12] Plaintiffs note that four of the ten holdings (representing approximately 11% of STEP's market value as of 3/31/08) eventually resulted in realized losses. But, as plaintiffs concede, in March 2008, defendants could not have known which (if any) of these four issuers were likely to default at some point

---

[12]    The list at page 7 shows that notes issued by Sigma constituted the tenth largest investment in STEP and accounted for 2.4% of its market value. The nine largest holdings, which accounted for 36% of its market value, were all issued by finance companies or financial institutions.

down the road. Three of the four (Lehman Brothers, CIT, and Sigma) still had *Moody's* ratings of A1 or A3. There was no way defendants could have known that while Bear Stearns' notes (which had a Baa1 rating) would ultimately be paid off, Lehman Brothers' better-rated notes would default six months later. Nor could defendants have predicted that in 2009 it would sell the CIT notes (which as of 3/31/08 were rated A3) at a loss because it feared a CIT bankruptcy, but that HSBC Finance notes (lower rated at Aa3) would be paid in full at maturity.

So what do plaintiffs believe a prudent portfolio manager would have done under these circumstances? Do they claim that defendants should have sold off — at a discount — *all ten* of STEP's largest holdings, which would have included debt securities issued by GE Capital, Citigroup, Morgan Stanley, Goldman Sachs, Bear Stearns, and HSBC Finance? As plaintiffs acknowledge, by August 2007, there was a severe liquidity crisis in the credit markets. Plaintiffs do not allege that it would even have been *possible* to sell $5 billion worth of such securities — let alone that doing so would have reduced the losses that STEP ultimately suffered. Under these circumstances, selling all of these holdings off at a discount would seem, on its face, to be a highly *im*prudent act — particularly when all of the issuers were making scheduled interest payments on time and the best judgment of defendants' portfolio managers at the time was that all of the securities would be paid in full at maturity. *See* Def. Ex. V, at 12.

In *Twombly*, the Supreme Court held that the plaintiffs' allegations of an antitrust conspiracy were insufficient to plausibly suggest that the defendants had entered into an agreement to restrain trade — as opposed to legally engaging in parallel conduct. In reaching that result, the Court observed that district courts "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," with all of the "inevitably costly and protracted discovery" such cases necessarily entail. *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). The same principle applies here. Plaintiffs' broad-based attack on defendants' multi-billion dollar securities lending program threatens a "potentially massive factual controversy," which should not be allowed to proceed unless and until plaintiffs can articulate sufficient facts to plausibly suggest that the losses they suffered were due to defendants' imprudence, rather than to the effects of the worst financial crisis since the Great Depression.

Indeed, plaintiffs' complaint would fail even under a pre-*Twombly* regime. Despite amending their complaint and filing a 25-page opposition to defendants' motion to dismiss, it is still unclear what plaintiffs' theory is — apart from the unsustainable claim that the collateral pools should have been structured from the outset to avoid any risk of loss. Without some explanation as to when or how or why defendants supposedly acted imprudently, defendants have no notice as to what they supposedly did wrong and no way of responding effectively to plaintiffs' complaint.

## IV. Other Securities Lending Cases Do Not Support Plaintiffs' Claims.

Plaintiffs try to create the impression (at 20) that there is a long line of cases denying motions to dismiss in securities lending cases. But most of the cases plaintiffs cite are entirely beside the point.[13] There are only two cases in which the courts addressed motions to dismiss similar to defendants' motion in this case. One is *Diebold*, which is distinguishable for the

---

[13]     For example, in *Comp. Okla. v. BNY Mellon, N.A.*, 2009 WL 2366112, at *2-*4 (E.D. Okla. 2009) (Pl. Ex. D), the issue was whether plaintiff's claims were barred by either Oklahoma's economic loss doctrine or exculpatory clauses in the governing agreement — not whether plaintiff had stated a common law claim for imprudence. *St. Petersburg v. Wachovia Bank Nat'l Ass'n*, 2010 WL 2991431, at *2-*3 (M.D. Fla. 2010) (Pl. Ex. L), also did not address the adequacy of any prudence claims. Similarly, although both *BP Corp. N.A. Inc. Sav. Plan Inv. Oversight Comm. v. N. Trust Invs., N.A.*, No. 08-cv-06029 (N.D. Ill. June 18, 2009) (minute order) (Pl. Ex. C), and *FedEx Corp. v. N. Trust Co.*, No. 08-cv-02827 (W.D. Tenn. May 20, 2009) (Pl. Ex. G) involved Northern's securities lending program, neither decision discusses a prudence claim. The issue in the *BP Plans* case was whether the plaintiffs could pursue state law claims along with their ERISA claims; in *FedEx* the issue was whether the plaintiff had properly pleaded consideration for a settlement agreement that defendants had allegedly breached.

14

reasons outlined above. The other is *The Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of N.Y. Mellon Corp.*, where the court dismissed a complaint alleging that BNY Mellon had acted imprudently by investing cash collateral in Lehman notes and not selling those notes prior to Lehman's unexpected collapse.[14] 2010 WL 1558587, at *6-*7 (S.D.N.Y. 2010) (Def. Ex. W-2). The district court dismissed the complaint because the Lehman notes were purchased in accordance with the collateral pool's investment guidelines, and plaintiffs had failed to offer "any factually supported assertions that Defendants 'actually or constructively knew about Lehman's imminent collapse'" and thus acted imprudently by not selling those notes prior to Lehman's collapse. *Id.* at *6. The same rationale applies here. Plaintiffs have not alleged that defendants failed to follow the detailed investment guidelines in purchasing fixed-income securities for STEP and Core USA. They have not offered any "factually supported assertions" that defendants actually or constructively knew that *any* of the securities that ultimately became impaired were likely to default. And plaintiffs have failed to offer any other plausible theory to explain how or why defendants supposedly acted imprudently in administering the collateral pool investments.

## CONCLUSION

For the foregoing reasons and the reasons set forth in defendants' opening brief, plaintiffs' Amended Complaint should be dismissed for failure to state a claim.

Respectfully submitted,

Dated: November 12, 2010                          /s/ Michele Odorizzi

---

[14] Contrary to plaintiffs' characterization (at 13 n.7), Judge Berman did not vacate this opinion. Instead, he reluctantly vacated the dismissal with prejudice, because he felt "constrained" to allow plaintiff to replead. *The Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v. The Bank of N.Y. Mellon Corp.*, 2010 WL 3958790, at *3 (S.D.N.Y. 2010) (Ex. 5 hereto).

Michele Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 South Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Counsel for Defendants Northern Trust
Investments, N.A. and The Northern Trust
Company*

16