IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | No.  09 C 7203 |
| v. | ) ) | Judge Robert W. Gettleman |
| NORTHERN TRUST INVESTMENTS, N.A, and THE NORTHERN TRUST COMPANY, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Louisiana Firefighters' Retirement System, Public School Teachers' Pension & Retirement Fund of Chicago, the Board of Trustees of The City of Pontiac Police & Fire Retirement System, and the Board of Trustees of the City of Pontiac General Employees Retirement System, on behalf of themselves and all others similarly situated, have brought a three count amended putative class action complaint against defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") alleging breach of fiduciary duties (Count I); breach of contract (Count II) and breach of duty of good faith and fair dealing ("Count III").  Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  For the reasons discussed below, the motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiffs all invested, either directly, indirectly, or both in defendant NTC's securities lending program ("SLP"). Through that program, NTC arranges loans of securities owned by its customers and/or sponsored funds to pre-approved borrowers, who use the securities for a variety of purposes. The borrowers pledged collateral equal to 102% of the market value of the loaned securities, usually in cash. NTC then invests the cash in fixed-income securities, which pay interest, generating revenue for the participants in the program. When the loans are terminated the collateral is returned to the borrowers, along with an additional payment or "rebate" as compensation for the use of the collateral. If the value of the borrowed securities increases, more collateral must be posted. If the value of the securities decreases, collateral is returned to the borrower. The collateral is invested in commingled pools operated by defendants (the "Collateral Pools"). Because the amount of cashed collateral held by defendants must be adjusted and the collateral must be repaid when the loan is terminated, at least some of the collateral must be held in conservative, short-term liquid investments to preserve capital while generating nominal return.

When a loan matures or is called back, the borrower returns the security and receives back the collateral it originally posted. The borrower also receives, as a rebate, the interest on the collateral. The amount of the rebate is intended to reflect the intrinsic value of the loaned security and the fact that some securities are in greater demand than others. The higher the demand is for the security, the lower the rebate paid. Therefore, the collateral reinvestment need

---

[1]The background facts are taken from plaintiffs' complaint and are accepted as true for purposes of the instant motion.

generate only a higher return than the rebate promised to the borrower for the participating lenders to realize a return. The earnings from the collateral reinvestment generated above the rebate rate is termed the "lending spread" and represents the profit in the transaction. The profit is split between the participating lender and defendants based on an agreed revenue sharing arrangement, with defendant receiving up to 40% of the lending spread in addition to any fees otherwise charged.

Plaintiffs allege that while defendants collect a percentage of the lending spread, they bear no downside risk of any loses incurred by the Collateral Pools. If there is a "collateral deficiency," i.e., the invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption, defendants would not be required to make up the difference owed to the borrowers. Thus, according to plaintiffs, defendants bore none of the risk of loss, leaving defendants with the incentive to take greater risks with plaintiffs' assets.

Participants could participate in the SLP either directly, indirectly, or both. Direct participants entered into a securities lending agreement with defendants allowing defendants to lend out securities from the participant's investment portfolio and giving defendant discretion to invest the collateral received from those loans in one or more specified Collateral Pool. Indirect participants invested in commingled investment funds established and managed by defendants (the "commingled lending funds"). These funds in turn participated in the SLP. The commingled lending funds acted as direct participants in the SLP and entered into a securities lending agreement with defendants, allowing defendants to lend out securities held in the commingled lending funds for the benefit of the investors in those funds, and giving defendants discretion to invest the collateral received from those loans in one or more specified Collateral

Pool.  For indirect lending clients, NTI, as lending agent, negotiated with NTC for the

commingled lending funds to pay a 40% fee for securities lending.  According to plaintiffs,

NTC, when negotiating at arm's length with other direct participants, agreed to fees less than

half of that amount.

