## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,<br><br>           Defendants. | Judge Robert W. Gettleman, *Judge Presiding*<br><br>Magistrate Judge Michael T. Mason<br><br><br><br>Civil Action No. 09-7203 |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("Northern"), by and through their attorneys, pursuant to Fed. R. Civ. P. 8(b), file the following Answer[1] and Affirmative Defenses to Plaintiffs' Amended Class Action Complaint in the above-captioned case. To the extent any allegations are not expressly admitted herein, they are hereby denied. Pursuant to Fed. R. Civ. P. 8(b), any statement as to which defendants lack knowledge or information sufficient to form a belief about the truth shall have the effect of a denial.

---

[1] No answer is required with respect to the headings, prayers for relief, and other contents of the Amended Complaint that do not set forth allegations of fact and are not included within numbered paragraphs as required by Fed. R. Civ. P. 10(b).

## I.  INTRODUCTION

1.      This is a case about a fiduciary who improperly invested its clients' assets. Here, Northern Trust, in violation of its fiduciary and contractual duties, invested and maintained its clients' assets in risky, long-term investments—including hundreds of millions of dollars of unregistered, illiquid securities that plummeted in value. Plaintiffs and members of the Class have incurred massive realized losses as a result of these breaches of Northern Trust's fiduciary and contractual duties, which caused Northern Trust's securities lending program (the "SLP") to lose over $1 billion.

**ANSWER TO PARAGRAPH 1:**     Defendants deny the allegations of this paragraph.


2.      Northern Trust operates the SLP in which Plaintiffs and the Class participate, either directly and/or indirectly. As explained more fully below, through the SLP, Defendants lend out securities belonging to Plaintiffs and the Class, and receive cash and other collateral to secure those loans. Defendants then invest the cash collateral in several Northern Trust collective investment pools (the "Collateral Pools"), including, but not limited to, the Short Term Extendable Portfolio ("STEP") and the Core USA Collateral Section ("Core USA"). These Collateral Pools were fully discretionary on the part of Northern Trust; Plaintiffs and the Class had no control over the selection or management of the investments in the Collateral Pools.

**ANSWER TO PARAGRAPH 2:**     Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are loaned to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed-income instruments pursuant to and in compliance with the Collateral Pools' guidelines.  Defendants specifically deny that the collective fund STEP is in and of itself a collateral pool, but admit that, at times, STEP units formed a component of certain custom funds

utilized for cash collateral reinvestment.[2]  Defendants further admit that, at times, Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago, Plaintiff The Board of Trustees of the City of Pontiac Police and Fire Retirement System, and Plaintiff The Board of Trustees of the City of Pontiac General Employees Retirement System participated directly in the Northern Trust securities lending program.  Defendants further admit that, at times, Plaintiff Firefighters' Retirement System, Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago, and Plaintiff The Board of Trustees of the City of Pontiac Police and Fire Retirement System invested plan assets in certain Northern Trust collective funds that engaged in securities lending. To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.


3.      The Collateral Pools ostensibly sought to achieve conservative returns, and their primary focus was on preserving capital and maintaining liquidity. Because the cash invested in the Collateral Pools was collateral for loaned securities and had to be returned to the borrowers of the securities upon the termination of the loan, all of the Collateral Pools were to be invested in highly conservative, short-term investments designed to maintain liquidity.

**ANSWER TO PARAGRAPH 3:**   To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to

---

[2] For the sake of clarity, Defendants herein utilize the term "Collateral Pools" to include STEP, conforming to the definition assigned by Plaintiffs; this shall not be construed as an admission that STEP was ever a securities lending collateral pool in and of itself.

characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny any remaining allegations of this paragraph.

4.      Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class by imprudently investing the Collateral Pools, including STEP and Core USA, in risky and long-term securities.  For example, as of July 31, 2007, almost 70% of the securities held in STEP were not due to mature for over eighteen months, and over 20% of the securities in STEP were not due for at least 10 years.

**ANSWER TO PARAGRAPH 4:**     Defendants deny the allegations of this paragraph.

5.      Defendants further breached their fiduciary and contractual duties to Plaintiffs by investing in securities that were both high-risk and fell outside the purportedly conservative investment objectives of the Collateral Pools. The STEP portfolio included hundreds of millions of dollars in exotic, unregistered securities issued by "structured investment vehicles" or "SIVs"—entities that were identified in hearings before the congressional Financial Crisis Inquiry Commission as one of the "causes of the financial crisis" that "served no good or productive purpose in the financial system." And both STEP and Core USA held hundreds of millions of dollars of risky securities backed by mortgages and other consumer loans, and billions more in securities issued by banks with massive exposure to mortgages and consumer loans.

**ANSWER TO PARAGRAPH 5:**     Defendants deny the allegations of this paragraph.

6.      Indeed, notwithstanding the warnings of Northern Trust's own Chief Economist and other Northern Trust economists as early as 2004 that major banks faced significant risk because of their excessive exposure to the U.S. real estate market (including through mortgage backed securities and other complex derivative products), Defendants filled the Collateral Pools, including STEP and Core USA, with securities issued by such banks, and other investments exposed to the real estate market.

**ANSWER TO PARAGRAPH 6:**     Defendants deny the allegations of this paragraph.


7.      Defendants were motivated to build STEP and Core USA around such risky, long-term securities because of a compensation scheme that gave rise to a conflict of interest. Specifically, Northern Trust shared in the returns generated from the investment of cash collateral in the Collateral Pools—taking up to 40% of the earnings in the Pools—but bore no downside risk on any losses in the Collateral Pools. As a result, Defendants stood to materially gain by investing the Pools in higher-risk securities that generated greater returns, regardless of the additional credit and liquidity risk inherent in those investments or the fact that they were wholly inappropriate for conservative, short-term, and liquid funds like STEP and Core USA. On information and belief, this conflict drove Defendants to invest STEP and Core USA in risky and long-term securities, and to maintain significant exposure to mortgage-backed securities, exotic investments backed by mortgage-backed securities, and securities issued by financial institutions that themselves had significant exposure to those same mortgage markets, all of which were inappropriate for the Collateral Pools.

**ANSWER TO PARAGRAPH 7:**     Defendants deny the allegations of this paragraph.

8.    On information and belief, yet another conflict of interest prevented Northern Trust from selling securities in the Collateral Pools at a loss, even if done to mitigate risk and avoid potentially larger losses. Specifically, according to internal Northern Trust documents, accounting rules required Northern Trust to consolidate the entire Collateral Pool onto its books in the event that a Collateral Pool incurred a realized loss (such as by selling securities at a loss) if investors in the Collateral Pool failed to offset that loss.  Such an event would have resulted in a multi-billion dollar loss to Defendants.  Thus, by continuing to hold securities that had incurred unrealized losses, and that were at risk for failure, Defendants avoided the ramifications of consolidating the Collateral Pools. On information and belief, Northern Trust's self-interested concern about the risk of consolidation—rather than an unbiased assessment of the best interests of Plaintiffs and the Class—motivated the Defendants to maintain several Collateral Pool assets that were destined to fail in the face of the subprime mortgage collapse and growing financial crisis.

**ANSWER TO PARAGRAPH 8:**    Defendants deny the allegations of this paragraph.

9.    Specifically, in the face of overwhelming evidence that, as Northern Trust economists had repeatedly warned, the mortgage crisis was developing into a broader economic crisis that threatened to cause significant losses to the Collateral Pools, Defendants failed to prudently divest the Collateral Pools' investments in Lehman Brothers, Capmark Financial Group, and two SIVs that issued exotic, illiquid securities—all four of which eventually collapsed—which would have mitigated the massive risks the Defendants themselves had created.

**ANSWER TO PARAGRAPH 9:**    Defendants deny the allegations of this paragraph.

5

10. As a result, and despite the clear warning signs discussed herein, Defendants continued to hold these high-risk securities in the Collateral Pools in the mere hope that the issuers of those securities would survive the financial crisis—an investment decision informed by Defendants' own self-interest in avoiding consolidation of the impaired Collateral Pools. Northern Trust retained these Collateral Pool investments notwithstanding the fact that months before the first securities held in STEP and Core USA defaulted resulting in massive realized losses, Defendants recognized that the Collateral Pools were no longer appropriate, conservative investments for SLP participants. Indeed, a Northern Trust executive has testified that, by April 2008, Defendants "would not be going out and selling STEP as an investment vehicle to new prospects."

**ANSWER TO PARAGRAPH 10:** To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

11. As a result of Northern Trust's conduct in imprudently structuring and managing the Collateral Pools, in September 2008 STEP and Core USA incurred massive realized losses upon the collapses of the two SIVs whose securities were held by STEP, and of Lehman Brothers—a bank that months earlier had disclosed exposure to billions of dollars in losses tied to mortgage-backed securities—whose long-term securities were held by STEP and Core USA. Northern Trust's imprudent conduct in investing the STEP and Core USA Collateral Pools in long-term and risky securities resulted in these two Pools alone suffering over $1 billion in

6

realized losses. This included over $400 million of losses on investments in Lehman Brothers securities that were not due to mature until as late as January 2012, and approximately $400 million of realized losses on investments in SIVs that were not due to mature until as late as August 2011.

**ANSWER TO PARAGRAPH 11:** Defendants deny the allegations of this paragraph.


12. On the grounds that those losses had impaired the liquidity of the Collateral Pools, Defendants limited withdrawals by Plaintiffs and the Class from the Collateral Pools, effectively locking them into the risky, long-term investment strategy Defendants had implemented for these purportedly conservative, short-term funds. As a result, Plaintiffs and the Class suffered more harm as STEP and Core USA incurred additional realized losses due to Defendants' breaches of their fiduciary and contractual obligations, including hundreds of millions of dollars of realized losses on long-term investments in CIT Group, Capmark Financial Group and Sallie Mae.

**ANSWER TO PARAGRAPH 12:** Defendants deny the allegations of this paragraph.


13. Despite the fact that the losses in the Collateral Pools were the direct result of Defendants' mismanagement, Northern Trust took the position that the SLP participants— including Plaintiffs and the Class—were responsible for those losses. Accordingly, Northern Trust took steps to compel Plaintiffs and the Class to contribute hundreds of millions of dollars to the Collateral Pools to offset the losses caused by Defendants' imprudent investments. First, in the months following the Lehman Brothers collapse, Defendants improperly redirected earnings from the Collateral Pools that were due to Plaintiffs and the Class, and allocated those monies to offset the losses in the Collateral Pools. Then, because those earnings were

7

insufficient to fully offset the realized losses in the Collateral Pools, Northern Trust demanded that Plaintiffs and the Class provide additional lump-sum payments totaling hundreds of millions of dollars to further offset these losses. Through this Action, Plaintiffs and the Class seek to recover the monies improperly seized by Northern Trust, the amounts paid to Northern Trust in response to Defendants' improper demand to cover the realized losses, and a judgment that Defendants are liable for the realized losses that have not been paid by Plaintiffs or the Class and for any remaining unrealized losses in the Collateral Pools incurred as a result of their misconduct.

**ANSWER TO PARAGRAPH 13:** Defendants deny the allegations of this paragraph.


II.     **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a different state than at least one defendant.

**ANSWER TO PARAGRAPH 14:** To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants admit that Plaintiffs purport to bring their claims as a class action, but deny that Plaintiffs are entitled to bring their claims as a class action. Defendants admit that Plaintiffs claim the amount in controversy exceeds five million dollars, but deny that Plaintiffs are entitled to any relief. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred within this District, and the Defendants' principal places of business are in Chicago, Illinois.

**ANSWER TO PARAGRAPH 15:** The first sentence of this paragraph states a legal conclusion as to which no answer is required. Defendants admit their principal places of business are in Chicago, Illinois. Defendants deny the remaining allegations of this paragraph.

## III.   THE PARTIES

16.     Plaintiff Firefighters' Retirement System ("Louisiana Firefighters") is a public pension plan organized for the benefit of active and retired firefighters in the State of Louisiana. Louisiana Firefighters participated indirectly in the SLP. Among other funds, Louisiana Firefighters invested in Northern Trust's NTGI Collective Daily S&P MidCap 400 Equity Index Fund and its NTGI Collective Daily S&P 500 Equity Index Fund, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA and STEP. Louisiana Firefighters suffered losses on its investments in funds that indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 16:** Defendants admit on information and belief the allegations in the first sentence of this paragraph. Defendants admit that, at points in time, Plaintiff Louisiana Firefighters invested in the NTGI-QM Collective Daily S&P MidCap 400 Equity Index Fund – Lending and the NTGI-QM Collective Daily S&P 500 Equity Index Fund – Lending. Defendants further admit that those two funds participated in the Northern Trust securities lending program. Defendants admit that the cash collateral those two collective funds received through Northern Trust's securities lending program was invested in Core USA in the

case of the S&P MidCap 400 fund, and a collateral pool including STEP units in the case of the S&P 500 fund. Defendants deny the remaining allegations of this paragraph.

