# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>NORTHERN TRUST INVESTMENTS, INC., and THE NORTHERN TRUST COMPANY,<br><br>      Defendants. | Case No. 09-7203<br><br>Hon. Robert W. Gettleman<br><br>Magistrate Judge Susan E. Cox |
| NORTHERN TRUST INVESTMENTS, INC., and THE NORTHERN TRUST COMPANY,<br><br>      Third-Party Plaintiffs,<br><br>      v.<br><br>THE BOARD OF TRUSTEES FOR THE LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES FOR THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM,<br><br>      Third-Party Defendants. | |

|  |
|---|
| THE NORTHERN TRUST COMPANY,<br><br>   Counter-Plaintiff,<br><br>   v.<br><br>PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO,<br><br>   Counter-Defendant. |

**NORTHERN TRUST'S RESPONSE IN OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL**

**INTRODUCTION**

Plaintiffs' motion represents the worst of the "jump the gun" school of discovery. Under that mode of litigation, parties — like plaintiffs here — prematurely run into court on the slightest pretext, seeking unclear "relief" to which they are not entitled. Federal Rule 37(a)(1) and Local Rule 37.2, which require the existence of a concrete discovery dispute before a party may seek judicial relief, were designed to prevent this very type of motion. As we show below, had plaintiffs followed those rules, their motion never would have been filed.

Indeed, because the parties are still negotiating discovery compromises, it is difficult to understand even what is supposedly in dispute between the parties. Plaintiffs say they are bringing the motion for a ruling on ESI protocols, but to this day, there is no impasse as to the ESI negotiations. The main relief sought by the motion — namely, an advisory opinion that Northern Trust Investments, N.A., and The Northern Trust Company (collectively, "Northern Trust") must disclose confidential non-party client information without redaction of client names "when producing documents" — has nothing to do with ESI protocols. And because the parties have yet to meet and confer regarding the guidance that this Court provided in its October 21, 2011 Order as to the discovery of materials concerning "a sample set of four other investors to be

agreed upon by the parties," questions about the delays, burdens, and costs related to such information remain purely hypothetical and premature.

The many defects in plaintiffs' motion naturally flow from the fact that the parties have not reached any concrete discovery impasses. For example, Northern Trust never refused to produce documents responsive to legitimate discovery requests that might contain confidential non-party client information. The parties continue to conduct meet-and-confer sessions on plaintiffs' discovery requests. For this reason, plaintiffs' complaints about unknown "spreadsheets and similar documents" that *may* contain confidential non-party client information are based on mere speculation. Nor can we fathom how plaintiffs can say that they must see such documents without redaction of non-party client names when plaintiffs do not even know what any such documents might contain. Thus, plaintiffs put the cart before the horse when they seek an advisory ruling denying any redaction of non-party client names — no matter what — *before* the identity and scope of documents that may be subject to such redaction is even known.[1] Only then can the parties (and the Court, if need be) gauge plaintiffs' alleged "need" to know client names versus the delays, burdens, and costs of protecting non-party client information through methods other than name redaction.

And plaintiffs' suggestion that Northern Trust is somehow using the Illinois Banking Act (the "Banking Act" or "Act"), 205 Ill. Comp. Stat. 5/48.1, as a pretext to make massive redactions or to delay production is false. Plaintiffs themselves have not produced a single

---

1. In their motion, plaintiffs (a) do not mention *any* of their document requests that might call for confidential non-party client information; (b) do not state that the parties are at an impasse (they are not) regarding those requests; (c) do not describe what documents containing confidential non-party client information would even be responsive to such requests; (d) do not state that Northern Trust refused to produce such speculative documents *because* they contained confidential non-party information (which never happened); and (e) do not explain how redaction of non-party client names from such unknown documents would be improper or could possibly prejudice them. There simply is no foundation for the advisory ruling that plaintiffs seek.

document, and there is no dispute that both sides are still negotiating the scope of the discovery requests.[2] As for the Banking Act, it protects the confidential information of Northern Trust's clients and must be followed in connection with discovery on non-party clients.[3] Northern Trust has complied with the Act in cases other than this one when it produced documents containing information about non-party clients by redacting client identities (such as in the *Diebold* and *BP Plans* actions) ***or***, where appropriate, by giving advance notice to the affected clients that their confidential documents will be produced under a protective order and without redacting the clients' names (such as in *Diebold*).[4] But the scope of any particular document production must be considered when deciding which form of compliance with the Act is most appropriate and expeditious and causes the least delay, cost, disruption, and burden. Plaintiffs ignored that obvious principle when they filed this motion well before the parties had finished negotiations on the scope of the discovery at issue.

