## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | Judge Robert W. Gettleman, *Judge Presiding* <br><br> Magistrate Judge Susan E. Cox |
| Plaintiffs, | Civil Action No. 09-7203 |
| v. | **JURY TRIAL DEMANDED** |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | |
| Defendants. | |
| THE NORTHERN TRUST COMPANY, | |
| Counter-Plaintiff, | |
| v. | |
| THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, | |
| Counter-Defendant. | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT
## AND DEFENDANTS' COUNTERCLAIM

Defendants Northern Trust Investments, Inc., formerly known as Northern Trust Investments, N.A., ("NTI") and The Northern Trust Company ("NTC") (together, "Northern Trust"), by and through their attorneys, pursuant to Fed. R. Civ. P. 8(b) and 15(a)(1), file the following Answer[1] and Affirmative Defenses to Plaintiffs' Second Amended Class Action Complaint in the above-captioned case. To the extent any allegations are not expressly admitted herein, they are hereby denied. Pursuant to Fed. R. Civ. P. 8(b), any statement as to which defendants lack knowledge or information sufficient to form a belief about the truth shall have the effect of a denial.

## I.    INTRODUCTION

1.    This is a case about a fiduciary who improperly invested its clients' assets. Here, Northern Trust, in violation of its fiduciary and contractual duties, invested and maintained its clients' assets in risky, long-term investments—including hundreds of millions of dollars of unregistered, illiquid securities that plummeted in value. The Plans and members of the Class have incurred massive realized losses as a result of these breaches of Northern Trust's fiduciary and contractual duties, which caused Northern Trust's securities lending program (the "SLP") to lose over $1 billion.

**ANSWER TO PARAGRAPH 1:** Defendants deny the allegations of this paragraph.

2.    Northern Trust operates the SLP in which the Plans and the Class participate, either directly and/or indirectly. As explained more fully below, through the SLP, Defendants lend out securities belonging to the Plans and the Class, and receive cash and other collateral to secure those loans. Defendants then invest the cash collateral in several Northern Trust collective

---

[1]    No answer is required with respect to the headings, prayers for relief, and other contents of the Amended Complaint that do not set forth allegations of fact and are not included within numbered paragraphs as required by Fed. R. Civ. P. 10(b).

investment pools (the "Collateral Pools"), including, but not limited to, the Short Term Extendable Portfolio ("STEP") and the Core USA Collateral Section ("Core USA"). These Collateral Pools were fully discretionary on the part of Northern Trust; the Plans and the Class had no control over the selection or management of the investments in the Collateral Pools.

**ANSWER TO PARAGRAPH 2:** Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are loaned to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed income instruments pursuant to and in compliance with the Collateral Pools' guidelines. Defendants specifically deny that the collective fund STEP is in and of itself a collateral pool, but admit that, at times, STEP units formed a component of certain custom funds utilized for cash collateral reinvestment.[2] Defendants further admit that, at times, the plans and boards of the Public School Teachers' Pension & Retirement Fund of Chicago, the City of Pontiac Police and Fire Retirement System, and the City of Pontiac General Employees Retirement System participated directly in the Northern Trust securities lending program. Defendants further admit that, at times, the plan assets and the boards of the Louisiana Firefighters' Retirement System, the Public School Teachers' Pension & Retirement Fund of Chicago, and the City of Pontiac Police and Fire Retirement System were invested in certain Northern Trust collective funds that engaged in securities lending. To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of

---

[2] For the sake of clarity, Defendants herein utilize the term "Collateral Pools" to include STEP, conforming to the definition assigned by Plaintiffs; this shall not be construed as an admission that STEP was ever a securities lending collateral pool in and of itself.

applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.


3.      The Collateral Pools ostensibly sought to achieve conservative returns, and their primary focus was on preserving capital and maintaining liquidity. Because the cash invested in the Collateral Pools was collateral for loaned securities and had to be returned to the borrowers of the securities upon the termination of the loan, all of the Collateral Pools were to be invested in highly conservative, short-term investments designed to maintain liquidity.

**ANSWER TO PARAGRAPH 3:** To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.


4.      Defendants breached their fiduciary and contractual duties to the Boards, the Plans, and the Class by imprudently investing the Collateral Pools, including STEP and Core USA, in risky and long-term securities. For example, as of July 31, 2007, almost 70% of the securities held in STEP were not due to mature for over eighteen months, and over 20% of the securities in STEP were not due for at least 10 years.

**ANSWER TO PARAGRAPH 4:** Defendants deny the allegations of this paragraph.

5.     Defendants further breached their fiduciary and contractual duties to the Boards, the Plans, and the Class by investing in securities that were both high-risk and fell outside the purportedly conservative investment objectives of the Collateral Pools. The STEP portfolio included hundreds of millions of dollars in exotic, unregistered securities issued by "structured investment vehicles" or "SIVs"—entities that were identified in hearings before the congressional Financial Crisis Inquiry Commission as one of the "causes of the financial crisis" that "served no good or productive purpose in the financial system." And both STEP and Core USA held hundreds of millions of dollars of risky securities backed by mortgages and other consumer loans, and billions more in securities issued by banks with massive exposure to mortgages and consumer loans.

**ANSWER TO PARAGRAPH 5:**  Defendants deny the allegations of this paragraph.


6.     Indeed, notwithstanding the warnings of Northern Trust's own Chief Economist and other Northern Trust economists as early as 2004 that major banks faced significant risk because of their excessive exposure to the U.S. real estate market (including through mortgage backed securities and other complex derivative products), Defendants filled the Collateral Pools, including STEP and Core USA, with securities issued by such banks, and other investments exposed to the real estate market.

**ANSWER TO PARAGRAPH 6:**  Defendants deny the allegations of this paragraph.


7.     Defendants were motivated to build STEP and Core USA around such risky, long-term securities because of a compensation scheme that gave rise to a conflict of interest. Specifically, Northern Trust shared in the returns generated from the investment of cash

collateral in the Collateral Pools—taking up to 40% of the earnings in the Pools—but bore no downside risk on any losses in the Collateral Pools. As a result, Defendants stood to materially gain by investing the Pools in higher-risk securities that generated greater returns, regardless of the additional credit and liquidity risk inherent in those investments or the fact that they were wholly inappropriate for conservative, short-term, and liquid funds like STEP and Core USA. On information and belief, this conflict drove Defendants to invest STEP and Core USA in risky and long-term securities, and to maintain significant exposure to mortgage-backed securities, exotic investments backed by mortgage-backed securities, and securities issued by financial institutions that themselves had significant exposure to those same mortgage markets, all of which were inappropriate for the Collateral Pools.

**ANSWER TO PARAGRAPH 7:** Defendants deny the allegations of this paragraph.

8. On information and belief, yet another conflict of interest prevented Northern Trust from selling securities in the Collateral Pools at a loss, even if done to mitigate risk and avoid potentially larger losses. Specifically, according to internal Northern Trust documents, accounting rules required Northern Trust to consolidate the entire Collateral Pool onto its books in the event that a Collateral Pool incurred a realized loss (such as by selling securities at a loss) if investors in the Collateral Pool failed to offset that loss. Such an event would have resulted in a multi-billion dollar loss to Defendants. Thus, by continuing to hold securities that had incurred unrealized losses, and that were at risk for failure, Defendants avoided the ramifications of consolidating the Collateral Pools. On information and belief, Northern Trust's self-interested concern about the risk of consolidation—rather than an unbiased assessment of the best interests of the Plans and the Class—motivated the Defendants to maintain several Collateral Pool assets

that were destined to fail in the face of the subprime mortgage collapse and growing financial crisis.

**ANSWER TO PARAGRAPH 8:**  Defendants deny the allegations of this paragraph.


9.     Specifically, in the face of overwhelming evidence that, as Northern Trust economists had repeatedly warned, the mortgage crisis was developing into a broader economic crisis that threatened to cause significant losses to the Collateral Pools, Defendants failed to prudently divest the Collateral Pools' investments in Lehman Brothers, Capmark Financial Group, and two SIVs that issued exotic, illiquid securities—all four of which eventually collapsed—which would have mitigated the massive risks the Defendants themselves had created.

**ANSWER TO PARAGRAPH 9:**  Defendants deny the allegations of this paragraph.


10.     As a result, and despite the clear warning signs discussed herein, Defendants continued to hold these high-risk securities in the Collateral Pools in the mere hope that the issuers of those securities would survive the financial crisis—an investment decision informed by Defendants' own self-interest in avoiding consolidation of the impaired Collateral Pools. Northern Trust retained these Collateral Pool investments notwithstanding the fact that months before the first securities held in STEP and Core USA defaulted resulting in massive realized losses, Defendants recognized that the Collateral Pools were no longer appropriate, conservative investments for SLP participants. Indeed, a Northern Trust executive has testified that, by April 2008, Defendants "would not be going out and selling STEP as an investment vehicle to new prospects."

**ANSWER TO PARAGRAPH 10:** To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

11. As a result of Northern Trust's conduct in imprudently structuring and managing the Collateral Pools, in September 2008 STEP and Core USA incurred massive realized losses upon the collapses of the two SIVs whose securities were held by STEP, and of Lehman Brothers—a bank that months earlier had disclosed exposure to billions of dollars in losses tied to mortgage-backed securities—whose long-term securities were held by STEP and Core USA. Northern Trust's imprudent conduct in investing the STEP and Core USA Collateral Pools in long-term and risky securities resulted in these two Pools alone suffering over $1 billion in realized losses. This included over $400 million of losses on investments in Lehman Brothers securities that were not due to mature until as late as January 2012, and approximately $400 million of realized losses on investments in SIVs that were not due to mature until as late as August 2011.

**ANSWER TO PARAGRAPH 11:** Defendants deny the allegations of this paragraph.

12. On the grounds that those losses had impaired the liquidity of the Collateral Pools, Defendants limited withdrawals by the Plans and the Class from the Collateral Pools, effectively locking them into the risky, long-term investment strategy Defendants had implemented for these purportedly conservative, short-term funds. As a result, the Plans and the Class suffered more harm as STEP and Core USA incurred additional realized losses due to Defendants' breaches of

their fiduciary and contractual obligations, including hundreds of millions of dollars of realized losses on long-term investments in CIT Group, Capmark Financial Group and Sallie Mae.

**ANSWER TO PARAGRAPH 12:** Defendants deny the allegations of this paragraph.


13.     Despite the fact that the losses in the Collateral Pools were the direct result of Defendants' mismanagement, Northern Trust took the position that the SLP participants— including the Plans and the Class—were responsible for those losses. Accordingly, Northern Trust took steps to compel the Plans and the Class to contribute hundreds of millions of dollars to the Collateral Pools to offset the losses caused by Defendants' imprudent investments. First, in the months following the Lehman Brothers collapse, Defendants improperly redirected earnings from the Collateral Pools that were due to the Plans and the Class, and allocated those monies to offset the losses in the Collateral Pools. Then, because those earnings were insufficient to fully offset the realized losses in the Collateral Pools, Northern Trust demanded that the Plans and the Class provide additional lump-sum payments totaling hundreds of millions of dollars to further offset these losses. Through this Action, the Boards, the Plans, and the Class seek to recover the monies improperly seized by Northern Trust, the amounts paid to Northern Trust in response to Defendants' improper demand to cover the realized losses, and a judgment that Defendants are liable for the realized losses that have not been paid by the Boards, the Plans, or the Class and for any remaining unrealized losses in the Collateral Pools incurred as a result of their misconduct.

**ANSWER TO PARAGRAPH 13:** Defendants deny the allegations of this paragraph.


## II.     <u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). The amount in controversy exceeds five million dollars

($5,000,000.00) exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a different state than at least one defendant.

**ANSWER TO PARAGRAPH 14:** To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants admit that Plaintiffs purport to bring their claims as a class action, but deny that Plaintiffs are entitled to bring their claims as a class action. Defendants admit that Plaintiffs claim the amount in controversy exceeds five million dollars, but deny that Plaintiffs are entitled to any relief. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred within this District, and the Defendants' principal places of business are in Chicago, Illinois.

**ANSWER TO PARAGRAPH 15:** The first sentence of this paragraph states a legal conclusion as to which no answer is required. Defendants admit their principal places of business are in Chicago, Illinois. Defendants deny the remaining allegations of this paragraph.

III.    **THE PARTIES**

16. Plaintiff Louisiana Firefighters' Retirement System is a public pension plan organized for the benefit of active and retired firefighters in the State of Louisiana. It has the power and the privileges of a corporation, including the power to sue in its own name. Louisiana Firefighters participated indirectly in the SLP. Among other funds, Louisiana Firefighters invested in Northern Trust's NTGI Collective Daily S&P MidCap 400 Equity Index Fund and its NTGI Collective Daily S&P 500 Equity Index Fund, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA and STEP. Louisiana

Firefighters suffered losses on its investments in funds that indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 16:** Defendants admit on information and belief the allegations in the first sentence of this paragraph. The second sentence of this paragraph states a legal conclusion as to which no answer is required. Defendants admit that, at points in time, Louisiana Firefighters invested in the NTGI-QM Collective Daily S&P MidCap 400 Equity Index Fund – Lending and the NTGI-QM Collective Daily S&P 500 Equity Index Fund – Lending. Defendants further admit that those two funds participated in the Northern Trust securities lending program. Defendants admit that the cash collateral those two collective funds received through Northern Trust's securities lending program was invested in Core USA in the case of the S&P MidCap 400 fund, and a collateral pool including STEP units in the case of the S&P 500 fund. Defendants deny the remaining allegations of this paragraph.


17. Plaintiff the Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago is a body politic and corporate with the authority to administer Chicago Teachers and to bring legal proceedings on its behalf. Chicago Teachers is a public pension fund established for the exclusive benefit of teachers and certain other employees of the Chicago Public Schools. Chicago Teachers serves over 24,000 retirees and 32,000 contributing members, and has over $9.2 billion in assets under management. The Board of Chicago Teachers entered into a securities lending agreement with NTC for the benefit of Chicago Teachers. Pursuant to that agreement, Chicago Teachers participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including STEP. Chicago Teachers also participated indirectly in the SLP through its investment in the S&P 400

Special Purpose MidCap Fund, a collective investment fund managed by Defendants that participated in the SLP. Chicago Teachers suffered losses on its investments that directly and indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 17:** Defendants admit on information and belief the allegations in the first sentence of this paragraph, except to the extent the allegations of this sentence state a legal conclusion, for which no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the second sentence of this paragraph. Defendants admit that Plaintiff Chicago Teachers Board entered into a securities lending agreement with NTC. Defendants refer to the securities lending authorization agreement for its content and deny any allegations inconsistent therewith. Defendants admit that, at points in time, Chicago Teachers and its Board invested in the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Special Purpose Index Fund – Lending. Defendants further admit that that collective fund participated in the Northern Trust securities lending program. Defendants further admit that, at points in time, Chicago Teachers and its Board participated directly in the Northern Trust securities lending program. Defendants admit that the cash collateral Chicago Teachers and its Board received as a direct participant in Northern Trust's securities lending program was invested in a custom cash fund established for Chicago Teachers and its Board that included, among other things, investments in STEP. Defendants deny the remaining allegations of this paragraph.

18.     Plaintiff The Board of Trustees of the City of Pontiac Police and Fire Retirement System is the trustee and plan administrator of a public pension plan and trust established for the

exclusive benefit of police, firemen, and certain other employees of the Pontiac, Michigan police and fire forces. The Board of Trustees of Pontiac Police and Fire is authorized to bring lawsuits on behalf of Pontiac Police and Fire. Pontiac Police and Fire serves over 370 retirees, and as of December 31, 2009, has over $223 million in assets under its management. Pontiac Police and Fire entered into a securities lending authorization agreement with NTC. Pursuant to that agreement, Pontiac Police and Fire participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA. Pontiac Police and Fire also participated indirectly in the SLP through its investments in the NTGI Daily Russell 1000 Value Equity Index Fund, the NTGI Daily Russell 1000 Growth Equity Index Fund, and the NTGI Daily Intermediate Government/Credit Bond Index Fund, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA and STEP. Pontiac Police and Fire suffered losses on its investments that directly and indirectly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 18:** Defendants admit on information and belief the allegations in the first sentence of this paragraph. The second sentence of this paragraph states a legal conclusion as to which no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the third sentence of this paragraph. Defendants admit that Pontiac Police and Fire entered into a securities lending authorization agreement with NTC. Defendants refer to the securities lending authorization agreement for its content and deny any allegations inconsistent therewith. Defendants admit that, at points in time, Pontiac Police and Fire participated directly in the Northern Trust securities lending program. Defendants further admit that, at points in time, Pontiac Police and Fire invested in the NTGI-

QM Collective Daily Russell 1000 Value Equity Index Fund – Lending, the NTGI-QM Collective Daily Russell 1000 Growth Equity Index Fund – Lending, and the NTGI-QM Collective Daily Government / Credit Bond Index Fund – Lending. Defendants further admit that those three collective funds participated, directly or indirectly, in the Northern Trust securities lending program. Defendants admit that cash collateral that Pontiac Police and Fire and the above three collective funds received through Northern Trusts' securities lending program was invested in investments including Core USA. Defendants deny that Pontiac Police and Fire had any investment, direct or indirect, in STEP. Defendants deny the remaining allegations of this paragraph.

19.     Plaintiff The Board of Trustees of the City of Pontiac General Employees Retirement System is the trustee and plan administrator of a public pension plan and trust established for the exclusive benefit of the public employees of Pontiac, Michigan. The Board of Trustees of Pontiac General is authorized to bring lawsuits on behalf of Pontiac General. Pontiac General serves over 1,375 active participants, beneficiaries, and retirees, and as of December 3 1, 2009, has over $390 million in assets under management. Pontiac General entered into a securities lending authorization agreement with NTC. Pursuant to that agreement, Pontiac General participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including Core USA. Pontiac General suffered losses on its investments that directly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools.

**ANSWER TO PARAGRAPH 19:** Defendants admit on information and belief the allegations in the first sentence of this paragraph. The second sentence of this paragraph states a legal

conclusion as to which no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the third sentence of this paragraph. Defendants admit that Pontiac General entered into a securities lending authorization agreement with NTC. Defendants refer to the securities lending agreement for its content and deny any allegations inconsistent therewith. Defendants admit that, at points in time, Pontiac General participated directly in Defendants' securities lending program. Defendants admit that, at points in time, the cash collateral Pontiac General received through Northern Trusts' securities lending program was invested in investments that included Core USA. Defendants deny the remaining allegations of this paragraph.

20.     Defendant Northern Trust Investments, N.A. has its principal place of business in Chicago, Illinois. NTI acts as a trustee to the Collateral Pools that invested the cash collateral provided by borrowers in the SLP. At all relevant times, NTI was and is a fiduciary to Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all other members of the Class, because it has possession and control over the assets of the Plans and the Class, discretion over how to invest these assets, and because it otherwise manages all aspects of the funds in which the Plans and the Class invested. As a fiduciary to the Plans and the Class, NTI was obligated to act with prudence, due care, good faith and loyalty in investing and managing the collective funds and Defendants' securities lending program.

**ANSWER TO PARAGRAPH 20:** Defendants admit that Northern Trust Investments, Inc. (formerly known as Northern Trust Investments, N.A.) has its principal place of business in Chicago, Illinois. Defendants admit that NTI acts as the trustee of STEP. To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for

their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny the remaining allegations of this paragraph.

21.     Defendant Northern Trust Company has its principal place of business in Chicago, Illinois. NTC served as a securities lending agent for Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all direct and indirect participants in the SLP, with responsibility for administering the SLP, including negotiating and entering into agreements with securities borrowers, receiving borrowers' collateral and matching borrower loan requests with the eligible securities of SLP participants. At all relevant times, NTC was and is a fiduciary to Chicago Teachers, Louisiana Firefighters, Pontiac Police and Fire, and Pontiac General, and all other members of the Class, and was obligated to act with prudence, due care, good faith and loyalty in administering the SLP, including overseeing the management and investment of collateral received for lent securities.

**ANSWER TO PARAGRAPH 21:** Defendants admit that The Northern Trust Company has its principal place of business in Chicago, Illinois. To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are

vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

IV. **SUBSTANTIVE ALLEGATIONS**

    A. **Northern Trust's Securities Lending Program**

    22. Since 1981, Northern Trust has been one of the largest providers of securities lending services for public retirement systems, foundations, endowments, insurance companies, and ERISA-qualified plans. By December 31, 2007, Northern Trust's SLP boasted 664 clients, representing approximately $1.13 trillion of lendable securities.

**ANSWER TO PARAGRAPH 22:** To the extent this paragraph purports to characterize Northern Trust documents or communications to clients or potential clients, Defendants refer to those documents and communications for their content and deny any allegations inconsistent therewith. Defendants admit that, as of December 31, 2007, the securities lending program involved approximately $1.126 trillion in lendable assets of 664 clients. Defendants deny the remaining allegations in this paragraph.

    23. Through Northern Trust's SLP, the Plans and the Class sought to earn incremental returns by lending eligible securities from their portfolios—including corporate equities, corporate bonds, and government securities—to approved borrowers in return for cash and other collateral. During the term of those loans, the cash collateral received from securities borrowers (which must be returned to the borrower when the loaned securities are returned) is reinvested in one or more commingled funds, or Collateral Pools, managed by NTI. The Collateral Pool funds—which were all purportedly invested in short-term, conservative and highly liquid fixed

income securities that generate predictable returns—include Core USA and STEP. Each of these Collateral Pools had investment objectives that required Northern Trust to manage the Collateral Pools in a manner consistent with preserving capital and providing for liquidity.

**ANSWER TO PARAGRAPH 23:** Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are loaned to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed income instruments pursuant to and in compliance with the Collateral Pools' guidelines. To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning the Plans' or putative class members' intentions or practices in regards to securities lending. To the extent that this paragraph purports to universally describe all securities lending arrangements between Defendants and the Plaintiffs, the Plans, or putative class members, Defendants deny those allegations and any remaining allegations of this paragraph.

24. Traditionally, the reinvestment income generated through investments in the Collateral Pools has been used by securities lending participants to offset expenses associated with maintaining the portfolio (such as custody costs or brokerage commissions), to maximize overall portfolio performance, or to lower a portfolio's effective tax rate through dividend arbitrage. Accordingly, investment of collateral through the SLP was intended to generate only

modest returns, with a primary focus on preservation of capital and liquidity to ensure that the cash collateral could be returned to borrowers upon the termination of the securities loan.

**ANSWER TO PARAGRAPH 24:** To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements involving the Defendants, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning the Plaintiffs', the Plans', or putative class members' intentions or practices in regards to securities lending. Defendants deny any remaining allegations of this paragraph.

25. The borrowers who tender cash collateral in exchange for the loaned securities often use borrowed securities to cover an already established short position, hedge an investment (such as an equity derivative or convertible bond), or take advantage of an arbitrage opportunity. In order to borrow a security through the SLP, borrowers are required to put up collateral worth at least 102% of the borrowed security's current market value to secure their obligation to return the securities when the loan is either called back or matures. The value of the borrowed security is monitored on a daily basis, and the borrower is required to maintain the same 102% collateral even if that value fluctuates.

**ANSWER TO PARAGRAPH 25:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations

inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.

26. When the loan matures or is called back, the borrower returns the security and gets back the collateral it originally posted. The borrower also receives interest on the collateral—known as the rebate—for the use of the cash collateral. The amount of the rebate is intended to reflect the intrinsic value of the loaned security and the fact that some securities are more highly sought after than others—that is, the higher the demand for the security, the lower the rebate that will be paid. Accordingly, the collateral reinvestment must only generate a higher return than the rebate promised back to the borrower in order for the participating lender to realize a return. The earnings from the collateral reinvestment generated above the rebate rate equals the "lending spread" and represents the profit in the transaction. This profit is split between the participating lender and Northern Trust based upon a revenue sharing arrangement, with Northern Trust receiving up to 40% of the lending spread, in addition to any fees otherwise charged by Northern Trust.

**ANSWER TO PARAGRAPH 26:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending

arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.

27.     Importantly though, while Northern Trust collects a percentage of the lending spread, it does not bear the downside risk of any losses incurred by the Collateral Pools. In the case of a "collateral deficiency"—which occurs when the invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption—Northern Trust would not be required to make up the difference owed to the borrowers, and it therefore bore none of the risk of loss. This system effectively incentivized Northern Trust to take greater risks with the assets of the Plans and the Class because although Northern Trust would recover a percentage of any profits, it would be responsible for 0% of any losses.

