**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,<br><br>      Defendants. | Case No. 09-7203<br><br>Hon. Robert W. Gettleman<br><br>Magistrate Judge Susan E. Cox |
| THE NORTHERN TRUST COMPANY,<br><br>      Counter-Plaintiff,<br><br>      v.<br><br>THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO,<br><br>      Counter-Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**COUNTER-DEFENDANT'S MOTION TO DISMISS THE COUNTERCLAIM**

Counter-Defendant the Board of Trustees (the "Board") of the Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") respectfully submits this memorandum of law in support of its motion to dismiss the counterclaim filed by The Northern Trust Company ("NTC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

**PRELIMINARY STATEMENT**

NTC's claim for breach of contract rests on the proposition that the Board allegedly failed to make payments to cover losses in a securities lending program ("SLP") that, according to NTC, *suffered no losses*. Moreover, according to NTC, any such payments to cover the nonexistent losses would have been owed to the borrowers of CTPF's securities – *not to NTC*. Indeed, NTC never alleges that the Securities Lending Agreement ("SLA") required the Board to make any such payments to NTC. According to NTC, the SLA required the Board to make payments into its collateral investment fund (the "Custom Fund") only if the Custom Fund was unable to repay collateral to the borrowers of CTPF's securities. NTC never alleges that the Custom Fund was unable to repay collateral to borrowers, and its insistence that the SLP was always profitable precludes that allegation.

Instead, NTC claims that it "*may*" have "*voluntarily*" provided "*temporary loans*" to the Custom Fund to cover investment losses – the very losses NTC emphatically claims did not exist. NTC fails to allege that it actually made any such loan. NTC fails to allege that any such temporary loan – which would have been made to an investment fund that NTC managed and controlled – was not repaid in full. Putting aside the fact that NTC never explains how it might have been harmed by the loans it never made to cover the losses that didn't exist, NTC fails to identify *any provision of the SLA* that requires the Board to cover the harm that might, however implausibly, result from such "voluntary" loans.

These allegations cannot support a claim of breach of contract. NTC must explain both the obligation to NTC that the Board purportedly breached, and how that breach harmed NTC. NTC does neither. Instead, it repeatedly insists that the SLP it operated for the benefit of CTPF was at all times profitable and suffered no losses. Moreover, because the money invested in the

program was cash collateral provided by the borrowers of CTPF's securities, NTC cannot explain how it could have been harmed even if the SLP incurred losses. To the contrary, NTC expressly alleges that the Board's obligation was to repay the cash collateral to those borrowers – ***not to NTC***. But NTC never even pleads the existence of the conditions requiring such payment under the SLA.

Taking NTC's allegations as true, its cause of action is absurd. Northern Trust simply cannot play the victim in this case, where it operated the SLP and invested borrowers' collateral for the benefit of clients like CTPF, but had none of its own skin in the game. Northern Trust may believe that the best defense is a good offense, but its serial attempts to harass plaintiffs by filing facially defective claims against them must end. *See*, *e.g.*, *La. Firefighters' Ret. Sys. v. N. Trust Investments, N.A.*, 2012 WL 601861 (N.D. Ill. Feb. 23, 2012) (dismissing counterclaim and third-party claims); *BP Corp. N. Am. Inc. Sav. Plan Inv. Oversight Comm. v. N. Trust Invs., N.A.*, 692 F. Supp. 2d 980 (N.D. Ill. 2010) (dismissing Northern Trust's claims for indemnification and contribution from plaintiffs); *FedEx Corp.v. N. Trust Co.*, 2010 WL 2836345 (W.D. Tenn. July 16, 2010) (same).

