# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) The Hon. Robert W. Gettleman, |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) *Judge Presiding.* ) ) Magistrate Judge Susan E. Cox ) |
| Defendants. | ) ) Case No. 09-CV-07203 |
| THE NORTHERN TRUST COMPANY, | ) ) ) |
| Counter-Plaintiff, | ) ) |
| v. | ) ) ) |
| THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, | ) ) ) ) |
| Counter-Defendant. | ) |

**THE NORTHERN TRUST COMPANY'S MEMORANDUM IN OPPOSITION TO
COUNTER-DEFENDANT'S MOTION TO DISMISS THE COUNTERCLAIM**

| | |
|---|---|
| Caryn L. Jacobs | Michele Odorizzi |
| WINSTON & STRAWN LLP | MAYER BROWN LLP |
| 35 West Wacker Drive | 71 South Wacker Drive |
| Chicago, Illinois 60601 | Chicago, Illinois 60606 |
| (312) 558-5600 | (312) 782-0600 |
| cjacobs@winston.com | modorizzi@mayerbrown.com |

*Counsel for Counter-Plaintiff The Northern Trust Company*

Dated: August 27, 2012

Defendant/Counter-Plaintiff The Northern Trust Company ("NTC") files this memorandum in opposition to the motion filed by Counter-Defendant The Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago ("the CTPF Board" or "the Board") to dismiss NTC's Counterclaim.

**INTRODUCTION**

The CTPF Board's motion to dismiss is puzzling, to say the least, in light of the allegations of plaintiffs' own Second Amended Complaint ("SAC"). The SAC alleges that NTC, in its capacity as securities lending agent, imprudently invested cash collateral provided by borrowers to the CTPF Board and other direct lending customers and, as a result, a number of NTC-managed cash collateral vehicles suffered losses. Plaintiffs allege that NTC demanded that the CTPF Board and other lenders collectively make "lump-sum payments totaling hundreds of millions of dollars" to offset these losses. SAC ¶ 13. Plaintiffs' complaint seeks to recover unspecified amounts plaintiffs say they already paid (or NTC supposedly "seized") to cover those losses and asks for a declaration that the defendants, rather than plaintiffs, are liable for "realized losses that have not [yet] been paid by the Boards, the Plans or the Class." *Id*. NTC's counterclaim against the CTPF Board is the mirror-image of the complaint: NTC alleges that it did ***not*** imprudently invest the Board's cash collateral and that the Board therefore should be directed to deposit sufficient funds in its own custom collateral fund to offset the realized losses it has not yet covered.

There is no question but that, ***if*** NTC prevails on the prudence arguments, it is the CTPF Board—and not defendants—that will be required to make up the shortfall in its custom collateral fund created by investment losses suffered by that fund. The various arguments the CTPF Board makes in support of its motion to dismiss are transparent attempts to muddy the

waters and to divert the Court's attention from that simple point, which is enough, in and of itself, to require denial of the Board's motion to dismiss.

## BACKGROUND

On or about June 28, 1990, the Board, acting on behalf of the CTPF, entered into a Securities Lending Agreement ("SLA") with NTC. Under the SLA, the Board hired NTC to act as its securities lending agent and to lend securities owned by CTPF to certain third-party borrowers. Counterclaim ¶¶ 7-8. The borrowers provided collateral for the loaned securities. Insofar as cash collateral was provided, NTC invested the cash pursuant to the specific investment guidelines chosen by the Board. *Id.* ¶ 8. During the period at issue here, the Board directed NTC to invest cash collateral in its own custom investment vehicle—the Chicago Teachers Custom Collateral Portfolio (the "CTPF Custom Fund")—which was comprised of, among other things, units of STEP and units of STIF. *Id*. ¶ 9.

The Counterclaim alleges that under the SLA, CTPF and its Board were "solely liable and responsible for any and all losses in value, defaults, shortfalls, collateral deficiencies and principal losses in the value of invested cash collateral from securities lending." Counterclaim ¶ 10. In support of this proposition, the Counterclaim cites Section 10.3 of the SLA, as amended, which expressly provides that "any Collateral deficiency arising as a result of cash Collateral invested in a Custom fund . . . shall be allocated solely to the [CTPF] Board (assuming Agent [NTC] has fulfilled all obligations under this Agreement with respect to such Collateral)." *Id*. The Counterclaim specifically alleges that NTC did fulfill all of its obligations under the SLA with respect to the Collateral. Counterclaim ¶¶ 8, 15.

