**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | |
| | Judge Robert W. Gettleman, *Judge Presiding* |
| Plaintiffs, | Magistrate Judge Susan E. Cox |
| v. | Civil Action No. 09-7203 |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO STRIKE CERTAIN OF PLAINTIFFS' OBJECTIONS**
**TO DEFENDANTS' DOCUMENT REQUESTS AND TO COMPEL PRODUCTION**

**INTRODUCTION**

Defendants Northern Trust Investments, Inc. and The Northern Trust Company ("NTC") (collectively, "Northern") submit this Memorandum in support of their Motion to Strike Certain of Plaintiffs' Objections to Defendants' Document Requests and to Compel Production ("Motion"), seeking an order (1) striking certain overbroad and groundless objections that plaintiffs asserted to most of Northern's document requests; and (2) compelling plaintiffs to produce the documents responsive to these requests.

Plaintiffs have asserted three categories of objections that are the subject of this Motion. *First*, plaintiffs have improperly asserted an overarching objection—applicable to dozens of Northern's document requests—to producing *any* documents relating to Northern's pending affirmative defenses. *Second*, plaintiffs have asserted similarly overarching objections to Northern's requests for documents reflecting what plaintiffs knew about the very investments at issue in this case. Specifically, plaintiffs object to producing documents concerning the specific securities (and their issuers) as to which they claim damages, and their participation in securities lending, unless the documents relate directly to the collateral pools and/or lending funds that are the subject of their claims. That sweeping objection would allow plaintiffs to refuse to produce documents relevant to their claims if the documents do not specifically mention those pools or funds. *Third*, in response to portions of document requests seeking documents that cut against, or run contrary to, certain specific allegations in the complaint, plaintiffs have asserted baseless boilerplate objections of undue burden, vagueness, and lack of relevance.

None of these categorical objections has any merit. The objections should be stricken, and plaintiffs should be ordered to produce documents responsive to the subject requests.

## BACKGROUND

### I. Overview of the Second Amended Complaint and Northern's Affirmative Defenses

The plaintiffs in this case—Louisiana Firefighters' Retirement System ("LAFF"), the Board of the Public School Teachers' Pension & Retirement Fund of Chicago ("CTPF"), the Board of Trustees of the City of Pontiac Police & Fire Retirement System ("PPF"), and the Board of Trustees of the City of Pontiac General Employees Retirement System ("GERS")—are, or manage, certain public pension plans. Second Amended Complaint ("SAC"), Dkt. #159, ¶¶ 16-19. Their complaint arises from the plans' involvement in securities lending, an investment activity in which owners of securities lend the securities they own to borrowers, typically in exchange for cash collateral from the borrowers, and then invest that cash collateral in fixed income securities in the hope of earning a positive return. Plaintiffs say that they participated in Northern's securities lending program, either by using NTC as their agent to lend the securities they owned (so-called "direct" securities lending) or by investing in one or more of Northern's collective index funds (the "Lending Funds") that engaged in securities lending, and lost money as a result. *Id.* ¶¶ 16-38.

The gist of plaintiffs' claims is that they "placed their trust and confidence in Northern" in deciding to engage in direct securities lending and/or to invest in Lending Funds and maintained their participation in securities lending "in reliance on" Northern. *Id*. ¶¶ 85, 129.[1] They say that Northern was responsible for investing securities lending cash collateral in certain "Collateral Pools" Northern managed and that Northern violated its duties to plaintiffs by buying allegedly "high-risk" or "illiquid" securities (the "Subject Securities"), such as notes of Lehman

---

[1] The operative pleading is currently the SAC. At the time Northern served the document requests at issue in this Motion, the operative pleading was the Amended Complaint. Dkt. #32. The fact allegations in the two complaints are substantially similar for purposes of this motion.

Brothers or Sigma Finance, or by not selling such securities before realized losses were incurred. When a small fraction of Collateral Pool securities declined in value after the unprecedented financial meltdown of 2008, plaintiffs sued. *Id.* ¶¶ 1-6, 11-13, 16-19, 38-114.

