**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br>     v.<br><br>NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,<br><br>                  Defendants. | Judge Robert W. Gettleman, *Judge Presiding*<br><br>Magistrate Judge Susan E. Cox<br><br>Civil Action No. 09-7203 |

**NORTHERN TRUST'S OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL
COMPLIANCE WITH THE COURT'S OCTOBER 23, 2013 ORDER**

Defendants Northern Trust Investments, Inc. and The Northern Trust Company (jointly, "Northern Trust") hereby respond to plaintiffs' motion to compel compliance with the Court's October 23, 2013 order ("Order"). The motion should be denied in full.

**ARGUMENT**

**I. The Order Does Not Require Collection of 20 New E-Mail Boxes.**

When plaintiffs recently moved to compel production of certain documents pertaining to the so-called "consolidation" issue, they asked the Court to allow discovery into "[i]nternal communications, including communications *to, from or among* Northern Trust's Board of Directors, Executive Committee, the NTGI Risk Council, and the members of the GERC."

(Dkt. # 261 at 14 (emphasis added).) Northern Trust opposed that motion on a number of grounds, one of which was the undue cost and burden of the requested discovery at this stage of the case. (Dkt. # 267 at 13-15.) We explained that, as written, the discovery could extend to pulling 20 additional e-mail boxes, which would take 6 to 15 weeks to do and cost more than $100,000 in vendor processing charges alone,[1] even before considering *any* legal fees and the further delays and expenses of the hosting, searching, reviewing, and producing functions. (Dkt. # 267 at 15; Dkt. # 268 at ¶ 32.) We also demonstrated that such broad and time-consuming merits-related discovery—which would delay class certification briefing by months—was contrary to this Court's instruction that the parties focus "like a laser beam" on discovery "necessary for class certification" and to United States District Judge Gettleman's statement that he hoped he could set a class certification schedule by early October 2013. (Dkt. # 267 at 1, 14-15.)

This Court's Order partially granting and denying the discovery plaintiffs sought and giving Northern Trust 30 days in which to produce that discovery struck a compromise designed to allow some additional discovery without unduly delaying the case. Instead of allowing discovery into internal communications "*to, from or among*" certain groups of individuals (per plaintiffs' request), the Court limited discovery to certain "internal communications *between*" the Northern Trust senior management, Board of Directors, Executive Committee, the NTGI Risk Council and the GERC. (Dkt. # 287 at 4 (emphasis added).) By excluding discovery into communications to or from a single group member on which no other group member was copied, the Order substantially reduced the number of e-mail boxes that might have to be collected so

---

[1] Since we have collected 5 of these 20 e-mail boxes in response to the Order, we have a more certain estimate of these costs, namely, about $103,000 for vendor processing costs and more than $10,000 in additional annual hosting charges. (Jacobs Declaration, dated November 18, 2013 ("Jacobs Decl.") ¶ 15.)

2

that compliance with the Order would not be impossible within the 30-day deadline. Yet the Order would still effectively capture what the members of these groups were saying *to each other* (if anything) about the "consolidation" issue. The Order thus struck a balance between the parties' positions without engendering the kind of undue delay that both the Court and Judge Gettleman sought to avoid.

Northern Trust takes compliance with the Order extremely seriously. When the Order was issued, Northern Trust immediately began to implement it, involving more than two dozen personnel from Northern Trust, outside counsel, and a third-party electronic review database provider in that task. At enormous expense of time and money, these individuals have been working diligently to comply with the letter and spirit of the Order, including its November 22 deadline. In connection with collecting and searching electronically stored information ("ESI"), Northern Trust investigated the facts from numerous angles in order to plan and execute an effective, thorough, and reasonable method for obtaining responsive documents to the extent they existed. (Jacobs Decl. ¶ 10; Josefson Declaration, Dkt. # 294, 296 ("Josefson Decl.") Ex. G.)

In addition to all of this work, Northern Trust responded to plaintiffs' questions about the scope of its collection and searches of ESI, explaining that the Order did not require collection of the e-mail box of every member of the groups referenced therein.[2] Northern Trust also told plaintiffs about the due diligence it had conducted to determine how it planned to comply with

---

[2] Plaintiffs' "guessing game" argument (Motion at 7) is incomprehensible and counterfactual. Plaintiffs' letter to Northern Trust named three accounting employees whose e-mail boxes they thought should be collected and searched, even though Northern Trust's previous correspondence had already indicated that it had collected two of the three individuals' e-mail boxes. During the phone call the parties had about that letter, Northern Trust readily made clear that it had already collected those e-mail boxes and stated that, although the current search terms did not include their names, it would add their names to the search terms. (Josefson Decl., Ex. G; Jacobs Decl. ¶¶ 26-28.) Plaintiffs are evidently confused about the difference between collecting versus searching an e-mail box.

