## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Judge Robert W. Gettleman, *Judge Presiding* |
| v. | Magistrate Judge Susan E. Cox |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | Civil Action No. 09-7203 |
| Defendants. | |

## DECLARATION OF CARYN L. JACOBS

I, Caryn L. Jacobs, declare:

1.     I am a partner at Winston & Strawn LLP ("Winston"), and I serve as counsel of record for Northern Trust Investments, Inc. and The Northern Trust Company (jointly, "Northern Trust") in this case. I am a resident of Illinois and am over the age of 18. I state the following based on personal knowledge and on information that I learned and materials I reviewed in connection with my representation of Northern Trust in this case.

**Northern Trust is using appropriate search terms**

2.     The Court's October 23, 2013 Order ("Order") granted plaintiffs discovery of "documents relating to whether defendants' alleged failure to mitigate realized losses in the collateral pools resulted from a desire to avoid consolidation of the pools on Northern's balance

sheet," further describing the internal communications category of such documents as communications "specifically about" the issue of "risks concerning the effect of losses in the pools on Northern's balance sheet." (Order, clause (2)). Therefore Northern Trust used text search terms designed to target communications concerning risks of consolidation of the collateral reinvestment vehicles onto Northern Trust's balance sheet. These terms are even broader than the ones plaintiffs agreed to concerning a prior search for documents relating to the "consolidation" issue that Northern Trust conducted pursuant to this Court's order of February 27, 2013 (before plaintiffs filed the motion to compel that led to the October 23, 2013 Order).

3. Attached as Exhibit 1 is a true and correct copy of Avi Josefson's email of March 19, 2013 proposing search terms for additional discovery under this Court's Order of February 27, 2013, interpreting Category 9 of the October 21, 2011 Prioritization Order. The terms proposed include the string (consolidat* OR "FIN*46" OR "ARB*51"), without any other terms that appear to in any way relate to the issue of consolidation risk. After negotiation between the parties, plaintiffs agreed to terms including the string ((consolidat* OR fin46 OR "FIN 46" OR "fin-46" OR "ARB 51" OR "arb-51" OR arb51) w/100 ("securities lending" OR sl OR secslending OR seclending OR "sec lending" OR "pool*" OR "collateral section*" OR "lending collateral" OR "collateral reinvest*" OR "cash collateral" OR "Core*" OR cusa OR STEP OR "stif*step" OR "step*stif" OR "short term extendable" OR "short term extendible" OR FCP OR "NTI NTCC" OR "commingled fund*" OR "custom section")). *See* Dkt. 262 Ex. J (March 27, 2013 Brook Long email proposing final revisions to search terms); Dkt. 268 Ex. 18 (March 27, 2013 Rebecca Boon email agreeing to email search terms).

4. While not required under the Order, Northern Trust, in constructing the search terms for the present review, decided on its own initiative, and before any communications from

plaintiffs' counsel regarding such search terms, to broaden the search terms related to consolidation in an abundance of caution. As plaintiffs already signed off on narrower search terms for prior searches on the "consolidation issue," their complaints on the broader search terms now being used are unwarranted.

5.      Aside from proposing a handful of isolated terms that are plainly overbroad— such as "fund" or "loss" or "balance sheet" (Josefson Decl. Ex. D), which could draw in a vast universe of irrelevant documents for a financial institution such as Northern Trust—plaintiffs before filing the instant motion did not propose a set of terms they would have found satisfactory in response to the Court's Order. On the parties' phone conference on November 4, 2013 before the instant motion was filed, I told plaintiffs we would be willing to review proposed revisions to the search terms from plaintiffs.

6.      Based on our investigations, including reviewing terminology used in emails, we believe it is necessary to include in the search terms some mention of either some version of the word "consolidation" or the specific accounting guidelines under which consolidation risk arises. We believe document reviewers would have a very hard time trying to identify whether a document had any relation to the issue of consolidation risk without the use of this terminology. Documents of which we are aware that discuss consolidation risk generally invariably use some form of that word. While I stated this position on our November 4 call with the plaintiffs, I never indicated that we were unwilling to consider proposed terms that did not include these terms.

