**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,

Defendants.

The Hon. Robert W. Gettleman, *Judge Presiding.*

Magistrate Judge Susan E. Cox

Case No. 09-CV-07203

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO THE MOTION FOR A PRELIMINARY INJUNCTION FILED BY THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND**

Caryn L. Jacobs
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
cjacobs@winston.com

Michele Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
modorizzi@mayerbrown.com

*Counsel for Defendants*

## INTRODUCTION

CTPF's Reply is filled with misstatements of fact and law. One of the most glaring is CTPF's assertion (at 1) that The Northern Trust Company ("NTC") "has refused to continue providing securities lending services as a third-party securities lending agent" to CTPF pending the resolution of the parties' dispute concerning the approximately REDACTED in securities lending losses that CTPF has yet to pay. In fact, the opposite is true: in the very document CTPF cites (May 12, 2014 Josefson Decl. Ex. S), NTC told CTPF that it is "willing and able" to serve as a third-party securities lending agent "on terms acceptable to all parties." Contrary to the impression CTPF tries to create, changing the *status quo* so that NTC would be lending securities held by CTPF's proposed new custodian (BNYM) is not something that can be done overnight. Rather, it is a complicated undertaking that would require new agreements to be negotiated and would take a substantial amount of time and effort to implement. *See* Supplemental Declaration of Donald Anderson ¶¶ 9-10, attached hereto as Exhibit 1. Discussions between NTC and CTPF concerning a possible third-party lending arrangement are ongoing; unless and until an impasse is reached in those negotiations, CTPF's motion for a preliminary injunction continues to be premature.[1]

In any event, despite offering a wealth of new arguments, CTPF's Reply does not come close to showing that CTPF can meet its heavy burden of showing that it is entitled to preliminary injunctive relief.

---

[1] CTPF's complaint (at 1) that NTC is making it "impossible" to transition custody to BNYM by July 1, 2014 is incomprehensible. CTPF admits there is no expiration date to its custody agreement, and offers no evidence of any harm (much less irreparable harm) if that arbitrary date is not met. It was CTPF that waited years before filing the current motion, which asks this Court to put conditions on its transition to new providers, and that request is still under consideration. Indeed, the Court warned CTPF that it might not be able to decide the issue before late July or August 2014. Josefson Decl., Ex. R, at 11:22-23. In the meantime, the Court told CTPF that "you have to keep the status quo as much as possible." *Id.* at 11:18-21. The status quo is that NTC is CTPF's custodian and securities lending agent. Supplemental Anderson Decl. ¶¶ 9-10.

## ARGUMENT

### I. CTPF Has Not Shown That It Faces Irreparable Harm.

When it filed its motion for a preliminary injunction, CTPF claimed that it was facing an emergency because its agreements with NTC expired at the end of June 2014. In its Reply (at 4), CTPF now admits that its agreements with NTC have no expiration date. Nevertheless, CTPF continues to argue that it will be irreparably harmed if its decision to switch to a new custodian and new securities lending agent is hampered in any way by its outstanding obligations to pay its remaining securities lending losses. As NTC's Opposition demonstrates, however, to the extent that there is a dispute with CTPF over the terms of its exit from NTC's securities lending program, it is simply a fight over money, for which CTPF has an adequate remedy at law.

Indeed, that would be the case even if NTC had insisted that CTPF pay the total outstanding REDACTED in losses before NTC would agree to cooperate with the transition to new service providers.[2] CTPF says in its Reply (at 2) that NTC's proposals for the transition would force CTPF to "accept a liability it has vigorously contested for six years." But there is a very large difference between paying payables that have been reflected on CTPF's account statements and that CTPF itself has recognized for the past five years (*see infra* at 10) and accepting final responsibility for that liability. NTC has never disputed that CTPF can pay its payables and then seek recovery for those amounts in this lawsuit.

