**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

THE BOARD OF TRUSTEES OF THE
PUBLIC SCHOOL TEACHERS' PENSION
& RETIREMENT FUND OF CHICAGO,

              Plaintiff,

v.

NORTHERN TRUST INVESTMENTS, N.A.,
and THE NORTHERN TRUST COMPANY,

              Defendants.

THE NORTHERN TRUST COMPANY,

              Counter-Plaintiff,

v.

THE BOARD OF TRUSTEES OF THE
PUBLIC SCHOOL TEACHERS' PENSION
& RETIREMENT FUND OF CHICAGO,

              Counter-Defendant.

Judge Robert W. Gettleman,
*Judge Presiding*

Magistrate Judge Susan E. Cox

Civil Action No. 09-7203

**JURY TRIAL DEMANDED**

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE
SUPPLEMENTAL COMPLAINT OF THE BOARD OF TRUSTEES OF THE PUBLIC
SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO
AND NTC'S AMENDED COUNTERCLAIMS**

Defendants Northern Trust Investments, Inc., formerly known as Northern Trust Investments, N.A., ("NTI") and The Northern Trust Company ("NTC") (together, "Northern Trust"), by and through their attorneys, pursuant to Fed. R. Civ. P. 8(b) and 15(a)(1), file the following Answer and Affirmative Defenses to Plaintiff's Supplemental Complaint in the above-captioned case, and Defendant/Counter-Plaintiff NTC files the following Amended Counterclaims.[1] To the extent any allegations are not expressly admitted herein, they are hereby denied. Pursuant to Fed. R. Civ. P. 8(b), any statement as to which defendants lack knowledge or information sufficient to form a belief about the truth shall have the effect of a denial.[2]

## I.   **INTRODUCTION**

1.      This is a case about a fiduciary who improperly invested its clients' assets. Here, Northern Trust, in violation of its fiduciary and contractual duties, invested and maintained its clients' assets in risky, long-term investments—including hundreds of millions of dollars of unregistered, illiquid securities that plummeted in value. Chicago Teachers incurred massive realized losses as a result of these breaches of Northern Trust's fiduciary and contractual duties, which caused Northern Trust's securities lending program (the "SLP") to lose over $1 billion.

**ANSWER TO PARAGRAPH 1:** Defendants deny the allegations of this paragraph.

2.      Northern Trust operates the SLP in which Chicago Teachers directly participated. As explained more fully below, through the SLP, Defendants lend out securities belonging to participants in the SLP, and receive cash and other collateral to secure those loans. Defendants then invest the cash collateral in several Northern Trust collective investment pools (the

---

[1]      NTC filed its Amended Counterclaims against Plaintiff on September 26, 2014. Dkt. #390. NTC incorporates that filing into this filing as if fully set forth herein.

[2]      No answer is required with respect to the headings, prayers for relief, and other contents of the Amended Complaint that do not set forth allegations of fact and are not included within numbered paragraphs as required by Fed. R. Civ. P. 10(b).

"Collateral Pools"), including, but not limited to, the Short Term Extendable Portfolio ("STEP") and the Core USA Collateral Section ("Core USA"). These Collateral Pools were fully discretionary on the part of Northern Trust; Chicago Teachers, like other participants in the SLP, had no control over the selection or management of the investments in the Collateral Pools.

**ANSWER TO PARAGRAPH 2:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage, because Plaintiff has alleged no claim based on Core USA. Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are loaned to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed income instruments pursuant to and in compliance with the Collateral Pools' guidelines. Defendants deny that the collective fund STEP is in and of itself a collateral pool, but admit that, at times, STEP units formed a component of certain custom funds utilized for cash collateral reinvestment.[3] Defendants further admit that, at times, Chicago Teachers and its Board participated directly in the Northern Trust securities lending program.[4] To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

---

[3]     For the sake of clarity, Defendants herein utilize the term "Collateral Pools" to include STEP, conforming to the definition assigned by Plaintiff; this shall not be construed as an admission that STEP was ever a securities lending collateral pool in and of itself.

[4]     The Public School Teachers' Pension and Retirement Fund of Chicago is hereafter referred to as "Chicago Teachers." The Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago is hereafter referred to as the "Board," or "Plaintiff."

3.      The Collateral Pools ostensibly sought to achieve conservative returns, and their primary focus was on preserving capital and maintaining liquidity.  Because the cash invested in the Collateral Pools was collateral for loaned securities and had to be returned to the borrowers of the securities upon the termination of the loan, all of the Collateral Pools were to be invested in highly conservative, short-term investments designed to maintain liquidity.

**ANSWER TO PARAGRAPH 3:** To the extent this paragraph purports to characterize Collateral Pool guidelines or various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny any remaining allegations of this paragraph.

4.      Defendants breached their fiduciary and contractual duties to the Teachers Board and Chicago Teachers by imprudently investing the Collateral Pools, including STEP and Core USA, in risky and long-term securities.  For example, as of July 31, 2007, almost 70% of the securities held in STEP were not due to mature for over eighteen months, and over 20% of the securities in STEP were not due for at least 10 years.

**ANSWER TO PARAGRAPH 4:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

5.      Defendants further breached their fiduciary and contractual duties to the Teachers Board and Chicago Teachers by investing in securities that were both high-risk and fell outside the purportedly conservative investment objectives of the Collateral Pools.  The STEP portfolio included hundreds of millions of dollars in exotic, unregistered securities issued by "structured

investment vehicles" or "SIVs"—entities that were identified in hearings before the congressional Financial Crisis Inquiry Commission as one of the "causes of the financial crisis" that "served no good or productive purpose in the financial system." And both STEP and Core USA held hundreds of millions of dollars of risky securities backed by mortgages and other consumer loans, and billions more in securities issued by banks with massive exposure to mortgages and consumer loans.

**ANSWER TO PARAGRAPH 5:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

6. Indeed, notwithstanding the warnings of Northern Trust's own Chief Economist and other Northern Trust economists as early as 2004 that major banks faced significant risk because of their excessive exposure to the U.S. real estate market (including through mortgage backed securities and other complex derivative products), Defendants filled the Collateral Pools, including STEP and Core USA, with securities issued by such banks, and other investments exposed to the real estate market.

**ANSWER TO PARAGRAPH 6:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

7. Defendants were motivated to build STEP and Core USA around such risky, long-term securities because of a compensation scheme that gave rise to a conflict of interest. Specifically, Northern Trust shared in the returns generated from the investment of cash collateral in the Collateral Pools—taking up to 40% of the earnings in the Pools—but bore no downside risk on any losses in the Collateral Pools. As a result, Defendants stood to materially

gain by investing the Pools in higher-risk securities that generated greater returns, regardless of the additional credit and liquidity risk inherent in those investments or the fact that they were wholly inappropriate for conservative, short-term, and liquid funds like STEP and Core USA. On information and belief, this conflict drove Defendants to invest STEP and Core USA in risky and long-term securities, and to maintain significant exposure to mortgage-backed securities, exotic investments backed by mortgage-backed securities, and securities issued by financial institutions that themselves had significant exposure to those same mortgage markets, all of which were inappropriate for the Collateral Pools.

**ANSWER TO PARAGRAPH 7:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

8. On information and belief, yet another conflict of interest prevented Northern Trust from selling securities in the Collateral Pools at a loss, even if done to mitigate risk and avoid potentially larger losses. Specifically, according to internal Northern Trust documents, accounting rules required Northern Trust to consolidate the entire Collateral Pool onto its books in the event that a Collateral Pool incurred a realized loss (such as by selling securities at a loss) if investors in the Collateral Pool failed to offset that loss. Such an event would have resulted in a multi-billion dollar loss to Defendants. Thus, by continuing to hold securities that had incurred unrealized losses, and that were at risk for failure, Defendants avoided the ramifications of consolidating the Collateral Pools. On information and belief, Northern Trust's self-interested concern about the risk of consolidation—rather than an unbiased assessment of the best interests of Chicago Teachers and other participants in the SLP—motivated the Defendants to maintain

several Collateral Pool assets that were destined to fail in the face of the subprime mortgage collapse and growing financial crisis.

**ANSWER TO PARAGRAPH 8:**  Defendants deny the allegations of this paragraph.

9.     Specifically, in the face of overwhelming evidence that, as Northern Trust economists had repeatedly warned, the mortgage crisis was developing into a broader economic crisis that threatened to cause significant losses to the Collateral Pools, Defendants failed to prudently divest the Collateral Pools' investments in Lehman Brothers, Capmark Financial Group, and two SIVs that issued exotic, illiquid securities—all four of which eventually collapsed—which would have mitigated the massive risks the Defendants themselves had created.

**ANSWER TO PARAGRAPH 9:**  To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

10.     As a result, and despite the clear warning signs discussed herein, Defendants continued to hold these high-risk securities in the Collateral Pools in the mere hope that the issuers of those securities would survive the financial crisis—an investment decision informed by Defendants' own self-interest in avoiding consolidation of the impaired Collateral Pools. Northern Trust retained these Collateral Pool investments notwithstanding the fact that months before the first securities held in STEP and Core USA defaulted resulting in massive realized losses, Defendants recognized that the Collateral Pools were no longer appropriate, conservative investments for SLP participants, including Chicago Teachers.  Indeed, a Northern Trust executive has testified that, by April 2008, Defendants "would not be going out and selling STEP as an investment vehicle to new prospects."

**ANSWER TO PARAGRAPH 10:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

11.     As a result of Northern Trust's conduct in imprudently structuring and managing the Collateral Pools, in September 2008 STEP and Core USA incurred massive realized losses upon the collapses of the two SIVs whose securities were held by STEP, and of Lehman Brothers—a bank that months earlier had disclosed exposure to billions of dollars in losses tied to mortgage-backed securities—whose long-term securities were held by STEP and Core USA. Northern Trust's imprudent conduct in investing the STEP and Core USA Collateral Pools in long-term and risky securities resulted in these two Pools alone suffering over $1 billion in realized losses. This included over $400 million of losses on investments in Lehman Brothers securities that were not due to mature until as late as January 2012, and approximately $400 million of realized losses on investments in SIVs that were not due to mature until as late as August 2011.

**ANSWER TO PARAGRAPH 11:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

12.     On the grounds that those losses had impaired the liquidity of the Collateral Pools, Defendants limited withdrawals by Chicago Teachers from the Collateral Pools, effectively locking it into the risky, long-term investment strategy Defendants had implemented for these purportedly conservative, short-term funds. As a result, Chicago Teachers suffered more harm

as STEP and Core USA incurred additional realized losses due to Defendants' breaches of their fiduciary and contractual obligations, including hundreds of millions of dollars of realized losses on long-term investments in CIT Group, Capmark Financial Group and Sallie Mae.

**ANSWER TO PARAGRAPH 12:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

13. Despite the fact that the losses in the Collateral Pools were the direct result of Defendants' mismanagement, Northern Trust took the position that the SLP participants—including Chicago Teachers—were responsible for those losses. Accordingly, Northern Trust took steps to compel Chicago Teachers to contribute millions of dollars to the Collateral Pools to offset the losses caused by Defendants' imprudent investments, demanding that Chicago Teachers provide lump-sum payments totaling millions of dollars to further offset these losses.

**ANSWER TO PARAGRAPH 13:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

14. Chicago Teachers and the Teachers Board refused to make the payments that Northern Trust improperly demanded. The written agreement governing Chicago Teachers' participation in Northern Trust's securities lending program, the Securities Lending Agreement ("SLA"), neither permits Northern Trust to make such demands nor requires the Teachers Board or Chicago Teachers to comply with such demands.

**ANSWER TO PARAGRAPH 14:** Defendants deny the allegations of this paragraph.

15.     Moreover, Northern Trust has admitted that the money it demanded was to repay Northern Trust for money that Northern Trust voluntarily advanced to cover the losses in the SLP.   Specifically, Northern Trust voluntarily advanced its own money to ensure that the borrowers who received securities through Northern Trust's SLP were repaid all of the cash collateral that Northern Trust had invested but lost.   The SLA did not permit Northern Trust to advance any money on behalf of the Teachers Board or Chicago Teachers.

**ANSWER TO PARAGRAPH 15:**   Defendants admit that the advances NTC made on Chicago Teachers' behalf were conditioned on repayment by Chicago Teachers, and that Chicago Teachers agreed to such repayment and never objected to the advances.   Defendants deny the remaining allegations of this paragraph.

16.     When the Teachers Board and Chicago Teachers refused to pay Northern Trust the money it demanded, Northern Trust began to improperly seize Chicago Teachers' securities lending earnings and retained those earnings to repay itself the money it claimed it was owed. The seizure of Chicago Teachers' earnings constitutes a separate and distinct breach of the SLA, which mandates that 85% of the earnings generated from Chicago Teachers' securities lending activity be remitted to Chicago Teachers, with the remaining 15% retained by Northern Trust as a fee.   Northern Trust's seizure of Chicago Teachers' earnings also constitutes a breach of Defendants' fiduciary duties.

**ANSWER TO PARAGRAPH 16:**   Defendants deny the allegations of this paragraph.

17.     In addition to improperly seizing millions of dollars of Chicago Teachers' securities lending earnings over Chicago Teachers' objections, Northern Trust further breached the parties' written agreement and its fiduciary duties by forcibly transferring securities from STEP to Chicago Teachers' securities lending collateral account (the "Chicago Teachers Custom

9

Fund") despite the fact that the parties' agreements prohibited such securities from being held in the Chicago Teachers Custom Fund. Northern Trust then further breached its duties to Chicago Teachers by removing those securities from the Chicago Teachers Custom Fund, assigning the securities to Chicago Teachers itself, and demanding that Chicago Teachers remit payment for those securities.

**ANSWER TO PARAGRAPH 17:** Defendants deny the allegations of this paragraph.

## II.   <u>JURISDICTION AND VENUE</u>

18.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"). The amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a different state than at least one defendant. The claims asserted herein were originally asserted in this Court on behalf of Chicago Teachers pursuant to CAFA, through the filing of the Class Action. Through this pleading, Plaintiff seeks to continue to prosecute the same claims initially asserted in the Class Action.

**ANSWER TO PARAGRAPH 18:** To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants admit that Plaintiff claims the amount in controversy exceeds five million dollars, but deny that Plaintiff is entitled to any relief. Defendants deny that class treatment is appropriate in the Class Action. Defendants deny the remaining allegations of this paragraph.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred within this District, and the Defendants' principal places of business are in Chicago, Illinois.

**ANSWER TO PARAGRAPH 19:**  The first sentence of this paragraph states a legal conclusion to which no answer is required.  Defendants admit that their principal places of business are in Chicago, Illinois.  Defendants deny the remaining allegations of this paragraph.

## III.    THE PARTIES

20.    Plaintiff the Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago is a body politic and corporate with the authority to administer Chicago Teachers and to bring legal proceedings on its behalf.  Chicago Teachers is a public pension fund established for the exclusive benefit of teachers and certain other employees of the Chicago Public Schools.  Chicago Teachers serves over 27,440 retirees and 30,969 contributing members, and has over $9.7 billion in assets under management.  The Teachers Board entered into the SLA with NTC for the benefit of Chicago Teachers.  Pursuant to the SLA, Chicago Teachers participated directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including STEP.  Chicago Teachers was also directly invested in the Core Collateral Section through its custom investment of non-cash or term collateral.  Chicago Teachers suffered losses on its investments that directly participated in the SLP because of Defendants' improper structuring and mismanagement of the Collateral Pools, including STEP and the Core Collateral Section.  Chicago Teachers also suffered losses through the actions Defendants took in violation of the parties' written contract after those investment losses were incurred.

**ANSWER TO PARAGRAPH 20:**  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is

required. Defendants admit on information and belief the allegations in the first sentence of this paragraph, except to the extent the allegations of this sentence state a legal conclusion, for which no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations in the second and third sentences of this paragraph. Defendants admit that Plaintiff entered into a securities lending agreement with NTC, pursuant to which Chicago Teachers' securities were lent to various borrowers. Defendants refer to the securities lending agreement for its content and deny any allegations inconsistent therewith. Defendants admit that, at all relevant times, the cash collateral received from participation in Northern Trust's securities lending program was invested in a custom account that included, among other things, investments in STEP. Defendants admit that, at all relevant times, the non-cash collateral received from participation in Northern Trust's securities lending program was invested in the Core Collateral Section. Defendants deny the remaining allegations of this paragraph.

21. Chicago Teachers also participated indirectly in the SLP through its investment in the S&P 400 Special Purpose MidCap Fund, a collective investment fund managed by Defendants that participated in the SLP. Claims arising from that indirect participation in the SLP remain the subject of the Class Action, and are not being pursued through this pleading.

**ANSWER TO PARAGRAPH 21:** Defendants admit that, at points in time, Plaintiff invested funds of Chicago Teachers in the NTGI-QM Collective Daily S&P Mid Cap 400 Equity Special Purpose Index Fund – Lending. Defendants further admit that that collective fund participated in the Northern Trust securities lending program. Defendants admit that this Supplemental Complaint does not pursue any claims relating to this investment. To the extent this paragraph purports to characterize the effect or content of pleadings or applicable legal principles, no

answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.

22.     Defendant Northern Trust Investments, N.A. has its principal place of business in Chicago, Illinois.  NTI acts as a trustee to the Collateral Pools that invested the cash collateral provided by borrowers in the SLP.  At all relevant times, NTI was and is a fiduciary to Chicago Teachers, because it has possession and control over the assets of Chicago Teachers, discretion over how to invest these assets, and because it otherwise manages all aspects of the Collateral Pools in which Chicago Teachers invested.  As a fiduciary to Chicago Teachers, NTI was obligated to act with prudence, due care, good faith and loyalty in investing and managing the SLP.

**ANSWER TO PARAGRAPH 22:** Defendants admit that NTI has its principal place of business in Chicago, Illinois.  Defendants admit that NTI acts as the trustee of STEP pursuant to the applicable Declaration of Trust.  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny the remaining allegations of this paragraph.

23.     Defendant Northern Trust Company has its principal place of business in Chicago, Illinois.  NTC served as a securities lending agent for Chicago Teachers, with

responsibility for administering the SLP, including negotiating and entering into agreements with securities borrowers, receiving borrowers' collateral and matching borrower loan requests with the eligible securities of SLP participants. At all relevant times, NTC was and is a fiduciary to Chicago Teachers, and was obligated to act with prudence, due care, good faith and loyalty in administering the SLP, including overseeing the management and investment of collateral received for lent securities.

**ANSWER TO PARAGRAPH 23:** Defendants admit that The Northern Trust Company has its principal place of business in Chicago, Illinois. Defendants admit that NTC served as a securities lending agent pursuant to the SLA. To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Northern Trust's Securities Lending Program

24.    Since 1981, Northern Trust has been one of the largest providers of securities lending services for public retirement systems, foundations, endowments, insurance companies, and ERISA-qualified plans. By December 31, 2007, Northern Trust's SLP boasted 664 clients, representing approximately $1.13 trillion of lendable securities.

**ANSWER TO PARAGRAPH 24:** To the extent this paragraph purports to characterize Northern Trust documents or communications to clients or potential clients, Defendants refer to those documents and communications for their content and deny any allegations inconsistent therewith. Defendants admit that, as of December 31, 2007, the securities lending program involved approximately $1.126 trillion in lendable assets of 664 clients. Defendants deny the remaining allegations in this paragraph.

25. Through Northern Trust's SLP, Chicago Teachers sought to earn incremental returns by lending eligible securities from their portfolios—including corporate equities, corporate bonds, and government securities—to approved borrowers in return for cash and other collateral. During the term of those loans, the cash collateral received from securities borrowers (which must be returned to the borrower when the loaned securities are returned) is reinvested in one or more commingled funds, or Collateral Pools, managed by NTI. The Collateral Pool funds—which were all purportedly invested in short-term, conservative and highly liquid fixed income securities that generate predictable returns—include Core USA and STEP. Each of these Collateral Pools had investment objectives that required Northern Trust to manage the Collateral Pools in a manner consistent with preserving capital and providing for liquidity.

**ANSWER TO PARAGRAPH 25:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants admit that Northern Trust operates a securities lending program, and that as part of that program, client assets are lent to certain borrowers, and cash collateral received from the borrowers is invested in the Collateral Pools, which are invested in fixed income instruments pursuant to and in compliance with the Collateral Pools' guidelines. To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content

and deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning Chicago Teachers' intentions or practices in regards to securities lending. To the extent that this paragraph purports to universally describe all securities lending arrangements between Defendants and the Plaintiff, Defendants deny those allegations and any remaining allegations of this paragraph.

26.     Traditionally, the reinvestment income generated through investments in the Collateral Pools has been used by securities lending participants to offset expenses associated with maintaining the portfolio (such as custody costs or brokerage commissions), to maximize overall portfolio performance, or to lower a portfolio's effective tax rate through dividend arbitrage. Accordingly, investment of collateral through the SLP was intended to generate only modest returns, with a primary focus on preservation of capital and liquidity to ensure that the cash collateral could be returned to borrowers upon the termination of the securities loan.

**ANSWER TO PARAGRAPH 26:** To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements in NTC's securities lending program, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief about the truth of allegations concerning the Plaintiff's intentions or practices in regard to securities lending. Defendants deny any remaining allegations of this paragraph.

27.     The borrowers who tender cash collateral in exchange for the loaned securities often use borrowed securities to cover an already established short position, hedge an investment

(such as an equity derivative or convertible bond), or take advantage of an arbitrage opportunity. In order to borrow a security through the SLP, borrowers are required to put up collateral worth at least 102% of the borrowed security's current market value to secure their obligation to return the securities when the loan is either called back or matures. The value of the borrowed security is monitored on a daily basis, and the borrower is required to maintain the same 102% collateral even if that value fluctuates.

**ANSWER TO PARAGRAPH 27:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.

28.     When the loan matures or is called back, the borrower returns the security and gets back the collateral it originally posted. The borrower also receives interest on the collateral—known as the rebate—for the use of the cash collateral. The amount of the rebate is intended to reflect the intrinsic value of the loaned security and the fact that some securities are more highly sought after than others—that is, the higher the demand for the security, the lower the rebate that will be paid. Accordingly, the collateral reinvestment must only generate a higher return than the rebate promised back to the borrower in order for the participating lender to realize a return. The earnings from the collateral reinvestment generated above the rebate rate equals the "lending spread" and represents the profit in the transaction. This profit is split between the participating lender and Northern Trust based upon a revenue sharing arrangement,

with Northern Trust receiving up to 40% of the lending spread, in addition to any fees otherwise charged by Northern Trust.

**ANSWER TO PARAGRAPH 28:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. To the extent that this paragraph purports to universally describe all securities lending arrangements, Defendants deny those allegations and any remaining allegations of this paragraph.

29.     Importantly though, while Northern Trust collects a percentage of the lending spread, it does not bear the downside risk of any losses incurred by the Collateral Pools. In the case of a "collateral deficiency"—which occurs when the invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption—the SLA did not require Northern Trust to make up the difference owed to the borrowers. This system effectively incentivized Northern Trust to take greater risks with the assets of Chicago Teachers because although Northern Trust would recover a percentage of any profits, it could not be required under the SLA to bear losses unless it acted imprudently.

**ANSWER TO PARAGRAPH 29:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

30.     Participation in the SLP could be direct or indirect.  Direct participants in the SLP, such as Chicago Teachers, entered into a securities lending agreement with Northern Trust which allowed Northern Trust to lend out securities from their investment portfolios and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools.  Confronted with the massive losses in the Collateral Pools, Defendants held direct SLP participants liable for those losses.

**ANSWER TO PARAGRAPH 30:**  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.

31.     Indirect SLP participants invested in commingled investment funds established and managed by Northern Trust (the "Commingled Lending Funds"), which in turn participated in the SLP.  The Commingled Lending Funds act as direct participants in the SLP, and entered into a securities lending agreement with Northern Trust, which allowed Northern Trust to lend out securities held in the Commingled Lending Funds for the benefit of investors in those funds, and which gave Northern Trust discretion to invest the collateral received from those loans in one or more specified Collateral Pools.  The Commingled Lending Funds suffered losses as a result of their direct participation in the SLP, and those losses—which were caused by Defendants' breaches of duty—were passed along to investors in the Commingled Lending Funds.  Chicago Teachers does not, through this Complaint, assert any claims arising from any investment in Commingled Lending Funds or other indirect participation in the SLP; those claims remain pending through the Class Action Complaint.

**ANSWER TO PARAGRAPH 31:**  To the extent this paragraph purports to characterize various agreements or documents including the Declaration of Trust referenced in the Supplemental Complaint, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants admit that this Supplemental Complaint does not assert any claims arising from any investment in Commingled Lending Funds.  Defendants deny the remaining allegations of this paragraph.

### B.     Northern Trust Served As A Fiduciary To Chicago Teachers

32.     Northern Trust served as a fiduciary to Chicago Teachers in connection with the management of the SLP and, in particular, the investment of collateral in the Collateral Pools.  As the investment manager charged with managing the investment of the Collateral Pools for the benefit of both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

**ANSWER TO PARAGRAPH 32:**  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a

belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

33. Documents created by Northern Trust, including materials that described and explained the SLP, acknowledge that "Northern Trust considers its Securities Lending Program as a fiduciary duty [and] Northern Trust recognizes that it is responsible for any losses that an account may suffer as a result of its failure to perform its fiduciary duties."

**ANSWER TO PARAGRAPH 33:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

34. Northern Trust's status as a fiduciary to Chicago Teachers was incorporated into the securities lending agreement signed by the Teachers Board. For example, the SLA incorporates by reference the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending ("FFIEC Policy"), which states that a "lender institution which exercises discretion in offering securities [on loan] on behalf of and for the benefit of customer-owners is acting as a fiduciary. For purposes of these guidelines, the underlying relationship may be as agent, trustee, or custodian." Here, Northern Trust acted as the "lender institution" that "offered securities" for loan on behalf of Chicago Teachers, who was the "customer-owner." Accordingly, Northern Trust, which acted as custodian, agent and/or trustee to Chicago Teachers, served as its fiduciary.

