**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 09 C 7203  Judge Jorge L. Alonso |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY, | ) ) ) ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs allege that defendants (collectively, "NT") breached their contracts with and fiduciary duty to plaintiffs by improperly investing plaintiffs' assets. NT has asserted third amended counterclaims against the Board of Trustees of the Public School Teachers' Pension & Retirement Fund of Chicago (the "Board") for breach of express and implied contract (Counts I-II), unjust enrichment (Count III), agency indemnification (Count IV), ratification (Count V), equitable estoppel (Count VI), and account stated (Count VII). The case is before the Court on the Board's Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion to dismiss all of the counterclaims. For the reasons set forth below, the Court grants in part and denies in part the motion.

**Facts**

On October 25, 1989, the Board and NT entered into a Master Custody Agreement that directs NT "[to] establish an account . . . to hold such assets of the [Board] as are transferred to it from time to time," and "one or more sub-accounts . . . for cash, securities and other property of the [Board]," in accordance with the Board's directions. (3d Am. Countercl., Ex. 1, Master Custody Agreement ¶¶ 2-3.) The Master Custody Agreement also states that:

> [NT] shall furnish the Board . . . with monthly statements of account showing all receipts and disbursements and the property in each Sub-account and the value thereof. An account shall be approved by the Board by . . . failure to object to the account within six months of the date upon which the account was delivered to the Board. To the extent permitted by law, the approval of an account shall constitute a full and complete discharge to NT of all matters set forth in that account.

(*Id.* ¶ 15.)

On June 28, 1990, the parties entered into a Securities Lending Agreement ("SLA") authorizing NT to lend the Board's securities to pre-approved third parties in exchange for collateral, which NT then invested in other securities to generate revenue for the Board. (*See generally id.*, Ex. 2, SLA; 5/6/11 Mem. Op. & Order at 2.) When a loan matured or was called back, the borrower returned the securities to NT and NT returned the collateral along with a rebate, *i.e.*, additional payment, to the borrower. (5/6/11 Mem. Op. & Order at 2.) The Board profited if the amount earned by the reinvested collateral exceeded the amount of the rebate. (*Id.*) The Board paid part of the profit to NT as a fee for its services. (*Id.* at 3.)

In 1995, the Board directed NT to invest part of the cash collateral from its securities lending in two funds managed by NT, the Short Term Extendable Portfolio ("STEP") and the Short Term Investment Fund ("STIF"), and to hold the STEP and STIF units in a sub-account. (3d Am. Countercl. ¶¶ 26, 29.) STIF is a constant-dollar fund, *i.e.*, a fund designed to maintain a constant

2

net asset value ("NAV") of $1.00 per unit. (*Id.* ¶ 27.) STEP is a mark-to-market fund, meaning that its NAV fluctuated daily based on the market value of its holdings. (*Id.*) Thus, the gains and losses of STEP securities were reflected in STEP's NAV and impacted the Board's earnings accordingly. (*Id.*) Though the Board knew that STEP was not a constant-dollar fund, it directed NT to keep the unit value of the STIF/STEP sub-account at a constant $1.00 NAV. (*Id.* ¶ 30.) Thus, the Board had to replenish the sub-account whenever reductions in STEP's NAV would otherwise have caused the NAV of the sub-account to fall below $1.00. (*Id.*)

Starting in mid-2007, securities held in STEP began to incur losses. (*Id.* ¶ 37.) On August 13, 2007, NT sent an email to the Board, saying that "the [Board's] securities lending earnings for the month of July are negative. The net earnings for the month are -$287,505.21. As we have in the past, we will carry the negative earnings forward to be offset versus future positive earnings unless you request otherwise." (3d Am. Countercl., Ex. 3, Email from Anderson to Huber (Aug. 13, 2007).) The Board never requested otherwise. (*Id.* ¶ 40.)

