**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOUISIANA FIREFIGHTERS' RETIREMENT SYSTEM, THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO, THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC POLICE & FIRE RETIREMENT SYSTEM, and THE BOARD OF TRUSTEES OF THE CITY OF PONTIAC GENERAL EMPLOYEES SYSTEM, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 09 C 7203<br><br>Judge Jorge L. Alonso |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, the Board of Trustees of the City of Pontiac Police and Fire Retirement System ("Pontiac Fire") and the Board of Trustees of the City of Pontiac General Employees Retirement System ("Pontiac General"),[1] allege that defendants Northern Trust Investments, N.A. and The Northern Trust Company (collectively "Northern Trust" or "NT") breached contracts with and their

---

[1] The other plaintiffs, Louisiana Firefighters' Retirement System and the Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago, settled their claims. (*See* 8/5/15 J.)

fiduciary duty to plaintiffs by improperly investing plaintiffs' assets. The case is before the Court on plaintiffs' Federal Rule of Civil Procedure ("Rule") 23 motion for class certification. For the reasons set forth below, the Court grants the motion.

**Background**

Plaintiffs and putative class members are direct participants in NT's securities lending program ("SLP"). (2d Am. Compl. ¶¶ 18-21.) They participate in the SLP by entering into securities lending authorization agreements ("SLAAs") with NT, which give NT the authority to lend out the clients' securities and invest the collateral received in, as relevant here, one or more of four collateral pools–Core USA, Core, Global Core, and European Core–chosen by the clients and managed by NT. (*Id.* ¶¶ 23, 28; Anderson Decl. ¶¶ 9, 18; *id.*, Exs. 1 & 2, SLAAs §§ 1, 3.1 & Schedule B; Missil Decl. ¶ 7.) Pontiac General and Pontiac Fire invested only in Core USA. (Anderson Decl., Exs. 1 & 2, Schedule B.) When the loans terminate, the borrowers return the securities and get their collateral back plus an amount of interest called a rebate. (2d Am. Compl. ¶ 26; Anderson Decl. ¶ 9.) If the collateral reinvestment generates a higher return than the rebate promised to the borrower, the lender makes a profit, ten to fifty percent of which NT receives as its management fee. (2d Am. Compl. ¶ 26; Anderson Decl. ¶ 13; *id.*, Exs. 1 & 2, SLAAs § 7.2.)

NT uses an "automated entitlement method" to "distribute loans equitably" among its securities lending clients; it "does not select client securities for lending based . . . upon the [clients'] investment objectives." (Josefson Decl., Ex. 1, Angel Report ¶¶ 32-33.) NT "use[s] the same group to manage all of the Core Pools with a team approach[:] 'Regarding assignments of particular

2

Collateral Pools to specific individuals during this time period, the Securities Lending Cash Reinvestment team within Short Duration Fixed Income took a team-based approach to making investment decisions in the Collateral Pools, with the portfolio manager assignment primarily designating responsibility for completion of administrative tasks . . . .'" (*Id.* ¶ 31) (quoting Defs.' Supplemental Resp. & Objections Pls.' 1st Set Interrogs. at 9).

The SLAAs signed by Pontiac General and Pontiac Fire state that any loss "arising from a Collateral Deficiency [, which occurs when "the collateral pool's total asset value [is] insufficient to repay the . . . borrowers,"] shall be allocated pro rata among all the Participating Lenders within a Collateral Section as of the date the Collateral Deficiency occurs." (Anderson Decl. ¶ 10; *id.*, Exs. 1 & 2, SLAAs § 3.5(ii).) However, NT is "liable for losses resulting from its negligence or intentional misconduct in performing the duties allocated to it under [the SLAA] with respect to Collateral." (Anderson Decl., Exs. 1 & 2, SLAAs § 3.5(iv).)