Plaintiffs claim that defendants, in pursuit of higher lending fees and in breach of their

fiduciary and contractual duties, ignored the investment objectives of the Collateral Pools and

imprudently invested hundreds of millions of dollars in exotic, unregistered securities, such as

structural investment vehicles ("SIVs") as well as other securities that were both too long term

and high risk for collateral investment.  For example, by mid-2007 more than half of the

securities in the Short Term Extendable Portfolio ("STEP") Collateral Pool were not due to

mature for at least two years, and 18% of those securities were not due to mature for at least 20

years.  Similarly, at the height of the financial crisis in October 2008, a third of the securities in

the Core USA Collateral Pool were not due to mature for over two years.

Plaintiffs allege that the longer-term securities carried a higher credit risk than

comparable short-term securities and were unsuitable for Collateral Pools.  Because they carried

a greater risk, the longer-term securities also yielded higher returns, providing defendants

greater returns through enhanced securities lending fees than investments in shorter-term notes.

In addition to longer-term securities, plaintiffs allege that defendants structured the

Collateral Pools with high levels of exposure to the housing market and to financial institutions

that were likewise heavily exposed to the housing market.  According to the complaint,

defendants ignored warning signs, including warnings by its own Chief Economist that a housing

bubble and recession would severely impact the United States banking industry because of

unprecedented exposure to housing loans and other commercial debt held by United States banks.

## DISCUSSION

Plaintiffs' complaint raises three claims. In Count I, plaintiffs allege that defendants breached their fiduciary duties as trustees of the Collateral Pools and investment manager of those pools by imprudently investing the Collateral Pools in securities that are high-risk, carried long maturity and/or were illiquid, and by failing to prudently manage the pool in response to clear evidence of a growing financial crisis. In Count II, plaintiffs allege that defendants breached their agreements with direct participants in the SLP, and the agreements entered into with the commingled lending funds on behalf of independent participants by: (1) imprudently investing the Collateral Pool and securities that were high risk, carried long maturities and/or were illiquid; (2) by failing to prudently manage the Collateral Pool in response to clear evidence of a growing financial crisis; (3) by failing to make the participants whole for losses caused by defendants' failure to perform their duties under the lending agreement; and (4) by failing as manager and lending agent to the commingled lending funds to negotiate a favorable fee payable to NTI for the commingled lending funds' participation in the SLP. In Count III, plaintiffs alleged that defendants breached their contractual duty of good faith and fair dealing.

Defendants have moved to dismiss all three counts under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Such motions test the sufficiency of the complaint, not the merits of the case. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, the complaint must meet the plausibility standard announced in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, but the

5

complaint must contain sufficient factual matter, accepted as true, to "state a claim that is plausible on its face." Id. A claim is facially plausible when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. In analyzing the complaint, the court must accept as true well pled factual allegations, but need not accept conclusory legal statements. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

Defendants challenge plaintiffs' claims of imprudent investment contained in Counts I and II as conclusory allegations unsupported by anything but 20/20 hindsight. In particular, defendants argue that in the fall of 2008 Lehman Brothers' bankruptcy triggered a series of events that adversely impacted securities lending programs like the SLP program at issue in the instant case. According to defendants, the Core USA Collateral Pool and the STEP Collateral Pool held fixed income securities issued by Lehman that defaulted when Lehman declared bankruptcy. Shortly thereafter certain SIVs in whose securities STEP had invested also failed. Other fixed-income securities held in the Collateral Pools also declined in value as the credit markets froze, creating a gap between the market value of the assets the pools held and the amount necessary to ensure repayment of all borrowers when loaned securities were returned. According to defendants, they took a number of steps to protect and support their clients in response to the financial crisis, some of which are detailed in the complaint. Defendants argue that theses steps demonstrate their prudence. Whether those steps are sufficient to establish that defendants acted prudently, however, goes to the merits of plaintiffs' claims, not to the sufficiency of the complaint, and cannot be decided at this juncture.