17.     Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") is a public pension fund established for the exclusive benefit of teachers and certain other employees of the Chicago Public Schools. Chicago Teachers serves over 24,000 retirees and 32,000 contributing members, and has over $9.2 billion in assets under management. Chicago Teachers participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including STEP. Chicago Teachers also participated indirectly in the SLP through its investment in the S&P 400 Special Purpose MidCap Fund, a collective investment fund managed by Defendants that participated in the SLP. Chicago Teachers suffered losses on its investments that directly and indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 17:**  Defendants admit on information and belief the allegations in the first sentence of this paragraph.  Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the second sentence of this paragraph.  Defendants admit that, at points in time, Plaintiff Chicago Teachers invested in the NTGI-QM Collective Daily S&P Midcap 400 Equity Special Purpose Index Fund – Lending.  Defendants further admit that that collective fund participated in the Northern Trust securities lending program. Defendants further admit that, at points in time, Plaintiff Chicago Teachers participated directly in the Northern Trust securities lending program.  Defendants admit that the cash collateral Plaintiff received as a direct participant in Northern Trust's securities lending program was

invested in a custom cash fund established for Chicago Teachers that included, among other things, investments in STEP. Defendants deny the remaining allegations of this paragraph.

18.     Plaintiff The Board of Trustees of the City of Pontiac Police and Fire Retirement System ("Pontiac Police and Fire") is the trustee and plan administrator of a public pension plan and trust established for the exclusive benefit of police, firemen, and certain other employees of the Pontiac, Michigan police and fire forces. Pontiac Police and Fire serves over 370 retirees, and as of December 31, 2009, has over $223 million in assets under its management. Pontiac Police and Fire participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA. Pontiac Police and Fire also participated indirectly in the SLP through its investments in the NTGI Daily Russell 1000 Value Equity Index Fund, the NTGI Daily Russell 1000 Growth Equity Index Fund, and the NTGI Daily Intermediate Government/Credit Bond Index Fund, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA and STEP. Pontiac Police and Fire suffered losses on its investments that directly and indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 18:**  Defendants admit on information and belief the allegations in the first sentence of this paragraph.  Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the second sentence of this paragraph.  Defendants admit that, at points in time, Plaintiff Pontiac Police and Fire participated directly in the Northern Trust securities lending program.  Defendants further admit that, at points in time, Plaintiff Pontiac Police and Fire invested in the NTGI-QM Collective Daily Russell 1000 Value Equity Index Fund – Lending, the NTGI-QM Collective Daily Russell 1000 Growth Equity Index Fund – Lending, and the NTGI-QM Collective Daily Government / Credit Bond Index Fund –

11

Lending. Defendants further admit that those three collective funds participated in the Northern Trust securities lending program. Defendants admit that cash collateral that Plaintiff Pontiac Police and Fire and the above three collective funds received through Northern Trusts' securities lending program was invested in investments including Core USA. Defendants deny that Plaintiff Pontiac Police and Fire had any investment, direct or indirect, in STEP. Defendants deny the remaining allegations of this paragraph.


19.     Plaintiff The Board of Trustees of the City of Pontiac General Employees Retirement System ("Pontiac General") is the trustee and plan administrator of a public pension plan and trust established for the exclusive benefit of the public employees of Pontiac, Michigan. Pontiac General serves over 1,375 active participants, beneficiaries, and retirees, and as of December 31, 2009, has over $390 million in assets under management. Pontiac General participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA. Pontiac General suffered losses on its investments that directly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 19:** Defendants admit on information and belief the allegations in the first sentence of this paragraph. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the second sentence of this paragraph. Defendants admit that, at points in time, Plaintiff Pontiac General participated directly in Defendants' securities lending program. Defendants admit that, at points in time, the cash collateral Plaintiff received through Northern Trusts' securities lending program was invested in investments that included Core USA. Defendants deny the remaining allegations of this paragraph.

20.     Defendant Northern Trust Investments, N.A. has its principal place of business in Chicago, Illinois. NTI acts as a trustee to the Collateral Pools that invested the cash collateral provided by borrowers in the SLP. At all relevant times, NTI was and is a fiduciary to Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all other members of the Class, because it has possession and control over the assets of Plaintiffs and the Class, discretion over how to invest these assets, and because it otherwise manages all aspects of the funds in which Plaintiffs and the Class invested. As a fiduciary to Plaintiffs and the Class, NTI was obligated to act with prudence, due care, good faith and loyalty in investing and managing the collective funds and Defendants' securities lending program.

**ANSWER TO PARAGRAPH 20:**  Defendants admit that Northern Trust Investments, N.A. has its principal place of business in Chicago, Illinois.  Defendants admit that NTI acts as the trustee of STEP.  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny the remaining allegations of this paragraph.


21.     Defendant Northern Trust Company has its principal place of business in Chicago, Illinois. NTC served as a securities lending agent for Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all direct and indirect participants in the SLP, with responsibility for administering the SLP, including negotiating and entering into

agreements with securities borrowers, receiving borrowers' collateral and matching borrower loan requests with the eligible securities of SLP participants. At all relevant times, NTC was and is a fiduciary to Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all other members of the Class, and was obligated to act with prudence, due care, good faith and loyalty in administering the SLP, including overseeing the management and investment of collateral received for lent securities.

**ANSWER TO PARAGRAPH 21:** Defendants admit that The Northern Trust Company has its principal place of business in Chicago, Illinois. To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.


IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Northern Trust's Securities Lending Program**

22.     Since 1981, Northern Trust has been one of the largest providers of securities lending services for public retirement systems, foundations, endowments, insurance companies, and ERISA-qualified plans. By December 31, 2007, Northern Trust's SLP boasted 664 clients, representing approximately $1.13 trillion of lendable securities.

**ANSWER TO PARAGRAPH 22:** To the extent this paragraph purports to characterize Northern Trust documents or communications to clients or potential clients, Defendants refer to

those documents and communications for their content and deny any allegations inconsistent therewith. Defendants admit that, as of December 31, 2007, the securities lending program involved approximately $1.126 trillion in lendable assets of 664 clients. Defendants deny the remaining allegations in this paragraph.

23.     Through Northern Trust's SLP, Plaintiffs and the Class sought to earn incremental returns by lending eligible securities from their portfolios—including corporate equities, corporate bonds, and government securities—to approved borrowers in return for cash and other collateral. During the term of those loans, the cash collateral received from securities borrowers (which must be returned to the borrower when the loaned securities are returned) is reinvested in one or more commingled funds, or Collateral Pools, managed by NTI. The Collateral Pool funds—which were all purportedly invested in short-term, conservative and highly liquid fixed income securities that generate predictable returns—include Core USA and STEP. Each of these Collateral Pools had investment objectives that required Northern Trust to manage the Collateral Pools in a manner consistent with preserving capital and providing for liquidity.

**ANSWER TO PARAGRAPH 23:**  Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are loaned to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed-income instruments pursuant to and in compliance with the Collateral Pools' guidelines.  To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal

conclusions is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning Plaintiffs' or putative class members' intentions or practices in regards to securities lending. To the extent that this paragraph purports to universally describe all securities lending arrangements between Defendants and the Plaintiffs or putative class members, Defendants deny those allegations and any remaining allegations of this paragraph.

24. Traditionally, the reinvestment income generated through investments in the Collateral Pools has been used by securities lending participants to offset expenses associated with maintaining the portfolio (such as custody costs or brokerage commissions), to maximize overall portfolio performance, or to lower a portfolio's effective tax rate through dividend arbitrage. Accordingly, investment of collateral through the SLP was intended to generate only modest returns, with a primary focus on preservation of capital and liquidity to ensure that the cash collateral could be returned to borrowers upon the termination of the securities loan.

**ANSWER TO PARAGRAPH 24:** To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements involving the Defendants, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning Plaintiffs' or putative class members' intentions or

16

practices in regards to securities lending.  Defendants deny any remaining allegations of this paragraph.


25.     The borrowers who tender cash collateral in exchange for the loaned securities often use borrowed securities to cover an already established short position, hedge an investment (such as an equity derivative or convertible bond), or take advantage of an arbitrage opportunity. In order to borrow a security through the SLP, borrowers are required to put up collateral worth at least 102% of the borrowed security's current market value to secure their obligation to return the securities when the loan is either called back or matures. The value of the borrowed security is monitored on a daily basis, and the borrower is required to maintain the same 102% collateral even if that value fluctuates.

**ANSWER TO PARAGRAPH 25:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required.  To the extent that this paragraph purports to universally describe all securities lending arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.


26.     When the loan matures or is called back, the borrower returns the security and gets back the collateral it originally posted. The borrower also receives interest on the collateral—known as the rebate—for the use of the cash collateral. The amount of the rebate is intended to reflect the intrinsic value of the loaned security and the fact that some securities are

17

more highly sought after than others—that is, the higher the demand for the security, the lower the rebate that will be paid. Accordingly, the collateral reinvestment must only generate a higher return than the rebate promised back to the borrower in order for the participating lender to realize a return. The earnings from the collateral reinvestment generated above the rebate rate equals the "lending spread" and represents the profit in the transaction. This profit is split between the participating lender and Northern Trust based upon a revenue sharing arrangement, with Northern Trust receiving up to 40% of the lending spread, in addition to any fees otherwise charged by Northern Trust.

**ANSWER TO PARAGRAPH 26:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.

27. Importantly though, while Northern Trust collects a percentage of the lending spread, it does not bear the downside risk of any losses incurred by the Collateral Pools. In the case of a "collateral deficiency"—which occurs when the invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption—Northern Trust would not be required to make up the difference owed to the borrowers, and it therefore bore none of the risk of loss. This system effectively incentivized Northern Trust to take greater risks with the

assets of the Plaintiffs and the Class because although Northern Trust would recover a percentage of any profits, it would be responsible for 0% of any losses.

**ANSWER TO PARAGRAPH 27:**  Defendants deny the allegations of this paragraph.


28.     Plaintiffs and the Class could participate in the SLP directly, indirectly, or both. Direct participants in the SLP entered into a securities lending agreement with Northern Trust which allowed Northern Trust to lend out securities from their investment portfolios and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools. Confronted with the massive losses in the Collateral Pools, Defendants seek to hold direct SLP participants liable for those losses by redirecting earnings due to those direct SLP participants to offset such losses and demanding cash payments from direct SLP participants to further offset losses.

**ANSWER TO PARAGRAPH 28:**  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.


29.     Indirect SLP participants invested in commingled investment funds established and managed by Northern Trust (the "Commingled Lending Funds"), which in turn participated in the SLP. The Commingled Lending Funds act as direct participants in the SLP, and entered into a securities lending agreement with Northern Trust, which allowed Northern Trust to lend out securities held in the Commingled Lending Funds for the benefit of investors in those funds,

and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools. The Commingled Lending Funds suffered losses as a result of their direct participation in the SLP, and those losses—which were caused by Defendants' breaches of duty—were passed along to the Plaintiffs and Class Members who invested in the Commingled Lending Funds. On information and belief, Defendants caused the Commingled Lending Funds to make payments to offset losses in the Collateral Pools, and thereby caused harm to Plaintiffs and the members of the Class who invested in the Commingled Lending Funds.

**ANSWER TO PARAGRAPH 29:** To the extent this paragraph purports to characterize various agreements or documents including the Declaration of Trust referenced in the Amended Complaint, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.


30. Each of the Commingled Lending Funds was set up as a commingled fund, also referred to as a "Participating Trust," pursuant to a Declaration of Trust. The Commingled Lending Funds were established for the collective investment of a group of investors. All the investors in each commingled fund shared, pro rata, in any gains and losses for the Fund. During 2007 and 2008, Northern Trust's Collective Funds Trusts held over fifty commingled funds. NTI created each commingled fund that was offered to participants in the Plans by executing a Fund Declaration that described each Commingled Lending Fund's investment policy and objective. For example, the Aggregate Bond Fund's investment objective was to approximate the overall

performance of the Lehman Brothers Aggregate Bond Index. The Fund Declarations for the Commingled Lending Funds stated that the Commingled Lending Funds "may participate" in securities lending, and that the "lending agent"—NTC—would "indemnify, defend and hold harmless the [Commingled Lending Funds] from and against any losses, damages, costs, and expenses the [Commingled Lending Funds] may incur as a result of failure of the lending agent to perform its duties and responsibilities under the lending agreement."