---

2. Plaintiffs' claim that Northern Trust is "relying on the absence of an ESI protocol" to delay document production (Pls.' Mem. at 2) is therefore incorrect.

3. The Banking Act provides bank customers with a statutory right to confidentiality and authorizes penalties against financial institutions that violate that right of privacy. *See generally* 205 Ill. Comp. Stat. 5/48.1; *People v. Nesbitt*, 938 N.E.2d 600, 606 (Ill. App. 2d Dist. 2010). Under the Act, unless an exception applies, "a bank may not disclose to any person, except to the customer or his duly authorized agent, any financial records or financial information obtained from financial records relating to that customer of that bank." 205 Ill. Comp. Stat. 5/48.1(c). "Financial records" includes any "item containing information pertaining to any relationship established in the ordinary course of a bank's business between a bank and its customer." *Id.* 5/48.1(a)(4). One exception to the prohibition against disclosure is where "the financial records are disclosed in response to a lawful subpoena, summons, warrant, citation to discovery assets, or court order." *Id.* 5/48.1(c)-(d). Before making any such disclosure, though, the bank must "mail a copy of the subpoena, summons, warrant, citation to discover assets, or court order to the person establishing the relationship with the bank, if living, and otherwise his personal representative, if known, at his last known address by first class mail, postage prepaid." *Id.* 5/48.1(d).

4. In *Diebold*, this latter process was followed regarding two clients — the BP Corp. Northern America Inc. Savings Plan Investment Oversight Committee and Investment Committee (the "BP Plans") and FedEx Corp. and the FedEx Corporation Employees' Pension Plan ("FedEx") — in response to a request by the *Diebold* plaintiffs to produce documents produced by Northern Trust in the lawsuits brought by the BP Plans and FedEx. Tellingly, one of those clients (BP Plans) objected to such production, and its outside counsel appeared at court hearings and engaged in weeks of negotiations with the parties to resolve the BP Plans' concerns about its confidential information. (Kipp Decl. ¶ 17.)

Moreover, plaintiffs never explain how *they* — who are not subject to the provisions and penalties of the Banking Act, and do not represent and have *no* connection to these non-party clients — should be allowed to dictate how *Northern Trust* complies with an Act governing Northern Trust and its own non-party clients. Nor do plaintiffs even try to show that they would be prejudiced in any way *if* Northern Trust were to choose to redact client names when producing responsive documents containing confidential non-party client information. Thus, plaintiffs could not justify the relief sought, even if the motion did not have to be denied under Rule 37(a)(1) and Local Rule 37.2.

The fatally premature nature of plaintiffs' motion has been confirmed by this Court's Order of October 21, 2011. That Order prioritized discovery and mandated that, at this stage of the case, plaintiffs are entitled to non-party client-related documents otherwise responsive to certain of plaintiffs' requests *only* for "a sample set of four other investors to be agreed upon by the parties." (Dkt. #126, cls. (1), (6), (7) & (9).) In light of that ruling — limiting non-party client production to *four* clients, versus potentially *hundreds* or even *thousands* of clients sought by plaintiffs' blunderbuss document requests — Northern Trust is confident that the parties can work out an agreement on how best to protect confidential non-party client information.

Plaintiffs' one ESI-related request in the motion is equally premature. Plaintiffs argue that all "spreadsheet" documents should be produced in *native* format without acknowledging — much less addressing — Northern Trust's position that *native* format is inappropriate for spreadsheets that contain redactions (whether for privilege, confidentiality concerns, or other reasons). But plaintiffs also fail to tell the Court that the parties were not, and *are not*, at an impasse on this point. As we show below, the parties continue to have fruitful negotiations on this very issue, vitiating plaintiffs' request for "relief." The motion should be denied in full.