**ANSWER TO PARAGRAPH 27:**  Defendants deny the allegations of this paragraph.

28.     The Plans and the Class could participate in the SLP directly, indirectly, or both. Direct participants in the SLP entered into a securities lending agreement with Northern Trust which allowed Northern Trust to lend out securities from their investment portfolios and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools. Confronted with the massive losses in the Collateral Pools, Defendants seek to hold direct SLP participants liable for those losses by redirecting earnings due to those direct SLP participants to offset such losses and demanding cash payments from direct SLP participants to further offset losses.

**ANSWER TO PARAGRAPH 28:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations

20

inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

29.    Indirect SLP participants invested in commingled investment funds established and managed by Northern Trust (the "Commingled Lending Funds"), which in turn participated in the SLP. The Commingled Lending Funds act as direct participants in the SLP, and entered into a securities lending agreement with Northern Trust, which allowed Northern Trust to lend out securities held in the Commingled Lending Funds for the benefit of investors in those funds, and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools. The Commingled Lending Funds suffered losses as a result of their direct participation in the SLP, and those losses—which were caused by Defendants' breaches of duty—were passed along to the Plans and Class Members who invested in the Commingled Lending Funds. On information and belief, Defendants caused the Commingled Lending Funds to make payments to offset losses in the Collateral Pools, and thereby caused harm to the Plans and the members of the Class who invested in the Commingled Lending Funds.

**ANSWER TO PARAGRAPH 29:**  To the extent this paragraph purports to characterize various agreements or documents including the Declaration of Trust referenced in the second amended complaint, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

30.     Each of the Commingled Lending Funds was set up as a commingled fund, also referred to as a "Participating Trust," pursuant to a Declaration of Trust. The Commingled Lending Funds were established for the collective investment of a group of investors. All the investors in each commingled fund shared, pro rata, in any gains and losses for the Fund. During 2007 and 2008, Northern Trust's Collective Funds Trusts held over fifty commingled funds. NTI created each commingled fund that was offered to indirect participants in the SLP by executing a Fund Declaration that described each Commingled Lending Fund's investment policy and objective. For example, the Aggregate Bond Fund's investment objective was to approximate the overall performance of the Lehman Brothers Aggregate Bond Index. The Fund Declarations for the Commingled Lending Funds stated that the Commingled Lending Funds "may participate" in securities lending, and that the "lending agent"—NTC—would "indemnify, defend and hold harmless the [Commingled Lending Funds] from and against any losses, damages, costs, and expenses the [Commingled Lending Funds] may incur as a result of failure of the lending agent to perform its duties and responsibilities under the lending agreement."

**ANSWER TO PARAGRAPH 30:**  To the extent this paragraph purports to characterize various agreements or documents including the referenced Declaration of Trust and Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny any remaining allegations of this paragraph.

31.     On behalf of indirect participants in the SLP who invested in the Commingled Lending Funds, and as a fiduciary and agent of those indirect SLP participants and the Commingled Lending Funds, NTI negotiated the fee paid by the Commingled Lending Funds for their participation in the SLP. As a fiduciary, NTI had a duty to obtain the lowest fee possible for the Commingled Lending Funds and the investors therein. In violation of that duty, the fee NTI and NTC negotiated was 40% of the Commingled Lending Funds' earnings from their Collateral Pool investments—far higher than the rates NTC negotiated with many direct participants in the SLP, which were as low as 15%. By failing to negotiate for the Commingled Lending Funds and the investors therein a favorable rate comparable to the lowest rates given to other securities lending participants, NTI cost the members of the Class millions of dollars in excess fees to the benefit of Northern Trust and thereby breached its fiduciary duties to the Plans and the Class. That breach resulted from a conflict of interest that arose from the relationship between NTI and NTC, and NTI's interest in generating profits for NTC, a related party.

**ANSWER TO PARAGRAPH 31:**  Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  Moreover, this paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.


32.     Northern Trust served as a fiduciary to the Plans and the Class in connection with the management of the SLP and, in particular, the investment of collateral in the Collateral Pools. As the investment manager charged with managing the investment of the Collateral Pools for the

benefit of both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

**ANSWER TO PARAGRAPH 32:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

33. Documents created by Northern Trust, including materials that described and explained the SLP, acknowledge that "Northern Trust considers its Securities Lending Program as a fiduciary duty [and] Northern Trust recognizes that it is responsible for any losses that an account may suffer as a result of its failure to perform its fiduciary duties."

**ANSWER TO PARAGRAPH 33:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

34.     Northern Trust's status as a fiduciary was incorporated into the securities lending agreements signed by or on behalf of the Plans and, on information and belief, the Class. For example, the securities lending agreements that the Boards and/or the Plans and members of the Class entered into with Northern Trust incorporate by reference the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending ("FFIEC Policy"), which states that a "lender institution which exercises discretion in offering securities [on loan] on behalf of and for the benefit of customer-owners is acting as a fiduciary. For purposes of these guidelines, the underlying relationship may be as agent, trustee, or custodian." Here, Northern Trust acted as the "lender institution" that "offered securities" for loan on behalf of the Plans and the Class, who were the "customer-owners." Accordingly, Northern Trust, which acted as custodian, agent and/or trustee to the Plans and the Class, served as their fiduciary.

**ANSWER TO PARAGRAPH 34:**  To the extent this paragraph purports to characterize various agreements or other documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.


35.     Furthermore, the securities lending agreements explicitly set forth this obligation, and Northern Trust's general obligation to prudently manage the Collateral Pools for the benefit of the Plans and the Class, specifically providing that Northern Trust agreed to "indemnify and

hold harmless" the Boards, the Plans, and members of the Class "for any direct losses, damages, costs and expenses (including reasonable attorney fees) [they] incur[] resulting from ... Northern's failure to ... make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 35:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

36. In the securities lending agreements, Northern Trust also agreed to "indemnify and hold harmless" members of the Class for "any direct losses, damages, costs and expenses (including reasonable attorney fees)" for failure to comply with the FFIEC Policy. Under the FFIEC Policy, Defendants were obligated to invest the cash collateral in safe, liquid instruments. Specifically, the FFIEC Policy states that "[g]enerally, a lender institution will invest cash collateral in repurchase agreements, master notes, a short term investment fund, U.S. or Eurodollar certificates of deposits, commercial paper or some other type of money market instrument," and the "lender institution is responsible for making [the cash collateral] income productive."

**ANSWER TO PARAGRAPH 36:** To the extent this paragraph purports to characterize various agreements or other documents including the referenced FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of

applicable legal principles, no answer to such legal conclusions is required.  Defendants deny any remaining allegations of this paragraph.

37.     As set forth herein, Defendants breached their fiduciary and contractual duties to the Boards, the Plans, and the Class through their imprudent structuring and management of the Collateral Pools' investments, which caused the Plans and the Class to incur significant losses and be subjected to further losses as a result of withdrawal limitations imposed by Defendants.

**ANSWER TO PARAGRAPH 37:**  Defendants deny the allegations of this paragraph.

38.     Defendants also acted as a fiduciary on behalf of the indirect participants in the SLP, who were harmed through their investment in the Commingled Lending Funds. Defendants further breached their fiduciary duties to the Plans and Class Members who invested in the Commingled Lending Funds by failing to negotiate the lowest possible fee on behalf of the Commingled Lending Funds and their participants.

**ANSWER TO PARAGRAPH 38:**  Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  To the extent an answer is required, Defendants answer that the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.

**B.     Defendants Improperly Structured and Mismanaged The Collateral Pools**

39.     The Collateral Pools, including STEP and Core USA, were purportedly conservative, short-term and highly liquid investment vehicles. Because the collateral received

from securities borrowers was essentially borrowed money that had to be returned to the borrowers upon the remittance of those securities, Defendants were required—both by contract and by the prudent investor standard that governs their fiduciary duty—to invest the cash collateral conservatively and prudently in safe, short-term, and liquid instruments. Moreover, because the Plans and the members of the Class bear the risk of loss in the Collateral Pools, Defendants were obligated to ensure that their investment decisions were made purely in the interests of those investors, and did not sacrifice safety and liquidity in exchange for higher returns. Therefore, it was critical for Defendants to invest Collateral Pool assets in safe, short-term instruments both to guard against losses arising from default, and to maintain adequate liquidity consistent with the narrow purpose of the Collateral Pools.

**ANSWER TO PARAGRAPH 39:** To the extent this paragraph purports to characterize agreements or documents including Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

40. Defendants disregarded these obligations and instead focused on and sought out higher returns in structuring the Collateral Pools by investing in risky and long-term securities, which exposed these purportedly short-term, liquid Pools to significant credit and liquidity risk. In 2007, as earlier predicted by Northern Trust's own Chief Economist, financial firms in which these Collateral Pools invested disclosed exposure to losses on mortgages and other consumer

loans. Consequently, Defendants' improper structuring of the Collateral Pool portfolios by investing in these securities caused the Pools to lose value.

**ANSWER TO PARAGRAPH 40:** Defendants deny the allegations of this paragraph.


41.     In the face of those developments, which Northern Trust should have recognized as posing significant risk to the Collateral Pools in light of the imprudent manner in which Defendants had invested the Pools, Defendants again breached their fiduciary and contractual duties by maintaining several Collateral Pool assets—specifically, the STEP investments in the SIVs and Capmark Financial Group, and the STEP and Core USA investments in Lehman Brothers—that had incurred unrealized losses and presented a level of risk that Northern Trust, in light of its sophistication and the warnings of its economists, should have recognized made those investments imprudent for the conservative Collateral Pools. Indeed, rather than actively manage STEP and Core USA to mitigate the risk they had created, Defendants adopted the untenable position that securities held in STEP and Core USA would pay fully if held to maturity, and therefore decided that these securities would not be sold. Because Defendants had imprudently populated STEP and Core USA with long-term securities, many of which would not mature for decades, that decision effectively converted STEP and Core USA from "ultra short-term" funds to long-term funds, which were not appropriate for the investment of securities lending collateral. This was not simply a bad decision, it was also a conflicted one, motivated by Northern Trust's self-interest in improperly structuring the portfolios and in avoiding consolidating losses onto its books.

**ANSWER TO PARAGRAPH 41:** Defendants deny the allegations of this paragraph.

1. **Defendants Improperly Structured STEP And Core USA By Investing In Long-Term, High-Risk And Illiquid Securities**

   a. **STEP And Core USA Were Structured As Long-Term Investment Funds**

42.     Northern Trust established STEP as "an ultra short duration total return fund that seeks to outperform high grade, short term money market instruments." STEP was purportedly appropriate for investors with an investment horizon of just one year.

**ANSWER TO PARAGRAPH 42:** To the extent this paragraph purports to characterize Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

43.     Similarly Core USA was to be a highly conservative, short-term fund in which cash collateral was to be invested to generate returns "consistent with the preservation of capital and maintenance of liquidity," with "liquidity and principal preservation as prime objectives" of the fund. The other Collateral Pools, which were intended to serve the same purpose as STEP and Core USA, were by their nature and purpose required to be similarly invested in conservative, short-term investments.

**ANSWER TO PARAGRAPH 43:** To the extent this paragraph purports to characterize various agreements or documents including Collateral Pool guidelines, Defendants refer to those agreements and documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

44.     Notwithstanding these clear objectives, Defendants violated their fiduciary and contractual duties by structuring the Collateral Pools as long-term investment funds. For example, of the securities held in the STEP portfolio as of July 31, 2007,

- 76% were not due for at least another 12 months;

- 69% were not due for at least another 18 months;

- 54% were not due for at least another 2 years;

- 21% were not due for at least another 10 years;

- 18% were not due for at least another 20 years; and

- 9% were not due for at least another 30 years.

**ANSWER TO PARAGRAPH 44:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


45.     Similarly, Core USA held billions of dollars worth of securities that would not mature for years. Indeed, as of October 2008, over 30% of the securities held in Core USA were not due to mature for over 2 years.

**ANSWER TO PARAGRAPH 45:** To the extent this paragraph purports to characterize documents such as reports on Core USA holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

46.    These long-term securities were wholly improper for "ultra short term" funds such as STEP and Core USA, and exposed the Plans and the Class to significant credit and liquidity risk.

**ANSWER TO PARAGRAPH 46:**  Defendants deny the allegations of this paragraph.

47.    The securities that ultimately caused hundreds of millions of dollars of realized losses to the Collateral Pools included long-term securities in which Defendants should never have invested securities lending cash collateral. For example, the STEP and Core USA investments in Lehman Brothers were not due to mature until as late as January 2012—more than three years after Lehman Brothers collapsed. The exotic SIV securities held by STEP were not due to mature until as late as August 2011, with 70% of one of these SIVs' securities maturing in 2010—more than a year after the SIVs collapsed. And other securities in which Northern Trust imprudently invested the Collateral Pools—resulting in realized losses to SLP participants—had similar distant maturity dates, including: CIT securities not due to mature until as late as March 2010; Capmark Financial securities not due to mature until as late as May 2010; Greenpoint Mortgage securities not due to mature until as late as June 2010; and Sallie Mae securities not due to mature until as late as October 2011. These securities were held in the Collateral Pools as of May 2008, and even at the apex of the financial crisis later that year were not due to mature for up to 3 years. Such long-term securities had no place in the purportedly short-term Collateral Pools.

**ANSWER TO PARAGRAPH 47:**  Defendants deny the allegations of this paragraph.

> **b.    Defendants Invested STEP And Core USA In High-Risk And Illiquid Securities**

48.     Northern Trust invested Collateral Pool assets in securities that were illiquid, highly-leveraged, or risky asset-based securities such as floating rate notes, SIVs, and derivatives. These types of investments were inconsistent with the clear objectives of the Collateral Pools and inordinately risky for funds purportedly created to preserve capital and maintain liquidity.

**ANSWER TO PARAGRAPH 48:**  Defendants deny the allegations of this paragraph.


49.     STEP and Core USA in particular were imprudently exposed to significant losses related to the U.S. mortgage market and other consumer loans. Despite the warnings of Northern Trust's own Chief Economist and other Northern Trust economists that investment in the mortgage markets presented significant risks to banks that held mortgage-backed securities, the Collateral Pools held billions of dollars of securities issued by such banks, as well as mortgage-backed securities and securities issued by exotic SIVs that traded in asset-backed securities, including those backed by residential mortgages.

**ANSWER TO PARAGRAPH 49:**  Defendants deny the allegations of this paragraph.


50.     Indeed, as of October 2008, over 80% of the investment securities held in Core USA were asset-backed securities—including securities backed by mortgages and other consumer loans—and securities issued by banks and financial institutions which themselves were exposed to mortgages and other consumer loans. As of October 2008, the Core USA collateral pool directly held over $2.8 billion in mortgage-backed securities, almost all of which were not due to mature for at least another ten years. Of the more than $7.6 billion in asset-backed securities held in Core USA as of October 2008, 80%—or over $6.3 billion—were not

due to mature for over two years. These investments were long-term in nature and were therefore inappropriate for a short-term and liquid fund such as Core USA.

**ANSWER TO PARAGRAPH 50:** To the extent this paragraph purports to characterize documents such as reports on Core USA holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

**c.** **STEP Held Exotic, High-Risk Structured Investment Vehicles**

51.     In addition to the long-term and high risk securities discussed above that were held in the Collateral Pools, STEP faced further risk because it held other exotic, illiquid securities. Specifically, as of July 31, 2007, over 15% of the securities in STEP were invested in unregistered securities—securities which, by definition, can only be sold under certain narrow circumstances. Those unregistered securities included investments in two SIVs. SIVs are a type of structured investment product which operates similar to banks by borrowing money by issuing short-term securities (such as medium-term notes and commercial paper) at low interest rates and then lending that money by buying long-term securities (including mortgage-backed securities) at higher interest, making a profit for investors from the difference in the interest rates.

**ANSWER TO PARAGRAPH 51:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

52.     The two SIVs whose securities were held in STEP—Sigma Finance and Theta Finance—which were created and managed by the United Kingdom-based investment management company, Gordian Knot, were heavily reliant on their credit ratings in order to continue to raise, and rollover, short-term funding. The notes issued by SIVs are exotic, high-risk investments that were outside the enumerated classes of securities that were permitted to be held in STEP. For example, Theta was designed to earn returns by buying bonds and selling credit-default swaps, and its bond portfolio included credit card debt, bank and insurer obligations, mortgage-backed securities, and collateralized loan obligations. Similarly, Sigma invested in subprime mortgage-backed securities, other consumer credit receivables, and collateralized debt obligations. Sigma and Theta therefore had extensive and highly-leveraged exposure to the most volatile sectors of the credit markets. Moreover, because SIVs in general, and Sigma and Theta in particular, lacked an established track record, they were inappropriate investments for a conservative fund such as STEP.

**ANSWER TO PARAGRAPH 52:**  Defendants deny the allegations of this paragraph.


53.     Sigma and Theta presented even higher risk than other SIVs because they were not sponsored by a major financial institution. Bank-sponsored SIVs, such as those sponsored by major financial institutions like Citigroup, have the ability to seek support from their sponsor in times of economic distress. The difference in risk profile between supported and unsupported SIVs was well known to Northern Trust, as revealed in a Northern Trust document from January 2008 that distinguishes between SIVs supported by sponsoring banks, and unsupported SIVs such as Sigma and Theta. The document, which describes the investment process and philosophy of Northern Trust's management of its Northern Trust money market funds, boasts a prudent

approach to investing in SIVs by noting that the money market funds' investment concentration in SIVs sponsored by major global banks was "intentional." Specifically, Northern Trust explains that "[b]ank sponsorship typically provides very strong implicit support via back-up liquidity lines of credit, management oversight, and credit quality discipline, not to mention a vested interest in the success of the SIV." Notwithstanding this recognition of the risks of investing in unsupported SIVs and the prudent approach taken with other Northern Trust products, Northern Trust invested STEP assets in these risky securities.

**ANSWER TO PARAGRAPH 53:** To the extent this paragraph purports to characterize documents including Collateral Pool guidelines, reports on STEP holdings, or other Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

54.     On information and belief, Defendants' decision to imprudently structure STEP and Core USA by investing in risky and long-term investments resulted from a conflict of interest. Northern Trust shared in the earnings generated by the Collateral Pools, therefore Defendants were motivated to invest the Pools in securities that generated higher returns, and often carried higher risks. Because longer-term fixed income securities generally yield higher returns than comparable short-term securities, Defendants invested STEP and Core USA in longer-term securities—including securities that would not mature for decades. As a longer-term security locks the investor in for an extended period, such securities generally carry higher credit risk—the risk that the issuer of the security may be unable to pay the obligation due at maturity—than comparable short-term securities. Regardless of these risks, Northern Trust

seems to have focused only on the fact that these high-risk securities, such as those issued by SIVs or backed by pools of residential mortgages or other consumer loans, pay a higher return than securities of a comparable term issued by governmental entities or established corporations.

**ANSWER TO PARAGRAPH 54:** Defendants deny the allegations of this paragraph.

55.     Because Northern Trust bore no risk of loss if the investments in STEP and Core USA defaulted, Defendants accepted the additional risk presented by investing in risky and long-term securities in order to generate higher returns for themselves. In light of the objectives of the Collateral Pools, which were purportedly conservative, short-term funds that were required to remain liquid so that the invested collateral could be returned to borrowers in the SLP, the additional returns earned by undertaking that risk was imprudent and unwarranted.

**ANSWER TO PARAGRAPH 55:** Defendants deny the allegations of this paragraph.

> 2.     **Northern Trust Identified The Housing Bubble And The Economic Risk It Posed To The Investments In The Collateral Pools**

56.     Northern Trust imprudently exposed STEP and Core USA to mortgage-backed securities even though it was fully aware of the serious risks posed by these investments. Long before the Northern Trust SLP incurred the first losses tied to the collapse of the mortgage market and the resulting financial crisis, Northern Trust determined that U.S. housing prices were highly inflated, that the inflation in the housing market was unsustainable, and that the bursting of the housing bubble would have severe consequences for investors.

**ANSWER TO PARAGRAPH 56:** Defendants deny the allegations of this paragraph.

57.     Specifically, as early as 2004, Northern Trust's Chief Economist, Paul Kasriel, wrote extensively about the unsustainable inflation in the U.S. housing market and the risk that it posed to the broader U.S. economy in general, and the banking sector in particular. Defendants acknowledge Kasriel's acumen and prescience in predicting the housing bust and the impact on the financial markets, and touted that he "identified early on the formation of the housing bubble and *foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst*." (Emphasis added).

**ANSWER TO PARAGRAPH 57:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


58.     For instance, by mid-2004 Kasriel noted that "about 60% of U.S. banks' earning assets are mortgage-related, a post World War II high." In a June 2004, report Kasriel compared the housing market to the stock market in 1999 immediately before it experienced a rapid decline in value. The following month, Kasriel described the housing market as "an accident waiting to happen" and warned that "the most serious collateral damage from a housing bust would be a wounded U.S. banking system" because "U.S. commercial banks have become major investors in mortgage-related debt." Kasriel specifically noted the historical correlation between a distressed banking industry and investor losses, posing the question, "[s]o what if the U.S. banking system falls on hard times? History suggests that as goes a nation's banking system, so goes its economy."

**ANSWER TO PARAGRAPH 58:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


59.      In the following years, Kasriel repeatedly warned about the state of the housing market and the impact its collapse would have on the economy. Citing research by fellow Northern Trust economist Asha Bangalore, in February 2006 Kasriel again warned of the broad economic risk posed by the housing bubble and reiterated the connection between the inflated housing market and the overall health of the economy, predicting that, "[t]he developing softness in the housing market is likely to have a significant negative impact on the economy as a whole. ... Forget about the GM. The new mantra is: As goes housing, so goes the nation – or, at least, the nation's economy."

**ANSWER TO PARAGRAPH 59:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


60.      Numerous media sources quoted Kasriel's warnings in 2006 that the U.S. housing market was in a "recession" and that the housing market would "pull[] the economy down" in 2007. For example, in June 2006 Kasriel commented that "[i]f the U.S. housing bubble were to go 'whoosh,' great damage would be done to the U.S. banking system." Similarly, in September

2006, he opined that, "[i]f we're to have a severe recession in the housing market, it would seem to me that *the banking system cannot escape significant losses*." (Emphasis added).

**ANSWER TO PARAGRAPH 60:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


61.     Later that year, in November 2006, Kasriel noted that the housing recession was far from over, highlighting the fact that "[a] typical housing downturn sees a drop of 50 percent from the peak, and at this point we are only about halfway there." One month later, Kasriel affirmed that, "[u]nless this turns out to be a more moderate than usual housing recession, unlikely given the amount of speculation and leverage involved in the boom, then we have 'miles to go' before we can put this housing recession 'to sleep.'"

**ANSWER TO PARAGRAPH 61:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


62.     Kasriel continued to warn of the perils of banks' extensive exposure to the housing market and in September reaffirmed his view that, "this is the most inflated housing market in the post-war era," concluding that "*the banking system could not escape significant losses*" from a severe recession in housing. (Emphasis added). Specifically, in December 2006, Kasriel was quoted as stating that, "U.S. banks currently hold record amounts of mortgage-

related assets on their books. If the housing market were to go into a deep recession resulting in massive mortgage defaults, *the U.S. banking system could sustain huge losses* similar to what the Japanese banks experienced in the 1990s." (Emphasis added). In that same month, Kasriel foretold of the looming economic downturn, suggesting that "crippled banking systems seem to result from the bursting of asset bubbles because of the sharp decline in the value of the collateral backing bank loans." He later estimated that due to exposure to the mortgage market, "[i]f a prolonged housing bust ensues, banks could be in big trouble." The culmination of these facts formed Kasriel's projections in late 2006 of "slower economic growth in the next five quarters," coupled with higher unemployment.

**ANSWER TO PARAGRAPH 62:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.


63. Other Northern Trust economists echoed Kasriel's views. For example, Northern Trust Vice President and economist Asha Bangalore stated in September 2006 that, "[a]dditional price declines [in the housing market] should not be surprising.... We have a recession in the housing market.... Usually it takes two or three years to stabilize." Bangalore also highlighted the significant impact a burst housing bubble would have on the rest of the economy, attributing roughly 43 % of "new jobs created ... since the end of 2001 to the boom in housing."

**ANSWER TO PARAGRAPH 63:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

64.     In 2007, Kasriel repeated his concern that banks were holding record high levels of mortgage-related assets and expressed concern in not knowing "how much the now infamous CDOs represent of the total." In March 2007, Kasriel predicted "increased foreclosures and more inventory on a [housing] market that already has too much." That month he also observed that it was "doubtful" that the housing recession had hit bottom, stating, "I think the housing recession is not over, that the subprime issues will prolong it." By December 2007, Kasriel commented that the problems for U.S. banks were both a direct problem related to mortgage-backed securities and "indirect mortgage challenges as a result of loans you made to other purchasers of the 'toxic waste' originated during this credit cycle."