## STATEMENT OF FACTS

Northern Trust operated the SLP in which the Board and the other named plaintiffs participated during the Class Period.[1] Affirmative Defenses ¶ 10. NTC served as the securities lending agent for all of the direct and indirect participants in the SLP, and was responsible for

---

[1] The Statement of Facts draws from the allegations as pleaded by NTC in the Counterclaim, which expressly incorporate the Affirmative Defenses asserted by NTC and Northern Trust Investments, N.A. (collectively "Northern Trust"). All references to "Affirmative Defenses" refer to the 19 enumerated affirmative defenses and the 133 paragraphs of supporting allegations. All references to "Counterclaim" refer to NTC's Counterclaim for Breach of Contract against the Board and Affirmative Defenses and supporting allegations expressly incorporated therein.

administering the SLP. *Id.* ¶¶ 30, 58, 71, 112. Northern Trust clients, including CTPF, either participated directly in the SLP by lending their own securities to borrowers in exchange for collateral, or indirectly by investing in a commingled investment fund operated by Northern Trust that in turn would lend its securities to borrowers. *Id.* ¶¶ 5-8. Northern Trust managed the SLP participants' investments of cash collateral in order to generate profits for those participants. *Id.* ¶¶ 5, 10.

Northern Trust has taken the position that the SLP was profitable, and vigorously asserts that position repeatedly throughout its pleading. *Id.* ¶¶ 3, 51, 67, 86, 104, 213; Counterclaim ¶ 12. Indeed, according to Northern Trust, CTPF's investments in the SLP – which Northern Trust selected and managed – "***are profitable and were profitable for years***" and any "claims of massive losses" from the SLP "***are simply not true***." Affirmative Defenses ¶ 3. According to NTC, even investments that defaulted or were placed into conservatorship generated profits for the SLP participants (including CTPF), (*id.*) and any temporary decline in the value of the collateral pools was reversed and eliminated. *Id.* ¶ 130. As a result of the overall profitability of the SLP and the reversal of any temporary deficiencies, Northern Trust asserts that the Board (and the other SLP participants) ***suffered no injury or damages from their investment in Northern Trust's SLP***. *Id.* ¶¶ 66, 86, 103, 121, 175, 182, 212, 219; Counterclaim ¶ 5. Northern Trust's vigorous assertion that the SLP was profitable and that no participant incurred any loss flatly contradicts the central thesis of NTC's claim for breach of contract: that the Board failed to make certain unspecified payments ***to cover losses incurred on its investment of cash collateral in NTC's SLP***.[2]

---

[2] NTC's Counterclaim periodically alleges that CTPF *and* the Board materially and substantially breached the SLA and should be required to pay for the losses. Counterclaim ¶¶ 10-14.

NTC claims that the Board is liable under the SLA that governs the SLP for "any Collateral Deficiency arising as a result of cash Collateral invested in a Custom fund." *Id.* ¶ 10.[3] NTC does not allege that the SLA provides for the Board to pay NTC to cover any such deficiency. Instead, NTC asserts that an unidentified provision of the SLA requires the Board to return the value of the cash collateral in the Custom Fund *to the borrowers of CTPF's securities* at the time that the loans of CTPF's securities to those borrowers terminate. *Id.* ¶ 11. Indeed, NTC's Counterclaim makes clear that that the Board only had an affirmative obligation to make payments "*[i]f the value of the [Custom Fund] is insufficient to repay the Borrowers in full*." In that case, NTC alleges that CTPF and the Board – and not NTC – are obligated to make up the difference "by paying sufficient funds into [the Custom Fund] to ensure full repayment of all the Borrowers." *Id.* ¶ 11. Thus, according to NTC, the Board's only payment obligation under the SLA is contingent upon the Custom Fund being unable to repay collateral to borrowers, and the only payment the Board could be compelled to make would be to the Custom Fund – not NTC.

Critically, NTC does not allege that the Custom Fund at any time lacked sufficient funds

---

However, CTPF was not a party to the SLA that NTC alleges it breached and the Court has already ruled that "non-parties to a contract are not liable for its breach." *La. Firefighters' Ret. Sys.*, 2012 WL 601861, *4. To the extent that the Counterclaim asserts a claim based on conduct of CTPF, the claim is barred by the law of the case doctrine. *See Pierce v. Sys. Transp., Inc.*, 2004 WL 2481038, *2 (N.D. Ill. Nov. 2, 2004) ("a ruling made in an earlier phase of a case controls throughout the proceedings."); *People ex rel. Madigan v. Ill. Commerce Comm'n*, 967 N.E.2d 863, 870 (Ill. App. Ct. 2012) ("the law-of-the case doctrine generally bars relitigation of an issue previously decided in the same case.").