Although over the years the Board enjoyed net profits from its direct securities lending activities, during the period at issue here, the CTPF Custom Fund incurred some losses when the

2

value of the STEP units it held declined because certain securities held by STEP defaulted, were sold below par, or declined in market value. Counterclaim ¶ 12. Because of those losses, the value of the CTPF Custom Fund is insufficient to fully return all of the collateral provided by all of the borrowers who borrowed securities from CTPF when those loans are terminated. The Board is responsible for making up that shortfall. Counterclaim ¶ 11. NTC has demanded on a number of occasions that the CTPF Board put sufficient funds in the CTPF Custom Fund to ensure that borrowers can be repaid in full, but the Board has so far refused to do so. *Id*.

Throughout the period at issue here, the CTPF Board continued to engage in securities lending under the SLA and has continued to use the CTPF Custom Fund for the investment of cash collateral. In its Counterclaim, NTC seeks a declaratory judgment that, under the terms of the SLA, the Board has a contractual obligation to put sufficient funds into the CTPF Custom Fund to offset all of the losses that Fund suffered, in order to ensure that there will be sufficient assets in the CTPF Custom Fund to return 100% of the collateral to borrowers when all of the loaned securities are returned. Absent such payments, NTC, acting as the CTPF Board's agent, would eventually be forced to default on CTPF's obligation to return collateral to the borrowers. Counterclaim ¶ 11. The borrowers would then be entitled to seize and sell the CTPF securities that have been out on loan. *Id.* To prevent such a default, which would inflict injury on CTPF, NTC has on occasion loaned its own funds to the CTPF Custom Fund. *Id.* NTC seeks repayment of those loans, as well, with interest. *Id*. at 151 (prayer for relief).

The Counterclaim alleges (¶¶ 8, 15) that NTC at all times acted prudently and according to the Board's directions in investing the CTPF's cash collateral. If NTC prevails (as it should), the Counterclaim seeks only that the Board do what it agreed to do—accept responsibility for the investment losses suffered by the CTPF Custom Fund. Toward that end, NTC seeks an order

3

compelling the Board to put sufficient funds into the CTPF Custom Fund to cover any and all investment losses that Fund suffered and to repay NTC (with interest) for amounts NTC temporarily loaned to the Fund to offset a portion of those losses. Counterclaim at 151.

## ARGUMENT

**I.     NTC Has Properly Alleged A Breach Of The SLA By The Board.**

    **A.     The Counterclaim Sufficiently Alleges That The CTPF Custom Fund Suffered Losses During The Period At Issue Here.**

The Court dismissed NTC's last Counterclaim because, although CTPF was designated as the plaintiff, the Board had actually signed the SLP. Dkt. # 155 at 8-9. As the Court may recall, even after that ruling, CTPF continued to insist that it was the right party to bring the lawsuit under the SLA, but that NTC could not counterclaim against it. After discussions with the Court about who the proper party was both to sue and be sued, plaintiffs amended their complaint to name the Board as the plaintiff. *See* 3/7/12 Tr. at 11-17. NTC then re-filed its Counterclaim, naming the plaintiff Board as the Counter-Defendant. In its renewed motion to dismiss the Counterclaim, the Board no longer argues that NTC has sued the wrong party. Yet it once again attacks the Counterclaim on a theory that flies in the face of its own complaint. In the SAC, plaintiffs allege that the STEP component of the CTPF Custom Fund suffered "massive" losses, which NTC has demanded that the Board cover, and that NTC should be required to bear those losses because it supposedly invested the collateral imprudently. SAC ¶¶ 11, 13. But in its motion to dismiss, the Board claims that NTC should not be able to bring a mirror-image counterclaim seeking a determination that the Board is required to bear those very same losses because NTC has supposedly taken the position that the Board's securities lending program "*suffered no losses*." CTPF Br. at 2. This argument is nonsensical.

NTC's Counterclaim explicitly alleges (as does the SAC) that the CTPF Custom Fund

4

"incurred losses, both realized and unrealized" during the period at issue here. Counterclaim ¶ 12. The Board ignores this clear and unequivocal allegation and tries to twist two other allegations made in defendants' affirmative defenses into a denial that "there was ever a loss to the Custom Fund." CTPF Br. at 8. The Court should reject that cynical ploy.