Northern has asserted 19 affirmative defenses to these claims, none of which plaintiffs have challenged. These defenses include comparative fault, superseding fault, failure to mitigate, waiver, ratification, acquiescence, assumption of risk, and estoppel, and are based on more than 50 pages of detailed factual allegations. Defs.' Answer and Affirmative Defenses ("Aff. Def."), Dkt. #167, pp. 87-146. The crux of these defenses is that plaintiffs knowingly accepted the risks of securities lending, earned large sums of money from that strategy, stayed the course when certain Collateral Pool securities sustained unrealized losses, and sought to hold Northern responsible for the risks plaintiffs voluntarily assumed *only after* the Collateral Pools later incurred unforeseen realized losses. Among other things, Northern alleges that plaintiffs:

- are financially sophisticated investors (advised by internal professionals and external consultants) with a fiduciary duty to prudently make and monitor plan investments;

- chose how to invest cash collateral from their direct securities lending activities and knew and accepted how the Lending Funds' cash collateral was invested;

- knew and accepted the risk of the Collateral Pools' holdings and performance, and themselves held the kinds of securities that they now claim were improper on their face;

- had sole decision-making power over whether to engage in or withdraw from direct securities lending and to make, hold, and sell interests in the Lending Funds, and chose to maintain and even increase their exposure to the foregoing after being informed of unrealized losses; and

- could have avoided all or most of their alleged losses by reducing or eliminating their exposure to securities lending on multiple occasions over the alleged class period.

*Id.* pp. 87-91, 125-46. As an example of plaintiffs' substantial participation in the investments about which they complain, CTPF designed its own unique collateral reinvestment strategy,

seeking higher potential returns from a more aggressive strategy, and then chose to "stay the course" when Northern told CTPF in August 2007 that this strategy had incurred some unrealized losses. *Id.* ¶¶ 32-33, 39-45. As another example, LAFF chose to *increase* its exposure to securities lending after first learning of unrealized losses. *Id.* ¶ 117.

Plaintiffs thus assumed the risk of, acquiesced in, failed to object to, and ratified Northern's management of the Collateral Pools; waived and are estopped from blaming Northern for doing exactly what they told Northern to do; failed to mitigate damages by not reducing or eliminating their securities lending exposure when they could have done so; and are comparatively at fault for any losses. *Id.* pp. 125-46. Proof relating to these defenses (and to plaintiffs' claims) will include presenting evidence of: Northern's extensive disclosures to plaintiffs about the risks they were undertaking and of plaintiffs' acceptance of such risks; what plaintiffs knew and thought about the performance and risks of the Collateral Pools, the Subject Securities and their issuers (such as Lehman or Sigma), the types of securities plaintiffs criticize (such as floating rate notes, asset-backed securities, and structured investment vehicles ("SIVs")), the markets, and the economy; and whether plaintiffs in fact relied on and placed their trust in Northern. *See, e.g.*, SAC ¶¶ 85, 129; Aff. Def. ¶¶ 1, 4, 7, 9, 22, 25-26, 34, 36, 40, 50, 59-60, 68-69, 75, 79-80, 85, 95-96, 105-106, 114, 116, 134, 140, 149, 151, 153, 156, 160, 163.

Put simply, plaintiffs' own conduct (including their interactions with securities lending programs run by Northern and others) *impeaches and rebuts* plaintiffs' own allegations. And to the extent such conduct pertains to an affirmative defense, it wholly defeats plaintiffs' claims or reduces their alleged damages *irrespective of plaintiffs' own allegations*.

## II.     Northern's Document Requests and Plaintiffs' Improper Responses and Objections

Northern served plaintiffs with an initial document request directed jointly to all four plaintiffs (the "All-Plaintiff RFP," Ex. 1a) *and* four separate sets of document requests directed

individually to the four plaintiffs (the "Plaintiff-Specific RFPs," Exs. 2a, 3a, 4a, and 5a).[2]  The

RFPs sought documents on such matters as plaintiffs' involvement in securities lending; their

knowledge and communications about the Lending Funds in which they invested and the

Collateral Pools to which they were exposed; the Subject Securities and types of securities they

now say were too risky; and the issuers of securities they say were susceptible to default.  (*See*

Exs. 1a-5a.)    All of these requests relate to particular allegations in the complaint, seek

information that could impeach or rebut those allegations, and/or concern Northern's defenses

and affirmative defenses.