3

the Order and agreed to hear consider any suggestions or objections plaintiffs raised, going so far as to expand its ESI collection and searches in several respects at plaintiffs' request. (Jacobs Decl. at ¶¶ 7, 10, 14, 28, 30, Ex. 2; Josefson Decl. Exs. C, G.) At no point during all of these efforts did Northern Trust ever say or even suggest that plaintiffs had the burden of ensuring that Northern Trust complied with the Order. (Jacobs Decl. at ¶ 30.)[3]

Instead of compromising on a single point, plaintiffs prematurely ran into court. (See Court's order striking the presentment of their motion, Dkt. # 298.) Stripped of its errors and misstatements,[4] plaintiffs' motion reflects one primary complaint: that the Order *required* Northern Trust to collect the e-mail box of every member of the internal Northern Trust groups named in the Order (about 15 more e-mail boxes). (Motion at 1-8.) But the Order does not say that. Nor could that have been the Order's intent, since merely collecting 20 e-mail boxes would

---

[3] Plaintiffs bizarrely construe Northern Trust's willingness to confer with plaintiffs about collection efforts and search terms as an attempt to "shift" the burden of compliance with the Order on plaintiffs. (Motion at 5-7.) Such a stance would mean that litigants could never confer about discovery, as required by federal and local rules, without being accused of abdicating their discovery responsibilities. Northern Trust of course never purported to impose any burden on plaintiffs concerning compliance with the Order. *Plaintiffs asked* to be heard on Northern Trust's process for responding to the Order by seeking information about such matters as search terms. (Jacobs Decl. at ¶ 30; Josefson Decl. Exs. A, C.) In response, we told plaintiffs—orally and in writing—that Northern Trust was responsible for determining how to comply with the Order, but that we would take their suggestions into account (which we did). (Jacobs Decl. at ¶¶ 5, 7, 30; Josefson Decl. Exs. C, J.) The lack of any factual basis whatsoever for plaintiffs' "burden-shifting" argument moots any request for the information that they claim they would need if the burden of compliance with the Order were to be shifted to them. (See Motion at 5.)

[4] The misstatements and omissions in the motion are legion. Northern Trust *never* said (Motion at 2-5) that it had no intention of complying with the Order or that it would not gather e-mail boxes required thereby due to lack of time or undue burden. Nor did Northern Trust ever claim (Motion at 5) that plaintiffs were responsible for identifying whose e-mail boxes should be gathered. (Jacobs Decl. at ¶ 31.) Plaintiffs neglect to reveal Northern Trust's decision to add the e-mail boxes of 5 individuals to its database. (Jacobs Decl. at ¶ 14.) They also fail to mention that when they asked Northern Trust to collect and search the e-mail boxes of 5 additional individuals, Northern Trust assured them that the e-mail boxes had already been collected and would be searched (among dozens of others such boxes). (*Id.* at ¶¶ 26-29.) Plaintiffs also never asked for the names of Risk Council or GERC members until after they filed the instant motion; we gave them those names and revealed the names of such members whose e-mail boxes we already had or were gathering and whose e-mail boxes we were *not* gathering. (Josefson Decl. Ex. G; Jacobs Decl. Ex. 2.)

have been physically impossible within the Order's 30-day compliance date (Dkt. # 268 at ¶ 32),[5] a fact plaintiffs do not dispute. Plaintiffs' apparent willingness to agree to more time for e-mail box collection (Motion at 5) ignores the fundamental inconsistency between the Order's 30-day deadline and our uncontested proof that 20 e-mail boxes cannot even be gathered—much less searched—within that period.[6]

Plaintiffs also argue that because the Order required producing certain documents "between" certain individuals, it implicitly required gathering the e-mail box of every such individual because "between" should be read to include "to" **or** "from" any one of these individuals. (Jacobs Decl. at ¶ 8; Motion at 8-9.) Again, the Order does not say this. To the contrary, the Order declined to use the words spelled out in plaintiffs' prior motion ("to, from or among," Dkt. # 261 at page 14), requiring production of more limited communications "between" certain individuals (Order at 4). Only a sender's or a receiver's box may be needed to find any such communication, not both. As we show in Section II below, the e-mail boxes we are searching are more than adequate to comply with the Order. The motion should be denied on these grounds alone.[7]

---

[5] This estimate, which was based on our experience with prior searches, turned out to be accurate in fact. Mechanically collecting the first 3 e-mail boxes in connection with the Order consumed 5 calendar days alone. (Jacobs Decl. at ¶ 14.) Using this "run rate" translates into over 6 weeks for document collection and search-platform loading alone, while the Order required full compliance in about 30 days.