7.      Plaintiffs refer the Court to certain documents they found that they believe refer to consolidation risk. Plaintiffs quote Exhibit K to the Josefson Declaration for the words "back[ing] up the STEP fund and put[ting] the sub-par positions on our Books." (Motion at 7

3

n.3, 8.)  Those are not the words of a Northern Trust employee, but rather are the words of a Northern Trust employee attempting to paraphrase the statement of a client, the BP plans, regarding what options the client envisioned Northern Trust having.  Nor does this document reflect Northern Trust's concerns about consolidation risk resulting from realized losses, as opposed to a client's suggestion that Northern Trust use its own money to offset certain unrealized losses.  As for Josefson Decl. Ex. M, similarly discussing "backing up STEP" as a suggestion by the client BP plans, the client was not discussing consolidation of STEP, but was suggesting that Northern Trust could pay for ("back up") losses to help clients.  As for the statement "we do not want to realize any losses in the STEP fund if that can be avoided" (Josefson Decl. Ex. L), plaintiffs' implication seems to be that it is a reference to consolidation risk.  It is not.  The documents also do not fall within the Order's parameters for production of documents "between" members of certain board, committee, or senior management groups.  In any event, plaintiffs never proposed any variation of "backing up STEP" as a search term before filing their motion to compel.  Despite these problems with plaintiffs' arguments, the issue is now moot, because Northern Trust, in a spirit of compromise, proposed to include this concept in its searches.  Exhibit 2 is a true and correct copy of an email chain between Mr. Long and Ms. Boon from November 12, 2013 to November 14, 2013, in which Mr. Long made this proposal.

**Northern Trust is using appropriate search procedures**

8.     Clause (2) of the Order requires production of "internal communications *between* [the parties listed in clause (1)] specifically about this issue" (emphasis added).  Thus, Northern Trust's search is limited to communications "between" those parties, *i.e.*, sent from one of the parties listed in the Order to at least one of the others listed in the Order.  Plaintiffs' suggestion that the Order requires Northern Trust to search all emails these people received regardless of

4

who sent them, and all emails they sent regardless of to whom they sent them, cannot be squared with the Order's express limitation to communications "***between*** these parties."

**Northern Trust has collected the appropriate email boxes to search**

9.      As the correspondence attached to Mr. Josefson's declaration reflects, Northern Trust's search for electronically stored information in connection with clauses (1) and (2) of the penultimate paragraph of the Order is being run across the entire database of custodian email boxes that have been collected and processed for searching.

10.      The entire email database we have available for search contains approximately 100 custodian boxes for the 2007 to 2009 period, along with several other boxes covering parts of that period.  The only way in which a communication "between" two of the people covered by the Order would not be covered by our search is if *both* the sender *and all* of the recipients are people whose email boxes we do not have.  Thus Northern Trust conducted an investigation to seek to determine whether or not one could reasonably expect there to be responsive emails that were uniquely in the boxes we are not collecting.  The investigation included communicating with witnesses, reviewing documents, and reviewing meeting minutes and packages, among other things.  We described our investigation to plaintiffs' counsel during our phone call of November 4, 2013.  We determined through that investigation that finding any responsive documents *uniquely* in the boxes we did not have was so unlikely that collecting those boxes was not reasonably necessary to comply with the Order and would be unduly burdensome, costly, and time-consuming.

11.      Plaintiffs' reference to an assertion by Northern Trust that the search demanded by plaintiffs' previous motion to compel would require collection of 21 custodians' email boxes

is erroneous.  This assertion was apparently based on Paragraph 31 of my previous Declaration, which stated as follows:

> Plaintiffs' motion to compel now demands 'Internal communications, including communications *to, from or among* Northern Trust's Board of Directors, Executive Committee, the NTGI Risk Council, and the members of the GERC.'  Based on a review of information about the members of these committees and collection of Northern Trust ESI to date, an ESI search under *this new request as written* would require, among other things, the collection of 20 new Northern Trust employee custodians' email "boxes" beyond custodians collected thus far, and a collection of additional material from existing custodians' email "boxes" that would be approximately the size of a 21st custodian "box." (Emphasis added.)