CTPF continues to try to dress up its purported harm by claiming that NTC is attempting

[2] CTPF's continued assertion that NTC has taken that position is simply not true. The problem is not NTC, but CTPF, which apparently decided to switch providers without considering how that switch would be accomplished, let alone whether the schedule the Board originally contemplated was realistic. Indeed, to this day, CTPF has not explained how it wants to accomplish the transition.

to thwart the CTPF Board's exercise of its fiduciary obligations.[3] But the CTPF Board had no fiduciary obligation to switch providers at this late date. It continued to retain NTC for more than five years after the financial crisis that precipitated this lawsuit and more than four years after CTPF filed this lawsuit; when it announced its decision to switch to BNYM and Deutsche Bank, the Board publicly thanked NTC and praised its service to CTPF. *See* Opp. at 11. In its Reply (at 3), CTPF argues for the first time that it is obvious that the Board has "lost confidence" in NTC. But that is just lawyers' argument; CTPF does not offer any testimony to support its claim. And any claim that CTPF lacks confidence in NTC's abilities is belied by CTPF's proposal to retain NTC as its third-party securities lending agent even after custody is transitioned to BNYM. In any event, as Judge Hibbler held in the *BP* case, a fiduciary cannot transform a claim for money damages into irreparable harm simply by asserting that it has "lost confidence" in a service provider and therefore must be allowed to sever the relationship with that provider immediately, without suffering any financial consequences.[4]

---

[3] CTPF's lead-in to this argument is grossly misleading. It claims (at 2) that NTC "does not dispute that where, as here, pension fund trustees are prevented from exercising their fiduciary and statutory duties pursuant to Illinois law the trustees and the fund suffer irreparable harm." In fact, as NTC's Opposition makes clear, NTC vigorously disputes CTPF's claim that its Board has been prevented from exercising its fiduciary and statutory duties.

[4] CTPF tries to distinguish the *BP* case by arguing that the plaintiffs there were not seeking to terminate NTC as a securities lending agent or custodian and did not claim that NTC was "impeding public pension trustees' statutorily-imposed fiduciary responsibilities." Reply at 4-5. These are distinctions without a difference. The *BP* plaintiffs were pension plan fiduciaries, who had fiduciary responsibilities under ERISA, and who had employed NTC as an investment manager. They sought a preliminary injunction to prevent the Northern Trust defendants from enforcing restrictions they had imposed on withdrawals from Northern Trust collective funds that had suffered securities lending losses. The *BP* plaintiffs argued, just as CTPF does here, that they would suffer irreparable harm if their pension plans were forced to continue their relationship with Northern Trust because they, as fiduciaries, "no longer have faith in the NT Defendants' ability to manage the assets of the Funds for the benefit of the Plan Participants, and, accordingly, need to sever the relationship with the NT Defendants immediately." BP Brief at 3, *BP Corp. N. Am. Inc. Sav. Plan Oversight Comm. v. Northern Trust Investments, N.A.*, No. 08-cv-6029 (N.D. Ill. Oct. 29, 2008) ECF No. 19.

## II. CTPF Has Not Shown A Likelihood Of Success On The Merits.

### A. NTC Did Not Agree To Bear Any And All Securities Lending Losses.

In its preliminary injunction motion, CTPF argued that it is likely to succeed on a claim that it does not even make in its complaint—namely, that NTC agreed in the CTPF Securities Lending Agreement ("SLA") to bear the risk of all securities lending losses whether or not it was imprudent. NTC's Opposition argued (among other things) that CTPF should be judicially estopped from making such an argument because ¶ 27 of CTPF's own complaint alleges that, absent proof of imprudence, NTC "bore none of the risk of loss" from securities lending. In Reply (at 6 n.5), CTPF argues that ¶ 27 of its complaint merely repeated NTC's position and does not represent CTPF's view of the parties' agreement. But that is not what the complaint says. Paragraph 27 alleges that NTC had no incentive to avoid losses because "while Northern Trust collects a percentage of the lending spread, it does not bear the downside risk of any losses incurred by the Collateral Pools. . . . Although Northern Trust would recover a percentage of any profits, it would be responsible for 0% of any losses." Having alleged that NTC "bore none of the risk of loss," CTPF cannot now seek a preliminary injunction on the ground that it is likely to succeed on the claim that NTC bore the ***entire*** risk of loss.