**ANSWER TO PARAGRAPH 34:** To the extent this paragraph purports to characterize various agreements or other documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the

legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

35.     Furthermore, the SLA explicitly set forth this obligation, and Northern Trust's general obligation to prudently manage the Collateral Pools for the benefit of Chicago Teachers, specifically providing that Northern Trust agreed to "indemnify and hold harmless" Chicago Teachers and the Teachers Board "for any direct losses, damages, costs and expenses (including reasonable attorney fees) [they] incur[] resulting ...  from Northern's failure to ...  make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 35:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

36.     In the SLA, Northern Trust also agreed to "indemnify and hold harmless" Chicago Teachers and the Teachers Board for "any direct losses, damages, costs and expenses (including reasonable attorney fees)" for failure to comply with the FFIEC Policy. Under the FFIEC Policy, Defendants were obligated to invest the cash collateral in safe, liquid instruments. Specifically, the FFIEC Policy states that "[g]enerally, a lender institution will invest cash collateral in repurchase agreements, master notes, a short term investment fund, U.S. or

Eurodollar certificates of deposits, commercial paper or some other type of money market instrument," and the "lender institution is responsible for making [the cash collateral] income productive."

**ANSWER TO PARAGRAPH 36:** To the extent this paragraph purports to characterize various agreements or other documents, including the referenced FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

37.    As set forth herein, Defendants breached their fiduciary and contractual duties to the Teachers Board and Chicago Teachers through their imprudent structuring and management of the Collateral Pools' investments, which caused Chicago Teachers to incur significant losses and be subjected to further losses as a result of withdrawal limitations imposed by Defendants.

**ANSWER TO PARAGRAPH 37:** Defendants deny the allegations of this paragraph.

### C.    Defendants Improperly Structured And Mismanaged The Collateral Pools

38.    The Collateral Pools, including STEP and Core USA, were purportedly conservative, short-term and highly liquid investment vehicles. Because the collateral received from securities borrowers was essentially borrowed money that had to be returned to the borrowers upon the remittance of those securities, Defendants were required—both by contract and by the prudent investor standard that governs their fiduciary duty—to invest the cash collateral conservatively and prudently in safe, short-term, and liquid instruments. Moreover, Defendants were obligated to ensure that their investment decisions were made purely in the interests of Chicago Teachers and other participants in the SLP, and did not sacrifice safety and

liquidity in exchange for higher returns. Therefore, it was critical for Defendants to invest Collateral Pool assets in safe, short-term instruments both to guard against losses arising from default, and to maintain adequate liquidity consistent with the narrow purpose of the Collateral Pools.

**ANSWER TO PARAGRAPH 38:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize agreements or documents including Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

39. Defendants disregarded these obligations and instead focused on and sought out higher returns in structuring the Collateral Pools by investing in risky and long-term securities, which exposed these purportedly short-term, liquid Pools to significant credit and liquidity risk. In 2007, as earlier predicted by Northern Trust's own Chief Economist, financial firms in which these Collateral Pools invested disclosed exposure to losses on mortgages and other consumer loans. Consequently, Defendants' improper structuring of the Collateral Pool portfolios by investing in these securities caused the Pools to lose value.

**ANSWER TO PARAGRAPH 39:** Defendants deny the allegations of this paragraph.

40. In the face of those developments, which Northern Trust should have recognized as posing significant risk to the Collateral Pools in light of the imprudent manner in which Defendants had invested the Pools, Defendants again breached their fiduciary and contractual duties by maintaining several Collateral Pool assets—specifically, the STEP investments in the

SIVs and Capmark Financial Group, and the STEP and Core USA investments in Lehman Brothers—that had incurred unrealized losses and presented a level of risk that Northern Trust, in light of its sophistication and the warnings of its economists, should have recognized made those investments imprudent for the conservative Collateral Pools.  Indeed, rather than actively manage STEP and Core USA to mitigate the risk they had created, Defendants adopted the untenable position that securities held in STEP and Core USA would pay fully if held to maturity, and therefore decided that these securities would not be sold.  Because Defendants had imprudently populated STEP and Core USA with long-term securities, many of which would not mature for decades, that decision effectively converted STEP and Core USA from "ultra short-term" funds to long-term funds, which were not appropriate for the investment of securities lending collateral.  This was not simply a bad decision, it was also a conflicted one, motivated by Northern Trust's self-interest in improperly structuring the portfolios and in avoiding consolidating losses onto its books.

**ANSWER TO PARAGRAPH 40:**  To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

**1.  Defendants Improperly Structured STEP And Core USA By Investing In Long-Term, High-Risk And Illiquid Securities**

**a.  STEP And Core USA Were Structured As Long-Term Investment Funds**

41.  Northern Trust established STEP as "an ultra short duration total return fund that seeks to outperform high grade, short term money market instruments."  STEP was purportedly appropriate for investors with an investment horizon of just one year.

**ANSWER TO PARAGRAPH 41:** To the extent this paragraph purports to characterize Collateral Pool guidelines or Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

42. Similarly Core USA was to be a highly conservative, short-term fund in which cash collateral was to be invested to generate returns "consistent with the preservation of capital and maintenance of liquidity," with "liquidity and principal preservation as prime objectives" of the fund. The other Collateral Pools, which were intended to serve the same purpose as STEP and Core USA, were by their nature and purpose required to be similarly invested in conservative, short-term investments.

**ANSWER TO PARAGRAPH 42:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize various agreements or documents including Collateral Pool guidelines, Defendants refer to those agreements and documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

43. Notwithstanding these clear objectives, Defendants violated their fiduciary and contractual duties by structuring the Collateral Pools as long-term investment funds. For example, of the securities held in the STEP portfolio as of July 31, 2007,

- 76% were not due for at least another 12 months;

- 69% were not due for at least another 18 months;

- 54% were not due for at least another 2 years;

- 21% were not due for at least another 10 years;

- 18% were not due for at least another 20 years; and

- 9% were not due for at least another 30 years.

**ANSWER TO PARAGRAPH 43:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

44. Similarly, Core USA held billions of dollars' worth of securities that would not mature for years. Indeed, as of October 2008, over 30% of the securities held in Core USA were not due to mature for over 2 years.

**ANSWER TO PARAGRAPH 44:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize documents such as reports on Core USA holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

45. These long-term securities were wholly improper for "ultra short term" funds such as STEP and Core USA, and exposed Chicago Teachers to significant credit and liquidity risk.

**ANSWER TO PARAGRAPH 45:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

27

46.     The securities that ultimately caused hundreds of millions of dollars of realized losses to the Collateral Pools included long-term securities in which Defendants should never have invested securities lending cash collateral.   For example, the STEP and Core USA investments in Lehman Brothers were not due to mature until as late as January 2012—more than three years after Lehman Brothers collapsed.   The exotic SIV securities held by STEP were not due to mature until as late as August 2011, with 70% of one of these SIVs' securities maturing in 2010—more than a year after the SIVs collapsed.   And other securities in which Northern Trust imprudently invested the Collateral Pools—resulting in realized losses to SLP participants—had similar distant maturity dates, including: CIT securities not due to mature until as late as March 2010; Capmark Financial securities not due to mature until as late as May 2010; Greenpoint Mortgage securities not due to mature until as late as June 2010; and Sallie Mae securities not due to mature until as late as October 2011.   These securities were held in the Collateral Pools as of May 2008, and even at the apex of the financial crisis later that year were not due to mature for up to 3 years.   Such long-term securities had no place in the purportedly short-term Collateral Pools.

**ANSWER TO PARAGRAPH 46:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.   Defendants deny the allegations of this paragraph.

### b.     Defendants Invested STEP And Core USA In High-Risk And Illiquid Securities

47.     Northern Trust invested Collateral Pool assets in securities that were illiquid, highly-leveraged, or risky asset-based securities such as floating rate notes, SIVs, and derivatives.   These types of investments were inconsistent with the clear objectives of the

Collateral Pools and inordinately risky for funds purportedly created to preserve capital and maintain liquidity.

**ANSWER TO PARAGRAPH 47:** Defendants deny the allegations of this paragraph.

48.     STEP and Core USA in particular were imprudently exposed to significant losses related to the U.S. mortgage market and other consumer loans.  Despite the warnings of Northern Trust's own Chief Economist and other Northern Trust economists that investment in the mortgage markets presented significant risks to banks that held mortgage-backed securities, the Collateral Pools held billions of dollars of securities issued by such banks, as well as mortgage-backed securities and securities issued by exotic SIVs that traded in asset-backed securities, including those backed by residential mortgages.

**ANSWER TO PARAGRAPH 48:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

49.     Indeed, as of October 2008, over 80% of the investment securities held in Core USA were asset-backed securities—including securities backed by mortgages and other consumer loans—and securities issued by banks and financial institutions which themselves were exposed to mortgages and other consumer loans.  As of October 2008, the Core USA collateral pool directly held over $2.8 billion in mortgage-backed securities, almost all of which were not due to mature for at least another ten years.  Of the more than $7.6 billion in asset-backed securities held in Core USA as of October 2008, 80%—or over $6.3 billion—were not due to mature for over two years.  These investments were long-term in nature and were therefore inappropriate for a short-term and liquid fund such as Core USA.

**ANSWER TO PARAGRAPH 49:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize documents such as reports on Core USA holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

### c. STEP Held Exotic, High-Risk Structured Investment Vehicles

50. In addition to the long-term and high risk securities discussed above that were held in the Collateral Pools, STEP faced further risk because it held other exotic, illiquid securities. Specifically, as of July 31, 2007, over 15% of the securities in STEP were invested in unregistered securities—securities which, by definition, can only be sold under certain narrow circumstances. Those unregistered securities included investments in two SIVs. SIVs are a type of structured investment product which operates similar to banks by borrowing money by issuing short-term securities (such as medium-term notes and commercial paper) at low interest rates and then lending that money by buying long-term securities (including mortgage-backed securities) at higher interest, making a profit for investors from the difference in the interest rates.

**ANSWER TO PARAGRAPH 50:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings or Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

51. The two SIVs whose securities were held in STEP—Sigma Finance and Theta Finance—which were created and managed by the United Kingdom-based investment management company, Gordian Knot, were heavily reliant on their credit ratings in order to continue to raise, and rollover, short-term funding. The notes issued by SIVs are exotic, high-

risk investments that were outside the enumerated classes of securities that were permitted to be held in STEP. For example, Theta was designed to earn returns by buying bonds and selling credit-default swaps, and its bond portfolio included credit card debt, bank and insurer obligations, mortgage-backed securities, and collateralized loan obligations. Similarly, Sigma invested in subprime mortgage-backed securities, other consumer credit receivables, and collateralized debt obligations. Sigma and Theta therefore had extensive and highly-leveraged exposure to the most volatile sectors of the credit markets. Moreover, because SIVs in general, and Sigma and Theta in particular, lacked an established track record, they were inappropriate investments for a conservative fund such as STEP.

**ANSWER TO PARAGRAPH 51:** Defendants deny the allegations of this paragraph.

52. Sigma and Theta presented even higher risk than other SIVs because they were not sponsored by a major financial institution. Bank-sponsored SIVs, such as those sponsored by major financial institutions like Citigroup, have the ability to seek support from their sponsor in times of economic distress. The difference in risk profile between supported and unsupported SIVs was well known to Northern Trust, as revealed in a Northern Trust document from January 2008 that distinguishes between SIVs supported by sponsoring banks, and unsupported SIVs such as Sigma and Theta. The document, which describes the investment process and philosophy of Northern Trust's management of its Northern Trust money market funds, boasts a prudent approach to investing in SIVs by noting that the money market funds' investment concentration in SIVs sponsored by major global banks was "intentional." Specifically, Northern Trust explains that "[b]ank sponsorship typically provides very strong implicit support via back-up liquidity lines of credit, management oversight, and credit quality discipline, not to mention a vested interest in the success of the SIV." Notwithstanding this recognition of the

31

risks of investing in unsupported SIVs and the prudent approach taken with other Northern Trust products, Northern Trust invested STEP assets in these risky securities.

**ANSWER TO PARAGRAPH 52:** To the extent this paragraph purports to characterize documents including Collateral Pool guidelines, reports on STEP holdings, or other Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

53.     On information and belief, Defendants' decision to imprudently structure STEP and Core USA by investing in risky and long-term investments resulted from a conflict of interest. Northern Trust shared in the earnings generated by the Collateral Pools, therefore Defendants were motivated to invest the Pools in securities that generated higher returns, and often carried higher risks. Because longer-term fixed income securities generally yield higher returns than comparable short-term securities, Defendants invested STEP and Core USA in longer-term securities—including securities that would not mature for decades. As a longer-term security locks the investor in for an extended period, such securities generally carry higher credit risk—the risk that the issuer of the security may be unable to pay the obligation due at maturity—than comparable short-term securities. Regardless of these risks, Northern Trust seems to have focused only on the fact that these high-risk securities, such as those issued by SIVs or backed by pools of residential mortgages or other consumer loans, pay a higher return than securities of a comparable term issued by governmental entities or established corporations.

**ANSWER TO PARAGRAPH 53:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

54.     Because the SLA did not require Northern Trust to cover all losses if the investments in STEP and Core USA defaulted, Defendants accepted the additional risk presented by investing in risky and long-term securities in order to generate higher returns for themselves. In light of the objectives of the Collateral Pools, which were purportedly conservative, short-term funds that were required to remain liquid so that the invested collateral could be returned to borrowers in the SLP, the additional returns earned by undertaking that risk was imprudent and unwarranted.

**ANSWER TO PARAGRAPH 54:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements, or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.

### 2.     Northern Trust Identified The Housing Bubble And The Economic Risk It Posed To The Investments In The Collateral Pools

55.     Northern Trust imprudently exposed STEP and Core USA to mortgage-backed securities even though it was fully aware of the serious risks posed by these investments.  Long before the Northern Trust SLP incurred the first losses tied to the collapse of the mortgage market and the resulting financial crisis, Northern Trust determined that U.S. housing prices were highly inflated, that the inflation in the housing market was unsustainable, and that the bursting of the housing bubble would have severe consequences for investors.

**ANSWER TO PARAGRAPH 55:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

56.     Specifically, as early as 2004, Northern Trust's Chief Economist, Paul Kasriel, wrote extensively about the unsustainable inflation in the U.S. housing market and the risk that it posed to the broader U.S. economy in general, and the banking sector in particular.  Defendants acknowledge Kasriel's acumen and prescience in predicting the housing bust and the impact on the financial markets, and touted that he "identified early on the formation of the housing bubble and *foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst."*  (Emphasis added).

**ANSWER TO PARAGRAPH 56:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

57.     For instance, by mid-2004 Kasriel noted that "about 60% of U.S. banks' earning assets are mortgage-related, a post World War II high."  In a June 2004 report, Kasriel compared the housing market to the stock market in 1999 immediately before it experienced a rapid decline in value.  The following month, Kasriel described the housing market as "an accident waiting to happen" and warned that "the most serious collateral damage from a housing bust would be a wounded U.S. banking system" because "U.S. commercial banks have become major investors in mortgage-related debt."  Kasriel specifically noted the historical correlation between a distressed banking industry and investor losses, posing the question, "[s]o what if the U.S. banking system falls on hard times? History suggests that as goes a nation's banking system, so goes its economy."

**ANSWER TO PARAGRAPH 57:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

58.     In the following years, Kasriel repeatedly warned about the state of the housing market and the impact its collapse would have on the economy. Citing research by fellow Northern Trust economist Asha Bangalore, in February 2006 Kasriel again warned of the broad economic risk posed by the housing bubble and reiterated the connection between the inflated housing market and the overall health of the economy, predicting that, "[t]he developing softness in the housing market is likely to have a significant negative impact on the economy as a whole. ... Forget about the GM. The new mantra is: As goes housing, so goes the nation – or, at least, the nation's economy."

**ANSWER TO PARAGRAPH 58:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

59.     Numerous media sources quoted Kasriel's warnings in 2006 that the U.S. housing market was in a "recession" and that the housing market would "pull[] the economy down" in 2007. For example, in June 2006 Kasriel commented that "[i]f the U.S. housing bubble were to go 'whoosh,' great damage would be done to the U.S. banking system." Similarly, in September 2006, he opined that, "[i]f we're to have a severe recession in the housing market, it would seem to me that *the banking system cannot escape significant losses*." (Emphasis added).

**ANSWER TO PARAGRAPH 59:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

60.     Later that year, in November 2006, Kasriel noted that the housing recession was far from over, highlighting the fact that "[a] typical housing downturn sees a drop of 50 percent from the peak, and at this point we are only about halfway there."  One month later, Kasriel affirmed that, "[u]nless this turns out to be a more moderate than usual housing recession, unlikely given the amount of speculation and leverage involved in the boom, then we have 'miles to go' before we can put this housing recession 'to sleep.'"

**ANSWER TO PARAGRAPH 60:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

61.     Kasriel continued to warn of the perils of banks' extensive exposure to the housing market and in September 2006 reaffirmed his view that, "this is the most inflated housing market in the post-war era," concluding that "***the banking system could not escape significant losses***" from a severe recession in housing.  (Emphasis added).  Specifically, in December 2006, Kasriel was quoted as stating that, "U.S. banks currently hold record amounts of mortgage-related assets on their books.  If the housing market were to go into a deep recession resulting in massive mortgage defaults, ***the U.S. banking system could sustain huge losses*** similar to what the Japanese banks experienced in the 1990s."  (Emphasis added).  In that same month, Kasriel foretold of the looming economic downturn, suggesting that "crippled banking systems seem to result from the bursting of asset bubbles because of the sharp decline in the value of the collateral backing bank loans."  He later estimated that due to exposure to the

36

mortgage market, "[i]f a prolonged housing bust ensues, banks could be in big trouble."  The culmination of these facts formed Kasriel's projections in late 2006 of "slower economic growth in the next five quarters," coupled with higher unemployment.

**ANSWER TO PARAGRAPH 61:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

62.     Other Northern Trust economists echoed Kasriel's views.  For example, Northern Trust Vice President and economist Asha Bangalore stated in September 2006 that, "[a]dditional price declines [in the housing market] should not be surprising....  We have a recession in the housing market....  Usually it takes two or three years to stabilize."  Bangalore also highlighted the significant impact a burst housing bubble would have on the rest of the economy, attributing roughly 43% of "new jobs created ...  since the end of 2001 to the boom in housing."

**ANSWER TO PARAGRAPH 62:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

63.     In 2007, Kasriel repeated his concern that banks were holding record high levels of mortgage-related assets and expressed concern in not knowing "how much the now infamous CDOs represent of the total."  In March 2007, Kasriel predicted "increased foreclosures and more inventory on a [housing] market that already has too much."  That month he also observed that it was "doubtful" that the housing recession had hit bottom, stating, "I think the housing recession is not over, that the subprime issues will prolong it."  By December 2007, Kasriel

commented that the problems for U.S. banks were both a direct problem related to mortgage-backed securities and "indirect mortgage challenges as a result of loans you made to other purchasers of the 'toxic waste' originated during this credit cycle."

**ANSWER TO PARAGRAPH 63:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

64. Kasriel's warnings continued into 2008 and indicated that problems were spreading to other debt instruments. In June, for example, Kasriel opined that, "[w]e are not finished with the mortgage problem, but you are starting to see increased delinquencies in other forms of consumer debt." Kasriel also understood that the underpinnings of the recession did not end with the mortgage crisis. In June 2008, Kasriel equated the economic situation to "the eye of a hurricane. We had the first wave of the credit crisis, and it was quite damaging. But ***there is another wave coming, and it's likely to be as destructive***." (Emphasis added).

**ANSWER TO PARAGRAPH 64:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

65. Throughout this period, Kasriel also noted the significant concerns surrounding SIVs. For example, in October 2007, he observed:

> SIVs are investment funds, some of which have off-balance sheet affiliations with large financial institutions, such as Citigroup, that purchase asset-backed securities, financing their purchases through the issuance of asset-backed commercial paper (ABCP). In recent months, investors' appetite for ABCP has all but evaporated due to

> concern about the credit quality of the assets, especially subprime
> mortgage-related paper backing the commercial paper.

That observation was highly prescient because the inability to continue selling ABCP backed by the risky assets held by the SIVs contributed to the insolvency of many SIVs, including Sigma and Theta. Moreover, Kasriel believed that, "questionable assets on their books such as subprime mortgage-related securities" had impaired the SIVs, and SIVs including Sigma and Theta were unable to sell those assets to recoup their costs in acquiring them.

**ANSWER TO PARAGRAPH 65:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

66.     Thus, long before the first losses were incurred in the Collateral Pools, and at a time when Defendants could have restructured the Collateral Pools to avoid the risks presented by mortgage-backed securities, other asset-backed securities, SIVs, and the securities of financial institutions that, as Kasriel warned, faced significant risk from their own holdings of such mortgage-backed and asset-backed securities, Northern Trust was aware of the risks it had created in the Collateral Pools.

**ANSWER TO PARAGRAPH 66:** Defendants deny the allegations of this paragraph.

67.     Despite that knowledge, Northern Trust ignored the warnings of its own Chief Economist and other Northern Trust economists, and kept the Collateral Pools, including STEP and Core USA, invested in securities with significant exposure to mortgage-backed securities, SIVs, and financial institutions that Kasriel warned were overly exposed to mortgage-backed investments, contrary to the stated purpose of the Collateral Pools to preserve capital and

maintain liquidity. For example, Northern Trust maintained both STEP and Core USA in significant investments in Lehman Brothers, which had extensive exposure to the real estate market. Because many of these securities, including those of Lehman Brothers, would not mature for years, the risk that the Collateral Pools would incur a material loss from the collapse of the housing bubble that Kasriel identified was highly likely.

**ANSWER TO PARAGRAPH 67:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

### 3. Defendants Failed To Prudently Respond To The Growing Economic Crisis

#### a. The Mortgage Meltdown And Disclosure Of Massive Losses By Banks That Invested In Mortgage And Consumer Debt Crystallized The Risk Facing The Collateral Pools

68. The catastrophe that Kasriel and Bangalore repeatedly warned of—that the housing collapse would bring down the economy and, in particular, the banks that had invested heavily in mortgages—started materializing in 2007. The collapse of the subprime mortgage market in the first quarter of 2007 should have made clear to Defendants, given their sophistication and their access to their own economists' prior warnings, the inherent risk in the long-term, illiquid portfolios Defendants built into the Collateral Pools, including STEP and Core USA.

**ANSWER TO PARAGRAPH 68:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

69. For example, in February 2007, HSBC—one of the world's largest banks, wrote down the value of mortgage-backed securities it held by $10.5 billion, reflecting the significant decline in the value of such asset-backed investments. Just weeks later, the collapse of the nation's second largest mortgage lender, New Century, was the first in a series of major mortgage lenders that failed in the following months, with roughly 100 mortgage lenders failing by the end of the year. By virtue of its sophistication and the warnings it received from Kasriel, Northern Trust knew or should have known that those failures signaled that the web of securities built on mortgages and other consumer loans were at significant risk of failure. Those securities included mortgage-backed securities, such as those held in STEP and Core USA, SIVs that invested in those securities, such as Sigma and Theta, and the securities of financial institutions that were heavily invested in mortgage-backed securities and other investments backed by mortgages.

**ANSWER TO PARAGRAPH 69:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants admit, on information and belief, that in February 2007, HSBC reported it would be taking a bad debt charge for 2006 of approximately $10.5 billion, and cited the subprime mortgage market in its announcement; that New Century Financial Corp. declared bankruptcy in April 2007; and that more than 100 mortgage lenders ceased operations in 2007. In part due to Plaintiff's vague and undefined use of terms including "largest," "major," and "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first two sentences of this paragraph. Defendants deny the remaining allegations of this paragraph.

70.     Defendants' decision to invest the Collateral Pools in SIVs was imprudent, ignored the consistent warnings of Northern Trust's own economists, and ultimately resulted from Northern Trust's conflicted positions.

**ANSWER TO PARAGRAPH 70:**  Defendants deny the allegations of this paragraph.

71.     The ramifications of the structural ineptitude in the Collateral Pools was played out further when Defendants—refusing to take losses on the Pools' distressed assets before the unrealized losses further accumulated—maintained the Collateral Pools' investments in Sigma and Theta, Lehman Brothers, and Capmark Financial Group.

**ANSWER TO PARAGRAPH 71:**  Defendants deny the allegations of this paragraph.

72.     Indeed, it should have been clear to Northern Trust by mid-2007 that the subprime mortgage collapse implicated a broad array of investments held in the Collateral Pools.  In June 2007, two multi-billion dollar hedge funds managed by Bear Stearns collapsed due to losses tied to subprime mortgages.   By August 2007, numerous investment funds—including those managed by major banks, such as French bank BNP Paribas—reported significant losses as a result of the subprime collapse, and the resultant lessening of liquidity in the markets as investors steered away from asset-backed securities.  In an article published on August 13, 2007, the *Wall Street Journal* described the significant risks major financial institutions faced, noting that "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

**ANSWER TO PARAGRAPH 72:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith.  In part due to Plaintiff's vague and undefined use of terms including

"collapse," "tied to," "major," "significant," Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second and third sentences of this paragraph concerning Bear Stearns and investment funds including those managed by BNP Paribas. Defendants deny the remaining allegations of this paragraph.

73.     If their own economists' warnings, coupled with the warnings in the media and the collapse of hedge funds managed by Bear Stearns, BNP Paribas, and others did not make clear to these sophisticated Defendants the risk that major financial institutions faced from the subprime collapse, the final months of 2007 established that fact for Northern Trust. At the end of September 2007, Swiss banking giant UBS disclosed a quarterly loss of almost $700 million. In October 2007, Merrill Lynch disclosed a loss of $8.4 billion. That same month, Citigroup disclosed losses of $5.9 billion, which quickly grew to more than $15 billion, and revealed that it faced total exposure of $55 billion. All of those losses were tied, directly or indirectly, to the mortgage meltdown. Significantly, Citigroup also revealed that the SIVs it sponsored faced billions of dollars in losses due to investments in asset-backed securities, including those tied to mortgages.