On November 13, 2007, NT wrote a letter to the Board, which states:

> I am writing to clarify [NT's] currently existing process relating to treatment of negative earnings in your securities lending program. . . . With July and August negative earnings reaching higher levels than in the past, we felt it would be timely to re-confirm our process.
>
> Under the securities lending authorization agreement, clients are responsible for a portion of losses incurred due to negative earnings. As an accommodation, we currently offer clients who incur negative earnings, in any given month two options concerning the obligation to repay [NT] for the loss created after we pay the rebates to borrowers for use of their collateral. Clients may elect to repay us as soon as practical in the month following the loss, after the audited earnings are communicated. Alternatively, clients may elect to repay their obligation by carrying forward negative earnings and applying any future months' securities lending earnings against the obligation (the "carryforward option"). A client who opts to no longer use STEP as a part of their collateral reinvestment or who leaves the securities lending program overall must repay their obligation in full at that time.

3

> . . . .
>
> For those clients requesting that [securities lending] negative earnings be carried forward to be offset by future earnings, [NT] will report the following transactions, going forward:
>
> . . . .
>
> - Amount due to [NT] to cover . . . negative earnings will be recorded as an obligation/liability in the client's account . . . .
>
> As of any reporting date, any outstanding liability balance will be reflected on the client's Asset Detail template, to represent the amount due to [NT].
>
> In subsequent periods when the [securities lending] earnings are positive, [NT] will record those earnings as usual, but will also record a transaction that reduces the balance of the obligation to [NT] balance by the client's net [securities lending] positive earnings . . . . Once the liability reaches zero, this transaction will no longer be reported.

(*Id.*, Ex. 4, Letter from Stevenson to Huber (Nov. 13, 2007).)

From 2007 through May 2010, NT made advances on the Board's behalf whenever the Board had negative securities lending earnings. (*Id.* ¶ 50.) The Board's account statements from NT during that period each had an entry titled "liability to [NT] for Securities Lending Negative Earnings." (3d Am. Countercl. ¶ 47.)

In February 2008, NT first applied the Board's share of positive securities lending earnings to repay NT for advances it had made on the Board's behalf. (*Id.*) The Board's account statements from NT from February 2008 until the Board withdrew from NT's securities lending program showed the amount of positive securities lending earnings NT used "to reduce amount due to [NT] to cover securities lending negative earnings." (*Id.*) The Board never objected to any of these statements. (*Id.* ¶¶ 48, 50.)

4

From 2007 through August 2008, NT's advances to cover the Board's negative earnings covered only unrealized losses, *i.e.*, temporary losses in value that might be recovered. (*Id.* ¶¶ 32, 54.) However, after Lehman Brothers filed for bankruptcy in 2008, the Lehman securities in the STEP fund incurred realized losses, *i.e.*, losses that cannot be or are unlikely to be recovered. (*Id.* ¶¶ 32, 55.) On September 29, 2008, NT told the Board that, as a result of the permanent impairment of Lehman's and other securities:

> [O]n an aggregate basis, STEP recognized the full extent of realized losses of $402,248,390 for Lehman and $230,850,003 for Sigma and Theta combined. Prior to the point of segregating these assets in the [Securities Lending Agreement], these losses had been treated as unrealized loss and so did not affect the NAV or yield of the [account] used for securities lending in any way differently from what would have been had these remained unrealized losses.
>
> Our Securities Lending Authorization Agreement with you identifies your risk for all realized and unrealized principal losses. [NT] has borne some unrealized losses contingently in the past to the extent of its fee split as an accommodation to clients utilizing STEP and based on an expectation that these securities would mature at par. Now that the losses for Lehman, Sigma and Theta are realized losses (as they are highly unlikely to be recovered at par value), we can no longer absorb these losses not previously passed on to you.
>
> . . . .
>
> Your total amount owed for [NT's] previously absorbed realized loss equals $8,672,616.61. . . .
>
> Please note that in order to reduce the impact of these losses, Northern will again offer clients the opportunity to carry-forward the losses (rather than pay them off directly) so that these losses may be offset in time by any future positive securities lending earnings. If you would like to utilize this option, please let me know as soon as possible. Please also be aware that, at this point, we intend to continue absorbing a portion of your share of unrealized losses as we have in the past, although we are not under any contractual obligation to do so and we reserve the right to adjust this policy in the future.