Each of the Core pools had a constant dollar net asset value ("NAV"), *i.e.*, each unit traded at a $1.00, even if the market value of the underlying investments fluctuated above or below their book value. (Missil Decl. ¶ 15.) "If the market value of a security held in a collateral pool drops below its book value, that creates a potential for a loss." (*Id.*) "The loss is deemed to be 'unrealized' if it is believed that the market value of the security will recover or that the principal due will be paid in full at maturity." (*Id.*) "A loss is deemed to be 'realized' if [NT] sells the security at a price below its book value or the value of a security is believed to be permanently impaired because (for example) the issuer has defaulted or declared bankruptcy." (*Id.*)

3

The Core pools are supposed to be short-term funds that "seek[] to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity." (*See* Anderson Decl., Ex. 3, Core USA Collateral Schedule, Investment Objectives; *id.*, Ex. 4, Core Collateral Schedule, Investment Objectives; *id.*, Ex. 5, Global Core Collateral Schedule, Investment Objectives; *id.*, Ex. 6, European Core Collateral Schedule, Investment Objectives.) But, plaintiffs allege, NT invested the pools' assets in securities that were illiquid, highly leveraged, or risky, including residential mortgage-backed securities ("RMBS") and securities of Lehman Brothers Holding, Inc. ("Lehman") and CIT Group, Inc., and continued to hold those investments even after the subprime mortgage market, major hedge funds, and other financial institutions collapsed in 2007 and 2008. (2d Am. Compl. ¶¶ 4-5, 43, 45, 69-79, 81-83, 86, 89-93, 97-104.)

On September 15, 2008, Lehman, securities of which were held by each of the Core pools, declared bankruptcy. (Missil Decl. ¶ 17.) On September 18 or 19, 2008, NT declared a collateral deficiency in each of the pools. (*Id.*; Anderson Decl. ¶ 10; 2d Am. Compl. ¶ 96.) NT allocated responsibility for the deficiency in each pool to each participating lender based on its share of the total amount on loan by recording (i) a payable in each investor's account in the amount of its share of the collateral deficiency, and (ii) a receivable for the same amount from that investor in the account of the affected collateral pool. (Missil Decl. ¶ 20.) Pontiac General's share of the realized loss of the Lehman deficiency was $123,510. (*Id.*, Ex. 8, Pontiac General Securities Lending Update (Nov. 2010).) Pontiac Fire's share of the realized loss of the Lehman deficiency was $48,002. (*Id.*, Ex. 9, Pontiac Fire Securities Lending Update (Nov. 2010).) Plaintiffs paid the Lehman payables on December 15, 2009. (Missil Decl. ¶¶ 20, 29.)

4

On September 25, 2008, Washington Mutual, Inc. ("WaMu"), securities of which were held by European Core, went into receivership. (*Id.* ¶ 21.) NT declared a second collateral deficiency in the European Core pool and assigned each investor in that pool an additional payable for its share of the deficiency and recorded a receivable for the same amount from that investor in the European Core account. (*Id.*) European Core investors had to pay the payable by December 15, 2009. (*Id.* ¶¶ 21, 29.)

Even after sustaining realized losses, the Lehman and WaMu securities retained some value, estimated to be thirteen cents and ten cents on the dollar, respectively. (*Id.* ¶ 24.) In September 2008, NT segregated those securities from the pools into subfunds. (*Id.*) Thus, there was a Lehman subfund for each of the four pools and a WaMu subfund for European Core. (*Id.*) Investors in any pool that held Lehman or WaMu securities when they became impaired were assigned a payable to purchase their shares of the relevant subfund at the above prices based on the same proportion used to allocate the relevant collateral deficiency associated with the subfund and were also assigned a share of the subfund of the same value. (*Id.* ¶ 25.) On December 15, 2009, Pontiac General paid $18,456 and Pontiac Fire paid $7,713 for their respective shares of the Lehman subfund. (*Id.* ¶ 27 n.3; *id.*, Ex. 8, Pontiac General Securities Lending Update (Nov. 2010); *id.*, Ex. 9, Pontiac Fire Securities Lending Update (Nov. 2010).)

After the Lehman bankruptcy, NT required investors who sought to withdraw from the SLP to pay their full share of the collateral deficiency, both the realized and the unrealized losses, by October 30, 2009. (*Id.* ¶¶ 31-32.) NT created the Staged Withdrawal Program ("SWP"), which

5

enabled exiting investors to pay their payables over time. (*Id.* ¶ 32.) "A minority of putative class members elected to participate in the SWP." (*Id.* ¶ 31.)