Defendants also argue that plaintiffs' claims that the Collateral Pools were imprudently structured must fail because the investment guidelines for the pools (particularly Core USA and

6

STEP) expressly allowed the types of investments made by defendants.  This precise argument

was rejected by Judge Hibbler in Diebold v. Northern Trust Investments, N.A., 2010 WL

3700387 (N.D. Ill. 2010), and is also rejected here.  The fact that a pool's guidelines would allow

a type of investment does not per se indicate that such an investment would be prudent given a

particular set of financial circumstances.  It was defendants' duty to determine whether an

allowed investment would be prudent.  As Judge Hibbler noted (id. At *3):

> Whether a particular investment choice was imprudent is a particularly fact-
> sensitive inquiry that would not be appropriate to resolve on a motion to dismiss.
> The Plaintiffs have alleged that the Defendants were confronted with a set of
> circumstances – notably that for two years the market risk of asset-backed
> investments was increasing and that it was becoming difficult to sell fixed-income
> investments like those in the collateral pools – that would have caused a prudent
> investor to amend its securities lending program to protect the assets of the
> collateral pools.

Plaintiffs' complaint details a number of warning signs, including statements by

defendants' own chief economist, that plaintiffs allege should have caused a prudent fiduciary to

alter the investments of the Collateral Pool's assets.  "If, for example, a prudent investor would

have increased the percentage of liquid assets in the collateral pool in response to the economic

situation that confronted the Defendants and yet the Defendants allowed the percentage of liquid

assets in the Collateral Pool to remain the same,  Defendants may have acted imprudently."  Id.

at *4.

Whether plaintiffs can establish that these warning signs would have caused a reasonably

prudent fiduciary to act differently than did defendants, or whether defendants are correct that

plaintiffs are simply relying on 20/20 hindsight, is a question of fact that might possibly (but not

likely) be resolved on summary judgment, but cannot be decided on a motion to dismiss.

Consequently, the court concludes that Counts I and II of the complaint contain sufficient factual

7

detail to state claims with respect to the allegations that defendants failed to act prudently in managing the Collateral Pools.

In Count III, plaintiffs allege that defendants breached their duty of good faith and fair dealing that plaintiffs allege is implied in the agreements with the direct participants and the commingled lending funds, by failing to manage the Collateral Pools prudently. In Illinois, breach of the duty of good faith and fair dealing is not an independent cause of action, but is merely a basis for a breach of contract action. LaSalle Bank National Association v. Paramount Properties, 588 F. Supp.2d 840, 854 (N.D. Ill. 2008). Because the claim in Count III is subsumed in the breach of contract claim contained in Count II, defendants' motion to dismiss Count III is granted.

Finally, defendants challenge plaintiffs' claim in Count II that as manager and lending agent to the commingled lending funds, defendants breached their contractual duty to those funds and the indirect participants by negotiating rates that were higher than those negotiated by some of the direct participants, as high as 40% of all earnings generated by the Collateral Pool. As defendants argue, however, the contracts in question expressly authorized a monthly fee equal to 40% of the funds' net securities lending revenue. The fees were disclosed and agreed to by plaintiffs. The fact that defendants had negotiated smaller fees with certain direct participants (including some of the instant plaintiffs) does not compel defendants to negotiate a similar fee with all customers. Plaintiffs were told and agreed to the fees in question. They cannot claim that defendants breached a contract by charging the agreed upon fee. See e.g., In re: Smith Barney Fund Transfer Agent Litigation, 2007 WL 2809600 at *3 (S.D. N.Y. 2007).

8

Accordingly, defendants' motion to dismiss the claim in Count II based on the 40% fee is granted.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in part and denied in part. Defendants are directed to answer Counts I and II of the amended complaint, consistent with this opinion, on or before May 31, 2011. This matter is set for a report on status June 9, 2011, at 9:00 a.m.

**ENTER:** **May 6, 2011**

**Robert W. Gettleman**
**United States District Judge**