**ANSWER TO PARAGRAPH 30:** To the extent this paragraph purports to characterize various agreements or documents including the referenced Declaration of Trust and Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

31.     On behalf of indirect participants in the SLP who invested in the Commingled Lending Funds, and as a fiduciary and agent of those indirect SLP participants and the Commingled Lending Funds, NTI negotiated the fee paid by the Commingled Lending Funds for their participation in the SLP. As a fiduciary, NTI had a duty to obtain the lowest fee possible for the Commingled Lending Funds and the investors therein. In violation of that duty, the fee NTI and NTC negotiated was 40% of the Commingled Lending Funds' earnings from their Collateral Pool investments—far higher than the rates NTC negotiated with many direct participants in the SLP, which were as low as 15%. By failing to negotiate for the Commingled Lending Funds and the investors therein a favorable rate comparable to the lowest rates given to other securities lending participants, NTI cost the members of the Class millions of dollars in excess fees to the

benefit of Northern Trust and thereby breached its fiduciary duties to Plaintiffs and the Class. That breach resulted from a conflict of interest that arose from the relationship between NTI and NTC, and NTI's interest in generating profits for NTC, a related party.

**ANSWER TO PARAGRAPH 31:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. Moreover, this paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.

32.     Northern Trust served as a fiduciary to Plaintiffs and the Class in connection with the management of the SLP and, in particular, the investment of collateral in the Collateral Pools. As the investment manager charged with managing the investment of the Collateral Pools for the benefit of both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

**ANSWER TO PARAGRAPH 32:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a

belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

33.     Documents created by Northern Trust, including materials that described and explained the SLP, acknowledge that "Northern Trust considers its Securities Lending Program as a fiduciary duty [and] Northern Trust recognizes that it is responsible for any losses that an account may suffer as a result of its failure to perform its fiduciary duties."

**ANSWER TO PARAGRAPH 33:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

34.     Northern Trust's status as a fiduciary was incorporated into the securities lending agreements signed by Plaintiffs and, on information and belief, the Class. For example, the securities lending agreements that Plaintiffs and members of the Class entered into with Northern Trust incorporate by reference the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending ("FFIEC Policy"), which states that a "lender institution which exercises discretion in offering securities [on loan] on behalf of and for the benefit of customer-owners is acting as a fiduciary. For purposes of these guidelines, the underlying relationship may be as agent, trustee, or custodian." Here, Northern Trust acted as the "lender institution" that "offered securities" for loan on behalf of Plaintiffs and the Class, who were the "customer-owners." Accordingly, Northern Trust, which acted as custodian, agent and/or trustee to Plaintiffs and the Class, served as their fiduciary.

23

**ANSWER TO PARAGRAPH 34:** To the extent this paragraph purports to characterize various agreements or other documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

35. Furthermore, the securities lending agreements explicitly set forth this obligation, and Northern Trust's general obligation to prudently manage the Collateral Pools for the benefit of Plaintiffs and the Class, specifically providing that Northern Trust agreed to "indemnify and hold harmless" Plaintiffs and members of the Class "for any direct losses, damages, costs and expenses (including reasonable attorney fees) [they] incur[] resulting from…Northern's failure to…make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 35:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

36.     In the securities lending agreements, Northern Trust also agreed to "indemnify and hold harmless" members of the Class for "any direct losses, damages, costs and expenses (including reasonable attorney fees)" for failure to comply with the FFIEC Policy. Under the FFIEC Policy, Defendants were obligated to invest the cash collateral in safe, liquid instruments. Specifically, the FFIEC Policy states that "[g]enerally, a lender institution will invest cash collateral in repurchase agreements, master notes, a short term investment fund, U.S. or Eurodollar certificates of deposits, commercial paper or some other type of money market instrument," and the "lender institution is responsible for making [the cash collateral] income productive."

**ANSWER TO PARAGRAPH 36:**  To the extent this paragraph purports to characterize various agreements or other documents including the referenced FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny any remaining allegations of this paragraph.


37.     As set forth herein, Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class through their imprudent structuring and management of the Collateral Pools' investments, which caused Plaintiffs and the Class to incur significant losses and be subjected to further losses as a result of withdrawal limitations imposed by Defendants.

**ANSWER TO PARAGRAPH 37:**  Defendants deny the allegations of this paragraph.

38.     Defendants also acted as a fiduciary on behalf of the indirect participants in the SLP, who were harmed through their investment in the Commingled Lending Funds. Defendants further breached their fiduciary duties to the Plaintiffs and Class Members who invested in the Commingled Lending Funds by failing to negotiate the lowest possible fee on behalf of the Commingled Lending Funds and their participants.

**ANSWER TO PARAGRAPH 38:**   Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.   To the extent an answer is required, Defendants answer that the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.   To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.

### B.     Defendants Improperly Structured and Mismanaged The Collateral Pools

39.     The Collateral Pools, including STEP and Core USA, were purportedly conservative, short-term and highly liquid investment vehicles. Because the collateral received from securities borrowers was essentially borrowed money that had to be returned to the borrowers upon the remittance of those securities, Defendants were required—both by contract and by the prudent investor standard that governs their fiduciary duty—to invest the cash collateral conservatively and prudently in safe, short-term, and liquid instruments. Moreover, because Plaintiffs and the members of the Class bear the risk of loss in the Collateral Pools, Defendants were obligated to ensure that their investment decisions were made purely in the interests of those investors, and did not sacrifice safety and liquidity in exchange for higher returns. Therefore, it was critical for Defendants to invest Collateral Pool assets in safe, short-

term instruments both to guard against losses arising from default, and to maintain adequate liquidity consistent with the narrow purpose of the Collateral Pools.

**ANSWER TO PARAGRAPH 39:** To the extent this paragraph purports to characterize agreements or documents including Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.


40.     Defendants disregarded these obligations and instead focused on and sought out higher returns in structuring the Collateral Pools by investing in risky and long-term securities, which exposed these purportedly short-term, liquid Pools to significant credit and liquidity risk. In 2007, as earlier predicted by Northern Trust's own Chief Economist, financial firms in which these Collateral Pools invested disclosed exposure to losses on mortgages and other consumer loans. Consequently, Defendants' improper structuring of the Collateral Pool portfolios by investing in these securities caused the Pools to lose value.

**ANSWER TO PARAGRAPH 40:** Defendants deny the allegations of this paragraph.


41.     In the face of those developments, which Northern Trust should have recognized as posing significant risk to the Collateral Pools in light of the imprudent manner in which Defendants had invested the Pools, Defendants again breached their fiduciary and contractual duties by maintaining several Collateral Pool assets—specifically, the STEP investments in the SIVs and Capmark Financial Group, and the STEP and Core USA investments in Lehman

Brothers—that had incurred unrealized losses and presented a level of risk that Northern Trust, in light of its sophistication and the warnings of its economists, should have recognized made those investments imprudent for the conservative Collateral Pools. Indeed, rather than actively manage STEP and Core USA to mitigate the risk they had created, Defendants adopted the untenable position that securities held in STEP and Core USA would pay fully if held to maturity, and therefore decided that these securities would not be sold. Because Defendants had imprudently populated STEP and Core USA with long-term securities, many of which would not mature for decades, that decision effectively converted STEP and Core USA from "ultra short-term" funds to long-term funds, which were not appropriate for the investment of securities lending collateral. This was not simply a bad decision, it was also a conflicted one, motivated by Northern Trust's self-interest in improperly structuring the portfolios and in avoiding consolidating losses onto its books.

**ANSWER TO PARAGRAPH 41:** Defendants deny the allegations of this paragraph.

1. **Defendants Improperly Structured STEP And Core USA By Investing In Long-Term, High-Risk And Illiquid Securities**

    a. **STEP And Core USA Were Structured As Long- Term Investment Funds**

42.    Northern Trust established STEP as, "an ultra short duration total return fund that seeks to outperform high grade, short term money market instruments." STEP was purportedly appropriate for investors with an investment horizon of just one year.

**ANSWER TO PARAGRAPH 42:** To the extent this paragraph purports to characterize Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

28

43. Similarly Core USA was to be a highly conservative, short-term fund in which cash collateral was to be invested to generate returns "consistent with the preservation of capital and maintenance of liquidity," with "liquidity and principal preservation as prime objectives" of the fund. The other Collateral Pools, which were intended to serve the same purpose as STEP and Core USA, were by their nature and purpose required to be similarly invested in conservative, short-term investments.

**ANSWER TO PARAGRAPH 43:** To the extent this paragraph purports to characterize various agreements or documents including Collateral Pool guidelines, Defendants refer to those agreements and documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

44. Notwithstanding these clear objectives, Defendants violated their fiduciary and contractual duties by structuring the Collateral Pools as long-term investment funds. For example, of the securities held in the STEP portfolio as of July 31, 2007,

- 76% were not due for at least another 12 months;

- 69% were not due for at least another 18 months;

- 54% were not due for at least another 2 years;

- 21% were not due for at least another 10 years;

- 18% were not due for at least another 20 years; and

- 9% were not due for at least another 30 years.

29

**ANSWER TO PARAGRAPH 44:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

45.     Similarly, Core USA held billions of dollars worth of securities that would not mature for years. Indeed, as of October 2008, over 30% of the securities held in Core USA were not due to mature for over 2 years.

**ANSWER TO PARAGRAPH 45:** To the extent this paragraph purports to characterize documents such as reports on Core USA holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

46.     These long-term securities were wholly improper for "ultra short term" funds such as STEP and Core USA, and exposed Plaintiffs and the Class to significant credit and liquidity risk.

**ANSWER TO PARAGRAPH 46:** Defendants deny the allegations of this paragraph.

47.     The securities that ultimately caused hundreds of millions of dollars of realized losses to the Collateral Pools included long-term securities in which Defendants should never have invested securities lending cash collateral. For example, the STEP and Core USA investments in Lehman Brothers were not due to mature until as late as January 2012—more than three years after Lehman Brothers collapsed. The exotic SIV securities held by STEP were

not due to mature until as late as August 2011, with 70% of one of these SIVs' securities maturing in 2010—more than a year after the SIVs collapsed. And other securities in which Northern Trust imprudently invested the Collateral Pools—resulting in realized losses to SLP participants—had similar distant maturity dates, including: CIT securities not due to mature until as late as March 2010; Capmark Financial securities not due to mature until as late as May 2010; Greenpoint Mortgage securities not due to mature until as late as June 2010; and Sallie Mae securities not due to mature until as late as October 2011. These securities were held in the Collateral Pools as of May 2008, and even at the apex of the financial crisis later that year were not due to mature for up to 3 years. Such long-term securities had no place in the purportedly short-term Collateral Pools.

**ANSWER TO PARAGRAPH 47:**  Defendants deny the allegations of this paragraph.

> **b.      Defendants Invested STEP And Core USA In High-Risk And Illiquid Securities**

48.      Northern Trust invested Collateral Pool assets in securities that were illiquid, highly-leveraged, or risky asset-based securities such as floating rate notes, SIVs, and derivatives. These types of investments were inconsistent with the clear objectives of the Collateral Pools and inordinately risky for funds purportedly created to preserve capital and maintain liquidity.

**ANSWER TO PARAGRAPH 48:**  Defendants deny the allegations of this paragraph.

49.      STEP and Core USA in particular were imprudently exposed to significant losses related to the U.S. mortgage market and other consumer loans. Despite the warnings of Northern Trust's own Chief Economist and other Northern Trust economists that investment in the

mortgage markets presented significant risks to banks that held mortgage-backed securities, the Collateral Pools held billions of dollars of securities issued by such banks, as well as mortgage-backed securities and securities issued by exotic SIVs that traded in asset-backed securities, including those backed by residential mortgages.

**ANSWER TO PARAGRAPH 49:** Defendants deny the allegations of this paragraph.

50. Indeed, as of October 2008, over 80% of the investment securities held in Core USA were asset-backed securities—including securities backed by mortgages and other consumer loans—and securities issued by banks and financial institutions which themselves were exposed to mortgages and other consumer loans. As of October 2008, the Core USA collateral pool directly held over $2.8 billion in mortgage-backed securities, almost all of which were not due to mature for at least another ten years. Of the more than $7.6 billion in asset-backed securities held in Core USA as of October 2008, 80%—or over $6.3 billion—were not due to mature for over two years. These investments were long-term in nature and were therefore inappropriate for a short-term and liquid fund such as Core USA.

**ANSWER TO PARAGRAPH 50:** To the extent this paragraph purports to characterize documents such as reports on Core USA holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

c. **STEP Held Exotic, High-Risk Structured Investment Vehicles**

51. In addition to the long-term and high risk securities discussed above that were held in the Collateral Pools, STEP faced further risk because it held other exotic, illiquid

securities. Specifically, as of July 31, 2007, over 15% of the securities in STEP were invested in unregistered securities—securities which, by definition, can only be sold under certain narrow circumstances. Those unregistered securities included investments in two SIVs. SIVs are a type of structured investment product which operates similar to banks by borrowing money by issuing short-term securities (such as medium-term notes and commercial paper) at low interest rates and then lending that money by buying long-term securities (including mortgage-backed securities) at higher interest, making a profit for investors from the difference in the interest rates.