**BACKGROUND**

Plaintiffs propounded their First Request for the Production on Documents (the "Requests") on Northern Trust on July 1, 2011, to which Northern Trust responded on August 5, 2011. (Kipp Decl. ¶ 2 & Ex. 1 thereto.) As pertinent here, Northern Trust objected to producing documents "that would identify client names; client identifying information; and client banking, financial, and other information" and "that would violate any provision of any and all applicable laws, rules, and practices concerning and protecting client names, client information, and client banking, financial, and other information." (*Id.* ¶ 2 & Ex. 1 thereto at 7-8.)

The parties have held several meet-and-confer discussions regarding the scope and content of plaintiffs' Requests (including the above-described objections) which have not yet resulted in an impasse. (*Id.* ¶¶ 12-14 & Ex. 6 thereto.) During one such discussion, for example, plaintiffs took the initial position that Northern Trust must produce confidential financial information of possibly hundreds or even thousands of its non-party clients that are responsive to its discovery requests. (*Id.* ¶ 12.) No impasse was ever reached on this issue before this Court ruled on October 21, 2011, that plaintiffs are entitled at this stage of the case to non-party client discovery concerning only "a sample set of four other investors to be agreed upon by the parties." (Dkt. #126, cls. (1), (6), (7) & (9).)

Plaintiffs also took the position that, if and when Northern Trust produced confidential documents of non-party clients, Northern Trust should not have to redact client names because a protective order would adequately protect the clients' confidential information. (Kipp Decl. ¶¶ 12, 14 & Ex. 6 thereto at 2.) Plaintiffs acknowledged, however, that even in that case, if client names were not redacted, the Banking Act would require Northern Trust to mail notice to all affected clients that their confidential information was being produced in litigation. (*Id.* ¶¶ 12-14

& Ex. 6 thereto at 1.)

Importantly, plaintiffs do not represent these non-party clients, are not entitled to know their identities,[5] and have never explained why they have any legitimate need to know non-party client names. Their claim that Northern Trust wants to redact "all client financial data" (Pls.' Mem. at 7) is wrong. Redaction would cover only client names, addresses, logos and other client-identifying information, and documents would include all financial data and be produced on a client-by-client basis.

For its part, Northern Trust *never* took the position that the Banking Act absolutely prohibited Northern Trust from disclosing its clients' confidential information under the appropriate circumstances and protections. (Kipp Decl. ¶¶ 12-13.) But Northern Trust explained that it (and not plaintiffs) was subject to the Banking Act's penalties for violations of the Act and that it (and not plaintiffs) knew the delays, burdens, and costs associated with the options under the Act to either redact non-party client names or to notify non-party clients that it was producing their confidential information in unredacted form under permitted circumstances, *see* 205 Ill. Comp. Stat. 5/48.1(c)(2), (d). (Kipp Decl. ¶¶ 12-13.)

Northern Trust also pointed out that the delays, costs, burdens, and disruption of either option depends in part on the *number* of affected non-party clients. Because plaintiffs' vastly overbroad discovery requests theoretically seek discovery of *every* Northern Trust securities lending client, Northern Trust described to plaintiffs the enormous problems associated with

---

5. Plaintiffs do not represent these non-party clients of Northern Trust and are not, as a matter of law, entitled to insist upon disclosure of these client names. *Marks v. Global Mortgage Group Inc.*, on which plaintiffs rely at page 4 of their memorandum, supports this point. 218 F.R.D. 492, 497 n.4 (S.D. W. Va. 2003) (agreeing that "personally-identifiable information about the members of the proposed class should not be released until a class is properly certified"); *accord Bradford v. WR Starkey Mortg., LLP*, 2007 WL 2302514, at *2 (N.D. Ga. 2007) (Ex. A hereto) (denying motion to compel documents pertaining to putative class members: "Though discovery on this matter is appropriate with regard to the named plaintiff, it would be improper to allow plaintiff to engage in classwide discovery on this issue prior to class certification.").

potentially notifying **hundreds** or even **thousands** of clients, and telling them their confidential data might someday be produced in a court case. (Kipp Decl. ¶ 12.)