**ANSWER TO PARAGRAPH 64:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

65.     Kasriel's warnings continued into 2008 and indicated that problems were spreading to other debt instruments. In June, for example, Kasriel opined that, "[w]e are not finished with the mortgage problem, but you are starting to see increased delinquencies in other forms of consumer debt." Kasriel also understood that the underpinnings of the recession did not end with the mortgage crisis. In June 2008, Kasriel equated the economic situation to "the eye of

a hurricane. We had the first wave of the credit crisis, and it was quite damaging. But ***there is another wave coming, and it's likely to be as destructive***." (Emphasis added).

**ANSWER TO PARAGRAPH 65:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

66. Throughout this period, Kasriel also noted the significant concerns surrounding SIVs. For example, in October 2007, he observed:

> SIVs are investment funds, some of which have off-balance sheet affiliations with large financial institutions, such as Citigroup, that purchase asset-backed securities, financing their purchases through the issuance of asset-backed commercial paper (ABCP). In recent months, investors' appetite for ABCP has all but evaporated due to concern about the credit quality of the assets, especially subprime mortgage-related paper backing the commercial paper.

That observation was highly prescient because the inability to continue selling ABCP backed by the risky assets held by the SIVs contributed to the insolvency of many SIVs, including Sigma and Theta. Moreover, Kasriel believed that, "questionable assets on their books such as subprime mortgage-related securities" had impaired the SIVs, and SIVs including Sigma and Theta were unable to sell those assets to recoup their costs in acquiring them.

**ANSWER TO PARAGRAPH 66:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

67. Thus, long before the first losses were incurred in the Collateral Pools, and at a time when Defendants could have restructured the Collateral Pools to avoid the risks presented by mortgage-backed securities, other asset-backed securities, SIVs, and the securities of financial institutions that, as Kasriel warned, faced significant risk from their own holdings of such mortgage-backed and asset-backed securities, Northern Trust was aware of the risks it had created in the Collateral Pools.

**ANSWER TO PARAGRAPH 67:** Defendants deny the allegations of this paragraph.

68. Despite that knowledge, Northern Trust ignored the warnings of its own Chief Economist and other Northern Trust economists, and kept the Collateral Pools, including STEP and Core USA, invested in securities with significant exposure to mortgage-backed securities, SIVs, and financial institutions that Kasriel warned were overly exposed to mortgage-backed investments, contrary to the stated purpose of the Collateral Pools to preserve capital and maintain liquidity. For example, Northern Trust maintained both STEP and Core USA in significant investments in Lehman Brothers, which had extensive exposure to the real estate market. Because many of these securities, including those of Lehman Brothers, would not mature for years, the risk that the Collateral Pools would incur a material loss from the collapse of the housing bubble that Kasriel identified was highly likely.

**ANSWER TO PARAGRAPH 68:** Defendants deny the allegations of this paragraph.

3. **Defendants Failed To Prudently Respond To The Growing Economic Crisis**

a. **The Mortgage Meltdown And Disclosure Of Massive Losses By Banks That Invested In Mortgage And Consumer**

### Debt Crystallized The Risk Facing The
### Collateral Pools

69.     The catastrophe that Kasriel and Bangalore repeatedly warned of—that the housing collapse would bring down the economy and, in particular, the banks that had invested heavily in mortgages—started materializing in 2007. The collapse of the subprime mortgage market in the first quarter of 2007 should have made clear to Defendants, given their sophistication and their access to their own economists' prior warnings, the inherent risk in the long-term, illiquid portfolios Defendants built into the Collateral Pools, including STEP and Core USA.

**ANSWER TO PARAGRAPH 69:**  Defendants deny the allegations of this paragraph.


70.     For example, in February 2007, HSBC—one of the world's largest banks, wrote down the value of mortgage-backed securities it held by $10.5 billion, reflecting the significant decline in the value of such asset-backed investments. Just weeks later, the collapse of the nation's second largest mortgage lender, New Century, was the first in a series of major mortgage lenders that failed in the following months, with roughly 100 mortgage lenders failing by the end of the year. By virtue of its sophistication and the warnings it received from Kasriel, Northern Trust knew or should have known that those failures signaled that the web of securities built on mortgages and other consumer loans were at significant risk of failure. Those securities included mortgage-backed securities, such as those held in STEP and Core USA, SIVs that invested in those securities, such as Sigma and Theta, and the securities of financial institutions that were heavily invested in mortgage-backed securities and other investments backed by mortgages.

**ANSWER TO PARAGRAPH 70:** Defendants admit, on information and belief, that in February 2007, HSBC reported it would be taking a bad debt charge for 2006 of approximately $10.5 billion, and cited the subprime mortgage market in its announcement; that New Century Financial Corp. declared bankruptcy in April 2007; and that more than 100 mortgage lenders ceased operations in 2007. In part due to Plaintiffs' vague and undefined use of terms including "largest," "major," and "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first two sentences of this paragraph. Defendants deny the remaining allegations of this paragraph.

71. Defendants' decision to invest the Collateral Pools in SIVs was imprudent, ignored the consistent warnings of Northern Trust's own economists, and ultimately resulted from Northern Trust's conflicted positions.

**ANSWER TO PARAGRAPH 71:** Defendants deny the allegations of this paragraph.

72. The ramifications of the structural ineptitude in the Collateral Pools was played out further when Defendants—refusing to take losses on the Pools' distressed assets before the unrealized losses further accumulated—maintained the Collateral Pools' investments in Sigma and Theta, Lehman Brothers, and Capmark Financial Group.

**ANSWER TO PARAGRAPH 72:** Defendants deny the allegations of this paragraph.

73. Indeed, it should have been clear to Northern Trust by mid-2007 that the subprime mortgage collapse implicated a broad array of investments held in the Collateral Pools. In June 2007, two multi-billion dollar hedge funds managed by Bear Stearns collapsed due to losses tied

46

to subprime mortgages. By August 2007, numerous investment funds—including those managed by major banks, such as French bank BNP Paribas—reported significant losses as a result of the subprime collapse, and the resultant lessening of liquidity in the markets as investors steered away from asset-backed securities. In an article published on August 13, 2007, the *Wall Street Journal* described the significant risks major financial institutions faced, noting that "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

**ANSWER TO PARAGRAPH 73:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. In part due to Plaintiffs' vague and undefined use of terms including "collapse," "tied to," "major," "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second and third sentences of this paragraph concerning Bear Stearns and investment funds including those managed by BNP Paribas. Defendants deny the remaining allegations of this paragraph.

74. If their own economists' warnings, coupled with the warnings in the media and the collapse of hedge funds managed by Bear Stearns, BNP Paribas, and others did not make clear to these sophisticated Defendants the risk that major financial institutions faced from the subprime collapse, the final months of 2007 established that fact for Northern Trust. At the end of September 2007, Swiss banking giant UBS disclosed a quarterly loss of almost $700 million. In October 2007, Merrill Lynch disclosed a loss of $8.4 billion. That same month, Citigroup disclosed losses of $5.9 billion, which quickly grew to more than $15 billion, and revealed that it

faced total exposure of $55 billion. All of those losses were tied, directly or indirectly, to the mortgage meltdown. Significantly, Citigroup also revealed that the SIVs it sponsored faced billions of dollars in losses due to investments in asset-backed securities, including those tied to mortgages.

**ANSWER TO PARAGRAPH 74:**  Defendants deny the allegations of this paragraph.

### b. Northern Trust Ignored The Warnings Of Its Economists And The Evidence That The Mortgage Collapse Threatened the Collateral Pools

75.    Defendants ignored the warnings of Northern Trust's Chief Economist and other Northern Trust economists, the failures of mortgage lenders, the collapse of financial institutions, and disclosures of massive losses by major banks. All of those developments, taken together, demonstrated the significant risk facing the Collateral Pools as a result of the imprudent investments made by Defendants. In the face of this growing financial crisis, Defendants— having structured the purportedly conservative Collateral Pools, including STEP and Core USA, with securities issued by companies at the heart of the crisis—failed to act. Indeed, rather than restructuring the portfolios of those Pools to focus on short-term securities (which would reduce credit risk) and securities with less exposure to catastrophic losses, Defendants determined to stay on the perilous course they had chartered.

**ANSWER TO PARAGRAPH 75:**  Defendants deny the allegations of this paragraph.

76.    A comparison of the holdings in STEP in July 2007 and September 2008 demonstrates that Defendants failed to shift that "ultra short term" fund from long-term investments to short-term investments in any significant manner. While in July 2007, over 76%

of the securities in STEP were not due for at least 12 months, in September 2008 over 71% of the securities in STEP were not due for at least 12 months. In both July 2007 and September 2008, approximately 20% of the portfolio was not due for at least 10 years, and only about 10% was due to mature within 6 months.

**ANSWER TO PARAGRAPH 76:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

77. On information and belief, that failure was driven by a conflict of interest that prevented Northern Trust from managing the Collateral Pools wholly for the benefit of the Plans and the Class. Northern Trust was incentivized to avoid incurring realized losses by selling securities that presented an unacceptable level of risk to the conservative Collateral Pools—specifically, the investments in Lehman Brothers, Capmark Financial Group, and Sigma and Theta—because Northern Trust would be required to consolidate the entire Collateral Pools onto its books if it could not otherwise force the Plans and the Class to cover losses realized from the sale of these impaired securities. Such consolidation would result in massive losses to Defendants, as they would be required to write down the value of these impaired securities held in the Collateral Pools.

**ANSWER TO PARAGRAPH 77:** Defendants deny the allegations of this paragraph.

78. An internal Northern Trust document, discussing a call held between Northern Trust executives and a client impacted by losses in the SLP, reflects Defendants' understanding

that "Back[ing] up the STEP fund" meant to "put the sub-par positions on our Books." Another internal Northern Trust document, entitled "Redemptions – Common and Collective Funds," states: "Our independent auditors have advised that accounting rules require us to recover realized losses from securities lending investors in order to avoid consolidation of all STEP fund assets onto our balance sheet." In an attempt to avoid a situation wherein Northern Trust was required to either recover hundreds of millions of dollars of losses from its own clients or else consolidate these losses onto its own balance sheet, Defendants determined that they would not sell these impaired securities at a loss, even if doing so would help to mitigate the risk of greater potential losses to the Plans and the Class.

**ANSWER TO PARAGRAPH 78:** To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

79.     Rather than refocusing STEP and Core USA on the conservative, short-term securities that should have been in those funds all along, Defendants instead determined to wait for these high-risk securities in the Collateral Pools to mature, and ignored the clear risk that the issuers of those securities would collapse. Given the long-term nature of those securities, Defendants' decision effectively locked the Plans and the Class into a long-term investment with significant exposure to the financial crisis.

**ANSWER TO PARAGRAPH 79:** Defendants deny the allegations of this paragraph.

**C.     Defendants' Imprudence Results In Losses To The Collateral Pools**

80.    As a result of Northern Trust's imprudent investment decisions and mismanagement, the Collateral Pools suffered massive realized losses on their exposure to exotic, illiquid, and long-term securities—securities in which the Collateral Pools never should have been invested due to the clear objectives of the Pools and the warnings regarding many of these securities issued by Northern Trust's own economists. This imprudent structuring and management of the Pools resulted in well over $1 billion in realized losses for the STEP and Core USA Collateral Pools alone. For example, as of September 2008, STEP had incurred realized losses of approximately $460 million on Lehman Brothers and over $400 million on the Sigma and Theta SIVs, which both entered receivership in late 2008. In 2009, STEP incurred realized losses on notes issued by CIT, of which STEP held $395 million, most of which were not due to mature until 2009-2010. STEP also had significant exposure to Greenpoint Mortgage ($103 million) and Capmark Financial Group ($153 million), both of which were not due to mature until 2010. Similarly, Core USA faced approximately $220 million in realized losses on CIT floating rate notes not due to mature until 2009-2010, in addition to the realized losses from its Lehman Brothers holdings.

**ANSWER TO PARAGRAPH 80:** To the extent this paragraph purports to characterize documents such as reports on Core USA and STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

81.    The Collateral Pools incurred these realized losses even though Northern Trust could have taken advantage of numerous opportunities to mitigate the risk posed by their imprudent initial investment decisions. For example, in July 2007, the Collateral Pools incurred

significant unrealized losses on several securities. Rather than seeking to mitigate further losses, or even recognizing those losses as a harbinger of the risk facing the portfolios it had filled with long-term, high-risk instruments, Northern Trust imprudently determined to hold the impaired securities in the hopes that, despite the worsening economic climate, the investments would pay at maturity. Given the long terms of the securities at issue—the losses incurred in July 2007 included bonds issued by Sallie Mae, some of which would not mature until October 201 1—that decision was contrary to the purported investment purpose of the short-term Collateral Pools.

**ANSWER TO PARAGRAPH 81:**  Defendants deny the allegations of this paragraph.


82.     The following month the Collateral Pools again incurred significant unrealized losses, which Northern Trust knew or should have known were related to the collapsing mortgage market and the impact of that collapse on the financial sector of the economy. Nonetheless, despite the continuing losses incurred by the Collateral Pools, the growing evidence, discussed above, about the risks facing institutions across the economy, and the warnings of its own Chief Economist, Defendants held to their refusal to actively manage the portfolios of the Collateral Pools to mitigate further risk.

**ANSWER TO PARAGRAPH 82:**  Defendants deny the allegations of this paragraph.


83.     Moreover, by August 2007, Northern Trust was fully aware that the subprime collapse and growing financial crisis was impacting the liquidity of the markets for fixed income securities. Indeed, Michael Vardas, the Managing Director of Northern Trust Quantitative Management and Capital Markets, who was responsible for overseeing the SLP, testified that Defendants saw the "market come under some stress in the Summer of 2007" and tried to build

liquidity in STEP and Core USA. According to Vardas, however, Defendants' effort at building liquidity was limited to "allowing the assets in these collateral pools to mature" and "reinvesting them in very short maturity investments." The nature of the investments to which Defendants, albeit belatedly, sought to refocus the Collateral Pools—according to Vardas, "[m]oney market – very short money market investments, treasury and agency securities"—confirms that the long-term, high-risk securities in which Defendants had previously invested the Collateral Pools were inappropriate.

**ANSWER TO PARAGRAPH 83:** To the extent this paragraph purports to characterize prior testimony, Defendants refer to that prior testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

84.     Despite that knowledge, and the clear risk that the combination of decreasing liquidity and mounting investment losses were poised to deliver a significant blow to the Collateral Pools, Defendants permitted billions of dollars in withdrawals from the Collateral Pools during this period. Specifically, according to a Northern Trust e-mail authored by Guy Sclafani, a Vice President at Northern Trust Global Investments, STEP "decreased in size over the last 6 months [December 2007 to June 2008] and ***much of the cash we have received has been used to fund departures***, but the market value decrease also reflects a seasonal lag in securities lending activity." (Emphasis added). An attachment to that e-mail shows that, during those six months at the height of the financial crisis, STEP decreased by $2.61 billion, or, over 17%.

**ANSWER TO PARAGRAPH 84:** To the extent this paragraph purports to characterize Northern Trust internal documents available to Plaintiffs or reports on the holdings of STEP, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

85. Those withdrawals were permitted despite the fact that Defendants were purportedly seeking to build liquidity in the Collateral Pools. Moreover, investors in the Collateral Pools who were permitted to withdraw during this period—from December 2007 through September 2008—were able to withdraw by simply bearing their pro-rata share of the loss incurred in the Collateral Pool. In contrast, and as discussed in greater depth below, after September 2008, Defendants only permitted "in-kind" withdrawals—effectively requiring the Plans and the Class to purchase distressed securities from the Collateral Pools at full value. Permitting withdrawals prior to September 2008 further impaired the liquidity of STEP, and harmed the Plans and the members of the Class who remained invested in STEP in reliance on Defendants' ability, as sophisticated fiduciaries, to prudently manage the Collateral Pools.

**ANSWER TO PARAGRAPH 85:** Defendants deny the allegations in this paragraph.

86. As the financial crisis escalated, Defendants continued to refuse to prudently dispose of Lehman Brothers securities held in the Collateral Pools despite growing evidence that major financial institutions' securities, including those of Lehman Brothers, were imprudent investments for conservative vehicles such as the Collateral Pools. For example, the collapse of Bear Stearns in March 2008, and its purchase by J.P. Morgan for a fire sale price of $10 per share, demonstrated the frailty of the financial giants that formed the backbone of the Collateral

Pools' portfolios. That same month, as credit rating agencies downgraded several monoline insurers and finance companies, and many financial institutions scrambled to shore up their capital levels, STEP incurred another material loss.

**ANSWER TO PARAGRAPH 86:** Defendants deny the allegations in this paragraph.

87. Even as it failed to mitigate further losses and ensure the liquidity of the Collateral Pools by divesting the Pools of assets doomed to failure, including, but not limited to, Sigma and Theta, Northern Trust recognized that the "rising cost of credit coupled with amplified demand for liquidity forced many large market participants to sell fixed income securities at distressed prices" with "the financial markets [at] the brink of a dramatic meltdown."

**ANSWER TO PARAGRAPH 87:** To the extent the portion of this paragraph within quotes purports to characterize various internal Northern Trust documents available to Plaintiffs, or written communications from Defendants to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

88. Rather than actively trying to refocus the Collateral Pools on short-term investments that, while lower yielding, carried less credit risk than the long-term instruments in which Northern Trust had invested, Defendants actually made changes to permit more long-term investments in the Collateral Pools. Specifically, in or about the Summer of 2007, Northern Trust implemented changes to the investment guidelines for Core USA to permit up to 15% of the

portfolio to be invested in securities with maturities longer than three years. That change was made to increase earnings.

**ANSWER TO PARAGRAPH 88:** To the extent this paragraph purports to characterize Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


89. By April 2008, the evidence was irrefutable that Defendants' imprudent investment strategy exposed the Collateral Pools—and STEP in particular—to significant further losses. That month, both Moody's and S&P downgraded Sigma Finance Corporation—one of the SIV assets held by STEP—and put the issuer on watch for further downgrades. Indeed, Moody's and S&P further downgraded Sigma several additional times in the following months. Price declines of STEP's $330 million in Sigma holdings following the downgrades contributed to a 12.35% annualized monthly decline in STEP's returns. Notwithstanding the ratings agencies' downgrades and even though 70% of the Sigma securities STEP held were not due to mature until 2010, Defendants determined not to dispose of those securities, based on the position that "the Sigma portfolio is extremely high quality" and Sigma would "repay the capital notes held in STEP at par on maturity." That position was unfounded, and wholly at odds with the prevailing market view of Sigma and Theta.

**ANSWER TO PARAGRAPH 89:** To the extent this paragraph purports to characterize published documents and articles, internal Northern Trust documents available to Plaintiffs, or written communications from Defendants to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

90.     Moreover, Northern Trust knew that Sigma and its corporate sibling, Theta, faced a real risk of failure because they were not being supported by their sponsor, Gordian Knot. Indeed, a Northern Trust document dated January 2008—almost four months before the April 2008 downgrades of Sigma—identified the inherent weaknesses of SIVs lacking a sponsor, distinguishing SIVs that were sponsored by a financial institution capable of providing financial support from those, such as Sigma and Theta that lacked such support. That document stressed that Northern Trust's strategy of limiting the SIV investments in its money market portfolios to primarily bank-sponsored SIVs "has proved especially valuable in recent weeks as the banks sponsoring five of the nine SIVs the Northern Money Market Fund has invested in have announced plans to put their own capital behind the funding needs of their SIVs."

**ANSWER TO PARAGRAPH 90:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

91.     In February 2008, a Citi analyst and the *Financial Times* reported that Sigma was the largest SIV without support from a major bank. In particular, the *Financial Times* reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles. The lack of a large bank behind Sigma leaves it vulnerable to collapse." Other investors who, unlike Defendants, heeded these warnings were able to extricate themselves from investments in Gordian Knot's SIVs without incurring significant losses, long before those SIVs collapsed.

**ANSWER TO PARAGRAPH 91:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

92.     The risks of investing in SIVs that lack such a sponsor was driven home in February 2008, when two unsupported SIVs in which Northern Trust's money market funds had invested—Whistlejacket Capital LLC and White Pine Finance LLC—defaulted, causing massive losses to those money market funds. Northern Trust agreed to provide up to $229 million to stabilize those funds in the wake of the SIV losses. Despite having acknowledged the higher risk presented by unsupported SIVs such as Sigma and Theta, having witnessed the collapse of similarly unsupported SIVs and the resulting impact on Northern Trust funds, and the significant downgrades of Sigma and Theta, Defendants maintained their position that those investments would continue to perform if held to maturity. The more than $400 million of Sigma and Theta securities in STEP would not fully mature, however, for over one year in the case of Theta and for over three years in the case of Sigma.

**ANSWER TO PARAGRAPH 92:** To the extent this paragraph purports to characterize published documents and articles, or any Capital Support Agreement, Defendants refer to those documents, articles, and agreements for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

93.     As 2008 continued, Defendants understood that the situation in the Collateral Pools was dire. Michael Vardas, the Northern Trust Managing Director overseeing the SLP,

testified repeatedly that, as of April 2008, Northern Trust "would not be going out and selling STEP as an investment vehicle to new prospects." Despite the view that STEP was no longer an appropriate investment vehicle, Defendants continued their self-interested strategy of simply holding on to the long-term securities in STEP and the other Collateral Pools, which became increasingly risky as the financial crisis escalated. The improper structure of the Collateral Pools in illiquid and highly exotic investments such as Lehman and Sigma resulted in the Defendants' insufficient attempts to restructure the Pools and increase liquidity. Indeed, in his testimony, Vardas confirmed that, as of April 2008, Defendants' efforts to increase liquidity in STEP remained limited to "predominantly allowing assets to mature and reinvesting proceeds in shorter dated investments."

**ANSWER TO PARAGRAPH 93:** To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

94. Internal Northern Trust documents from this time period show that Defendants saw the need to increase liquidity more quickly, but refused to incur any losses in order to do so. For example, an internal draft letter dated May 12, 2008 written by Guy Sclafani, the Vice President at Northern Trust Global Investments, stated: "We would like to implement a change as quickly as possible but we do not want to realize any losses in the STEP fund if they can be avoided. Therefore implementing a change may take some time. We estimate it may take between 6 and 18 months to restructure the securities lending pool." That same draft letter also shows that, as of May 2008, Northern Trust understood that STEP was not an appropriate

investment for the Northern Trust Commingled Lending Funds in which the Plans and the Class invested. Specifically, the letter states that Northern Trust was "reconsider[ing] the structure of the securities lending collateral pool for these index securities. We are considering a number of options including reducing the allocation to STEP in the pool *as well as eliminating it entirely*...." (Emphasis added). In another internal document, Kendall Kay, a Senior Vice President at Northern Trust Global Investments, expressed his agreement with Sclafani's letter, writing, "I think this works."

**ANSWER TO PARAGRAPH 94:** To the extent this paragraph purports to characterize Northern Trust internal documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.


95. In September 2008, STEP plummeted in value as Northern Trust declared STEP's investments in securities issued by the SIVs, Sigma and Theta, had become "permanently impaired." These securities were transferred from STEP to a liquidation account, and the losses on those investments became fully realized. Core USA also incurred a significant loss, primarily on its Lehman Brothers investment. Despite the complete collapse of Sigma and Theta, Defendants, hampered by a disabling conflict of interest, refused to divest the Collateral Pools of similarly impaired securities.

**ANSWER TO PARAGRAPH 95:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs or written communications to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

96.     On September 19, 2008, Northern Trust declared a collateral deficiency in Core USA and STEP resulting from the collapse of Lehman Brothers, and the Sigma and Theta SIVs. As a result, the Plans and the Class, as the lenders, had significant exposure to these losses, and Northern Trust soon posted a "payable" to each of the lenders that participated in these pools, resulting in a reduction in value of each lender's investments.

**ANSWER TO PARAGRAPH 96:** Defendants admit that Northern Trust declared a collateral deficiency in Core USA on September 19, 2008.  Defendants deny the remaining allegations of this paragraph.