[3] Under the SLA, a "Collateral deficiency" is "any failure deficiency, impairment or loss in value of any item of non-cash collateral, or of any investment of cash collateral . . . ." Counterclaim ¶ 10. NTC alleges that the Chicago Teachers Custom Collateral Portfolio (*i.e.*, CTPF's investment in certain commingled funds used by multiple SLP participants to invest securities lending cash collateral) is a "Custom Fund" for purposes of this provision. *Id.*

to repay the borrowers of CTPF's securities. Thus, NTC fails to allege the existence of the condition precedent to the sole contractual obligation it cites. Instead, NTC claims that it "*may*" have "*temporarily and voluntarily*" lent its own funds to the Custom Fund and that it was injured "in amounts to be determined at trial." Counterclaim ¶ 11. In the next paragraph, NTC states that the SLP was profitable and that no participant suffered a loss, but that the Board must "ma[k]e the required payments for all such losses." *Id.* ¶ 12. Nowhere does NTC allege that it actually lent its funds to the Custom Fund. Neither does NTC provide the dates, amounts or terms of such loans, or cite the contractual provisions that permit NTC to "voluntarily" make loans to the Custom Fund subject to repayment by the Board. Indeed, NTC does not allege that its loans to the Custom Fund, if any were made, were not repaid with interest. Given that Northern Trust manages and operates the Custom Fund, it was uniquely positioned to negotiate the terms, and ensure the repayment of, any loans NTC made to the Custom Fund.

## ARGUMENT

NTC fails to state a claim for breach of contract for multiple reasons. *First*, under NTC's own theory of the case, the Board's obligation to make any payment only arose if investment losses rendered the Custom Fund incapable of repaying collateral to a borrower. NTC not only fails to allege such a loss occurred, but forcibly asserts the opposite: that the SLP was always profitable and resulted in no losses. *Second*, even if such a loss had occurred, NTC alleges that the Board's obligation was to third-party borrowers, not NTC. *Third*, NTC fails to allege that it actually made a loan to cover any collateral deficiency for which the Board could be liable. *Fourth*, even if NTC did "voluntarily" make "temporary loans" to the Custom Fund, it has not alleged any harm resulting from such loans. *Fifth*, even assuming that NTC was harmed through voluntary, temporary loans that it actually did make to the Custom Fund, NTC fails to identify

any contractual provision that requires the Board to indemnify such harm, undertaken "voluntarily." *Finally,* even if NTC had alleged harm resulting from its issuance of a "voluntary" loan, it is blackletter Illinois law that "voluntary" payments are not recoverable absent extreme circumstances that NTC does not allege are present here. Accordingly, NTC's counterclaim must be dismissed.

## I. Legal Standard

Even under the liberal pleading standard of Rule 8(a), conclusory and speculative allegations are insufficient to state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566, 127 S.Ct. 1955, 1965 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*) (internal quotations omitted); *see Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough [under *Twombly*] to give a threadbare recitation of the elements of a claim without factual support."); *Imagenetix, Inc. v. Walgreen Co.*, 2012 WL 1231067, *5 (N.D. Ill. Apr. 12, 2012) (conclusory allegations "[e]ven under the notice pleading standard of Rule 8 [are] not enough."). To state a claim for breach of contract in Illinois, the claimant must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2012) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). NTC's allegations do not plausibly suggest that the Board breached a contract or that NTC was damaged therefrom, and are therefore conclusory and speculative in violation of Rule 8(a).