The first paragraph the Board cites is ¶ 3 of the Affirmative Defenses, in which defendants challenge plaintiffs' portrayal of securities lending as a risky enterprise that resulted in "massive" losses. In the sentence the Board quotes, defendants note that, when viewed from a longer term perspective, securities lending overall turned out to be a profitable investment activity for Northern Trust customers. That is true even taking into account the losses that some Northern Trust collateral vehicles suffered during the period at issue here, which resulted from an unforeseeable and unprecedented financial crisis. As NTC further explained in its Counterclaim, the CTPF Board's direct securities lending activity was profitable on a net basis when viewed from the beginning of the SLA; that is, the CTPF made more money from engaging in securities lending than it lost. Counterclaim ¶ 12. But NTC did not and does not deny that the CTPF Custom Fund suffered investment losses during the period at issue here because of its investment in STEP. *Id*. It is those losses that the Board is trying to recover from NTC in this case and that NTC contends the Board (rather than NTC) is responsible for paying.

The second paragraph the Board points to is ¶ 130 of defendants' Affirmative Defenses, which explains that the unrealized loss portion of the Collateral Deficiency that NTC declared in September 2008 in the *Core USA* Collateral Section was ultimately reversed. But surely the Board understands that it chose **not** to use Core USA for its direct lending activities and instead chose to create its own custom fund using (among other things) units of STEP. Counterclaim ¶ 9; *see also* SAC ¶ 17. What happened to Core USA is therefore irrelevant to CTPF. As plaintiffs

5

allege and NTC has acknowledged, unlike Core USA, STEP suffered realized losses and was ***not*** able to reverse all of its unrealized losses.[1] As a result, while there are many direct lending customers who used Core USA who have no conceivable claim against the defendants because they suffered no realized losses, that was not the case for the CTPF Board.[2] Thus, the Board's first argument—that NTC cannot seek a declaration concerning the proper allocation of losses because NTC itself claims there were no losses—is wholly inconsistent with NTC's ***and*** plaintiffs' own allegations and is thus a complete red herring.

### B. NTC Seeks A Determination That The Board Rather Than NTC Is Responsible For The Investment Losses Suffered By The CTPF Custom Fund.

The second reason the Board offers for dismissing the Counterclaim is that, even if the CTPF Custom Fund suffered losses, "NTC alleges that the Board's obligation was to third party borrowers, not NTC" and therefore NTC will not suffer any harm if the Board breaches its obligation. CTPF Br. at 6, 11. This is another red herring. It is true that NTC does not seek a money judgment for itself for the shortfall in the CTPF Custom Fund caused by investment losses. Instead, NTC seeks a declaration that it is the Board's responsibility to make up for that shortfall by putting more money into the CTPF Custom Fund and an order requiring it to discharge that responsibility. Counterclaim at 151. As noted above, the Board alleges in its complaint that NTC should be required to make the CTPF Custom Fund whole because NTC

---

[1] Unrealized losses are created when the market price of a fixed-income security held by a collateral fund drops below par; the loss is realized if the security defaults or is sold at a price below par. Some, but not all, of the unrealized losses STEP suffered in 2007 and 2008 were reversed when market prices later increased. *See* Affirmative Defenses ¶ 39 (incorporated by reference into Counterclaim by Counterclaim ¶ 5); Counterclaim ¶ 12.

[2] As explained in the Affirmative Defenses (¶¶ 122-32), the reversal of the unrealized loss portion of the Collateral Deficiency and certain voluntary payments and fee concessions NTC made to direct lending customers who used Core USA eliminated or substantially reduced the losses those customers, including the two Pontiac plaintiffs, suffered. Defendants did not make the same argument with respect to the CTPF Board because its collateral from direct lending was not invested in Core USA.

supposedly made imprudent investments. Given that allegation, NTC clearly has standing to counterclaim for a determination that it is the Board, rather than NTC, that must plug the "hole" in the CTPF Custom Fund caused by investment losses. *See, e.g.*, 28 U.S.C. § 2201 ("[i]n a case of actual controversy," the court "may declare the rights and other legal relations of any interested party seeking such declaration").[3]

It is undisputed that the SLA "allocates" to the CTPF Board "any Collateral deficiency arising as a result of cash Collateral invested in a Custom fund . . . (assuming Agent [NTC] has fulfilled all obligations under this Agreement with respect to such Collateral)." Counterclaim ¶ 10. The Board acknowledges that if (as Counterclaim ¶ 15 alleges) NTC discharged its obligations with respect to the Collateral, this provision would require the Board to cover any shortfall between the value of the assets held by the CTPF Custom Fund and the amount necessary to repay borrowers. The Board argues, however, that its obligation to cover the shortfall is not triggered unless and until the CTPF Custom Fund is in fact unable to repay CTPF borrowers when loans terminate. It then contends that the Counterclaim should be dismissed because NTC does not allege that the CTPF Custom Fund has been unable to repay borrowers. CTPF Br. at 8. This argument should also be rejected because it is contrary to the plain language of the SLA and betrays a fundamental misunderstanding of the securities lending process.