In response, plaintiffs asserted virtually identical, sweeping objections to most of the

RFPs.    For example, regarding the Plaintiff-Specific RFPs, plaintiffs asserted the same

boilerplate objection to producing documents that, in plaintiffs' view, relate only to Northern's

affirmative defenses or are, in their view, otherwise unrelated to their case-in-chief.  (*See, e.g.*,

Ex. 2b, CTPF's responses and objections to its Plaintiff-Specific RFP, Resp. 1-10, 12, 16, 24-43,

46-47, 49-52 and 59-62.)    Based on this broad objection, Plaintiffs refused to produce *any*

*documents* to various of Northern's requests, including requests seeking documents germane to

the following matters:

---

[2] Exhibit numbers refer to the exhibits attached to the Appendix filed contemporaneously herewith. Plaintiffs responded jointly to the All-Plaintiff RFP, which is attached to the Appendix as Ex. 1b.  The individual responses and objections to each of the Plaintiff-Specific RFPs are attached as Exs. 2b, 3b, 4b, and 5b.  Plaintiff LAFF served a Corrected Response to its Plaintiff-Specific RFP, attached as Exhibit 5b. The four Plaintiff-Specific RFPs contain substantially similar, but not precisely identical, requests to each individual plaintiff.  *See* Ex. A (chart matching the various requests in each Plaintiff-Specific RFP). Although each plaintiff responded separately to the Plaintiff-Specific RFP directed to that plaintiff, the responses provided and objections asserted by CTPF, PPF, and GERS were essentially identical.  The primary difference in LAFF's objections and responses is that LAFF indicated that it would produce some documents (subject to objections) in response to certain requests to which the other three plaintiffs refused to produce any documents.  (Ex. 5b, LAFF's Objections to its Plaintiff-Specific RFP, Resp. 6, 16, 28-29, 30-32, 34, 45-46.)    Conversely, LAFF refused to produce any documents in response to one request to which the other three plaintiffs agreed to produce some documents.  (*Id.*, Resp. 38.)    For simplicity, when referring to the requests contained in the Plaintiff-Specific RFPs (or the objections thereto), this Memorandum will generally refer to the Plaintiff-Specific RFP directed to CTPF.

- **Plaintiffs' reliance on Northern in making and holding the direct securities lending and Lending Fund investments at issue here (Ex. 2b, *e.g.*, Resp. 49-50).** Such documents pertain, for example, to plaintiffs' reliance claims (SAC ¶¶ 85, 127) and proximate causation.[3]

- **The identity, and other information about, plaintiffs' investment personnel who made and monitored the plans' investment decisions in this case, and information about plan duties, governance, and authority to engage in securities lending (Ex. 2b, *e.g.*, Resp. 1-2, 5-7, 8-9).** Such documents relate to the direct securities lending and Lending Fund investments at issue here and are necessary, for example, to gather information about potential deponents and plaintiffs' decision-making process in making those investments, which could rebut claims of reliance on, or imprudence by, Northern, and support Affirmative Defenses 1-14 and 17.

- **Mitigation of damages and any objections plaintiffs made to their account statements (Ex. 2b, *e.g.*, Resp. 52-53).** Such documents pertain to Affirmative Defenses 3, 9, and 12-14.

- **Plaintiffs' direct securities lending with non-Northern managers and investment in non-Northern funds that engage in securities lending, as well as plaintiffs' investment strategies and risk tolerances overall and with respect to securities lending (including the investments at issue in this case) (Ex. 2b, *e.g.*, Resp. 13-16, 40).** Among other things, such documents could show Northern's conformance with industry standards;[4] plaintiffs' risk tolerances and views about the value and safety of the Subject Securities, their issuers, and the types of securities plaintiffs criticize here; plaintiffs' knowledge of and decisions regarding cash collateral investment strategies (including those of the Collateral Pools); and plaintiffs' reasons for making the investments in this case.[5]

---

[3] Proximate cause is an element of a breach of fiduciary duty claim. *Covinsky v. Hannah Marine Corp.*, 903 N.E.2d 422, 431-32 (Ill. App. Ct. 2009).

[4] Compliance with industry standards is a defense to allegations of breach of fiduciary duties. *See Jones v. O'Higgins*, No. 87-CV-1002, 1989 WL 103035, at *9 (N.D.N.Y. 1989) (finding no imprudence or breach of fiduciary duty where advisor acted "within the standards and practice in the investment industry"); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1229-30 (N.D. Cal. 2008) (same, regarding investment options that were "competitive with the industry standard").