[6] Had Northern Trust thought collecting 20 boxes was mandated by the Order, it would not have simply ignored the Order, but would have sought relief from the November 22 deadline from the Court.

[7] For the same reason, it is equally meritless for plaintiffs to argue that Northern Trust unduly limited the documents to be produced by requiring them to be "between" at least one member of the committees listed in the Court's Order and at least one other such member. (Motion at 8-9.) In fact, that is exactly what the Order provides. Plaintiffs also negatively characterize the members of these committees as "a narrowly defined list." But that list again tracks the language of the Order, which refers to membership in various groups (the Board, Risk Council, GERC, and Northern Trust senior management). (Order at 4.)

**II. Northern Trust Is Collecting All the Appropriate E-Mail Boxes.**

As part of its efforts to fully comply with the Order, Northern Trust carefully considered the language of the Order and investigated the likely sources of potentially responsive documents concerning the consolidation issues as framed by the Court. That investigation included (among other things) questions to numerous Northern Trust employees; inquiry into the accounting policy function; review of meeting minutes, packages, and other documents; and inquiry into the roles of the Corporation's senior management and members of the Risk Council, GERC, and Board. (Jacobs Decl. at ¶ 10.)[8]

In an effort to be overly inclusive and thorough, Northern Trust decided to apply the searches to an existing database containing dozens of e-mail boxes of accounting, securities lending, index fund, and other personnel. This database also includes the e-mail boxes of all of the members of the Board and Executive Committee identified by plaintiffs in the instant motion who have such boxes on Northern Trust's system[9] and the e-mail boxes of most of the members of the Risk Council and GERC (including all chairs). (Jacobs Decl. at ¶¶ 9-10, 16-19.) As to members of the Risk Council and GERC whose e-mail boxes had not already been collected at the time the Order was issued, Northern Trust inquired into the extent to which such members might have had involvement in the consolidation issue outside of committee duties and collected additional e-mail boxes in an effort to be overly inclusive. (*Id.* at ¶¶ 18-19.) As to the remaining

---

[8] In a throw-away comment, plaintiffs say Northern Trust did not "share" this investigation with plaintiffs. That is false. We described our investigation; we said that we had collected all Board e-mail boxes in Northern Trust's possession and the e-mail boxes of most members of the Risk Council and GERC; and we explained that the Court ordered narrower discovery ("between") than the discovery plaintiffs sought ("to, from or among"). (Jacobs Decl. at ¶ 10, 12, 17.)

[9] Plaintiffs purport to express surprise that the e-mail boxes of all independent directors are not on Northern Trust's e-mail system, although they never claim to have believed otherwise. (Motion at 6 n.2.) These individuals are not Northern Trust employees.

members of the Risk Council and GERC, Northern Trust determined, due to their job functions and other facts, that it was extremely unlikely that responsive ESI (if any) to or from such individuals would not be located in the dozens of pertinent e-mail boxes already collected. (*Id.* at ¶¶ 18-20.) Northern Trust is confident that it has collected the right e-mail boxes for a reasonable and robust effort to locate responsive documents.

Plaintiffs purport to fear that this collection effort might miss a responsive document. But they proffer no case (there is none) holding that discovery requires pulling every e-mail box of every person who could conceivably contain a unique responsive e-mail no matter what the expense or delay. To the contrary, the Federal Rules require the balancing of burdens and costs against the likelihood of discovering responsive documents. *See, e.g.*, Fed. R. Civ. P. 26(b)(2)(C)(iii).