12.     My statement is inapplicable to the search called for in the Order.   My statement was instead based upon the burden presented by the plaintiffs' "new request as written" at that time, which, because it included communications "to, from or among" a certain group could have covered not only communications within the group, but also communications solely from any one member of the group *to* people outside the group (and vice versa).  This Court did not order that search, but ordered a narrower production of communications "between" the members of the groups, which we discussed with plaintiffs' counsel during our phone call of November 4, 2013.

13.     My statement was also based upon knowledge as of the date of my declaration, which was supplemented after the Court's October 23, 2013 Order by additional investigation. We have determined through those investigations that it is not necessary to collect all the boxes referenced in my previous declaration in order to find the responsive documents within the "communications between" category described by the Court's Order, because it is unlikely that the individuals whose boxes we do not have would have communicated solely with each other

without including individuals listed in my October 31 letter whose boxes we *do* have as either "to" or "cc" recipients.

14.     Plaintiffs claim that "Northern Trust has now stated that it intends to collect for review the files of just two additional custodians" rather than the 20 new custodians I mentioned in my previous declaration. (Motion at 2.) That is inaccurate. We have collected not two but five of the 20 I was referencing. We decided upon collecting three of those five directly in response to the Order, without any suggestion from the plaintiffs. The other two we decided to collect after further consideration (and after plaintiffs' November 1, 2013 letter and our November 4, 2013 call with plaintiffs' counsel).

15.     As I described in my previous declaration, the mechanical process of obtaining and loading email boxes is time consuming and cumbersome. The time that collection takes and the expense required for processing is proportionate to the number of custodians collected. For the first three boxes of the five that we collected in connection with the Order, it took five calendar days for Northern Trust to collect the email boxes and send them to our vendor for processing. It took an additional seven calendar days for the documents to be loaded for searching. Based on recent experience, to add 15 more boxes would be expected to take at least 6 weeks and potentially longer. The vendor's charges for processing the five custodians collected in connection with the Order will be $25,840, and those custodians will cost $211 in hosting charges monthly. Based on this, we estimate that the vendor processing charges alone for the 15 new custodians plaintiffs demand would be around $77,521. We estimate the additional hosting cost that this collection of 15 custodians would generate at approximately $633 per month thereafter. These do not include any legal fees (including search, review, and production efforts). Plaintiffs' motion states "Northern Trust stated during a recent meet and

confer that it will not search the email boxes of the members of the Board of Directors, Executive Committee, the NTGI Risk Council, and the GERC (the 'Committees')." This is inaccurate, because we have agreed to search our entire database, which includes most of those email boxes.

16.     Josefson Declaration Exhibit E lists committee members whose email boxes plaintiffs apparently want Northern Trust to collect and search. The Board members on that list have no Northern Trust email accounts.

17.     As we informed plaintiffs on our November 4, 2013 call, the database to be searched includes the email boxes of most members of the Global Enterprise Risk Committee (GERC) and the NTGI Risk Committee. Our search includes the email boxes of eight of the twelve individuals who were members of GERC during the relevant period (who also comprised the membership of the Northern Trust senior Management Group during the relevant period), including the chair.

18.     Our investigations have indicated that it is not reasonably likely that the four remaining individuals on the GERC and senior Management Group would have had substantive involvement with any discussion of the risk of the consolidation of the collateral pools onto Northern Trust's balance sheet due to the incurrence of realized losses in a communication that did not include one or more individuals whose email has been collected. These individuals' primary responsibilities at Northern Trust dealt with matters like human resources, IT, and personal financial services. For example, Timothy Moen was a human resources executive; Jana Schreuder was an information technology and operations executive; Sherry Barrat and William Morrison were, during the relevant period, executives of Personal Financial Services.

19.     Northern Trust's search includes 14 of 24 individuals who were voting or advisory members of the Northern Trust Global Investments Risk Committee (or Council) during the relevant period, including the chair of the committee.  Our investigation indicates that the 10 individuals whose boxes we have not collected are not reasonably likely to have been involved in communications regarding the "consolidation issue" as set forth in the Order that did not also involve at least one individual whose box we have collected.