Nor is such a claim supported by the SLA. The Court did not hold that the SLA allocates losses to NTC; on the contrary, in its November 2012 opinion, the Court noted CTPF's concession that it bears all losses, unless it can prove imprudence. Dkt. # 199 at 6. And even if the specific provision allocating losses to CTPF somehow dropped out of the SLA through subsequent amendments (which it did not), there is not a single word in that document from which the Court could conclude that NTC, which was investing funds on CTPF's behalf as its

agent, had departed from customary risk allocations and undertaken the extraordinary burden of paying for investments losses that were ***not*** attributable to any negligence on its part.

### B. CTP Has Not Shown A Likelihood Of Success On Its Claims Regarding REDACTED

REDACTED

5 REDACTED

6 REDACTED

REDACTED

CTPF's own financial statements specifically acknowledge that it owes about $19.2 million to "brokers," rather than to NTC. In its June 30, 2012 financial statements, CTPF explained that "[a] loss due to the Funds' custodian on securities lending transactions of $44.3 million is accrued for in both Securities lending collateral payable for $25.1 million and ***Due to Brokers*** for $19.2 million." *See* Anderson Decl. ¶ 42 (emphasis added); Supplemental Anderson Decl. ¶ 7. REDACTED

The identical language appears in CTPF's most recent financial statements, as of June 30, 2013, which were posted on CTPF's website in May 2014, ***after*** NTC filed its Opposition and ***after*** CTPF filed its Reply. Supplemental Anderson Decl. ¶ 7.

Rather than acknowledging what its own financial statements plainly say, CTPF seeks to conceal the truth. At page 13 of its Reply, CTPF quotes the first portion of the description of the payable as being "owed 'to the Funds' custodian,'" while conveniently ignoring the $19.2 million payable that is "Due to Brokers." REDACTED

---

REDACTED

REDACTED

If the amount in question were in dispute and if NTC were seeking payment for itself, as CTPF now contends, it is inconceivable that CTPF's accountants would have booked it as a payable "Due to Brokers." If the claim had been disputed and, in CTPF's view, liability was not probable, there would have been no accrual; at most, CTPF would have disclosed that it had a contingent liability in the amount of $19.2 million as a result of a claim by NTC. *See, e.g.*, *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 198 (1st Cir. 2005) (accrual of a loss contingency is improper unless it is "probable" that a loss has been incurred; when a loss is neither probable nor remote the proper treatment is financial statement disclosure). Tellingly, CTPF's litigation disclosures in its financial statements make no mention of any disputed payables.

REDACTED

REDACTED

### C. CTPF Has Not Shown A Likelihood Of Success On Its Claims Regarding Amounts It Still Owes To NTC.

CTPF's Reply raises new factual and legal arguments with respect to the approximately REDACTED that CTPF still owes to NTC for amounts that NTC advanced on CTPF's behalf to cover some of its securities lending losses temporarily, either until those losses could be offset by positive earnings or until CTPF decided to exit NTC's securities lending program. All of those arguments are without merit.

First, CTPF contends that it never expressly agreed to repay NTC. That is not true. As shown in ¶ 22 of the Anderson Declaration, REDACTED

[7] REDACTED

REDACTED CTPF has offered no testimony or even argument to rebut these admissions.

Even if that conduct were not enough to constitute what CTPF calls an "express" agreement, the parties' agreement is evidenced by, among other things, REDACTED and CTPF's acknowledgement of its payment obligations in its financial statements, including its just-released June 30, 2013 financial statements. Significantly, CTPF does not offer any testimony or other evidence showing that the agreement described in detail in the declarations NTC submitted with its Opposition did not exist. Instead, CTPF relies entirely on unsupported lawyers' arguments.

For example, CTPF argues that it is irrelevant that its own financial statements have consistently shown a payable due to NTC for the exact amount that NTC calculated as due from CTPF under this agreement. But once again if CTPF did not believe that it owed the amounts in question to NTC or did not think that it was probable that NTC would be entitled to collect,

CTPF would not have recorded those amounts as a payable owing to NTC, nor would it have accrued for them. Instead, it would have disclosed the amount due as a contingent liability.

REDACTED

*See Maley v. Design Benefits Plan, Inc.*, 2004 WL 2203439, at *2 (N.D. Ill. Sept. 29, 2004) (holding that plaintiff could not raise untimely challenges to transactions reflected in account statements because parties' contract required those objections to be raised within 60 days); *Szulik v. State Street Bank & Trust Co.*, 935 F.Supp.2d 240, 262 (D. Mass 2013) (applying same rule to bank custodial statements); *Lamm v. State Street Bank & Trust Co.*, 889 F.Supp.2d 1321, 1330 (S.D. Fla. 2012) (same).