**ANSWER TO PARAGRAPH 73:** Defendants deny the allegations of this paragraph.

> **b.     Northern Trust Ignored The Warnings Of Its Economists And The Evidence That The Mortgage Collapse Threatened the Collateral Pools**

74.     Defendants ignored the warnings of Northern Trust's Chief Economist and other Northern Trust economists, the failures of mortgage lenders, the collapse of financial institutions, and disclosures of massive losses by major banks. All of those developments, taken together, demonstrated the significant risk facing the Collateral Pools as a result of the imprudent investments made by Defendants. In the face of this growing financial crisis, Defendants—

having structured the purportedly conservative Collateral Pools, including STEP and Core USA, with securities issued by companies at the heart of the crisis—failed to act. Indeed, rather than restructuring the portfolios of those Pools to focus on short-term securities (which would reduce credit risk) and securities with less exposure to catastrophic losses, Defendants determined to stay on the perilous course they had chartered.

**ANSWER TO PARAGRAPH 74:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

75. A comparison of the holdings in STEP in July 2007 and September 2008 demonstrates that Defendants failed to shift that "ultra short term" fund from long-term investments to short-term investments in any significant manner. While in July 2007, over 76% of the securities in STEP were not due for at least 12 months, in September 2008 over 71% of the securities in STEP were not due for at least 12 months. In both July 2007 and September 2008, approximately 20% of the portfolio was not due for at least 10 years, and only about 10% was due to mature within 6 months.

**ANSWER TO PARAGRAPH 75:** To the extent this paragraph purports to characterize documents such as reports on STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

76. On information and belief, that failure was driven by a conflict of interest that prevented Northern Trust from managing the Collateral Pools wholly for the benefit of Chicago Teachers and other participants in the SLP. Northern Trust was incentivized to avoid incurring realized losses by selling securities that presented an unacceptable level of risk to the

44

conservative Collateral Pools—specifically, the investments in Lehman Brothers, Capmark Financial Group, and Sigma and Theta—because Northern Trust would be required to consolidate the entire Collateral Pools onto its books if it could not otherwise force Chicago Teachers and other participants in the SLP to cover losses realized from the sale of these impaired securities. Such consolidation would result in massive losses to Defendants, as they would be required to write down the value of these impaired securities held in the Collateral Pools.

**ANSWER TO PARAGRAPH 76:** Defendants deny the allegations of this paragraph.

77. An internal Northern Trust document, discussing a call held between Northern Trust executives and a client impacted by losses in the SLP, reflects Defendants' understanding that "Back[ing] up the STEP fund" meant to "put the sub-par positions on our Books." Another internal Northern Trust document, entitled "Redemptions – Common and Collective Funds," states: "Our independent auditors have advised that accounting rules require us to recover realized losses from securities lending investors in order to avoid consolidation of all STEP fund assets onto our balance sheet." In an attempt to avoid a situation wherein Northern Trust was required to either recover hundreds of millions of dollars of losses from its own clients or else consolidate these losses onto its own balance sheet, Defendants determined that they would not sell these impaired securities at a loss, even if doing so would help to mitigate the risk of greater potential losses to Chicago Teachers.

**ANSWER TO PARAGRAPH 77:** To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

78.     Rather than refocusing STEP and Core USA on the conservative, short-term securities that should have been in those funds all along, Defendants instead determined to wait for these high-risk securities in the Collateral Pools to mature, and ignored the clear risk that the issuers of those securities would collapse.  Given the long-term nature of those securities, Defendants' decision effectively locked Chicago Teachers into a long-term investment with significant exposure to the financial crisis.

**ANSWER TO PARAGRAPH 78:**  To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  Defendants deny the allegations of this paragraph.

### D.     Defendants' Imprudence Results In Losses To The Collateral Pools

79.     As a result of Northern Trust's imprudent investment decisions and mismanagement, the Collateral Pools suffered massive realized losses on their exposure to exotic, illiquid, and long-term securities—securities in which the Collateral Pools never should have been invested due to the clear objectives of the Pools and the warnings regarding many of these securities issued by Northern Trust's own economists.  This imprudent structuring and management of the Pools resulted in well over $1 billion in realized losses for the STEP and Core USA Collateral Pools alone.  For example, as of September 2008, STEP had incurred realized losses of approximately $460 million on Lehman Brothers and over $400 million on the Sigma and Theta SIVs, which both entered receivership in late 2008.  In 2009, STEP incurred realized losses on notes issued by CIT, of which STEP held $395 million, most of which were not due to mature until 2009-2010.  STEP also had significant exposure to Greenpoint Mortgage ($103 million) and Capmark Financial Group ($153 million), both of which were not due to mature until 2010.  Similarly, Core USA faced approximately $220 million in realized losses on

46

CIT floating rate notes not due to mature until 2009-2010, in addition to the realized losses from its Lehman Brothers holdings.

**ANSWER TO PARAGRAPH 79:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize documents such as reports on Core USA and STEP holdings, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

80. The Collateral Pools incurred these realized losses even though Northern Trust could have taken advantage of numerous opportunities to mitigate the risk posed by their imprudent initial investment decisions. For example, in July 2007, the Collateral Pools incurred significant unrealized losses on several securities. Rather than seeking to mitigate further losses, or even recognizing those losses as a harbinger of the risk facing the portfolios it had filled with long-term, high-risk instruments, Northern Trust imprudently determined to hold the impaired securities in the hopes that, despite the worsening economic climate, the investments would pay at maturity. Given the long terms of the securities at issue—the losses incurred in July 2007 included bonds issued by Sallie Mae, some of which would not mature until October 2011—that decision was contrary to the purported investment purpose of the short-term Collateral Pools.

**ANSWER TO PARAGRAPH 80:** Defendants deny the allegations of this paragraph.

81. The following month the Collateral Pools again incurred significant unrealized losses, which Northern Trust knew or should have known were related to the collapsing mortgage market and the impact of that collapse on the financial sector of the economy. Nonetheless, despite the continuing losses incurred by the Collateral Pools, the growing evidence, discussed above, about the risks facing institutions across the economy, and the

warnings of its own Chief Economist, Defendants held to their refusal to actively manage the portfolios of the Collateral Pools to mitigate further risk.

**ANSWER TO PARAGRAPH 81:** Defendants deny the allegations of this paragraph.

82.     Moreover, by August 2007, Northern Trust was fully aware that the subprime collapse and growing financial crisis was impacting the liquidity of the markets for fixed income securities.   Indeed, Michael Vardas, the Managing Director of Northern Trust Quantitative Management and Capital Markets, who was responsible for overseeing the SLP, testified that Defendants saw the "market come under some stress in the Summer of 2007" and tried to build liquidity in STEP and Core USA.  According to Vardas, however, Defendants' effort at building liquidity was limited to "allowing the assets in these collateral pools to mature" and "reinvesting them in very short maturity investments."  The nature of the investments to which Defendants, albeit belatedly, sought to refocus the Collateral Pools—according to Vardas, "[m]oney market – very short money market investments, treasury and agency securities"—confirms that the long-term, high-risk securities in which Defendants had previously invested the Collateral Pools were inappropriate.

**ANSWER TO PARAGRAPH 82:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  To the extent this paragraph purports to characterize prior testimony, Defendants refer to that prior testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

83.     Despite that knowledge, and the clear risk that the combination of decreasing liquidity and mounting investment losses were poised to deliver a significant blow to the Collateral Pools, Defendants permitted billions of dollars in withdrawals from the Collateral

Pools during this period. Specifically, according to a Northern Trust e-mail authored by Guy Sclafani, a Vice President at Northern Trust Global Investments, STEP "decreased in size over the last 6 months [December 2007 to June 2008] and ***much of the cash we have received has been used to fund departures***, but the market value decrease also reflects a seasonal lag in securities lending activity." (Emphasis added). An attachment to that e-mail shows that, during those six months at the height of the financial crisis, STEP decreased by $2.61 billion, or over 17%.

**ANSWER TO PARAGRAPH 83:** To the extent this paragraph purports to characterize Northern Trust internal documents available to Plaintiff or reports on the holdings of STEP, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

84. Those withdrawals were permitted despite the fact that Defendants were purportedly seeking to build liquidity in the Collateral Pools. Moreover, investors in the Collateral Pools who were permitted to withdraw during this period—from December 2007 through September 2008—were able to withdraw by simply bearing their pro-rata share of the loss incurred in the Collateral Pool. In contrast, and as discussed in greater depth below, after September 2008, Defendants only permitted "in-kind" withdrawals—effectively requiring Chicago Teachers to purchase distressed securities from the Collateral Pools at full value. Permitting withdrawals prior to September 2008 further impaired the liquidity of STEP, and harmed Chicago Teachers who remained invested in STEP.

**ANSWER TO PARAGRAPH 84:** Defendants deny the allegations in this paragraph.

85. As the financial crisis escalated, Defendants continued to refuse to prudently dispose of Lehman Brothers securities held in the Collateral Pools despite growing evidence that

major financial institutions' securities, including those of Lehman Brothers, were imprudent investments for conservative vehicles such as the Collateral Pools. For example, the collapse of Bear Stearns in March 2008, and its purchase by J.P. Morgan for a fire sale price of $10 per share, demonstrated the frailty of the financial giants that formed the backbone of the Collateral Pools' portfolios. That same month, as credit rating agencies downgraded several monoline insurers and finance companies, and many financial institutions scrambled to shore up their capital levels, STEP incurred another material loss.

**ANSWER TO PARAGRAPH 85:** Defendants deny the allegations in this paragraph.

86. Even as it failed to mitigate further losses and ensure the liquidity of the Collateral Pools by divesting the Pools of assets doomed to failure, including, but not limited to, Sigma and Theta, Northern Trust recognized that the "rising cost of credit coupled with amplified demand for liquidity forced many large market participants to sell fixed income securities at distressed prices" with "the financial markets [at] the brink of a dramatic meltdown."

**ANSWER TO PARAGRAPH 86:** To the extent the portion of this paragraph within quotes purports to characterize various internal Northern Trust documents available to Plaintiff, or written communications from Defendants to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

87. Rather than actively trying to refocus the Collateral Pools on short-term investments that, while lower yielding, carried less credit risk than the long-term instruments in which Northern Trust had invested, Defendants actually made changes to permit more long-term investments in the Collateral Pools. Specifically, in or about the Summer of 2007, Northern

Trust implemented changes to the investment guidelines for Core USA to permit up to 15% of the portfolio to be invested in securities with maturities longer than three years. That change was made to increase earnings.

**ANSWER TO PARAGRAPH 87:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize Collateral Pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

88. By April 2008, the evidence was irrefutable that Defendants' imprudent investment strategy exposed the Collateral Pools—and STEP in particular—to significant further losses. That month, both Moody's and S&P downgraded Sigma Finance Corporation—one of the SIV assets held by STEP—and put the issuer on watch for further downgrades. Indeed, Moody's and S&P further downgraded Sigma several additional times in the following months. Price declines of STEP's $330 million in Sigma holdings following the downgrades contributed to a 12.35% annualized monthly decline in STEP's returns. Notwithstanding the ratings agencies' downgrades and even though 70% of the Sigma securities STEP held were not due to mature until 2010, Defendants determined not to dispose of those securities, based on the position that "the Sigma portfolio is extremely high quality" and Sigma would "repay the capital notes held in STEP at par on maturity." That position was unfounded, and wholly at odds with the prevailing market view of Sigma and Theta.

**ANSWER TO PARAGRAPH 88:** To the extent this paragraph purports to characterize published documents and articles, internal Northern Trust documents available to Plaintiff, or written communications from Defendants to clients, Defendants refer to those documents for

their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

89.     Moreover, Northern Trust knew that Sigma and its corporate sibling, Theta, faced a real risk of failure because they were not being supported by their sponsor, Gordian Knot. Indeed, a Northern Trust document dated January 2008—almost four months before the April 2008 downgrades of Sigma—identified the inherent weaknesses of SIVs lacking a sponsor, distinguishing SIVs that were sponsored by a financial institution capable of providing financial support from those, such as Sigma and Theta, that lacked such support. That document stressed that Northern Trust's strategy of limiting the SIV investments in its money market portfolios to primarily bank-sponsored SIVs "has proved especially valuable in recent weeks as the banks sponsoring five of the nine SIVs the Northern Money Market Fund has invested in have announced plans to put their own capital behind the funding needs of their SIVs."

**ANSWER TO PARAGRAPH 89:** To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

90.     In February 2008, a Citi analyst and the *Financial Times* reported that Sigma was the largest SIV without support from a major bank. In particular, the *Financial Times* reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles. The lack of a large bank behind Sigma leaves it vulnerable to collapse." Other investors who, unlike Defendants, heeded these warnings were able to extricate themselves from investments in Gordian Knot's SIVs without incurring significant losses, long before those SIVs collapsed.

**ANSWER TO PARAGRAPH 90:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

91.    The risks of investing in SIVs that lack such a sponsor was driven home in February 2008, when two unsupported SIVs in which Northern Trust's money market funds had invested—Whistlejacket Capital LLC and White Pine Finance LLC—defaulted, causing massive losses to those money market funds. Northern Trust agreed to provide up to $229 million to stabilize those funds in the wake of the SIV losses. Despite having acknowledged the higher risk presented by unsupported SIVs such as Sigma and Theta, having witnessed the collapse of similarly unsupported SIVs and the resulting impact on Northern Trust funds, and the significant downgrades of Sigma and Theta, Defendants maintained their position that those investments would continue to perform if held to maturity. The more than $400 million of Sigma and Theta securities in STEP would not fully mature, however, for over one year in the case of Theta and for over three years in the case of Sigma.

**ANSWER TO PARAGRAPH 91:** To the extent this paragraph purports to characterize published documents and articles, or any Capital Support Agreement, Defendants refer to those documents, articles, and agreements for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

92.    As 2008 continued, Defendants understood that the situation in the Collateral Pools was dire. Michael Vardas, the Northern Trust Managing Director overseeing the SLP, testified repeatedly that, as of April 2008, Northern Trust "would not be going out and selling STEP as an investment vehicle to new prospects." Despite the view that STEP was no longer an

appropriate investment vehicle, Defendants continued their self-interested strategy of simply holding on to the long-term securities in STEP and the other Collateral Pools, which became increasingly risky as the financial crisis escalated. The improper structure of the Collateral Pools in illiquid and highly exotic investments such as Lehman and Sigma resulted in the Defendants' insufficient attempts to restructure the Pools and increase liquidity. Indeed, in his testimony, Vardas confirmed that, as of April 2008, Defendants' efforts to increase liquidity in STEP remained limited to "predominantly allowing assets to mature and reinvesting proceeds in shorter dated investments."

**ANSWER TO PARAGRAPH 92:** To the extent this paragraph purports to characterize prior testimony, Defendants refer to that testimony for its content (without conceding its admissibility) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

93. Internal Northern Trust documents from this time period show that Defendants saw the need to increase liquidity more quickly, but refused to incur any losses in order to do so. For example, an internal draft letter dated May 12, 2008 written by Guy Sclafani, the Vice President at Northern Trust Global Investments, stated: "We would like to implement a change as quickly as possible but we do not want to realize any losses in the STEP fund if they can be avoided. Therefore implementing a change may take some time. We estimate it may take between 6 and 18 months to restructure the securities lending pool." That same draft letter also shows that, as of May 2008, Northern Trust understood that STEP was not an appropriate investment for the Northern Trust Commingled Lending Funds. Specifically, the letter states that Northern Trust was "reconsider[ing] the structure of the securities lending collateral pool for these index securities. We are considering a number of options including reducing the allocation

to STEP in the pool *as well as eliminating it entirely*....”  (Emphasis added).  In another internal document, Kendall Kay, a Senior Vice President at Northern Trust Global Investments, expressed his agreement with Sclafani's letter, writing, “I think this works.”

**ANSWER TO PARAGRAPH 93:** To the extent this paragraph purports to characterize Northern Trust internal documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

94.     In September 2008, STEP plummeted in value as Northern Trust declared STEP's investments in securities issued by the SIVs, Sigma and Theta, had become “permanently impaired.”  These securities were transferred from STEP to a liquidation account, and the losses on those investments became fully realized.  Core USA also incurred a significant loss, primarily on its Lehman Brothers investment.  Despite the complete collapse of Sigma and Theta, Defendants, hampered by a disabling conflict of interest, refused to divest the Collateral Pools of similarly impaired securities.

**ANSWER TO PARAGRAPH 94:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  To the extent this paragraph purports to characterize Northern Trust documents available to Plaintiff or written communications to clients, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

95.     On September 19, 2008, Northern Trust declared a collateral deficiency in Core USA and STEP resulting from the collapse of Lehman Brothers, and the Sigma and Theta SIVs.  As a result, the Teachers Board and Chicago Teachers, as the lenders, had significant exposure to

these losses, and Northern Trust soon posted a "payable" to each of the lenders that participated in these pools, resulting in a reduction in value of each lender's investments.

**ANSWER TO PARAGRAPH 95:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants admit that Northern Trust declared a collateral deficiency in Core USA on September 19, 2008. Defendants deny the remaining allegations of this paragraph.

96. Beyond the general economic factors and warnings by Northern Trust economists that should have apprised these sophisticated Defendants that the investments in Lehman Brothers, Sigma, and Theta presented an improper level of risk for the purportedly conservative Collateral Pools, specific facts about those issuers should have raised red flags for an investment manager such as Northern Trust, prior to September 2008, that these investments were not appropriate for the Collateral Pools. For example, in May 2008, David Einhorn—a prominent investment manager who runs the hedge fund Greenlight Capital—publicly questioned the accuracy of Lehman Brothers' financial reports. Furthermore, in June 2008, Lehman Brothers disclosed material exposure to the mortgage crisis, and took a $3 billion write-down of commercial and residential mortgages, mortgage-backed securities, and real estate holdings. In response to that disclosure, Einhorn again questioned the accuracy of Lehman Brothers' financial reporting. On June 10, 2008, Wachovia issued an analyst report titled "Too Many Inconsistencies," that downgraded Lehman Brothers, citing the lack of transparency concerning Lehman Brothers' exposure to the mortgage meltdown. These disclosures—almost three months before Lehman Brothers' bankruptcy—were imprudently disregarded by Defendants.

**ANSWER TO PARAGRAPH 96:** To the extent this paragraph purports to characterize published documents and articles, including those setting forth or describing the views of David

Einhorn, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

97.     Similarly, the collapse of Sigma and Theta should not have been surprising to Northern Trust, had it prudently followed the developments concerning those SIVs. The reduced liquidity in the fixed-income market in August 2007—which Defendants were aware of—had a significant impact on SIVs, whose business model involves buying and selling fixed-income securities. Between August and October of 2007, more than a dozen SIVs failed as the credit rating agencies lowered ratings due to concern about the quality of assets held by SIVs.

**ANSWER TO PARAGRAPH 97:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

98.     In October 2007, *Fortune* magazine railed against investments in SIVs—which it called "shadowy debt instruments"—by commingled funds such as mutual funds. At this time, Sigma's only hope of survival hinged on the chance that its large asset base might be sold as its debt obligations matured. This early indication of financial distress, at a time when smaller SIVs unequipped with the asset base of Sigma began to fail, should have raised a warning flag to Defendants. Later that month, the markets again signaled that Sigma's viability was in doubt when Gordian Knot's attempt to raise financing for Sigma's approximately $22.5 billion in debt due in 2008 raised a paltry $20 million.

**ANSWER TO PARAGRAPH 98:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their

content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

99.     By December 2007, observers were specifically warning that Sigma—which had an enormous amount of debt coming due in 2008—was at significant risk of failure. For example, a December 17, 2007 article on the website of the *Financial Times*, "Second Wave of SIV Liquidity Problems Looms," warned of a "liquidity squeeze [that] will affect some SIVs more than others. Sigma Finance, run by Gordian Knot, accounts for 22.5 percent of all MTNs [medium term notes] issued by all SIVs. It must repay about $22.5bn by the end of September [2008] and another $2.5bn by the end of the quarter." In January 2008, an analyst report by Citigroup voiced further concerns about Gordian Knot's SIVs, noting that Sigma was the "only non-bank sponsored SIV still looking to secure support." The report provided fresh warnings about the massive obligations that Sigma had to satisfy in 2008.

**ANSWER TO PARAGRAPH 99:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

100.     When, in April 2008 the ratings of Sigma securities were cut, an article on *Bloomberg News* tied the downgrade to Sigma's need to "refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow...." One month earlier, when Standard and Poor's issued a warning that Sigma's debt would be downgraded, a Citi analyst noted that, "Sigma is the only remaining SIV not to have secured support [for financing purposes].... In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owed." If these

signs were not clear enough, a *Bloomberg News* article in April 2008 reported that money market funds had already reduced their investments in Sigma and rolled new money into more conservative programs. In contrast, by April 2008, Defendants had failed to divest of their deteriorating investments in Sigma despite the warning signs.

**ANSWER TO PARAGRAPH 100:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

101. By July 2008, Sigma's fate was nearly sealed. The Citi analyst remarked that, "[i]f Sigma were to enter into an enforcement/default on its debt...[b]anks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." However, Defendants did nothing to safeguard the remaining assets in the Pools by divesting itself of Sigma investments. By September 2008, Sigma was served with a notice of default and shortly thereafter entered into receivership.

**ANSWER TO PARAGRAPH 101:** To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content (without adopting any views of the author stated therein) and deny any allegations inconsistent therewith. Defendants admit that Sigma was served with a notice of default by a counterparty on or about September 30, 2008, and that receivers were appointed for Sigma on or about October 6, 2008. Defendants deny the remaining allegations of this paragraph.

102. The risks facing Sigma and Theta should have been clear to Defendants well before September 2008. Considering Defendants' own differentiation between the risks posed by unsupported SIVs, the drumbeat of warnings about Sigma and its inability to sell new notes,

Northern Trust's experience with the failure of two such SIVs in its money market fund in February 2008, and the downgrade of Sigma and Theta in April 2008, the decision by Defendants to continue holding those securities with the expectation that they would perform to maturity over the course of up to three years was highly imprudent.

**ANSWER TO PARAGRAPH 102:** Defendants deny the allegations of this paragraph.

103.    Indeed, as Northern Trust continued to hold these securities, other investors were fleeing Sigma in droves. As of September 2008, money market funds, which held $5 billion in Sigma debt in April 2008, had no holdings in Sigma debt. Many of these investors were able to recoup nearly their entire investment in Sigma, and therefore incurred minimal losses, as late as September 2008. Northern Trust therefore failed to take the clear actions required to protect Chicago Teachers.

**ANSWER TO PARAGRAPH 103:** To the extent this paragraph states legal conclusions, no answer is required. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first three sentences of this paragraph, due to the vagueness of those allegations. Defendants deny the remaining allegations of this paragraph.

104.    For these reasons, the losses incurred in STEP on Sigma and Theta securities were avoidable had Northern Trust prudently managed the Collateral Pools.

**ANSWER TO PARAGRAPH 104:** Defendants deny the allegations of this paragraph.

105.    Northern Trust added even further injury when the Lehman Brothers, Sigma, and Theta losses were realized in September 2008 by implementing limitations on withdrawals from the Collateral Pools. Specifically, Northern Trust required an SLP participant seeking to immediately withdraw from the SLP to take an "in-kind" withdrawal of that participant's pro rata

share of the Collateral Pools. The withdrawing participant would be required to contribute cash equal to the book value of its share of the securities held in the Collateral Pool and would, in turn, receive an allocation of the securities in the Pool—including high-risk and long-term securities with a current value far below the cash contribution. Previously, if SLP participants had chosen to withdraw while the Collateral Pools carried an unrealized loss, they were only required to cover that loss, and thereby avoid future losses on the imprudent investments made by Defendants.

**ANSWER TO PARAGRAPH 105:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize Collateral Pool withdrawal guidelines or Northern Trust documents to which Plaintiff has access, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

106. Alternately, SLP participants could choose a staged withdrawal from the Collateral Pools, whereby participants would be able to recover a fixed dollar amount in intervals over an extended period of time. Northern Trust estimated that this staged withdrawal process could take up to nine months for full withdrawal. And upon completion of the process, any payables would be due in full, therefore forcing these withdrawing SLP participants to cover the realized losses.

**ANSWER TO PARAGRAPH 106:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize Collateral Pool and collective fund withdrawal guidelines, or Northern Trust documents to which Plaintiff has access, Defendants refer to those documents for their

content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

107.    These new withdrawal limitations effectively locked Chicago Teachers into the Collateral Pools. The cash contribution required to effect an "in-kind" withdrawal presented an onerous, if not impossible, hurdle that Chicago Teachers could not meet without difficulty, both because of the amount of cash necessary to effect a withdrawal, the risky nature of the securities the withdrawing SLP participant would receive and the need to retain an investment advisor to then manage those high-risk, long-term and illiquid securities. As a result, Chicago Teachers had no real choice but to remain in the SLP, and remain exposed to the risks in the Collateral Pools, even as the economy worsened after September 2008.

**ANSWER TO PARAGRAPH 107:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

108.    As a result, Chicago Teachers incurred further harm as other risky securities held in the Collateral Pools accumulated additional realized losses. As with the losses incurred on investments in Sigma and Theta, those losses could have been avoided had Defendants heeded and responded to the warnings of Northern Trust's own economists, the evidence in 2007 that major financial institutions faced risks of massive losses and potential collapse, or the specific red flags about the SIVs, specifically Sigma, held in the Collateral Pools.

**ANSWER TO PARAGRAPH 108:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants deny the allegations of this paragraph.

109.    In 2009, STEP and Core USA incurred significant realized losses on securities issued by CIT, a bank that was extensively involved in residential mortgage lending and other consumer loans.  Long before those losses were incurred, CIT disclosed that it had lost hundreds of millions of dollars as a result of risky mortgage and consumer lending.  Indeed, during the final half of 2007, CIT incurred over $1.5 billion in write-downs, charges and provisions for losses tied to its portfolio of subprime mortgage loans.  In the first quarter of 2008, CIT disclosed an additional $218 million charge to further reduce the value of its mortgage portfolio and disclosed that it faced almost $200 million in additional losses on its portfolio of student loans. By mid-2008, CIT had disposed of its portfolio of subprime mortgages, receiving less than half of what the company had previously claimed the assets were worth.  Given the purportedly conservative nature of the Collateral Pools, Defendants' decision to continue holding fixed income securities issued by CIT, in the face of the mounting disclosures about that company's financial condition over the course of more than a year, constituted a violation of their fiduciary and contractual duties.