(*Id.*, Ex. 5, Letter from Stevenson to Huber (Sept. 29, 2008).) After this letter, and after every other realized loss, NT's account statements to the Board reflected a liability titled "securities lending

5

STEP fund reimbursement." (3d Am. Countercl. ¶ 56.) The Board never objected to the statements. (*Id.* ¶ 58.)

In May 2014, the Board told NT that it "did not agree" that NT could apply the Board's securities lending earnings to pay down its liability to NT and demanded that NT stop doing so. (*Id.* ¶ 70.)

## **Discussion**

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Board argues that all of NT's counterclaims are defeated by the integration clause of the SLA, which states:

> This Agreement, including the Schedules annexed hereto and the Master Custody Agreement dated October 25, 1989, between and among the Board, the Treasurer and [NT] (and any written amendments or modifications thereto signed by the parties thereto) contains the entire agreement between and among the Board, the Treasurer and [NT] relating to the lending of securities in the [Board's] portfolio of securities held by [NT], supersedes all prior agreements on this subject, and may not be modified or amended except by a writing signed by the parties hereto.

(3d Am. Countercl., Ex. 2, SLA, ¶ 16.) In the Board's view, NT's decision to advance money on the Board's behalf falls within the scope of the SLA. Thus, the Board argues, any contract claim stemming from an alleged modification of the SLA or another purported contract relating to securities lending is barred by the integration clause.

As a matter of Illinois law, however, an integration clause does not preclude NT from pursuing a contract claim based on a subsequent oral modification of the SLA. *See U.S. Neurosurgical, Inc. v. City of Chi.*, 572 F.3d 325, 332 (7th Cir. 2009) ("[U]nder Illinois law, the terms of a written contract can be modified by a subsequent oral agreement notwithstanding contractual language to the contrary." (citing *Tadros v. Kuzmak*, 660 N.E.2d 162, 170 (Ill. App. Ct. 1995))); *Gondeck v. A Clear Title & Escrow Exch., LLC*, No. No. 11 C 6341, 2013 WL 4564994, at *5 (N.D. Ill. Aug. 28, 2013) ("Although Gondeck's agreement with A Clear Title provided that a 'signed' order was necessary before his deposits could be 'surrendered' . . . , it is settled law in Illinois that parties may modify contracts orally after including a contract provision that precludes oral modification." (quotations and alteration omitted)); *Tadros*, 660 N.E.2d at 170 ("The law seems well settled; the terms of a written contract can be modified by a subsequent oral agreement even though, as in this case, the contract precludes oral modifications."). Moreover, because the subject matter of the alleged modification, NT's advancement of funds on behalf of the Board, is not addressed in the SLA, that agreement does not preclude NT from pursuing claims for breach of implied contract and unjust enrichment. *See Stone v. City of Arcola*, 536 N.E.2d 1329, 1339 (Ill. App. Ct. 1989) (stating that the existence of an express contract between the parties on one subject does not mean there cannot be another express or implied contract between them on another); *Heavey v. Ehret*, 519 N.E.2d 996, 1001 (Ill. App. Ct. 1988) ("No claim on a contract implied in law can be asserted if an express contract or a contract implied in fact exists between the parties and concerns the same subject matter, but the rule is otherwise if the quasi-contractual claim involves different subject matter.").

Alternatively, the Board argues that the SLA does not create the predicate for NT's claims, *i.e.*, it does not make the Board liable for losses incurred in its securities lending account. The Board contends that any such liability arose from section 10 of the SLA as amended in 1992 by the First Amendment (known as the "Letter Amendment"). The reference to the Board's liability was subsequently removed from section 10 by the Seventh Amendment to the SLA. Thus, the Board concludes, the SLA as currently written does not make it liable for securities lending losses.