At the end of September 2008, NT reduced the securities lending fee it had negotiated with plaintiffs for the next year (October 1, 2008 through September 30, 2009), saving Pontiac General $26,015 and Pontiac Fire $9,874. (Missil Decl. ¶¶ 37, 45; *id.*, Ex. 8, Pontiac General Securities Lending Update (Nov. 2010); *id.*, Ex. 9, Pontiac Fire Securities Lending Update (Nov. 2010).)

In late October 2008, NT made $150 million in "client support" payments to investors in the pools that incurred collateral deficiencies, "with each [investor's] portion calculated pro rata based on that [investor's] share of the collateral deficiency declared in the relevant pool on September 18, 2008." (Missil Decl. ¶ 36.) Pontiac General received $131,522 and Pontiac Fire received $51,115 of that amount. (*Id.*, Ex. 8, Pontiac General Securities Lending Update (Nov. 2010); *id.*, Ex. 9, Pontiac Fire Securities Lending Update (Nov. 2010).)

On July 16, 2009, NT sold securities of CIT Group Inc., which were held by all four Core pools, at a loss. (Missil Decl. ¶ 22.) "NTC allocated responsibility for this deficiency to the affected investors based on their ratable shares of the affected pools on two dates, namely, September 18, 2008 (in the amount in which the CIT securities had incurred unrealized loss at that point) and July 16, 2009 (for losses over that prior amount)." (*Id.*) (emphasis omitted). On December 15, 2009, Pontiac General and Pontiac Fire paid their respective shares of the CIT realized losses, $27,383 and $10,818. (*Id.*, Ex. 8, Pontiac General Securities Lending Update (Nov. 2010); *id.*, Ex. 9, Pontiac Fire Securities Lending Update (Nov. 2010).)

In December 2009, NT sold at a loss RMBS held in each of the four pools for an aggregate realized loss of $33.64 million. (*See* Josefson Decl., Ex. 2, Hartzmark Report ¶ 30 & Ex. 1.) In March 2010, NT sold at a loss RMBS held in each of the four pools for an aggregate realized loss of $21.57 million. (*See id.* ¶ 32 & Ex. 1.) In April 2010, NT sold RMBS held in each of the four pools for an aggregate realized loss of $32.95 million. (*See id.* ¶ 33 & Ex. 1.) In May 2010, NT sold RMBS held in each of the four pools for an aggregate realized loss of $16.50 million. (*Id.* ¶ 34 & Ex. 1.) In September and October 2010, NT sold RMBS held in each of the four pools for an aggregate realized loss of $4,000. (*Id.* ¶ 35 & Ex. 1.)

In April and May 2010, NT declared additional collateral deficiencies in European Core and Global Core as a result of losses from sales of RMBS and assigned each investor in those pools additional payables for its share of the deficiencies, which had to be paid by December 15, 2009. (Missil Decl. ¶ 23.) NT did not, however, declare collateral deficiencies in Core or Core USA as a result of losses from sales of RMBS. (*Id.*)

Plaintiffs allege that NT's purchase and/or retention of RMBS and securities of Lehman and CIT for the Core pools breached their SLAAs and NT's fiduciary duty to plaintiffs and the putative class members.

**Discussion**

Plaintiffs ask the Court to certify a class defined as:

> All persons or entities that are not governed by ERISA and that directly invested or maintained investments or assets, as of September 18, 2008 or thereafter (the "Class Period") in the Core Collateral Section, Core USA Collateral Section, Global Core Collateral Section, and/or European Core Collateral Section (the "Core Pools") and were damaged thereby.

(Mot. Class Certification at 1.)

NT argues that plaintiffs cannot be class representatives, or even prosecute this suit on their own, because their claims are moot. *See Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002) (stating that the "the mootness of a named plaintiff's claim . . . makes him presumptively [an] inadequate [class representative]"). Specifically, NT states that the payments and fee concessions it made to Pontiac General and Pontiac Fire, totaling $157,537 and $60,989, respectively, more than made up for the amount of Lehman and CIT realized losses for which they had to pay, totaling $150,793 and $58,820, respectively. (*See* Missil Decl., Exs. 8 & 9, Pontiac General & Pontiac Fire Securities Lending Updates (Nov. 2010).) Moreover, NT says that plaintiffs were not damaged by the sale of RMBS because they did not have to make out-of-pocket payments for those realized losses. (NT Mem. Opp'n Mot. Class Certification at 12.)