**ANSWER TO PARAGRAPH 51:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

52.     The two SIVs whose securities were held in STEP—Sigma Finance and Theta Finance—which were created and managed by the United Kingdom-based investment management company, Gordian Knot, were heavily reliant on their credit ratings in order to continue to raise, and rollover, short-term funding. The notes issued by SIVs are exotic, high-risk investments that were outside the enumerated classes of securities that were permitted to be held in STEP. For example, Theta was designed to earn returns by buying bonds and selling credit-default swaps, and its bond portfolio included credit card debt, bank and insurer obligations, mortgage-backed securities, and collateralized loan obligations. Similarly, Sigma invested in subprime mortgage-backed securities, other consumer credit receivables, and collateralized debt obligations. Sigma and Theta therefore had extensive and highly-leveraged exposure to the most volatile sectors of the credit markets. Moreover, because SIVs in general, and Sigma and Theta

in particular, lacked an established track record, they were inappropriate investments for a conservative fund such as STEP.

**ANSWER TO PARAGRAPH 52:** Defendants deny the allegations of this paragraph.


53.     Sigma and Theta presented even higher risk than other SIVs because they were not sponsored by a major financial institution. Bank-sponsored SIVs, such as those sponsored by major financial institutions like Citigroup, have the ability to seek support from their sponsor in times of economic distress. The difference in risk profile between supported and unsupported SIVs was well known to Northern Trust, as revealed in a Northern Trust document from January 2008 that distinguishes between SIVs supported by sponsoring banks, and unsupported SIVs such as Sigma and Theta. The document, which describes the investment process and philosophy of Northern Trust's management of its Northern Fund money market funds, boasts a prudent approach to investing in SIVs by noting that the money market funds' investment concentration in SIVs sponsored by major global banks was "intentional." Specifically, Northern Trust explains that "[b]ank sponsorship typically provides very strong implicit support via back-up liquidity lines of credit, management oversight, and credit quality discipline, not to mention a vested interest in the success of the SIV." Notwithstanding this recognition of the risks of investing in unsupported SIVs and the prudent approach taken with other Northern Trust products, Northern Trust invested STEP assets in these risky securities.

**ANSWER TO PARAGRAPH 53:** To the extent this paragraph purports to characterize documents including Collateral Pool guidelines, reports on STEP holdings, or other Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content

and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

54.     On information and belief, Defendants' decision to imprudently structure STEP and Core USA by investing in risky and long-term investments resulted from a conflict of interest. Northern Trust shared in the earnings generated by the Collateral Pools, therefore Defendants were motivated to invest the Pools in securities that generated higher returns, and often carried higher risks. Because longer-term fixed income securities generally yield higher returns than comparable short-term securities, Defendants invested STEP and Core USA in longer-term securities—including securities that would not mature for decades. As a longer-term security locks the investor in for an extended period, such securities generally carry higher credit risk—the risk that the issuer of the security may be unable to pay the obligation due at maturity—than comparable short-term securities. Regardless of these risks, Northern Trust seems to have focused only on the fact that these high-risk securities, such as those issued by SIVs or backed by pools of residential mortgages or other consumer loans, pay a higher return than securities of a comparable term issued by governmental entities or established corporations.

**ANSWER TO PARAGRAPH 54:**  Defendants deny the allegations of this paragraph.

55.     Because Northern Trust bore no risk of loss if the investments in STEP and Core USA defaulted, Defendants accepted the additional risk presented by investing in risky and long-term securities in order to generate higher returns for themselves. In light of the objectives of the Collateral Pools, which were purportedly conservative, short-term funds that were required to

remain liquid so that the invested collateral could be returned to borrowers in the SLP, the additional returns earned by undertaking that risk was imprudent and unwarranted.

**ANSWER TO PARAGRAPH 55:** Defendants deny the allegations of this paragraph.

>           **2.     Northern Trust Identified The Housing Bubble And The Economic Risk It Posed To The Investments In The Collateral Pools**

56.     Northern Trust imprudently exposed STEP and Core USA to mortgage-backed securities even though it was fully aware of the serious risks posed by these investments. Long before the Northern Trust SLP incurred the first losses tied to the collapse of the mortgage market and the resulting financial crisis, Northern Trust determined that U.S. housing prices were highly inflated, that the inflation in the housing market was unsustainable, and that the bursting of the housing bubble would have severe consequences for investors.

**ANSWER TO PARAGRAPH 56:** Defendants deny the allegations of this paragraph.

57.     Specifically, as early as 2004, Northern Trust's Chief Economist, Paul Kasriel, wrote extensively about the unsustainable inflation in the U.S. housing market and the risk that it posed to the broader U.S. economy in general, and the banking sector in particular. Defendants acknowledge Kasriel's acumen and prescience in predicting the housing bust and the impact on the financial markets, and touted that he "identified early on the formation of the housing bubble and ***foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst***." (Emphasis added).

**ANSWER TO PARAGRAPH 57:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

58.     For instance, by mid-2004 Kasriel noted that "about 60% of U.S. banks' earning assets are mortgage-related, a post World War II high." In a June 2004, report Kasriel compared the housing market to the stock market in 1999 immediately before it experienced a rapid decline in value. The following month, Kasriel described the housing market as "an accident waiting to happen" and warned that "the most serious collateral damage from a housing bust would be a wounded U.S. banking system" because "U.S. commercial banks have become major investors in mortgage-related debt." Kasriel specifically noted the historical correlation between a distressed banking industry and investor losses, posing the question, "[s]o what if the U.S. banking system falls on hard times? History suggests that as goes a nation's banking system, so goes its economy."

**ANSWER TO PARAGRAPH 58:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

59.     In the following years, Kasriel repeatedly warned about the state of the housing market and the impact its collapse would have on the economy. Citing research by fellow Northern Trust economist Asha Bangalore, in February 2006 Kasriel again warned of the broad economic risk posed by the housing bubble and reiterated the connection between the inflated housing market and the overall health of the economy, predicting that, "[t]he developing softness

in the housing market is likely to have a significant negative impact on the economy as a whole. … Forget about the GM. The new mantra is: As goes housing, so goes the nation – or, at least, the nation's economy."

**ANSWER TO PARAGRAPH 59:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


60.     Numerous media sources quoted Kasriel's warnings in 2006 that the U.S. housing market was in a "recession" and that the housing market would "pull[] the economy down" in 2007. For example, in June 2006 Kasriel commented that "[i]f the U.S. housing bubble were to go 'whoosh,' great damage would be done to the U.S. banking system." Similarly, in September 2006, he opined that, "[i]f we're to have a severe recession in the housing market, it would seem to me that ***the banking system cannot escape significant losses***." (Emphasis added).

**ANSWER TO PARAGRAPH 60:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


61.     Later that year, in November 2006, Kasriel noted that the housing recession was far from over, highlighting the fact that "[a] typical housing downturn sees a drop of 50 percent from the peak, and at this point we are only about halfway there." One month later, Kasriel affirmed that, "[u]nless this turns out to be a more moderate than usual housing recession,

unlikely given the amount of speculation and leverage involved in the boom, then we have 'miles to go' before we can put this housing recession 'to sleep.'"

**ANSWER TO PARAGRAPH 61:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


62.     Kasriel continued to warn of the perils of banks' extensive exposure to the housing market and in September reaffirmed his view that, "this is the most inflated housing market in the post-war era," concluding that "***the banking system could not escape significant*** losses" from a severe recession in housing. (Emphasis added). Specifically, in December 2006, Kasriel was quoted as stating that, "U.S. banks currently hold record amounts of mortgage-related assets on their books. If the housing market were to go into a deep recession resulting in massive mortgage defaults, **the U.S. banking system could sustain huge losses** similar to what the Japanese banks experienced in the 1990s." (Emphasis added). In that same month, Kasriel foretold of the looming economic downturn, suggesting that "crippled banking systems seem to result from the bursting of asset bubbles because of the sharp decline in the value of the collateral backing bank loans." He later estimated that due to exposure to the mortgage market, "[i]f a prolonged housing bust ensues, banks could be in big trouble." The culmination of these facts formed Kasriel's projections in late 2006 of "slower economic growth in the next five quarters," coupled with higher unemployment.

**ANSWER TO PARAGRAPH 62:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

63.     Other Northern Trust economists echoed Kasriel's views. For example, Northern Trust Vice President and economist Asha Bangalore stated in September 2006 that, "[a]dditional price declines [in the housing market] should not be surprising…. We have a recession in the housing market…. Usually it takes two or three years to stabilize." Bangalore also highlighted the significant impact a burst housing bubble would have on the rest of the economy, attributing roughly 43% of "new jobs created … since the end of 2001 to the boom in housing."

**ANSWER TO PARAGRAPH 63:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

64.     In 2007, Kasriel repeated his concern that banks were holding record high levels of mortgage-related assets and expressed concern in not knowing "how much the now infamous CDOs represent of the total." In March 2007, Kasriel predicted "increased foreclosures and more inventory on a [housing] market that already has too much." That month he also observed that it was "doubtful" that the housing recession had hit bottom, stating, "I think the housing recession is not over, that the subprime issues will prolong it." By December 2007, Kasriel commented that the problems for U.S. banks were both a direct problem related to mortgage-backed securities and "indirect mortgage challenges as a result of loans you made to other purchasers of the 'toxic waste' originated during this credit cycle."

**ANSWER TO PARAGRAPH 64:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

65.     Kasriel's warnings continued into 2008 and indicated that problems were spreading to other debt instruments. In June, for example, Kasriel opined that, "[w]e are not finished with the mortgage problem, but you are starting to see increased delinquencies in other forms of consumer debt." Kasriel also understood that the underpinnings of the recession did not end with the mortgage crisis. In June 2008, Kasriel equated the economic situation to "the eye of a hurricane. We had the first wave of the credit crisis, and it was quite damaging. But ***there is another wave coming, and it's likely to be as destructive***." (Emphasis added).

**ANSWER TO PARAGRAPH 65:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

66.     Throughout this period, Kasriel also noted the significant concerns surrounding SIVs. For example, in October 2007, he observed:

> SIVs are investment funds, some of which have off-balance sheet affiliations with large financial institutions, such as Citigroup, that purchase asset-backed securities, financing their purchases through the issuance of asset-backed commercial paper (ABCP). In recent months, investors' appetite for ABCP has all but evaporated due to concern about the credit quality of the assets, especially subprime mortgage-related paper backing the commercial paper.

That observation was highly prescient because the inability to continue selling ABCP backed by the risky assets held by the SIVs contributed to the insolvency of many SIVs, including Sigma

and Theta. Moreover, Kasriel believed that, "questionable assets on their books such as subprime mortgage-related securities" had impaired the SIVs, and SIVs including Sigma and Theta were unable to sell those assets to recoup their costs in acquiring them.

**ANSWER TO PARAGRAPH 66:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

67.    Thus, long before the first losses were incurred in the Collateral Pools, and at a time when Defendants could have restructured the Collateral Pools to avoid the risks presented by mortgage-backed securities, other asset-backed securities, SIVs, and the securities of financial institutions that, as Kasriel warned, faced significant risk from their own holdings of such mortgage-backed and asset-backed securities, Northern Trust was aware of the risks it had created in the Collateral Pools.

**ANSWER TO PARAGRAPH 67:** Defendants deny the allegations of this paragraph.

68.    Despite that knowledge, Northern Trust ignored the warnings of its own Chief Economist and other Northern Trust economists, and kept the Collateral Pools, including STEP and Core USA, invested in securities with significant exposure to mortgage-backed securities, SIVs, and financial institutions that Kasriel warned were overly exposed to mortgage-backed investments, contrary to the stated purpose of the Collateral Pools to preserve capital and maintain liquidity. For example, Northern Trust maintained both STEP and Core USA in significant investments in Lehman Brothers, which had extensive exposure to the real estate

market. Because many of these securities, including those of Lehman Brothers, would not mature for years, the risk that the Collateral Pools would incur a material loss from the collapse of the housing bubble that Kasriel identified was highly likely.

**ANSWER TO PARAGRAPH 68:**  Defendants deny the allegations of this paragraph.

> **3.** **Defendants Failed To Prudently Respond To The Growing Economic Crisis**
>
> **a.** **The Mortgage Meltdown And Disclosure Of Massive Losses By Banks That Invested In Mortgage And Consumer Debt Crystallized The Risk Facing The Collateral Pools**

69.    The catastrophe that Kasriel and Bangalore repeatedly warned of—that the housing collapse would bring down the economy and, in particular, the banks that had invested heavily in mortgages—started materializing in 2007. The collapse of the subprime mortgage market in the first quarter of 2007 should have made clear to Defendants, given their sophistication and their access to their own economists' prior warnings, the inherent risk in the long-term, illiquid portfolios Defendants built into the Collateral Pools, including STEP and Core USA.