For example, just the process of trying to identify the clients to whom the mailing would go — given that no class has been certified and the scope of any putative class is hotly disputed — would be heavily litigated and extremely costly and burdensome. (*Id.*) That alone would cause delays. And because these non-party clients are protective of their confidential information, such a mass mailing would almost certainly trigger a deluge of letters, questions, intervention attempts, complaints, involvement of third-party lawyers, and/or phone calls that would overwhelm Northern Trust and this Court. (*Id.*) Indeed, when Northern Trust followed the mailing option regarding just **two** non-party clients in the *Diebold* case — both of whom had previously filed securities lending actions against Northern Trust and undergone discovery — one of those clients raised objections that involved that client's outside counsel, *took ten weeks to resolve*, and required negotiating and entering a supplemental protective order. (*Id*. ¶ 17.) The delays occasioned by an ill-conceived mass mailing to non-party clients who have never filed any lawsuit against Northern Trust would multiply the ten-week delay resulting from that **one** client's objections.

Accordingly, Northern Trust noted its unwillingness to conduct such a mass mailing, while taking the position that the issue (redaction of names versus mailing of notice) was premature until the parties reached agreement (or obtained a Court order if agreement was impossible) on the scope of discovery, including *how many* of Northern Trust's non-party clients' documents would be subject to discovery. (*Id.* ¶ 12.) Only then could the costs, burdens, and delays be addressed with concrete facts.

Plaintiffs belittle these legitimate concerns.[6] (Pls.' Mem. at 5.) But unlike Northern Trust, plaintiffs have no knowledge on which to judge the burdens of the mailed notice process or the disruption to Northern Trust and its many non-party clients from such a mass mailing. And simple common sense requires that before deciding how best to comply with the Act's confidentiality provisions — either through redaction of client names or through the mailed notification process — one needs to know, at a minimum, how many clients would be affected by the potential discovery. At the time plaintiffs filed their motion, *that* issue was still the subject of ongoing discussions directed to narrowing plaintiffs' overbroad discovery requests to a sample set of non-party clients. (Kipp Decl. ¶ 12.)

Ultimately, *before* the parties came to an impasse on the number of non-party clients as to which Northern Trust would produce otherwise responsive documents in its possession — but *after* plaintiffs prematurely filed this motion — this Court's October 21, 2011 ruling concerning the prioritization of discovery resolved that very issue. (Dkt. #126.) In its Order, the Court limited (at this stage of the case) the discovery by plaintiffs seeking non-party client documents to a sample of *four* non-party clients to be agreed upon by the parties. In light of this ruling, Northern Trust is confident that the parties can work out how best to comply with the Banking Act concerning discovery relating to such non-party clients.

The parties have also met and conferred on several occasions regarding the terms of ESI

---

6. Neither of the two cases that plaintiffs cite at page 4 of their memorandum addresses Northern Trust's argument that this Court should consider the extreme harm associated with plaintiffs' proposal. To the contrary, both cases reaffirm that, where appropriate, courts should fashion remedies to protect both the producing party and the non-parties whose confidential information is at issue. *See Marks*, 218 F.R.D. at 497 ("[T]he Court recognizes . . . that Congress has expressed a strong interest in protecting the privacy of consumers' financial information. For that reason, it is appropriate for a court to exercise its broad discretion to fashion protective orders."); *Laxalt v. McClatchy*, 809 F.2d 885, 889 (D.C. Cir. 1987) ("The fact that a document subject to the Privacy Act is not, however, irrelevant to the manner in which discovery should proceed. Although discovery standards under the FRCP permit access to relevant documents protected by the Act, those same FRCP standards give the District Court ample discretion to fashion appropriate protective orders upon a showing of good cause.").

protocols. (*Id.* ¶¶ 3-10 & Exs. 2-5 thereto.) Plaintiffs admit that the parties quickly reached agreement on all terms except for one: the production of "spreadsheets, databases, and similar files" in *native* format. (Pls.' Mem. at 3.) Northern Trust stated that producing such documents in *.tiff* format would reduce its already high production costs and burdens and improve its quality control over its productions. (Kipp Decl. ¶¶ 6, 8-9 & Ex. 5 thereto at 2-4.) As a compromise, however, Northern Trust offered to produce in *native* format all spreadsheets that would *not* require redaction, but maintained that if a spreadsheet *did* legitimately require redaction, Northern Trust would produce it in redacted *.tiff* format. (*Id.* ¶¶ 6, 8-9 & Ex. 5 thereto at 3.)