97.     Beyond the general economic factors and warnings by Northern Trust economists that should have apprised these sophisticated Defendants that the investments in Lehman Brothers, Sigma, and Theta presented an improper level of risk for the purportedly conservative Collateral Pools, specific facts about those issuers should have raised red flags for an investment manager such as Northern Trust, prior to September 2008, that these investments were not appropriate for the Collateral Pools. For example, in May 2008, David Einhorn—a prominent investment manager who runs the hedge fund Greenlight Capital—publicly questioned the accuracy of Lehman Brothers' financial reports. Furthermore, in June 2008, Lehman Brothers disclosed material exposure to the mortgage crisis, and took a $3 billion write-down of commercial and residential mortgages, mortgage-backed securities, and real estate holdings. In response to that disclosure, Einhorn again questioned the accuracy of Lehman Brothers' financial reporting. On June 10, 2008, Wachovia issued an analyst report titled "Too Many Inconsistencies," that downgraded Lehman Brothers, citing the lack of transparency concerning

Lehman Brothers' exposure to the mortgage meltdown. These disclosures—almost three months before Lehman Brothers' bankruptcy—were imprudently disregarded by Defendants.

**ANSWER TO PARAGRAPH 97:** To the extent this paragraph purports to characterize published documents and articles, including those setting forth or describing the views of David Einhorn, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

98.     Similarly, the collapse of Sigma and Theta should not have been surprising to Northern Trust, had it prudently followed the developments concerning those SIVs. The reduced liquidity in the fixed income market in August 2007—which Defendants were aware of—had a significant impact on SIVs, whose business model involves buying and selling fixed income securities. Between August and October of 2007, more than a dozen SIVs failed as the credit rating agencies lowered ratings due to concern about the quality of assets held by SIVs.

**ANSWER TO PARAGRAPH 98:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

99.     In October 2007, *Fortune* magazine railed against investments in SIVs—which it called "shadowy debt instruments"—by commingled funds such as mutual funds. At this time, Sigma's only hope of survival hinged on the chance that its large asset base might be sold as its debt obligations matured. This early indication of financial distress, at a time when smaller SIVs

unequipped with the asset base of Sigma began to fail, should have raised a warning flag to Defendants. Later that month, the markets again signaled that Sigma's viability was in doubt when Gordian Knot's attempt to raise financing for Sigma's approximately $22.5 billion in debt due in 2008 raised a paltry $20 million.

**ANSWER TO PARAGRAPH 99:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

100.    By December 2007, observers were specifically warning that Sigma—which had an enormous amount of debt coming due in 2008—was at significant risk of failure. For example, a December 17, 2007, article on the website of the *Financial Times*, "Second Wave of SIV Liquidity Problems Looms," warned of a "liquidity squeeze [that] will affect some SIVs more than others. Sigma Finance, run by Gordian Knot, accounts for 22.5 percent of all MTNs [medium term notes] issued by all SIVs. It must repay about $22.5bn by the end of September [2008] and another $2.5bn by the end of the quarter." In January 2008, an analyst report by Citigroup voiced further concerns about Gordian Knot's SIVs, noting that Sigma was the "only non-bank sponsored SIV still looking to secure support." The report provided fresh warnings about the massive obligations that Sigma had to satisfy in 2008.

**ANSWER TO PARAGRAPH 100:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

101.     When, in April 2008 the ratings of Sigma securities were cut, an article on *Bloomberg News* tied the downgrade to Sigma's need to "refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow...." One month earlier, when Standard and Poor's issued a warning that Sigma's debt would be downgraded, a Citi analyst noted that, "Sigma is the only remaining SIV not to have secured support [for financing purposes].... In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owed." If these signs were not clear enough, a *Bloomberg News* article in April 2008 reported that money market funds had already reduced their investments in Sigma and rolled new money into more conservative programs. In contrast, by April 2008, Defendants had failed to divest of their deteriorating investments in Sigma despite the warning signs.

**ANSWER TO PARAGRAPH 101:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

102.     By July 2008, Sigma's fate was nearly sealed. The Citi analyst remarked that, "[i]f Sigma were to enter into an enforcement/default on its debt... [b]anks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." However, Defendants did nothing to safeguard the remaining assets in the Pools by divesting itself of Sigma investments. By September 2008, Sigma was served with a notice of default and shortly thereafter entered into receivership.

**ANSWER TO PARAGRAPH 102:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants admit that Sigma was served with a notice of default by a counterparty on or about September 30, 2008, and that receivers were appointed for Sigma on or about October 6, 2008. Defendants deny the remaining allegations of this paragraph.

103. The risks facing Sigma and Theta should have been clear to Defendants well before September 2008. Considering Defendants' own differentiation between the risks posed by unsupported SIVs, the drumbeat of warnings about Sigma and its inability to sell new notes, Northern Trust's experience with the failure of two such SIVs in its money market fund in February 2008, and the downgrade of Sigma and Theta in April 2008, the decision by Defendants to continue holding those securities with the expectation that they would perform to maturity over the course of up to three years was highly imprudent.

**ANSWER TO PARAGRAPH 103:** Defendants deny the allegations of this paragraph.

104. Indeed, as Northern Trust continued to hold these securities, other investors were fleeing Sigma in droves. As of September 2008, money market funds, which held $5 billion in Sigma debt in April 2008, had no holdings in Sigma debt. Many of these investors were able to recoup nearly their entire investment in Sigma, and therefore incurred minimal losses, as late as September 2008. Northern Trust therefore failed to take the clear actions required to protect the members of the Class.

**ANSWER TO PARAGRAPH 104:** To the extent this paragraph states legal conclusions, no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first three sentences of this paragraph, due to the vagueness of those allegations. Defendants deny the remaining allegations of this paragraph.

105. For these reasons, the losses incurred in STEP on Sigma and Theta securities were avoidable had Northern Trust prudently managed the Collateral Pools.

**ANSWER TO PARAGRAPH 105:** Defendants deny the allegations of this paragraph.

106. Northern Trust added even further injury when the Lehman Brothers, Sigma, and Theta losses were realized in September 2008 by implementing limitations on withdrawals from the Collateral Pools. Specifically, Northern Trust required an SLP participant seeking to immediately withdraw from the SLP to take an "in-kind" withdrawal of that participant's pro rata share of the Collateral Pools. The withdrawing participant would be required to contribute cash equal to the book value of its share of the securities held in the Collateral Pool and would, in turn, receive an allocation of the securities in the Pool—including high-risk and long-term securities with a current value far below the cash contribution. Previously, if SLP participants had chosen to withdraw while the Collateral Pools carried an unrealized loss, they were only required to cover that loss, and thereby avoid future losses on the imprudent investments made by Defendants.

**ANSWER TO PARAGRAPH 106:** To the extent this paragraph purports to characterize Collateral Pool withdrawal guidelines or Northern Trust documents to which Plaintiffs have

access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

107. Similarly, indirect SLP participants who invested in the Commingled Lending Funds could only withdraw from those Funds by accepting an in-kind distribution of securities from the Collateral Pools. Thus, an investor in a Commingled Lending Fund that was invested in the common stock of companies on the S&P 400 index, such as Chicago Teachers, could only withdraw from that Fund by accepting an allocation of the fixed income securities held in the Collateral Pools—including mortgage backed securities—which were wholly distinct from the securities in which the Fund had invested.

**ANSWER TO PARAGRAPH 107:** To the extent this paragraph purports to characterize Collateral Pool and collective fund withdrawal guidelines, or Northern Trust documents to which Plaintiffs have access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

108. Alternately, SLP participants could choose a staged withdrawal from the Collateral Pools, whereby participants would be able to recover a fixed dollar amount in intervals over an extended period of time. Northern Trust estimated that this staged withdrawal process could take up to nine months for full withdrawal. And upon completion of the process, any payables would be due in full, therefore forcing these withdrawing SLP participants to cover the realized losses.

**ANSWER TO PARAGRAPH 108:** To the extent this paragraph purports to characterize Collateral Pool and collective fund withdrawal guidelines, or Northern Trust documents to which

Plaintiffs have access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

109. These new withdrawal limitations effectively locked SLP participants into the Collateral Pools. The cash contribution required to effect an "in-kind" withdrawal presented an onerous, if not impossible, hurdle that the Plans and the Class could not meet without difficulty, both because of the amount of cash necessary to effect a withdrawal, the risky nature of the securities the withdrawing SLP participant would receive and the need to retain an investment advisor to then manage those high-risk, long-term and illiquid securities. As a result, the Plans and the Class had no real choice but to remain in the SLP, and remain exposed to the risks in the Collateral Pools, even as the economy worsened after September 2008.

**ANSWER TO PARAGRAPH 109:** Defendants deny the allegations of this paragraph.

110. As a result, the Plans and the Class incurred further harm as other risky securities held in STEP and Core USA accumulated additional realized losses. As with the losses incurred on investments in Sigma and Theta, those losses could have been avoided had Defendants heeded and responded to the warnings of Northern Trust's own economists, the evidence in 2007 that major financial institutions faced risks of massive losses and potential collapse, or the specific red flags about the SIVs, specifically Sigma, held in the Collateral Pools.

**ANSWER TO PARAGRAPH 110:** Defendants deny the allegations of this paragraph.

111. In 2009, STEP and Core USA incurred significant realized losses on securities issued by CIT, a bank that was extensively involved in residential mortgage lending and other

consumer loans. Long before those losses were incurred, CIT disclosed that it had lost hundreds of millions of dollars as a result of risky mortgage and consumer lending. Indeed, during the final half of 2007, CIT incurred over $1.5 billion in write-downs, charges and provisions for losses tied to its portfolio of subprime mortgage loans. In the first quarter of 2008, CIT disclosed an additional $218 million charge to further reduce the value of its mortgage portfolio and disclosed that it faced almost $200 million in additional losses on its portfolio of student loans. By mid-2008, CIT had disposed of its portfolio of subprime mortgages, receiving less than half of what the company had previously claimed the assets were worth. Given the purportedly conservative nature of the Collateral Pools, Defendants' decision to continue holding fixed income securities issued by CIT, in the face of the mounting disclosures about that company's financial condition over the course of more than a year, constituted a violation of their fiduciary and contractual duties.

**ANSWER TO PARAGRAPH 111:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning CIT's business practices. Defendants deny the remaining allegations of this paragraph.


112. The CIT losses included losses on securities with a book value of more than $260 million that, when held in the Collateral Pools when the news about CIT's losses became known in mid-2007, were not due to mature for almost two years or more. The length of the investments in CIT were at odds with the investment objectives of the Collateral Pools and made them improper investments in what were purportedly short-term funds.

**ANSWER TO PARAGRAPH 112:** Defendants answer that the allegations in the first sentence of this paragraph are incomprehensible, including the phrases "the CIT losses included losses" and the phrase "when held in the Collateral Pools when the news about CIT's losses became known." Defendants thus lack knowledge and information sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph. Defendants deny the remaining allegations of this paragraph.

113.     In addition to CIT, the Collateral Pools incurred additional realized losses after the withdrawal limitations were implemented that were similarly avoidable because significant red flags existed about the issuers of those securities, and their exposure to losses tied to mortgages or other consumer debt. These included Sallie Mae, a student loan company that, as early as January 2008, disclosed that it faced $750 million in losses on risky loans, Capmark Financial, a mortgage and real estate investment firm, and Greenpoint Mortgage, a mortgage lender that issued mortgage-backed securities held in STEP.

**ANSWER TO PARAGRAPH 113:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

114.     Defendants have taken the position that the Plans and the Class are liable for the realized and any unrealized losses incurred in the Collateral Pools. To offset the realized losses, Defendants improperly redirected earnings from securities lending that were due to the Plans and the Class and applied those earnings to offset the realized losses in the Collateral Pools. Defendants then demanded, and continue to demand, that the Plans and the Class reimburse the Collateral Pools for the realized losses that resulted from Defendants' misconduct. And because

of the withdrawal limitations Defendants implemented, the Plans and the Class lack the ability to freely exit the SLP or the Commingled Lending Funds participating therein.

**ANSWER TO PARAGRAPH 114:** Defendants admit that Plaintiffs, the Plans, and/or putative class members are responsible for principal losses in invested cash collateral resulting from their participation in securities lending. Defendants deny the remaining allegations of this paragraph.

## V. CLASS ACTION ALLEGATIONS

115. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of persons similarly situated (the "Class"):

> All persons or entities that are not governed by ERISA and that invested or maintained investments or assets, directly or indirectly, between January 1, 2007 and the present (the "Class Period") in any Collateral Pool, as defined herein, managed or operated by Northern Trust, and were damaged thereby.

**ANSWER TO PARAGRAPH 115:** Defendants admit that Plaintiffs purport to bring a class action, but deny that they are entitled to bring this action on behalf of a class. Defendants deny the remaining allegations of this paragraph.

116. Excluded from the Class are Defendants, any subsidiaries or affiliates of the Defendants, officers and directors of the Defendants, heirs, successors or assignees of any of the Defendants or their officers and directors, and any entity in which any Defendant has a controlling or substantial interest, except for any Commingled Lending Funds, as defined herein, which are expressly included in the Class.

**ANSWER TO PARAGRAPH 116:** Defendants admit that Plaintiffs purport to bring a class action, but deny that they are entitled to bring this action on behalf of a class. Defendants deny the remaining allegations of this paragraph.

117. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of investors throughout the country participated in the SLP and invested, either directly or indirectly, in the Collateral Pools during the Class Period and sustained losses as a result of Defendants' misconduct. For example, in 2008, Northern Trust identified 670 participating clients in 49 worldwide markets. Furthermore, well over one hundred investors have sought redemptions from the Commingled Lending Funds that have been restricted due to illiquidity and collateral deficiencies in the Collateral Pools. Direct and indirect SLP participants and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail.

**ANSWER TO PARAGRAPH 117:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiffs, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny that this action may be maintained as a class action. Defendants deny the remaining allegations of this paragraph.

118. Plaintiffs' claims are typical of the claims of the members of the Class because they arise from Defendants' fiduciary status and their violation of those duties, which applies uniformly to all members of the Class; are based on substantially similar or uniform agreements

governing the participation in and administration of the SLP that were entered into by or on behalf of the Plans and all members of the Class, and Defendants; and arise from Defendants' uniform course of conduct in failing to properly exercise their discretionary authority in administering the SLP and investing Collateral Pool assets in good faith. If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

**ANSWER TO PARAGRAPH 118:** Defendants deny the allegations of this paragraph.

119. The claims of Plaintiffs and all other Class members originate from the same misconduct and breaches of duty committed by Defendants with regard to its management of the SLP in which the Plans participated and for which Defendants' conduct was the same. Proceeding as a class action is particularly appropriate here because the Collateral Pool assets managed by Defendants treat any losses as proportional to all investors, and, therefore, Defendants' imprudent actions and other breaches affected all Class members in the same manner.

**ANSWER TO PARAGRAPH 119:** Defendants deny the allegations of this paragraph.

120. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a. Whether Defendants are fiduciaries to the Class members;

b. Whether Defendants breached their fiduciary duties to the Class;

    c.   Whether Defendants' acts proximately caused losses to the Class and, if so, the appropriate relief to which they are entitled;

    d.   Whether Defendants breached terms of their contracts with the Class members;

    e.   Whether Defendants breached their contractual duties of good faith and fair dealing with respect to the Class; and

    f.   Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

**ANSWER TO PARAGRAPH 120:** Defendants deny the allegations of this paragraph.


121.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action and fiduciary litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

**ANSWER TO PARAGRAPH 121:** Defendants deny the allegations of this paragraph.


122.   A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

**ANSWER TO PARAGRAPH 122:** Defendants deny the allegations of this paragraph.

123.   In addition, prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Prosecution of separate actions would also create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

**ANSWER TO PARAGRAPH 123:**  Defendants deny the allegations of this paragraph.

## COUNT I

## CLAIM FOR BREACH OF FIDUCIARY DUTY

124.   Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

**ANSWER TO PARAGRAPH 124:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

125.   The Defendants undertook to act as an agent and fiduciary for each Plan and member of the Class, and Defendants owed each Plan and Class member a fiduciary duty. By reason of their fiduciary relationships, Defendants specifically owed and owe the Plans and members of the Class the highest obligation of due care, good faith and loyalty in the administration of the SLP and the management of the Collateral Pools.

**ANSWER TO PARAGRAPH 125:** This paragraph contains legal conclusions to which no answer is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

75

126.    Specifically, as the trustee to the Collateral Pools, investment manager of the Collateral Pools, and securities lending agent in securities lending transactions, charged with managing the investment of the Collateral Pools for the benefit of the Plans and the Class, including both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

**ANSWER TO PARAGRAPH 126:** This paragraph contains legal conclusions to which no answer is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny the remaining allegations of this paragraph.

127.    Northern Trust has acknowledged its fiduciary status with respect to participants in the SLP, both in materials produced by Defendants, and by the terms of the securities lending agreements Northern Trust entered into with direct participants in the SLP and through agreements with the Commingled Lending Fund in which indirect SLP participants invested. Moreover, Northern Trust's role as fiduciary to all participants in the SLP is confirmed by the FFIEC Policy, which was expressly incorporated by reference into the securities lending agreements.

**ANSWER TO PARAGRAPH 127:** To the extent this paragraph refers to agreements or other documents such as the FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize

the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

128. As a fiduciary to the Plans and the Class, Northern Trust had full discretion to manage the Collateral Pools for the benefit of the Plans and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of the Plans and the Class.

**ANSWER TO PARAGRAPH 128:** To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

129. The Plans and the Class placed their trust and confidence in Northern Trust by virtue of, among other things, Northern Trust's superior knowledge and possession and control over the Plans' and Class members' securities and the collateral investments in the SLP.

**ANSWER TO PARAGRAPH 129:** Defendants deny the allegations of this paragraph.

130. Northern Trust breached its fiduciary duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid. Northern Trust further breached its fiduciary duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 130:** Defendants deny the allegations of this paragraph.

131. Northern Trust further breached its fiduciary duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 131:** Defendants deny the allegations of this paragraph.

132. As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of the Plans and the Class. Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk that would be borne solely by the Plans and the Class. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain certain at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those

conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to the Plans and the Class.

**ANSWER TO PARAGRAPH 132:** Defendants deny the allegations of this paragraph.

133. In addition, the Defendants owed and owe fiduciary duties to the indirect participants in the SLP who are members of the Class, including Chicago Teachers, Louisiana Firefighters, and Pontiac Police and Fire. Specifically, as the trustee to the Commingled Lending Funds, investment manager of the Collateral Pools, and securities lending agent in securities lending transactions, charged with managing the investment of the Collateral Pools for the benefit of the indirect participants in the SLP, Northern Trust had a fiduciary duty to negotiate the lowest possible fees on behalf of the Commingled Lending Funds and the investors therein.

**ANSWER TO PARAGRAPH 133:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. This paragraph contains conclusions of law to which no answer is required. To the extent an answer is required, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. To the extent further answer is required, Defendants deny the remaining allegations of this paragraph.

134. Northern Trust has acknowledged its fiduciary status with respect to indirect participants in the SLP, through agreements with the Commingled Lending Fund in which indirect SLP participants invested.

**ANSWER TO PARAGRAPH 134:** To the extent this paragraph refers to agreements or the Declaration of Trust, Defendants refer to those documents for their content and deny any

allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

135. As a fiduciary to the indirect participants in the SLP, Northern Trust had the ability to negotiate on behalf of the indirect participants the fees payable to Northern Trust for the Commingled Lending Funds' participation in the SLP. That duty required Defendants to negotiate in good faith the lowest possible rate it could achieve for the Commingled Lending Funds and the participants therein.

**ANSWER TO PARAGRAPH 135:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. To the extent an answer is required, Defendants deny the allegations of this paragraph.

136. Northern Trust breached its fiduciary duties by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants. The conflict of interest caused Defendants to breach their fiduciary duties, and caused harm to the Plans and the Class.

**ANSWER TO PARAGRAPH 136:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required. To the extent an answer is required, Defendants deny the allegations of this paragraph.


137. As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plans and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 137:** Defendants deny the allegations of this paragraph.

<u>COUNT II</u>

**CLAIM FOR BREACH OF CONTRACT**

138. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 138:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.


139. The agreements that Northern Trust entered into with the direct participants in the SLP, and the agreements entered into with the Commingled Lending Funds on behalf of indirect participants in the SLP, are valid and enforceable agreements. The Boards and the Plans have performed all required duties and fulfilled all relevant conditions of those agreements.

**ANSWER TO PARAGRAPH 139:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent an answer is required, Defendants deny the allegations of this paragraph.

140.    Those agreements required Northern Trust to "make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 140:** This paragraph contains legal conclusions to which no answer is required.  To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

141.    Those agreements further imbued Northern Trust with full discretion to manage the Collateral Pools for the benefit of the Plans and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein.

**ANSWER TO PARAGRAPH 141:** This paragraph contains legal conclusions to which no answer is required.  To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

142.    Northern Trust breached its contractual duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid. Northern Trust further breached its duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 142:**  Defendants deny the allegations of this paragraph.

143.    Northern Trust further breached its contractual duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 143:** Defendants deny the allegations of this paragraph.


144.    Northern Trust also breached its contractual indemnity obligations as lending agent to the Commingled Lending Funds and their participants by failing to make them whole for losses caused by the failure of Northern Trust to perform its duties and responsibilities under the Lending Agreements.

**ANSWER TO PARAGRAPH 144:** Defendants deny the allegations of this paragraph.


145.    In addition, as manager and lending agent to the Commingled Lending Funds, Defendants had full discretion to negotiate the securities lending fee with Northern Trust. By virtue of their contractual relationship, they were required to negotiate on behalf of the indirect participants a favorable fee payable to Northern Trust for the Commingled Lending Funds' participation in the SLP.

**ANSWER TO PARAGRAPH 145:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  To the extent an answer is required, no answer is required to the extent of the legal conclusions of this paragraph.  Answering further, the allegations of the first sentence of this paragraph are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

146.    Northern Trust further breached its contractual duties owed to the Commingled Lending Funds by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants. The conflict of interest caused Defendants to breach their contractual duties and caused harm to the Plans and the Class.

**ANSWER TO PARAGRAPH 146:** Claims based on the fee of 40% have been dismissed by the Court, and therefore no answer is required.  To the extent an answer is required, Defendants deny the allegations of this paragraph.


147.    As a direct and proximate result of Defendants' breaches of contract, the Plans and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 147:**  Defendants deny the allegations of this paragraph.


## COUNT III

### CLAIM FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

148.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 148:** Count III of the second amended complaint is substantively identical to Count III of Plaintiffs' first amended complaint which has already been dismissed by the Court.  Therefore, no answer is required.

149.    Defendants' agreements with the Boards and/or the Plans, and the Class, and for the benefit of the Plans and the Class, including agreements with the Commingled Lending Funds on behalf of investors therein, gave rise to a duty of good faith and fair dealing. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of the Plans and the Class. As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of the Plans and the Class. Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk that would be borne solely by the Plans and the Class. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain impaired and at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to the Plans and the Class.

**ANSWER TO PARAGRAPH 149:** Count III of the second amended complaint is substantively identical to Count III of Plaintiffs' first amended complaint which has already been dismissed by the Court.  Therefore, no answer is required.


150.    In addition, the Defendants' duty of good faith and fair dealing owed to the Commingled Lending Funds required that Defendants negotiate a favorable fee on behalf of investors in the Commingled Lending Funds, who participated indirectly in the SLP.

**ANSWER TO PARAGRAPH 150:** Count III of the second amended complaint is substantively identical to Count III of Plaintiffs' first amended complaint which has already been dismissed by the Court.  Therefore, no answer is required.

151.    Northern Trust breached its duties of good faith and fair dealing by negotiating rates that were higher than those negotiated by some of the direct SLP participants, as high as 40% of all earnings generated by the Collateral Pools. As set forth above, the negotiations that resulted in those egregious fees were conducted between related entities and therefore tainted by a conflict of interest that prevented Defendants from achieving a preferable rate on behalf of the Commingled Lending Funds and the indirect SLP participants, in violation of their duties.

**ANSWER TO PARAGRAPH 151:** Count III of the second amended complaint is substantively identical to Count III of Plaintiffs' first amended complaint which has already been dismissed by the Court.  Therefore, no answer is required.

152.    As a direct and proximate result of the breaches of Defendants' duty of good faith and fair dealing, the Plans and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 152:** Count III of the second amended complaint is substantively identical to Count III of Plaintiffs' first amended complaint which has already been dismissed by the Court.  Therefore, no answer is required.