## II. NTC Fails To Allege A Breach By The Board

According to NTC, the Board is *liable* under the SLA for collateral deficiencies in the Custom Fund under certain circumstances. Counterclaim ¶ 10. However, the fact that the SLA holds the Board liable for certain losses does not mean that the Board has *an affirmative obligation to "make payments"* to the Custom Fund, let alone to NTC. Because the funds invested in the SLP do not belong to NTC, the Board's liability for the losses on such investments does not require a payment to NTC. On the contrary, NTC expressly alleges that the Board is only "obligated to make up the difference by paying sufficient funds into [the Custom Fund] to ensure full repayment of all of the Borrowers … *[i]f the value of the [Custom Fund] is insufficient to repay the Borrowers in full."* *Id.* ¶ 11 (emphasis added). NTC's allegations – that CTPF's investments in the SLP *"are profitable and were profitable for years"* (Affirmative Defenses ¶ 3) and that *Northern Trust reversed any collateral deficiencies* that temporarily occurred in the collateral pools in which CTPF invested (Affirmative Defenses ¶ 130) – do not plausibly suggest that there was ever a loss to the Custom Fund, let alone a loss that rendered the Custom Fund incapable of repaying collateral to borrowers.

Significantly, *NTC never alleges that the Custom Fund could not repay the borrowers.* NTC thus fails to allege the existence of the condition precedent to the Board's purported obligation, and the Board could not have breached the SLA if that obligation never arose. *See, e.g.*, *Mijes v. Primerica Life Ins. Co.*, 740 N.E.2d 1160, 1163 (Ill. App. Ct. 2000) ("the contract is neither enforceable nor effective until the condition is performed or the contingency occurs.") (internal quotations omitted); *Maywood Proviso State Bank v. York State Bank & Trust Co.*, 625 N.E.2d 83, 87 (1993) ("The obligations of the parties end in the event that a condition precedent is not satisfied."); *Quetel Corp. v. Columbia Comm'ns Int'l, Inc.*, 787 F. Supp. 1, 3 (D.D.C.

1992) (dismissing breach of contract claim where "[defendant]'s contractual obligation could not arise until [a condition was met]. Because this event never occurred, . . . [defendant]'s duty under the contract never arose.").

NTC's pleading deficiencies go even further. NTC claims that the SLA gave it the ability to *"temporarily and voluntarily* make up the difference [between what was in the Custom Fund and what borrowers were owed] by lending its own funds to the [Custom Fund]." Counterclaim ¶ 11. NTC never claims to have actually made such a loan, or that such loan was not repaid. Moreover, even if NTC did "voluntarily" lend money to the Custom Fund, which it does not allege, NTC never points to any contractual provision that requires the Board to make payments to NTC as a result of such voluntary loans. *See Hoffman v. Nationwide Mut. Ins. Co.*, 2011 WL 3158708, *8 (N.D. Ill. July 26, 2011) (dismissing claim for breach of contract where "Plaintiffs do not identify . . . a contract provision that Defendants allegedly breached"). Further, even if NTC did make the "voluntary" payment that it alleges it was entitled to make under the SLA, under Illinois law, "money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered unless the payment was made under circumstances amounting to compulsion." *Williams-Ellis v. Mario Tricoci Hair Salons & Day Spas*, 2007 WL 3232490, *9 (N.D. Ill. Nov. 1, 2007) (quoting *King First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1171 (Ill. Ct. App. 2005)). NTC's allegations do not suggest fraud on the part of the Board nor any duress or mistake of fact; on the contrary, NTC obviously had the ability to review the SLA and it concedes that any loan it may have made to the Custom Fund was "voluntary" and "temporary." *See id.*; Counterclaim ¶¶ 11, 14.

Accordingly, NTC cannot recover for any voluntary payment that may have been made regardless of its theory of liability.[4]

Of course, even if the Board was required to make a payment to the Custom Fund, that payment would be made for the benefit of third-party borrowers, not NTC: "Chicago Teachers and its Board must return the collateral provided to it by the Borrowers *to those Borrowers* . . . when such loans are terminated." *Id.* ¶ 11 (emphasis added). But NTC never says that the borrowers were not repaid when the loans terminated. NTC's assertion that this provision establishes a contractual duty for the Board to make payments to NTC, and its theory that the Board could have breached this provision by failing to pay NTC makes no sense. In short, NTC has failed to allege facts giving rise to any contractual obligation of the Board to render payment to NTC, and conspicuously fails to allege the existence of the single condition precedent required under the SLA to trigger that obligation. As a result, its claim for breach of contract must be dismissed.