The SLA broadly defines the term "Collateral deficiency" to include "any failure, deficiency, impairment or loss in value of . . . any investment of cash collateral," including a default by an issuer or any other event "that causes the Agent [NTC] to believe the income or

---

[3] Plaintiffs' own complaint demonstrates that there is an "actual controversy" about who bears the responsibility for the losses in the CTPF Custom Fund. Moreover, to the extent NTC is required to identify some harm that would result if it were not able to compel the Board to comply with its obligations, it is easy to do so: NTC's business as a securities lending agent would suffer significant harm if borrowers were unable to trust NTC and NTC's direct lending customers to return their collateral promptly when loans terminated.

7

principal of the security or other instrument is likely not to be paid in accordance with its terms when due." *See* Ex. A to Affirmative Defenses/Counterclaim, Dkt. # 167-3 at 22. Under this provision, NTC has the right to demand that the Board make up ***any*** loss of value in a collateral investment. Thus, whenever the total value of the assets in the CTPF Custom Fund is insufficient to repay the collateral owed to ***all*** of CTPF's borrowers, NTC has the right to demand that the Board make up the shortfall. Counterclaim ¶ 11. The Counterclaim alleges that NTC properly made such a demand in light of the losses (both realized and unrealized) suffered by the CTPF Custom Fund and that the Board has refused to comply with those demands. *Id*. ¶¶ 11-12. That is enough, standing alone, to state claim for breach of the SLA.

The Board's suggestion that it has no obligation unless and until the CTPF is actually unable to return collateral to ***any*** of its borrowers is not only contrary to the plain language of the SLA, but fails to take into account how a securities lending program works. To take a simple example, suppose NTC, as the CTPF Board's agent, loaned CTPF securities that had a market value of $100,000 to a borrower and the borrower provided $102,000 in cash collateral in return. Assume further that NTC invested the $102,000 in a fixed-income instrument that paid 3% interest. If all went well, CTPF would get the 3% interest payment (less any rebate paid to the borrower and NTC's fee) and the borrower would get its $102,000 back when the loan was terminated. But if the issuer of the fixed income instrument defaulted and NTC was forced to sell the instrument for $80,000, there would be a $22,000 shortfall. Under the terms of the SLA, that is a "Collateral deficiency" that CTPF would be required to cover immediately. Nowhere in the SLA are any additional conditions imposed on that obligation.

If, as in this case, the direct securities lending customer has a very large number of securities out on loan at any one time, with new loans being made every day and old loans being

terminated, there may be no practical need to fully cover all losses (whether unrealized or realized) immediately. The securities lending agent can make use of the cash held by the custom fund, including cash collateral posted by new borrowers and principal repayments from fixed income instruments, to repay the old borrowers as loans terminate. But when losses are realized and therefore become fixed and irreversible, a permanent shortfall is created between the total amount needed to repay *all* borrowers when *all* loans are terminated and the total assets available to provide that repayment. That is the situation that NTC alleges now exists in the CTPF Custom Fund. Counterclaim ¶¶ 10-12. Under the plain terms of the SLP, NTC has the right to demand that the Board make up the shortfall now, without waiting for an emergency situation in which the CTPF Board is about to default on its obligations to borrowers.

Thus, contrary to the Board's arguments, the Counterclaim does state a claim for a declaratory judgment that the CTPF Board—rather than NTC—has a current obligation to make up the shortfall that exists in the CTPF Custom Fund as a result of collateral investment losses.

## II. NTC Has Stated A Claim For Repayment Of Amounts It Temporarily Loaned To The CTPF Custom Fund To Ensure That Borrowers Would Be Repaid When Loans Terminated.