[5] Plaintiffs' investment strategies and conduct with respect to the Subject Securities and other securities lending are relevant to their claims and Northern's defenses. *See generally Blue Cross Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, Civ. No. 11-2529, slip op. at 18-19 (D. Minn. Apr. 18, 2012) (allowing such discovery because if plaintiffs "held similar investments elsewhere in their portfolios, that information is probative of whether Plaintiffs sincerely believed that the allegedly faulty investments were, in fact, improper," and because "Plaintiffs' involvement with other securities lending programs generally may be relevant to their understanding of such a program's operation or procedures").

- • **Plaintiffs' decisions to engage in direct securities lending at Northern or invest in the Lending Funds; their analysis and communications (including specific meetings) about their decision to make, increase, or decrease the foregoing investments; their approval of the Collateral Pools; what they knew about the performance of such Pools; and their evaluation of, and practices and policies regarding monitoring, their securities lending investments (Ex. 2b, *e.g.*, Resp. 28-31, 33-34, 36-39, 47).** Such documents plainly pertain to the very investments at issue here.[6]

With respect to both the Plaintiff-Specific RFPs and the All-Plaintiff RFP, plaintiffs asserted a series of related general and specific objections through which they objected to producing documents that do not relate *specifically* to the Lending Funds or Collateral Pools.[7] These objections give plaintiffs unbridled discretion to withhold large categories of relevant documents responsive to various requests in the Plaintiff-Specific RFPs, including requests seeking documents relevant to the following matters:

- • **What plaintiffs relied upon in making the investments in this case (Ex. 2b, *e.g.*, Resp. 3, 32, 46).** This allows plaintiffs improperly to withhold documents relevant to, for example, their own investment due diligence, knowledge of industry information, and anything on which they relied from Northern or non-Northern sources, that did not relate to plaintiffs' exposure to a Lending Fund or Collateral Pool.[8]

---

[6] Plaintiffs refuse to produce any documents in response to Requests 13, 14, 15 and 53 not based on their objection relating to Northern's affirmative defenses, but on other grounds. Specifically, Plaintiffs refuse to produce documents in response to Requests 13, 14 and 53 on the grounds that the requests do not directly relate to plaintiffs' "investment of cash collateral" in Northern's securities lending program "through" the Collateral Pools and/or Lending Funds, an improper objection we discuss below (Ex. 2b, Resp. 13-14, 53), and refuse to produce documents in response to Request 15 based on their objection that the requested documents are irrelevant to the case (*id.*, Resp. 15).

[7] Through these related, sweeping objections, Plaintiffs refuse to produce relevant documents relating to securities lending, the Lending Funds, the Collateral Pools, and the Subject Securities *if* the documents did not specifically relate to plaintiffs' "participation" or "investment of cash collateral" in Northern Trust's securities lending program "*through*" the Collateral Pools and/or Lending Funds. (*See* Ex. 1b, plaintiffs' joint objections to the All-Plaintiff RFP, Gen. Obj. 8, Obj. to Def. and Instr. 5, and Resp. 4-8, 12-14, 25, 29, 31-32, 35-37, 40, 42, 44, 48, 53; Ex. 2b, Gen. Obj. 10, Obj. to Def. and Instr. 5, and Resp. 1-4, 7-8, 10-14, 17-18, 20-25, 27, 31-32, 38, 40-44, 46-48, 51, 53-54, 56, 62.)

[8] Information plaintiffs relied on in making securities lending decisions, including information from sources other than Northern, is relevant to plaintiffs' claims and Northern's defenses. *See City of Farmington Hills Empls. Ret. Sys. v. Wells Fargo Bank, N.A.*, Civ. No. 10-4372, slip op. at 2 (D. Minn. Oct. 16, 2012).