As we explained to plaintiffs, we believe it extremely unlikely that our collection efforts will miss responsive documents. As an initial matter, we have yet to locate a single document—even among the company's accountants and securities lending personnel—that remotely supports plaintiffs' theory that Northern Trust investment personnel failed to sell securities to avoid consolidation risk.[10] (See Dkt. # 261 at 10-11 (plaintiffs' allegations).) Plaintiffs' naïve expectation that everyone within Northern Trust was talking about consolidation risk associated with realized losses—a non-sequitur if there ever was one—is simply wrong. In any event, responsive documents (to the extent any exist) would *not* be found by Northern Trust's e-mail box collection *only* if (i) a member of the Risk Council or GERC whose e-mail box was not collected (for example, a human resources executive) communicated about the consolidation

---

[10] The reason is simple; plaintiffs are wrong about the accounting. The only documents of which we are aware that even mention concern over consolidation risk in connection with realized losses do not relate to investment decisions at all, but instead refer to consolidation risks associated with whether Northern Trust may voluntarily use its own money to offset realized losses experienced by its clients.

7

issue with another like individual (say, a technology and operations executive) *and* (ii) *none* of the dozens of Northern Trust personnel whose e-mail boxes have been collected (and who have a far greater chance of having been involved in consolidation discussions) were recipients of same. (Jacobs Decl. at ¶¶ 10, 17-20.) Nothing in our investigation indicates that such communications happened or that such documents exist.

Plaintiffs say that not collecting e-mail boxes of certain members of the Risk Council and GERC is tantamount to "not search[ing] that person's emails." (Motion at 4.) Not so. As we explained to plaintiffs, the ESI collected would contain *every* e-mail to or from all members of these committees to the extent the database contained the boxes of at least one other sender or recipient of such e-mails. Since the individuals whose e-mail has been collected were far closer to securities lending and accounting issues than the Risk Council and GERC members in dispute, we are effectively and properly searching the relevant e-mails.

### III. Northern Trust Never Admitted That It Had to Collect All Member E-Mail Boxes.

Plaintiffs say the instant motion should be granted because Northern Trust admitted that it would have to collect the e-mail boxes of all members of the Risk Council or GERC if plaintiffs' prior motion to compel were to be granted. (Motion at 3-4.) That is false, and plaintiffs know it.

In describing the burden of granting plaintiffs' prior motion to compel, Northern Trust explicitly stated that an order granting the motion to compel "*as written,*" including all responsive communications "*to, from or among*" members of certain committees, would require collecting about 20 additional e-mail boxes of members of the Risk Council, GERC, and Board whose boxes had not yet been collected. (Dkt. #267 at page 15 (emphasis added); Dkt. #268 at ¶ 31.) That was because production of documents "to, from or among" those individuals could

include a document on which *only one member* of these groups was involved (*i.e.*, a document "to" or "from" that individual on which no other member was a sender or recipient). As described in Section I above, however, the Order did not grant that discovery, and thus our estimate of what compliance with plaintiffs' original demand might entail does not apply to the Order. Under the Order, and based on additional knowledge gathered during an investigation into how best to comply with the Order, Northern Trust conscientiously determined it should collect 5 (not 20) additional e-mail boxes in total. (Jacobs Decl. at ¶¶ 10, 13-14.) Although we explained this to plaintiffs in detail before they filed their motion (*id.* at ¶ 10), they nevertheless misrepresented our position to this Court. Plaintiffs have every right to disagree with our position, but not to mischaracterize it.

### IV. Plaintiffs Expressly Approved the Kind of Search Terms Northern Trust is Using.

Northern Trust has already searched for documents concerning the so-called "consolidation" issue to the extent they constituted internal communications of "investment decision-makers." (Jacobs Decl. at ¶¶ 2-3, see generally Dkt. #248.) Plaintiffs helped draft and agreed with the search terms used for that earlier discovery, all of which made some reference to a form of the word "consolidation" or to related accounting principles (such as FIN 46). (Jacobs Decl. ¶¶ 2-4 & Ex. 1.)

After Northern Trust collected and searched for those documents,[11] plaintiffs asked the Court to extend that discovery to certain "[i]nternal communications, including communications to, from or among Northern Trust's Board of Directors, Executive Committee, the NTGI Risk Council, and the members of the GERC [Global Enterprise Risk Committee]." (Dkt. #261 at

---

[11] Plaintiffs misleadingly imply that they are "again" seeking relief concerning discovery on the consolidation issue (Motion at 3), but plaintiffs had no complaints about Northern Trust's prior production as it pertained to consolidation. Instead, plaintiffs simply asked the Court to expand its prior order, which had limited such discovery to certain "investment-decision makers." (Dkt. # 248 at 2.)