20.     Plaintiffs have no basis for claiming that "a search which does not include the email boxes" that Northern Trust has not collected "will not yield the vast majority" of the responsive internal communications between the parties mentioned by the Court's October 23, 2013 Order.  (Motion at 3.)  In fact, Northern Trust believes based on its investigations that the searches it is conducting are appropriate and robust.

21.     Plaintiffs claim that "individuals . . . whose files Defendants have indicated that they will not add to the . . . search. . . . include: Northern Trust Corporation's Chief Financial Officer [and] its Head of Corporate Risk Management." (Motion at 7.)  As public sources of information show, this statement is incorrect.

22.     Plaintiffs characterize William Morrison (currently Northern Trust Corporation President and Chief Operating Officer) as the Chief Financial Officer of Northern Trust Corporation.  Josefson Decl. Ex. E.  Mr. Morrison assumed that position in about September 2009, a year *after* the realized losses on Lehman and Sigma securities.  The Chief Financial Officer of Northern Trust at the relevant time was Steven Fradkin, whose email box is being searched.

23.     Plaintiffs characterize Jana Schreuder as Head of Corporate Risk Management. Josefson Decl. Ex. E.  Ms. Schreuder held that position through about October 2007, about a

year before the realized losses about which plaintiffs complain. The Head of Corporate Risk Management at the relevant time was Joyce St. Clair, whose email box we added to our database in response to the Order.

24.  Plaintiffs inaccurately claimed that Northern Trust has "withheld" or "refused to disclose to Plaintiffs . . . the identities of the members of the Committees." (Motion at 2, 6.) This complaint is now moot because Northern Trust since supplied this information (see below and Exhibit 2), but the reality is that Northern Trust never "refused" to do this in the first place. At the outset, Northern Trust's letter of October 31, 2013 contained a full list of the relevant senior management and committee members, who comprised the "to/from" list on page 2. Josefson Decl. Ex. C at 2. Moreover, the plaintiffs had never asked for any disclosure of committee member identities in the correspondence and communications regarding the Order. Plaintiffs first raised this notion on the day before they filed their motion to compel, in an email in which plaintiffs' counsel Rebecca Boon referenced "Defendants' failure to disclose the identities of the members of the relevant Committees." Josefson Decl. Ex. H. Northern Trust did not "fail" to disclose the identities of the members, and if plaintiffs needed more information matching the persons listed in our October 31 letter to the committees they served on, they simply could have asked. Exhibit E to Mr. Josefson's Declaration lists members of the NTGI Risk Committee, the Board of Directors (which is also a matter of public record), and the Executive Committee (ditto), so plaintiffs appear to have been complaining solely about the GERC. On November 13, 2013, Mr. Long disclosed promptly after plaintiffs' first request the members of the GERC and the NTGI Risk Council/Committee, and noted the Board and Executive Committees were listed in Northern Trust's public annual reports. (Ex. 2.)

**Northern Trust is engaging in an appropriate review of meeting materials**

25.    Plaintiffs claim Northern Trust has "not confirmed that they will produce the meeting materials of the Committees that are expressly called for by the Court's Order." (Motion at 2-3.)  Plaintiffs never even asked for any such confirmation.  Plaintiffs sent a letter on October 25, 2013 that asked solely about the production of contracts and ESI search procedures. Josefson Ex. A.  After Northern Trust supplied information on those topics, Josefson Ex. C, plaintiffs' November 1, 2013 letter asserted that Northern Trust had been "silent with regard to how Northern Trust plans to collect the meeting materials, including meeting minutes that are the subject of Judge Cox's Order," Josefson Ex. D at 1.  The "proposal" was silent because the plaintiffs had not asked for that information.  Plaintiffs' November 1 letter asserted that plaintiffs would be raising that issue with Northern Trust in a conference call, but then plaintiffs never raised that issue in the parties' November 4 call.  In any event, meeting minutes and materials of the NTGI Risk Committee and Board pertaining to securities lending pools have already been produced.  Northern Trust intends—and always intended since before plaintiffs' October 25 letter—to review and produce any responsive non-privileged materials or minutes of the GERC.