In addition to arguing that there was no explicit agreement to repay NTC's advances, CTPF contends that it objected to NTC's application of positive securities lending earnings to pay down those advances. Again, CTPF offers no testimony of any CTPF employee who claims to have objected or who purports to contradict the declarations NTC submitted along with its Opposition. Instead, CTPF speculates that Kathryn Stevenson, CTPF's custody relationship manager, would have been the recipient of any objections, rather than NTC's two declarants.

But NTC's declarants were the securities lending relationship personnel responsible for the CTPF account over the relevant time period. In any event, NTC submits herewith Ms. Stevenson's declaration (attached as Exhibit 2), REDACTED

REDACTED

Finally, on the fact side, CTPF argues that this lawsuit constituted a sufficient objection. But the complaint did not and does not allege that NTC had no right to advance funds for the benefit of CTPF, nor does it claim that NTC has no right to payment for amounts it advanced. Instead, the complaint is focused entirely on CTPF's class-wide allegations that NTC acted imprudently in investing securities lending collateral and therefore should bear the investment losses. It is within that context that CTPF complained that NTC owes money to CTPF and a purported class.

On the legal side, CTPF argues that the Court concluded in November 2012 that the unambiguous terms of SLA prohibited NTC from advancing funds on CTPF's behalf to cover CTPF's losses on a temporary basis, thus cutting off any conceivable right NTC might have to claim reimbursement for its advances. The first problem with this argument is that it misconstrues the Court's opinion. The Court held only that the SLA did not expressly ***permit*** NTC to make advances and therefore any refusal by CTPF to immediately repay those advances in full did not constitute a breach of the SLA. It did not hold that there was an affirmative

prohibition on advances. And the fact that the SLA is ***silent*** on the question of advances does not mean that NTC is precluded from obtaining reimbursement under another theory.

As NTC explained in its Opposition, there are a variety of legal theories other than breach of the SLA that support the conclusion that NTC is entitled to be reimbursed for amounts it advanced on CTPF's behalf on the understanding that NTC would be repaid out of securities lending earnings or "in full" when CTPF exited securities lending. Those theories include indemnification of an agent, implied-in-fact contract, restitution and unjust enrichment. CTPF does not deny that the facts set forth in NTC's Opposition would ordinarily support recovery under all of these theories. Instead, it contends that NTC cannot make these arguments because it has a written contract with CTPF (the SLA) and theories of implied contract, restitution and the like cannot be asserted in the face of an express contract. This argument, however, is based on a fundamental misunderstanding of Illinois law.

CTPF admits that the general rule is that the existence of a contract precludes a claim for quasi-contractual relief when both the express and alleged implied contracts cover the ***same subject matter***. The purpose of the rule is to avoid having a purported oral or implied-in-fact contract trump the explicit allocation of risks and responsibilities set forth in the parties' written agreement. *See, e.g.*, *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir, 2003) (cited CTPF Reply at 7). When the express contract does ***not*** cover the subject matter in question, however, this policy does not apply, and the courts allow claims to be asserted based on alternative, quasi-contractual theories. *See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 1994 WL 714611 at *6-7 (N.D. Ill. Dec. 19, 1994) (allowing quasi-contract claim because "the quasi contract action . . . does not arise under the same subject matter as the Agreement"); *IMPO Glazetile, Inc. v. Fla. Tile Indus., Inc.*, 1994 WL 630550, at *5 (N.D. Ill.

Nov. 8, 1994) (allowing quasi-contractual relief "because the subject matter" was "outside the contract"); *Bd. of Dirs. of Carriage Way Prop. Owners Ass'n v. W. Nat'l Bank of Cicero*, 139 Ill.App.3d 542, 547 (1st Dist. 1985) (holding that the contract "did not address" two issues and therefore "did not constitute a contract concerning the same subject matter" on those issues, and the "claim for quasi-contractual relief was thus not precluded"); *Otto Real Estate, Inc v. Shelter Invs.*, 153 Ill.App.3d 756, 759-61 (4th Dist. 1987) (finding parties formed a valid implied in fact contract after they formed their express contract).