**ANSWER TO PARAGRAPH 109:**  To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage.  To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations concerning CIT's business practices.  Defendants deny the remaining allegations of this paragraph.

110.    The CIT losses included losses on securities with a book value of more than $260 million that, when held in the Collateral Pools when the news about CIT's losses became known in mid-2007, were not due to mature for almost two years or more.  The length of the

investments in CIT were at odds with the investment objectives of the Collateral Pools and made them improper investments in what were purportedly short-term funds.

**ANSWER TO PARAGRAPH 110:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. Defendants answer that the allegations in the first sentence of this paragraph are incomprehensible, including the phrases "the CIT losses included losses" and the phrase "when held in the Collateral Pools when the news about CIT's losses became known." Defendants thus lack knowledge and information sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph. Defendants deny the remaining allegations of this paragraph.

111. In addition to CIT, the Collateral Pools incurred additional realized losses after the withdrawal limitations were implemented that were similarly avoidable because significant red flags existed about the issuers of those securities, and their exposure to losses tied to mortgages or other consumer debt. These included Sallie Mae, a student loan company that, as early as January 2008, disclosed that it faced $750 million in losses on risky loans, Capmark Financial, a mortgage and real estate investment firm, and Greenpoint Mortgage, a mortgage lender that issued mortgage-backed securities held in STEP.

**ANSWER TO PARAGRAPH 111:** To the extent this paragraph contains allegations regarding Core USA, they should be stricken as irrelevant surplusage. To the extent this paragraph purports to characterize published documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

**E.     Defendants Breached The SLA By Seizing Chicago Teachers' Securities Lending Earnings And Investing The Chicago Teachers Custom Fund In Prohibited Securities**

### 1.     The Securities Lending Agreement

112.     In 1990, the Teachers Board and Northern Trust entered into the SLA, which the parties subsequently amended seven times (together with all amendments, the "SLA").   (The SLA is attached hereto as Exhibit A).   The SLA provides, *inter alia*, that Northern Trust will lend Chicago Teachers' securities to third-party borrowers in exchange for cash collateral.   The SLA further provides that Northern Trust must invest the cash collateral in specified investments managed by Northern Trust, and that "[s]uch collateral shall be commingled in a pool with collateral Northern has accepted with respect to loans of securities from portfolios held by Northern of other participants in Northern's securities lending program."   With respect to the cash collateral held in the Chicago Teachers Custom Fund, the SLA further provides that such collateral "shall be invested in the [Chicago Teachers Custom Fund]."

**ANSWER TO PARAGRAPH 112:** Defendants admit that Plaintiff entered into a securities lending agreement with NTC.   Defendants refer to the securities lending agreement and subsequent amendments thereto for their content and deny any allegations inconsistent therewith.

113.     As noted, the securities lending cash collateral received by Chicago Teachers was invested through what Defendants referred to as the Chicago Teachers "Custom Fund."   The investments that the Chicago Teachers Custom Fund were permitted to hold were specified in the Master Custody Agreement entered into between the Teachers Board and NTC.   The SLA expressly incorporates by reference the Master Custody Agreement to define the permissible investments to be held in the Chicago Teachers Custom Fund.   Specifically, the SLA refers to the Chicago Teachers Custom Fund as the "Sub-Account," an account that is defined and discussed

in the Master Custody Agreement referenced in and incorporated by the SLA. The Third

Amendment to the Master Custody Agreement, which was entered into in May 1995, states that

the cash in the "Sub-Account" (which the SLA equates to the Chicago Teachers Custom Fund)

"shall be invested all in units of The Northern Trust Company Collective Short Term Investment

Fund ('STIF') and The Northern Trust Company Collective Short Term Extendible Portfolio

('STEP')." Moreover, the Third Amendment to the Master Custody Amendment specifies the

allocation of Chicago Teachers' investments between STIF and STEP:

> Allocation between those two funds shall be determined from time
> to time by the Fund and Northern and shall initially be 60% STEP
> and 40% STIF, with a tolerance of + or - 5% (resulting in a range
> of 65% to 55% STEP and 35% to 45% STIF). Northern shall
> monitor the allocation between the funds each business day and in
> the event the Northern determines that the allocation is outside
> such range, Northern shall, as soon as practicable, buy or sell units
> of STEP or, at its discretion, STIF to the extent necessary to bring
> the allocation back within such range.

No provision of the SLA or Master Custody Agreement permitted the Chicago Teachers

Custom Fund to hold any investment or security other than units of STIF or STEP.

**ANSWER TO PARAGRAPH 113:** To the extent this paragraph purports to characterize

various agreements, Defendants refer to those documents for their content and deny any

allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal

effect of such agreements or of applicable legal principles, no answer to such legal conclusions is

required. Defendants deny any remaining allegations of this paragraph.

114. The SLA also provides for treatment of the revenues generated from Chicago

Teachers' participation in securities lending. Specifically, the Seventh Amendment of the SLA,

dated July 1, 2005, provides that NTC receive a monthly fee equal to 15% of Chicago Teachers'

"Net Revenue." Net Revenue is defined to mean "the sum of (a), in the case of cash Collateral,

aggregate net income during the period from the investment of cash Collateral less aggregate rebates payable to Borrowers with respect to such Collateral ....”  The Seventh Amendment to the SLA requires that the remainder of Chicago Teachers' lending revenue – 85% of all Net Revenue – be “credited monthly to [the Teachers Board's] account.”  No provision of the SLA or Master Custody Agreement provides for any other use of the Net Revenues generated from Chicago Teachers' participation in securities lending.

**ANSWER TO PARAGRAPH 114:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.

115.    On May 15, 1995, the SLA was amended for the third time (incorrectly titled “Second Amendment,” hereinafter the “Third Amendment”).   Section 10.3 of the Third Amendment provides that if the amount of loan rebates due to borrowers exceeds the amount of income in the Chicago Teachers Custom Fund, the shortfall would be allocated between the Teachers Board and Northern Trust.  Section 10.3 was stricken from the SLA in 2005 by the Seventh Amendment to the SLA, which deleted Section 10 in its entirety.

**ANSWER TO PARAGRAPH 115:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph.

116.    Section 2 of the Third Amendment added a new provision to the second full paragraph of the First Amendment to the SLA, dated February 21, 1992 (the "Letter Amendment"), which provided that if Northern Trust "fulfilled all obligations" under the SLA, "any Collateral deficiency [in Chicago Teachers' Custom Fund] ...  shall be allocated solely to the Board ...."  This provision was also stricken from the SLA in 2005 by the Seventh Amendment because the Letter Amendment amended the original Section 10 of the SLA.[5]

**ANSWER TO PARAGRAPH 116:** To the extent this paragraph and footnote purport to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph and footnote purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  Defendants deny the remaining allegations of this paragraph and footnote.

117.    The SLA makes clear that the Teachers Board and Northern Trust intended the SLA to be the sole agreement governing securities lending by Chicago Teachers through Northern Trust's SLP.  Moreover, the SLA can only be amended through formal writings signed by the parties.  The SLA states:

> This Agreement, including the Schedules annexed hereto and the Master Custody Agreement dated October 25, 1989, between and among the Board, the Treasurer and Northern (and any written amendments or modifications thereto signed by the parties thereto) ***contains the entire agreement between and among the Board, the Treasurer and Northern relating to the lending of securities*** in the Fund's portfolio of securities held by Northern, supersedes all

---

[5] Before it was deleted in 2005, Section 2 of the Third Amendment did not allocate liability for losses on collateral investments between the Teachers Board and Defendants; rather, this provision reflected the fact that Chicago Teachers was the only SLP participant invested in the Chicago Teachers Custom Fund. In contrast, the securities lending agreements of SLP investors who did not utilize a "custom" collateral fund in which they were the sole investors contained provisions stating that a collateral deficiency would be allocated pro-rata among the SLP participants.

prior agreements on this subject, and ***may not be modified or amended except by a writing signed by the parties hereto***. (Emphasis added).

Since the Teachers Board and Northern Trust first entered into the SLA in 1990, the SLA has been amended seven times through formal writings signed by the parties, most recently in July 2005.

**ANSWER TO PARAGRAPH 117:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

118.    No provision in the SLA permits Northern Trust to advance any monies on behalf of Chicago Teachers or the Teachers Board, and no provision in the SLA permits Northern Trust to demand that Chicago Teachers or the Teachers Board make payments into the Chicago Teachers Custom Fund, or make payments to Defendants in connection with the SLP. Northern Trust's securities lending agreements with other participants in the SLP did include provisions authorizing such conduct, but the Teachers Board did not agree to include these provisions in the Chicago Teachers SLA.

**ANSWER TO PARAGRAPH 118:** To the extent this paragraph purports to characterize various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny the remaining allegations of this paragraph.

119.     As set forth herein, Defendants breached the express terms of the SLA by failing to remit to Chicago Teachers 85% of the Net Revenues from securities lending, and instead seizing 100% of the Net Revenue; by forcing the Chicago Teachers Custom Fund to purchase and hold securities other than units of STIF and STEP; and by removing those securities from the Chicago Teachers Custom Fund and assigning them to Chicago Teachers directly.

**ANSWER TO PARAGRAPH 119:**  Defendants deny the allegations of this paragraph.

### 2.     Northern Trust Voluntarily Covered Securities Lending Losses

120.     Before the first realized losses in STEP were incurred in September 2008, certain securities held in STEP experienced unrealized losses that caused STEP's daily return to be lower than the amount of rebates and interest owed to borrowers that day.  Northern Trust used the term "negative earnings" to describe the difference between the amount earned by the Chicago Teachers Custom Fund (which was driven by the performance of STEP units held therein) and the amount owed to borrowers.  Until September 2008, all of the "negative earnings" in STEP were caused by unrealized losses on securities held in STEP.

**ANSWER TO PARAGRAPH 120:** Defendants admit that, before September 2008, certain securities held in STEP experienced unrealized losses that impacted STEP's daily return. Defendants admit the allegations in the second sentence of this paragraph, except that the performance of the Chicago Teachers Custom Fund was affected by all of its investments, not only STEP.  Defendants deny the remaining allegations of this paragraph.

121.     In a letter dated November 13, 2007, Northern Trust took the position that Chicago Teachers and Northern Trust should share liability for "negative earnings" in the same proportion as Northern Trust and Chicago Teachers shared Net Revenue, *i.e.*, Northern Trust would be responsible for 15% of negative earnings and Chicago Teachers would be responsible

for 85%. Northern Trust did not ask Chicago Teachers to make any payments to cover the 85% share negative earnings. Rather, when the Chicago Teachers Custom Fund incurred negative earnings, Northern Trust advanced 100% of the required payments to borrowers, voluntarily loaning its own funds to "make up the difference." Northern Trust took the position that, because the losses causing the negative earnings were unrealized losses, the negative earnings would reverse when the unrealized losses reversed and the securities recovered their full value.

**ANSWER TO PARAGRAPH 121:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants admit the allegations in the fourth sentence of this paragraph. Defendants deny the remaining allegations of this paragraph.

122. Neither the Teachers Board nor Chicago Teachers agreed to repay Northern Trust for the money it paid to the borrowers. An internal Northern Trust email among senior executives responsible for the SLP dated October 8, 2008, confirms that the November 13, 2007 letter referenced in paragraph 121 above "did not ask clients to acknowledge their liability."

**ANSWER TO PARAGRAPH 122:** To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

123. On September 19, 2008, Northern Trust declared certain securities held in STEP that had previously experienced unrealized losses to be permanently impaired. Northern Trust moved these holdings out of STEP and segregated them into a "STEP Liquidation Fund." When Northern Trust transferred the impaired securities, it assigned a value of $0.13 to securities

71

issued by Lehman Brothers, and $0.43 to securities issued by two "structured investment vehicles," Sigma and Theta. The accounting impact of Northern Trust's decision to permanently impair and transfer these securities was that STEP immediately recognized realized losses on the impaired securities which, in turn, caused realized losses in the Chicago Teachers Custom Fund.

**ANSWER TO PARAGRAPH 123:** Defendants admit that on September 18, 2008, certain Lehman securities held in STEP that previously experienced unrealized losses were determined to be permanently impaired, and that on September 19, 2008, certain Sigma and Theta securities held in STEP that previously experienced unrealized losses were determined to be permanently impaired. Defendants admit that these permanently impaired assets were segregated into the "STEP Liquidation Fund." Defendants admit that the price for the Lehman securities at the time they were determined to be were permanently impaired was $0.13 and that the price for the Sigma and Theta securities at the time they were determined to be were permanently impaired was $0.43. Defendants deny the remaining allegations in this paragraph.

### 3. Northern Trust Demands Payment For Losses It Voluntarily Covered

124. In a letter dated September 29, 2008, Northern Trust took the position that, under the SLA, Chicago Teachers was liable for 100% of the realized losses incurred in the Chicago Teachers Custom Fund as a result of the losses incurred in STEP. According to Northern Trust, Chicago Teachers' liability included amounts that Northern Trust had previously voluntarily covered by advancing funds to the borrowers when unrealized losses gave rise to negative earnings. The September 29 letter did not identify any agreement between Northern Trust and Chicago Teachers concerning repayment of those funds. On the contrary, the September 29 letter confirmed that Northern Trust had advanced those funds "as an accommodation to clients

utilizing STEP and based on an expectation that these securities would mature at par," rather than any expectation of repayment by Chicago Teachers.

**ANSWER TO PARAGRAPH 124:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

125.    Northern Trust demanded that Chicago Teachers repay Northern Trust by December 31, 2008 for the entirety of the realized losses – both the 15% of the losses that Northern Trust had previously offered to bear and the 85% that Northern Trust had voluntarily covered but subsequently contended was the responsibility of Chicago Teachers. Northern Trust referred to this demand for payment as a "reimbursement" to Northern Trust.

**ANSWER TO PARAGRAPH 125:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

126.    The September 29 letter did not propose any new agreement or amendment of the SLA to address the payment demanded by Northern Trust; rather, the letter incorrectly asserted that Northern Trust was enforcing existing terms of the SLA by demanding this payment from Chicago Teachers.

**ANSWER TO PARAGRAPH 126:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

4.      **Northern Trust's Illusory Transfer Of Impaired Securities From STEP To Chicago Teachers In Violation of the SLA**

127.    In addition to demanding that Chicago Teachers make these payments to Northern Trust, Defendants further violated the SLA by improperly dumping prohibited securities into the Chicago Teachers Custom Fund, and then demanding that Chicago Teachers pay the "transfer cost" – effectively the purchase price – of those impaired securities.

**ANSWER TO PARAGRAPH 127:** Defendants deny the allegations of this paragraph.

128.    Specifically, after Northern Trust transferred impaired securities from STEP into the newly created STEP Liquidation Fund (as described in paragraph 123, above), Northern Trust assigned each STEP investor, including the Chicago Teachers Custom Fund, a "pro rata interest" in the STEP Liquidation Fund. Northern Trust then determined to close down the STEP Liquidation Fund, and unilaterally decided to transfer the impaired securities held in the STEP Liquidation Fund to the custom funds of STEP investors, based upon their pro-rata share of the STEP Liquidation Fund. Northern Trust then removed the impaired securities from the custom funds of STEP investors, including Chicago Teachers, and assigned them to STEP investors directly. In short, Northern Trust decided that certain securities in STEP were "permanently impaired," moved those securities into the STEP Liquidation Fund, transferred those impaired securities to the STEP investors' custom funds, and then removed the securities from the STEP investors' custom funds and attempted to transfer them directly to the STEP investors.

**ANSWER TO PARAGRAPH 128:** Defendants admit that NTI transferred certain permanently impaired securities from STEP to the STEP Liquidation Fund and that holders of STEP units as of that date were assigned a *pro rata* interest in the STEP Liquidation Fund. Defendants deny the remaining allegations of this paragraph.

129.     The securities at issue included bonds of Lehman Brothers and notes issued by the Sigma and Theta SIVs.  The transfer of these securities was expressly prohibited by the SLA, which states that Chicago Teachers' cash collateral must be invested in the Chicago Teachers Custom Fund, and the Chicago Teachers Custom Fund can only hold units of STEP or STIF, both commingled funds operated by Defendants.  *See* paragraph 112, *supra*.  Accordingly, it was a breach of the SLA for Northern Trust to place units of the STEP Liquidation Fund or actual bonds issued by Lehman Brothers, Sigma and Theta into the Chicago Teachers Custom Fund.

**ANSWER TO PARAGRAPH 129:** Defendants admit that the securities held by the STEP Liquidation Fund included securities of Lehman Brothers, Sigma, and Theta.  Defendants deny the remaining allegations of this paragraph.

130.     Northern Trust then determined to transfer the impaired securities (Lehman Brothers, Sigma and Theta) from the Chicago Teachers Custom Fund to Chicago Teachers itself. In doing so, Northern Trust assigned those securities what it termed a "market value" of $21.6 million, and demanded that Chicago Teachers pay that amount into the Chicago Teachers Custom Fund as payment for the impaired securities.  The transfer of these securities from the Chicago Teachers Custom Fund to Chicago Teachers was never approved by Chicago Teachers or the Teachers Board.  Moreover, that transfer was prohibited by the SLA, which provides that Chicago Teachers' securities lending cash collateral must be commingled in a collateral pool, and that the cash collateral at issue here "shall be invested in [the Chicago Teachers Custom Fund]."  *See* paragraph 112, *supra*.  Accordingly, it was a breach of the SLA for Northern Trust to remove investments from Chicago Teachers Custom Fund and assign those securities to Chicago Teachers directly.

**ANSWER TO PARAGRAPH 130:**  Defendants deny the allegations of this paragraph.

131. Chicago Teachers never agreed to any of the transactions described in paragraphs 127 to 130, *supra*. The SLA prohibits the Chicago Teachers Custom Fund from holding any investments other than units of STEP or STIF. The SLA further prohibits Northern Trust from removing investments from the Chicago Teachers Custom Fund and transferring those investments to Chicago Teachers. Indeed, nothing in the parties' agreements permits Northern Trust to sell or transfer such investments to Chicago Teachers. When Chicago Teachers refused to pay the $21.6 million that Northern Trust demanded as payment for the transfer of the Lehman Brothers, Sigma and Theta securities, Northern Trust posted a "receivable" for that amount in the Chicago Teachers Custom Fund. The SLA does not permit the Chicago Teachers Custom Fund to hold a receivable from a public pension fund as an investment asset, or as collateral for loaned securities.

**ANSWER TO PARAGRAPH 131:** Defendants deny the allegations of this paragraph.

132. In addition to violating the SLA, the transfer of these impaired securities from STEP to the Chicago Teachers Custom Fund and then to Chicago Teachers was illusory. Northern Trust maintained control over these impaired securities even after they were ostensibly transferred to Chicago Teachers' account. When Theta, which was in liquidation, generated returns from the sale of assets in liquidation, Northern Trust kept that money for itself to "repay" itself for the money it was demanding from Chicago Teachers to cover losses in STEP. For example, by letter to Chicago Teachers' Executive Director, Kevin Huber, dated January 10, 2013, Northern Trust informed Chicago Teachers that on December 27, 2012, Northern Trust had "received a partial principal recovery on the Theta security," and allocated $724,885 of that distribution to the Chicago Teachers Custom Fund "based on [Chicago Teachers'] pro rata interest in the [STEP Liquidation Fund]." Rather than deliver those monies to Chicago Teachers

as a recovery on a security that Chicago Teachers purportedly owned, Northern Trust unilaterally determined to apply that money to the "transfer cost to the CTPF Custom Fund of $15,957,319.53 in connection with the segregation of Sigma and Theta to the [STEP Liquidation Fund]." Northern Trust informed Chicago Teachers in the January 10 letter:

> [T]he CTPF Custom Fund's interest from the Theta distribution will be distributed from the [STEP Liquidation Fund] in the following manner: *1) Proceeds will first be used to pay the securities lending obligations related to Sigma and Theta. This includes both the reimbursement to Northern Trust associated with the Sigma and Theta loss and the transfer costs described above related to the segregation of the securities* ...." (Emphasis added).

**ANSWER TO PARAGRAPH 132:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

133. Northern Trust received a second partial principal recovery on the Theta security on January 23, 2013 and allocated $726,319.02 to the Chicago Teachers Custom Fund. Again, by letter dated January 31, 2013, Northern Trust informed Chicago Teachers that Northern Trust had unilaterally determined to allocate those monies to "reimburse" itself for Theta losses in STEP, and to pay down the "transfer" cost associated with Sigma and Theta. Northern Trust also applied Chicago Teachers' share of additional recoveries on the Theta security in October 2013 ($363,159.51) and January 2014 ($726,319.02) to pay down Chicago Teachers' purported liabilities pursuant to letters containing the same language set forth above in paragraph 132.

**ANSWER TO PARAGRAPH 133:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those

documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

134. Similarly, when Northern Trust sold the Lehman Brothers bonds that it had transferred to Chicago Teachers, rather than remit the proceeds of that sale to Chicago Teachers, Northern Trust unilaterally decided to direct that money to pay down the purported $21.6 million "deficiency" in the Chicago Teachers Custom Fund, which Northern Trust had itself created. Specifically, on November 9, 2010, Northern Trust allocated approximately $7.8 million to Chicago Teachers as proceeds from the sale of Lehman bonds, and then applied $5.4 million to the "reimbursement" and $2.4 million to the purported $21.6 million "deficiency" in the Chicago Teachers Custom Fund. Northern Trust stated in a letter to Chicago Teachers' Executive Director, Kevin Huber, on November 5, 2010:

> In light of your obligations under the agreements governing your securities lending activities, your interest in the cash proceeds from the recent Lehman floating rate note sales will be distributed from the STEP Liquidation Fund in the following manner: *1) Proceeds will first be used to pay the securities lending obligations related to the Lehman bankruptcy. This includes both the reimbursement to Northern Trust and the transfer costs related to the segregation of the Lehman notes*; 2) Next proceeds will be used to pay for any outstanding negative earnings carry forward owed to Northern Trust; and 3) Any residual proceeds will be deposited to your account(s). (Emphasis added).

Following the sale of those Lehman Brothers bonds, Northern Trust claimed that the Chicago Teachers Custom Fund was deficient by $19.2 million.

**ANSWER TO PARAGRAPH 134:** To the extent this paragraph purports to characterize written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

135.    That purported deficiency existed solely as a result of Northern Trust's misconduct.  Even if those investments were not imprudent, Northern Trust breached the SLA by creating a deficiency in the Chicago Teachers Custom Fund.  Because the SLA limited the investments of the Chicago Teachers Custom Fund to units of STIF and STEP, Northern Trust was not authorized to move the impaired securities from STEP (or the STEP Liquidation Fund) to the Chicago Teachers Custom Fund.

**ANSWER TO PARAGRAPH 135:**  Defendants deny the allegations of this paragraph.

136.    Northern Trust's unilateral decision to transfer the securities to the Chicago Teachers Custom Fund and ultimately to Chicago Teachers (but manage the securities for the benefit of Northern Trust) caused harm to Chicago Teachers, which has now been forced to cover the purported deficiency in the Chicago Teachers Custom Fund in connection with its termination of Northern Trust.

**ANSWER TO PARAGRAPH 136:**  Defendants deny the allegations of this paragraph.

> **5.     Northern Trust Seized Chicago Teachers' Securities Lending Earnings In Violation Of The SLA, And Over The Objections Of Chicago Teachers**

137.    Chicago Teachers and the Teachers Board repeatedly refused to accept liability for the losses incurred in STEP, including both the payment Northern Trust demanded and the purported "receivable" for the securities improperly transferred to the Chicago Teachers Custom Fund.

**ANSWER TO PARAGRAPH 137:**  Defendants deny the allegations of this paragraph.

138.    Indeed, an internal Northern Trust email sent by Northern Trust Senior Vice President Kathy Stevenson on September 22, 2008 – a week before Northern Trust formally

demanded payment – reflected that Chicago Teachers' Executive Director had "raised the question of client assuming loss and bearing risk and reducing NT's risk as a result of NT's decision to declare" certain of the securities in STEP permanently impaired. On September 30, 2008, the day after Northern Trust sent its letter demanding payment from Chicago Teachers, Ms. Stevenson sent another email, this time to Kevin Huber, Chicago Teachers' Executive Director, stating "I am aware of your need to see a quantification of all of the overall losses your Fund has experienced during these past couple weeks...."

**ANSWER TO PARAGRAPH 138:** To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiff, or written communications from Defendants to Chicago Teachers, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

139. When Ms. Stevenson subsequently wrote to Mr. Huber to reiterate that the "deadline" for payment unilaterally established by Northern Trust was approaching, Mr. Huber made emphatically clear that Chicago Teachers refused to make the demanded payments. In a January 1, 2009 email, Mr. Huber wrote to Ms. Stevenson:

> Until there is proper documentation on the valuation of the loss ... and until there is rationale on why this has to be realized right now within 90 days from the time that you all deemed [these securities] permanently impaired ..., and until I see the analysis from your attorneys that validates all of this (this being defined that you all (Northern Trust) can permanently impair the assets and you all do not have to accept any of the loss), *I am not going to recognize[] these payables as due* .... (Emphasis added).

**ANSWER TO PARAGRAPH 139:** To the extent this paragraph purports to characterize written communications between Defendants and Chicago Teachers, Defendants refer to those

documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

140.     Northern Trust recognized that Chicago Teachers refused to make the payments Northern Trust demanded. For example, an April 23, 2009 internal from Northern Trust Senior Vice President Kathy Stevenson stated that Chicago Teachers' Executive Director "confirmed that **they will not be paying their STEP payable** until they feel confident that they rightfully incurred the loss and that it is a proper payable" and that the Teachers Board "went into executive session to discuss 'potential' litigation against Northern Trust." In another internal email sent on October 16, 2009, Ms. Stevenson wrote "Since Chicago Teachers' [sic] has yet to pay the first clawback, I do not anticipate they will be paying the other payables on a timely basis either."