The premise of the Board's argument, that its liability arises from section 10 of the SLA, is incorrect. The original SLA addresses the allocation of securities lending revenues in section 10 but says nothing, in section 10 or anywhere else, about the allocation of deficiencies. (*See id.* § 10 ("The loan premium paid by the borrower . . . shall be apportioned 30 percent to [NT] and 70 percent to the [Board] . . . . The [Board's] portion of the loan premium shall be credited monthly to the account."). That void was filled by the second full paragraph on page 2 of the Letter Amendment:

> Because securities become available for loan for all participants [in NT's securities lending program] in an arbitrary sequence and because it cannot be predicted what type of Collateral a borrower will furnish, all clients within a section are deemed to have a relatively equal opportunity to profit from the lending of securities. As before, in return for that opportunity, should a Collateral deficiency occur beyond [NT's] responsibilities, the deficiency shall be allocated pro rata among all client lenders within the section. Each lender's pro rata share of a deficiency shall be determined based on that client's portion of the total value of borrowed securities outstanding within the section as of the date the collateral is needed under the agreement with the borrower.

(3d Am. Countercl., Ex. 2, SLA, Letter to Caldwell from Bargerhuff at 2 (Feb. 21, 1992).) In the third full paragraph on that page, the Letter Amendment addresses the subject matter of section 10, the payment of NT's fee:

> Revenues collected from Securities Lending will continue to be credited monthly to your account, provided that we will simultaneously deduct from your account as compensation for our services under the Securities Lending program, fees equal to

those percentages of loan premium as are specified in your Securities Lending
agreement.

(*Id.*)

The Letter Amendment does not explicitly say that the first paragraph quoted above is a new section of the SLA and the second is a modification of section 10. But that is the only reasonable inference that can be drawn, given the language of the Third Amendment[1] of the SLA. Paragraph two of the Third Amendment amends "the second full paragraph on page 2 of the Letter Amendment (relating to Collateral deficiencies)," *i.e.*, the first paragraph quoted above, by adding the following language:

> Notwithstanding the foregoing, any Collateral deficiency arising as a result of cash Collateral invested in [the Board's fund] shall not be allocated among client lenders but shall be allocated solely to the Board assuming [NT] has fulfilled all obligations under this agreement with respect to such Collateral). For purposes of this Agreement, a "Collateral deficiency" shall mean any failure, deficiency, impairment or loss of value of any item of non-cash collateral, or of any investment of cash collateral . . . .

(*Id.*, Third Amend. ¶ 2.) Paragraph three of the Third Amendment amends section 10. (*See id.* ¶ 3 (stating that "[p]aragraph 10 of the [SLA] is amended to read as follows . . . .").) Given the distinction drawn by the Third Amendment between "the second full paragraph on page 2 of the Letter Amendment" and section 10, the former has to be a distinct provision of the SLA rather than an amendment to the latter.

Section 10 was modified twice more after the Third Amendment (*see id.*, Sixth & Seventh Amends.), and as the Board notes, now makes no reference to the Board's liability. (*See id.* Seventh Amend.) But "the second full paragraph on page 2 of the Letter Amendment," which is not a part

---

[1]The Court refers to the later of the two amendments denominated "Second Amendment" as the Third Amendment.

of section 10, was not amended. (*See id.*, Fourth, Fifth, Sixth & Seventh Amends.). Thus, contrary to the Board's belief, the provision in "the second full paragraph on page 2 of the Letter Amendment," that "any Collateral deficiency arising as a result of cash Collateral invested in [the Board's fund] . . . shall be allocated solely to the Board," which creates the predicate liability NT seeks to enforce, remains in the SLA.[2]

The Board's next contention is that NT's claims are defeated by judicial admissions it made in the first two incarnations of its counterclaims. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). However, "[w]hen a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). "An amended pleading ordinarily supersedes the prior pleading," such that "[t]he prior pleading is in effect withdrawn as to all matters not restated in the amended pleading and becomes functus officio." *Id.* (quotation omitted). Accordingly, NT's prior statements do not defeat its claims.[3]

---

[2]In the course of its opinion dismissing NT's second amended counterclaims, the Court stated that the second full paragraph on page 2 of the Letter Amendment "amended the original Section 10 of the SLA." (*See* 11/6/12 Mem. Opinion & Order at 3.) This statement was not a ruling, however, and thus is not subject to the discretionary doctrine of law of the case. *See Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995) (stating that "[t]he doctrine of law of the case establishes a presumption" the "strength [of which] varies with the circumstances" that "a ruling made at one stage of a lawsuit will be adhered to throughout the suit").