NT's argument assumes that plaintiffs' damages are limited to the amounts they were required to pay for realized losses. However, if plaintiffs prevail on their contract claim, they potentially can recover damages based on their expectation interest; that is, the amount that will compensate them "for the loss . . . fulfillment of the contract would have prevented or . . . the breach of it has entailed." *Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 52 (Ill. App. Ct.

2013) (quotation omitted). Plaintiffs say their expectation interest is the amount of realized loss suffered by Core USA as a result of an imprudent investment multiplied by their pro rata shares of the pool on the date the loss was realized or the improperly-retained investment should have been sold, an amount for which NT's client support payments and fee reductions did not compensate them. Because NT offers no authority for the notion that expectation damages, which is normally the measure of damages for breach of contract, *see id.*, are not recoverable here, the Court holds that plaintiffs' claims are not moot.

Having determined that plaintiffs' claims are live, the Court turns to the elements of Rule 23. Plaintiffs' proposed class can be certified only if it satisfies all of the elements of Rule 23(a)–numerosity, commonality, typicality, and adequacy of representation–and one of the elements of Rule 23(b)–here, that common questions of law or fact predominate over individual questions and a class action is a superior method for adjudicating the controversy. *See id.*; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "On issues affecting class certification . . . , a court may not simply assume the truth of the matters as asserted by the plaintiff," but must "'receive evidence . . . and resolve [any relevant factual] disputes before deciding whether to certify the class.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Plaintiffs bear the burden of showing by a preponderance of the evidence that a proposed class satisfies the Rule 23 requirements. *Id.*

NT does not challenge the numerosity requirement, and the Court finds that this element is met. (*See* Castillo Decl. ¶ 2 (estimating a class size of 300)); *see also Steinbrecher v. Oswego Police Officer Dickey*, 138 F. Supp. 2d 1103, 1106 (N.D. Ill. 2001) (citing *Ringswald v. Cnty. of DuPage*,

9

196 F.R.D. 509, 512 (N.D. Ill. 2000)) ("Although there is no threshold or magic number at which joinder becomes impracticable, a class of forty is generally sufficient to satisfy Rule 23(a)(1).").

NT contends, however, that plaintiffs have not satisfied the commonality and typicality requirements. Commonality is satisfied if the claims of plaintiffs and the putative class members "depend upon a common contention . . . . that . . . is capable of classwide resolution," *i.e.*, "determin[ing] . . . its truth or falsity will resolve an issue that is central to the validity of each one of the claims." *Wal-Mart Stores, Inc. v. Dukes*, __ U.S.__, 131 S. Ct. 2541, 2551 (2011); *see Messner*, at 699 F.3d 815 ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." ) (quotation omitted). "'[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (quoting *De La Fuente v. Stokley-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

Among the questions common to all putative class members' claims are whether: (1) NT owed a fiduciary duty to participants in the SLP who invested in the Core pools; (2) it was imprudent for NT to purchase and hold RMBS and securities of Lehman and CIT Group in the Core pools given their stated investment objectives; and (3) NT's purchase and retention of RMBS and securities of Lehman and CIT Group in the Core pools constituted negligence or intentional misconduct in breach of the SLAAs.

NT contends that these questions cannot be resolved on a class-wide basis because "prudence cannot be assessed . . . without reference to the risk/reward profiles of individual clients in the SLP." (NT Mem. Opp'n Mot. Class Cert. at 20-21.) The Court disagrees. NT purportedly made investments for the collateral pools based on the guidelines for each pool, not the risk/reward profiles of individual securities lenders. Thus, the issue is whether it was prudent for NT to purchase the contested securities for any of the collateral pools, not whether it was prudent for the putative class members to participate in the SLP or invest in any particular pool. In other words, the focus is on NT's actions, not those of the class members. As a result, the class members' risk/reward profiles, the size and composition of their portfolios, their use or failure to use a third-party investment manager, the collateral they deem acceptable, their return expectations, and the like have no relevance to the prudence inquiry.