**ANSWER TO PARAGRAPH 69:**  Defendants deny the allegations of this paragraph.

70.    For example, in February 2007, HSBC—one of the world's largest banks, wrote down the value of mortgage-backed securities it held by $10.5 billion, reflecting the significant decline in the value of such asset-backed investments. Just weeks later, the collapse of the nation's second largest mortgage lender, New Century, was the first in a series of major mortgage lenders that failed in the following months, with roughly 100 mortgage lenders failing by the end of the year. By virtue of its sophistication and the warnings it received from Kasriel,

Northern Trust knew or should have known that those failures signaled that the web of securities built on mortgages and other consumer loans were at significant risk of failure. Those securities included mortgage-backed securities, such as those held in STEP and Core USA, SIVs that invested in those securities, such as Sigma and Theta, and the securities of financial institutions that were heavily invested in mortgage-backed securities and other investments backed by mortgages.

**ANSWER TO PARAGRAPH 70:** Defendants admit, on information and belief, that in February 2007, HSBC reported it would be taking a bad debt charge for 2006 of approximately $10.5 billion, and cited the subprime mortgage market in its announcement; that New Century Financial Corp. declared bankruptcy in April 2007; and that more than 100 mortgage lenders ceased operations in 2007. In part due to Plaintiffs' vague and undefined use of terms including "largest," "major," and "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first two sentences of this paragraph. Defendants deny the remaining allegations of this paragraph.


71.     Defendants' decision to invest the Collateral Pools in SIVs was imprudent, ignored the consistent warnings of Northern Trust's own economists, and ultimately resulted from Northern Trust's conflicted positions.

**ANSWER TO PARAGRAPH 71:**  Defendants deny the allegations of this paragraph.


72.     The ramifications of the structural ineptitude in the Collateral Pools was played out further when Defendants—refusing to take losses on the Pools' distressed assets before the

unrealized losses further accumulated—maintained the Collateral Pools' investments in Sigma and Theta, Lehman Brothers, and Capmark Financial Group.

**ANSWER TO PARAGRAPH 72:** Defendants deny the allegations of this paragraph.


73. Indeed, it should have been clear to Northern Trust by mid-2007 that the subprime mortgage collapse implicated a broad array of investments held in the Collateral Pools. In June 2007, two multi-billion dollar hedge funds managed by Bear Stearns collapsed due to losses tied to subprime mortgages. By August 2007, numerous investment funds—including those managed by major banks, such as French bank BNP Paribas—reported significant losses as a result of the subprime collapse, and the resultant lessening of liquidity in the markets as investors steered away from asset-backed securities. In an article published on August 13, 2007, *the Wall Street Journal* described the significant risks major financial institutions faced, noting that "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

**ANSWER TO PARAGRAPH 73:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. In part due to Plaintiffs' vague and undefined use of terms including "collapse," "tied to," "major," "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second and third sentences of this paragraph concerning Bear Stearns and investment funds including those managed by BNP Paribas. Defendants deny the remaining allegations of this paragraph.

74.     If their own economists' warnings, coupled with the warnings in the media and the collapse of hedge funds managed by Bear Stearns, BNP Paribas, and others did not make clear to these sophisticated Defendants the risk that major financial institutions faced from the subprime collapse, the final months of 2007 established that fact for Northern Trust. At the end of September 2007, Swiss banking giant UBS disclosed a quarterly loss of almost $700 million. In October 2007, Merrill Lynch disclosed a loss of $8.4 billion. That same month, Citigroup disclosed losses of $5.9 billion, which quickly grew to more than $15 billion, and revealed that it faced total exposure of $55 billion. All of those losses were tied, directly or indirectly, to the mortgage meltdown. Significantly, Citigroup also revealed that the SIVs it sponsored faced billions of dollars in losses due to investments in asset-backed securities, including those tied to mortgages.

**ANSWER TO PARAGRAPH 74:**     Defendants deny the allegations of this paragraph.

> **b.     Northern Trust Ignored The Warnings Of Its Economists And The Evidence That The Mortgage Collapse Threatened the Collateral Pools**

75.     Defendants ignored the warnings of Northern Trust's Chief Economist and other Northern Trust economists, the failures of mortgage lenders, the collapse of financial institutions, and disclosures of massive losses by major banks. All of those developments, taken together, demonstrated the significant risk facing the Collateral Pools as a result of the imprudent investments made by Defendants. In the face of this growing financial crisis, Defendants—having structured the purportedly conservative Collateral Pools, including STEP and Core USA, with securities issued by companies at the heart of the crisis—failed to act. Indeed, rather than restructuring the portfolios of those Pools to focus on short-term securities (which would reduce

46

credit risk) and securities with less exposure to catastrophic losses, Defendants determined to stay on the perilous course they had chartered.

**ANSWER TO PARAGRAPH 75:** Defendants deny the allegations of this paragraph.


76.    A comparison of the holdings in STEP in July 2007 and September 2008 demonstrates that Defendants failed to shift that "ultra short term" fund from long-term investments to short-term investments in any significant manner. While in July 2007, over 76% of the securities in STEP were not due for at least 12 months, in September 2008 over 71% of the securities in STEP were not due for at least 12 months. In both July 2007 and September 2008, approximately 20% of the portfolio was not due for at least 10 years, and only about 10% was due to mature within 6 months.

**ANSWER TO PARAGRAPH 76:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.   Defendants deny the remaining allegations of this paragraph.


77.    On information and belief, that failure was driven by a conflict of interest that prevented Northern Trust from managing the Collateral Pools wholly for the benefit of Plaintiffs and the Class. Northern Trust was incentivized to avoid incurring realized losses by selling securities that presented an unacceptable level of risk to the conservative Collateral Pools—specifically, the investments in Lehman Brothers, Capmark Financial Group, and Sigma and Theta—because Northern Trust would be required to consolidate the entire Collateral Pools onto its books if it could not otherwise force Plaintiffs and the Class to cover losses realized from the

47

sale of these impaired securities. Such consolidation would result in massive losses to Defendants, as they would be required to write down the value of these impaired securities held in the Collateral Pools.

**ANSWER TO PARAGRAPH 77:**  Defendants deny the allegations of this paragraph.


78.     An internal Northern Trust document, discussing a call held between Northern Trust executives and a client impacted by losses in the SLP, reflects Defendants' understanding that "Back[ing] up the STEP fund" meant to "put the sub-par positions on our Books." Another internal Northern Trust document, entitled "Redemptions – Common and Collective Funds," states: "Our independent auditors have advised that accounting rules require us to recover realized losses from securities lending investors in order to avoid consolidation of all STEP fund assets onto our balance sheet." In an attempt to avoid a situation wherein Northern Trust was required to either recover hundreds of millions of dollars of losses from its own clients or else consolidate these losses onto its own balance sheet, Defendants determined that they would not sell these impaired securities at a loss, even if doing so would help to mitigate the risk of greater potential losses to Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 78:**  To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.


79.     Rather than refocusing STEP and Core USA on the conservative, short-term securities that should have been in those funds all along, Defendants instead determined to wait for these high-risk securities in the Collateral Pools to mature, and ignored the clear risk that the

issuers of those securities would collapse. Given the long-term nature of those securities, Defendants' decision effectively locked Plaintiffs and the Class into a long-term investment with significant exposure to the financial crisis.

**ANSWER TO PARAGRAPH 79:**  Defendants deny the allegations of this paragraph.


### C.     Defendants' Imprudence Results In Losses To The Collateral Pools

80.     As a result of Northern Trust's imprudent investment decisions and mismanagement, the Collateral Pools suffered massive realized losses on their exposure to exotic, illiquid, and long-term securities—securities in which the Collateral Pools never should have been invested due to the clear objectives of the Pools and the warnings regarding many of these securities issued by Northern Trust's own economists. This imprudent structuring and management of the Pools resulted in well over $1 billion in realized losses for the STEP and Core USA Collateral Pools alone. For example, as of September 2008, STEP had incurred realized losses of approximately $460 million on Lehman Brothers and over $400 million on the Sigma and Theta SIVs, which both entered receivership in late 2008. In 2009, STEP incurred realized losses on notes issued by CIT, of which STEP held $395 million, most of which were not due to mature until 2009-2010. STEP also had significant exposure to Greenpoint Mortgage ($103 million) and Capmark Financial Group ($153 million), both of which were not due to mature until 2010. Similarly, Core USA faced approximately $220 million in realized losses on CIT floating rate notes not due to mature until 2009-2010, in addition to the realized losses from its Lehman Brothers holdings.

**ANSWER TO PARAGRAPH 80:** To the extent this paragraph purports to characterize documents such as reports on Core USA and STEP holdings, Defendants refer to those

documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

81.     The Collateral Pools incurred these realized losses even though Northern Trust could have taken advantage of numerous opportunities to mitigate the risk posed by their imprudent initial investment decisions. For example, in July 2007, the Collateral Pools incurred significant unrealized losses on several securities. Rather than seeking to mitigate further losses, or even recognizing those losses as a harbinger of the risk facing the portfolios it had filled with long-term, high-risk instruments, Northern Trust imprudently determined to hold the impaired securities in the hopes that, despite the worsening economic climate, the investments would pay at maturity. Given the long terms of the securities at issue—the losses incurred in July 2007 included bonds issued by Sallie Mae, some of which would not mature until October 2011—that decision was contrary to the purported investment purpose of the short-term Collateral Pools.

**ANSWER TO PARAGRAPH 81:**  Defendants deny the allegations of this paragraph.

82.     The following month the Collateral Pools again incurred significant unrealized losses, which Northern Trust knew or should have known were related to the collapsing mortgage market and the impact of that collapse on the financial sector of the economy. Nonetheless, despite the continuing losses incurred by the Collateral Pools, the growing evidence, discussed above, about the risks facing institutions across the economy, and the warnings of its own Chief Economist, Defendants held to their refusal to actively manage the portfolios of the Collateral Pools to mitigate further risk.

**ANSWER TO PARAGRAPH 82:**  Defendants deny the allegations of this paragraph.

50

83.     Moreover, by August 2007, Northern Trust was fully aware that the subprime collapse and growing financial crisis was impacting the liquidity of the markets for fixed income securities. Indeed, Michael Vardas, the Managing Director of Northern Trust Quantitative Management and Capital Markets, who was responsible for overseeing the SLP, testified that Defendants saw the "market come under some stress in the Summer of 2007" and tried to build liquidity in STEP and Core USA. According to Vardas, however, Defendants' effort at building liquidity was limited to "allowing the assets in these collateral pools to mature" and "reinvesting them in very short maturity investments." The nature of the investments to which Defendants, albeit belatedly, sought to refocus the Collateral Pools—according to Vardas, "[m]oney market – very short money market investments, treasury and agency securities"—confirms that the long-term, high-risk securities in which Defendants had previously invested the Collateral Pools were inappropriate.

**ANSWER TO PARAGRAPH 83:**  To the extent this paragraph purports to characterize prior testimony, Defendants refer to that prior testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

84.     Despite that knowledge, and the clear risk that the combination of decreasing liquidity and mounting investment losses were poised to deliver a significant blow to the Collateral Pools, Defendants permitted billions of dollars in withdrawals from the Collateral Pools during this period. Specifically, according to a Northern Trust e-mail authored by Guy Sclafani, a Vice President at Northern Trust Global Investments, STEP "decreased in size over the last 6 months [December 2007 to June 2008] and ***much of the cash we have received has***

51

*been used to fund departures*, but the market value decrease also reflects a seasonal lag in securities lending activity." (Emphasis added). An attachment to that e-mail shows that, during those six months at the height of the financial crisis, STEP decreased by $2.61 billion, or, over 17%.

**ANSWER TO PARAGRAPH 84:** To the extent this paragraph purports to characterize Northern Trust internal documents available to Plaintiffs or reports on the holdings of STEP, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


85. Those withdrawals were permitted despite the fact that Defendants were purportedly seeking to build liquidity in the Collateral Pools. Moreover, investors in the Collateral Pools who were permitted to withdraw during this period—from December 2007 through September 2008—were able to withdraw by simply bearing their pro-rata share of the loss incurred in the Collateral Pool. In contrast, and as discussed in greater depth below, after September 2008, Defendants only permitted "in-kind" withdrawals—effectively requiring Plaintiffs and the Class to purchase distressed securities from the Collateral Pools at full value. Permitting withdrawals prior to September 2008 further impaired the liquidity of STEP, and harmed Plaintiffs and the members of the Class who remained invested in STEP in reliance on Defendants' ability, as sophisticated fiduciaries, to prudently manage the Collateral Pools.