Northern Trust's position on this issue is content-neutral, and was driven solely by the undue burden and quality-control problems that would arise when producing a redacted document in *native* format. (*Id.* ¶¶ 6, 8-9 & Ex. 5 thereto at 2-4.) Redacting and producing a document in *native* format essentially creates a wholly new "live" document, making it impossible to control the document's content thereafter and creating a great risk of loss of control over original and modified documents. (*Id.* ¶ 8 & Ex. 5 thereto at 3.) Beyond that, the effort to redact a *native* document takes many times longer than redacting a *.tiff* document, and would compound the production time and costs associated with redactions. (*Id.* ¶ 8 & Ex. 5 thereto at 3-4.) Northern Trust also said it would entertain plaintiffs' reasonable, good-faith requests to examine spreadsheets in redacted *native* format if, for some reason, plaintiffs found the redacted *.tiff* format unreadable or unusable. (*Id.* ¶ 6.)

The parties continue to negotiate the ESI protocol to this day. As late as October 21, 2011 — more than a week *after* plaintiffs filed their premature motion to compel — the parties held fruitful discussions during which plaintiffs stated that they would consider a further concession by Northern Trust to produce redacted spreadsheets in *.tiff* format that would be as

"useable" as possible — that is, in a format that would allow plaintiffs to identify the worksheets' names, column headings, and row numbers and that would "unhide" all of the worksheets' previously hidden columns and rows. (*Id.* ¶ 10.) Thus, there never was an impasse on the ESI issue presented in plaintiffs' motion, either before plaintiffs filed it or to this day. (*Id.* ¶¶ 10-11.) The motion on that point remains premature.

## ARGUMENT

**I. Plaintiffs' Motion Concerning ESI Protocols Should Be Denied As Premature, And Lacks Merit In Any Event.**

Federal Rule 37 mandates that, before a party may seek a court order compelling discovery, it must first attempt to obtain the sought-after information "without court action" by conferring with the party from which discovery is sought. Fed. R. Civ. P. 37(a)(1). Local Rule 37.2 echoes that requirement, stating that this Court "will refuse" to address "all motions for discovery and production of documents" under Federal Rule 37 unless the moving party attests that the parties "are unable to reach an accord" regarding the discovery sought. Loc. R. 37.2.

The purpose of such conference requirements "is to prevent the parties from dragging the court into every discovery dispute while discovery is ongoing." *See Lapsley v. Xtek, Inc.*, 2008 WL 4690999, at *2 (N.D. Ind. 2008) (Ex. B hereto) (explaining the Northern District of Indiana's analog to Local Rule 37.2). As this Court states in its case management procedures, "the parties can and should work out most discovery disputes" without invoking the Court through "the filing of discovery motions." Case Management Procedure – Discovery Motions (Cox, J.), *available at* http://www.ilnd.uscourts.gov/home/JudgeInfo.aspx (last visited Oct. 27, 2011). And at least one other Judge in this district is in accord: "Each hour needlessly spent on a [discovery] dispute is an hour squandered." *Paulcheck v. Union Pac. R.R. Co.*, 2010 WL 1727856, at *1 (N.D. Ill. 2010) (Cole, M.J.) (Ex. C hereto); *accord Autotech Tech. Ltd. P'ship v.*

*Automationdirect.com, Inc.*, 2007 WL 2736681, at *2 (N.D. Ill. 2007) (Cole, M.J.) (Ex. D hereto) (same).

Here, there is no discovery impasse on the ESI protocol on which plaintiffs prematurely sought relief. As we explain on pages 9 and 10 herein, the sole open issue is whether legitimately redacted "spreadsheets or similar documents" should be produced in *native* (per plaintiffs) or *.tiff* (per Northern Trust) format, and the parties are still discussing a potential compromise.[7] (*Id.* ¶¶ 10-11.) Indeed, in an October 21 call, plaintiffs expressed appreciation for Northern Trust's attempts to work toward a compromise, conceding that they were unsure whether they even wanted "all" spreadsheets in *native* format in the first instance, since a large number of spreadsheets sought mostly likely would be irrelevant to their claims. (*Id.* ¶ 10.)