## **AFFIRMATIVE DEFENSES**

In support of further and separate defenses to the causes of action brought by plaintiffs, and without admitting that it has the burden of proof on any fact, issue, element of a claim, or any of these matters, or that anything stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject is relevant to plaintiffs' allegations, Northern Trust alleges as follows:

### **Introduction**

1.     This is a case in which plaintiffs seek to hold Northern Trust responsible for investment decisions that the Plans[3] actively made and that their Boards (who governed and owed fiduciary duties to the Plans) actively made on behalf of their respective Plans. Northern Trust did not exercise overall and final investment discretion over the Plans' assets. And Northern Trust could not and did not make the decision that the Plans would engage in the investment practice of securities lending about which plaintiffs now complain. The Plans and their Boards were fully informed about the nature of the investments that they made and understood and knowingly accepted the risks associated with those investments when they decided to make and maintain them. By this action, the Plans and their Boards cannot disavow responsibility for their deliberate and informed investment decisions simply because they now purport to be dissatisfied with the consequences of those decisions.

---

[3]     "Plans," as defined by plaintiffs in their second amended complaint and used in these Affirmative Defenses, shall mean "Chicago Teachers," "Pontiac Police and Fire," "Pontiac General," and "Louisiana Firefighters" (each of which is a defined term in the second amended complaint). The Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago, The Board of Trustees of the City of Pontiac Police and Fire Retirement System, The Board of Trustees of the City of Pontiac General Employees Retirement System, and The Board of Trustees of the Louisiana Firefighters Retirement System are collectively defined as the "Boards." Plaintiffs collectively are the Boards of Chicago Teachers, Pontiac Police and Fire, and Pontiac General, and Louisiana Firefighters.

2.      Each of the Plans is a defined benefit plan in which each Plan's Board and its advisors make all the investment decisions.  Participants in these Plans (such as employees or retirees) did not make the investment decisions at issue in this case.

3.      The investments that plaintiffs say caused "massive realized losses" are profitable and were in fact profitable for years.  Even *after* the economic meltdown of September 2008—when Lehman Brothers filed for bankruptcy, the Federal Reserve bailed out AIG, Fannie Mae and Freddie Mac were placed in conservatorship, and Merrill Lynch was sold to Bank of America—the investments at issue generated profits.   So even if Northern Trust bore responsibility for any losses resulting from those investments (which it does not), plaintiffs' claims of massive losses are simply not true.

4.      This case is *not*, therefore, about an investment manager placing gullible investors, without their knowledge or acquiescence, into losing investments that they never wanted or did not understand.  To the contrary, all of the Plans and their Boards were financially sophisticated investors advised by internal professionals and external consultants.   Before making these investments, each Plan and its Board investigated their attributes and engaged in arm's-length contractual negotiations with NTC or NTI over their specific terms and conditions (including fees).  The Plans and their Boards, and not Northern Trust, decided how they would invest Plan assets.  They were thus active and controlling decision-makers concerning all aspects of the investments that are the subject of the second amended complaint.  And in fact, those investments performed as represented, even under dire and unforeseeable economic conditions.

5.      The investments at issue in this case concern "securities lending," an investment practice in which securities owned by a lender are "lent" to a third-party borrower, typically in exchange for cash collateral that is thereafter invested with the goal of making overall profits.

Plaintiffs purport to bring claims arising out of decisions by the Plans and their Boards to cause the Plans to engage in both "direct" and "indirect" securities lending.

6.      Here, the Boards of Chicago Teachers, Pontiac Police and Fire, and Pontiac General—advised by internal staff and external consultants—decided that their Plans would engage in "direct" securities lending, and each Board respectively negotiated the individual terms and conditions of the securities lending agreement between NTC and the Chicago Teachers Board, NTC and Pontiac Police and Fire, and NTC and Pontiac General, respectively. Under those agreements, the Plans "directly" lent securities held by the Plans to third-party borrowers.

7.      Because a client that engages in "direct" securities lending decides how to invest cash collateral from its lending activities, there is no single "right" way to invest securities lending cash collateral.  Here, each Plan and its Board—advised by its internal staff and external consultants—decided how cash collateral from securities lending should be invested based on any number of factors important to it, including each Plan's own individual overall investment strategy, goals, and risk tolerance.  The Plans and their Boards, and not Northern Trust, chose the Plans' "cash collateral investment strategy."  The Boards knew far more about the investment strategies, objectives, and risk and reward tolerances of their respective Plans than Northern Trust could or did know, and were thus in a better position than Northern Trust to decide what cash collateral investment risks were acceptable to them.  At all times, Northern Trust complied with the written investment guidelines governing the strategy selected by each Plan and its Board.

8.      All of the Plans, except for Pontiac General, also engaged in "indirect" securities lending, which involved investing (by buying "units") in certain Northern Trust Global

Investments ("NTGI") unregistered collective investment funds that engaged in securities lending or held units of other such funds that engaged in securities lending. As further described below, each of these collective investment funds had as its investment objective to "approximate" the performance of certain third-party stock or bond market indexes (such as the S&P 500 index). Proceeds from securities lending by these funds affected the funds' net asset values ("NAVs"). Each of these three Plans and their Boards, advised by their respective internal staffs and external consultants, affirmatively chose to invest Plan assets in one or more collective investment funds that engaged in securities lending or held units of other such funds that engaged in securities lending; they made all the decisions to buy, sell, and hold units in such funds.

9.      When the Plans and their Boards chose to invest in such collective investment funds, they were fully aware of the funds' participation in securities lending and how cash collateral from such securities lending was invested. The Boards knowingly accepted, for their own particular reasons and unique overall investment strategies, the risks associated with those investments. It was up to them, and not Northern Trust, to determine if the potential risks and rewards of the investments suited their overall investment objectives; only they (and not Northern Trust) could make that determination based on the information they obtained, from a variety of sources, about the investments. Having greater knowledge about their respective Plans, these Boards were in a better position than Northern Trust to decide what risks were acceptable for their respective Plans.

10.     All of the Plans and their Boards were obligated to determine how to invest Plan assets prudently. While Northern Trust made certain investments available to the Plans (and provided them with appropriate information about those investments), each Plan and its Board

were responsible for making—and in fact made—the decision for the Plan to engage in "direct" and/or "indirect" securities lending. At all times, Northern Trust managed those investments according to all of the investment guidelines and objectives applicable to them. The Plans and their Boards actively made the investment decisions at issue here, with full information and open eyes, for their own reasons and based on their own particular circumstances. Accordingly, they cannot impose liability onto Northern Trust for any alleged losses resulting from those investments.

## Factual Background

### The Boards Are Responsible for Investment of the
### Plans' Assets and Owed the Plans Important Duties.

11.     The Board of Trustees of the Louisiana Firefighters' Retirement System ("Louisiana Firefighters Board") administers and is responsible for the operation of Louisiana Firefighters. It is a fiduciary of Louisiana Firefighters and has overall fiduciary responsibility for, and overall discretionary authority and control over, the investment of Louisiana Firefighters' assets. Northern Trust did not have these duties.

12.     The Chicago Teachers Board governs and has the duty to invest the assets of Chicago Teachers. It is a fiduciary of Chicago Teachers and has overall fiduciary responsibility for, and overall discretionary authority and control over, the investment of Chicago Teachers' assets. Northern Trust did not have these duties.

13.     The Pontiac Police and Fire Board administers and acts on all matters concerning Pontiac Police and Fire. It is a fiduciary of Pontiac Police and Fire and has overall fiduciary responsibility for, and overall discretionary authority and control over, the investment of Pontiac Police and Fire's assets. Northern Trust did not have these duties.

14.     The Pontiac General Board administers and acts on all matters concerning Pontiac General.  It is a fiduciary of Pontiac General and has overall fiduciary responsibility for, and overall discretionary authority and control over, the investment of the Pontiac General's assets. Northern Trust did not have these duties.

15.     Each Board's fiduciary duty to its respective Plan included, without limitation, deciding how to invest overall Plan assets and to make individual investments of Plan assets; setting, reviewing, and changing (where appropriate) the Plan's overall investment policy and asset allocation; and monitoring and evaluating the Plan's overall investment portfolio performance.  Northern Trust did not have these duties.

16.     Each of the Boards had a fiduciary duty to its respective Plan to conduct a prudent investigation and due diligence in connection with and before investing any and all of the assets of such Plan and for monitoring the continuing appropriateness of those investment decisions.  In that regard, each Board had overall responsibility for determining which portion of its respective Plan's assets should be allocated to any one or more investments in order to fulfill the overall objectives of such Plan.  Northern Trust did not have these duties.

17.     Each of the Boards had a fiduciary duty to its respective Plan to select and retain internal and outside investment staff, professionals, and managers; to establish appropriate investment guidelines, directions, and limitations for such staff, professionals, or managers; and to monitor the performance and continued appropriateness of such decisions (including determining whether each outside investment professional or manager was meeting applicable investment objectives and fulfilling its responsibilities prudently and pursuant to applicable law and contractual arrangements).

18.     Each of the Chicago Teachers, Pontiac Police and Fire, and Pontiac General Boards was required to act with the care, skill, prudence, and diligence required by the specific state laws governing its actions in choosing and monitoring the continued appropriateness and performance of the cash collateral investment strategy that it chose for the investment of cash collateral from "direct" securities lending.

19.     Each of the Chicago Teachers, Pontiac Police and Fire, and Louisiana Firefighters Boards was required to act with the care, skill, prudence, and diligence required by the specific state laws governing its actions in choosing and monitoring the continued appropriateness and performance of its investments in the collective investment funds that participate in securities lending.

20.     In connection with the foregoing duties, each Board had a fiduciary duty to give appropriate consideration to factors such as the opportunity for gain and the risk of loss of its respective Plan; the diversification of the Plan's overall portfolio of investments; the liquidity and current return of the Plan's portfolios relative to the anticipated cash flow requirement of the Plan; and the projected return of the Plan's investment portfolio relative to the funding objectives of the Plan.  Northern Trust did not have these duties.  These duties of the Boards included, without limitation, a responsibility to understand and assess, among other things, the structure, risks, and costs of securities lending, whether "direct" or "indirect."

21.     These Boards had the foregoing fiduciary duties when they and/or their Plans initially entered into contractual arrangements governing or relating to securities lending with NTC or NTI; when they and their Plans chose a cash collateral investment strategy; and when they and their Plans made each additional securities lending investment decision (including providing directions to Northern Trust for deposits to and withdrawals from collective

93

investment funds that engaged in securities lending or held units of other such funds that engaged in securities lending). Each of the Boards also had the foregoing fiduciary duties on an ongoing basis *after* they and their Plans made such investment decisions to ensure that each investment decision was and continued to be in compliance with the terms of the Plan's governing documents; was consistent with and fulfilled the goals and strategies of the Plan; and was and continued to be an appropriate investment for the Plan.

22.    The Boards were required to have the requisite expertise, knowledge, and information to understand how to fulfill their fiduciary duties, including to understand the structure of, and the nature of the risks, costs, and potential returns of, the "direct" and "indirect" securities lending investment decisions that they made. If the Boards and their staffs lacked that expertise, knowledge, and information, their fiduciary duties required them to consult the appropriate independent experts or others who had the requisite expertise, knowledge, and information.

23.    At all times relevant to this case, each of the Plans and their Boards retained ultimate control and discretion over the investment of Plan assets.

24.    At all times relevant to this case and with respect to plaintiffs' allegations and the allegations in Northern Trust's affirmative defenses and counterclaim, Northern Trust acted prudently and in good faith, with due care, in compliance with all relevant agreements, and without negligence, recklessness, or intentional wrongdoing.

### Chicago Teachers and its Board Made and Maintained the Investments at Issue In this Case with Knowledge of their Potential Risks.

25.    Chicago Teachers is a sophisticated investor.

26.    Chicago Teachers and its Board made the investment decisions about which the Board complains in this case. They authorized and directed the "direct" lending of plan assets,

as well as the investment of such assets in one of the collective investment funds that are at issue in this case. In connection with those investment decisions, the Chicago Teachers Board chose, supervised, consulted, and directed knowledgeable internal staff and external consultants. Chicago Teachers undertook the actions alleged in support of these affirmative defenses at the direction, and with the knowledge, of the Chicago Teachers Board as advised by its internal staff and external consultants.

## Chicago Teachers and its Board Affirmatively Chose to Engage in "Direct" Securities Lending.

27.     In 1990, Chicago Teachers and its Board chose to engage in "direct" securities lending and to use NTC as its securities lending agent. The Chicago Teachers Board negotiated and signed a Securities Lending Agreement (hereafter, and as amended on multiple occasions, the "Chicago Teachers SLA") (attached, with amendments, as Exhibit A) with NTC on June 28, 1990, which governed the parties' securities lending relationship. The Chicago Teachers SLA remains in effect to this day.

28.     In connection with entering into the Chicago Teachers SLA, Chicago Teachers and its Board actively chose a cash collateral investment strategy and thereby directed the manner in which cash collateral from securities lending would be invested. Northern Trust always complied with those directions and the guidelines applicable to the cash collateral investment strategy.

29.     At all times relevant to this case, Chicago Teachers and its Board understood the investment practice of securities lending and its risks—including the risk of loss in connection with the investment of cash collateral received from securities lending—and voluntarily and knowingly chose to engage in, and to incur the risks associated with, securities lending.

30.     Under the Chicago Teachers SLA, Chicago Teachers and its Board "directly" lent their securities to third-party borrowers and NTC served as securities lending agent, performing various agreed-upon securities lending services in exchange for fees that Chicago Teachers and its Board, on the one hand, and NTC, on the other hand, negotiated and agreed to at arm's-length, and renegotiated from time to time.  Chicago Teachers and its Board negotiated NTC's securities lending fee as part of a negotiation of all fees associated with the total relationship between Chicago Teachers and Northern Trust (including custody, cash management, and investment management services).

31.     The Chicago Teachers SLA provides for Chicago Teachers and its Board to lend securities to certain borrowers and for cash collateral received from those borrowers to be invested pursuant to a cash collateral investment strategy governed by investment guidelines that Chicago Teachers and its Board expressly chose.  Also pursuant to the Chicago Teachers SLA, Chicago Teachers and its Board agreed that they would be responsible for principal losses in investments made with cash collateral from securities lending.

32.     After engaging in securities lending for approximately five years, and in an effort to increase its income from securities lending, Chicago Teachers and its Board affirmatively changed the applicable cash collateral investment strategy, accepting more risk in exchange for potentially greater investment returns.

33.     Chicago Teachers and its Board therefore directed NTC to create a custom fund for the sole use of Chicago Teachers and tailored to Chicago Teachers' unique investment guidelines (the "Chicago Teachers Custom Collateral Portfolio" or the "Portfolio").  None of the other named plaintiffs in this case, nor any alleged putative class member, nor any other investor, ever used this personalized Portfolio.

34.     These new investment guidelines were reflected in amendments to the Chicago Teachers SLA, and Chicago Teachers and its Board thereby directed NTC to invest cash collateral generated by securities lending pursuant to those guidelines.  From time to time, Chicago Teachers and its Board initiated and directed changes to the investment guidelines of the Chicago Teachers Custom Collateral Portfolio.  From its inception and at all times thereafter, Chicago Teachers and its Board were fully aware of the investment guidelines applicable to this Portfolio (and therefore how cash collateral from securities lending was and would be invested), in part because those guidelines were created pursuant to Chicago Teachers' own specifications and instructions.

35.     The investments made in the Chicago Teachers Custom Collateral Portfolio always complied with Chicago Teachers' investment guidelines.

36.     Chicago Teachers' customized guidelines, beginning in 1995, directed that securities lending cash collateral be invested in (among other things) units of the Short Term Extendable Portfolio ("STEP") and of the Short Term Investment Fund ("STIF") in percentages selected by Chicago Teachers and its Board.  At all times relevant to this case, both STEP and STIF were Northern Trust collective investment funds that held fixed income securities pursuant to each fund's governing investment guidelines (and that did not themselves engage in securities lending).  Chicago Teachers and its Board were aware of the investment guidelines, characteristics, securities holdings, and risk profiles of STEP and STIF at all relevant times.  Indeed, wholly outside of the securities lending context and by no later than 1995, Chicago Teachers directly bought units of STEP and of STIF as part of its cash management program and clearly understood and accepted the nature of those investments and their guidelines and risks.

37.     The investments made in STIF and STEP always complied with their applicable guidelines.

38.     Northern Trust's disclosures of information about STEP and STIF to Chicago Teachers and its Board were extensive and frequent, and included both written and oral communications.  Long before certain securities held in STEP experienced a realized loss (in September 2008, when the bankruptcy filing of Lehman Brothers Holding Inc. ("Lehman") caused Lehman to default on fixed income securities held in STEP), Northern Trust had provided Chicago Teachers and its Board with an enormous amount of information about STEP and STIF, including the identity of the fixed income securities held in STEP and STIF, the performance of those securities, and the effect that those securities had on securities lending revenue.

39.     In August 2007, STEP experienced its first monthly loss in its history due to unrealized losses in certain of the securities that it held, which negatively affected the Chicago Teachers Custom Collateral Portfolio.  An unrealized loss means a loss that may be temporary and that may never come to fruition if the price of the security recovers or the principal due on the instrument is ultimately paid in full at maturity.  At that time, Northern Trust immediately brought this information to the attention of Chicago Teachers and its Board; discussed the causes of the unrealized losses with them; quantified the loss to them; and answered their questions related to the losses.  At that time, Northern Trust provided Chicago Teachers and its Board with a list of STEP's current holdings and other detailed information about the attributes of STEP, including (without limitation): the identity of the securities (including, but not limited to, Lehman, Capmark Financial Group, and CIT Group) held by STEP that contributed to the unrealized losses (and that, many months later, unexpectedly caused certain realized losses);

STEP's investment in subprime securities (approximately 1%); the maturity breakdowns of STEP's holdings; and STEP's sector and security-type distribution.

40.     Chicago Teachers and its Board could have chosen to change their cash collateral investment strategy or to reduce, limit, or completely withdraw from securities lending. After receiving this and other information, and in light of what they already knew about the cash collateral investment strategy that they had chosen, however, Chicago Teachers and its Board made an affirmative decision to "stay the course" and remain in the securities lending program without changes. In making that decision, Chicago Teachers and its Board considered (among other things) that the current market conditions were an "aberration," that securities lending was still profitable, and that Chicago Teachers was a "long-term" securities lending investor. Chicago Teachers' cash collateral investment strategy remained acceptable to it and within its risk tolerance.

41.     Near the end of 2007, and despite notification by and discussions with Northern Trust about additional unrealized losses resulting from Chicago Teachers' customized cash collateral investment strategy, Chicago Teachers' own external consultant advised it that its "more aggressive collateral pool should aid performance over longer time periods, but as with any added return, some additional risk is taken which increases the likeliness of short term variances, such as those experienced in the second half of [2007]." This was an explicit recognition by Chicago Teachers and its advisors that it had chosen to take on "additional risk" and the consequences associated with that risk. Again, Chicago Teachers made no changes to its cash collateral investment strategy, accepting the risks and rewards of that self-selected strategy based on its own unique considerations.

42.     Northern Trust continued to communicate detailed information to Chicago Teachers and its Board about the Chicago Teachers Custom Collateral Portfolio throughout 2008.  For example, before September 2008, in both oral and written communications with Chicago Teachers, Northern Trust continued to describe and disclose the precise securities held in STEP and STIF that plaintiffs *now* allege Northern Trust should never have bought or held. Those communications focused on the same structured investment vehicles now called "exotic" in plaintiffs' second amended complaint and the mortgage-backed securities ("MBS") and the securities of Lehman, Capmark, CIT, Sallie Mae, and Greenpoint that the second amended complaint *now* condemns as imprudent.

43.     Notwithstanding its receipt of the foregoing information long before the unprecedented market and economic events of September 2008, Chicago Teachers did not direct changes to its securities lending strategy, including in the investment of cash collateral from securities lending.  Instead, Chicago Teachers and its Board continued to accept the risks of these investments.

44.     The events of September 2008, including Lehman's bankruptcy filing, the AIG bailout, the sale of Merrill Lynch, and the conservatorship of Fannie Mae and Freddie Mac, were unprecedented and unforeseen.

45.     After those events, Chicago Teachers' own internal advisor opined that "markets may not be predictable in the short term"; that the "current investment environment is the worst in memory"; that the market is "undergoing a once-in-a-century correction"; and that the "economic turbulence" was "unprecedented."  These remarks directly contradict the allegations that plaintiffs are making against Northern Trust in this case.

46.     And, during the alleged putative class period in this case, Chicago Teachers—through investment managers unaffiliated with Northern Trust—bought and held, for Chicago Teachers' pension plan portfolio, the very kinds of securities that it now says Northern Trust could not have prudently bought or held in STEP or STIF.

47.     Chicago Teachers' "direct" securities lending investments performed as represented and, through this lawsuit, Chicago Teachers and its Board unfairly and inappropriately seek to hold Northern Trust liable as an insurer of their own investment decisions.

48.     At all times relevant to this case, Chicago Teachers and its Board, internal staff, and external consultants had sufficient information about the cash collateral investment strategy Chicago Teachers chose that, if they truly considered the purchase or holding of the securities contained in the Chicago Teachers Custom Collateral Portfolio to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change that investment strategy.  They did not do so.

49.     Before September 2008, no representatives of Chicago Teachers ever directed Northern Trust to reduce, limit, or terminate Chicago Teachers' "direct" securities lending investments or to change the way in which cash collateral from securities lending was invested.

50.     To allow Chicago Teachers and its Board to evade responsibility for their own informed investment decisions would be to permit a sophisticated investor to have it both ways: to accept an investment's rewards while waiting to see whether known risks materialize *and* to be reimbursed for the investment's losses if those known risks do in fact materialize.  This "heads I win, tails you lose" approach is contrary to the applicable agreements and to law.

51.     Chicago Teachers and its Board profited from their overall "direct" securities lending investments, even after taking into account losses during the alleged putative class period due to a few of the securities held in STEP.

**Chicago Teachers and its Board Affirmatively Chose to Engage in "Indirect" Securities Lending.**

52.     Chicago Teachers also engaged in "indirect" securities lending.

53.     On January 6, 2006, the Chicago Teachers Board negotiated and entered into an agreement ("Chicago Teachers Agreement") (attached as Exhibit B) with NTI in which it designated the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Special Purpose Index Fund-Lending "for investment by [Chicago Teachers] from time to time in such proportions or amounts as [Chicago Teachers] shall direct in writing" ("S&P Mid Cap 400 SP Lending Fund").

54.     The S&P Mid Cap 400 SP Lending Fund, which was created in about November 2005, was an unregistered collective investment fund that engaged in securities lending.  It was created only because Chicago Teachers and its Board specifically asked Northern Trust to create the fund pursuant to their specifications.

55.     At the inception of this fund, and when it sold all of its units in the fund in 2011, Chicago Teachers was the sole holder of units in the S&P Mid Cap 400 SP Lending Fund.

56.     The Chicago Teachers Agreement reflects that a Declaration of Trust of the Northern Trust Global Investments-Quantitative Management Collective Funds Trust, as amended from time to time and effective January 31, 2006 ("Declaration of Trust") (attached as Exhibit C), governs the collective funds at issue in this case (which would include the S&P Mid Cap 400 SP Fund) and incorporates that Declaration of Trust into the Chicago Teachers Agreement.  The Declaration of Trust provided that NTI shall not be liable for any losses from

the subject investment "except to the extent such loss shall have been caused by its own negligence, willful misconduct, or lack of good faith."

57.    A "Fund Declaration" specifically created the S&P Mid Cap 400 SP Lending Fund and was incorporated into the Declaration of Trust.  That Fund Declaration described the investment objective of the S&P Mid Cap 400 SP Lending Fund as follows: "The Fund will be maintained by the Trustee with the objective of providing investment results that approximate the total return of the Standard & Poor's Mid Cap 400 Index."  That Fund Declaration expressly stated that the fund could engage in securities lending.

58.    Pursuant to a Securities Lending Authorization Agreement between NTI and NTC ("NTI/NTC SLAA") (attached as Exhibit D), NTC (as lending agent) lent out securities held in the S&P Mid Cap 400 SP Lending Fund to certain borrowers; cash collateral from such loans was invested in a collateral pool called "Core USA"; and any resulting earnings (as defined in the NTI/NTC SLAA) were paid to the S&P Mid Cap 400 SP Lending Fund.  Also pursuant to the NTI/NTC SLAA, the S&P Mid Cap 400 SP Lending Fund paid NTC a fee from such securities lending earnings as compensation for NTC's services as securities lending agent; securities lending earnings net of the securities lending fee contributed to the fund's NAV.  The NTI/NTC SLAA also provided that NTC would be liable "only for its negligence or intentional misconduct" and that "[i]n no event shall [NTC] be liable for special, indirect or consequential damages of any kind, even though [NTC] may have been previously informed of the possibility that such damages may occur."