### III. NTC Fails To Allege That It Suffered Damages

Even if NTC had sufficiently alleged that the Board breached the SLA, its claim must be dismissed because it has failed to plead the requisite element of damages. As a threshold matter, any suggestion that NTC could have been harmed is belied by NTC's repeated assertion that the SLP was always profitable and did not incur losses that caused harm to any participants. *See* Affirmative Defenses ¶¶ 51, 67, 219 (alleging that CTPF suffered no losses and in fact profited from participation in the SLP); *see also id.* ¶¶ 66, 103, 121, 175, 182, 212 (alleging that there

---

[4] NTC's mistaken belief that it could recover under the SLA is irrelevant. *See Randazzo v. Harris Bank Palatine, N.A.*, 104 F. Supp. 2d 949, 953 (N.D. Ill. 2000) ("A mistake of law does not excuse a voluntary payment.")

were no damages suffered by participants in the SLP and the SLP was profitable); *id.* ¶ 3 (alleging that leading up to and after the economic meltdown, CTPF's SLP investments "generated profits," and "claims of massive losses are simply untrue"). These allegations alone require dismissal of NTC's claim because it does not and cannot allege how the Board could have failed to cover losses in a profitable program that incurred no losses.

NTC also never alleges any facts that plausibly suggest that it was ever at risk of loss, let alone harmed. The investments at issue in the Custom Fund were made with the cash collateral provided by the borrowers, for the direct benefit of CTPF and other investors. *Id.* ¶ 5. NTC was simply the "lending agent," in which capacity it lent CTPF's securities. Counterclaim ¶ 8. Even if the SLP incurred a loss, NTC never alleges how a loss in the Custom Fund could have caused harm to NTC. Indeed, if anyone has a right to recover from the Board under NTC's theory, it would be any third-party borrowers who have not been paid. NTC does not even allege that any such borrowers exist.

Unable to point to any obligation under the SLA that the Board allegedly breached, NTC instead implies that the Board is required to compensate NTC for providing its own funds to the Custom Fund. But NTC again fails to allege facts that would support such a claim. All NTC can state is that the SLA permitted NTC to voluntarily make temporary loans to the Custom Fund. ***NTC never alleges that it actually made any such loans***. *See* Counterclaim ¶ 11. Even if such loans were made, NTC fails to plead any damage it suffered as a result, and the sparse facts that are pleaded make it implausible that NTC could have been harmed.

Specifically, the loans that NTC claims it was authorized to make – but does not claim to have made – would have been made to the Custom Fund. The Custom Fund is NTC's term for the commingled cash collateral pools in which CTPF and other SLP participants invested their

11

securities lending cash collateral. That is, they are funds operated and managed by Northern Trust. So the loans at issue would have been made by NTC to funds controlled by Northern Trust, pursuant to terms that Northern Trust effectively negotiated with itself. Because NTC never alleges that a single loan was made, it of course provides no information about loans that were not repaid. NTC never explains why it would not have reimbursed itself (at a rate negotiated with itself) for any voluntary loan that it made to a fund that it managed and controlled. Absent additional allegations, it is implausible to presume that (1) NTC actually made loans; (2) Northern Trust failed to negotiate with Northern Trust fair terms for such loans; and (3) that Northern Trust caused the Custom Fund it operated to default on its loan to NTC, thus causing some harm. But that is the assumption NTC requires the Court to make to sustain the claim that NTC has been harmed.

In light of the above, NTC could not have been harmed by the Board's failure to loan monies to the Custom Fund and its allegations do not plausibly suggest otherwise, warranting dismissal. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) ("Illinois law is clear that, to state a claim for breach of contract, one must be able to prove actual damages.") (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)); *Browning v. Eckland Consultants, Inc.*, 2004 WL 2687961, *5 (Ill. App. Ct. 2004) (dismissing contract claim where plaintiff-assignee failed to allege that assignor "sustained damages"); *DeHart v. U.S. Bank, N.A. ND*, 2011 WL 3651270, *6 (D.N.J. Aug. 18, 2011) (plaintiff's "failure to allege damages or any ascertainable loss is fatal to [its] complaint.").