In addition to seeking a declaration that the Board is responsible for making up the existing shortfall in the CTPF Custom Fund and an order compelling it to discharge that responsibility, the Counterclaim also seeks repayment, with interest, of loans NTC temporarily made to the Fund to cover a portion of the shortfall. The Board offers a number of reasons why this claim should be dismissed, all of which should be rejected.

### A. The Board's Claims That NTC Has Not Properly Alleged That It Was Harmed Are Without Merit.

The Board argues first that NTC does not allege that it actually made any loans to the CTPF Custom Fund. CTPF Br. at 6, 11. But that is simply not true. Paragraph 11, which the

9

Board apparently relies upon for this argument, alleges that NTC "may" make such loans, in the sense that it has the right to do so under the SLA. But ¶ 14 specifically alleges that NTC *did* make such loans to the CTPF Custom Fund. That paragraph alleges that "NTC itself has been injured by and incurred damages and costs from Chicago Teachers' and its Board's material breach" of their obligations under the SLA "including by temporarily and voluntarily lending NTC's own funds to the [CTPF Custom Fund]" to cover losses that the CTPF and its Board were obligated to pay. NTC seeks repayment of the amounts loaned, with interest.

The Board also argues (at 11-12) that NTC has not shown that it was harmed by any temporary loans it made because NTC has not explained why it did not engage in self-help by repaying itself (with interest) out of the Custom Fund. The Board begins this argument by inaccurately describing its own Custom Fund as "NTC's term for the commingled cash collateral pools in which CTPF and other SLP participants invested their securities lending collateral." As the Counterclaim alleges in ¶ 9 (and the Board must surely know), however, the Board opted *not* to invest in the commingled collateral pools that NTC offers to direct lending customers. The Board chose instead to have its own separate "custom" fund in which *only* CTPF's cash collateral was and is invested. Thus, the CTPF Custom Fund belongs to CTPF; although NTC manages it as CTPF's agent, we doubt very much that the CTPF Board would agree that NTC has the right to repay itself for loans it temporarily extended to cover collateral investment losses out of assets belonging to CTPF. Indeed, the SAC specifically complains that NTC had no right to use plaintiffs' assets to offset any collateral investment losses, accusing NTC of improperly "seizing" securities lending revenues for that purpose. SAC ¶ 13.[4]

Moreover, as NTC alleges, the CTPF Custom Fund experienced significant ***realized***

---

[4] If the Board is willing to allow NTC to repay itself, with interest, out of the CTPF Custom Fund, then NTC would be happy to do so.

losses and therefore has a ***permanent*** shortfall. If NTC were to repay itself, with interest, from the CTPF Custom Fund, that would only increase the size of the shortfall in the CTPF Custom Fund and put the Board at even greater risk of defaulting on its obligation to borrowers to return their collateral when the loans have ended. Under these circumstances, it is irrelevant whether the Board owes its own Custom Fund or whether it owes NTC—either way, the Counterclaim seeks a determination that it is the Board, rather than NTC, that is responsible for the investment losses suffered by the CTPF Custom Fund and an order requiring the Board to pay those losses, whether to the Fund or NTC.

Finally, the Board complains that the Counterclaim does not specifically allege the amount that NTC temporarily loaned to the CTPF Custom Fund, but rather says only that the amount is to be determined at trial. The Board contends that under the Federal Rules, NTC is required to quantify the amount of its alleged damages in its Counterclaim. This is an odd argument for the Board to make, since its own complaint says only that plaintiffs seek an award of an "appropriate measure of damages to be determined at trial." SAC Prayer for Relief (f). In any event, the rule in federal court is that the plaintiff must plead sufficient facts to show that it has suffered actual harm, but need not ***quantify*** its damages at the pleading stage. *See, e.g.*, *Ho-Chunk Nation v. J.C. Penney Co., Inc.*, 1999 U.S. Dist. LEXIS 10716, at *36 (N.D. Ill. July 2, 1999) (third-party claim was adequately pleaded where J.C. Penney alleged that a contract was breached and "as a result, J.C. Penney has been damaged"; "[w]e need not presently determine the level of J.C. Penney's damages, nor is J.C. Penney required to plead its damages amount"). The cases the Board cites at page 13 of its brief are not to the contrary.[5] Here, NTC has

---

[5] *Universal Bankcard Sys., Inc. v. Bankcard Am., Inc.*, 998 F. Supp. 961, 967 (N.D. Ill. 1998), is not a pleading case; instead, that opinion involved a motion for judgment after trial. *Valenti v. Mitsubishi Motor Sales of Am., Inc.*, 773 N.E.2d 1199, 1203 (Ill. App. 2002), was an appeal from a summary judgment ruling. *Salazar v. Lehman Bros. Bank*, 2010 WL 3998047, at *2 (D. Ariz. Oct. 12, 2010), was a

11

sufficiently pleaded actual harm by pleading that it made loans that the Board has declined to repay; at this stage of the proceedings, it is not required to do any more.

> B. **The Court Should Reject The Board's Argument That NTC Cannot Seek Reimbursement For Loans It Made Voluntarily.**

The rest of the Board's arguments against the Counterclaim revolve around its assertion that NTC has no right, as a matter of law, to recover any amounts it "voluntarily" loaned to the CTPF Custom Fund. The Board seizes on the use of the term "voluntary" in the Counterclaim and argues that the voluntary payment doctrine precludes NTC from recovering any amounts it loaned to the CTPF Custom Fund unless it can show that one of the exceptions to that doctrine, such as duress, applies. But the voluntary payment doctrine does not apply here because NTC did not make a payment in response to a claim of right. *See* CTPF Br. at 9. Instead, it temporarily loaned money to the CTPF Custom Fund. That loan was "voluntary" only in the sense that NTC was not absolutely *required* under the SLA to make such a loan. As the Counterclaim explains in ¶ 11, NTC could have chosen instead to allow CTPF to default on its obligations to borrowers, which would have resulted in the seizure of securities owned by CTPF.

That NTC was not *required* to loan funds to the CTPF Custom Fund to repay borrowers is only the beginning of the analysis, however. A person who "pays a debt for which another is primarily liable and which in equity and good conscience should have been discharged by the latter" is entitled to recover from the primary obligor under principles of subrogation, so long as the person paying is not a "mere volunteer" or "stranger." *Bost v. Paulson's Enterprises, Inc.*, 343 N.E.2d 168, 172 (Ill. App. 1976); *Sher v. Robin*, 291 N.E.2d 801, 804 (Ill. 1972). A "mere

---

pleading case but does not help the Board because the dismissal there was based on the plaintiff's inability to articulate *how* or *why* a lender's alleged RESPA violation had caused any actual damages. Finally, whatever pleading obligation the Illinois courts may impose is irrelevant because, as the court noted in the case the Board cites, *Akinyemi v. JP Morgan Chase Bank, N.A.*, 908 N.E.2d 163, 169 (Ill. App. 2009) , Illinois is a fact pleading state, while notice pleading rules apply in federal court.

12

volunteer" is a person who "is under no legal obligation or liability to pay the debt." *American Nat'l Bank & Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455, 463 (7th Cir. 1982). Because "Illinois courts favor subrogation," they "construe broadly the requirement that there be a 'legal obligation or liability to pay the debt.'" *Custom Cartage, Inc. v. Motorola, Inc.*, 1999 WL 965686 at *6 (N.D. Ill. Oct. 15, 1999). "There is sufficient compulsion to support legal subrogation in cases where there exists a potential for legal liability, as well as the disruption of normal relations and the frustration of reasonable expectations." *Id.* (citing *Weyerhaeuser*, 692 F.2d at 463). As the Illinois Supreme Court put it in *Sher v. Robin*, if the plaintiff was "compelled to pay for the protection of his own interest and rights," he is entitled to reimbursement from the person whose obligation he discharged. 291 N.E.2d at 804.

Here, NTC was not a stranger, nor did it act as a "mere volunteer" when it loaned money to the CTPF Custom Fund. As securities lending agent for the CTPF Board, NTC was responsible for making sure that borrowers were fully repaid out of CTPF's funds when loans were terminated. It was also responsible for making sure that the CTPF Custom Fund had sufficient assets to ensure that *all* borrowers would be repaid. Indeed, that is why the SLP specifically gives NTC, as agent, the power to determine when a "Collateral deficiency" has occurred. The SLP "allocates" the responsibility for any and all collateral deficiencies to the Board. NTC at the very least has implied *authority* to lend funds to the Custom Fund to reduce or eliminate the collateral deficiency until the Board discharges that responsibility or, in the case of unrealized losses, the deficiency disappears because market conditions improve. To hold otherwise would mean that NTC would be powerless to protect CTPF's interest in obtaining the return of its securities if, for whatever reason, the Board was unwilling or unable to come up with the funds necessary to ensure that borrowers would be fully repaid.

13

Plaintiffs have alleged in this case that NTC acted as a fiduciary. If NTC had refused to offer any assistance to the CTPF Custom Fund and CTPF had, as a result, lost valuable securities, it is likely that the Board would have claimed that NTC violated fiduciary obligations by refusing to provide any assistance to avoid such a result. The mere threat of such a claim, as well as the parties' own business interests in ensuring the smooth functioning of the securities lending program, provides an ample basis for concluding that NTC was not acting as a volunteer.

*Advance Mortgage Corp. v. Concordia Mut. Life Ass'n*, 481 N.E.2d 1025 (Ill. App. 1985), is directly on point and fully supports that conclusion. In that case, a mortgage servicer sued the investor who owned the mortgage for taxes and insurance premiums the servicer had advanced out of its own funds. The servicer and the owner had a written contract in which the owner appointed the servicer as its agent. Under the contract, the agent had an obligation to make diligent efforts to make sure that taxes and insurance were paid, but was "required" to make payments only out of funds supplied by the borrower or the investor. Although the court recognized that the agent was not required to advance funds to cover insurance and taxes, it held that the agent had been acting within the scope of its agency in so doing. The court noted that "[a] principal is bound not only for the precise act which he expressly authorized the agent to do, but also for whatever belongs to the doing of it or is necessary to its performance." 481 N.E.2d at 1029. It also noted that a principal is bound by its agent's actions when the agent "exercises an inherent power stemming from the agency relationship." *Id*. The agency agreement in that case did not ***prohibit*** the servicer from advancing its own funds. *Id*. Under those circumstances, the court concluded that the servicer had not only acted within the scope of its agency in advancing funds but faced potential liability had it failed to do so. Because it had thus not acted as a "mere volunteer," the servicer was entitled to reimbursement.

Alternatively, the *Advance Mortgage* court concluded that, even if the servicer had acted outside the scope of its authority as agent, the owner had ratified its conduct by retaining the benefits of the servicer's actions. The court explained that "[a] party cannot repudiate the acts of another done on his behalf and at the same time accept the fruits and benefits of those acts." *Id*. at 1031. Ratification of the advance was "equivalent to original authority" to make the advance, with the expectation that it would be repaid. *Id*. at 1030.

Similarly, in this case, NTC was acting within the scope of its authority as agent in lending funds to the CTPF Custom Fund to ensure that borrowers would be fully paid. Although it was not *required* to lend those funds, there was nothing in the SLA that *prohibited* it from doing so. Furthermore, CTPF has clearly accepted the fruits and benefits of NTC's acts because its Custom Fund—CTPF's own property—is necessarily larger than it would have been absent the loans. Having accepted the benefit of NTC's loans to cover a portion of the collateral deficiency, the facts alleged demonstrate that the CTPF Board ratified NTC's decision to provide it with temporary funding and implicitly agreed to repay NTC if the Board is ultimately found to be responsible for the full amount of the deficiency. At the very least, the Counterclaim raises questions of fact on this issue, which cannot be resolved on a motion to dismiss.

## CONCLUSION

For the foregoing reasons, the CTPF Board's motion to dismiss NTC's Counterclaim should be denied. If, however, the Court concludes that the Counterclaim, or any portion thereof, fails to state a claim, NTC respectfully seeks the right to replead.

                                              Respectfully submitted,

Dated: August 27, 2012                        /s/ Caryn L. Jacobs

| | |
|---|---|
| Caryn L. Jacobs | Michele Odorizzi |
| WINSTON & STRAWN LLP | MAYER BROWN LLP |
| 35 West Wacker Drive | 71 South Wacker Drive |
| Chicago, Illinois 60601 | Chicago, Illinois 60606 |
| (312) 558-5600 | (312) 782-0600 |
| cjacobs@winston.com | modorizzi@mayerbrown.com |

*Counsel for Counter-Plaintiff The Northern Trust Company*

16

## **CERTIFICATE OF SERVICE**

   The undersigned, an attorney, hereby certifies under penalty of perjury that a copy of the foregoing THE NORTHERN TRUST COMPANY'S MEMORANDUM IN OPPOSITION TO COUNTER-DEFENDANT'S MOTION TO DISMISS THE COUNTERCLAIM was served on counsel for all parties electronically via the CM/ECF system on August 27, 2012.

Dated: August 27, 2012             /s/ Todd J. Ehlman