- **Plaintiffs' knowledge of securities lending generally and the investments at issue here; their knowledge and choices of cash collateral investment strategies (including regarding securities of Lehman and Sigma) in Northern and non-Northern programs; external and internal communications about the foregoing; and documents regarding alleged losses here (Ex. 2b, *e.g.*, Resp. 4, 10, 12, 22-23, 25-27, 35, 41, 44, 62).**[9]  This allows plaintiffs improperly to withhold documents relating to, for example, their own knowledge and choices that bore on their investment decisions in this case.[10]

- **The economic and market conditions, and their effect on plaintiffs' direct securities lending and investment in the Lending Funds in this case and on securities lending generally (Ex. 2b, *e.g.*, Resp. 17, 44).**  This allows plaintiffs improperly to withhold documents reflecting, for example, plaintiffs' knowledge of these conditions and their effect on securities lending and the investments at issue in this case, including plaintiffs' knowledge about whether the global financial crisis of 2008 and the subsequent losses and defaults should have been foreseen.

- **Plaintiffs' knowledge, analysis, and communications—and Northern's disclosures—about their direct securities lending and Lending Fund investments in this case; plaintiffs' decisions to make, increase, or decrease those activities; and the Collateral Pools (Ex. 2b, *e.g.*, Resp. 22-23, 25, 32, 44, 46, 51).**  This allows plaintiffs improperly to withhold documents reflecting, for example, plaintiffs' analysis and discussions about cash collateral investment strategies and disclosures from Northern on such issues.

- **Agreements and other documentation between Northern and plaintiffs governing and relating to plaintiffs' direct securities lending or investment in Lending Funds.  (Ex. 2b, *e.g.*, Resp. 18-19**). This allows plaintiffs improperly to withhold documents that do not expressly mention the Collateral Pools or the Lending Funds.

Plaintiffs made the same unsupportable objections to the All-Plaintiff RFP, including to

various requests seeking documents relevant to the following matters:

- **Plaintiffs' allegation (SAC ¶ 85) that they continued to hold their investments *in reliance on* Northern (Ex. 1b, *e.g.*, Resp. 1).**  This allows Plaintiffs improperly to limit their production to documents about the Collateral Pools or Lending Funds,

---

[9] With regard to the LAFF request that corresponds to CTPF Plaintiff-Specific RFP Request 44, LAFF refused to produce any documents.  (Ex. 5b, Resp. 38.)

[10] Plaintiffs' own views of issuers of securities that sustained a loss are relevant to causation and damages and are thus discoverable.  *See Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 257 (S.D.N.Y. 2012).

even if plaintiffs' alleged reliance on Northern was based on other dealings with Northern, on experiences with non-Northern managers, or on other sources.

- **Securities lending and plaintiffs' exposure to securities lending with Northern and through non-Northern managers (Ex. 1b, *e.g.*, Resp. 4, 7-8).** This allows plaintiffs improperly to limit their production to documents about the Collateral Pools or Lending Funds, even if the documents shed light on plaintiffs' risk tolerances, standards of prudence, and views about the risks associated with securities lending.

- **Issuers plaintiffs claim were subject to failure, securities issued by them, the types of securities plaintiffs claim were imprudent, and the securities causing alleged losses here, as well as plaintiffs' own investments in and knowledge of same (Ex. 1b, *e.g.*, Resp. 5-6, 14, 27, 33-37, 41-42, 44).** This allows plaintiffs improperly to limit their production to documents relating only to specific securities held in the Collateral Pools and withhold documents reflecting their knowledge of and investment in the securities of issuers, such as Lehman or Sigma; the types of investments, such as floating rate notes, asset-backed securities, and SIVs; and the industries, such as finance, that plaintiffs criticize here.

- **The complaint's allegations that Northern improperly invested and structured the Collateral Pools and about Northern's withdrawal and redemption restrictions (Ex. 1b, *e.g.*, Resp. 10-14, 16, 24-25, 29, 31, 40).** This allows plaintiffs improperly to limit their production to documents about the Collateral Pools or Lending Funds, even though Northern is entitled to present an industry-standards defense to rebut liability, and even if documents relating to plaintiffs' investments through non-Northern managers reflected their approval of the aspects of Northern's program that plaintiffs challenge here.

Finally, in response to 24 of the requests in the All-Plaintiff RFP, plaintiffs objected to requests seeking documents that would impeach or rebut key allegations of their complaint— *which the RFPs specifically cited*—as "vague," "overbroad," "unduly burdensome," or "not reasonably calculated to lead to the discovery of admissible evidence." (*E.g.*, Ex. 1b, Resp. 12-14, 23-25, 29, 31-32, 34-37, 41-42, 44, 46-49, 51-54.) These objections are not well-taken, as they pertain to RFPs that actually cite specific allegations in plaintiffs' complaint.

Plaintiffs' objections would allow them to withhold documents that relate to cited paragraphs of their own complaint, rebut their own allegations, and/or prove Northern's defenses. These could include, for example, documents revealing plaintiffs' view that Lehman's or Sigma's failure was unforeseeable (impeaching their claims to the contrary here); showing

plaintiffs' transactions through non-Northern managers in the Subject Securities or their issuers (impeaching their claims that such securities were too risky or "exotic"); or acknowledging plaintiffs' view that securities lending generally remained prudent and that they should "stay the course" (impeaching their claim that Northern should have restructured the Collateral Pools).

Northern has attempted to resolve the issues presented herein through the meet-and-confer process, but such efforts have been unsuccessful; after numerous communications on these issues with plaintiffs' counsel, plaintiffs refused to withdraw their improper objections. (Ex. B, Certificate of Compliance with L.R. 37.2.) Regarding the RFPs as to which plaintiffs did not agree to produce *any* documents, plaintiffs have not changed their position. With respect to the RFPs as to which plaintiffs agreed to produce *some* documents, plaintiffs refused to identify what kinds or categories of documents they have withheld as a result of their objections, disclosing only that they would produce documents that *they* deemed relevant, even though the objections would allow them to withhold broad categories of documents that *Northern* considered relevant. (*Id*. ¶ 10.) This, of course, left Northern to guess about what documents it would and would not receive, and left it in the dark as to whether plaintiffs' objections effectively conceal key documents to which it is entitled. As the parties are at an impasse on these matters, Northern now asks the Court to intervene and strike plaintiffs' meritless objections and order production of any documents withheld as a result of such objections.

## ARGUMENT

The Federal Rules of Civil Procedure provide for discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The material sought does not have to be admissible at the trial; it need only be "reasonably calculated to lead to the discovery of admissible evidence." *Id.* Further, documents relevant to a defendant's defenses

and affirmative defenses are subject to production to the same extent as documents relevant to a plaintiff's claims; plaintiffs may not unilaterally limit discovery to their own theory of the "case.[11] Where, as in this case, discovery objections have been improperly asserted and discovery improperly withheld, the court should strike the objections and compel the proper production.[12]

## I. Plaintiffs Improperly Refuse to Produce Documents Relating to Northern's Affirmative Defenses.

After Northern filed its 19 pending affirmative defenses, plaintiffs did not move to dismiss or otherwise challenge them, so the defenses are clearly at issue in this case. Yet plaintiffs repeatedly have refused to withdraw the objections they had asserted to dozens of the RFPs that, in their view, were objectionable because they sought information relating to affirmative defenses (or to Northern's former third-party claims, the substance of which is now incorporated into Northern's affirmative defenses). This objection is entirely improper.

The RFPs to which this improper objection was asserted seek information relating to plaintiffs' investment knowledge, analysis, and practices with respect to the Lending Funds, Subject Securities, Collateral Pools, plaintiffs' securities lending activities, or related matters. Such information is highly relevant to ***both*** plaintiffs' claims ***and*** Northern's affirmative defenses. As an example, if plaintiffs—who had fiduciary duties to invest plan assets prudently—knew that the Collateral Pools held Lehman securities (which plaintiffs call a "highly

---

[11] *E.g.*, *Shay v. Lifting Gear Hire, Corp.*, No. 12 C 1687, 2012 WL 6680313, at *4 (N.D. Ill. Dec. 21, 2012) (ordering production of documents relating to defendant's failure to mitigate defense); *Sloan v. Zurn*, No. 10 C 204, 2012 WL 1237744, at *9 (N.D. Ill. Apr. 12, 2012) (same, for defendant's invalidity defense); *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) (same, for defendant's prior express consent defense).

[12] Fed. R. Civ. P. 37; *see also Magalis v. Adams*, No. 08-CV-3135, 2009 WL 3756446, at *5 (C.D. Ill. Nov. 5, 2009) (striking improper objections and compelling discovery); *Anglin v. Vill. of Wash, Park*, No. 03-846, 2006 WL 1308579, at *2 (S.D. Ill. May 10, 2006) (same); *Meyer v. S. Pac. Lines*, 199 F.R.D. 610, 616 (N.D. Ill. 2001) (same); *Morris v. Swank Educ. Enters, Inc.*, No. 04 C 50056, 2004 WL 1899987, at *10 (N.D. Ill. August 20, 2004) (granting in part motion to strike discovery objections and to compel production).

exotic" investment) and approved that investment and/or did not reduce or limit their exposure to it, that would impeach their allegations that buying or holding those securities (or any Lehman debt) was patently imprudent, *e.g.*, SAC ¶¶ 9, 41, 47, 68, 86, 93; undermine proof of causation and damages, *e.g.*, *id.* ¶ 85; and help prove Northern's defenses of mitigation, ratification, estoppel, assumption of risk, comparative fault, and so forth, Aff. Def. pp. 87-146. And if plaintiffs' documents admit that the 2008 global financial crisis or the failures of firms such as Lehman were unforeseen, that would impeach their allegations that Northern should have seen "clear warning signs" of those events months or even years before, *e.g.*, SAC ¶¶ 10, 74, 97, 99. It would be equally relevant to Northern's affirmative defenses—not to mention such issues as reliance, causation, and damages—if plaintiffs *possessed* information they claim constituted "clear warning signs" requiring a massive restructuring of the Collateral Pools, or thought that Lehman had a high risk of failure, but did nothing about it. Given (1) plaintiffs' own fiduciary duties, (2) what they knew about Collateral Pool investment in securities of issuers such as Lehman, and (3) their own consideration of economic events in making investment decisions— *e.g.*, Aff. Def. ¶¶ 39-40, 42, 45, 80, 116-17, 140—documents of this type likely exist.

Because the information sought may both undermine the credibility of plaintiffs' claims and support Northern's affirmative defenses, it clearly meets the standard of being "reasonably calculated to lead to the discovery of admissible evidence." Accordingly, the Court should strike this objection and order production accordingly.

## II. Plaintiffs Improperly Refuse to Produce Documents Relating to the Lending Funds, Collateral Pools, Subject Securities, Securities Lending, and Related Matters.

As described above, plaintiffs assert a group of sweeping objections, embodied in two of their "general objections" and repeated in their individual responses and objections, that limits their document production to those documents that specifically relate to their "participation" or

"investment of cash collateral" in Northern's securities lending program "through the Collateral Pools and/or the [] Lending Funds." (*See e.g.*, Ex. 1b, Gen. Obj. 8 and Obj. to Instr. and Def. 5; Ex. 2b, Gen. Obj. 10 and Obj. to Instr. and Def. 5.) Because this broad objection is asserted through general objections (in addition to specific objections to numerous particular requests), it applies to all of Northern's document requests, even those relating directly to the Subject Securities and plaintiffs' own securities lending activities with Northern. Thus, it improperly narrows the scope of plaintiffs' production.

Many categories of documents may not, on their face, relate directly to a plaintiff's exposure to the Collateral Pools through direct lending or investment in the Lending Funds, yet are highly relevant. Such documents might include documents relating to plaintiffs' knowledge of, and investment in: the Subject Securities; the security types that plaintiffs criticize (such as floating rate notes, asset-backed securities, allegedly "exotic" SIVs, and derivatives, *e.g.*, SAC ¶¶ 48, 52); or the securities of issuers (such as Lehman or Sigma) that plaintiffs allege were bad credit risks (*e.g.*, *id*. ¶¶ 86, 97).[13] Under this objection, plaintiffs could withhold documents discussing that Lehman's default was unforeseeable or that Lehman would never default, despite plaintiffs' claims to the contrary in this case (*id*.). The objections would even allow plaintiffs to withhold any knowledge they had of Northern economist Paul Kasriel's economic writings, even though plaintiffs allege that he warned of impending defaults (*e.g.,* SAC ¶¶ 57-70).

---

[13] This could include documents showing the extent of plaintiffs' knowledge and professional guidance regarding the Subject Securities or the kinds of securities plaintiffs criticize as imprudent (*e.g.*, SAC ¶ 48); whether plaintiffs considered such securities to be risky; whether plaintiffs considered such securities to be worthy of investment, despite any perceived risk; or why plaintiffs maintained their securities lending investments, given their knowledge of the performance or risks of such securities. The documents might show, for example, that plaintiffs were knowledgeable regarding such securities, considered them to be safe, and, because of this, maintained their participation in securities lending. Alternatively, they might show that plaintiffs were so pleased with their securities lending revenues, or with the overall performance of the Lending Funds, that they maintained their securities lending investments despite their knowledge of the associated risks. In any event, the documents clearly are relevant to plaintiffs' claims and Northern's affirmative defenses.

Such documents would be relevant even if they did not specifically reference *Northern's* securities lending program, but under plaintiffs' overbroad objections, plaintiffs could also withhold information they knew about the risks of securities lending generally or through non-Northern managers during the economic and market conditions at issue here. Although such documents might (1) impeach plaintiffs' allegations that Northern *should and could have* restructured its Collateral Pools to deal with such conditions, (2) support Northern's defenses, and (3) relate to an industry standard defense, they would not be produced as long as they did not "relate" to specific Collateral Pools and Lending Funds. The same is true as to documents reflecting plaintiffs' own discussions or analysis of the economy, the credit markets, and/or issuers' viability, which—depending on what they say—could support Northern's mitigation and superseding cause defenses and/or impeach plaintiffs' allegations that any reasonable fiduciary would not have bought (or would have sold) the Subject Securities.

These documents could reflect plaintiffs' knowledge, analysis, and conclusions about the very cash collateral investment strategies they criticize; the market and economic conditions they now say "clearly" pointed to a market meltdown; the safety and value of fixed income securities they call imprudent; the issuers they claim were liable to fail; and the collateral pools they claim were improperly structured. Such documents would relate directly to plaintiffs' allegations that they relied on, and placed trust and confidence in, Northern; plaintiffs' prudence and causation allegations; and Northern's defenses of assumption of risk, comparative fault, and so forth. For example, it would impeach plaintiffs' claim that investment decisions made by Northern were imprudent and breached fiduciary duties if—through non-Northern managers—plaintiffs or non-Northern managers made those same or similar investments; bought and held securities issued by Lehman, Sigma, or other issuers of the Subject Securities; approved collateral pool structures of

other lending agents similar to the Collateral Pools here; or maintained investments through those managers of the type they claim Northern should have sold.  Plaintiffs' attempt to limit discovery into such key sources of their knowledge—including the total mix of information available to them—is counter-factual and should not be allowed.

**III.  Plaintiffs Improperly Refuse to Produce Documents Cutting Against Specific Allegations in the Complaint.**

Finally, plaintiffs improperly have asserted boilerplate vagueness, relevance, and burden objections to document requests that expressly reference allegations in their complaint and seek documents that cut against, or run contrary to, those allegations.  (*See* Ex. 1b, Resp. 12-14, 32, 42 (responding to requests citing plaintiffs' own allegations that Northern's collateral pool investments were inappropriate or too risky); Resp. 23-25, 29, 31, 34-37, 41, 44 (same, that Northern improperly held the subject investments and/or failed to mitigate losses by selling the investments earlier); Resp. 46 (same, that withdrawal limitations imposed by Northern prevented plaintiffs from exiting securities lending or the Lending Funds); Resp. 47-49, 51-54 (same, that the case meets the requirements of a class action).)  Such objections are wholly without merit, and amount to another obstructionist tactic designed to avoid producing defense-favorable documents.  The requests are clear, and they clearly relate to the issues plaintiffs themselves have injected in the case.  Plaintiffs' objections should be stricken, and the responsive documents should be produced.

**CONCLUSION**

For the foregoing reasons, the Court should strike the challenged objections and compel plaintiffs to produce responsive documents, unlimited by those objections.

Dated: January 17, 2013

Respectfully submitted,

 /s/ Caryn L. Jacobs

Caryn L. Jacobs
Todd J. Ehlman
Robert L. Michels
Brook R. Long
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Tel:  (312) 558-5600
Fax:  (312) 558-5700
CJacobs@winston.com
TEhlman@winston.com
RMichels@winston.com
BLong@winston.com

Michele L. Odorizzi
Justin A. McCarty
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel:  (312) 782-0600
Fax:  (312) 701-7711
MOdorizzi@mayerbrown.com
JMcCarty@mayerbrown.com

*Attorneys for The Northern Trust Company
and Northern Trust Investments, N.A.*