9

page 14; Dkt. #268 at ¶ 31.) In the Order partly granting that request, the Court defined the discovery dispute at issue as "whether defendants' alleged failure to mitigate realized losses in the collateral pools resulted from a desire to avoid consolidation of the pools on Northern's balance sheet," further describing the issue on which discovery would be allowed as certain communications "specifically about this issue" where "risks concerning the effect of losses in the pools on Northern's balance sheet were discussed." (Order at 3-4.)

To search for responsive documents, Northern Trust properly used as its starting point the very search terms plaintiffs found acceptable when Northern Trust previously searched for documents on the consolidation issue. (Jacobs Decl. at ¶¶ 2-3.) Use of those exact search terms would have been sufficient here but, in an abundance of caution, Northern Trust expanded those terms, once on its own initiative and again after sharing and discussing its proposed search terms with plaintiffs. (*Id.* at ¶¶ 4, 28; Josefson Decl. Ex. C.) Among other things, those terms use every form of the word "consolidate." (Jacobs Decl. at ¶ 4.)

Despite plaintiffs' prior acceptance of search terms *narrower* than the terms Northern Trust is now using, and despite the Order's express reference to discussions "specifically" about the consolidation issue, plaintiffs now say Northern Trust should conduct a search that includes finding and reviewing documents that have *no reference to consolidation.* They never explain how that could even be possible without capturing huge volumes of wholly unrelated documents that would cost a fortune to review. Our own investigation, moreover, reveals that when consolidation issues are discussed, some form of that word is invariably used. (Jacobs Decl. at ¶ 5.)

In an effort to support their far-fetched suggestion, plaintiffs breathlessly cite two documents produced in the *BP* litigation that use the terms "back up the STEP fund" and

"backstopping," which they say may yield relevant documents. As an initial matter, plaintiffs waived this claim; they had these documents for years and never cited them in any motion or communications with us about search terms. *See* F.R.C.P. 26(b)(2)(C) (courts may restrict discovery that is "unreasonably cumulative or duplicative"). They also plainly misread the documents themselves, which do not refer to consolidation risk at all and which reflect the words of a client, not of the Northern Trust committee members or senior management listed in the Order. (Jacobs Decl. at ¶¶ 5-7.)

On November 12, before Northern Trust filed a response to the motion on this and other points, the Court ordered the parties to confer about the issues in dispute. In yet another attempt at compromise, Northern Trust agreed to add the concept of "backing up" or "back stopping" to its searches with appropriate connective terms even before the parties had their "meet and confer session." This proposal mooted the only specific search terms that plaintiffs proposed in the instant motion. (Jacobs Decl. Ex. 2.)

In response to the Court's November 12 order, Northern Trust promptly proposed a meet and confer call for Thursday, November 14, but plaintiffs said they could not meet until Monday, November 18, the day before the rescheduled presentment of their motion. (Jacobs Decl. Ex. 2; ¶¶ 32-34). Late in the afternoon of Friday, November 15, the last business day before that conference -- which was three weeks after the Order and just one week before the discovery due date -- plaintiffs sent Northern Trust for the first time a set of detailed and complex proposed revisions to Northern Trust's current search terms. Because this last minute proposal left inadequate time for Northern Trust's consideration, Northern Trust asked that plaintiffs postpone the presentment of their motion, but plaintiffs refused.

The current search terms (as expanded a number of times already in the three weeks since the issuance of the Order) are robust; plaintiffs' challenges to them are baseless; and the motion should be denied. Nevertheless, we remain willing to consider plaintiffs' newly-proposed terms, if permitted additional time to do so, in order to attempt to moot this portion of the motion.[12]

## CONCLUSION

The motion to compel should be denied in full.

Dated: November 18, 2013

Respectfully submitted,

/s/ Caryn L. Jacobs
Caryn L. Jacobs
Todd J. Ehlman
Robert L. Michels
Brook R. Long
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
CJacobs@winston.com
TEhlman@winston.com
RMichels@winston.com
BLong@winston.com

Michele L. Odorizzi
Justin A. McCarty
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
MOdorizzi@mayerbrown.com
JMcCarty@mayerbrown.com

*Attorneys for The Northern Trust Company and Northern Trust Investments, Inc.*

---

[12] Finally, Northern Trust of course intends to produce responsive minutes and documents to the extent they exist. Plaintiffs' implication that Northern Trust would not do so (Motion at 9) is unsupported. (Jacobs Decl. at ¶ 25.)

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a copy of the foregoing NORTHERN TRUST'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL was served on counsel of record for all parties electronically via the CM/ECF system on November 18, 2013.

/s/ Caryn L. Jacobs