**Northern Trust has made no "illusory compromises"**

26.    Plaintiffs claim that they "identified five individuals of senior management who, based on the limited documents already produced by Northern Trust, appear to have been involved in discussions regarding consolidation" and that after Northern Trust "agreed to search the files of these individuals – purportedly in the spirit of compromise – plaintiffs later learned that defendants had already collected the email boxes for these individuals, and had intended to include these individuals in their search from the beginning." (Motion at 6-7.)  This is an inaccurate description of what occurred with regard to plaintiffs' raising questions about the 5

individuals (Richard Kukla, Lauren Allnutt, Aileen Blake, Kristin Missil, and Jeff Benner).

27.      During our November 4, 2013 call with plaintiffs' counsel, we explained that we had already collected the e-mail boxes of Richard Kukla, Lauren Allnutt, Aileen Blake, Kristin Missil, and Jeff Benner.

28.      Northern Trust's agreement on the November 4, 2013 call (reiterated in Mr. Long's November 7, 2013 email) to include Allnutt, Kukla, and Blake in the "to/from" group in response to plaintiffs' November 1, 2013 letter request was not an "illusory" agreement. None of the three were part of the "senior management" of Northern Trust Corporation or members of the committees at issue during the relevant period, so the Order did not require their names to be in the "to/from" group.

29.      As for Kristin Missil and Jeff Benner, Northern Trust never agreed, and does not currently agree, to include Missil or Benner in the "to/from" list, because they were neither "senior management" nor members of the committees at issue during the relevant period, and because their email was already searched in the previous ESI review and production. Northern Trust understood plaintiffs to be asking on the November 4 call whether the search for emails between those on the "to/from" list (which does not include Benner or Missil) was being run against the mailboxes of Benner and Missil. We responded that it was, because their mailboxes had been collected. That was merely a statement of fact in response to a question, not a compromise "agreement" to do anything beyond what our October 31, 2013 letter stated we intended to do.

**Northern Trust has not attempted to "shift" any "burdens" to plaintiffs**

30.      Plaintiffs claim that Northern Trust has "attempted to impose upon Plaintiffs the burden of identifying specific custodians to add to Defendants' list of custodians whose emails

are being gathered." (Motion at 2). That is not true, as we explained in writing to plaintiffs (see our November 8, 2013 email, contained within Josefson Decl. Ex. J). We understand that Northern Trust has its own responsibility to comply with the Order by conducting a reasonable search for communications responsive to that Order, and have never said anything to the contrary. Since plaintiffs asked Northern Trust to consider their views on the scope of our searches, we invited plaintiffs to provide specifics on why they thought Northern Trust was wrong about this. That is not "burden shifting" at all; it was an effort to understand plaintiffs' vague, shifting, and unsupported claim that the scope of our searches is too narrow so we could consider modifying those searches to avoid disputes. At no point in the negotiations or correspondence did Northern Trust claim that plaintiffs had the burden of ensuring that Northern Trust complied with the Order.

31.     In sum, we are collecting and searching all email boxes that our investigation indicates are reasonably likely to contain unique responsive documents (if any), and we are collecting and searching additional boxes above and beyond that in an abundance of caution and/or a spirit of compromise.

**The parties' discussions subsequent to the Court's November 12 order**

32.     On November 12, Ms. Boon acknowledged the Court's order that the parties further confer, but initially imposed preconditions to such a meeting (namely, Northern Trust's provision of certain information). (Ex. 2.)

33.     Northern Trust proposed a meet and confer date of November 14 without preconditions. (*Id.*)

34.     The plaintiffs abandoned their preconditions, but stated they could not meet and confer until November 18, the day before the rescheduled presentment date of November 19.

(*Id.*)  The meet and confer was then scheduled for Monday, November 18 at 10 a.m. Central Time.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of November, 2013.

/s/ Caryn L. Jacobs           

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing DECLARATION OF CARYN L. JACOBS with exhibit was served on counsel of record for all parties electronically via the CM/ECF system on November 18, 2013.


Dated: November 18, 2013                                    /s/ Caryn L. Jacobs