In this case, the Court held that the SLA did not expressly authorize advances by NTC. But neither did it prohibit such advances. Under Illinois law, the fact that the express contract is silent on that issue did not prevent the formation of an implied-in-fact contract regarding the advances, nor does it prevent NTC from seeking restitution for amounts it advanced on the understanding that NTC would be repaid. Hornbook agency law confirms this result: under the Restatement, an agent is entitled to be indemnified for payments it makes on its principal's behalf absent a specific agreement to the contrary. *See* Opp. at 18.[8]

For these same reasons, CTPF's arguments about parol evidence, the SLA's integration clause, and the absence of any modification of the SLA are beside the point. NTC is not trying to read any obligations into the SLA, nor is it claiming that the SLA was modified in any way. Instead, NTC's legal theory is that CTPF is obligated, entirely apart from the SLA, to reimburse NTC for amounts it advanced on behalf of CTPF on the condition and with the understanding

[8] At pages 7-8 of its Reply, CTPF cites comment f to Section 34 of the Restatement 2d of Agency for the general principle that agency contracts "can be assumed to spell out the intent of the principal accurately with a high degree of particularity." But that says nothing about the possibility that an agency contract may be silent on issues such as the agent's right to reimbursement for advances made on behalf of its principal.

that it would be repaid over time, out of positive securities lending revenues or would be paid "in full" if CTPF decided to exit NTC's securities lending program.

Apart from theories of implied-in-fact contract, restitution, and indemnification, NTC also has a right to reimbursement under theories of ratification and estoppel, both under agency principles and in light of ¶ 15 of the Custody Agreement, which required CTPF to object within 6 months to liabilities posted on its account statements. *See* Opp. at 7. CTPF offers no argument in response to any of these theories other than its all-purpose assertion that NTC should be precluded from raising any new factual or legal theories by its failure to do so in its Counterclaim. Under Rule 13(a), however, NTC was required to plead only compulsory counterclaims that were ripe "at the time" it filed its answer. When NTC filed its counterclaim, it asserted a claim for breach of the SLA on the theory that CTPF's failure to reimburse NTC and its own Custom Fund for amounts due constituted a breach of the SLA. NTC did not assert a counterclaim based on the facts and legal theories outlined in its Opposition for the simple reason that such a claim was not yet ripe. REDACTED

REDACTED

In addition, CTPF had not yet sent NTC a letter stating that it intended to exit NTC's securities lending program or terminate NTC's custody services, nor had it filed a motion for preliminary injunction seeking to terminate NTC's services without having

to pay its payables. Those events only just occurred and are ongoing. An attempt to exit NTC's program triggers CTPF's obligation under the parties' agreement to pay its obligations REDACTED Anderson Decl. at ¶ 23 and Ex. 10. Under those circumstances, any claim by NTC based on the facts and theories outlined in its Opposition would have been premature.[9]

**CONCLUSION**

For the foregoing reasons and the reasons set forth in NTC's Opposition, CTPF's motion for a preliminary injunction should be denied.[10]

Respectfully submitted,

/s/ Caryn L. Jacobs

Attorney for The Northern Trust Company and Northern Trust Investments, Inc.

[9] Given the positions CTPF has now taken, NTC intends to seek leave to file an amended counterclaim to assert claims for repayment of the amounts it advanced on behalf of CTPF.

[10] If the motion were granted, the Court would have to require CTPF to post a bond. Contrary to CTPF's argument (at 15 n.15), the exemption from the bonding requirement in Rule 65(c) applies only to the "United States, its officers, and its agencies" and does not apply to state agencies. *See Waterfront Comm'n of N.Y. Harbor v. Constr. & Marine Equip. Co.*, 928 F.Supp. 1388, 1405 (D.N.J. 1996).

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies under penalty of perjury that a copy of the foregoing DEFENDANTS' SUR-REPLY IN OPPOSITION TO THE MOTION FOR A PRELIMINARY INJUNCTION FILED BY THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND was served on counsel of record for all parties electronically via the CM/ECF system on May 29, 2014.

Dated: May 29, 2014 /s/ Caryn L. Jacobs