**ANSWER TO PARAGRAPH 140:** To the extent this paragraph purports to characterize internal Northern Trust documents available to Plaintiff, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

141.     Indeed, Northern Trust has repeatedly acknowledged the refusal of Chicago Teachers and the Teachers Board to make any of the payments demanded by Northern Trust. Northern Trust filed counterclaims in 2011 and 2012 in an effort to recover the exact monies that Chicago Teachers refused to pay. In briefs it filed in support of those counterclaims, Northern Trust admitted that Chicago Teachers:

- "consistently refused to pay its obligations,"

- "has not paid for all such losses" in STEP; and

- "has refused to comply with [Northern Trust's] demands" for payment.

**ANSWER TO PARAGRAPH 141:** To the extent this paragraph purports to characterize written documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

142. In contravention of the unambiguous terms of the SLA, over Chicago Teachers' emphatic objections, and despite acknowledging that Chicago Teachers and the Teachers Board were unwilling to pay the money Northern Trust demanded, ***Northern Trust seized Chicago Teachers' securities lending earnings to pay itself the monies that Chicago Teachers refused to pay***. Specifically, rather than allocating the Net Revenues from securities lending as mandated by the SLA – which required that 85% of all Net Revenues "shall be credited monthly to [Chicago Teachers'] account" – Northern Trust retained 100% of the Net Revenues generated from Chicago Teachers' participation in securities lending. Of that, Northern Trust kept 15% as its fee (as provided for by the SLA) and improperly kept 85% to repay itself for the money it voluntarily paid to borrowers to cover losses in securities lending.

**ANSWER TO PARAGRAPH 142:** Defendants deny the allegations of this paragraph.

143. Northern Trust continued to seize Chicago Teachers' securities lending earnings until September 2014, when the Court granted the Teachers Board's motion for injunctive relief. Northern Trust took Chicago Teachers' earnings on the 15th day of every month in which the Teachers Fund generated positive earnings, and documented the amount taken on "Funding & Disbursement Reports." The Funding & Disbursement Reports state that the earnings are being taken by Northern Trust "to reduce [the] amount due to Northern Trust to cover securities lending negative earnings."

**ANSWER TO PARAGRAPH 143:** To the extent this paragraph purports to characterize the Court's order or written communications from Defendants to Chicago Teachers, Defendants

refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

144. According to the Funding & Disbursement Reports created by Northern Trust, Northern Trust has taken over $100 million in Chicago Teachers' securities lending earnings in excess of its 15% fee.

**ANSWER TO PARAGRAPH 144:** Defendants deny the allegations of this paragraph.

> **6.** **Northern Trust Breached Its Duties In Connection With Chicago Teachers' Transition To A New Custodian And Securities Lending Agent**

145. On February 20, 2014, the Teachers Board voted to terminate Northern Trust as Chicago Teachers' custodial bank and securities lending agent. In violation of its fiduciary duties to Chicago Teachers, Northern Trust refused to accept that termination unless Chicago Teachers accepted liability for all of the unrealized and realized losses incurred in the Chicago Teachers Custom Fund, and remitted payment to Northern Trust of approximately $37 million. As a result, the Teachers Board was forced to file a motion for a preliminary injunction before this Court to enjoin Northern Trust from (1) preventing the Teachers Board from terminating Northern Trust as a fiduciary; (2) withholding any of Chicago Teachers' accounts or assets in connection with such termination; and (3) causing Chicago Teachers to breach or default upon any agreements with the third-party borrowers who borrowed Chicago Teachers' securities through the SLP. This Court granted the Teachers Board's motion on September 16, 2014, and directed the parties "to meet and confer with respect to devising a method of making an orderly transition that would result in the least risk to both [Chicago] Teachers and [Northern Trust]."

**ANSWER TO PARAGRAPH 145:** Defendants lack knowledge to admit or deny the allegations in the first sentence of this paragraph. To the extent this paragraph purports to

characterize the Court's order, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

146.     To make an orderly transition that would minimize risk and harm to Chicago Teachers, the Teachers Board directed Northern Trust to enter into a third-party securities lending agreement with Chicago Teachers' new securities lending agent.  This would have prevented or minimized any disruption of securities lending while the transition to a new custodian was being implemented, and thereby would have minimized the harm to Chicago Teachers arising from the transition.  Chicago Teachers directed Northern Trust, as its fiduciary, to implement the transition pursuant to this method.  In violation of its fiduciary duties to Chicago Teachers, Northern Trust refused to implement this method of transition, thereby causing harm to Plaintiff and Chicago Teachers.  Northern Trust further breached its duties by refusing to accept its termination and abide by the directive of the Teachers Board, by delaying the transition for months while the preliminary injunction motion was briefed and litigated, and by continuing all the while to take Chicago Teachers' securities lending earnings to pay down nonexistent liabilities.

**ANSWER TO PARAGRAPH 146:**  Defendants deny the allegations of this paragraph.

147.     The method of transition that Northern Trust forced Chicago Teachers to implement, in violation of Northern Trust's fiduciary duties to Chicago Teachers, required Chicago Teachers to pay over $19 million to cover a purported deficiency in the Chicago Teachers Custom Fund.  Any such deficiency is the result of Defendants' conduct.  Chicago Teachers has suffered harm and will incur additional harm arising from the costs incurred in connection that payment.

**ANSWER TO PARAGRAPH 147:**  Defendants deny the allegations of this paragraph.

## COUNT I

CLAIM FOR BREACH OF FIDUCIARY DUTY
FOR IMPRUDENT INVESTMENT MANAGEMENT

148.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

**ANSWER TO PARAGRAPH 148:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

149.     The Defendants undertook to act as an agent and fiduciary for Chicago Teachers, and Defendants owed Chicago Teachers a fiduciary duty.   By reason of their fiduciary relationship, Defendants specifically owed and owe Chicago Teachers the highest obligation of due care, good faith and loyalty in the administration of the SLP and the management of the Collateral Pools.

**ANSWER TO PARAGRAPH 149:** This paragraph contains legal conclusions to which no answer is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

150.     Specifically, as the trustee to the Collateral Pools, investment manager of the Collateral Pools, and securities lending agent in securities lending transactions, charged with managing the investment of the Collateral Pools for the benefit of Chicago Teachers and other SLP participants, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

85

**ANSWER TO PARAGRAPH 150:** This paragraph contains legal conclusions to which no answer is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny the remaining allegations of this paragraph.

151. Northern Trust has acknowledged its fiduciary status with respect to Chicago Teachers, both in materials produced by Defendants, and by the terms of the SLA and Master Custody Agreement Northern Trust entered into with Plaintiff. Moreover, Northern Trust's role as fiduciary to Chicago Teachers is confirmed by the FFIEC Policy, which was expressly incorporated by reference into the SLA.

**ANSWER TO PARAGRAPH 151:** To the extent this paragraph refers to agreements or other documents such as the FFIEC Policy, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or documents, or of applicable legal principles, no answer to such legal conclusions is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

152. As a fiduciary to Chicago Teachers, Northern Trust had full discretion to manage the Collateral Pools for Chicago Teachers' benefit, within the confines of the narrow purpose and objective of those Pools, as described herein. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Chicago Teachers.

**ANSWER TO PARAGRAPH 152:** To the extent this paragraph purports to characterize various agreements or Collateral Pool guidelines, Defendants refer to those documents for their

content and deny any allegations inconsistent therewith. To the extent this paragraph purports to characterize the legal effect of such agreements or guidelines, or of applicable legal principles, no answer to such legal conclusions is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

153. Chicago Teachers placed its trust and confidence in Northern Trust by virtue of, among other things, Northern Trust's superior knowledge and possession and control over Chicago Teachers' securities and the collateral investments in the SLP.

**ANSWER TO PARAGRAPH 153:** Defendants deny the allegations of this paragraph.

154. Northern Trust breached its fiduciary duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid. Northern Trust further breached its fiduciary duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 154:** Defendants deny the allegations of this paragraph.

155. Northern Trust further breached its fiduciary duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 155:** Defendants deny the allegations of this paragraph.

156. As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of the SLP participants, including Chicago Teachers. Specifically, the structure of Defendants'

compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain certain at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Chicago Teachers.

**ANSWER TO PARAGRAPH 156:** Defendants deny the allegations of this paragraph.

157. As a direct and proximate result of Defendants' breaches of fiduciary duty, Chicago Teachers has sustained substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 157:** Defendants deny the allegations of this paragraph.

## COUNT II

### CLAIM FOR BREACH OF CONTRACT
### FOR IMPRUDENT INVESTMENT MANAGEMENT

158. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 158:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

159. The agreement that Northern Trust entered into with Plaintiff is a valid and enforceable agreement. The SLA is the only agreement that governs Chicago Teachers' participation in the Northern Trust SLP. The Teachers Board performed all required duties and fulfilled all relevant conditions of that agreement.

**ANSWER TO PARAGRAPH 159:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants admit that the SLA is valid and enforceable. Defendants deny the remaining allegations of this paragraph.

160.     That agreement required Northern Trust to "make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

**ANSWER TO PARAGRAPH 160:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

161.     That agreement further imbued Northern Trust with full discretion to manage the Collateral Pools for the benefit of Chicago Teachers, within the confines of the narrow purpose and objective of those Pools, as described herein.

**ANSWER TO PARAGRAPH 161:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

162.     Northern Trust breached its contractual duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid.

Northern Trust further breached its duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

**ANSWER TO PARAGRAPH 162:** Defendants deny the allegations of this paragraph.

163. Northern Trust further breached its contractual duties by ignoring the consistent warnings issued by its own Chief Economist and other Northern Trust economists regarding the very securities in which it invested the Collateral Pools.

**ANSWER TO PARAGRAPH 163:** Defendants deny the allegations of this paragraph.

164. Defendants' agreement with Plaintiff gave rise to a duty of good faith and fair dealing. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Chicago Teachers. As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of Chicago Teachers and other SLP participants. Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk. Further, Northern Trust's concern about the risk that it would be required to consolidate if the Collateral Pools realized losses marred Defendants' management of the Pools, and motivated Defendants to retain impaired and at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Chicago Teachers.

**ANSWER TO PARAGRAPH 164:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer

to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

165.     As a direct and proximate result of Defendants' breaches of its contracts with Plaintiff, including the breaches of Defendants' duty of good faith and fair dealing that arise from those contracts, Chicago Teachers sustained substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 165:** Defendants deny the allegations of this paragraph.

## COUNT III

CLAIM FOR BREACH OF CONTRACT
FOR SEIZURE OF EARNINGS

166.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 166:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

167.     The SLA that Northern Trust entered into with Plaintiff is a valid and enforceable agreement. The SLA is the only agreement that governs Chicago Teachers' participation in the Northern Trust SLP. The Teachers Board performed all required duties and fulfilled all relevant conditions of that agreement.

**ANSWER TO PARAGRAPH 167:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants admit that the SLA is valid and enforceable. Defendants deny the remaining allegations of this paragraph.

168.    The SLA requires Northern Trust to remit 85% of the Net Revenue generated from Chicago Teachers' participation in securities lending each month to the Chicago Teachers account.  The SLA permits Northern Trust to retain just 15% of such Net Revenue as Northern Trust's fee.

**ANSWER TO PARAGRAPH 168:** This paragraph contains legal conclusions to which no answer is required.  To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

169.    The SLA does not provide for any circumstance in which Northern Trust is permitted to retain more that 15% of such Net Revenue for any reason.  The SLA does not provide for any circumstance in which Northern Trust is permitted to withhold from Chicago Teachers any of the 85% of monthly Net Revenue that the SLA requires be paid to Chicago Teachers' account.

**ANSWER TO PARAGRAPH 169:** This paragraph contains legal conclusions to which no answer is required.  To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

170.    Moreover, no provision in the SLA holds Chicago Teachers or the Teachers Board liable for losses incurred on the investment of securities lending collateral.  Even if such liability exists, nothing in the SLA permits Northern Trust to seize Chicago Teachers' earnings or other assets to cover such liability, nor permits Northern Trust to demand payments from Chicago Teachers or the Teachers Board to cover such liability.

**ANSWER TO PARAGRAPH 170:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

171. The SLA does not permit Northern Trust to extend loans or pay liabilities on behalf of Chicago Teachers or the Teachers Board. To the extent that Northern Trust voluntarily extends such loans or pays such liabilities, the SLA does not permit Northern Trust to seek repayment from Chicago Teachers or the Teachers Board.

**ANSWER TO PARAGRAPH 171:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

172. In violation of the SLA, Northern Trust improperly seized and retained 100% of the Net Revenue generated by Chicago Teachers' participation in securities lending during every month when Net Revenue was generated. This improper seizure included taking the 85% of Net Revenue due to Chicago Teachers each month under the SLA. Northern Trust seized those earnings to repay itself for funds it voluntarily advanced to cover losses incurred on the investment of securities lending cash collateral.

**ANSWER TO PARAGRAPH 172:** Defendants deny the allegations of this paragraph.

173. Defendants' agreement with Plaintiff gave rise to a duty of good faith and fair dealing. That duty required Defendants to act in the interest of and for the benefit of Chicago Teachers. Despite the plain language of the SLA, Northern Trust resorted to self-help by

improperly seizing tens of millions of dollars of Chicago Teachers' earnings and improperly retaining those monies for its own use. By unilaterally seizing Chicago Teachers' earnings in violation of the plain terms of the SLA and over Plaintiff's and Chicago Teachers' objections, Northern Trust breached its duties of good faith and fair dealing, and placed its interests ahead of those of Chicago Teachers, and caused harm to Chicago Teachers.

**ANSWER TO PARAGRAPH 173:** This paragraph contains legal conclusions to which no answer is required. Defendants deny the remaining allegations of this paragraph.

174.    As a direct and proximate result of Defendants' breaches of its contracts with Plaintiff, including the breaches of Defendants' duty of good faith and fair dealing that arise from those contracts, Chicago Teachers sustained substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 174:**  Defendants deny the allegations of this paragraph.

<u>**COUNT IV**</u>

CLAIM FOR BREACH OF CONTRACT
FOR TRANSFER OF SECURITIES

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

**ANSWER TO PARAGRAPH 175:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

176.    The SLA that Northern Trust entered into with Plaintiff is a valid and enforceable agreement. The SLA is the only agreement that governs Chicago Teachers' participation in the Northern Trust SLP. The Teachers Board performed all required duties and fulfilled all relevant conditions of that agreement.

**ANSWER TO PARAGRAPH 176:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants admit that the SLA is valid and enforceable. Defendants deny the remaining allegations of this paragraph.

177. The SLA mandates that Chicago Teachers' cash collateral must be invested in the Chicago Teachers Custom Fund, and that the Chicago Teachers Custom Fund is only permitted to hold units of STIF and STEP. Under the SLA, no other investments may be held by the Chicago Teachers Custom Fund. The SLA does not permit Northern Trust to place any other investments in the Chicago Teachers Custom Fund. The SLA also does not permit Northern Trust to transfer any securities or investments from the Chicago Teachers Custom Fund to Chicago Teachers itself, or require Chicago Teachers to remit payment for such securities.

**ANSWER TO PARAGRAPH 177:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

178. In violation of the SLA, Northern Trust improperly caused the Chicago Teachers Custom Fund to hold units of the STEP Liquidation Fund. Subsequently, Northern Trust violated the SLA by causing the Chicago Teachers Custom Fund to hold units of securities issued by Lehman Brothers, Sigma and Theta. Such investments by the Chicago Teachers Custom Fund were prohibited by the SLA.

**ANSWER TO PARAGRAPH 178:** Defendants deny the allegations of this paragraph.

179.    Northern Trust further breached the SLA by transferring the Lehman Brothers, Sigma and Theta securities from the Chicago Teachers Custom Fund to Chicago Teachers. Northern Trust improperly assigned Chicago Teachers a liability for what it described as the market cost of those securities, and assigned the Chicago Teachers Custom Fund a receivable in the same amount.    This caused the Chicago Teachers Custom Fund to hold as an asset a receivable from Chicago Teachers, despite the fact that such holding was prohibited by the SLA.

**ANSWER TO PARAGRAPH 179:**  Defendants deny the allegations of this paragraph.

180.    Plaintiff and Chicago Teachers objected to and refused to pay that liability.  The liability was improper not only because the underlying transfers of securities were prohibited by the SLA, but because the transfer was illusory, in that Northern Trust retained control of the securities at issue and retained for its own benefit any returns they generated.

**ANSWER TO PARAGRAPH 180:**  Defendants deny the allegations of this paragraph.

181.    Upon the Teachers Board's termination of Northern Trust as securities lending agent, Chicago Teachers was required to pay the improper liability to remove the purported deficiency in the Chicago Teachers Custom Fund, which was created by Defendants' breach of the SLA.

**ANSWER TO PARAGRAPH 181:**  Defendants deny the allegations of this paragraph.

182.    Defendants' agreement with Plaintiff gave rise to a duty of good faith and fair dealing.  That duty required Defendants to act in the interest of and for the benefit of Chicago Teachers.  Defendants breached their duties of good faith and fair dealing through Northern Trust's illusory transfer of prohibited investments to the Chicago Teachers Custom Fund, and

subsequently to Chicago Teachers, as Defendants placed their interests ahead of those of Chicago Teachers and caused harm to Chicago Teachers.

**ANSWER TO PARAGRAPH 182:** This paragraph contains legal conclusions to which no answer is required. To the extent this paragraph refers to various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

183. As a direct and proximate result of Defendants' breaches of its contracts with Plaintiff, including the breaches of Defendants' duty of good faith and fair dealing that arise from those contracts, Chicago Teachers sustained substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 183:** Defendants deny the allegations of this paragraph.

## COUNT V

CLAIM FOR BREACH OF FIDUCIARY DUTY
FOR SEIZURE OF EARNINGS AND TRANSFER OF SECURITIES

184. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

**ANSWER TO PARAGRAPH 184:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

185. The Defendants undertook to act as an agent and fiduciary for Chicago Teachers, and Defendants owed Chicago Teachers a fiduciary duty. By reason of their fiduciary relationship, Defendants specifically owed and owe Chicago Teachers the highest obligation of due care, good faith and loyalty in the administration of the SLP. This required Defendants to place the interests of Chicago Teachers ahead of Defendants' own interests.

97

**ANSWER TO PARAGRAPH 185:** This paragraph contains legal conclusions to which no answer is required. The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny the remaining allegations of this paragraph.

186. As set forth above in paragraphs 137 to 144, Northern Trust seized Chicago Teachers' earnings from securities lending and kept those monies for itself. By resorting to self-help to resolve the dispute between Chicago Teachers and Defendants regarding the liability for losses incurred in the SLP, Northern Trust placed its own interests ahead of the interests of Chicago Teachers. This constituted a breach of Defendants' fiduciary duties to Chicago Teachers, including the duty of loyalty.

**ANSWER TO PARAGRAPH 186:** Defendants deny the allegations of this paragraph.

187. As set forth above in paragraphs 127 to 136, Northern Trust transferred prohibited securities to the Chicago Teachers Custom Fund, then purported to transfer those securities from the Chicago Teachers Custom Fund to Chicago Teachers, and then assigned the Chicago Teachers Custom Fund with a receivable for the value Northern Trust assigned to those securities. When those securities generated returns, Northern Trust used the money generated by the securities for its own benefit, unilaterally deciding to retain millions of dollars for itself, and using millions of dollars to reduce the improper deficiency Defendants' actions had created in the Chicago Teachers Custom Fund.

**ANSWER TO PARAGRAPH 187:** Defendants deny the allegations of this paragraph.

188. As a direct and proximate result of Defendants' breaches of fiduciary duty, Chicago Teachers has sustained substantial harm, including the damages set forth herein.

98

**ANSWER TO PARAGRAPH 188:** Defendants deny the allegations of this paragraph.

## COUNT VI

CLAIM FOR BREACH OF FIDUCIARY DUTY
FOR TRANSITION OF CUSTODIAL AND LENDING SERVICES

189.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

**ANSWER TO PARAGRAPH 189:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

190.    The Defendants undertook to act as an agent and fiduciary for Chicago Teachers, and Defendants owed Chicago Teachers a fiduciary duty.  By reason of their fiduciary relationship, Defendants specifically owed and owe Chicago Teachers the highest obligation of due care, good faith and loyalty in the administration of the SLP.  This required Defendants to place the interests of Chicago Teachers ahead of Defendants' own interests.

**ANSWER TO PARAGRAPH 190:** This paragraph contains legal conclusions to which no answer is required.  The allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny the remaining allegations of this paragraph.

191.    As set forth above in paragraph 145, Northern Trust refused to accept the Teachers Board's resolution to terminate Northern Trust as its custodian and securities lending agent, forcing the Teachers Board to file a motion for a preliminary injunction in order to implement the directive of the Teachers' Board.  Northern Trust's decision to delay the transition and force Chicago Teachers to continue to retain Northern Trust enabled Northern Trust to continue seizing Chicago Teachers' securities lending earnings for itself.  By preventing the

99

implementation of the Teachers Board's directive to terminate Northern Trust, Northern Trust placed its own interests ahead of the interests of Chicago Teachers. This constituted a breach of Defendants' fiduciary duties to Chicago Teachers, including the duty of loyalty.

**ANSWER TO PARAGRAPH 191:** Defendants deny the allegations of this paragraph.

192. As set forth above in paragraphs 146 to 147, after this Court granted the Teachers Board's motion for a preliminary injunction and ordered the parties to meet and confer to develop a method of transition that would cause the least risk to Chicago Teachers and Northern Trust, Northern Trust refused to accept Chicago Teachers' proposed method of transition and instead, forced Chicago Teachers to accept a method of transition that resulted in additional harm and costs to Chicago Teachers. By refusing to abide by Chicago Teachers' directives to Northern Trust, and by putting its own interests ahead of Chicago Teachers, Northern Trust breached its fiduciary duties to Chicago Teachers.

**ANSWER TO PARAGRAPH 192:** Defendants deny the allegations of this paragraph.

193. As a direct and proximate result of Defendants' breaches of fiduciary duty, Chicago Teachers has sustained substantial harm, including the damages set forth herein.

**ANSWER TO PARAGRAPH 193:** Defendants deny the allegations of this paragraph.

**DEFENDANTS' AFFIRMATIVE DEFENSES TO THE SUPPLEMENTAL COMPLAINT OF THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO AND NTC'S AMENDED COUNTERCLAIMS**

Defendants Northern Trust Investments, Inc. ("NTI"), formerly known as Northern Trust Investments, N.A., and The Northern Trust Company ("NTC") (collectively, "Northern Trust") assert the following affirmative defenses to the causes of action brought by Plaintiff the Board of Trustees (the "Board") of the Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers").  Northern Trust asserts these affirmative defenses without admitting that it has the burden of proof on any fact, issue, element of a claim, or any other matter relating to such defenses, and without admitting that anything stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject raised by Plaintiff is actionable, relevant, or admissible.

In support of these affirmative defenses, Northern Trust alleges as follows:

## Introduction

1.      This is a case in which the Board seeks to hold Northern Trust responsible for investment decisions that Chicago Teachers actively made and that the Board (which governed and owed fiduciary duties to Chicago Teachers) actively made on behalf of Chicago Teachers. Northern Trust did not exercise overall and final investment discretion over Chicago Teachers' assets.  And Northern Trust could not and did not make the decision that Chicago Teachers would engage in the investment practice of securities lending about which Plaintiff now complains.  Chicago Teachers and its Board made that decision, and both were fully informed about the nature of the investments that they made and understood and knowingly accepted the risks associated with those investments when they decided to make and maintain them.  By this action, Chicago Teachers and its Board cannot disavow responsibility for their deliberate and

informed investment decisions simply because they now purport to be dissatisfied with the consequences of those decisions.

2.     Chicago Teachers is a defined benefit plan for which its Board, its staff, and its advisors make all the investment decisions.

3.     The investments that the Board says caused "massive realized losses" are profitable and were in fact profitable for years.   Even *after* the economic meltdown of September 2008—when Lehman Brothers filed for bankruptcy, the Federal Reserve bailed out AIG, Fannie Mae and Freddie Mac were placed in conservatorship, and Merrill Lynch was sold to Bank of America—the investments at issue generated overall profits.   So even if Northern Trust bore responsibility for any losses resulting from certain of those investments (which it does not), Plaintiff's claims of massive losses are simply not true.

4.     This case is not, therefore, about an investment manager placing gullible investors, without their knowledge or acquiescence, into losing investments that they never wanted or did not understand.   To the contrary, Chicago Teachers and its Board were financially sophisticated investors advised by internal professionals and external consultants.   Before making these investments, Chicago Teachers and its Board investigated their attributes and engaged in arm's-length contractual negotiations with NTC or NTI over their specific terms and conditions (including fees).   Chicago Teachers and its Board, and not Northern Trust, decided how they would invest Chicago Teachers' assets.   They were thus active and controlling decision-makers concerning all aspects of the investments that are the subject of the Supplemental Complaint.   And in fact, those investments performed as represented, even under dire and unforeseeable economic conditions.

5.      The investments at issue in this case concern "securities lending," an investment practice in which securities owned by a lender are "lent" to a third-party borrower, typically in exchange for cash collateral that is thereafter invested with the goal of making overall profits. The Board purports to bring claims arising out of decisions by it and Chicago Teachers to cause Chicago Teachers to engage in securities lending.

6.      Here, the Board—advised by internal staff and external consultants—decided that Chicago Teachers would engage in securities lending, and the Board negotiated the individual terms and conditions of the securities lending agreement between NTC and the Board.  Under that agreement, Chicago Teachers lent securities that it held to third-party borrowers.

7.      Because a client that engages in securities lending decides how to invest collateral from its lending activities, there is no single "right" way to invest securities lending collateral. Here, Chicago Teachers and its Board—advised by internal staff and external consultants— decided how collateral, whether cash or non-cash, from securities lending should be invested based on any number of factors important to it, including Chicago Teachers' own individual overall investment strategy, goals, and risk tolerance.  Chicago Teachers and its Board, and not Northern Trust, chose Chicago Teachers' collateral investment strategy.  The Board knew far more about the investment strategies, objectives, and risk and reward tolerances of Chicago Teachers than Northern Trust could or did know, and was thus in a better position than Northern Trust to decide what collateral investment risks were acceptable to it.  At all times, Northern Trust complied with the written investment guidelines governing the strategy selected by Chicago Teachers and its Board.

8.      Chicago Teachers and its Board were obligated to determine how to invest Chicago Teachers' assets prudently.   Although Northern Trust made certain investments

103

available to the Board and Chicago Teachers (and provided them with appropriate information about those investments), Chicago Teachers and its Board were responsible for making—and in fact made—the decision for Chicago Teachers to engage in securities lending. At all times, Northern Trust managed those investments according to all of the investment guidelines and objectives applicable to them. Chicago Teachers and its Board actively made the investment decisions at issue here, with full information and open eyes, for their own reasons and based on their own particular circumstances. Accordingly, they cannot impose liability onto Northern Trust for any alleged losses resulting from those investments.

9.    For these reasons, the Board's claim that Northern Trust imprudently invested Chicago Teachers' securities lending collateral must fail.

10.    The Board's claim that it does not have to honor agreements it made to cover losses it sustained on specific securities lending investments also fails. In this case, Chicago Teachers' securities lending investments incurred certain unrealized losses in 2007, some of which later became realized losses as a result of Lehman Brothers' 2008 bankruptcy filing and the ensuing global economic meltdown. Although the Board and Chicago Teachers were plainly liable for those losses at that time, NTC, as a client accommodation, worked out a longer-term repayment agreement with them to cover negative securities lending earnings associated with those losses. Under that agreement, NTC agreed temporarily to advance funds on Chicago Teachers' behalf to cover such negative earnings on the condition that Chicago Teachers would repay NTC out of Chicago Teachers' share of future positive securities lending earnings. The agreement expressly provided that if Chicago Teachers ever exited NTC's securities lending program, it would have to repay its remaining liability for the advances to NTC "in full."

11.     The parties consistently performed under the repayment agreement from 2007 through 2014.  From 2007 to 2010, NTC periodically advanced funds on Chicago Teachers' behalf in reliance on the foregoing promise to repay the advances from future earnings or "in full" upon exit from NTC's securities lending program.  And, with Chicago Teachers' full knowledge and consent, NTC, on a monthly basis, applied any and all of Chicago Teachers' share of positive securities lending earnings to reduce its liability to NTC.  NTC provided Chicago Teachers and its Board with dozens of monthly statements, to which neither objected, clearly reflecting both this repayment liability and the repayments to NTC.  Far from objecting to this record of performance of the parties' agreement, Chicago Teachers accepted the statements as accurate reflections of its own liabilities and payments, and even referred to its liability as a "loan" from or a "debt" to NTC and reflected its liability to NTC on its audited financial statements.  Indeed, even after Chicago Teachers initially sued Northern Trust in 2009, alleging that Northern Trust made imprudent investment decisions in connection with certain securities lending investments, Chicago Teachers and its Board continued to honor the repayment agreement.

12.     At the time of this filing, Chicago Teachers has paid about 90% of its liability to NTC; approximately $15 million remains to be paid.

13.     In February 2014, the Board informed NTC that it decided to exit NTC's securities lending program, thus triggering its obligation to fully repay all of NTC's conditional advances.  Thereafter, and in violation of all applicable agreements with NTC, the Board and Chicago Teachers made clear that Chicago Teachers would not cover all of its remaining investment losses and would not finish repaying NTC in full for NTC's conditional advances on Chicago Teachers' behalf.

14.     The Amended Counterclaims seek to require the Board to honor its agreements with and obligations to NTC by, among other things, repaying NTC for all of NTC's conditional advances on Chicago Teachers' behalf.  And the affirmative defenses asserted herein vitiate any of the Board's eleventh-hour claims that rely on the Board's attempt to disavow its longstanding agreements with and obligations to NTC.

### Factual Background

## I.     The Board is Responsible for Investment of Chicago Teachers' Assets and Owed Chicago Teachers Important Duties.

15.     Chicago Teachers is a $10 billion pension fund that maintains a wide variety of investments and engages numerous investment managers.  The Board and Chicago Teachers are sophisticated investors.

16.     The Board governs and has the duty to invest the assets of Chicago Teachers.  At all relevant times, the Board was acting as trustee and fiduciary of, and on behalf of, Chicago Teachers.  As part of its fiduciary duties, the Board was responsible for the investment of Chicago Teachers' assets and had overall responsibility for determining which portion of Chicago Teachers' assets should be allocated to any one or more investments in order to fulfill Chicago Teachers' overall objectives.  Northern Trust did not have those duties.

17.     The duties of the Board and Chicago Teachers' staff included, without limitation, deciding how to invest Chicago Teachers' assets and how to make individual investments of Chicago Teachers' assets; setting, reviewing, and changing (where appropriate) Chicago Teachers' overall investment policy and asset allocation; and monitoring and evaluating Chicago Teachers' overall investment portfolio performance.  Northern Trust did not have these duties.

18.     The Board and Chicago Teachers' staff had a fiduciary duty to conduct a prudent investigation and prudent due diligence in connection with and before investing any and all of the assets of Chicago Teachers, and for monitoring the continuing appropriateness of those investments.

19.     The Board had a fiduciary duty to Chicago Teachers to select and retain competent internal and outside investment staff, professionals, and managers; to establish appropriate investment guidelines, directions, and limitations for such staff, professionals, or managers; and to monitor the performance and continued appropriateness of such decisions (including determining whether each outside investment professional or manager was meeting applicable investment objectives and fulfilling its responsibilities prudently and pursuant to applicable law and contractual arrangements).

20.     The Board was required to act with the care, skill, prudence, and diligence required by law in choosing and monitoring the continued appropriateness and performance of the investment strategy that it chose for the investment of cash and non-cash collateral from securities lending.

21.     The Board and Chicago Teachers' staff were required to act with the care, skill, prudence, and diligence required by law in choosing and monitoring the continued appropriateness and performance of its securities lending investments at issue in this action.

22.     In connection with the foregoing duties, the Board and Chicago Teachers' staff had a fiduciary duty to give appropriate consideration to factors such as the opportunity for gain and the risk of loss of Chicago Teachers; the diversification of Chicago Teachers' overall portfolio of investments; the liquidity and current return of Chicago Teachers' portfolios relative to the anticipated cash flow requirement of Chicago Teachers; and the projected return

of Chicago Teachers' investment portfolio relative to the funding objectives of Chicago Teachers. Northern Trust did not have these duties. These duties of the Board and Chicago Teachers included, without limitation, a responsibility to understand and assess, among other things, the structure, risks, and costs of securities lending.

23. The Board and Chicago Teachers had the foregoing fiduciary duties when initially entering into contractual or other arrangements governing or relating to securities lending with Northern Trust; when choosing a collateral investment strategy; when making each additional securities lending investment decision; and when making any decision regarding the level of risk that they were willing to assume with respect to securities lending investments. They had these fiduciary duties on an ongoing basis *after* making such investment decisions to ensure that each investment decision was and continued to be in compliance with the terms of Chicago Teachers' governing documents; was consistent with and fulfilled the goals and strategies of Chicago Teachers; and was and continued to be an appropriate investment for Chicago Teachers.

24. Both the Board and Chicago Teachers' staff were required to have the requisite expertise, knowledge, and information to understand how to fulfill their fiduciary duties, including to understand the structure of, and the nature of the risks, costs, and potential returns of, the investment decisions, agreements, and arrangements they made. If they lacked that expertise, knowledge, and information, their fiduciary duties required them to obtain the skills and/or to consult the appropriate independent experts or others who had the requisite expertise, knowledge, and information. At all relevant times, the Board and Chicago Teachers' staff retained independent investment consultants that advised them on, among other things, securities lending.

25.     At all times relevant to this case, Chicago Teachers and its Board retained ultimate control and discretion over the investment of Chicago Teachers' assets.

26.     As to all events alleged herein, and at all times relevant to this case, Chicago Teachers' staff, including its executive director, were acting on behalf of Chicago Teachers and its Board, within the proper scope of their authority.

27.     At all times relevant to this case, Northern Trust acted prudently and in good faith, with due care, in compliance with all relevant agreements, and without negligence, recklessness, or intentional wrongdoing.

## II.     Chicago Teachers and its Board Understood that Securities Lending is an Investment Activity That Involves Risk.

28.     Securities lending is an investment practice in which securities owned by a lender are lent to third-party borrowers, typically in exchange for cash collateral that is thereafter invested.  The lender must pay "rebates" (or interest) to the borrowers on the cash collateral during the course of the loans, and when yield from the invested cash collateral exceeds these rebates and other expenses, the lender receives positive securities lending earnings.  When non-cash collateral is accepted for a loan, the borrower typically pays fees in return.

29.     When the loan of a security is terminated, the lender of that security (through its agent) is responsible for returning the cash or non-cash collateral associated with the security to the borrower as a condition of the borrower's return of that security to the lender.  If the lender is unable fully to repay the borrower's cash collateral, one of the borrower's remedies is to retain the lender's security.  As the Board has alleged both in this Supplemental Complaint and in the Second Amended Class Action Complaint, if Chicago Teachers' "invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption," Northern Trust would

not be required to "make up the difference . . . to the borrowers." (See Dkt. #399 ¶ 29; Dkt. #159 ¶¶ 27, 55.) Instead, the "Plan[]" would have to make up that difference. (Dkt. # 159 ¶¶ 27, 55.)

30.     Here, the Board engaged NTC as its securities lending agent. In that role, NTC provided numerous services. Among other things, NTC performed credit assessments of the borrowers within the securities lending program; negotiated rebate rates and other loan terms with borrowers; facilitated loan settlement; oversaw investment of cash collateral received from borrowers; performed daily mark to markets of loans and collateral with borrowers; carried out instructions from the lenders or borrowers to terminate loans; maintained records of the loans, cash collateral, rebates, revenue, and earnings (profits or losses) from the transactions; managed the cash flows with borrowers for rebates and other payments; and distributed the earnings and provided detailed reporting to the lender. As the fee for these services, and pursuant to industry practice, lenders typically pay their securities lending agents a negotiated percentage of the lenders' securities lending earnings. At all relevant times, the Board agreed to pay NTC 15% of securities lending earnings as NTC's fee for its services as securities lending agent.

31.     Because securities lending is an investment activity, it entails risks, including collateral investment risk. A security purchased with cash collateral could temporarily lose its value (sustaining what is known as an "unrealized" loss, since the security's value could recover) or become permanently impaired (sustaining a "realized" loss that cannot be, or is not expected to be, recovered). At all times, the Board and the Chicago Teachers' staff and consultants understood the investment practice of securities lending and were aware of and understood these risks, and they voluntarily and knowingly chose to engage in securities lending and incur these risks.

32.     In the securities lending industry, it is industry custom and practice that lenders are responsible for 100% of the losses in the principal value of their invested cash collateral. Lenders—not their agents—are the principals in their securities lending transactions.   As described in more detail below, collateral reinvestment risk materialized in this case, when, in mid-September 2008, Lehman's bankruptcy filing triggered an unprecedented and unforeseeable global economic meltdown.

### III.     The Board and Chicago Teachers Affirmatively Chose to Engage in Securities Lending.

33.     The Board and Chicago Teachers made the investment decisions about which the Board complains in this case.   They authorized and directed the lending of plan assets.   In connection with those investment decisions, the Board chose, supervised, consulted, and directed knowledgeable internal staff and external consultants.   Chicago Teachers undertook the actions alleged in support of these affirmative defenses at the direction, and with the knowledge, of the Board as advised by its internal staff and external consultants.

34.     In about 1989, the Board engaged NTC to become the custodian of Chicago Teachers' assets pursuant to a Master Custody Agreement ("MCA") executed by the Board and NTC (attached, with amendments, as Exhibit 1).   Shortly thereafter, the Board voted to "permit" Chicago Teachers to engage in securities lending by lending securities from its portfolio of securities held in NTC's custody.   Accordingly, on about June 28, 1990, the Board (on behalf of Chicago Teachers) and NTC entered into the Securities Lending Agreement ("SLA") (attached, with amendments, as Exhibit 2).   That agreement and its amendments make clear that NTC's role was to be the "Agent" and that the Board, on Chicago Teachers' behalf, was the principal in the securities lending transactions.   Both the SLA and the MCA, as amended, remain in effect.

35.     NTC thereafter lent Chicago Teachers' securities to specifically authorized borrowers in exchange for cash collateral on which Chicago Teachers, through NTC as agent, paid the borrowers a "rebate" rate as interest.  During the course of these loans, NTC invested that cash collateral in compliance with investment guidelines selected by the Board and Chicago Teachers.  For years, those investments generated securities lending earnings for Chicago Teachers.  NTC calculated these earnings at month end, paying them to Chicago Teachers in the following month (along with payment of NTC's 15% fee).

36.     In connection with entering into the SLA, the Board and Chicago Teachers actively chose a collateral investment strategy and thereby directed the manner in which cash collateral and non-cash from securities lending would be invested.

37.     Northern Trust always complied with those directions and the guidelines applicable to the collateral investment strategy.

38.     Pursuant to the SLA, the Board and Chicago Teachers agreed that they would be responsible for principal losses in investments made with cash collateral from securities lending.  The SLA also made clear that NTC acted only as an agent and that the Board, as the investor and principal (on behalf of Chicago Teachers), was liable for all such investment losses (absent certain wrongdoing by NTC).  The SLA nowhere allocates such risk to NTC.

39.     At all relevant times, the SLA (in a 1995 amendment) provided that "any Collateral deficiency arising as a result of cash Collateral invested in [the] Custom Fund . . . shall be allocated solely to the [Chicago Teachers] Board (assuming Agent [NTC] has fulfilled all obligations under this Agreement with respect to such Collateral).  For purposes of this Agreement, a 'Collateral deficiency' shall mean any failure, deficiency, impairment or loss in value of any item of non-cash collateral, or of any investment of cash collateral, including but

112

not limited to" a default by the issuer of a security or instrument, a loss in a permissible investment of the Custom Fund, or a shortfall arising from the liquidation of an investment in such portfolio. The SLA did not allocate the cash collateral losses at issue here to NTC.

40. The Board and Chicago Teachers have repeatedly acknowledged that they were contractually responsible for 100% of securities lending losses. In its Supplemental Complaint, the Board alleges that NTC "bore no downside risk on any losses in the Collateral Pools." (Dkt. # 399 ¶ 7; *see also id.* ¶ 29 (alleging that NTC "does not bear the downside risk of any losses incurred by the Collateral Pools").) The Board similarly alleged in its Second Amended Class Action Complaint that NTC "bore none of the risk of loss" and "would be responsible for 0% of any losses," and that if Chicago Teachers' "invested collateral becomes so impaired that it is not sufficient to repay the borrower upon redemption[,] Northern Trust would not be required to make up the difference to the borrowers." (Dkt. # 159 ¶ 27; *accord id.* ¶ 29.) The Board alleged instead that Chicago Teachers would "bear the risk of loss" in the invested cash collateral. (Dkt. # 159 ¶ 39.) Indeed, the Court in this case found that "the Board does not dispute that in the absence of some fault of NTC the SLA allocates losses to the Board." (November 6, 2012 Order, Dkt. # 199 at 6.)

## IV. The Board and Chicago Teachers Affirmatively Chose to Use "STEP" for Investment of Cash Collateral from Securities Lending.

41. In about 1995, after engaging in securities lending for approximately five years, and in an effort to increase income from securities lending, the Board and Chicago Teachers affirmatively changed the applicable cash collateral investment strategy, accepting more risk in exchange for potentially greater investment returns.

42.    The Board and Chicago Teachers therefore directed NTC to create a custom fund for the sole use of Chicago Teachers, tailored to Chicago Teachers' unique investment guidelines (the "Custom Fund").  No other investor ever used this personalized Custom Fund.

43.    These new investment guidelines were reflected in amendments to the MCA and SLA, and the Board and Chicago Teachers thereby directed NTC to invest cash collateral generated by securities lending pursuant to those guidelines.  From time to time, the Board and Chicago Teachers initiated and directed changes to the investment guidelines of the Custom Fund.  From its inception and at all times thereafter, the Board and Chicago Teachers were fully aware of the investment guidelines applicable to this Custom Fund (and therefore how cash collateral from securities lending was and would be invested), in part because those guidelines were created pursuant to Chicago Teachers' own specifications and instructions.

44.    The investments made in the Custom Fund always complied with Chicago Teachers' investment guidelines.

45.    The Custom Fund was used for the investment of Chicago Teachers' cash collateral from securities lending and for repayment of borrowers' cash collateral.  Thus, when one of Chicago Teachers' securities lending loans was terminated—whether by Chicago Teachers or one of its borrowers—the assets in this Custom Fund were the source of repayment of that borrower's cash collateral (resulting in that borrower's return of the borrowed security to Chicago Teachers).

46.    Chicago Teachers' customized guidelines, beginning in 1995, directed that securities lending cash collateral be invested in (among other things) units of the Short Term Extendable Portfolio ("STEP") and of the Short Term Investment Fund ("STIF") in percentages selected by Chicago Teachers and its Board.  At all times relevant to this case, both STEP and

STIF were NTI collective investment funds that held fixed income securities pursuant to each fund's governing investment guidelines (and that did not themselves engage in securities lending).

47.     STIF is a fund designed with the objective of maintaining a constant net asset value ("NAV") of $1.00 per unit.  In contrast, STEP was a daily mark-to-market fund, not a constant-dollar fund.  This meant that STEP's NAV fluctuated every day based on the market value of its holdings.  Thus, if a STEP security experienced a realized or unrealized loss, that change would be reflected in STEP's NAV (and would decrease Chicago Teachers' securities lending earnings).  And if a security with a previous unrealized loss regained its value, that unrealized gain would also be reflected in STEP's NAV (and would increase Chicago Teachers' securities lending earnings).

48.     STEP offered the potential for greater return than STIF, as well as greater return than Chicago Teachers' previous cash collateral investment strategy.  But STEP also carried a greater risk of loss.  The Board and Chicago Teachers were at all times aware of this trade-off and knowingly decided to pursue a riskier cash collateral investment strategy.

49.     The Board and Chicago Teachers acknowledged in writing that they understood and accepted that STEP was a mark-to-market fund and STIF was a constant $1.00 fund, but they nevertheless directed NTC to maintain the unit value of the Custom Fund holding those units at a constant $1.00.  Per the parties' agreement, yield on the Custom Fund was to be determined based on maintaining the Custom Fund at $1.00, with amounts above $1.00 to be distributed through earnings, notwithstanding STEP's mark-to-market nature.  To accomplish this, Chicago Teachers would necessarily have to replenish its Custom Fund when, for example,

reductions in STEP's NAV would have otherwise caused a reduction in the NAV of the Custom Fund below $1.00.

50.     The Board and Chicago Teachers were aware of the investment guidelines, characteristics, securities holdings, and risk profiles of STEP and STIF at all relevant times. Indeed, wholly outside of the securities lending context and by no later than 1995, Chicago Teachers directly bought units of STEP and of STIF as part of its cash management program and clearly understood and accepted the nature of those investments and their guidelines and risks.

51.     Northern Trust always complied with the Board's and Chicago Teachers' instructions regarding investment of securities lending cash collateral.  Those investments were prudently made and complied with all applicable investment guidelines, agreements, laws, and regulations.   And the investments made in STIF and STEP always complied with their applicable guidelines.

52.     Northern Trust's disclosures of information about STEP and STIF to Chicago Teachers and its Board were extensive and frequent, and included both written and oral communications.  Long before certain securities held in STEP experienced a realized loss (in September 2008, when the bankruptcy filing of Lehman Brothers Holding Inc. ("Lehman") caused Lehman to default on fixed income securities held in STEP), Northern Trust had provided Chicago Teachers and its Board with an enormous amount of information about STEP and STIF, including the identity of the fixed income securities held in STEP and STIF, the performance of those securities, and the effect that those securities had on securities lending revenue.

53.     In August 2007, STEP experienced its first monthly loss in its history due to unrealized losses in certain of the securities that it held, which negatively affected the Custom Fund's monthly return.  (An unrealized loss means a loss that may be temporary and that may never come to fruition if the price of the security recovers or the principal due on the instrument is ultimately paid in full at maturity.)  At that time, Northern Trust immediately brought this information to the attention of Chicago Teachers and its Board; discussed the causes of the unrealized losses with them; quantified the loss to them; and answered their questions related to the losses.  At that time, Northern Trust provided Chicago Teachers and its Board with a list of STEP's current holdings and other detailed information about the attributes of STEP, including (without limitation): the identity of the securities (including, but not limited to, those of Lehman, Capmark Financial Group, and CIT Group) held by STEP that contributed to the unrealized losses (and that, many months later, unexpectedly caused certain realized losses); STEP's investment in subprime securities (approximately 1%); the maturity breakdowns of STEP's holdings; and STEP's sector and security-type distribution.

54.     The Board and Chicago Teachers could have chosen to change their cash collateral investment strategy or to reduce, limit, or completely withdraw from securities lending.  After receiving this and other information, and in light of what they already knew about the cash collateral investment strategy that they had chosen, however, they made an affirmative decision to "stay the course" and remain in the securities lending program without changes.  In making that decision, Chicago Teachers and its Board considered (among other things) that the current market conditions were an "aberration," that securities lending was still profitable, and that Chicago Teachers was a "long-term" securities lending investor.  Chicago

Teachers' cash collateral investment strategy remained acceptable to it and its Board and within their risk tolerance.

55.     Near the end of 2007, and despite notification by and discussions with Northern Trust about additional unrealized losses resulting from Chicago Teachers' customized cash collateral investment strategy, Chicago Teachers' own external consultant advised it and its Board that Chicago Teachers' "more aggressive collateral pool should aid performance over longer time periods, but as with any added return, some additional risk is taken which increases the likeliness of short term variances, such as those experienced in the second half of [2007]." This was an explicit recognition by the Board, Chicago Teachers, and their advisors that the Board and Chicago Teachers had chosen to take on "additional risk" and the consequences associated with that risk.  Again, neither the Board nor Chicago Teachers made any changes in cash collateral investment strategy, accepting the risks and rewards of that self-selected strategy based on their own unique considerations.

56.     Northern Trust continued to communicate detailed information to Chicago Teachers and its Board about the Custom Fund throughout 2008.  For example, before September 2008, in both oral and written communications with Chicago Teachers, Northern Trust continued to describe and disclose the precise securities held in STEP and STIF that the Board *now* alleges Northern Trust should never have bought or held.  Those communications focused on the same structured investment vehicles now called "exotic" in this Supplemental Complaint and the mortgage-backed securities and the securities of Lehman, Capmark, CIT, Sallie Mae, and Greenpoint that the Supplemental Complaint *now* condemns as imprudent.

57.     Notwithstanding their receipt of the foregoing information long before the unprecedented market and economic events of September 2008, the Board and Chicago

Teachers did not direct changes to their securities lending strategy, including in the investment of cash collateral from securities lending. Instead, they continued to accept the risks of these investments.

58.     The events of September 2008, including Lehman's bankruptcy filing, the AIG bailout, the sale of Merrill Lynch, and the conservatorship of Fannie Mae and Freddie Mac, were unprecedented and unforeseen. Securities sustained realized losses worldwide, and securities lending programs were not immune from the effects of the crisis. Certain securities held in STEP also sustained realized losses in September 2008.

59.     After those events, the Board's and Chicago Teachers' own internal advisor opined that "markets may not be predictable in the short term"; that the "current investment environment is the worst in memory"; that the market is "undergoing a once-in-a-century correction"; and that the "economic turbulence" was "unprecedented." These remarks directly contradict the allegations that Plaintiff is making against Northern Trust in this case.

60.     And, during the relevant period, Chicago Teachers—through investment managers unaffiliated with Northern Trust—bought and held, for Chicago Teachers' pension plan portfolio, the very kinds of securities that it now says Northern Trust could not have prudently bought or held in STEP or STIF.

61.     Chicago Teachers' securities lending investments performed as represented and, through this lawsuit, Chicago Teachers and its Board unfairly and inappropriately seek to hold Northern Trust liable as an insurer of their own investment decisions.

62.     At all times relevant to this case, Chicago Teachers and its Board, internal staff, and external consultants had sufficient information about the cash collateral investment strategy Chicago Teachers chose that, if they truly considered the purchase or holding of the securities

contained in the Custom Fund to have constituted a breach of fiduciary duties, they had a fiduciary obligation to change that investment strategy. They did not do so.

63. Before September 2008, no representatives of Chicago Teachers ever directed Northern Trust to reduce, limit, or terminate Chicago Teachers' securities lending investments or to change the way in which collateral from securities lending was invested.

64. To allow Chicago Teachers and its Board to evade responsibility for their own informed investment decisions would be to permit a sophisticated investor to have it both ways: to accept an investment's rewards while waiting to see whether known risks materialize and to be reimbursed for the investment's losses if those known risks do in fact materialize. This "heads I win, tails you lose" approach is contrary to the applicable agreements and to law.

65. Chicago Teachers and its Board profited overall from their securities lending investments, even after taking into account losses during the relevant time period due to a few of the securities held in STEP.

**V.  The Board and Chicago Teachers Affirmatively Chose Core for Investment of Non-Cash Collateral from Securities Lending and Sustained No Losses in Connection With Such Investment.**

66. Beginning no later than 1995, the Board and Chicago Teachers chose to use the Core Collateral Section ("Core") for investment of non-cash collateral from the lending of Chicago Teachers' securities. Core is a collateral pool designed with the objective of maintaining a constant NAV of $1.00 per unit. The ratio of the total market value of Core's assets to the book value of those assets is often referred to as the market-to-book ratio; when those values are sufficiently aligned, the value of a unit of Core is one dollar.

67. Before selecting Core for investment of non-cash collateral from securities lending, the Board and Chicago Teachers' staff received, understood, and accepted the

guidelines applicable to investments in Core. Core's investments were prudently made and always complied with its applicable guidelines.

68.    When Lehman unexpectedly filed for bankruptcy on September 15, 2008, Core was holding certain securities of Lehman. On September 19, 2008, Northern Trust declared a "Collateral Deficiency" in Core that was approximately equal to the aggregate difference between the market value of Core's assets and their book value. This was the first time in Core's history that such a collateral deficiency had been declared.

69.    Almost all of the Collateral Deficiency in Core was due to decreases in the price of certain Core assets constituting unrealized losses. The rest of the Collateral Deficiency was due to the "realized" impairment of the Lehman security following Lehman's bankruptcy filing.

70.    Chicago Teachers was liable, pursuant to the SLA, for its share of the Core Collateral Deficiency. However, Northern Trust did not require it to immediately pay that amount. Instead, Northern Trust posted a payable to Chicago Teachers' account for its share of the Core Collateral Deficiency.

71.    Thus, starting in about October 2008, Chicago Teachers' account statements from Northern Trust reflected the amount that Chicago Teachers owed the Core collateral pool as Chicago Teachers' share of the Core Collateral Deficiency. Neither the Board nor Chicago Teachers ever disputed this liability or its calculation, nor did they ever object to this entry in numerous account statements, whether at the time of the first posting or over the succeeding years.

72.    Shortly after the declaration of the Core Collateral Deficiency, on September 29, 2008, Northern Trust voluntarily made a cash payment to Chicago Teachers (among other clients) in connection with Chicago Teachers' use of Core for investment of its non-cash

collateral from securities lending. That payment, coupled with gains from subsequent sales of Core's impaired Lehman security, *more than offset Chicago Teachers' share of the realized losses in Core*. This payment was not required under or mandated by any contract or law.

73. As of November 30, 2009, Northern Trust partially reversed the unrealized loss portion of the Core Collateral Deficiency after concluding that the market values of securities held in Core had recovered to the point that such a reversal was appropriate. This reduced Chicago Teachers' liability to Core for the Core Collateral Deficiency, and the liability posted on Chicago Teachers' account statements was also reduced accordingly.

74. For the same reasons, on March 15, 2010, Northern Trust announced the reversal of the remaining unrealized loss portion of the Core Collateral Deficiency. This reduced Chicago Teachers' liability to Core for the Core Collateral Deficiency, and the liability posted on Chicago Teachers' account statements was also reduced accordingly. The November 2009 and March 2010 reductions in the unrealized loss portion of the Core Collateral Deficiency extinguished all of Chicago Teachers' liability for any of Core's unrealized losses.

75. Chicago Teachers thus sustained no losses from the use of Core for investment of its non-cash collateral from securities lending.

## VI. The Board and Chicago Teachers Agreed to a Repayment Arrangement for Making Good on All Investment Losses from Securities Lending.

76. As discussed above, in mid-2007, securities held in STEP incurred unrealized losses. And in the wake of Lehman's unexpected bankruptcy filing in mid-September 2008 and the economic tsunami that followed, certain STEP securities (including those issued by Lehman) incurred realized losses. Although the SLA makes clear that Chicago Teachers was responsible for covering all of those losses, it does not spell out any specific procedure for implementation of Chicago Teachers' liability for securities lending losses. Thus, the parties were free to, and

indeed did, work out an agreement regarding such a procedure. Their agreement did not contradict the SLA or supplant any of its express terms. It reflected NTC's decision to accommodate Chicago Teachers temporarily during a time of extreme market-wide illiquidity while maintaining the contractual allocation of risk between the parties, under which Chicago Teachers was ultimately liable for all securities lending losses.

77. At all relevant times, it was a common custom and practice in the securities lending industry for securities lending agents temporarily to advance their own funds on behalf of their principals to facilitate the complex and time-sensitive flow of payments required in connection with the processing of securities lending transactions, without such agents thereby assuming liability for such payments. Nothing in the SLA disallowed or prevented any such practice in this case.

78. On August 13, 2007, after certain STEP securities had experienced unrealized losses in July 2007, leading to negative securities lending earnings, NTC notified Chicago Teachers' Executive Director in writing of these losses and made an offer to Chicago Teachers concerning how the parties would handle the losses. NTC represented to Chicago Teachers that NTC would advance its own funds on Chicago Teachers' behalf to cover all of those unrealized negative earnings on the condition that Chicago Teachers would be liable for NTC's advances, which would "be offset versus future positive earnings unless you request otherwise." (Attached as Exhibit 3.)

79. Chicago Teachers accepted this offer and never "request[ed] otherwise." Chicago Teachers received valuable consideration under this agreement, including relief from immediately incurring the consequences of the losses, as well as the option to repay losses from future earnings instead of from current holdings.

80.     In reliance on Chicago Teachers' acceptance of its offer, NTC advanced its own funds temporarily on Chicago Teachers' behalf.  Had Chicago Teachers (or its Board) objected to the offer, NTC would have acted immediately to protect itself from loss, including not making the proposed advance.

81.     In August 2007, Chicago Teachers again incurred negative securities lending earnings.  On September 10, 2007, NTC notified Chicago Teachers' Executive Director in writing of this fact and again offered to advance its own funds on Chicago Teachers' behalf to cover those negative earnings on the same conditions described above.  Chicago Teachers again accepted the offer and never "request[ed] otherwise."

82.     In reliance on Chicago Teachers' acceptance of its offer, NTC advanced its own funds temporarily on Chicago Teachers' behalf.  Had Chicago Teachers (or its Board) objected to the offer, NTC would have acted immediately to protect itself from loss, including not making the proposed advance.

83.     In a letter to Chicago Teachers dated November 13, 2007, NTC confirmed the parties' course of conduct and provided Chicago Teachers with a detailed explanation of the conditions under which it would continue making advances of the kind described above.  NTC reiterated that Chicago Teachers had to repay the advances from future earnings and further explained that if Chicago Teachers were to "leave[] the securities lending program overall," it "must repay [its] obligation in full at that time."  (Attached as Exhibit 4.)  NTC also expressly "reserved the right to change this process in the future, including (but not limited to) . . . requiring the obligation to be paid as soon as is practicable for clients in the month following the loss" and charging a "market rate of interest on the amount of the obligation."  NTC advised Chicago Teachers that the alternative to this arrangement would be for Chicago Teachers to

cover its negative earnings "as soon as practical in the month following the loss, after the audited earnings are communicated." NTC concluded by asking Chicago Teachers to contact it if it had any questions about these matters.

84.     Chicago Teachers and its Board never objected to these written conditions. Indeed, through their words, conduct, failure to object to the contingent advances, and acceptance of the contingent advances, Chicago Teachers and its Board accepted these conditions, creating an enforceable contract with, and obligations to, NTC. In reasonable reliance on these facts and the repayment agreement, NTC continued conditionally to advance its own funds on Chicago Teachers' behalf. Had Chicago Teachers or its Board objected to the conditions for the advances, NTC would have acted immediately to protect itself from loss, including by not making the proposed advances.

85.     In that same November 13, 2007 communication, NTC explained how its advances, and Chicago Teachers' liability and payments, would be reflected on Chicago Teachers' statements of account:

- the "[a]mount due to Northern Trust to cover SL's [securities lending's] negative earnings will be recorded as an obligation/liability in the client's account";

- "[n]egative earnings will be recorded as negative income";

- "any outstanding liability balance will be reflected on the client's Asset Detail template, to represent the current amount due to Northern Trust"; and

- "[i]n subsequent periods when SL earnings are positive, Northern Trust will record those earnings as usual, but will also record a transaction that reduces the balance of the obligation to Northern Trust. . . by the client's net SL's positive earnings. . . . This will also be reported on the Investment Transaction Detail template. Once the liability reaches zero, this transaction will no longer be reported."

Thus, Chicago Teachers could be in no doubt that, under the option it had selected, NTC was expecting repayment; that the repayment obligations would be reported in Chicago Teachers'

statements of account; and that NTC, without further action by Chicago Teachers, would use Chicago Teachers' positive earnings to repay itself for its advances on Chicago Teachers' behalf. Chicago Teachers and its Board never objected to these characterizations of the transactions on the account statements.

86.　　NTC, as Chicago Teachers' custodian, thereafter provided Chicago Teachers and its Board with monthly account statements that reflected these transactions.　For example, in every month since November 2007, Chicago Teachers' monthly custody asset detail account reflected a liability entry titled "LIABILITY TO NORTHERN TRUST FOR SECURITIES LENDING NEGATIVE EARNINGS."　And in every month since February 2008, when NTC first applied Chicago Teachers' share of positive securities lending earnings to repay itself for its previous advances on Chicago Teachers' behalf, Chicago Teachers' monthly custody cash activity detail account reflected the precise amounts of Chicago Teachers' positive securities lending earnings used "TO REDUCE AMOUNT DUE TO NORTHERN TRUST TO COVER SECURITIES LENDING NEGATIVE EARNINGS."

87.　　Under the MCA, the Board agreed that as to such account statements:

> An account shall be approved by the Board by . . . failure to object to the account within six months of the date upon which the account was delivered to the Board.　To the extent permitted by law, the approval of an account shall constitute a full and complete discharge to Northern to all matters set forth in that account.

The Board and Chicago Teachers never objected to these, or any other, statements of account concerning Chicago Teachers' securities lending liability to NTC, to the use of Chicago Teachers' share of positive securities lending earnings to offset that liability to NTC, or to any other securities lending entries—either within six months of the statements' issuances or at any other time.　The Board and Chicago Teachers thus approved those account statements, which

constituted a "full and complete discharge to Northern Trust to all matters set forth in" those statements.

88.     All of these communications and actions made it crystal clear that NTC's advances were conditioned on repayment by Chicago Teachers.  No one from Chicago Teachers or the Board expressed the belief that such advances were irrevocable "gifts" from NTC to Chicago Teachers or that NTC did not or should not expect repayment from Chicago Teachers.

89.     NTC's advances on Chicago Teachers' behalf continued whenever Chicago Teachers experienced negative securities lending earnings, from 2007 through May 2010.  These advances continued to be reflected on Chicago Teachers' account statements, as were Chicago Teachers' repayments to NTC and other securities lending liabilities and transactions.  Chicago Teachers and its Board understood that, as long as Chicago Teachers remained in NTC's securities lending program, Chicago Teachers was obliged to repay NTC for the amounts NTC had advanced on its behalf, which would be repaid out of Chicago Teachers' future positive securities lending earnings.  For more than six years, Chicago Teachers, without objection by it or the Board, paid down this liability to NTC out of Chicago Teachers' share of positive securities lending earnings.  Over all of these years, moreover, neither the Board nor Chicago Teachers ever claimed that NTC breached the SLA by applying Chicago Teachers' share of positive securities lending earnings to repay NTC's advances.  In that time, Chicago Teachers repaid the vast majority of its liability.

90.     At all times, NTC made clear that it expected repayment of its advances, and neither the Board nor Chicago Teachers ever claimed that the advances were made with no expectation of repayment by Chicago Teachers.  And Chicago Teachers and its Board never revoked their acceptance of the conditions of the parties' repayment agreement while NTC was

making those advances.  Had they done so, NTC would have (among other things) ceased making the advances.  At all times, NTC relied upon, among other things, Chicago Teachers' and the Board's consistent and repeated acceptance and ratification of, acquiescence in, and failure to object to: NTC's conditional advances; NTC's account statements; and NTC's actions in applying Chicago Teachers' share of positive securities lending earnings to offset its liability to NTC.

91.     The Board and Chicago Teachers have repeatedly acknowledged Chicago Teachers' liability for NTC's advances on its behalf.

92.     As described below, for example, Chicago Teachers and the Board have recognized this negative earnings liability in Chicago Teachers' published financial statements for the last five years.  As another example, Chicago Teachers' Chief Investment Officer (CIO) sent NTC an email dated February 27, 2013, asking NTC to increase Chicago Teachers' securities lending volumes to "allow" Chicago Teachers "to pay off sooner" the "Securities Lending Carry Forward Liability."  In that email, the CIO specifically referred to the negative earnings liability as a "debt" of Chicago Teachers, writing:  "The sooner we pay off that debt the better financial position the Fund will be in."  And on October 30, 2013, the CIO characterized the negative earnings amounts that NTC had advanced to Chicago Teachers as a "loan" from NTC to Chicago Teachers and sought advice from NTC on how Chicago Teachers could pay off that loan more quickly.

93.     Before September 2008, NTC's advances on Chicago Teachers' behalf had covered only unrealized losses.  When such unrealized losses in STEP securities contributed to negative securities lending earnings, and when NTC advanced funds on Chicago Teachers' behalf as previously described, it was clear that all of NTC's advances would be repaid to NTC

128

as the securities recovered in value and generated offsetting positive securities lending earnings. The prospect of such positive earnings ensured that NTC would never permanently bear any of Chicago Teachers' securities lending losses. That is because (i) the 15% fee paid to NTC as a matter of course from those positive earnings, and (ii) the remaining 85% in positive earnings normally to be retained by Chicago Teachers that was to be applied against Chicago Teachers' outstanding liability to NTC, together would be sufficient to cover all of NTC's advances made in prior periods. To avoid double payment to NTC under these circumstances, therefore, the "negative earnings" liability on Chicago Teachers' account statements had reflected only 85% of the NTC advances, with the other 15% to come from NTC's normal 15% fee as asset prices in STEP securities recovered and resulted in positive securities lending earnings.

94. However, when the Lehman securities in STEP experienced a realized loss after Lehman's bankruptcy filing in mid-September 2008, the recovery of STEP securities could not fully reimburse NTC for all of its advances, because the Lehman securities would never recover their par value. That was also the case for other STEP securities that incurred realized losses as part of the fallout from the financial crisis.

95. When STEP's Lehman securities defaulted and became permanently impaired (producing realized losses), NTC informed Chicago Teachers of this event and explained, in a letter to Chicago Teachers' Executive Director dated September 29, 2008 (see attached Exhibit 5), that this required Chicago Teachers to reimburse NTC for the 15% portion of its advances, since that portion could not be repaid from future positive securities lending earnings generated from the appreciation of the impaired securities (which "are highly unlikely to be recovered at par value"). NTC's monthly custody asset detail account statement reflected this liability owed by Chicago Teachers to NTC as "SECURITIES LENDING STEP FUND REIMBURSEMENT";

this reimbursement liability was linked to Lehman securities and certain other securities that had experienced realized losses. The September 29 letter reminded Chicago Teachers that under the SLA, Chicago Teachers was responsible for all realized and unrealized losses (of which this reimbursement liability was a part) and that NTC would continue to advance funds on Chicago Teachers' behalf to cover any further unrealized losses "as we have in the past."

96.     Chicago Teachers and its Board never objected to this letter, to the concept of reimbursement liability, or to the subsequent account statements reflecting these reimbursement liabilities for realized losses, whether within six months of their posting on Chicago Teachers' account statements, or at any other time. Personnel from NTC and Chicago Teachers communicated about the negative earnings and reimbursement amounts (including explaining why Chicago Teachers was liable for them) on numerous occasions between 2007 and the present; through their words and conduct, Chicago Teachers and its Board understood the amounts and accepted that they were obligated to repay the amounts to NTC. Indeed, in this litigation, the Board has affirmatively alleged that it and Chicago Teachers are liable for 100% of securities lending losses absent imprudent investment by Northern Trust.

97.     As to every realized loss after Lehman's default, NTC made a similar communication to Chicago Teachers and a similar "reimbursement" entry in Chicago Teachers' custody account statements linked to the particular security (or securities) that had caused the realized loss. To the extent the obligation remained fully or partially unpaid, these entries appeared on Chicago Teachers' statements as liabilities, month after month, without objection. Chicago Teachers and its Board thus approved those account statements and thereby gave Northern Trust a "full and complete discharge . . . to all matters set forth in" those statements.

98.     Chicago Teachers and its Board have affirmatively acknowledged Chicago Teachers' obligation to pay NTC for these reimbursement amounts.  As described below, for example, the Board has recognized this reimbursement liability in Chicago Teachers' published financial statements for the last five years.  As another example, in July 2009, Chicago Teachers' Executive Director sent an internal email acknowledging Chicago Teachers' reimbursement obligation in response to an NTC request for reimbursement.  As a third example, in August 2013, Chicago Teachers' CIO asked NTC whether it could pay its reimbursement amounts out of positive securities lending earnings when it completed paying its negative earnings amounts from those earnings (to which NTC responded in the affirmative).  That same CIO referred to the reimbursement amounts as a "loan" from NTC to Chicago Teachers in a meeting with NTC personnel on October 30, 2013.

99.     Moreover, on at least six occasions in 2010, 2013, and 2014, when some of the permanently impaired STEP securities generated recoveries from various sources, including liquidation proceedings, NTC notified Chicago Teachers in writing that it planned to apply those recoveries against Chicago Teachers' reimbursement liability to NTC.  Chicago Teachers and its Board did not object to NTC's proposed use of those proceeds to reduce Chicago Teachers' reimbursement liability, and NTC used the funds to reduce that liability accordingly.  Indeed, when NTC wrote Chicago Teachers on February 4, 2014, confirming that proceeds from certain securities that had previously experienced realized losses had been applied to reduce Chicago Teachers' reimbursement liability to NTC, Chicago Teachers' response was to say "Thanks."

100.    Thus, the Board and Chicago Teachers clearly, repeatedly, and consistently (i) acknowledged liability for all of NTC's conditional and temporary advances on Chicago

Teachers' behalf and (ii) agreed to the use of Chicago Teachers' share of securities lending earnings (and other securities lending proceeds) to pay down that liability.

**VII. Chicago Teachers and its Board Have Recognized the Negative Earnings and Reimbursement Obligations as Liabilities to NTC on Chicago Teachers' Publicly Filed Audited Financial Statements.**

101.    The Board is required by its bylaws and rules to prepare an annual report containing its audited financial statements for its fiscal year ended June 30.  It posts those audited financial statements on its public website.

102.    Chicago Teachers' financial statements for its fiscal year July 1, 2008 through June 30, 2009, which were audited by KPMG LLP, state that Chicago Teachers posted a payable to NTC (Chicago Teachers' "custodian") resulting from certain securities lending transactions. The amount of that payable is tied to the negative earnings and reimbursement amounts that NTC recorded on Chicago Teachers' year-end account statements as due to NTC.  Chicago Teachers made no distinction between the amounts, treating them both as equally due to NTC.

103.    The negative earnings and reimbursement amounts remaining due to NTC are also reflected as amounts due to NTC in Chicago Teachers' financial statements for the periods ended June 30, 2010, 2011, 2012, and 2013.  The Board filed Chicago Teachers' June 30, 2013 financial statements in mid-May 2014, after filing its motion for a preliminary injunction against NTC.

104.    Notably, none of these financial statements reflects any of these amounts as contingent liabilities.

105.    As of May 31, 2014, Chicago Teachers owed NTC approximately $15 million to repay NTC for its conditional advances on Chicago Teachers' behalf.

**VIII. On March 31, 2014, the Board and Chicago Teachers Revealed that Chicago Teachers Will Seek to Exit NTC's Securities Lending Program Without Paying Its Liability to NTC.**

106.     In February 2014, Chicago Teachers informed NTC that it planned to terminate NTC as its custodian and use BNY-Mellon as its new custodian, and that it planned to exit NTC's securities lending program and use Deutsche Bank as its new securities lending agent. Thereafter, between late February and late March, NTC personnel had a number of phone, in-person, and email communications with Chicago Teachers personnel to attempt to understand how Chicago Teachers expected to implement those transitions (including how it planned to pay its securities lending liability).

107.     Chicago Teachers personnel never responded to NTC's questions.  Instead, on March 31, 2014, the Board filed a motion for preliminary injunction (Dkt. #319) asking this Court to enter an injunction allowing Chicago Teachers to exit NTC's securities lending program and remove its assets from NTC's custody without paying its securities lending liability to NTC. This motion was both premature and unnecessary, as neither the Board nor Chicago Teachers' staff had ever explained to Northern Trust how they intended to accomplish their intended transition, much less explore (and accept or reject) the various options for handling Chicago Teachers' securities lending liabilities or otherwise effecting such a transition.

108.     The Board's motion for preliminary injunction was the first time that Chicago Teachers and its Board, in connection with terminating NTC's services, sought (i) to abrogate the repayment agreement requiring Chicago Teachers to pay NTC in full if it ever left NTC's securities lending program, and (ii) to disavow liabilities that they had consistently acknowledged through communications and conduct spanning 2007 through 2014.

109.     On May 21, 2014, Chicago Teachers' new interim Executive Director (who had been appointed the previous week) and Board member wrote NTC that Chicago Teachers and the

Board did "not agree" that NTC could apply Chicago Teachers' securities lending earnings to pay down its liability to NTC and purported to instruct NTC to stop making those payments. This new interim Executive Director went so far as to claim that "[i]t has always been the position" of Chicago Teachers and its Board "that Northern Trust is not entitled to take any of [Chicago Teachers'] securities lending earnings for any reason."

110.    Before this May 21, 2014 letter, Chicago Teachers and the Board had agreed (and not objected) to NTC's application of Chicago Teachers' securities lending earnings to pay down its securities lending liability to NTC.  Indeed, the May 21 letter post-dates (i) the parties' repayment agreement by almost seven years; (ii) all of NTC's advances by four years; and (iii) the inception of payments to NTC from Chicago Teachers' share of positive securities lending earnings by over six years.  It also constitutes the first such instruction to NTC.  As NTC's June 4, 2014 response to the letter made clear, Chicago Teachers and its Board "cannot now revoke the very words and conduct on which Northern Trust relied years ago when it made [the] advances."

111.    Before these recent events, including the filing of the Supplemental Complaint, Chicago Teachers had fully recognized, and was knowingly and intentionally paying down, its liability to NTC.

## **AFFIRMATIVE DEFENSES**

Based upon the foregoing allegations, Northern Trust's answers to the Supplemental Complaint, and the allegations set forth below, Northern Trust asserts the following affirmative defenses, without assuming or admitting that it has the burden of proof on such affirmative defenses or any fact, issue, or element of same, and without limitation as to legal theories:

## First Affirmative Defense – Independent Superseding Cause

112.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

113.    At all relevant times, the Board and Chicago Teachers possessed and retained ultimate control and discretion over the investment of plan assets.

114.    At all relevant times, the Board and Chicago Teachers knew and understood the composition, holdings, and investment guidelines of Core, STEP, STIF, and the Custom Fund. If, as Plaintiff alleges, the market and economic conditions during the relevant time period so clearly rendered these vehicles imprudent, overly risky, and likely to sustain greater losses if maintained rather than sold—which Northern Trust denies—then the Board and Chicago Teachers should have reduced, limited, or terminated their securities lending investments or changed their investment strategies.  They did not; the Board and Chicago Teachers continued to maintain their securities lending investments at issue in this case.

115.    In fact, the losses experienced in Chicago Teachers' invested collateral were due to unprecedented and unexpected market events—including (without limitation) Lehman's bankruptcy filing and its aftermath—that Northern Trust did not predict and could not have predicted.

116.    If Northern Trust committed any wrongful act, which it denies, the superseding investment decisions made by the Board and Chicago Teachers and/or the unprecedented and unexpected market events broke the causal relationship between any such alleged wrongful act by Northern Trust and Plaintiff's claims of loss, injury, or damages.

117.    Plaintiff cannot recover for any loss, injury, or damages because any such any loss, injury, or damage was due, in whole or in part, to an independent superseding cause.

**Second Affirmative Defense – Failure to Mitigate**

118.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

119.     At all relevant times, Chicago Teachers and its Board, internal staff, and external consultants had detailed information about the investment strategies and risks associated with Chicago Teachers' securities lending investments.  If they truly considered the purchase or holding of the securities held in Core or STEP, or the holdings in the Custom Fund, or the guidelines applicable to the foregoing, to have constituted a breach of contract or a breach of trust or fiduciary duties, they had an obligation to reduce, limit, or terminate their securities lending investments or to change their securities lending investment strategies so as to mitigate any alleged damages.  They did not do so.

120.     At numerous points in time, the Board and Chicago Teachers could have taken reasonable steps to avoid all, or could have substantially reduced, alleged losses associated with their securities lending investments, including reducing or terminating securities lending or changing collateral investment strategies.  Had they done so, the alleged losses would have been greatly reduced.

121.     Plaintiff cannot recover for any loss, injury, or damages because of its failure to mitigate against such loss, injury, or damages (which would have to be reduced or eliminated accordingly).

**Third Affirmative Defense – Failure to Mitigate**

122.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

123.     At all relevant times, the Board and Chicago Teachers knew that NTC had advanced money on Chicago Teachers' behalf; that NTC expected Chicago Teachers to repay

the advances, which was a condition of making the advances; and that they had to repay, had agreed to repay, and were repaying NTC for the advances from Chicago Teachers' positive monthly securities lending earnings and collections from impaired STEP securities. If the Board or Chicago Teachers considered the advances or the repayments to have constituted a breach of contract or a breach of trust or fiduciary duties by NTC, they had an obligation to object in a clear and timely manner to the advances and repayments; to refuse to accept the advances; and to immediately pay for Chicago Teachers' securities lending liabilities in full promptly and as they were incurred. They did not do so; indeed, they affirmatively agreed to the conditional advances and the repayments and recognized the related liabilities.

124.     At numerous points in time, the Board and Chicago Teachers could have taken reasonable steps to avoid the requirement to repay NTC's advances, namely, by refusing to accept the conditional advances and by paying Chicago Teachers' securities lending liabilities in full immediately upon (and no later than the month following) the occurrence of those liabilities. They did not do so.

125.     Plaintiff cannot recover for any loss, injury, or damages because of its failure to mitigate against such loss, injury, or damages (which would have to be reduced or eliminated accordingly).

### Fourth Affirmative Defense – Failure to Mitigate

126.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

127.     Northern Trust never "refused to accept the [the Board's] resolution to terminate Northern Trust as its custodian and securities lending agent"; never "forc[ed] the [Board] to file a motion for a preliminary injunction" to implement that transition; and never delayed the transition or forced Chicago Teachers to retain NTC. To the contrary, the Board and Chicago

Teachers failed to discuss the transition with Northern Trust in a clear, timely, and good faith manner; failed to pay the liabilities reflected on their statements of account; and prematurely filed an unnecessary motion for preliminary injunction. And in fact, the ruling on the preliminary injunction motion required the Board and Chicago Teachers to pay certain liabilities and to establish an escrow covering other liabilities, which were at issue in the Board's motion. Any delays or alleged losses associated with the transition are due solely to the conduct of the Board and Chicago Teachers.

128. The Board and Chicago Teachers could have taken reasonable steps to avoid all, or could have substantially reduced, alleged losses associated with the transition of Chicago Teachers' securities lending program in accordance with the Board's alleged directives.

129. Plaintiff cannot recover for any loss, injury, or damages because of its failure to mitigate against such loss, injury, or damages (which would have to be reduced or eliminated accordingly).

### Fifth Affirmative Defense – Waiver

130. Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

131. To the extent the Board has alleged that the purchase or holding of the securities and investments contained in, or the guidelines applicable to, various Northern Trust vehicles (including, without limitation, Core, STEP, and the Custom Fund) were a breach of contract or a breach of trust or fiduciary duties, the Board waived such claims. Before making the securities lending investments at issue, the Board and Chicago Teachers well knew how collateral from securities lending was being invested and affirmatively and knowingly chose to make and maintain those investments and to accept the benefits from those investments. After making those investments, the Board and Chicago Teachers learned additional details about how such

collateral was being invested and how it was performing, and continued affirmatively and knowingly to maintain those investments and accept their benefits. Indeed, at times they even increased their securities lending exposure to what the Board now claims were overly risky and "exotic" securities, with full knowledge of the identity, nature, and risks of those investments and of the relevant acts of Northern Trust.

132.     If the Board and Chicago Teachers truly considered the purchase or holding of the securities contained in STEP, Core, the Custom Fund, or other vehicles to have constituted a breach of contract or a breach of trust or fiduciary duties, they had an obligation to reduce, limit, or terminate their securities lending investments and/or to change their securities lending investment strategies and pursue any other available remedies. At numerous points in time, Chicago Teachers and its Board could have avoided all or substantially reduced any alleged loss, injury, or damages associated with their securities lending investments by reducing, limiting, or terminating those investments; they did not do so. The Board and Chicago Teachers may not decide to maintain their investments to "see how they turned out" and then sue for any alleged loss, injury, or damage resulting from taking such calculated risks. By knowingly maintaining their investments at the relevant times, the Board intentionally relinquished any right to claim loss, injury, or damages caused by such investments.

133.     Plaintiff cannot recover for any loss, injury, or damages because it waived seeking or obtaining any relief due to the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint, including, without limitation, for relief based on its waiver of its claims when deciding to make, increase, and maintain the investments at issue in the Supplemental Complaint with awareness of the risks of those investments.

**Sixth Affirmative Defense – Waiver**

134.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

135.     The Board has alleged that Northern Trust improperly seized or withheld money due to Chicago Teachers to repay money that Northern Trust had advanced on Chicago Teachers' behalf.  But at all relevant times, the Board and Chicago Teachers agreed, and failed to object, to these repayments, knowing all the while that they were being made and why they were being made.  The Board also purports to bring claims arising from the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund.  But at all relevant times, the Board and Chicago Teachers knew of, and failed to object to, these matters.

136.     If the Board and Chicago Teachers considered these repayments, or the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund, to have constituted a breach of contract or a breach of trust or fiduciary duties by Northern Trust, they had an obligation to make clear and timely objections thereto, including before NTC made the conditional advances in the first place.  They did not.  By knowingly and intentionally failing to object to these matters, the Board and Chicago Teachers knowingly and intentionally relinquished any right to claim loss, injury, or damages caused thereby.

137.     Plaintiff cannot recover for any loss, injury, or damages because it waived seeking or obtaining any relief due to the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Seventh Affirmative Defense – Ratification

138.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

139.    To the extent that the Board claims that Northern Trust acted outside of the scope of its authority, it has ratified, and thereby authorized, Northern Trust's actions and cannot recover anything based on those actions.  The Board and Chicago Teachers were put on notice of the facts that now form the basis of their claims, but nevertheless chose to accept the benefits of, and move forward with, their investments. They had full knowledge of the material facts relating to the source of the benefits and the manner of acquisition, and did not return the benefits or repudiate Northern Trust's actions at any time, much less within a reasonable time.  Their failure to object in a clear and timely manner was wrongful, to Northern Trust's detriment.

140.    The Board and Chicago Teachers thus intentionally ratified Northern Trust's alleged conduct in this case, including, without limitation, the running of NTC's securities lending program; the investment of Chicago Teachers' cash and non-cash collateral from securities lending; the alleged losses; and the handling of payment for losses associated with such securities lending.

141.    Plaintiff is therefore barred, in whole or in part, from seeking or obtaining any relief in this case because it ratified the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Eighth Affirmative Defense – Ratification

142.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

143.    To the extent that the Board claims that Northern Trust acted outside of the scope of its authority, it has ratified and thereby authorized, Northern Trust's actions and cannot

recover anything based on those actions. In connection with the advances made on Chicago Teachers' behalf by NTC, the Board and Chicago Teachers received the benefit of NTC's actions with full knowledge of the material facts relating to those actions and of the benefits that NTC was conferring on them, including the source of the benefits and the manner of acquisition. Knowing of the NTC advances and that they were conditioned on Chicago Teachers' repayment thereof, the Board continued to engage NTC as securities lending agent for more than six years after the initial advance and more than three years after the final advance, and continued to allow the repayments at issue in the Supplemental Complaint.

144. Chicago Teachers and its Board did not return the benefits or repudiate NTC's actions at any time, much less within a reasonable time. To the contrary, they accepted all of the benefits of NTC's actions, repaid nearly 90% of the amounts conditionally advanced by NTC, and only purported to repudiate some of NTC's actions in mid-2014, which was an unreasonable point at which to attempt such a repudiation, as it occurred more than six years after NTC began making the subject advances and repayments, and more than three years after NTC's last such advance. Their failure to object in a clear and timely manner was wrongful, to Northern Trust's detriment.

145. The Board and Chicago Teachers thus intentionally ratified Northern Trust's alleged conduct in this case, including, without limitation, NTC's making of the advances on CTPF's behalf and the repayment of those advances from Chicago Teachers' positive securities lending earnings and other sources.

146. Plaintiff is therefore barred, in whole or in part, from seeking or obtaining any relief in this case because it ratified the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Ninth Affirmative Defense – Acquiescence

147.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

148.    The Board and Chicago Teachers knowingly and intentionally acquiesced in, and lacked due diligence in connection with pursuing alleged claims relating to, the securities and investments contained in, and the guidelines applicable to, various Northern Trust vehicles (including, without limitation, Core, STEP, and the Custom Fund), with full knowledge of the facts relating to, and the risks of, such investments.    Their repeated and longstanding acquiescence in these investments and guidelines concealed any dissatisfaction they may have had in the subject investments, to Northern Trust's detriment.

149.    Plaintiff is therefore barred, in whole or in part, from seeking or obtaining any relief in this case because it acquiesced in the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Tenth Affirmative Defense – Acquiescence

150.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

151.    The Board and Chicago Teachers intentionally acquiesced to, and lacked due diligence in connection with pursuing alleged claims relating to, the agreement and arrangement under which NTC advanced money on Chicago Teachers' behalf on the condition (to which Chicago Teachers agreed) that Chicago Teachers repay NTC for such advances, and the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund. Their repeated and longstanding acquiescence in these matters concealed any dissatisfaction they may have had in the subject conduct, to Northern Trust's detriment.

152.     Plaintiff is therefore barred, in whole or in part, from seeking or obtaining any relief in this case because it acquiesced in the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Eleventh Affirmative Defense – Assumption of Risk

153.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

154.     In the SLA, the Board and Chicago Teachers assumed the risk of loss from investment of cash collateral from their securities lending investments.

155.     The Board and Chicago Teachers knowingly and intentionally assumed the risks of the securities and investments contained in, and the guidelines applicable to, various Northern Trust vehicles (including, without limitation, Core, STEP, and the Custom Fund), with full knowledge of the risks of such investments.  They assumed both risks inherent in foregoing investments and the risks associated with Northern Trust's actions in connection with such investments.

156.     Plaintiff is therefore barred, in whole or in part, from seeking or obtaining any relief in this case because it impliedly and expressly assumed the risk of the alleged acts and omissions of Northern Trust as alleged in the Supplemental Complaint.

## Twelfth Affirmative Defense – Estoppel

157.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

158.     The Board and Chicago Teachers affirmatively, knowingly, and intentionally chose to make the securities lending investments in this case and to maintain those investments with full knowledge of the risks of such investments as market and economic conditions developed over the course of the alleged putative class period.  Had the Board and Chicago

Teachers, at any relevant time, determined that the risk associated with these collateral investment strategies and their guidelines (including, without limitation, investments in and guidelines of Core, STEP, and the Custom Fund) was or had become imprudent or unacceptable to them, they should have disclosed that determination to Northern Trust and instructed Northern Trust to reduce, limit, or terminate the investments. At the relevant times, the Board and Chicago Teachers knowingly concealed and did not disclose any such concerns to Northern Trust or direct changes in their investments, instead waiting to see "how their investments turned out" before claiming that the investments were unduly risky and imprudent.

159. The Board and Chicago Teachers intended or reasonably expected that Northern Trust would rely on their words and conduct expressing that the securities lending investment strategy they had chosen was, and continued to be, acceptable to them.

160. Northern Trust was unaware of, and reasonably relied to its detriment on, the words, actions, and omissions of the Board and Chicago Teachers as to their approval of, and desire to maintain, the securities lending investments at issue.

161. Northern Trust will be prejudiced by its reasonable reliance if the Board is permitted to go forward with its claims.

162. Plaintiff is therefore estopped from obtaining any relief due to the alleged actions and omissions of Northern Trust as alleged in the Supplemental Complaint.

**Thirteenth Affirmative Defense – Estoppel**

163. Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

164. The Board and Chicago Teachers knew, before NTC made the advances at issue here, that NTC would make the advances only on the conditions that Chicago Teachers repay NTC for the advances; that Chicago Teachers' positive securities lending earnings be applied to

145

repay NTC for those advances; and that Chicago Teachers repay NTC for those advances "in full" if it should ever exit NTC's securities lending program. They also knew that if they did not accept the foregoing conditions, their only alternative was for Chicago Teachers to pay its monthly securities lending liability contemporaneously, promptly, and in full, no later than the month following the incurrence of those liabilities, thereby obviating the need for any advances from NTC. Through their words and conduct, the Board and Chicago Teachers represented to NTC, and led NTC reasonably to believe, that they owed NTC, and would repay NTC for, all of these amounts. They intentionally failed to correct NTC's reasonable misapprehension that the Board and Chicago Teachers would fully repay these amounts.

165. If the Board and Chicago Teachers did not plan to comply with those stated conditions, they had a duty to so inform NTC, but did not, and intentionally concealed such material information from NTC. They were required to express their rejection of NTC's conditions before accepting the benefit of the conditional advances.

166. The Board and Chicago Teachers intended or reasonably expected that NTC would rely on their words and conduct when NTC decided to make and continue to make the subject advances.

167. In making the subject advances, NTC in fact reasonably relied in good faith and to its detriment on the Board's and Chicago Teachers' (i) words and conduct agreeing to repay NTC from Chicago Teachers' share of positive securities lending income, and (ii) failure to reveal that they secretly intended not to repay NTC from such amounts. NTC reasonably could not have known, and in fact did not know, that the Board and Chicago Teachers were misleading NTC as to their intentions regarding such repayment of their liability to NTC.

168.    Northern Trust will be prejudiced by its reasonable reliance if the Board is permitted to go forward with and recover under its claims.

169.    Plaintiff is therefore estopped from obtaining any relief due to the alleged actions and omissions of Northern Trust as alleged in the Supplemental Complaint.

**Fourteenth Affirmative Defense – Contract Conditions**

170.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

171.    The MCA authorizes NTC to create an "Account" for the custody of any assets that Chicago Teachers chooses to transfer to that Account.

172.    The MCA contains numerous provisions that govern Chicago Teachers' securities lending activities.  For example, it provides that the Board and Treasurer may engage NTC to lend the securities in the referenced Chicago Teachers' custody Account.

173.    The MCA also contains Chicago Teachers' instructions as to how NTC is to invest funds allocated to the defined "Sub-account." (*E.g.*, Exhibit 1, January 20, 1995 letter amendment.)  The SLA instructs NTC to invest cash collateral from securities lending in this Sub-account (which constitutes the Custom Fund).

174.    Paragraph 15 of the MCA provides for NTC to deliver periodic statements of account concerning receipts, disbursements, property, and market value in all of Chicago Teachers' Sub-accounts, including the Sub-account constituting the Custom Fund, which NTC did.  Those statements of account provided detailed reporting—delivered as frequently as daily to Chicago Teachers—on Chicago Teachers' securities lending investments, including (without limitation): the income that Chicago Teachers had earned from securities lending (including any periodic unrealized or realized losses from the securities in which cash collateral was invested);

fees from securities lending; detailed reports of assets and liabilities; and the identity and volumes of the securities out on loan.

175.     Paragraph 15 of the MCA provides that: "An account shall be approved by the Board by written notice delivered to [NTC] or by failure to object to the account within six months of the date upon which the account was delivered to the Board.  To the extent permitted by law, the approval of an account shall constitute a full and complete discharge to [NTC] to all matters set forth in that account."  The "matters set forth in the referenced account" include all aspects of Chicago Teachers' securities lending investments, including all securities lending liabilities; gains and losses from securities lending; payment of securities lending liabilities; securities lending fees; the impairment and treatment of the impairment of certain securities (including, without limitation, Lehman, Sigma, and Theta securities) held in collateral reinvestment vehicles (including, without limitation, STEP and Core); the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund; the liabilities that Chicago Teachers owed to Core and the Custom Fund; all liabilities (including the repayment liability) to Northern Trust; and the repayments to NTC (whether from Chicago Teachers' positive securities lending earnings or other assets or sources).

176.     NTC provided detailed account statements to Chicago Teachers and the Board on a monthly and more frequent basis, including monthly or other periodic asset detail reports and cash activity detail reports, that reflected, among other things, the foregoing matters.

177.     The Board, Chicago Teachers, and NTC specifically intended that these account statements establish, among other things, Chicago Teachers' securities lending investments, liabilities, payments, gains, and losses, as set forth in further detail in ¶ 175 herein.  Thus, the

account statements constituted an acknowledgement between the parties that the statements were true, that the balances stated were correct, and that Chicago Teachers would pay its liabilities.

178.    At all times relevant to this case, Chicago Teachers and its Board, internal staff, and external consultants had the knowledge and ability to timely make such contractually required objections to the matters set forth in the periodic statements of account.  They never made such a timely objection pursuant to the MCA, within six months after provision of the statements to the Board or Chicago Teachers, or at any other time.

179.    Accordingly, the Board has fully and completely discharged NTC from "all matters set forth" in those accounts, including any alleged losses or damages associated with securities lending, and Plaintiff is barred from recovering any such alleged losses or damages.  Moreover, because, under the express terms of the SLA, NTC may not be liable for any non-direct losses or damages, any relief thereunder against NTC must be limited accordingly.

### Fifteenth Affirmative Defense – Agency Indemnification

180.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

181.    NTC's advances on Chicago Teachers' behalf, and the repayment of NTC from Chicago Teachers' positive securities lending earnings and other sources, were made within the scope of NTC's agency vis-à-vis the Board, and NTC acted without fault and within the scope of its actual authority.

182.    The foregoing advances and repayments were beneficial to the Board and Chicago Teachers, NTC did not act officiously in making those advances and effecting and/or receiving repayments, and NTC and the Board had no contrary agreements.   Chicago Teachers and its Board knew of, approved of, and did not object to NTC's actions.  Knowing of the NTC advances, that they were conditioned on Chicago Teachers' repayment thereof, and of the

payments, the Board and Chicago Teachers continued to engage NTC as securities lending agent for more than six years.

183.     Accordingly, the Board has fully and completely discharged NTC from all claims concerning such advances and repayments.

## Sixteenth Affirmative Defense – Full or Partial Payment

184.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

185.     As alleged herein, after an announcement on September 29, 2008, Northern Trust voluntarily contributed $150 million to certain securities lending clients, including Chicago Teachers.  This voluntary contribution had the effect of eliminating or reducing any alleged losses to these clients due to the securities lending investments at issue in this case, including losses in Core.

186.     The contributions described above provided immediate and direct cash benefits to Chicago Teachers and its Board.

187.     Chicago Teachers and its Board received and accepted these benefits, which eliminated and/or reduced any alleged claim for loss, injury, or damages in this case. Accordingly, any relief awarded in this case must be reduced by the full value of these amounts voluntarily paid by Northern Trust.

## Seventeenth Affirmative Defense – No Standing

188.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

189.     Neither the Board nor Chicago Teachers incurred any loss, injury, or damages as a result of the conduct alleged against Northern Trust in the Supplemental Complaint.

190.    For example, as to investment of Chicago Teachers' non-cash collateral from securities lending, neither the Board nor Chicago Teachers have incurred any losses in connection with their investment in Core, because, among other reasons, any losses were more than fully offset by Northern Trust's payment to Chicago Teachers, coupled with gains from sales of the impaired Lehman securities.

191.    And as to investment of Chicago Teachers' cash collateral from securities lending, Chicago Teachers profited overall from the subject securities lending investments, and those investments achieved their objectives, notwithstanding losses associated with certain securities.

192.    In addition, neither the Board nor Chicago Teachers suffered any damages or losses associated with the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund.

193.    Plaintiff's claims are therefore barred, in whole or in part, because it lacks standing to bring one or more of the claims alleged.

**Eighteenth Affirmative Defense – Recovery Barred By the Acts or Omissions of Chicago Teachers and its Board**

194.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

195.    The Board and Chicago Teachers and its staff were obligated, and had fiduciary duties, to prudently invest the plan assets.  They were responsible for making—and in fact made—the decision to engage in securities lending and knowingly chose the collateral investment strategy for its lending activities.  Because they actively made the investment decisions at issue here with full information and open eyes, they cannot impose liability onto Northern Trust for any or all alleged losses resulting from those investments.

196.     Plaintiff's claims are therefore barred, in whole or in part, because if it sustained any loss, injury, or damage—which Northern Trust denies—any such loss, injury, or damage was due, in whole or in part, to its own knowing and intentional actions and/or omissions, which were more active than any alleged acts and omissions of Northern Trust.

## Nineteenth Affirmative Defense – Recovery Barred By the Acts or Omissions of Chicago Teachers and its Board

197.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

198.     The Board and Chicago Teachers were responsible for making—and in fact made—the decision to accept advances made by NTC on Chicago Teachers' behalf, on the condition that Chicago Teachers repay NTC (to which they agreed).  Because they made this decision with full information and open eyes, they cannot impose liability onto Northern Trust for any or all alleged losses allegedly resulting from that arrangement.  In this regard, their actions were more active than any alleged acts and omissions of Northern Trust

199.     Plaintiff's claims are therefore barred, in whole or in part, because if it sustained any loss, injury, or damage, any such loss, injury, or damage was due, in whole or in part, to its own actions and/or omissions.

## Twentieth Affirmative Defense – No Loss, Injury, or Damages

200.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

201.     Plaintiff has sustained no loss, injury, or damages and its claims are therefore barred, in whole or in part.

### Twenty-First Affirmative Defense – Compliance with All Applicable Agreements

202.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

203.    Plaintiff's claims are meritless because Northern Trust at all times complied with, and acted prudently and appropriately and well within its discretion under, the SLA; the MCA; the Declaration of Trust; all applicable investment guidelines (including those applicable to STEP, Core, and the Custom Fund); and all other agreements, arrangements, and understandings between the parties regarding the running of NTC's securities lending program, the investment of Chicago Teachers' cash and non-cash collateral from securities lending, the conditional advances NTC made on Chicago Teachers' behalf, the repayment of NTC, and the establishment and handling of, and transactions involving, the STEP Liquidation Fund, and the types of holdings in the Custom Fund.

### Twenty-Second Affirmative Defense – Statute of Limitations

204.    Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

205.    Plaintiff's claims should be dismissed because the applicable statutes of limitations have expired.  These include, without limitation, the claims concerning NTC's making, and Chicago Teachers' repayment of, NTC's conditional advances on Chicago Teachers' behalf; the investments and holdings in the Custom Fund; and the establishment and handling of, and transactions involving, the STEP Liquidation Fund.  The actions underlying these claims all occurred more than five years before the filing of the Supplemental Complaint, and the claims are therefore time-barred.

### Twenty-Third Affirmative Defense – Laches

206.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

207.     The Board and Chicago Teachers did not repudiate Northern Trust's actions alleged in the Board's claims concerning NTC's making, and Chicago Teachers' repayment of, NTC's conditional advances on Chicago Teachers' behalf; the investments and holdings in the Custom Fund; and the establishment and handling of, and transactions involving, the STEP Liquidation Fund, at any time, much less within a reasonable time.    To the contrary, they accepted all of the benefits of Northern Trust's actions, repaid nearly 90% of the amounts conditionally advanced by NTC, and purported to repudiate some of Northern Trust's actions only in mid to late 2014, which was an unreasonable point at which to attempt such a repudiation, as it occurred more than six years after the events at issue.    Plaintiff did not file the Supplemental Complaint until October 2014.    This constitutes a lack of due diligence and a failure to bring these claims in a timely manner.

208.     Northern Trust has been prejudiced by Plaintiff's failure to bring timely claims. For example, without limitation, had Plaintiff brought timely claims, Northern Trust could have acted to limit its own potential liability.

209.     Plaintiff's untimely claims are thus barred by the doctrine of laches.

### Twenty-Fourth Affirmative Defense – Voluntary Payment

210.     Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

211.     The Board and Chicago Teachers voluntarily paid money to NTC under NTC's claim of right to payment—specifically, under NTC's claim that it was owed such money to repay the advances NTC had previously and conditionally made on behalf of Chicago Teachers.

As described above, NTC made such claims of right in multiple communications from 2007 through 2014, including in emails, letters, oral communications, and statements of account spanning that period. The Board and Chicago Teachers had full knowledge of the facts surrounding these payments and NTC's claim to right to the payments and repeatedly acknowledged and accepted NTC's right to the payments.

212. The Board and Chicago Teachers did not pay this money to NTC as a result of fraud, coercion, compulsion, or mistake of fact.

213. Accordingly, Plaintiff's claims are barred by the voluntary payment doctrine.

### **Twenty-Fifth Affirmative Defense – Unjust Enrichment**

214. Northern Trust incorporates by reference and re-alleges its answers to Plaintiff's Supplemental Complaint and repeats and realleges the allegations in the preceding paragraphs.

215. The Board and Chicago Teachers received and accepted the benefit of NTC's advances on behalf of Chicago Teachers, all the while knowing that they were liable to repay those amounts, including in full upon exit from NTC's securities lending program. NTC made those advances only as agent and on the condition that they would be repaid, including repayment in full prior to Chicago Teachers' exit from NTC's securities lending program.

216. Only in 2014, years after the final such advance, did the Board and Chicago Teachers reveal that Chicago Teachers would try to exit NTC's securities lending program without finishing payment of its securities lending liabilities to NTC.

217. The Board and Chicago knew that NTC advanced these amounts on the condition of repayment, and that they had agreed to such repayment, before the advances were made, while the advances were being made, and before the advances ceased. NTC always made clear that Chicago Teachers had to repay the advances (including in full upon exit from NTC's securities

lending program), including in emails, letters, oral communications, and statements of account provided to the Board and Chicago Teachers from 2007 to 2014.

218.     NTC incurred a detriment by the Board's and Chicago Teachers' failure to repay NTC in full with respect to these advances, which rendered those funds unavailable to NTC.

219.     Allowing the Board and Chicago Teachers to retain the foregoing benefits, without repaying NTC, would unjustly enrich them in violation of fundamental principles of justice, equity, and good conscience.

220.     The SLA does not spell out how Chicago Teachers' securities lending liabilities are to be handled, and thus the parties' arrangements concerning the handling of those liabilities were and are a separate subject matter outside the scope of the provisions of the SLA.

221.     Accordingly, to the extent applicable, Plaintiffs' claims are barred by the doctrine of unjust enrichment.

*     *     *

Northern Trust reserves the right to amend these defenses to assert additional defenses to the fullest extent permitted by the Federal Rules of Civil Procedure.

## AMENDED COUNTERCLAIMS

222.     Counter-Plaintiff NTC hereby incorporates The Northern Trust Company's Amended Counterclaims Against the Board of Trustees of the Public School Teachers' Pension & Retirement Fund of Chicago (Dkt. # 390) in its entirety, including all allegations, counts, and prayers for relief set forth in that document, as though set forth fully herein.

## JURY DEMAND

Defendants and Counter-Plaintiff demand a trial by jury on all issues as to which there is a right to trial by jury.

Dated:   December 12, 2014
        Chicago, Illinois

Respectfully submitted,

/s/ Caryn L. Jacobs

Caryn L. Jacobs
Todd J. Ehlman
Robert L. Michels
Brook R. Long
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Tel:  (312) 558-5600
Fax:  (312) 558-5700
CJacobs@winston.com
TEhlman@winston.com
RMichels@winston.com
BLong@winston.com

Michele L. Odorizzi
Justin A. McCarty
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel:  (312) 782-0600
Fax:  (312) 701-7711
MOdorizzi@mayerbrown.com
JMcCarty@mayerbrown.com

*Attorneys for The Northern Trust Company
and Northern Trust Investments, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on December 12, 2014, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system. Copies of the document will be served on all counsel of record automatically by operation of the Court's CM/ECF filing system.

<u>/s/ Caryn L. Jacobs</u>
Caryn L. Jacobs