[3]The Court does not address the Board's argument that the voluntary payment doctrine bars NT's claims because that doctrine is an affirmative defense and thus not appropriately addressed on a Rule 12(b)(6) motion. *See Xechem v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Orders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for plaintiffs need not anticipate and attempt to plead around all potential defenses.") *Wermers Floorcovering, Inc. v. Santanna Nat. Gas Corp.*, 794 N.E.2d 1012, 1014 (Ill App. Ct. 2003) (characterizing the voluntary payment doctrine as an affirmative defense).

Even if its claims are not otherwise precluded, the Board argues that NT has not stated an express contract claim, which requires NT to allege "offer and acceptance, consideration, definite and certain terms of the contract, [NT's] performance of all required contractual conditions, the [Board's] breach of the terms of the contract, and damages resulting from the breach." *Mannion v. Stallings & Co., Inc.*, 561 N.E.2d 1134, 1138 (Ill. App. Ct. 1990). NT alleges that its offer was embodied in the August 13, 2007 email, which states "[a]s we have in the past, we will carry the negative earnings forward to be offset versus future positive earnings unless you request otherwise," and that the Board accepted by failing to object to the arrangement. (*See* NT's Opp'n Mot. Dismiss at 13; 3d Am Countercl. ¶¶ 39-40; *id.*, Ex. 3, Email from Anderson to Huber (Aug. 13, 2007).) The email does not, however, address whether or how the Board was to pay the deficit if future positive earnings were insufficient to offset negative earnings. Thus, the Court agrees with the Board that the email cannot be the basis for an express contract claim.

NT has, however, stated a claim for a contract implied-in-fact, or alternatively for unjust enrichment. *See Owen Wagener & Co. v. U.S. Bank*, 697 N.E.2d 902, 907 (Ill. App. Ct. 1998) (stating that a contract implied in fact is one in which "the[] agreement is arrived at by a consideration of the[] [parties'] acts and conduct") (quotation omitted); *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990) (stating that the elements of an unjust enrichment claim are "the performance of services by the plaintiff, the receipt of the benefit of those services by the defendant, and the unjustness of the defendant's retention of that benefit without compensating the plaintiff."). NT alleges that: (1) starting in 2007, it advanced money on the Board's behalf and NT recorded those transaction on the Board's account statements as a liability to NT; (2) starting in February 2008, NT applied the Board's share of positive securities lending

earnings to repay NT for advances and NT recorded those transactions on the Board's account statements as positive earnings used "to reduce amount due [NT] to cover securities lending negative earnings"; (3) the Board did not object to any of the statements or the arrangement until 2014; and (4) the Board acknowledged its debt to NT in its published financial statements and other documents. (3d Am. Countercl.¶¶ 44-72.) These allegations are sufficient to state a claim for breach of a contract implied-in-fact or unjust enrichment.[4]

The Court also rejects the Board's challenge to NT's equitable estoppel claim. The asserted infirmity of the claim is that it fails to allege that NT relied on the Board's account statements and the Board's failure to object to them. However, NT's incorporation of the account statement allegations into the estoppel claim and its allegation that it relied on the Board's "words and conduct" are sufficient to vault the low hurdle of Rule 12(b)(6). (See *id.* ¶¶ 107, 111-12)

The Court agrees with the Board, however, that the ratification claim fails. NT does not identify, and the Court has not found, any Illinois law supporting the existence of a ratification cause of action, and the allegations of that claim are duplicative of those in the agency indemnification and unjust enrichment counts. Accordingly, the ratification claim is dismissed.

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part the Board's motion to dismiss NT's third amended counterclaims [405]. The motion is granted as to the express contract claim asserted in Count I and the ratification claim asserted in Count V, but is otherwise denied.

---

[4]This conclusion disposes of the Board's argument that the account stated claim must be dismissed because NT has alleged no underlying liability to support it. (*See* Mem. Law Supp. Mot. Dismiss at 20.)

**SO ORDERED.**                                   **ENTERED:   March 17, 2015**

_____
**HON. JORGE ALONSO**
**United States District Judge**