Alternatively, NT argues that plaintiffs' claims are not common to or typical of those of the putative class members because NT's "no injury" defense against plaintiff does not apply to class members who were not made whole by NT's client support payments and fee reductions. *Koos v. First Nat. Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974) ("Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative."); *see Danis v. USN Commc'ns, Inc.*, 189 F.R.D. 391, 395 (N.D. Ill. 1999) (quoting *McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982)) ("In order to defeat typicality or adequacy, the specific defense must be 'unique, arguable and likely to usurp a significant portion of the litigant's time and energy.'"). As discussed above, however, because the "no injury" defense is based on NT's

damages theory, not that of plaintiffs, it is not clear that the defense is viable at all. Moreover, even if it is, NT itself asserts that the defense applies to "the vast majority" of ongoing participants in the pools and "[]likely" applies to investors who had a staged withdrawal as well. (*See* NT Mem. Opp'n Mot. Class Cert. at 13-14; Missil Decl. ¶¶ 47-48.) Thus, NT's own assertions defeat its claim that the "no injury" defense makes plaintiffs' claims atypical.

NT argues that it has other defenses, based on plaintiffs' admissions that "Core USA's investment guidelines were not out of line," "it was a safe pool," "no one could have foreseen Lehman's default," "NT was not negligent," and "[plaintiffs'] securities lending earnings exceeded their . . . expectations," that are unique to plaintiffs. (NT Mem. Opp'n Mot. Class Certification at 15-16) (quotations omitted). The Court disagrees. These statements are relevant, if at all, to defenses such as waiver, ratification, acquiescence, independent superseding cause, and comparative fault, which are common to the class.

NT also contends that commonality and typicality are lacking because plaintiffs' SLAAs, unlike those of most of the putative class members, are governed by Michigan, not Illinois, law. *See De La Fuente*, 713 F.2d at 232 (quoting H. Newberg, Class Actions § 1115(b) at 185 (1977)) ("'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'"); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules."); (Anderson Decl., Ex. 1, Pontiac General SLAA § 15 ("This Agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan another than the conflict of law principles thereof

12

. . . ."); *id.*, Ex. 2, Pontiac Fire SLAA § 15 (same).) Illinois enforces choice-of-law provisions unless "(1) the chosen State has no substantial relationship to the parties or the transaction or (2) application of the chosen law would be contrary to a fundamental public policy of a State with a materially greater interest in the issue in dispute." *Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.*, 568 N.E.2d 9, 14 (Ill. App. Ct. 1990). Because neither exception applies here, plaintiff's claims for breach of the SLAAs are governed by Michigan law. The plain language of the choice-of-law provision does not, however, extend to plaintiff's breach of fiduciary duty claim, which, under the Restatement's "most significant relationship test," is governed by Illinois law. *See Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005) ("[A] court must construe and apply unambiguous contract provisions as written."); *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007) ("Illinois has adopted the approach found in the Second Restatement of Conflict of Laws" and "appl[ies] the broad principle that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the 'most significant relationship' to the occurrence and the parties"). Moreover, as NT has previously represented, Michigan contract law does not materially differ from that of Illinois. (*See* NT Mem. Supp. Mot. Dismiss Am. Compl. at 8 n.8.); *see also Mich. One Funding, LLC v. MacLean*, No. 303799, 2012 WL 4210424, at *2 (Mich. Ct. App. Sept. 20, 2012) (setting forth elements of contract claim); *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001) (setting forth elements of contract claim). Thus, the existence of the Michigan choice-of-law provision in plaintiffs' SLAAs does not make their claims atypical.

Alternatively, NT argues that choice-of-law issues destroy commonality because twenty-eight of the 300 SLAAs are governed by laws of eleven states other than Illinois and Michigan and an additional fourteen are governed by the laws of five other countries. (*See* Castillo Decl. ¶ 3.) NT does not, however, provide the text of those provisions, so it is not clear whether they apply only to the contract claims or extend to the breach of fiduciary duty claims as well. Moreover, NT simply notes that the choice-of-law provisions exist; it does not assert that the laws of the other jurisdictions regarding breach of contract and fiduciary duty are, in fact, different from those of Illinois. *See Bridgestone/Firestone*, 288 F.3d at 1015. NT is not required to do so, however, as the burden rests with plaintiffs to show that the Rule 23 requirements are met, and plaintiffs have not shown that contract and fiduciary duty law in states other than Michigan is the same as that of Illinois. The problem can be cured, however, by adding the language in bold to the proposed class definition:

> All persons or entities that are not governed by ERISA and that directly invested or maintained investments or assets, as of September 18, 2008 or thereafter (the "Class Period") in the Core Collateral Section, Core USA Collateral Section, Global Core Collateral Section, and/or European Core Collateral Section (the "Core Pools") **pursuant to an agreement that is governed by the substantive law of Illinois or Michigan** and were damaged thereby.

With that alteration, any commonality problems posed by choice-of-law issues will be eliminated.

NT fares no better with its argument that different SLAA provisions regarding fiduciary duties destroy commonality. Plaintiffs allege that NT's fiduciary duty to them and the putative class members arises from the parties' relationship, not from a contractual provision. Thus, the fact that only some of the SLAAs contain references to fiduciary duties does not impact commonality.

Even if plaintiffs' claims are typical of those of other Core USA investors, NT argues that they are not typical of the claims of investors in the other pools because the four pools had

14

"variations in purposes, guidelines, risks, losses, and securities." (NT Mem. Opp'n. Mot. Class Certification at 17.) A similar argument was made to and rejected by the court in *Board of Trustees of the AFTRA Retirement Fund v. JP Morgan Chase Bank, N.A.*, 269 F.R.D. 340 (S.D.N.Y. 2010). The plaintiffs in that case, who participated in defendant's securities lending program by investing in collective investment vehicles ("CIVs"), sued defendant for breaching its fiduciary duty by buying and holding in the CIVs debt securities of Sigma Finance, Inc. *Id.* at 342-43. Plaintiffs sought certification of a class that included not only CIV investors but also investors with individual, directly-managed accounts for whom defendant bought and held Sigma securities. *Id.* at 341-42. Defendant opposed the motion, arguing that the differences between the CIVs and the individual accounts meant that individual issues would predominate. *Id.* at 342.

> The court disagreed:
>
> JPMC argues that to determine whether the 2009 Sigma MTNs were a prudent investment for the direct account holders, the fact finder must consider the guidelines and portfolio of each, thereby creating individualized questions that will predominate over all common issues.
>
> I disagree. While JPMC has identified some differences among the guidelines and risk-return profiles, these differences are extremely minor and none of them differentially affect the imprudence of the Sigma investment. The guidelines and risk-return profiles of both the collective investment vehicles and the direct accounts explicitly permit most of the common safe short-term money market instruments such as commercial paper, Treasury bills, repurchase agreements, floating rate notes, and corporate notes. They all have concentration guidelines. They all have maturity guidelines that keep the maturity fairly short. They all require the highest credit rating for short-term investments and that long-term paper be rated somewhere in the A category or higher. None of them permit investment in common stock, preferred stock, junk bonds, hedge funds, real estate, or collectibles.
>
> Plaintiffs' position is not that the Sigma MTNs could have been appropriate investments for some securities lending participants, but not others. Rather, plaintiffs argue that the Sigma MTNs were too risky an investment for any securities lending

15

> participant by virtue of the basic, low-risk, high-quality structure that a securities lending program entailed. That there were slight variations in guidelines and portfolios is irrelevant to the common thread that links the prudence claims of the direct account holders to those that invested in the collective investment vehicles that, according to plaintiffs, the Sigma MTNs were not a conservative, high-quality, low-risk investment.

*Id.* at 351.

Here, as in *AFTRA*, the similarities among the pools dwarf their differences. All four pools: (1) have the same investment objective, "to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity"; (2) permit investment in the same or substantially similar instruments; (3) have the same investment quality requirements; and (4) have the same maturity and liquidity requirements. (*See generally* Anderson Decl., Ex. 3, Core USA Collateral Schedule; *id.*, Ex. 4, Core Collateral Schedule; *id.*, Ex. 5, Global Core Collateral Schedule; *id.*, Ex. 6, European Core Collateral Schedule; Josefson Reply Decl., Ex. A, Angel Rebuttal Report ¶¶ 59, 65-66, 68 & Tables 1 & 2.) The same NT committees had review and oversight responsibility for all four pools. (Josefson Reply Decl., Ex. A, Angel Rebuttal Report ¶¶ 71-74.) Moreover, as in *AFTRA*, plaintiffs here allege that Lehman, CIT and RMBS were not appropriate investments for *any* pool because they were not "conservative, high-quality, low-risk investment[s]." *AFTRA*, 269 F.R.D. at 351. Thus, the fact that the four pools are not identical in every respect does not destroy commonality or typicality.

That leaves the adequacy requirement, which is comprised of two parts: "'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697

(7th Cir. 1986) (en banc)). NT does not challenge the first element, and the Court finds that plaintiffs' counsel is adequate to represent the class. NT challenges the second element, for many of the same reasons discussed and rejected above. In addition, however, NT argues that plaintiffs are inadequate representatives because their method of "[a]llocating realized losses to each class member based on its pro rata share of the pool on the date the pool realized losses": (1) "would give [plaintiffs] and other ongoing participants in the SLP a windfall by awarding damages to them based on losses they did not pay"; and (2) "could disadvantage Staged Withdrawal participants, by depriving them of any share of damages related to realized RMBS losses." (NT Mem. Opp'n Mot. Class Certification at 14-15.) Both contentions assume that class members can only recover damages equal to the amount of realized losses for which they paid, which, as discussed above, may not be true. Moreover, even if a different loss calculation applies to staged withdrawal participants, that does not preclude class certification. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine–if liability is established–the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.");[2] *Messner*, 669 F.3d at 815 (7th Cir. 2012) ("It is well established that the presence of individualized questions regarding damages does

---

[2]The *Butler* Court rejected the notion that *Comcast Corp. v. Behrend*, __ U.S.__, 133 S. Ct. 1426, 1433-35 (2013) requires that damages be identical for class members: "*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges." 727 F.3d at 799.

not prevent certification under Rule 23(b)(3)."). Thus, the adequacy requirement of Rule 23(a) is met.

So is the predominance requirement of Rule 23(b). The overarching questions in this case are also the common ones, *i.e.*, whether NT imprudently purchased and retained the contested securities in the Core pools. Moreover, contrary to NT's characterization, determination of its asserted defenses, *e.g.*, failure to mitigate, waiver, ratification, assumption of risk, and comparative fault, is not likely to require the Court to delve into the minutiae of each class member's communications internally and with NT. Rather, class members' knowledge of the pools' investments and their decisions to remain in the pools at any given point will likely be inferred from the contents of the standardized account statements NT issued. (*See, e.g.*, Giraldi Decl. ¶¶ 12-14; *id.*, Ex. 1, Collateral Detail Holdings Pontiac 3633.) Further, as noted above, though damages may have to be determined individually, that is not a basis for denying class certification. *See Butler*, 727 F.3d at 801 ("It would drive a stake through the heart of the class action device . . . to require that every member of the class have identical damages.").

The Court also finds that a class action is a superior method for fairly and efficiently adjudicating this controversy. Given the common liability issues, requiring each class member to litigate an individual suit would waste both the parties' and the Court's resources and potentially give rise to inconsistent results. Thus, class action treatment is the most efficient and sensible approach.

**Conclusion**

For the reasons set forth above, the Court grants plaintiffs' motion for class certification [450], and certifies the following class:

> All persons or entities that are not governed by ERISA and that directly invested or maintained investments or assets, as of September 18, 2008 or thereafter (the "Class Period") in the Core Collateral Section, Core USA Collateral Section, Global Core Collateral Section, and/or European Core Collateral Section (the "Core Pools") pursuant to an agreement that is governed by the substantive law of Illinois or Michigan and were damaged thereby.

The Court appoints Pontiac General and Pontiac Fire as class representatives, and appoints Bernstein Litowitz Berger & Grossman LLP and Sullivan, Ward, Asher & Patton, P.C. as class counsel.

**SO ORDERED.**     **ENTERED: December 21, 2015**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**