**ANSWER TO PARAGRAPH 85:** Defendants deny the allegations in this paragraph.


86. As the financial crisis escalated, Defendants continued to refuse to prudently dispose of Lehman Brothers securities held in the Collateral Pools despite growing evidence that

major financial institutions' securities, including those of Lehman Brothers, were imprudent investments for conservative vehicles such as the Collateral Pools. For example, the collapse of Bear Stearns in March 2008, and its purchase by J.P. Morgan for a fire sale price of $10 per share, demonstrated the frailty of the financial giants that formed the backbone of the Collateral Pools' portfolios. That same month, as credit rating agencies downgraded several monoline insurers and finance companies, and many financial institutions scrambled to shore up their capital levels, STEP incurred another material loss.

**ANSWER TO PARAGRAPH 86:** Defendants deny the allegations of this paragraph.

87. Even as it failed to mitigate further losses and ensure the liquidity of the Collateral Pools by divesting the Pools of assets doomed to failure, including, but not limited to, Sigma and Theta, Northern Trust recognized that the "rising cost of credit coupled with amplified demand for liquidity forced many large market participants to sell fixed income securities at distressed prices" with "the financial markets [at] the brink of a dramatic meltdown."

**ANSWER TO PARAGRAPH 87:** To the extent the portion of this paragraph within quotes purports to characterize various internal Northern Trust documents available to Plaintiffs, or written communications from Defendants to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

88. Rather than actively trying to refocus the Collateral Pools on short-term investments that, while lower yielding, carried less credit risk than the long-term instruments in which Northern Trust had invested, Defendants actually made changes to permit more long-term

investments in the Collateral Pools. Specifically, in or about the Summer of 2007, Northern Trust implemented changes to the investment guidelines for Core USA to permit up to 15% of the portfolio to be invested in securities with maturities longer than three years. That change was made to increase earnings.

**ANSWER TO PARAGRAPH 88:** To the extent this paragraph purports to characterize Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

89. By April 2008, the evidence was irrefutable that Defendants' imprudent investment strategy exposed the Collateral Pools—and STEP in particular—to significant further losses. That month, both Moody's and S&P downgraded Sigma Finance Corporation—one of the SIV assets held by STEP—and put the issuer on watch for further downgrades. Indeed, Moody's and S&P further downgraded Sigma several additional times in the following months. Price declines of STEP's $330 million in Sigma holdings following the downgrades contributed to a 12.35% annualized monthly decline in STEP's returns. Notwithstanding the ratings agencies' downgrades and even though 70% of the Sigma securities STEP held were not due to mature until 2010, Defendants determined not to dispose of those securities, based on the position that "the Sigma portfolio is extremely high quality" and Sigma would "repay the capital notes held in STEP at par on maturity." That position was unfounded, and wholly at odds with the prevailing market view of Sigma and Theta.

**ANSWER TO PARAGRAPH 89:** To the extent this paragraph purports to characterize published documents and articles, internal Northern Trust documents available to Plaintiffs, or written communications from Defendants to clients, Defendants refer to those documents for

their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

90.     Moreover, Northern Trust knew that Sigma and its corporate sibling, Theta, faced a real risk of failure because they were not being supported by their sponsor, Gordian Knot. Indeed, a Northern Trust document dated January 2008—almost four months before the April 2008 downgrades of Sigma—identified the inherent weaknesses of SIVs lacking a sponsor, distinguishing SIVs that were sponsored by a financial institution capable of providing financial support from those, such as Sigma and Theta that lacked such support. That document stressed that Northern Trust's strategy of limiting the SIV investments in its money market portfolios to primarily bank-sponsored SIVs "has proved especially valuable in recent weeks as the banks sponsoring five of the nine SIVs the Northern Money Market Fund has invested in have announced plans to put their own capital behind the funding needs of their SIVs."

**ANSWER TO PARAGRAPH 90:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

91.     In February 2008, a Citi analyst and the *Financial Times* reported that Sigma was the largest SIV without support from a major bank. In particular, the *Financial Times* reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles. The lack of a large bank behind Sigma leaves it vulnerable to collapse." Other investors who, unlike Defendants, heeded these warnings were able to extricate themselves from

55

investments in Gordian Knot's SIVs without incurring significant losses, long before those SIVs collapsed.

**ANSWER TO PARAGRAPH 91:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

92. The risks of investing in SIVs that lack such a sponsor was driven home in February 2008, when two unsupported SIVs in which Northern Trust's money market funds had invested—Whistlejacket Capital LLC and White Pine Finance LLC—defaulted, causing massive losses to those money market funds. Northern Trust agreed to provide up to $229 million to stabilize those funds in the wake of the SIV losses. Despite having acknowledged the higher risk presented by unsupported SIVs such as Sigma and Theta, having witnessed the collapse of similarly unsupported SIVs and the resulting impact on Northern Trust funds, and the significant downgrades of Sigma and Theta, Defendants maintained their position that those investments would continue to perform if held to maturity. The more than $400 million of Sigma and Theta securities in STEP would not fully mature, however, for over one year in the case of Theta and for over three years in the case of Sigma.

**ANSWER TO PARAGRAPH 92:** To the extent this paragraph purports to characterize published documents and articles, or any Capital Support Agreement, Defendants refer to those documents, articles, and agreements for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

93.     As 2008 continued, Defendants understood that the situation in the Collateral Pools was dire. Michael Vardas, the Northern Trust Managing Director overseeing the SLP, testified repeatedly that, as of April 2008, Northern Trust "would not be going out and selling STEP as an investment vehicle to new prospects." Despite the view that STEP was no longer an appropriate investment vehicle, Defendants continued their self-interested strategy of simply holding on to the long-term securities in STEP and the other Collateral Pools, which became increasingly risky as the financial crisis escalated. The improper structure of the Collateral Pools in illiquid and highly exotic investments such as Lehman and Sigma resulted in the Defendants' insufficient attempts to restructure the Pools and increase liquidity. Indeed, in his testimony, Vardas confirmed that, as of April 2008, Defendants' efforts to increase liquidity in STEP remained limited to "predominantly allowing assets to mature and reinvesting proceeds in shorter dated investments."

**ANSWER TO PARAGRAPH 93:**  To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

94.     Internal Northern Trust documents from this time period show that Defendants saw the need to increase liquidity more quickly, but refused to incur any losses in order to do so. For example, an internal draft letter dated May 12, 2008 written by Guy Sclafani, the Vice President at Northern Trust Global Investments, stated: "We would like to implement a change as quickly as possible but we do not want to realize any losses in the STEP fund if they can be avoided. Therefore implementing a change may take some time. We estimate it may take between 6 and 18 months to restructure the securities lending pool." That same draft letter also

shows that, as of May 2008, Northern Trust understood that STEP was not an appropriate investment for the Northern Trust Commingled Lending Funds in which Plaintiffs and the Class invested. Specifically, the letter states that Northern Trust was "reconsider[ing] the structure of the securities lending collateral pool for these index securities. We are considering a number of options including reducing the allocation to STEP in the pool *as well as eliminating it entirely*…." (Emphasis added). In another internal document, Kendall Kay, a Senior Vice President at Northern Trust Global Investments, expressed his agreement with Sclafani's letter, writing, "I think this works."

**ANSWER TO PARAGRAPH 94:** To the extent this paragraph purports to characterize Northern Trust internal documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

95.     In September 2008, STEP plummeted in value as Northern Trust declared STEP's investments in securities issued by the SIVs, Sigma and Theta, had become "permanently impaired." These securities were transferred from STEP to a liquidation account, and the losses on those investments became fully realized. Core USA also incurred a significant loss, primarily on its Lehman Brothers investment. Despite the complete collapse of Sigma and Theta, Defendants, hampered by a disabling conflict of interest, refused to divest the Collateral Pools of similarly impaired securities.

**ANSWER TO PARAGRAPH 95:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs or written communications to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

96.     On September 19, 2008, Northern Trust declared a collateral deficiency in Core USA and STEP resulting from the collapse of Lehman Brothers, and the Sigma and Theta SIVs. As a result, Plaintiffs and the Class, as the lenders, had significant exposure to these losses, and Northern Trust soon posted a "payable" to each of the lenders that participated in these pools, resulting in a reduction in value of each lender's investments.

**ANSWER TO PARAGRAPH 96:**  Defendants admit that Northern Trust declared a collateral deficiency in Core USA on September 19, 2008.  Defendants deny the remaining allegations of this paragraph.

97.     Beyond the general economic factors and warnings by Northern Trust economists that should have apprised these sophisticated Defendants that the investments in Lehman Brothers, Sigma, and Theta presented an improper level of risk for the purportedly conservative Collateral Pools, specific facts about those issuers should have raised red flags for an investment manager such as Northern Trust, prior to September 2008, that these investments were not appropriate for the Collateral Pools. For example, in May 2008, David Einhorn—a prominent investment manager who runs the hedge fund Greenlight Capital—publicly questioned the accuracy of Lehman Brothers' financial reports. Furthermore, in June 2008, Lehman Brothers disclosed material exposure to the mortgage crisis, and took a $3 billion writedown of commercial and residential mortgages, mortgage-backed securities, and real estate holdings. In response to that disclosure, Einhorn again questioned the accuracy of Lehman Brothers' financial reporting. On June 10, 2008, Wachovia issued an analyst report titled "Too Many Inconsistencies," that downgraded Lehman Brothers, citing the lack of transparency concerning

Lehman Brothers' exposure to the mortgage meltdown. These disclosures—almost three months before Lehman Brothers' bankruptcy—were imprudently disregarded by Defendants.

**ANSWER TO PARAGRAPH 97:** To the extent this paragraph purports to characterize published documents and articles, including those setting forth or describing the views of David Einhorn, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

98. Similarly, the collapse of Sigma and Theta should not have been surprising to Northern Trust, had it prudently followed the developments concerning those SIVs. The reduced liquidity in the fixed-income market in August 2007—which Defendants were aware of—had a significant impact on SIVs, whose business model involves buying and selling fixed-income securities. Between August and October of 2007, more than a dozen SIVs failed as the credit rating agencies lowered ratings due to concern about the quality of assets held by SIVs.

**ANSWER TO PARAGRAPH 98:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

99. In October 2007, *Fortune* magazine railed against investments in SIVs—which it called "shadowy debt instruments"—by commingled funds such as mutual funds. At this time, Sigma's only hope of survival hinged on the chance that its large asset base might be sold as its debt obligations matured. This early indication of financial distress, at a time when smaller SIVs unequipped with the asset base of Sigma began to fail, should have raised a warning flag to

Defendants. Later that month, the markets again signaled that Sigma's viability was in doubt when Gordian Knot's attempt to raise financing for Sigma's approximately $22.5 billion in debt due in 2008 raised a paltry $20 million.

**ANSWER TO PARAGRAPH 99:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

100. By December 2007, observers were specifically warning that Sigma—which had an enormous amount of debt coming due in 2008—was at significant risk of failure. For example, a December 17, 2007, article on the website of the *Financial Times*, "Second Wave of SIV Liquidity Problems Looms," warned of a "liquidity squeeze [that] will affect some SIVs more than others. Sigma Finance, run by Gordian Knot, accounts for 22.5 percent of all MTNs [medium term notes] issued by all SIVs. It must repay about $22.5bn by the end of September [2008] and another $2.5bn by the end of the quarter." In January 2008, an analyst report by Citigroup voiced further concerns about Gordian Knot's SIVs, noting that Sigma was the "only non-bank sponsored SIV still looking to secure support." The report provided fresh warnings about the massive obligations that Sigma had to satisfy in 2008.

**ANSWER TO PARAGRAPH 100:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

101.     When, in April 2008 the ratings of Sigma securities were cut, an article on *Bloomberg News* tied the downgrade to Sigma's need to "refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow.…" One month earlier, when Standard and Poor's issued a warning that Sigma's debt would be downgraded, a Citi analyst noted that, "Sigma is the only remaining SIV not to have secured support [for financing purposes]…. In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owed." If these signs were not clear enough, a *Bloomberg News* article in April 2008 reported that money market funds had already reduced their investments in Sigma and rolled new money into more conservative programs. In contrast, by April 2008, Defendants had failed to divest of their deteriorating investments in Sigma despite the warning signs.

**ANSWER TO PARAGRAPH 101:**   To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.


102.     By July 2008, Sigma's fate was nearly sealed. The Citi analyst remarked that, "[i]f Sigma were to enter into an enforcement/default on its debt…[b]anks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." However, Defendants did nothing to safeguard the remaining assets in the Pools by divesting itself of Sigma investments. By September 2008, Sigma was served with a notice of default and shortly thereafter entered into receivership.

**ANSWER TO PARAGRAPH 102:**   To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

62

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants admit that Sigma was served with a notice of default by a counterparty on or about September 30, 2008, and that receivers were appointed for Sigma on or about October 6, 2008. Defendants deny the remaining allegations of this paragraph.

103.    The risks facing Sigma and Theta should have been clear to Defendants well before September 2008. Considering Defendants' own differentiation between the risks posed by unsupported SIVs, the drumbeat of warnings about Sigma and its inability to sell new notes, Northern Trust's experience with the failure of two such SIVs in its money market fund in February 2008, and the downgrade of Sigma and Theta in April 2008, the decision by Defendants to continue holding those securities with the expectation that they would perform to maturity over the course of up to three years was highly imprudent.

**ANSWER TO PARAGRAPH 103:** Defendants deny the allegations of this paragraph.

104.    Indeed, as Northern Trust continued to hold these securities, other investors were fleeing Sigma in droves. As of September 2008, money market funds, which held $5 billion in Sigma debt in April 2008, had no holdings in Sigma debt. Many of these investors were able to recoup nearly their entire investment in Sigma, and therefore incurred minimal losses, as late as September 2008. Northern Trust therefore failed to take the clear actions required to protect the members of the Class.

**ANSWER TO PARAGRAPH 104:** To the extent this paragraph states legal conclusions, no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first three sentences of this paragraph, due to the vagueness of those allegations. Defendants deny the remaining allegations of this paragraph.

63

105. For these reasons, the losses incurred in STEP on Sigma and Theta securities were avoidable had Northern Trust prudently managed the Collateral Pools.

**ANSWER TO PARAGRAPH 105:** Defendants deny the allegations of this paragraph.

106. Northern Trust added even further injury when the Lehman Brothers, Sigma, and Theta losses were realized in September 2008 by implementing limitations on withdrawals from the Collateral Pools. Specifically, Northern Trust required an SLP participant seeking to immediately withdraw from the SLP to take an "in-kind" withdrawal of that participant's pro rata share of the Collateral Pools. The withdrawing participant would be required to contribute cash equal to the book value of its share of the securities held in the Collateral Pool and would, in turn, receive an allocation of the securities in the Pool—including high-risk and long-term securities with a current value far below the cash contribution. Previously, if SLP participants had chosen to withdraw while the Collateral Pools carried an unrealized loss, they were only required to cover that loss, and thereby avoid future losses on the imprudent investments made by Defendants.

**ANSWER TO PARAGRAPH 106:** To the extent this paragraph purports to characterize Collateral Pool withdrawal guidelines or Northern Trust documents to which Plaintiffs have access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

107. Similarly, indirect SLP participants who invested in the Commingled Lending Funds could only withdraw from those Funds by accepting an in-kind distribution of securities from the Collateral Pools. Thus, an investor in a Commingled Lending Fund that was invested in

the common stock of companies on the S&P 400 index, such as Plaintiff Chicago Teachers, could only withdraw from that Fund by accepting an allocation of the fixed income securities held in the Collateral Pools—including mortgage backed securities—which were wholly distinct from the securities in which the Fund had invested.

**ANSWER TO PARAGRAPH 107:** To the extent this paragraph purports to characterize Collateral Pool and collective fund withdrawal guidelines, or Northern Trust documents to which Plaintiffs have access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


108. Alternately, SLP participants could choose a staged withdrawal from the Collateral Pools, whereby participants would be able to recover a fixed dollar amount in intervals over an extended period of time. Northern Trust estimated that this staged withdrawal process could take up to nine months for full withdrawal. And upon completion of the process, any payables would be due in full, therefore forcing these withdrawing SLP participants to cover the realized losses.

**ANSWER TO PARAGRAPH 108:** To the extent this paragraph purports to characterize Collateral Pool and collective fund withdrawal guidelines, or Northern Trust documents to which Plaintiffs have access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


109. These new withdrawal limitations effectively locked SLP participants into the Collateral Pools. The cash contribution required to effect an "in-kind" withdrawal presented an onerous, if not impossible, hurdle that Plaintiffs and the Class could not meet without difficulty,

both because of the amount of cash necessary to effect a withdrawal, the risky nature of the securities the withdrawing SLP participant would receive and the need to retain an investment advisor to then manage those high-risk, long-term and illiquid securities. As a result, Plaintiffs and the Class had no real choice but to remain in the SLP, and remain exposed to the risks in the Collateral Pools, even as the economy worsened after September 2008.

**ANSWER TO PARAGRAPH 109:** Defendants deny the allegations of this paragraph.


110.    As a result, Plaintiffs and the Class incurred further harm as other risky securities held in STEP and Core USA accumulated additional realized losses. As with the losses incurred on investments in Sigma and Theta, those losses could have been avoided had Defendants heeded and responded to the warnings of Northern Trust's own economists, the evidence in 2007 that major financial institutions faced risks of massive losses and potential collapse, or the specific red flags about the SIVs, specifically Sigma, held in the Collateral Pools.

**ANSWER TO PARAGRAPH 110:** Defendants deny the allegations of this paragraph.


111.    In 2009, STEP and Core USA incurred significant realized losses on securities issued by CIT, a bank that was extensively involved in residential mortgage lending and other consumer loans. Long before those losses were incurred, CIT disclosed that it had lost hundreds of millions of dollars as a result of risky mortgage and consumer lending. Indeed, during the final half of 2007, CIT incurred over $1.5 billion in write-downs, charges and provisions for losses tied to its portfolio of subprime mortgage loans. In the first quarter of 2008, CIT disclosed an additional $218 million charge to further reduce the value of its mortgage portfolio and disclosed that it faced almost $200 million in additional losses on its portfolio of student loans. By mid-

2008, CIT had disposed of its portfolio of subprime mortgages, receiving less than half of what the company had previously claimed the assets were worth. Given the purportedly conservative nature of the Collateral Pools, Defendants' decision to continue holding fixed income securities issued by CIT, in the face of the mounting disclosures about that company's financial condition over the course of more than a year, constituted a violation of their fiduciary and contractual duties.

**ANSWER TO PARAGRAPH 111:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning CIT's business practices. Defendants deny the remaining allegations of this paragraph.


112. The CIT losses included losses on securities with a book value of more than $260 million that, when held in the Collateral Pools when the news about CIT's losses became known in mid-2007, were not due to mature for almost two years or more. The length of the investments in CIT were at odds with the investment objectives of the Collateral Pools and made them improper investments in what were purportedly short-term funds.

**ANSWER TO PARAGRAPH 112:** Defendants answer that the allegations in the first sentence of this paragraph are incomprehensible, including the phrases "the CIT losses included losses" and the phrase "when held in the Collateral Pools when the news about CIT's losses became known." Defendants thus lack knowledge and information sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph. Defendants deny the remaining allegations of this paragraph.

113.    In addition to CIT, the Collateral Pools incurred additional realized losses after the withdrawal limitations were implemented that were similarly avoidable because significant red flags existed about the issuers of those securities, and their exposure to losses tied to mortgages or other consumer debt. These included Sallie Mae, a student loan company that, as early as January 2008, disclosed that it faced $750 million in losses on risky loans, Capmark Financial, a mortgage and real estate investment firm, and Greenpoint Mortgage, a mortgage lender that issued mortgage-backed securities held in STEP.

**ANSWER TO PARAGRAPH 113:**    To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith.    Defendants deny the remaining allegations of this paragraph.


114.    Defendants have taken the position that Plaintiffs and the Class are liable for the realized and any unrealized losses incurred in the Collateral Pools. To offset the realized losses, Defendants improperly redirected earnings from securities lending that were due to Plaintiffs and the Class and applied those earnings to offset the realized losses in the Collateral Pools. Defendants then demanded, and continue to demand, that Plaintiffs and the Class reimburse the Collateral Pools for the realized losses that resulted from Defendants' misconduct. And because of the withdrawal limitations Defendants implemented, Plaintiffs and the Class lack the ability to freely exit the SLP or the Commingled Lending Funds participating therein.

**ANSWER TO PARAGRAPH 114:** Defendants admit that Plaintiffs and putative class members are responsible for principal losses in invested cash collateral resulting from their participation in securities lending. Defendants deny the remaining allegations of this paragraph.

## V. CLASS ACTION ALLEGATIONS

115. Louisiana Firefighters, Chicago Teachers, Pontiac Police and Fire, and Pontiac General bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of persons similarly situated (the "Class"):

> All persons or entities that are not governed by ERISA and that invested or maintained investments or assets, directly or indirectly, between January 1, 2007 and the present (the "Class Period") in any Collateral Pool, as defined herein, managed or operated by Northern Trust, and were damaged thereby.

**ANSWER TO PARAGRAPH 115:** Defendants admit that Plaintiffs purport to bring a class action, but deny that they are entitled to bring this action on behalf of a class. Defendants deny the remaining allegations of this paragraph.

116. Excluded from the Class are Defendants, any subsidiaries or affiliates of the Defendants, officers and directors of the Defendants, heirs, successors or assignees of any of the Defendants or their officers and directors, and any entity in which any Defendant has a controlling or substantial interest, except for any Commingled Lending Funds, as defined herein, which are expressly included in the Class.

**ANSWER TO PARAGRAPH 116:** Defendants admit that Plaintiffs purport to bring a class action, but deny that they are entitled to bring this action on behalf of a class. Defendants deny the remaining allegations of this paragraph.

117.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of investors throughout the country participated in the SLP and invested, either directly or indirectly, in the Collateral Pools during the Class Period and sustained losses as a result of Defendants' misconduct. For example, in 2008, Northern Trust identified 670 participating clients in 49 worldwide markets. Furthermore, well over one hundred investors have sought redemptions from the Commingled Lending Funds that have been restricted due to illiquidity and collateral deficiencies in the Collateral Pools. Direct and indirect SLP participants and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail.

**ANSWER TO PARAGRAPH 117:**   To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny that this action may be maintained as a class action.  Defendants deny the remaining allegations of this paragraph.

118.    Louisiana Firefighters', Chicago Teachers', Pontiac Police and Fire's, and Pontiac General's claims are typical of the claims of the members of the Class because they arise from Defendants' fiduciary status and their violation of those duties, which applies uniformly to all members of the Class; are based on substantially similar or uniform agreements governing the participation in and administration of the SLP that were entered into between Plaintiffs and by or on behalf of all members of the Class, and Defendants; and arise from Defendants' uniform course of conduct in failing to properly exercise their discretionary authority in administering the

SLP and investing Collateral Pool assets in good faith. If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

**ANSWER TO PARAGRAPH 118:**  Defendants deny the allegations of this paragraph.


119.    The claims of Louisiana Firefighters, Chicago Teachers, Pontiac Police and Fire, and Pontiac General, and all other Class members originate from the same misconduct and breaches of duty committed by Defendants with regard to its management of the SLP in which Plaintiffs participated and for which Defendants' conduct was the same. Proceeding as a class action is particularly appropriate here because the Collateral Pool assets managed by Defendants treat any losses as proportional to all investors, and, therefore, Defendants' imprudent actions and other breaches affected all Class members in the same manner.

**ANSWER TO PARAGRAPH 119:**  Defendants deny the allegations of this paragraph.


120.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a.    Whether Defendants are fiduciaries to the Class members;

b.    Whether Defendants breached their fiduciary duties to the Class;

c.    Whether Defendants' acts proximately caused losses to the Class and, if so, the appropriate relief to which they are entitled;

d.    Whether Defendants breached terms of their contracts with the Class members;

e.     Whether Defendants breached their contractual duties of good faith and fair dealing with respect to the Class; and

f.     Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

**ANSWER TO PARAGRAPH 120:**  Defendants deny the allegations of this paragraph.


121.    Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action and fiduciary litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

**ANSWER TO PARAGRAPH 121:**  Defendants deny the allegations of this paragraph.


122.    A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

**ANSWER TO PARAGRAPH 122:**  Defendants deny the allegations of this paragraph.


123.    In addition, prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Prosecution of separate actions would also create a risk of adjudications with respect to individual members of

the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

**ANSWER TO PARAGRAPH 123:** Defendants deny the allegations of this paragraph.

## COUNT I

**CLAIM FOR BREACH OF FIDUCIARY DUTY**

124.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

**ANSWER TO PARAGRAPH 124:**   Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

125.     The Defendants undertook to act as an agent and fiduciary for each Plaintiff and member of the Class, and Defendants owed each Plaintiff and Class member a fiduciary duty. By reason of their fiduciary relationships, Defendants specifically owed and owe Plaintiffs and members of the Class the highest obligation of due care, good faith and loyalty in the administration of the SLP and the management of the Collateral Pools.

**ANSWER TO PARAGRAPH 125:**   This paragraph contains legal conclusions to which no answer is required.   The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.   Defendants deny any remaining allegations of this paragraph.

126.     Specifically, as the trustee to the Collateral Pools, investment manager of the Collateral Pools, and securities lending agent in securities lending transactions, charged with

managing the investment of the Collateral Pools for the benefit of Plaintiffs and the Class, including both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

**ANSWER TO PARAGRAPH 126:**  This paragraph contains legal conclusions to which no answer is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny the remaining allegations of this paragraph.

127.    Northern Trust has acknowledged its fiduciary status with respect to participants in the SLP, both in materials produced by Defendants, and by the terms of the securities lending agreements Northern Trust entered into with direct participants in the SLP and through agreements with the Commingled Lending Fund in which indirect SLP participants invested. Moreover, Northern Trust's role as fiduciary to all participants in the SLP is confirmed by the FFIEC Policy, which was expressly incorporated by reference into the securities lending agreements.

**ANSWER TO PARAGRAPH 127:**  To the extent this paragraph refers to agreements or other documents such as the FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a

belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

128.     As a fiduciary to Plaintiffs and the Class, Northern Trust had full discretion to manage the Collateral Pools for the benefit of Plaintiffs and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 128:**   To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

129.     Plaintiffs and the Class placed their trust and confidence in Northern Trust by virtue of, among other things, Northern Trust's superior knowledge and possession and control over the Plaintiffs' and Class members' securities and the collateral investments in the SLP.

**ANSWER TO PARAGRAPH 129:**  Defendants deny the allegations of this paragraph.

130.     Northern Trust breached its fiduciary duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid.

Northern Trust further breached its fiduciary duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 130:**  Defendants deny the allegations of this paragraph.


131.    Northern Trust further breached its fiduciary duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 131:**  Defendants deny the allegations of this paragraph.


132.    As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of Plaintiffs and the Class. Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk that would be borne solely by Plaintiffs and the Class. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain certain at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 132:**  Defendants deny the allegations of this paragraph.

133.    In addition, the Defendants owed and owe fiduciary duties to the indirect participants in the SLP who are Plaintiffs and members of the Class. Specifically, as the trustee to the Commingled Lending Funds, investment manager of the Collateral Pools, and securities lending agent in securities lending transactions, charged with managing the investment of the Collateral Pools for the benefit of the indirect participants in the SLP, Northern Trust had a fiduciary duty to negotiate the lowest possible fees on behalf of the Commingled Lending Funds and the investors therein.

**ANSWER TO PARAGRAPH 133:**  Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  This paragraph contains conclusions of law to which no answer is required.  To the extent an answer is required, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.


134.    Northern Trust has acknowledged its fiduciary status with respect to indirect participants in the SLP, through agreements with the Commingled Lending Fund in which indirect SLP participants invested.

**ANSWER TO PARAGRAPH 134:**  To the extent this paragraph refers to agreements or the Declaration of Trust, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

135.    As a fiduciary to the indirect participants in the SLP, Northern Trust had the ability to negotiate on behalf of the indirect participants the fees payable to Northern Trust for the Commingled Lending Funds' participation in the SLP. That duty required Defendants to negotiate in good faith the lowest possible rate it could achieve for the Commingled Lending Funds and the participants therein.

**ANSWER TO PARAGRAPH 135:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. To the extent an answer is required, Defendants deny the allegations of this paragraph.

136.    Northern Trust breached its fiduciary duties by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants. The conflict of interest caused Defendants to breach their fiduciary duties, and caused harm to Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 136:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. To the extent an answer is required, Defendants deny the allegations of this paragraph.

137.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 137:** Defendants deny the allegations of this paragraph.


## COUNT II

## CLAIM FOR BREACH OF CONTRACT

138.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 138:**   Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.


139.   The agreements that Northern Trust entered into with the direct participants in the SLP, and the agreements entered into with the Commingled Lending Funds on behalf of indirect participants in the SLP, are valid and enforceable agreements. Plaintiffs have performed all required duties and fulfilled all relevant conditions of those agreements.

**ANSWER TO PARAGRAPH 139:**   This paragraph contains legal conclusions to which no answer is required.   To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.   To the extent an answer is required, Defendants deny the allegations of this paragraph.


140.   Those agreements required Northern Trust to "make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 140:**   This paragraph contains legal conclusions to which no answer is required.   To the extent this paragraph refers to various agreements, Defendants refer

to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

141.    Those agreements further imbued Northern Trust with full discretion to manage the Collateral Pools for the benefit of Plaintiffs and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein.

**ANSWER TO PARAGRAPH 141:**  This paragraph contains legal conclusions to which no answer is required.  To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

142.    Northern Trust breached its contractual duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid. Northern Trust further breached its duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 142:**  Defendants deny the allegations of this paragraph.

143.    Northern Trust further breached its contractual duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 143:**  Defendants deny the allegations of this paragraph.

144.     Northern Trust also breached its contractual indemnity obligations as lending agent to the Commingled Lending Funds and their participants by failing to make them whole for losses caused by the failure of Northern Trust to perform its duties and responsibilities under the Lending Agreements.

**ANSWER TO PARAGRAPH 144:**  Defendants deny the allegations of this paragraph.

145.     In addition, as manager and lending agent to the Commingled Lending Funds, Defendants had full discretion to negotiate the securities lending fee with Northern Trust. By virtue of their contractual relationship, they were required to negotiate on behalf of the indirect participants a favorable fee payable to Northern Trust for the Commingled Lending Funds' participation in the SLP.

**ANSWER TO PARAGRAPH 145:**  Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  To the extent an answer is required, Defendants deny the allegations of this paragraph.

146.     Northern Trust further breached its contractual duties owed to the Commingled Lending Funds by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants. The conflict of interest caused Defendants to breach their contractual duties and caused harm to Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 146:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. To the extent an answer is required, Defendants deny the allegations of this paragraph.

147. As a direct and proximate result of Defendants' breaches of contract, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 147:** Defendants deny the allegations of this paragraph.

## COUNT III

## CLAIM FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

148. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 148:** Count III has been dismissed by the Court, and therefore no answer is required.

149. Defendants' agreements with Plaintiffs and the Class, including agreements with the Commingled Lending Funds on behalf of investors therein, gave rise to a duty of good faith and fair dealing. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Plaintiffs and the Class. As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of Plaintiffs and the Class. Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to

increase their profits without regard for the increased risk that would be borne solely by Plaintiffs and the Class. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain impaired and at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Plaintiffs and the Class.

**ANSWER TO PARAGRAPH 149:**  Count III has been dismissed by the Court, and therefore no answer is required.

150.    In addition, the Defendants' duty of good faith and fair dealing owed to the Commingled Lending Funds required that Defendants negotiate a favorable fee on behalf of investors in the Commingled Lending Funds, who participated indirectly in the SLP.

**ANSWER TO PARAGRAPH 150:**  Count III has been dismissed by the Court, and therefore no answer is required.

151.    Northern Trust breached its duties of good faith and fair dealing by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants, in violation of their duties.

**ANSWER TO PARAGRAPH 151:**  Count III has been dismissed by the Court, and therefore no answer is required.

152.     As a direct and proximate result of the breaches of Defendants' duty of good faith and fair dealing, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 152:**  Count III has been dismissed by the Court, and therefore no answer is required.

**AFFIRMATIVE DEFENSES**

For further and separate defenses to the causes of action brought by Plaintiffs, and without admitting that they have the burden of proof on any fact, issue, element of a claim, or any of these matters, or that anything stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject is relevant to Plaintiffs' allegations, Defendants allege as follows.  Defendants reserve the right to amend these defenses to assert additional defenses to the full extent permitted by the Federal Rules of Civil Procedure.

1.     Plaintiffs' claims are barred, in whole or in part, because the Amended Complaint fails to state a claim upon which relief may be granted.

2.     Plaintiffs' claims are barred, in whole or in part, because they lack standing to bring one or more of the claims alleged, including to bring claims as a class action.

3.     Plaintiffs' claims are barred, in whole or in part, because their claims may not be maintained as a class action for failure to satisfy all of the requirements of Fed. R. Civ. P. 23.

4.     Plaintiffs' claims are barred, in whole or in part, because they sustained no losses or damages.

5.     Plaintiffs' claims are barred, in whole or in part, because they are not ripe.

6.      Plaintiffs' claims are barred, in whole or in part, because Defendants acted reasonably and prudently and in good faith at all times and fulfilled all of their legal and other duties.

7.      Plaintiffs' claims are barred, in whole or in part, because Defendants acted at all times in accordance and consistent with the terms of Plaintiffs' plan documents and all applicable agreements.

8.      Plaintiffs' claims are barred, in whole or in part, by virtue of the operation of Articles 2.03, 3.02, 4.08 and/or 5.02 of the Declaration of Trust.

9.      Plaintiffs' claims are barred, in whole or in part, by the terms of the Collective Fund Custody Agreements, Securities Lending Authorization Agreements, Investment Management Agreements, Master Custody Agreements, or other agreements between Defendants and the Plaintiffs.

10.      Plaintiffs' claims are barred, in whole or in part, because collateral from securities lending was invested at all times pursuant to and in accordance with applicable investment guidelines.

11.      Plaintiffs' claims are barred, in whole or in part, because they did not rely on Defendants in making investment decisions or in taking any action referenced in the Amended Complaint.

12.      Plaintiffs' claims are barred, in whole or in part, because Defendants made all appropriate disclosures to investors and because none of Defendants' alleged statements or omissions was materially false or misleading at the time it was purportedly made.

13.      Plaintiffs' claims are barred, in whole or in part, because no act or omission of Defendants caused Plaintiffs to sustain any injury.

14.     Plaintiffs' claims are barred, in whole or in part, because they cannot prove causation and damages.

15.     Plaintiffs' claims are barred, in whole or in part, because if Plaintiffs sustained any injury – which Defendants deny – any such injury was due, in whole or in part, to actions and/or omissions by Plaintiffs.

16.     Plaintiffs' claims are barred, in whole or in part, because if Plaintiffs sustained any injury – which Defendants deny – then Plaintiffs failed to mitigate such damages and their claims for damages should be barred or reduced accordingly.

17.     Plaintiffs' claims are barred, in whole or in part, because they ratified the alleged acts and omissions of Defendants as alleged in the Amended Complaint.

18.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs acquiesced in the alleged acts and omissions of Defendants as alleged in the Amended Complaint.

19.     Plaintiffs' claims are barred, in whole or in part, because they assumed the risk of the alleged acts and omissions of Defendants as alleged in the Amended Complaint.

20.     Plaintiffs' claims are barred, in whole or in part, because they are estopped from seeking any relief due to the alleged actions and omissions of Defendants alleged in the Amended Complaint.

21.     Plaintiffs' claims are barred, in whole or in part, because they have waived seeking or obtaining any relief due to the alleged acts and omissions of Defendants as alleged in the Amended Complaint.

22.     Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.

23.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

24.     Plaintiffs' claims are barred, in whole or in part, because their own unclean hands prevent them from obtaining any relief from Defendants.

25.     Plaintiffs' claims are barred, in whole or in part, because the doctrine of in pari delicto prevents them from obtaining any relief from Defendants.

26.     Plaintiffs' claims are barred, in whole or in part, because Defendants acted without negligence in all respects relevant to the Amended Complaint.

27.     Plaintiffs' claims are barred, in whole or in part, because, to the extent Defendants exercised discretion regarding the securities lending program, Defendants acted properly and within the scope of their discretion.

28.     The claims of Chicago Teachers, Pontiac Police and Fire, and Pontiac General are barred and discharged, in whole or in part, by their failure to timely object to statements of account as required under their custody agreements with Northern.

Dated: June 30, 2011                    Respectfully submitted,

                                         /s/ Caryn L. Jacobs

                                        Caryn L. Jacobs
                                        Todd J. Ehlman
                                        Brook R. Long
                                        WINSTON & STRAWN LLP
                                        35 W. Wacker Drive
                                        Chicago, Illinois 60601
                                        United States
                                        Tel: (312) 558-5600
                                        Fax: (312) 558-5700
                                        CJacobs@winston.com
                                        TEhlman@winston.com
                                        BLong@winston.com

                                        Michele L. Odorizzi
                                        MAYER BROWN LLP
                                        71 S. Wacker Drive
                                        Chicago, IL 60606
                                        United States
                                        Tel: (312) 782-0600
                                        Fax: (312) 701-7711
                                        MOdorizzi@mayerbrown.com

                                        *Attorneys for Defendants*

88

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies under penalty of perjury that a copy of the foregoing DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT was served on counsel for all parties electronically via the CM/ECF system on June 30, 2011.

Dated: June 30, 2011                               <u>/s/ Brook R. Long</u>