Plaintiffs told the Court on October 13 that, "if it weren't for the ESI issue," they would not have filed their motion to compel. (*Id.* ¶ 15 & Ex. 7 thereto at 54.) Because there is no "ESI issue," the motion is premature and must be denied.

Even if there were an impasse here, the motion should be denied. Plaintiffs do not explain why Northern Trust should bear the additional expense, burden, and quality-control risk of producing *all* redacted spreadsheets in *native* format, even those in which plaintiffs have no interest or as to which plaintiffs do not need *native* format. Because, under Northern Trust's current proposal, the *.tiff* format will look like a *native* document and plaintiffs can obtain a *native* document pursuant to a reasonable request, the motion simply is unreasonable.

---

7. Plaintiffs' assertions to the contrary, Northern Trust's many concessions on this point are perfectly consistent with the teachings of *The Sedona Conference Cooperation Proclamation*, which stresses, above all, "a culture of cooperation" that will, in turn, allow parties to "interpret[] the facts and argu[e] the appropriate application of law." The Sedona Conference, *The Sedona Conference Cooperation Proclamation*, at 1 (July 2008).

**II.     Plaintiffs' Motion Concerning Client Name Redaction Should Be Denied As Premature And Lacks Merit In Any Event.**

Plaintiffs' request for a standing order compelling Northern Trust to produce non-party clients' confidential financial information without redacting the clients' names is premature and so unconnected with a viable dispute that it constitutes a request for an advisory opinion. *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 540 F. Supp. 2d 994, 1005 (N.D. Ill. 2008) (Manning, J.) ("It is well established that federal courts are charged with ruling on actual controversies, as opposed to issuing advisory opinions about hypothetical events." (citing *Wisconsin Right to Life, Inc. v. Schober,* 366 F.3d 485, 488 (7th Cir. 2004))).[8]

As described at pages 6 through 9 above, such an order would have required providing notice to non-party clients *before* the scope of discovery and the number of affected clients was known and, thus, before one could analyze the costs, delays, and disruption of the name-redaction versus the mailed-notice methods of protecting confidential information. Given that it took ten weeks and a supplemental court order to resolve *one* clients' objections (upon receipt of mailed notice) to unredacted production of its confidential documents in Northern Trust's possession, resolution of discovery scope issues is clearly a necessary predicate to the kind of relief plaintiffs seek. Now that the Court — in its October 21 ruling — has determined the *number* of affected non-party clients as to which plaintiffs are entitled to some discovery, we are confident that the parties will be able to resolve the subject of this motion without the Court's intervention. Plaintiffs' motion should therefore be denied.

---

8.     Plaintiffs never have articulated why they need to see client names in the unknown and unidentified "documents" that they talk about in their memorandum. It is plaintiffs' "responsibility to identify specific documents, or specific categories of documents, to which they believe they are entitled." *Sauer v. Exelon Generation Co., LLC*, 2011 WL 3584780, at *6 (N.D. Ill. 2011) (Nolan, M.J.) (Ex. E hereto) (denying motion to compel where plaintiffs failed to identify with specificity the documents sought); *accord Ruffin v. Exel Direct, Inc.*, 2011 WL 1326221, at *8 (N.D. Ill. 2011) (Finnegan, M.J.) (Ex. F hereto) (denying motion to compel where plaintiffs relied on "sweeping statements" to describe the documents sought). Here, plaintiffs satisfy none of these standards.

## CONCLUSION

For all of the reasons stated above, Northern Trust respectfully requests this Court to deny plaintiffs' motion to compel.

Dated: October 27, 2011

Respectfully submitted,

/s/ Caryn L. Jacobs

Caryn L. Jacobs
Todd J. Ehlman
Brook R. Long
Nathan T. Kipp
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
(312) 558-5700 – Facsimile

Michele L. Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – Facsimile