59.    At all relevant times, Northern Trust never promised or guaranteed to Chicago Teachers or its Board that the investment objective of the S&P Mid Cap 400 SP Lending Fund would be achieved, and they were well aware of that fact.  In fact, the Fund Declaration

expressly states that: "Investments in the Fund are not deposits or obligations of, or guaranteed by, Northern Trust Investments, N.A. or any of its affiliates" and that "[i]nvestment in the Fund involves the possible loss of principal." Nor did Northern Trust make any promises to them about the extent to which securities lending would contribute to the ability of this fund to achieve its investment objective.

60. Throughout the alleged putative class period, Chicago Teachers and its Board knew that the S&P Mid Cap 400 SP Lending Fund engaged in securities lending. They also knew that the S&P Mid Cap 400 SP Lending Fund used Core USA for investment of cash collateral from the lending of the fund's securities, as well as such facts as the amount and identity of the fund's securities on loan, the fund's net income from securities lending, the value of cash and non-cash collateral held on the fund's behalf, the fees earned by NTC, and the identity of the fund's substantial borrowers (among other information). Although the Chicago Teachers Board alleges in this case that Northern Trust should have realized that it was imprudent to buy certain fixed income securities for Core USA, Chicago Teachers and its Board viewed such investments as prudent because (among other reasons) the same kinds of securities were bought for and held by Chicago Teachers through investment managers who had no connection with Northern Trust.

61. As reflected in the Chicago Teachers Agreement, the Chicago Teachers Board understood and agreed that NTC, an affiliate of NTI, would act as securities lending agent for the S&P Mid Cap 400 SP Lending Fund and understood the nature of and agreed to NTC's fees for that service. The Chicago Teachers Board knew when it entered into the Chicago Teachers Agreement that NTC's securities lending fee for investment in the S&P Mid Cap 400 SP Lending Fund was higher than the fee NTC received for acting as lending agent pursuant to the

Chicago Teachers SLA.  In connection with entering into the Chicago Teachers Agreement, the Chicago Teachers Board discussed that fact with Northern Trust and understood, accepted, and agreed to the differences in these fee structures.

62.     At all times relevant to this case, it was the sole decision of Chicago Teachers and its Board whether to buy, hold, or sell units in this fund, when to do so, and how many units to buy, hold, or sell.  Northern Trust did not have the discretion or authority to direct such purchases or sales.

63.     At all times relevant to this case, Chicago Teachers and its Board, internal staff, and external consultants had sufficient information about the Core USA cash collateral investment strategy that, if they truly considered the purchase and holding of the securities contained in the Core USA collateral pool to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change their investment strategy.   They did not do so.

64.     The S&P Mid Cap 400 SP Lending Fund did not fail to fulfill its stated investment objective to "approximate" the Standard & Poor's Mid Cap 400 Index.

65.     In fact, over the alleged putative class period, the S&P Mid Cap 400 SP Lending Fund outperformed the S&P's Mid Cap 400 Index.

66.     Neither Chicago Teachers nor its Board sustained any compensable injury, loss, or damages in connection with the investment in the S&P Mid Cap 400 Equity SP Lending Fund.

67.     Chicago Teachers profited from its "indirect" securities lending, even after taking into account losses in Core USA due to a few of the securities held in Core USA.

**Pontiac Police and Fire and Pontiac General and their Board Made and Maintained the Investments at Issue in this Case with Knowledge of their Potential Risks.**

68.     Both Pontiac Police and Fire and Pontiac General are sophisticated investors.

69.     Pontiac Police and Fire and Pontiac General, and their respective Boards, made the investment decisions about which each Board complains in this case.  Each authorized and directed the "direct" lending, respectively, of the assets of Pontiac Police and Fire and Pontiac General.  And each authorized and directed the investment of the assets of Pontiac Police and Fire in three of the collective investment funds that are at issue in this case.  In connection with these investment decisions, the Pontiac Police and Fire Board and the Pontiac General Board chose, supervised, consulted, and directed knowledgeable internal staff and external investment consultants.  Pontiac Police and Fire and Pontiac General undertook the actions alleged in support of these affirmative defenses at the direction, and with the knowledge, of each of its Boards as advised by their internal staffs and external consultants.

**Pontiac Police and Fire and Pontiac General Affirmatively Chose to Engage in "Direct" Securities Lending.**

70.     In 2007, Pontiac Police and Fire and Pontiac General chose to engage in "direct" securities lending and to use NTC as their lending agent.  They each individually negotiated and signed separate Securities Lending Authorization Agreements ("Pontiac Police and Fire SLAA" and "Pontiac General SLAA," attached as Exhibits E and F) with NTC on March 8, 2007, which governed each Plan's securities lending relationship with NTC.  In connection with entering into those securities lending arrangements with NTC, they each actively chose a cash collateral investment strategy and thereby directed the manner in which cash collateral from securities lending would be invested.  At all times relevant to this case, Pontiac Police and Fire and Pontiac General and their Boards understood the investment practice of securities lending and its risks— including the risk of loss in connection with the investment of cash collateral received from securities lending—and voluntarily and knowingly chose to engage in, and incur the risks associated with, securities lending.

71.     Under the Pontiac Police and Fire SLAA and the Pontiac General SLAA, each of Pontiac Police and Fire and Pontiac General "directly" lent its own securities to third-party borrowers and NTC served as lending agent, performing various agreed-upon securities lending services in exchange for a fee that each entity negotiated and agreed to at arm's-length with NTC.  Each of their securities lending fees were negotiated in view of the overall relationship between each of them (respectively) and Northern Trust.

72.     At the time of entering into those agreements, Pontiac Police and Fire and Pontiac General each concluded that it had negotiated a "favorable" securities lending fee with NTC. Also pursuant to the Pontiac Police and Fire SLAA and the Pontiac General SLAA, Pontiac Police and Fire and Pontiac General agreed that each would be responsible for principal losses in investments made with cash collateral from securities lending.

73.     Both the Pontiac Police and Fire SLAA and the Pontiac General SLAA provided that NTC would be liable "only for its own negligence or intentional misconduct" and that "[i]n no event shall [NTC] be liable for special, indirect or consequential damages of any kind, even though [NTC] may have previously been informed of the possibility that such damages may occur."

74.     The Pontiac Police and Fire SLAA and the Pontiac General SLAA provide for cash collateral received from the borrowers of the securities of Pontiac Police and Fire and Pontiac General to be invested pursuant to investment guidelines that Pontiac Police and Fire and Pontiac General expressly chose.  Before Pontiac Police and Fire and Pontiac General entered into these agreements, Northern Trust gave them and their external consultant descriptions of various options for investment of securities lending cash collateral.  Pontiac Police and Fire and Pontiac General each affirmatively chose Core USA for investment of cash collateral received

from securities lending, although another option with greater investment restrictions was available. Each also "agreed to be bound by the terms" of the Core USA guidelines.

75. Accordingly, Pontiac Police and Fire and Pontiac General directed Northern Trust to invest cash collateral from their securities lending activities in Core USA. Both Pontiac Police and Fire and Pontiac General and their Boards acknowledged receiving and were well aware of Core USA's cash collateral investment guidelines when they gave Northern Trust that direction.

76. At the time that Core USA's investment guidelines were revised in mid-2007, Pontiac Police and Fire and Pontiac General and their Boards received the revised guidelines. Their staffs reviewed the revisions, found them acceptable and "not out of line," and they made no changes to their cash collateral investment strategy. These are the very revised investment guidelines that plaintiffs now claim were imprudently revised by Northern Trust.

77. Each of Pontiac Police and Fire and Pontiac General and their Boards knowingly accepted, for its own unique reasons, the risks and rewards associated with the investment of cash collateral from securities lending in Core USA.

78. The investments made in Core USA always complied with its applicable investment guidelines.

79. Long before any security held in Core USA experienced a realized loss in this case (which did not occur until September 2008, when Lehman filed for bankruptcy and defaulted on fixed income securities held in Core USA), both Pontiac Police and Fire and Pontiac General and their Boards understood Core USA's investment profile including, without limitation, its credit quality and the ratings breakdown of its holdings; the weighted average life and maturity of its holdings; its exposure to subprime securities (approximately 1.0%); and the size of its holdings in asset-backed floating rate notes, certificates of deposit, repurchase

agreements, notes, time deposits, variable rate certificates of deposit, variable rate notes and bonds, Treasury and Agency securities, asset-backed commercial paper, and money market funds. Although they knew these details about Core USA well before September 2008, neither Pontiac Police and Fire, Pontiac General, nor their Boards directed Northern Trust to reduce, limit, or terminate their securities lending activities or to change the cash collateral investment strategy.

80. Put simply, the risks associated with these investments were clearly acceptable to Pontiac Police and Fire and Pontiac General and their Boards, including throughout 2007 and 2008. The Plans and the Boards are responsible for the investment decisions they made on behalf of the Plans. Although plaintiffs now claim in this case that Northern Trust breached alleged fiduciary duties by failing to sell Lehman securities before Lehman's September 2008 bankruptcy filing—implying that Northern Trust should have predicted Lehman's default— Pontiac Police and Fire's and Pontiac General's own external consultant reported that he "had no idea that the government would let Lehman fail." And while plaintiffs claim that Northern Trust was aware of a housing slump in 2007 that should have caused it to take unspecified corrective actions, that same consultant for Pontiac Police and Fire and Pontiac General opined, after Lehman's default, that "we are living through incredible times and you have to go back to the Great Depression to put this into context," later commenting that the country was suffering under the "deepest and worst recession since the Great Depression." Plaintiffs nowhere claim Northern Trust predicted, or should have predicted, those events.

81. Moreover, despite the allegations that they are now making in this case, during the alleged putative class period in this case, Pontiac Police and Fire and Pontiac General— through non-Northern Trust investment managers—bought and held, for their respective pension

plan portfolios, the very kinds of securities that they now say Northern Trust could not have prudently bought or held in Core USA.

82.     The "direct" securities lending investments that Pontiac Police and Fire and Pontiac General made performed as represented and, through this lawsuit, they unfairly and inappropriately seek to hold Northern Trust liable as an insurer of their own investment decisions.

83.     At all times relevant to this case, Pontiac Police and Fire and Pontiac General and their Boards, internal staffs, and external consultants, had sufficient information about Core USA that, if they truly considered the purchase or holding of the securities contained in the Core USA collateral pool to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change their cash collateral investment strategy.  They did not do so.

84.     Before September 2008, Pontiac Police and Fire and Pontiac General never directed Northern Trust to reduce, limit, or terminate their "direct" securities lending activities or to change the way in which cash collateral from securities lending was invested.

85.     To allow Pontiac Police and Fire and Pontiac General to evade responsibility for their own informed investment decisions would be to permit a sophisticated investor to have it both ways: to accept an investment's rewards while waiting to see whether known risks materialize *and* to be reimbursed for the investment's losses if those known risks do in fact materialize.  This "heads I win, tails you lose" approach is contrary to the applicable agreements and to law.

86.     Pontiac Police and Fire and Pontiac General profited from their "direct" securities lending program, even after taking into account losses due to a few of the securities held in Core USA.  Voluntary payments and fee concessions that Northern Trust provided directly to Pontiac

Police and Fire and Pontiac General (described in paragraphs 128-132 herein)—along with recoveries in the value of Core USA's assets and favorable sales of the Lehman securities that had been held in Core USA—alone exceeded their alleged losses in this case. And because Pontiac Police and Fire and Pontiac General continued to earn positive securities lending earnings over the course of the alleged putative class period, they received, in addition, hundreds of thousands of dollars worth of profits from the "direct" securities lending investments about which they complain in this case. They therefore have experienced no loss, injury, or damage from these investments.

87.     Both Pontiac Police and Fire and Pontiac General continued to lend their securities under the same Pontiac Police and Fire SLAA and the Pontiac General SLAA that they (respectively) signed in 2007 throughout the alleged putative class period and did not terminate such securities lending activities until in and about December 2011.

**Pontiac Police and Fire Affirmatively Chose to Engage in "Indirect" Securities Lending.**

88.     Pontiac Police and Fire also engaged in "indirect" securities lending.

89.     On June 19, 2004, Pontiac Police and Fire entered into an agreement (hereafter, and as later amended, "Pontiac Police and Fire Agreement") (attached, with amendments, as Exhibit G) with NTI in which it designated the NTGI Collective Daily Intermediate Government/Credit Index Fund-Lending "for investment by [Pontiac Police and Fire] from time to time in such proportions or amounts as [Pontiac Police and Fire] shall direct in writing" ("Intermediate Government/Credit Lending Fund").

90.     On February 2, 2007, Pontiac Police and Fire and NTI amended the Pontiac Police and Fire Agreement. By that amendment, made at the request of Pontiac Police and Fire, the NTGI-QM Collective Daily Russell 1000 Growth Equity Index Fund-Lending ("Russell

1000 Growth Lending Fund") and the NTGI-QM Collective Daily Russell 1000 Value Equity Index Fund-Lending ("Russell 1000 Value Lending Fund") were also designated "for investment by [Pontiac Police and Fire] from time to time in such proportions or amounts as [Pontiac Police and Fire] shall direct in writing."   The Pontiac Police and Fire Agreement remains in effect.

91.    The Intermediate Government/Credit, Russell 1000 Growth, and Russell 1000 Value Lending Funds were unregistered NTGI collective funds.  The Russell 1000 Growth and Russell 1000 Value Lending Funds engaged in securities lending; the Intermediate Government/Credit Lending Fund held units in other NTGI lending collective funds that engaged in securities lending.

92.    The Pontiac Police and Fire Agreement reflects that the Declaration of Trust governs the Intermediate Government/Credit, Russell 1000 Growth, and Russell 1000 Value Lending Funds (among other collective funds) and incorporates that Declaration of Trust into the Pontiac Police and Fire Agreement.  As described above, the Declaration of Trust provided that NTI shall not be liable for any losses from the subject investment "except to the extent such loss shall have been caused by its own negligence, willful misconduct, or lack of good faith."

93.    The Fund Declaration specifically creating the Intermediate Government/Credit Lending Fund described that fund's investment objective as follows: "The Fund will be maintained by the Trustee with the objective of providing investment results that approximate the overall performance of the Lehman Brothers Intermediate Government/Credit Index."  The Fund Declaration specifically creating the Russell 1000 Growth Lending Fund described that fund's  investment objective as follows: "The Fund will be maintained by the Trustee with the objective of providing investment results that approximate the overall performance of the common stocks included in the Russell 1000 Growth Index."  The Fund Declaration specifically

112

creating the Russell 1000 Value Lending Fund described that Fund's investment objective as follows: "The Fund will be maintained by the Trustee with the objective of providing investment results that approximate the overall performance of the common stocks included in the Russell 1000 Value Index." Each of these Fund Declarations was incorporated into the Declaration of Trust. Each Fund Declaration expressly stated that the fund could engage in securities lending.

94. Pursuant to the NTI/NTC SLAA, NTC (as securities lending agent) lent out securities held in these funds (or, as to the Intermediate Government/Credit Lending Fund, securities held in the lending collective funds in which the Intermediate Government/Credit Lending Fund held units) to certain borrowers; cash collateral from such loans was invested in Core USA; and any resulting earnings (as defined in the NTI/NTC SLAA) were paid, respectively, to each of the funds (or the funds in which the Intermediate Government/Credit Lending Fund held units). Also pursuant to the NTI/NTC SLAA, each of these funds (or, as to the Intermediate Government/Credit Lending Fund, the lending collective funds in which the Intermediate Government/Credit Lending Fund held units) paid NTC a fee from such securities lending earnings as compensation for NTC's services as securities lending agent; securities lending earnings net of the securities lending fee contributed to the applicable funds' NAVs. The NTI/NTC SLAA also provided that NTC would be liable "only for its negligence or intentional misconduct" and that "[i]n no event shall [NTC] be liable for special, indirect or consequential damages of any kind, even though [NTC] may have been previously informed of the possibility that such damages may occur."

95. At all relevant times, Northern Trust never promised or guaranteed to Pontiac Police and Fire that the investment objective of any of these three funds would be achieved, and

Pontiac Police and Fire was well aware of that fact. In fact, the Fund Declaration for each of the three funds expressly states that: "Investments in the Fund are not deposits or obligations of, or guaranteed by, Northern Trust Investments, N.A. or any of its affiliates" and that "[i]nvestment in the Fund involves the possible loss of principal." Nor did Northern Trust make any promises to Pontiac Police and Fire about the extent to which securities lending would contribute to the ability of any of these funds to achieve its investment objective.

96.     During the alleged putative class period, Pontiac Police and Fire knew that the Russell 1000 Growth and Russell 1000 Value Lending Funds engaged in securities lending and that the Intermediate Government/Credit Lending Fund held units in other NTGI collective funds that engaged in securities lending (all using Core USA for investment of cash collateral from such securities lending), and also knew the amount and identity of securities on loan for each fund, each fund's net income from securities lending, the value of cash and non-cash collateral held on each fund's behalf, the fees earned by NTC, and the identity of each of the fund's substantial borrowers (among other information).

97.     As reflected in the Pontiac Police and Fire Agreement, Pontiac Police and Fire understood and agreed that NTC, an affiliate of NTI, would act as securities lending agent for the fund and understood the nature of and agreed to NTC's fees for that service. Pontiac Police and Fire knew that NTC's securities lending fee for this investment was higher than its fee for acting as lending agent pursuant to Pontiac Police and Fire's SLAA, and Pontiac Police and Fire understood and accepted the differences in these fee structures.

98.     At all times, it was Pontiac Police and Fire's sole decision to determine whether to buy, hold, or sell units in these funds, when to do so, and how many to buy, hold, or sell. Northern Trust did not have discretion to direct such purchases or sales.

114

99.      And, during the alleged putative class period in this case, Pontiac Police and Fire—through non-Northern Trust investment managers—was invested in the very kinds of securities that it now says were a breach of fiduciary duty for Northern Trust to have bought and held in Core USA.  Pontiac Police and Fire and its Board, internal staff, and external consultants had sufficient information about the Core USA cash collateral investment strategy that, if they truly considered the purchase or holding of the securities contained in the Core USA collateral pool to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change Pontiac Police and Fire's investment strategy.  They did not do so.

100.    Pontiac Police and Fire never directed Northern Trust to sell all of its units in the Intermediate Government/Credit, Russell 1000 Growth, and Russell 1000 Value Lending Funds over the alleged putative class period; indeed, it maintained those investments long after the end of the that period and even after there were no restrictions on divestment.

101.    None of the foregoing three funds failed to fulfill its stated investment objective, which was to "approximate" its benchmark index.

102.    In fact, over the alleged putative class period, each of the three funds outperformed its index.

103.    Pontiac Police and Fire did not sustain any compensable injury, loss, or damages in connection with its investment in the Intermediate Government/Credit, Russell 1000 Growth, and Russell 1000 Value Lending Funds.

104.    Pontiac Police and Fire profited from its "indirect" securities lending, even after taking into account losses in Core USA due to a few of the securities held in Core USA.

### Louisiana Firefighters and its Board Made and Maintained the Investments at Issue in this Case with Knowledge of their Potential Risks.

105.    Louisiana Firefighters is a sophisticated investor.

106.    The Louisiana Firefighters Board authorized and directed the investment of Louisiana Firefighters' assets in two of the collective investment funds that are at issue in this case.  In connection with those investment decisions, the Louisiana Firefighters Board chose, supervised, consulted, and directed knowledgeable internal staff and external investment consultants.  Louisiana Firefighters undertook the actions alleged in support of these affirmative defenses at the direction, and with the knowledge, of the Louisiana Firefighters Board as advised by its staff and external consultants.

107.    On March 19, 2002, the Louisiana Firefighters Board entered into an agreement (hereafter, and as amended, the "Louisiana Firefighters Agreement") (attached, with amendments, as Exhibit H) with NTI in which it designated the NTGI-QM Collective Daily S&P 500 Equity Index Fund-Lending ("S&P 500 Lending Fund") "for investment by [Louisiana Firefighters] from time to time in such proportions or amounts as [Louisiana Firefighters] shall direct in writing."

108.    On March 15, 2007, the Louisiana Firefighters Board and NTI amended the Louisiana Firefighters Agreement.  By that amendment, the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Index Fund-Lending ("S&P Mid Cap 400 Lending Fund") was also designated "for investment by [Louisiana Firefighters] from time to time in such proportions or amounts as [Louisiana Firefighters] shall direct in writing."  (The S&P Mid Cap 400 Lending Fund is not the same fund as the S&P Mid Cap 400 SP Lending Fund in which Chicago Teachers invested.)

109.    Both the S&P 500 Lending Fund and the S&P Mid Cap 400 Lending Fund are unregistered NTGI collective investment funds that engaged in securities lending.

110.   The Louisiana Firefighters Agreement reflects that the Declaration of Trust governs the collective funds at issue in this case (which would include the S&P 500 and the S&P Mid Cap 400 Lending Funds) and incorporates that Declaration of Trust into the Louisiana Firefighters Agreement.  As described above, the Declaration of Trust provides that NTI shall not be liable for any losses from the subject investment "except to the extent such loss shall have been caused by its own negligence, willful misconduct, or lack of good faith."

111.   The Fund Declaration specifically creating the S&P MidCap 400 Lending Fund described the fund's investment objective as follows: "The Fund will be maintained by the Trustee with the objective of approximating the risk and return characteristics in the Standard & Poor's Mid Cap 400 Index."  The Fund Declaration specifically creating  the S&P 500 Lending Fund described the fund's investment objective as follows: "The Fund will be maintained by the Trustee with the objective of providing investment results that approximate the overall performance of the common stocks included in the Standard & Poor's® 500 Composite Stock Price Index." Each Fund Declaration was incorporated into the Declaration of Trust.  Both Fund Declarations expressly stated that the funds could engage in securities lending.

112.   Pursuant to the NTI/NTC SLAA, NTC (as securities lending agent) lent out securities held in the S&P Mid Cap 400 Lending Fund to certain borrowers; cash collateral from such loans was invested in Core USA; and any resulting earnings (as defined in the NTI/NTC SLAA) were paid to the S&P Mid Cap 400 Lending Fund.  Also pursuant to the NTI/NTC SLAA, the S&P Mid Cap 400 Lending Fund paid NTC a fee from such securities lending earnings as compensation for NTC's services as securities lending agent; securities lending earnings net of the securities lending fee contributed to the fund's NAV.  And pursuant to the NTI/NTC SLAA, NTC (as securities lending agent) lent out securities held in the S&P 500

Lending Fund to certain borrowers; cash collateral from such loans was invested in the STIF/STEP Custom Collateral Fund; and any resulting earnings (as defined in the NTI/NTC SLAA) were paid to the S&P 500 Lending Fund. Also pursuant to the NTI/NTC SLAA, the S&P 500 Lending Fund paid NTC a fee from such securities lending earnings as compensation for NTC's services as securities lending agent; securities lending earnings net of the securities lending fee contributed to the fund's NAV. The NTI/NTC SLAA also provided that NTC would be liable "only for its negligence or intentional misconduct" and that "[i]n no event shall [NTC] be liable for special, indirect or consequential damages of any kind, even though [NTC] may have been previously informed of the possibility that such damages may occur."

113. At all relevant times, Northern Trust never promised or guaranteed to Louisiana Firefighters that the investment objective of the S&P Mid Cap 400 Lending Fund or the S&P 500 Lending Fund would be achieved, and Louisiana Firefighters was well aware of that fact. In fact, the Fund Declarations for each of the two funds expressly state that: "Investments in the Fund are not deposits or obligations of, or guaranteed by, Northern Trust Investments, N.A. or any of its affiliates" and that "[i]nvestment in the Fund involves the possible loss of principal." Nor did Northern Trust make any promises to Louisiana Firefighters about the extent to which securities lending would contribute to the ability of either fund to achieve its respective investment objective.

114. During the alleged putative class period, Louisiana Firefighters knew that the lending funds in which it had bought units engaged in securities lending, used Core USA for investment of cash collateral from the lending of the S&P Mid Cap 400 Lending Fund's securities, and used the STIF/STEP Custom Collateral Fund for investment of cash collateral from the lending of the S&P 500 Lending Fund's securities. During that same period, Louisiana

Firefighters knew what securities were held in STEP and STIF, the amount and identity of securities on loan per fund, the net income from securities lending, the value of cash and non-cash collateral held on each fund's behalf, the fees earned by NTC, and the identity of each of the fund's substantial borrowers (among other information).

115.    As reflected in the Louisiana Firefighters Agreement, Louisiana Firefighters understood and agreed that NTC, an affiliate of NTI, would act as securities lending agent for the fund and understood the nature of and agreed to NTC's fees for that service.

116.    In the first half of 2008, long before any securities in STEP defaulted in September 2008, Northern Trust made additional disclosures to Louisiana Firefighters about STEP including, without limitation, the identity of the securities held in STEP (including the fixed income securities that experienced a default when Lehman filed for bankruptcy in September 2008); the STEP holdings in floating rate notes and asset and mortgage-backed securities; STEP's exposure to market volatility; negative earnings in STEP; and the effect of unrealized losses in securities held in STEP on the performance of the S&P 500 Lending Fund.

117.    For example, in early April 2008, Louisiana Firefighters was told about unrealized losses in STEP and provided with specific information about STEP's holdings, including the fixed income securities of Lehman, CIT, and Greenpoint and the residential and commercial MBS that are criticized in the second amended complaint (and that, months later, unexpectedly caused certain realized losses).  Knowing all this, Louisiana Firefighters not only did *not* seek to sell its units, but on April 30, 2008, it bought *more* units of both the S&P 500 Lending Fund and the S&P Mid Cap 400 Lending Fund.  Clearly, the risk profile of these investments was and remained acceptable to Louisiana Firefighters.

118.    At all times, it was Louisiana Firefighters' sole decision to determine whether to buy, hold, or sell units in these funds, when to do so, and how many to buy, hold, or sell. Northern Trust did not have discretion to direct such purchases or sales.

119.    At all times relevant to this case, the Louisiana Firefighters and its Board, internal staff, and external consultants had sufficient information about the Core USA collateral pool and the STIF/STEP Custom Collateral Fund that, if they truly considered the purchase or holding of the securities contained in the Core USA collateral pool or the STIF/STEP Custom Collateral Fund to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change Louisiana Firefighters' investment strategy.  They did not do so.

120.    Neither the S&P 500 Lending Fund nor the S&P Mid Cap 400 Lending Fund failed to fulfill its stated investment objective, which was to "approximate" its benchmark index.

121.    Louisiana Firefighters did not sustain any compensable injury, loss, or damages in connection with its investment in the S&P Mid Cap 400 Lending Fund or the S&P 500 Lending Fund.  Indeed, over the alleged putative class period, the S&P Mid Cap 400 Lending Fund outperformed the S&P's Mid Cap 400 Index.

### The "Collateral Deficiency" in Core USA and Northern Trust's Voluntary Payments and Investment Safeguards

122.    As described above, Pontiac Police and Fire and Pontiac General used Core USA for investment of cash collateral from each plan's "direct" securities lending activities.

123.    As also described above, Chicago Teachers invested in the S&P Mid Cap 400 SP Lending Fund; Pontiac Police and Fire invested in the Intermediate Government/Credit Lending Fund, the Russell 1000 Growth Lending Fund, and the Russell 1000 Value Lending Fund; and Louisiana Firefighters invested in the S&P Mid Cap 400 Lending Fund.  Of these, the Intermediate Government/Credit Lending Fund held units in other NTGI lending collective funds

that engaged in securities lending and used Core USA for their cash collateral investment; the remaining four funds used Core USA for investment of cash collateral from each fund's securities lending.

124.    Core USA's assets were valued using an amortized cost methodology rather than using market value and thus, at all relevant times, Core USA was a constant dollar NAV fund. The ratio of the total market value of Core USA's assets to the book (amortized cost) value of those assets is often referred to as the market-to-book ratio; when those values are sufficiently aligned, the value of a unit of Core USA is one dollar.

125.    When Lehman Brothers unexpectedly filed for bankruptcy on September 15, 2008, Core USA was holding certain debt securities of Lehman.  On September 19, 2008, Northern Trust declared a "Collateral Deficiency" in Core USA that was approximately equal to the aggregate difference between the market value of Core USA's assets and their book value. This was the first time in the entire long history of Core USA that such a collateral deficiency had been declared.

126.    Approximately 90% of the Collateral Deficiency was due to decreases in the price of certain Core USA assets constituting unrealized losses.  The rest of the Collateral Deficiency was due to the "realized" impairment of Lehman securities following its bankruptcy filing.

127.    Pontiac Police and Fire; Pontiac General; the S&P Mid Cap 400, the S&P Mid Cap 400 SP, the Russell 1000 Growth, and the Russell 1000 Value Lending Funds; and the NTGI lending collective funds whose units the Intermediate Government/Credit Lending Fund held—among other clients and other NTGI lending collective funds using Core USA for investment of cash collateral from securities lending—were liable, pursuant to their agreements with NTC, for their respective shares of the Collateral Deficiency.  However, Northern Trust did

not require them to immediately pay their shares of the Collateral Deficiency. Instead, Northern Trust posted a payable to each of their respective accounts for each entity's share of the Collateral Deficiency.

128.    Shortly thereafter, on September 29, 2008, Northern Trust announced that it had voluntarily made a payment of approximately $150 million to entities—including Pontiac Police and Fire, Pontiac General, and the foregoing lending collective funds—that used Core USA (among certain other constant dollar NAV collateral pools not involved in this case) for securities lending cash collateral investment, with each entity's portion calculated pro rata based on that entity's share of the Collateral Deficiency.  This was a cash payment by Northern Trust directly to Pontiac Police and Fire and Pontiac General, and also directly to these NTGI lending collective funds (whose NAVs were increased accordingly, directly benefiting investors in those funds).  For example, Pontiac Police and Fire received more than $60,000 and Pontiac General received more than $150,000 from Northern Trust.  These payments from Northern Trust to Pontiac Police and Fire, Pontiac General, and the affected funds was not required under or mandated by any contract or law.

129.    Also on September 29, 2008, Northern Trust announced that it would voluntarily reduce (and it did in fact reduce) its securities lending fees by 20% for a one-year period (from October 1, 2008 through September 30, 2009) for the same entities described immediately above. So, for example, in the case of the lending collective funds whose contractual obligation under the NTI/NTC SLAA was to pay a 40% fee out of securities lending earnings to NTC as securities lending agent, that fee was reduced to 32% for twelve months.  As another example, in the case of Pontiac Police and Fire and Pontiac General, whose contractual obligation under the Pontiac Police and Fire SLAA and the Pontiac General SLAA, respectively, was to pay a 35% fee out of

securities lending earnings to NTC as securities lending agent, that fee was reduced to 28% for twelve months. Because these entities continued to engage in securities lending over the alleged putative class period—and because Core USA's assets continued to generate income over that period—these fee reductions resulted in the payment of lower securities lending fees (and the retention of greater securities lending earnings) by each of them. For example, Pontiac Police and Fire was benefited by more than $9,800 and Pontiac General was benefited by more than $26,000 by these direct fee concessions from Northern Trust. The benefit to the lending collective funds was to increase their NAVs, directly benefiting investors in those funds. This fee reduction was not required under or mandated by any contract or law; to the contrary, the reduced fee was lower than the fee that NTC was otherwise entitled to under the applicable securities lending agreements.

130. As of November 30, 2009, Northern Trust partially reversed the unrealized loss portion of the Collateral Deficiency in Core USA after concluding that the market values of securities held in Core USA had recovered to the point that such a reversal was appropriate. On March 15, 2010, Northern Trust announced the reversal of the remaining unrealized portion of the Collateral Deficiency in Core USA, thereby extinguishing the remaining portion of that Collateral Deficiency in full. These reversals eliminated the unrealized loss portions of the payables described in paragraph 127 above that were remaining at the time of the reversals.

131. The portion of Northern Trust's voluntary $150 million payment described above paid to those entities using Core USA for investment of securities lending cash collateral in this case was *larger than* the share of realized losses in Core USA due to the Lehman impairments, both individually and in the aggregate.

132.     The foregoing voluntary payments and fee reductions by Northern Trust; the recovery in the value of securities that led to the reversal of the unrealized loss portion of the Collateral Deficiency; and the sales of Lehman securities that had been held by Core USA (among other factors) eliminated or substantially reduced any alleged loss, injury, or damage to Pontiac Police and Fire, Pontiac General, and the foregoing lending collective funds.

133.     In September and October 2008, after Lehman's bankruptcy filing, Northern Trust first imposed investment safeguards that created an equitable process for a client wanting to fully terminate its "direct" or "indirect" securities lending investments under which some of the proceeds of such a divestment would include certain "in-kind" securities in addition to cash. Even then, there were no limitations on the ability of the Plans and the Boards to make ordinary course redemptions and withdrawals from those investments (including for payment of benefits). Moreover, Northern Trust implemented procedures as early as September 25, 2008 to allow "direct" lenders to fully terminate their "direct" securities lending investments, and as early as January 2009 to allow "indirect" lenders to fully terminate their "indirect" securities lending investments.  Of the plaintiffs, only Louisiana Firefighters took advantage of those procedures in terminating its investments in the S&P 500 Lending Fund and the S&P Mid Cap 400 Lending Fund.

\*     \*     \*

Based upon the foregoing allegations, Northern Trust's answers to the second amended complaint, and the allegations set forth below, Northern Trust asserts the following affirmative defenses (without assuming, or admitting that it has, the burden of proof on such affirmative defenses or any fact, issue, or element of same):

## FIRST AFFIRMATIVE DEFENSE

**(Comparative Fault: Pontiac Police and Fire Board, Pontiac General Board, and Others)**

Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-133 in support of its affirmative defenses as if fully set forth herein.

134.    As described above, Pontiac Police and Fire and Pontiac General, along with their Boards, chose the cash collateral investment strategy for their Plans' "direct" securities lending and knew of and approved those strategies.

135.    As also described above, Pontiac Police and Fire and its Board chose to invest Plan assets in the Intermediate Government/Credit, Russell 1000 Growth, and Russell 1000 Value Lending Funds full knowing about, and choosing to incur the investment risk associated with, their participation in securities lending.

136.    Accordingly, the conduct of these Plans (with their Boards, staffs, and consultants) directly and proximately caused, and contributed to the cause, of any alleged losses to the Plans from their "direct" and "indirect" securities lending investments, and they are substantially more at fault than Northern Trust.

137.    Any recovery by Pontiac Police and Fire and Pontiac General, and/or their Boards, should be barred or reduced pursuant to the contributory or comparative negligence, fault, responsibility, or causation of others, including, but not limited to, these Plans, their Boards, and their staffs and consultants.

## SECOND AFFIRMATIVE DEFENSE
**(Independent Superseding Cause: All Plaintiffs)**

138.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-137 in support of its affirmative defenses as if fully set forth herein.

139.    At all times relevant to this case, each of the Plans and each of their Boards possessed and retained ultimate control and discretion over the investment of plan assets.

140.    At all times relevant to this case the Plans and their Boards knew and understood the composition, holdings, and investment guidelines of the cash collateral investment vehicle used in their securities lending investments (including the STIF/STEP Custom Collateral Fund, Core USA, and/or the Chicago Teachers Custom Collateral Portfolio).  If, as plaintiffs allege, the market and economic conditions during and before the alleged putative class period so clearly rendered these vehicles imprudent, overly risky, and likely to sustain greater losses if maintained rather than sold—which Northern Trust denies—then the Plans and their Boards should have reduced, limited, or terminated their securities lending investments or changed their investment strategies.  They did not; the Plans and their Boards continued to maintain their "direct" and "indirect" securities lending investments at issue in this case.

141.    In fact, the losses experienced by securities held in the STIF/STEP Custom Collateral Fund, Core USA, and the Chicago Teachers Custom Collateral Portfolio were due to unprecedented and unexpected market events—including (without limitation) Lehman's bankruptcy filing and its aftermath—that Northern Trust did not predict and could not have predicted.

142.    If Northern Trust committed any wrongful act, which it denies, the superseding investment decisions made by the Plans and their Boards and/or the unprecedented and

unexpected market events broke the causal relationship between any such alleged wrongful act by Northern Trust and plaintiffs' claims of loss, injury, or damages.

143.    The Plans and the Boards cannot recover for any loss, injury, or damages because any such any loss, injury, or damage was due, in whole or in part, to an independent superseding cause.

**THIRD AFFIRMATIVE DEFENSE**
**(Failure to Mitigate: All Plaintiffs)**

144.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-143 in support of its affirmative defenses as if fully set forth herein.

145.    At all times relevant to this case, the Plans and their Boards, internal staffs, and external consultants had detailed information about the investment strategies and risks associated with the Plans' "direct" and "indirect" securities lending investments.  If they truly considered the purchase or holding of the securities held in the STIF/STEP Custom Collateral Fund, Core USA, or the Chicago Teachers Custom Collateral Portfolio to have constituted a breach of contract or a breach of trust or fiduciary duties, they had an obligation to reduce, limit, or terminate their "direct" or "indirect" securities lending investments or to change their securities lending investment strategies so as to mitigate any alleged damages.  They did not do so.

146.    At numerous points in time, the Plans and their Boards could have taken reasonable steps to avoid all, or could have substantially reduced, alleged losses associated with their "direct" or "indirect" securities lending investments.  For example, the Plans and the Boards could have terminated their securities lending investments using Core USA as a cash collateral investment vehicle before Lehman's bankruptcy filing in September 2008; had they done so, all alleged losses from securities lending would have been avoided.  As another example, before

September 2008, Chicago Teachers and Louisiana Firefighters could have reduced or terminated their securities lending investments using, respectively, the Chicago Teachers Custom Collateral Portfolio or the STIF/STEP Custom Collateral Fund as a cash collateral vehicle; had they done so, alleged losses from securities lending would have been greatly reduced.

147.    The Plans and the Boards cannot recover for any loss, injury, or damages because of their failure to mitigate against such loss, injury, or damages (which would have to be reduced or eliminated accordingly).

**FOURTH AFFIRMATIVE DEFENSE**
**(Waiver: All Plaintiffs)**

148.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-147 in support of its affirmative defenses as if fully set forth herein.

149.    Plaintiffs have alleged that the purchase or holding of the securities contained in the STIF/STEP Custom Collateral Fund, Core USA, and/or the Chicago Teachers Custom Collateral Portfolio was a breach of contract or a breach of trust or fiduciary duties. Before making the "direct" and "indirect" securities lending investments at issue in this case, however, the Plans and the Boards well knew how cash collateral from securities lending was invested and affirmatively and knowingly chose to make and maintain those investments and to accept the benefits from those investments. After making those investments, the Plans and the Boards learned additional details about how such cash collateral was invested and how it was performing, and the Plans and the Boards continued affirmatively and knowingly to maintain those investments and accept their benefits. Indeed, at times they even increased their securities lending exposure to what plaintiffs now claim were overly risky and "exotic" securities, with full

knowledge of the identity, nature, and risks of those investments and of the relevant acts of Northern Trust.

150.    If the Plans and their Boards truly considered the purchase or holding of the securities contained in the STIF/STEP Custom Collateral Fund, Core USA, and/or the Chicago Teachers Custom Collateral Portfolio to have constituted a breach of contract or a breach of trust or fiduciary duties, they had an obligation to reduce, limit, or terminate their "direct" or "indirect" securities lending investments and/or to change their securities lending investment strategies and pursue any other available remedies.  At numerous points in time, the Plans and their Boards could have avoided all or substantially reduced any alleged loss, injury, or damages associated with their "direct" or "indirect" securities lending investments by reducing, limiting, or terminating those investments; they did not do so.  The Plans and their Boards could not decide to maintain their investments to "see how they turned out" and then sue for any alleged loss, injury, or damage resulting from taking such calculated risks.  By knowingly maintaining their investments at the relevant times, the Plans and the Boards relinquished any right to claim loss, injury, or damages caused by such investments.

151.    The Plans and the Boards cannot recover for any loss, injury, or damages because they waived seeking or obtaining any relief due to the alleged acts and omissions of Northern Trust as alleged in the second amended complaint, including, without limitation, for relief based on their knowing waiver of their claims when they decided to make, increase, and maintain investments with awareness of the risks of those investments.

## FIFTH AFFIRMATIVE DEFENSE
### (Ratification: All Plaintiffs)

152.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-151 in support of its affirmative defenses as if fully set forth herein.

153.     The Plans and the Boards were put on notice of the facts that now form the basis of their claims, but nevertheless chose to accept the benefits of, and move forward with, their investments.   The Plans and their Boards intentionally ratified their "direct" and "indirect" securities lending investments and the guidelines applicable to and the investments made in connection with the STIF/STEP Custom Collateral Fund, Core USA, and the Chicago Teachers Custom Collateral Portfolio with full knowledge of the risks of such investments.

154.     The Plans and the Boards are therefore barred, in whole or in part, from seeking or obtaining any relief in this case because they ratified the alleged acts and omissions of Northern Trust as alleged in the second amended complaint.

### SIXTH AFFIRMATIVE DEFENSE
**(Acquiescence: All Plaintiffs)**

155.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-154 in support of its affirmative defenses as if fully set forth herein.

156.     The Plans and their Boards intentionally acquiesced in the "direct" and "indirect" securities lending investments they made and the guidelines applicable to and the investments made in connection with the STIF/STEP Custom Collateral Fund, Core USA, and the Chicago Teachers Custom Collateral Portfolio with full knowledge of the risks of such investments

157.     The Plans and the Boards are therefore barred, in whole or in part, from seeking or obtaining any relief in this case because they acquiesced in the alleged acts and omissions of Northern Trust as alleged in the second amended complaint.

## SEVENTH AFFIRMATIVE DEFENSE
### (Assumption of Risk: All Plaintiffs)

158.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs'
second amended complaint and the allegations set forth in paragraphs 1-157 in support of its
affirmative defenses as if fully set forth herein.

159.     In each of the securities lending agreements at issue in this case—the Chicago
Teachers SLA, the Pontiac Police and Fire SLAA, and Pontiac General SLAA, the Chicago
Teachers Agreement, the Pontiac Police and Fire Agreement, the Louisiana Firefighters
Agreement, and the NTI/NTC SLAA—the Plans and their Boards assumed the risk of loss from
investment of cash collateral from their "direct" and "indirect" securities lending investments.

160.     The Plans and their Boards intentionally and knowingly assumed the risks of their
"direct" and "indirect" securities lending investments and the guidelines applicable to and the
investments made in connection with the STIF/STEP Custom Collateral Fund, Core USA, and
the Chicago Teachers Custom Collateral Portfolio with full knowledge of the risks of such
investments.

161.     The Plans and the Boards are therefore barred, in whole or in part, from seeking
or obtaining any relief in this case because they impliedly and expressly assumed the risk of the
alleged acts and omissions of Northern Trust as alleged in the second amended complaint.

## EIGHTH AFFIRMATIVE DEFENSE
### (Estoppel: All Plaintiffs)

162.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs'
second amended complaint and the allegations set forth in paragraphs 1-161 in support of its
affirmative defenses as if fully set forth herein.

163.     The Plans and the Boards affirmatively and knowingly chose to make the "direct" and "indirect" securities lending investments in this case and to maintain those investments with full knowledge of the risks of such investments as market and economic conditions developed over the course of the alleged putative class period.  Had any one of these Plans or their Boards, at any relevant time, determined that the risk associated with these cash collateral investment strategies was or had become imprudent or unacceptable to it, it should have disclosed that determination to Northern Trust and instructed Northern Trust to reduce, limit, or terminate the investments.  At the relevant times, the Plans and the Boards did not disclose any such concerns to Northern Trust or direct changes in their investments, instead waiting to see "how their investments turned out" before claiming that the investments were unduly risky and imprudent.

164.     Northern Trust reasonably relied to its detriment on the words, actions, and omissions of the Plans and their Boards as approval of and satisfaction with their "direct" and "indirect" securities lending investments.

165.     The Plans and their Boards are therefore estopped from obtaining any relief due to the alleged actions and omissions of Northern Trust as alleged in the second amended complaint.

## NINTH AFFIRMATIVE DEFENSE
### (Contract Conditions Under the Declaration of Trust: Chicago Teachers Board, Pontiac Police and Fire Board, and Louisiana Firefighters)

166.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-165 in support of its affirmative defenses as if fully set forth herein.

167.     The collective funds at issue in this case—the S&P Mid Cap 400 Lending Fund, the S&P Mid Cap 400 SP Lending Fund, the Intermediate Government/Credit Lending Fund, the Russell 1000 Growth Lending Fund, the Russell 1000 Value Lending Fund, and the S&P 500

Lending Fund (collectively, the "Six Lending Funds")—were governed by the Declaration of Trust (and each fund's respective Fund Declaration incorporated into that Declaration of Trust). NTI's rights and responsibilities as Trustee thereunder and the rights and responsibilities of investors (such as the Plans and/or their Boards) in the Six Lending Funds established thereunder are governed by the Declaration of Trust. The Chicago Teachers Agreement, the Pontiac Police and Fire Agreement, and the Louisiana Firefighters Agreement all expressly acknowledge that the Six Lending Funds are maintained under the Declaration of Trust and that the Declaration of Trust is made a part of the foregoing Agreements.

168.    At all relevant times, section 4.08 of the Declaration of Trust provided that an annual financial report would be prepared for the Six Lending Funds (among other collective funds governed by the Declaration of Trust) and furnished (or furnished upon request after notice) to investors in such funds. Such financial reports contained the financial statements of the Six Lending Funds (among others, including the financial statements of those funds in which the Intermediate Government/Credit Lending Fund held units) and were furnished and sent to investors in those funds (including the referenced Plans and their Boards) on an annual basis in compliance with the Declaration of Trust. These Plans and their Boards received such reports annually. These reports contained extensive information and disclosures about the Six Lending Funds (as well as the lending collective funds in which the Intermediate Government/Credit Lending Fund held units), including their securities lending activities, their cash collateral investment strategies, their amounts and identities of securities on loan, their NAVs, the declaration and amount of the Collateral Deficiency as it pertained to the affected lending collective funds, and the existence and effect of losses in STEP as they pertained to the

STIF/STEP Custom Collateral Fund and lending collective funds using that vehicle for investment of cash collateral from securities lending.

169.    At all relevant times, section 4.08(b) of the Declaration of Trust provided that if a collective fund investor does not file written objections to the referenced reports with NTI within 60 days after the report is sent by the Trustee, the financial report "shall be deemed to have been approved with the same effect as though judicially approved by a court of competent jurisdiction in a proceeding in which all persons interested were made parties and were properly represented before such court, and, to the fullest extent permitted by applicable law, the Trustee [NTI] shall be released and discharged from liability and accountability with respect to the propriety of its acts and transactions disclosed in the report."  The "acts and transactions disclosed in the report" include all aspects of securities lending by the Six Lending Funds (among other lending collective funds, including those in which the Intermediate Government/Credit Lending Fund held units), including that they engaged in securities lending, the cash collateral investment vehicles used for such lending and any losses associated with them, the full financial statements of STEP and STIF (including their specific holdings), the percentage and identity of each fund's securities on loan, the amount of NTC's fees from each fund, and the declaration and amount of the Collateral Deficiency.

170.    At all times relevant to this case, the referenced Plans and their Boards, internal staffs, and external consultants had the knowledge and ability to timely file such contractually-required objections with NTI concerning the acts and transactions disclosed in the reports.  They never filed such timely objections, and therefore any claims (including breach of fiduciary duty and breach of contract claims) based on the acts or transactions of NTI with respect to the Six Lending Funds (and any of the lending collective funds in they held units) have been released

and discharged from liability and accountability with respect to the propriety of such acts and transactions pursuant to the Declaration of Trust**.**

## TENTH AFFIRMATIVE DEFENSE
### (Contract Conditions Under the Declaration of Trust: Chicago Teachers Board, Pontiac Police and Fire Board, and Louisiana Firefighters)

171.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-170 in support of its affirmative defenses as if fully set forth herein.

172.    At all relevant times, sections 3.02 and 3.07, among other provisions, of the Declaration of Trust granted the NTI full discretion, control, and management of the Six Lending Funds (and other lending collective funds including those in which the Intermediate Government/Credit Lending Fund held units); section 3.02, for example, provided that NTI's "determination as to whether any investment, investment technique, or strategy is within the class or classes of investment in which a Fund may invest, and as to whether any particular investment technique or strategy is consistent with the guidelines, policies, and objectives of a Fund, shall be conclusive."  NTI was authorized under Section 3.07(d) to "lend securities" of the collective funds governed by the Declaration of Trust (including the Six Lending Funds), in connection with which, NTI and NTC entered into the NTI/NTC SLAA.

173.    At all relevant times, section 5.02 of the Declaration of Trust provided that NTI shall not be liable for any "purchase, retention, sale, or exchange of any investment, or for any loss in connection therewith, except to the extent such loss shall have been caused by its own negligence, willful misconduct, or lack of good faith."

174.    As Trustee under the Declaration of Trust, NTI always acted in good faith, with due care, and without negligence or willful misconduct, and accordingly, NTI has no liability to the Plans and the Boards.

175.     To the extent any injury, loss, or damage to these Plans or Boards can be established in this case (which Northern Trust denies), they would have been caused, in whole or in part, by the acts and omissions of these Plans or Boards (and their staffs and consultants), and not by NTI, which is not liable for the consequences of those acts and omissions.

176.     Moreover, because, under the express terms of the Declaration of Trust, NTI is liable only for alleged losses "to the extent" they are caused by "its own negligence, willful misconduct, or lack of good faith," any relief against NTI must be limited accordingly.

177.     The relief claimed by the Plans and the Boards must therefore be reduced or extinguished to the extent the relief claimed was caused by their own acts or omissions or the acts or omissions of their staffs, consultants, or others.

## ELEVENTH AFFIRMATIVE DEFENSE
**(Contract Conditions Under the NTI/NTC SLAA: Chicago Teachers Board, Pontiac Police and Fire Board, and Louisiana Firefighters)**

178.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-177 in support of its affirmative defenses as if fully set forth herein.

179.     At all relevant times, securities lending by the Six Lending Funds (and by the lending collective funds in which the Intermediate Government/Credit Lending Fund held units) was governed by the NTI/NTC SLAA.  Pursuant to that agreement, NTC acted as lending agent. In its role as lending agent, NTC performed numerous functions, including (without limitation) lending the securities of the Six Lending Funds (among those of other lending collective funds), entering into agreements with borrowers of such securities, and taking various actions with respect to NTI's selection of cash collateral investment vehicle (Core USA and the STIF/STEP Custom Collateral Fund).

180.    Section 9.4 of the NTI/NTC SLAA provided that NTC would be liable "only for its negligence or intentional misconduct" and that "[i]n no event shall [NTC] be liable for special, indirect or consequential damages of any kind, even though [NTC] may have been previously informed of the possibility that such damages may occur."

181.    As lending agent under the NTI/NTC SLAA, NTC always acted in good faith, with due care, and without negligence or willful misconduct, and accordingly, it has no liability to the Plans and the Boards.

182.    To the extent any injury, loss, or damage to these Plans or Boards can be established in this case (which Northern Trust denies), they would have been caused, in whole or in part, by the acts and omissions of these Plans or Boards (and their staffs and consultants), and not by NTC, which is not liable for the consequences of those acts and omissions.

183.    Moreover, because, under the express terms of the NTI/NTC SLAA, NTC may be liable "only for its negligence or intentional misconduct," any relief against NTC must be limited accordingly.

184.    The express terms of the NTI/NTC SLAA also provide that NTC cannot be liable for any "special, indirect or consequential damages of any kind."

185.    The relief claimed by the Plans and the Boards must therefore be reduced or extinguished to the extent the relief claimed was caused by their own acts or omissions or the acts or omissions of their staffs, consultants, or others.  Moreover, their damages must be limited by the terms of the NTI/NTC SLAA.

## TWELFTH AFFIRMATIVE DEFENSE
### (Contract Conditions: Chicago Teachers Board)

186.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-185 in support of its affirmative defenses as if fully set forth herein.

187.     On about October 25, 1989, the Chicago Teachers Board and NTC entered into a Master Custody Agreement (attached, with amendments, as Exhibit I) ("Chicago Teachers Master Custody Agreement").  The Chicago Teachers Master Custody Agreement authorizes NTC to create an "Account" for the custody of any assets that Chicago Teachers' chooses to transfer to that Account.

188.     The Chicago Teachers Master Custody Agreement contains numerous provisions that govern Chicago Teachers' "direct" securities lending activities.  For example, it provides that the Chicago Teachers Board and Treasurer may engage NTC to lend the securities in the referenced Chicago Teachers' custody Account.  And it sets NTC's securities lending fees applicable to such "direct" securities lending by Chicago Teachers.

189.     The Chicago Teachers Master Custody Agreement also contains Chicago Teachers' instructions as to how NTC is to invest funds allocated to the defined "Sub-account." (*E.g.*, Exhibit I, January 20, 1995 letter amendment.)  The Chicago Teachers SLA instructs NTC to invest cash collateral from securities lending in this Sub-account (which constitutes the Chicago Teachers Custom Collateral Portfolio).

190.     Paragraph 15 of the Chicago Teachers Master Custody Agreement provides for NTC to deliver periodic statements of account concerning receipts, disbursements, property, and market value in all of Chicago Teachers' Sub-accounts, including the Sub-account constituting the Chicago Teachers Custom Collateral Portfolio, which NTC did.  Those statements of account provided detailed reporting—delivered as frequently as daily to Chicago Teachers—on Chicago

Teachers' "direct" securities lending investments, including (without limitation): the income that Chicago Teachers had earned from securities lending (including any periodic unrealized or realized losses from the securities in which cash collateral was invested); fees from securities lending; detailed reports of assets and liabilities; and the identity and volumes of the securities out on loan.

191. Paragraph 15 of the Chicago Teachers Master Custody Agreement provides that: "An account shall be approved by the Board by written notice delivered to [NTC] or by failure to object to the account within six months of the date upon which the account was delivered to the Board. To the extent permitted by law, the approval of an account shall constitute a full and complete discharge to [NTC] to all matters set forth in that account." The "matters set forth in the referenced account" include all aspects of Chicago Teachers' "direct" securities lending investments, including gains and losses from securities lending and securities lending fees.

192. At all times relevant to this case, Chicago Teachers and its Board, internal staff, and external consultants had the knowledge and ability to timely make such a contractually-required objection to the matters set forth in the periodic statements of account. They never filed such a timely objection. Accordingly, Chicago Teachers and its Board have fully and completely discharged NTC from "all matters set forth" in those accounts, including any alleged losses or damages associated with "direct" securities lending.

193. Moreover, because, under the express terms of the Chicago Teachers SLA, NTC may not be liable for any non-direct losses or damages, any relief thereunder against NTC must be limited accordingly.

<u>**THIRTEENTH AFFIRMATIVE DEFENSE**</u>
**(Contract Conditions: Pontiac Police and Fire Board)**

139

194.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-193 in support of its affirmative defenses as if fully set forth herein.

195.     On about January 2, 2007, the Pontiac Police and Fire Board and NTC entered into a Master Custody Agreement (attached as Exhibit J) ("Pontiac Police and Fire Master Custody Agreement").  The Pontiac Police and Fire Master Custody Agreement authorizes NTC to create an "Account" for the custody of any assets that Pontiac Police and Fire chooses to transfer to that Account.

196.     The Pontiac Police and Fire Master Custody Agreement contains provisions that govern Pontiac Police and Fire's "direct" securities lending activities.  For example, it provides that the Pontiac Police and Fire Board "may authorize [NTC] to lend securities of the Account held by [NTC] pursuant to a separate written agreement between [NTC] and the [Pontiac Police and Fire] Board."  That same section also spells out certain conditions for such securities lending.  The Pontiac Police and Fire SLAA is the "separate written agreement" described in paragraph 19 of the Pontiac Police and Fire Master Custody Agreement and concerns the lending of securities in the "Account" that is the subject of that Master Custody Agreement.

197.     With reference to this same Account that engages in securities lending, paragraph 17 of the Pontiac Police and Fire Master Custody Agreement provides for NTC to deliver certain statements of account concerning the receipts, disbursements, property, and market value of that Account, which NTC did.  Those statements of account included detailed reporting—delivered as frequently as daily to Pontiac Police and Fire—on its "direct" securities lending investments, including (without limitation): the income that it received from securities lending, the amount of NTC's fee, the identity of the securities of Pontiac Police and Fire on loan, and (in consolidated

monthly reports showing the Plan's assets and liabilities in NTC's custody) Pontiac Police and Fire's Collateral Deficiency payable and changes to that payable.

198.    Paragraph 17 of the Pontiac Police and Fire Master Custody Agreement provides that: "A statement of account shall be approved by the Board by written notice delivered to [NTC] or by failure to object to the statement of account within one (1) year of the date upon which the account was delivered to the Board.  To the extent permitted by law, the approval of a statement of account shall constitute a full and complete discharge to [NTC] as to all matters set forth in that statement of account."   The phrase "all matters set forth in that statement of account" includes all aspects of Pontiac Police and Fire's "direct" securities lending investments, including Pontiac Police and Fire's Collateral Deficiency payable and changes to that payable, gains and losses from securities lending, and securities lending fees.

199.    At all times relevant to this case, Pontiac Police and Fire and its Board, internal staff, and external consultants had the knowledge and ability to timely make such a contractually-required objection to the matters set forth in the periodic statements of account. They never filed such a timely objection.  Accordingly, Pontiac Police and Fire has fully and completely discharged NTC from "all matters set forth in that account," including for any claims of loss, injury, or damages associated with "direct" securities lending.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Contract Conditions: Pontiac General Board)

200.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-199 in support of its affirmative defenses as if fully set forth herein.

201.    On about January 2, 2007, the Pontiac General Board and NTC entered into a Master Custody Agreement (attached as Exhibit K) ("Pontiac General Master Custody

Agreement").  The Pontiac General Master Custody Agreement authorizes NTC to create an "Account" for the custody of assets that Pontiac General chooses to transfer to that Account.

202.    The Pontiac General Master Custody Agreement contains provisions that govern Pontiac General's "direct" securities lending activities.  For example, it provides that the Pontiac General Board "may authorize [NTC] to lend securities of the Account held by [NTC] pursuant to a separate written agreement between [NTC] and the [Pontiac General] Board."  That same section also spells out certain conditions for such securities lending.  The Pontiac General SLAA is the "separate written agreement" described in paragraph 19 of the Pontiac General Master Custody Agreement and concerns the lending of securities in the "Account" that is the subject of that Master Custody Agreement.

203.    With reference to this same Account that engages in securities lending, paragraph 17 of the Pontiac General Master Custody Agreement provides for NTC to deliver certain statements of account concerning the receipts, disbursements, property, and market value of that Account, which NTC did.  Those statements of account included detailed reporting—delivered as frequently as daily to Pontiac General—on its "direct" securities lending investments, including (without limitation): the income received from securities lending, the amount of NTC's fee, the identity of the securities of Pontiac General on loan, and (in consolidated monthly reports showing the Plan's assets and liabilities in NTC's custody) Pontiac General's Collateral Deficiency payable and changes to that payable.

204.    Paragraph 17 of the Pontiac General Master Custody Agreement provides that: "A statement of account shall be approved by the Board by written notice delivered to [NTC] or by failure to object to the statement of account within one (1) year of the date upon which the account was delivered to the Board.  To the extent permitted by law, the approval of a statement

of account shall constitute a full and complete discharge to [NTC] as to all matters set forth in that statement of account." The phrase "all matters set forth in that statement of account" includes all aspects of Pontiac General's "direct" securities lending investments, including Pontiac General's Collateral Deficiency payable and changes to that payable, gains and losses from securities lending, and securities lending fees.

205. At all times relevant to this case, Pontiac General and its Board, staff, and consultants had the knowledge and ability to timely make such a contractually-required objection to the matters set forth in the periodic statements of account. They never filed such a timely objection. Accordingly, Pontiac General has fully and completely discharged NTC from "all matters set forth in that account," including for any claims of loss, injury, or damages associated with "direct" securities lending.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Full or Partial Payment: All Plaintiffs)

206. Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-205 in support of its affirmative defenses as if fully set forth herein.

207. As alleged in paragraphs 128-132 herein, after an announcement on September 29, 2008, Northern Trust voluntarily contributed $150 million to certain securities lending entities. This voluntary contribution had the effect of eliminating or reducing any alleged losses to these entities due to the securities lending investments at issue in this case.

208. NTC further voluntarily waived, for the period from October 1, 2008 through September 30, 2009, 20% of the securities lending fees that NTC was contractually entitled to from these same entities under the Chicago Teachers SLA, the Pontiac Police and Fire SLAA, the Pontiac General SLAA, and the NTI/NTC SLAA. This voluntary fee concession had the

effect of eliminating or reducing any alleged losses to these entities due to the securities lending investments at issue in this case

209.     Both the contributions and the fee concessions described above provided immediate and direct cash benefits to Chicago Teachers, Pontiac Police and Fire, and Pontiac General (and their Boards) and to the affected lending collective funds.

210.     The Plans and their Boards, and the affected lending collective funds, received and accepted these benefits, which eliminated and/or reduced any alleged claim for loss, injury, or damages in this case.  Accordingly, any relief awarded in this case must be reduced by the full value of these amounts voluntarily paid, and to these fee concessions voluntary made, by Northern Trust.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (No Standing: All Plaintiffs)

211.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-210 in support of its affirmative defenses as if fully set forth herein.

212.     Neither the Plans nor the Boards incurred any loss, injury, or damages as a result of the conduct alleged against Northern Trust in the second amended complaint.

213.     In fact, the Boards and Plans profited from their securities lending investments and those investments achieved their objectives.

214.     Plaintiffs' claims are therefore barred, in whole or in part, because they lack standing to bring one or more of the claims alleged, including to bring claims as a class action.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Recovery Barred By the Acts or Omissions of the Plans and Their Boards: All Plaintiffs)

215.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-214 in support of its affirmative defenses as if fully set forth herein.

216.    The Plans and their Boards were obligated, and had fiduciary duties, to prudently invest the plan assets.  Each Plan and its Board was responsible for making—and in fact made—the decision to engage in "direct" and/or "indirect" securities lending and knowingly chose the cash collateral investment strategy for its "direct" lending activities and knowingly accepted the cash collateral investment strategies of the Six Lending Funds.  Because the Plans and their Boards actively made the investment decisions at issue here with full information and open eyes, they cannot impose liability onto Northern Trust for any or all alleged losses resulting from those investments.

217.    The claims of the Plans and their Boards are therefore barred, in whole or in part, because if they sustained any loss, injury, or damage—which Northern Trust denies—any such loss, injury, or damage was due, in whole or in part, to their own actions and/or omissions.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (No Loss, Injury, or Damages: All Plaintiffs)

218.    Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-217 in support of its affirmative defenses as if fully set forth herein.

219.    Plaintiffs have sustained no loss, injury, or damages and their claims are therefore barred, in whole or in part.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Compliance with All Applicable Agreements: All Plaintiffs)

220.     Northern Trust incorporates by reference and re-alleges its answers to plaintiffs' second amended complaint and the allegations set forth in paragraphs 1-219 in support of its affirmative defenses as if fully set forth herein.

221.     The second amended complaint should be dismissed because Northern Trust at all times complied with, and acted prudently and appropriately and well within its discretion under, the Chicago Teachers Agreement and SLA; the Pontiac Police and Fire Agreement and SLAA; the Pontiac General SLAA; the Louisiana Firefighters Agreement; the Chicago Teachers Master Custody Agreement; the Pontiac Police and Fire Master Custody Agreement; the Pontiac General Master Custody Agreement; the Declaration of Trust; the NTI/NTC SLAA; the guidelines applicable to the STIF/STEP Custom Collateral Fund, Core USA, and the Chicago Teachers Custom Collateral Portfolio; and all of the Plans' other applicable agreements.


*     *     *

Northern Trust reserves the right to amend these defenses to assert additional defenses to the full extent permitted by the Federal Rules of Civil Procedure.

146

### NTC'S COUNTERCLAIM FOR BREACH OF CONTRACT AGAINST THE CHICAGO TEACHERS BOARD

NTC[4] brings this counterclaim for breach of contract against the Chicago Teachers Board.

### The Parties, Jurisdiction, and Venue

1.      Defendant/counter-plaintiff NTC is an Illinois state banking corporation with its principal place of business in Chicago, Illinois.

2.      Plaintiff/counter-defendant Chicago Teachers Board governs and has the duty to invest Chicago Teachers' assets.

3.      This Court has supplemental jurisdiction over the counterclaim pursuant to 28 U.S.C. § 1367 because this claim is related to the claims alleged in plaintiffs' second amended complaint, arises out of a common nucleus of operative fact, and is part of the same case or controversy.

4.      Venue over the counterclaim is proper in the Northern District of Illinois because counter-defendant resides in this district and counter-defendant's actions giving rise to the claims asserted herein occurred in this district.

### Counterclaim Allegations

5.      Northern Trust repeats and realleges the allegations in paragraphs 1 through 221 of its affirmative defenses and the preceding paragraphs of its counterclaim as if fully set forth herein.

6.      At all times relevant to this counterclaim, the Chicago Teachers Board was acting as trustee and fiduciary of, and on behalf of, Chicago Teachers and as the party to the agreements described herein pursuant to which relief under this counterclaim is sought.

---

[4]      Defined terms in this counterclaim are the same as in the affirmative defenses.

7.     On or about June 28, 1990, the Chicago Teachers Board (on behalf of Chicago Teachers) and NTC entered into the Chicago Teachers SLA.  At all relevant times, the Chicago Teachers SLA was and is a valid contract that remains in effect.

8.     The Chicago Teachers SLA provides the terms and conditions of securities lending by Chicago Teachers and the Board and of NTC's role as securities lending agent under that agreement.  As the lending agent, NTC arranged for certain securities of Chicago Teachers and the Board to be "loaned" to certain third-party borrowers ("Borrowers"), who provided collateral for the loans pursuant to the Chicago Teachers SLA.  When Borrowers paid that collateral in cash, the cash was invested pursuant to instructions provided by Chicago Teachers and it Board to NTC (and which NTC followed).  NTC always complied with all of these instructions and invested such cash collateral prudently and in compliance with the Chicago Teachers SLA and all applicable agreements, laws, and regulations.  The Chicago Teachers SLA provides that, as such loans were and are terminated, cash collateral has to be returned in full to the Borrowers.  Chicago Teachers and the Board paid NTC a "fee" for its services as securities lending agent based on a negotiated percentage of securities lending earnings generated from securities lending by Chicago Teachers and the Board.

9.     At all times relevant to this counterclaim, the Chicago Teachers SLA provided that cash collateral from the lending of the subject securities would be invested in the Chicago Teachers Custom Collateral Portfolio, comprised of, among other things, units of STEP and STIF.  At all relevant times, Northern Trust fully complied with all of the investment guidelines applicable to STEP, STIF, and the Chicago Teachers Custom Collateral Portfolio, and at all times, NTC prudently invested cash collateral from the lending of Chicago Teachers' and the

Board's securities in compliance with all provisions of the Chicago Teachers SLA and all applicable state, federal, and other laws and regulations.

10.     Under the Chicago Teachers SLA, Chicago Teachers and its Board were solely liable and responsible for any and all losses in value, defaults, shortfalls, collateral deficiencies, and principal losses in the value of invested cash collateral from securities lending by Chicago Teachers (hereafter, "losses").  Section 10.3 of the Chicago Teachers SLA expressly provides, for example, that "any Collateral deficiency arising as a  result of cash Collateral invested in a Custom fund [the Chicago Teachers Custom Collateral Portfolio] … shall be allocated solely to the [Chicago Teachers] Board (assuming Agent [NTC] has fulfilled all obligations under this Agreement with respect to such Collateral).  For purposes of this Agreement, a 'Collateral deficiency' shall mean any failure, deficiency, impairment or loss in value of any item of non-cash collateral, or of any investment of cash collateral, including but not limited" to defaults of issuers of a security or instrument, such an issuer's bankruptcy filing, any loss in a permissible investment of the Chicago Teachers Custom Collateral Portfolio, and shortfalls arising from liquidation of investments in such Portfolio.

11.     Also under the Chicago Teachers SLA, Chicago Teachers and its Board must return the collateral provided to it by the Borrowers to those Borrowers—and the value of the Chicago Teachers Custom Collateral Portfolio must be sufficient to return to those Borrowers all of the cash collateral paid by such Borrowers in connection with the loans of Chicago Teachers' securities to such Borrowers—when such loans are terminated.  If the value of the Chicago Teachers Custom Collateral Portfolio is insufficient to repay the Borrowers in full, Chicago Teachers and its Board—and not NTC—are obligated to make up the difference by paying sufficient funds into that Portfolio to ensure full repayment of all of the Borrowers; Chicago

Teachers and its Board have not done this. If Chicago Teachers does not make up this difference, NTC, in its capacity as lending agent, may temporarily and voluntarily make up the difference by temporarily lending its own funds to the Chicago Teachers' Custom Collateral Portfolio or by causing a default in Chicago Teachers' obligations to Borrowers (in which case the Borrowers would be entitled to retain Chicago Teachers' securities as a remedy for Chicago Teachers' failure to return to the Borrowers their cash collateral). Upon a default by Chicago Teachers and its Board, the Borrower may retain the securities of Chicago Teachers and its Board in recompense for the Borrower's provision of collateral to them according to the terms of the Chicago Teachers SLA.

12. Although Chicago Teachers and the Board received net profits from securities lending under the Chicago Teachers SLA over the duration of that agreement, during portions of the alleged putative class period, the Chicago Teachers Custom Collateral Portfolio incurred losses, both realized and unrealized; Chicago Teachers and its Board were and are wholly responsible for all such losses, have not paid such losses, and must pay those losses. NTC repeatedly notified Chicago Teachers and its Board of their responsibility and liability under the Chicago Teachers SLA to pay the amount of these losses into the Chicago Teachers Custom Collateral Portfolio. Despite its obligation under the Chicago Teachers SLA to make payments in the amount of all of the losses in Chicago Teachers Custom Collateral Portfolio into that Portfolio, Chicago Teachers and its Board have not made the required payments for all such losses or otherwise satisfied their payment obligations under the Chicago Teachers SLA, in an amount to be determined at trial.

13.     Chicago Teachers and its Board have therefore materially and substantially breached the Chicago Teachers SLA.  Chicago Teachers and its Board are, and should be required, to pay for all losses in the Chicago Teachers Custom Collateral Portfolio.

14.     Moreover, NTC itself has been injured by and incurred damages and costs from Chicago Teachers' and its Board's material breach of the Chicago Teachers SLA in amounts to be determined at trial, including by temporarily and voluntarily lending NTC's own funds to the Chicago Teachers Custom Collateral Portfolio to cover certain of the losses for which Chicago Teachers and its Board (and not NTC) are responsible and which they were and remain obligated to pay and should have paid into the Chicago Teachers Custom Collateral Portfolio pursuant to the Chicago Teachers SLA (but in fact did not pay).  Chicago Teachers and its Board are responsible for paying NTC back for this loan by NTC, including all interest and late fees.

15.     NTC complied with and fully performed all of its obligations under the Chicago Teachers SLA (including all obligations under the Chicago Teachers SLA with respect to collateral from securities lending) and all relevant laws, rules, and agreements.

16.     Chicago Teacher's and its Board's material and substantial breach of the Chicago Teachers SLA caused material and substantial injury to NTC and material and substantial deficiencies in the Chicago Teachers Custom Collateral Portfolio, for all of which they are liable.

WHEREFORE, NTC prays for judgment in its favor and against the Chicago Teachers Board for: all amounts necessary for the payment of all losses in the Chicago Teachers Custom Collateral Portfolio for which it is liable and which it has not paid (including interest, late fees, and attorneys' fees and costs) into the Chicago Teachers Custom Collateral Portfolio; a declaration that the Chicago Teachers Board has breached the Chicago Teachers SLA as set forth herein, including by its failure to deposit into the Portfolio the amount necessary to make up for

all losses for which it is responsible under the Chicago Teachers SLA; a declaration that the Chicago Teachers Board is required to, and must, pay into the Chicago Teachers Custom Collateral Portfolio, all losses and other amounts as herein described for which it is liable and has not paid; an award of all amounts needed to make NTC whole for loans it has made (including interest and late fees) to the Chicago Teachers Custom Collateral Portfolio and for which the Chicago Teachers Board is liable; an award of an appropriate measure of damages to NTC to be determined at trial; an award of interest, attorneys' fees, late fees, and costs; and an award of any and all other legal, equitable, and further relief as is just and proper.

## **JURY DEMAND**

Northern Trust demands a trial by jury on all issues within the second amended complaint and Counterclaim as to which there is a right to trial by jury.

Dated: June 5, 2012

Respectfully submitted,

 /s/ Caryn L. Jacobs

Caryn L. Jacobs
Todd J. Ehlman
Brook R. Long
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
United States
Tel:  (312) 558-5600
Fax:  (312) 558-5700
CJacobs@winston.com
TEhlman@winston.com
BLong@winston.com

Michele L. Odorizzi
Justin A. McCarty
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
United States
Tel:  (312) 782-0600
Fax:  (312) 701-7711
MOdorizzi@mayerbrown.com
JMcCarty@mayerbrown.com

*Attorneys for The Northern Trust Company
and Northern Trust Investments, Inc.*

153

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies under penalty of perjury that a copy of the foregoing DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT, AND DEFENDANTS' COUNTERCLAIM was served on counsel for all parties electronically via the CM/ECF system on June 5, 2012.

Dated: June 5, 2012                    /s/ Gregory M. Bassi