NTC's summary demand that the Board must "pay for all losses" and its unsupported declaration that NTC was injured "in amounts to be determined at trial" (Counterclaim ¶¶ 13-14)

do nothing to save its claim.[5] NTC fails to allege the terms and circumstances of any loan or "payment" for which it should be reimbursed by the Board. *Id.* ¶¶ 10-11. NTC's failure to describe its alleged damages with any particularity whatsoever or quantify its harm in any way leaves the Board without sufficient notice as to the damage, if any, NTC allegedly suffered and its claims must be dismissed for lack of particularity pursuant to Rule 8(a). *See Akinyemi v. JP Morgan Chase Bank, N.A.*, 391 Ill. App. 3d 334, 338, 908 N.E.2d 163, 169 (2009) (Plaintiff who "merely informed the court he would prove [damages] later at trial . . . did not sufficiently set forth a cause of action upon which relief could be granted.");[6] *Salazar v. Lehman Bros. Bank*, 2010 WL 3998047, *2 (D. Ariz. Oct. 12, 2010) (claim dismissed where damages in an amount "to be determined at trial" were considered conclusory and insufficient); *Valenti v. Mitsubishi Motor Sales of Am., Inc.*, 773 N.E.2d 1199, 1203 (Ill. App. Ct. 2002) ("basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation."); *Universal Bankcard Sys., Inc. v. Bankcard Am., Inc.*, 998 F. Supp.

---

[5] NTC's contradictory pleading merely underscores the deficiencies in its Counterclaim and the inconsistent nature of NTC's allegations. Parties are permitted to plead in the alternative, but all pleadings are also subject to Rule 11, neither of which "permits a plaintiff to intentionally ignore relevant evidence in order to assert unfounded claims." *Tibor Mach. Prods., Inc. v. Freudenberg-NOK Gen. P'ship,* 967 F. Supp. 1006, 1014 (N.D. Ill. 1997); *Great Lakes Higher Educ. Corp. v. Austin Bank of Chi.*, 837 F. Supp. 892, 894-95 (N.D. Ill. 1993). "Thus, a pleader may only assert contradictory statements of fact when the pleader legitimately is in doubt about the fact in question," *(id.)* which is not the case here.

[6] Although *Akinyemi* was decided under Section 2-615 of the Illinois Code of Civil Procedure, numerous Illinois courts have recognized the similarities between the Illinois statute and Rule 12(b)(6). *See, e.g., Crigler v. Axia Inc.*, 735 F. Supp. 868, 873 (N.D. Ill. 1990) ("Section 2-615, like its counterpart in Rule 12(b)(6) of the Federal Rules of Civil Procedure, provides for a substantive dismissal of a complaint on the merits for failure to state a claim."); *Holloway v. Meyer*, 726 N.E.2d 678, 682 (Ill. App. Ct. 2000) ("The difference, if any, between these two standards is not outcome determinative.").

961, 967 (N.D. Ill. 1998) ("a plaintiff who fails to quantify, however roughly, the harm that he has suffered is not entitled to an award of damages, other than (in the case of a breach of contract) nominal damages, which [NTC] has not sought.").

## CONCLUSION

For the foregoing reasons, the Counterclaim must be dismissed in its entirety and with prejudice. Counter-Defendant respectfully requests oral argument on this motion.

Dated: July 3, 2012

/s/ Avi Josefson
Avi Josefson
875 North Michigan Avenue
Suite 3100
Chicago, Illinois 60611
Tel: (312) 373-3880
Fax: (312) 794-7801
avi@blbglaw.com
Illinois Bar No. 6272453

David Wales
Rebecca E. Boon
Brett Van Benthysen
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 544-1444

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*Counsel for Plaintiff and Counter-Defendant The Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago*